Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
*Attorney for Plaintiff*

# IN THE FEDERAL DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irene Briseno, on her own behalf and as the personal representative of the estate of Damien Eryko Alvarado, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | **(Jury Trial Demanded)** |
| City of Tucson; Nicolo Solarino (Tucson Police); Francisco Santa Maria (Tucson Police); Marco Durazo (Tucson Police); Sean Yeandle (Tucson Police); Henry Gamez (Tucson Police); Donavan Vance (Tucson Police); R. Ake (Tucson Police); Joseph Gradias (Tucson Police); Eric Evans (Tucson Police); Scott Ellis (Tucson Police); Raymond Flex (Tucson Fire); Silas Spencer (Tucson Fire); Keith Goldstein (Tucson Fire); and Justin Canovali (private citizen), all in their individual capacities, | |
| Defendants. | |

1. On May 25, 2020, George Floyd's now-famous three words reverberated through every corner of the Globe: "I can't breathe." Two months earlier, those same three

1

words were uttered in Tucson by Damien Alvarado. For more than 15 minutes, Alvarado was held on the ground by Tucson police officers while he was clearly experiencing a medical emergency and verbalizing that he was in distress. Like George Floyd, much of the time that Alvarado spent restrained was face down on the ground. Like George Floyd, multiple officers stood by watching the scene unfold without so much as an utterance. Throughout the ordeal, Alvarado was punched, body-slammed, tased, handcuffed, kneeled upon, hogtied, hogtied again, and his head forced into a mesh hoodie. His suspected offense? A nonviolent misdemeanor. Also like George Floyd.

**JURISDICTION AND VENUE**

2. This court has subject-matter jurisdiction under 42 U.S.C. §§ 1983, 1343, and 12132; 28 U.S.C. § 1331; 29 U.S.C. § 794; the Fourth and Fourteenth Amendments to the U.S. Constitution.

3. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all state law claims because each state law claim arose out of the same set of facts and is so related to the federal law claims that it forms part of the same case or controversy.

4. Venue is proper in the Tucson Division of the District of Arizona because all of the incidents and omissions giving rise to this suit occurred in Tucson.

**PARTIES**

<u>Plaintiff</u>

5. Plaintiff Irene Briseno (hereafter "Briseno") is a resident of Cochise County, Arizona.

6. Briseno is the biological mother of her deceased, unmarried, adult son, Damien Eryko Alvarado (hereafter "Alvarado").

7. Briseno is the lawfully-designated personal representative of the estate of Damien Alvarado, having been appointed by the Pima County Superior Court on July 21, 2021.

8. Pursuant to A.R.S. § 14-3110, Briseno has standing to bring the claims in this suit in her role as personal representative of the estate of the deceased.

<u>Tucson Police Department Defendants</u>

9. Defendant City of Tucson is a public entity established by the laws and Constitution of the State of Arizona. Through its council and mayor and city manager, Defendant City of Tucson operates, manages, directs, and controls the Tucson Police Department, which employs other defendants in this action.

10. Defendant Nicolo Solarino is currently employed as a police officer with the City of Tucson and was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

11. At all relevant times, Defendant Solarino acted under the color of state law.

12. Defendant Francisco Santa Maria was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

13. At all relevant times, Defendant Santa Maria acted under the color of state law.

14. Defendant Marco Durazo was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

15. At all relevant times, Defendant Durazo acted under the color of state law.

16. Defendant Sean Yeandle was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

17. At all relevant times, Defendant Yeandle acted under the color of state law.

18. Defendant Henry Gamez was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

19. At all relevant times, Defendant Gamez acted under the color of state law.

20. Defendant Donavan Vance was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

21. At all relevant times, Defendant Vance acted under the color of state law.

22. Defendant R. Ake (first name unknown) was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

23. At all relevant times, Defendant Ake acted under the color of state law.

24. Defendant Joseph Gradias was employed as a Tucson Police officer on March 22, 2020. He is sued in his individual capacity.

25. At all relevant times, Defendant Gradias acted under the color of state law.

26. Defendant Scott Ellis was employed as a Tucson police officer with the rank of Sergeant on March 22, 2020. He is sued in his individual capacity.

27. At all relevant times, Defendant Ellis acted under the color of state law.

28. Defendant Eric Evans was employed as a Tucson police officer with the rank of Sergeant on March 22, 2020. He is sued in his individual capacity.

29. At all relevant times, Defendant Evans acted under the color of state law.

30. Defendants Solarino, Yeandle, Gamez, Durazo, Santa Maria, Vance, Ake, Gradias, Ellis, and Evans are referred to herein, collectively, as the "Individual Police Defendants."

31. Defendant Raymond Flex was employed as a paramedic with the Tucson Fire Department on March 22, 2020. He is sued in his individual capacity.

32. At all relevant times, Defendant Flex acted under the color of state law.

33. Defendant Silas Spencer was employed as a Firefighter with the Tucson Fire Department on March 22, 2020. He is sued in his individual capacity.

34. At all relevant times, Defendant Spencer acted under the color of state law.

35. Defendant Keith Goldstein was employed as a paramedic with the Tucson Fire Department on March 22, 2020. He is sued in his individual capacity.

36. At all relevant times, Defendant Goldstein acted under the color of state law.

37. Defendants Flex, Silas, and Goldstein are referred to herein, collectively, as the "Individual Fire Defendants."

## FACTUAL ALLEGATIONS

Tucson Police Department History of In-Custody Deaths and Taser Deaths

38. During the ten years leading up to Alvarado's death, there were at least three incidents in which a civilian was placed into restraints by Tucson police officers, subsequently suffered a heart attack while restrained, and later died while still in police custody.

39. The first was Benjamin Sotelo. He was restrained in both handcuffs and leg restraints by Tucson police officers in August 2010, placed face down on a fire department gurney, and subsequently went into cardiac arrest. The Pima County Medical Examiner ruled the death a homicide. No one was criminally charged in connection with Benjamin's death.

40. The second was Michael Carbone. In March 2012, Tucson police officers Tased Michael twice before handcuffing him. Paramedics with the Tucson Fire Department arrived on scene, placed him face down on the ground, and he stopped breathing. He is believed to have died of cardiac arrest.

41. The third was Delbert Germany. Delbert was restrained in both handcuffs and leg restraints by Tucson police officers in September 2012, went into cardiac arrest shortly after, and died in the hospital several days later.

42. In all three incidents, the deceased was behaving erratically when police arrived on scene. In at least two of those instances, Tucson police officers understood in the moment that they were dealing with an individual under the influence of cocaine or methamphetamine. For example, the day following Michael Carbone's in-custody death, but before the autopsy report was prepared, a police department spokesperson commented "that Mr. Carbone may have been under the influence of an unknown drug." Upon information and belief, in all three of the examples, the deceased had consumed a controlled substance hours prior to the police interaction.

43. Prior to March 2020, the broader police community in the United States understood the classic, "tell-tale" signs of cocaine and methamphetamine consumption. It was well-understood, for example, that a person who exhibited "superhuman" strength was likely to have recently consumed cocaine, methamphetamine, or a synthetic substance designed to mimic the effects of those drugs. It was also well-understood that an individual high on cocaine or methamphetamine posed a heightened risk of sudden, unexpected heart failure upon being restrained lying down. Furthermore, it was understood that males statistically posed a greater risk of this phenomenon than females.

44. Upon information and belief, the command staff of the Tucson Police Department prior to March 22, 2020 were aware of the three in-custody deaths described above, and knew of the circumstances surrounding those in-custody deaths. This includes, but is not limited to, current Chief Chad Kasmar, then-Chief Chris Magnus, then-Staff Assistant Chief Mike Silva, and then-Assistant Chief Carla Johnson.

45. Upon information and belief, the above-described command staff in March 2020 understood that at least two of the earlier in-custody deaths involved the consumption of cocaine or methamphetamine.

46. Additionally, during the years leading up to Alvarado's death, there were at least three incidents in which Tucson police officers deployed a Taser device on a person who died shortly after.

47. The first was Gary A. Decker. He received a Taser shock to his chest in a Tucson motel room in April 2009, became unresponsive shortly after, and died after being transported to the hospital. The death was ruled a homicide by the medical examiner. No one was charged in connection with his death.

48. The second was Tucson police officer Henry Fung. He volunteered to be Tased as part of a police training exercise in November 2011. He was Tased on a Monday, suddenly collapsed with no warning on that Tuesday, and died on that Wednesday in the hospital.

49. The third was Michael Carbone, described above. In March 2012, Michael died after being Tased twice by Tucson police officers.

50. Although Tasers are marketed as a non-lethal weapon, it has been linked to hundreds of in-custody police deaths since its widespread adoption by police agencies in the late 1990s. In 2006, for example, the Arizona Republic identified 167 individuals in the United States and Canada who died after being Tased by police. In 2012, Amnesty International reported that six individuals had died from the late 1990s through 2012 after being Tased by officers with the Phoenix Police Department alone. In June 2018, Reuters news agency documented 1,081 in-custody police deaths nationwide in which a Taser was used.

51. In addition to the more recent examples, Mark Anthony Romero died of cardiac arrest in 1998 or 1999 after Tucson police officers restrained both his hands and feet. Mr.

Romero was not Tased, but it is believed that Mr. Romero was suffering from either a mental health crisis or the effects of drugs at the time Tucson police restrained him.

<u>Alvarado is Involved in a Traffic Accident</u>

52. At approximately 5:15pm on March 22, 2020, Alvarado drove his vehicle southbound on Campbell Avenue in Tucson. While driving through the intersection at Prince Road, Alvarado's vehicle collided with two other vehicles.

53. Alvarado exited his vehicle and, upon information and belief, immediately checked on the wellbeing of the occupants of the two other vehicles.

54. Alvarado left the scene of the accident on foot, traveling eastbound along Prince Road.

55. Meanwhile, several eyewitnesses called 911 to report the accident.

56. At the time of the collision, the other two vehicles contained only drivers. There were no passengers.

57. Neither of the other two drivers reported to first responders that they sustained physical injuries following the collision.

58. Neither of the two drivers was transported to the hospital.

59. Neither of the two drivers asked to be transported to the hospital.

60. No bystanders were injured as a result of the collision.

61. Personnel from the Tucson Fire Department ("TFD") were the first emergency personnel to arrive to the scene of the collision.

62. Upon information and belief, personnel from TFD examined the two drivers who remained at the scene of the collision. Upon information and belief, the TFD personnel made independent determinations that the two drivers sustained no injuries.

63. Upon information and belief, Defendant Durazo was the first Tucson Police officer and Defendant Gamez was the second Tucson Police officer to arrive to the scene of the collision.

64. TFD personnel told Defendant Durazo that none of the vehicle occupants was injured.

65. In a separate conversation at the scene of the collision, TFD personnel told Defendant Gamez that none of the vehicle occupants was injured. Defendant Gamez repeated this information to his police colleagues, using his police radio.

66. Upon information and belief, Defendant Solarino heard this broadcast and was aware that none of the vehicle occupants was injured.

67. Under Arizona law, it is a misdemeanor offense to leave the scene of an accident in which there are no injuries. *See* A.R.S. §§ 28-662 & 28-663.

68. At the time, neither Defendant Gamez, nor Defendant Durazo, nor any other officers knew Alvarado's identity. At the time, officers knew only a general description of the fleeing driver and the general direction in which he fled.

69. At the time, Defendant Durazo did not know whether the driver who fled was the driver who caused the collision.

70. At the time, Alvarado (identity yet unknown) was suspected only of the misdemeanor offense described above.

71. At the time, officers did not have probable cause to believe that Alvarado was in possession of a firearm.

72. At the time, officers did not have probable cause to believe that Alvarado was in possession of any other type of weapon.

<u>Initial Encounter Between Alvarado and Police</u>

73. When the collision occurred, Defendant Justin Canovali and his adult son were at a nearby convenience store. They heard a loud noise. Defendant Justin Canovali observed Alvarado (identity yet unknown) leaving the scene of the accident.

74. Defendant Canovali and his son deputized themselves to investigate the misdemeanor crime that they believed Alvarado to have committed. They took it upon themselves to canvass the surrounding area and question nearby civilians about Alvarado's whereabouts. They located Alvarado in a nearby alleyway near Prince Road.

75. Defendant Canovali and his son found Alvarado lying on the ground in the alleyway and speaking in an illogical fashion. Defendant Canovali immediately recognized Alvarado's unusual behavior to be consistent with someone who is under the influence of drugs.

76. Defendant Justin Canovali engaged in conversation with Alvarado. The conversation was calm and there were no heated words exchanged between the two men during the time that Alvarado was lying on the ground. Upon information and belief, Defendant Canovali's brief conversation with Alvarado reinforced his belief that Alvarado was under the influence of drugs.

77. Upon information and belief, Defendant Canovali had never received professional training on how to detect when someone may be high on drugs.

78. Upon information and belief, Defendant Canovali did not obtain Alvarado's identity during his conversations with Alvarado. At this time, Alvarado's identity remained a mystery to Defendant Canovali and to officers.

79. Defendant Canovali did not see a weapon on Alvarado's person, and Alvarado did not indicate to Defendant Canovali that he was armed.

80. During Defendant Canovali's conversations with Alvarado, Canovali never felt personally threatened by Alvarado.

81. At approximately 5:40pm (roughly 25 minutes after the car collision), Defendant Solarino entered the alleyway in his marked police vehicle.

82. Upon seeing the approaching police vehicle, Alvarado stood up and ran toward a nearby block wall. Alvarado began to scale the block wall, with the apparent intention of escaping.

83. Upon information and belief, Defendant Justin Canovali immediately recognized that Alvarado was poised to escape over the block wall and recognized that Defendant Solarino would not reach the block wall quickly enough to prevent Alvarado's escape to the other side.

84. Alvarado was atop the block wall and about to drop down to the other side of the wall when Defendant Solarino exited his police vehicle and began running toward the wall. Before Solarino arrived to the wall, Defendant Canovali grabbed Alvarado's leg.

85. Defendant Solarino reached the wall, grabbed onto Alvarado. At this point, both Canovali and Solarino were grabbing onto Alvarado's legs with the intention of pulling him off the wall.

86. Defendant Solarino did not instruct Defendant Justin Canovali to step back from the scene. Instead, Solarino coordinated with Defendant Canovali, who was an unknown civilian at this time. Solarino gave instruction to Defendant Canovali on how best to achieve their joint objective of pulling Alvarado down from the wall. Defendant Canovali did his best to follow Defendant Solarino's instructions.

87. Defendant Solarino and Defendant Canovali succeeded in pulling Alvarado down from the wall. The struggle continued in the dirt of the alleyway.

88. Upon information and belief, Defendant Solarino at this point recognized that Alvarado was under the influence of cocaine or methamphetamine.

89. In an attempt to subdue Alvarado, Defendant Solarino punched Alvarado three times with a closed fist.

90. Alvarado never punched or kicked Defendants Solarino or Canovali.

91. Defendant Canovali continued collaborating with Defendant Solarino, now with the shared objective of subduing Alvarado on the ground.

92. At this time, Defendant Solarino removed a Taser device from his duty belt. Defendant Solarino momentarily took his hands off of Alvarado while he prepared his Taser device.

93. While Defendant Solarino readied his Taser device, Defendant Canovali threw Alvarado to the ground.

94. Upon information and belief, Defendant Solarino did not warn Alvarado of his intention to deploy the Taser device.

95. Defendant Solarino discharged his Taser device. This caused a small, nitrogen cartridge within the Taser device to propel two wires tipped with electrodes (also called probes) into Alvarado's body.

96. Upon information and belief, the two probes landed in Alvarado's bare skin, in a portion of his body where there was no clothing.

97. Defendant Solarino sent an electric charge into Alvarado's body twice in quick succession: each electric discharge was five seconds in duration.

98. For much or all of those ten seconds, Alvarado was on the ground.

99. The Taser device used by Defendant Solarino delivers 19 electric pulses per second on average. During the ten seconds that Alvarado was shocked by the Taser, his body received approximately 190 pulses of electricity.

100. By this time, it was clear to Defendant Solarino that Alvarado did not have a weapon on his person.

### Alvarado is Pinned to the Ground and Suffocated

101. Defendant Yeandle was the second Tucson police officer to arrive to the alley where the struggle was underway.

102.     Less than a minute after Yeandle's arrival to the alley, Defendant Gamez – who moments earlier had been at the scene of the collision – arrived to the alley.

103.     Upon information and belief, at this time, Defendant R. Ake also arrived to the alley.

104.     Approximately 1 min. and 30 seconds after Defendant Solarino deployed his Taser, Defendants Solarino, Yeandle, Ake, and Gamez succeeded in placing Alvarado on his stomach and handcuffing him behind his back.

105.     Upon information and belief, Defendants Solarino, Yeandle, Ake, and Gamez recognized that Alvarado exhibited an unusual degree of strength for someone of Alvarado's size, indicating that Alvarado was under the influence of either cocaine or methamphetamine.

106.     With Alvarado still on his stomach, Defendant Yeandle put his body weight on Alvarado in the process of handcuffing him and in the moments after handcuffing him.

107.     Upon information and belief, Defendant Ake firmly placed his elbow on the back of Alvarado's neck while Alvarado was being handcuffed. Then Defendant Ake shifted and placed his right knee on Alvarado's neck.

108.     Ake kept his knee on Alvarado's neck for approximately one minute.

109.     Upon information and belief, Defendant Yeandle encouraged Ake to place his knee on Alvarado's neck.

110.    At this time, Defendant Gradias became the fifth Tucson police officer to arrive to the alley. The other four Defendant officers continued holding Alvarado face down on the ground.

111.    Through this process, Alvarado made noises indicating that he was in medical distress.

112.    Approximately 2 minutes and 30 seconds after officers placed Alvarado onto his stomach, Alvarado exclaimed: "I can't breathe."

113.    Defendants Solarino, Yeandle, Gamez, Ake, and Gradias heard Alvarado make this statement.

114.    One of the Defendant officers responded: "Yes, you can. You're talking."

115.    Defendants Solarino, Yeandle, Gamez, Ake, and Gradias did not adjust their physical restraint methods following the "I can't breathe" comment.

116.    Approximately 30 seconds after Alvarado warned that he can't breathe, Defendant Gamez expressed concern for Alvarado's wellbeing. He said: "[Alvarado's] been in this downward position for a while. He's probably high, so we gotta get him on his side as soon as we can."

117.    Defendants Solarino, Yeandle, Ake, and Gradias were present when Defendant Gamez expressed this concern.

118.    Rather than immediately placing Alvarado on his side, however, Defendants Gamez, Gradias, Yeandle, and Ake continued pinning Alvarado in his existing

position (face down) for an additional 60 seconds. During this time, Defendant officers further immobilized an already-handcuffed Alvarado with a TARP restraint.

119.    A TARP restraint, also known as a "total appendage restraint procedure," is the simultaneous securing of a person's arms and legs. The arms are restrained with handcuffs while the legs are restrained at the ankle using a hobble or "ripp" restraint device. The legs are then clipped to the handcuffs. The person's legs bend backward, creating what is commonly thought of as a hogtie. The diagram below shows the typical result:



120.    Approximately one minute after Defendant Gamez expressed concern and approximately one minute and 30 seconds after Alvarado warned that he couldn't breathe, officers lifted Alvarado off of his stomach and placed him on his side.

121.    Approximately 2 minutes and 30 seconds after Defendant Gamez expressed concern and approximately 3 minutes after Alvarado alerted officers that he couldn't breathe, Alvarado again exclaimed that he couldn't breathe.

122.     Upon information and belief, Defendant Yeandle responded: "you can breathe just fine." Upon information and belief, Defendant Solarino responded: "if you can complain, you can breathe."

123.     Mere seconds after Alvarado warned officers for the second time that he couldn't breathe, Defendant Solarino ordered that a second TARP restraint be placed on Alvarado.

124.     Defendant Yeandle agreed with Defendant Solarino that a second TARP was necessary.

125.     Despite Alvarado already being handcuffed and hogtied with the first TARP, and despite clear signs that Alvarado was in distress, no Defendant officers in this moment expressed concern for the plan to hogtie Alvarado a second time. The only officer who had ever expressed concern (Defendant Gamez) remained silent as his colleagues applied the second TARP restraint.

126.     Upon information and belief, personnel from TFD were on scene by this time and were prepared to assess Alvarado, but the Individual Police Defendants refused them access to the patient.

127.     As Defendants Yeandle and Solarino began to apply the second TARP restraint, Alvarado said again: "I can't breathe." It was the third time that Defendants Yeandle, Solarino, Ake, and Gradias heard Alvarado use those words. Upon information and belief, it was also the third time that Defendant Gamez heard Alvarado use those words.

128. Defendant Yeandle responded this time as he had responded earlier: "you can breathe just fine." Defendant Solarino responded: "Stop complaining, stop talking, just start breathing."

129. As Defendants Yeandle and Solarino continued to apply the second TARP restraint, Defendant Gradias stood approximately five feet away, casually staring into the screen of his cell phone.

130. Upon information and belief, Defendants Santa Maria, Durazo, and Ellis had arrived on scene by this time and overhead Alvarado's third declaration that he can't breathe.

131. When Alvarado stated for the third time that he can't breathe, Defendant Ellis was the highest-ranking officer on scene.

132. Meanwhile, in the process of applying the second TARP restraint, Defendants Yeandle and Solarino forced Alvarado back onto his stomach. Approximately three minutes after Alvarado was first placed on his side in response to Defendant Gamez's expressed concern, officers yet again forced Alvarado into the facedown position.

133. This time, neither Defendant Gamez nor any other officers expressed concern.

134. Alvarado continued making noises of distress and, by this time, Alvarado was not resisting officers in any way.

135. Immediately after Defendants Yeandle and Solarino concluded placing the second TARP restraint on Alvarado, Defendant Ellis instructed the officers to place yet another restrictive device on Alvarado: a spit sock.

136.     A spit sock, also sometimes called a spit hood, is a mesh cloth that is placed over the entirety of a person's head. It is designed to prevent the subject from biting or spitting at officers. It has been linked to several instances of asphyxiation.



*image courtesy of USA TODAY*

137.     Following Defendant Ellis' instruction, one of the Defendant officers placed the spit sock over Alvarado's head. This was <u>after</u> Alvarado told officers three times that he couldn't breathe.

138.     By this time, there were two sergeants on scene. In addition to Sergeant Ellis, Sergeant Evans was nearby. Sergeant Evans stood observing less than 20 feet away. Defendant Evans never expressed concern with the manner in which Alvarado was restrained.

Alvarado Dies

139.     Shortly after the spit sock was placed on Alvarado, personnel from the Tucson Fire Department were permitted access to Alvarado by the Individual Police Defendants.

140.     The spit sock remained on Alvarado's head, preventing TFD personnel from being able to see Alvarado's eyes or facial expressions when evaluating his medical condition.

141.     Defendants Durazo and Vance kneeled down next to Alvarado during the entire medical evaluation by TFD personnel.

142.     Defendants Flex, Silas, and Goldstein undertook the medical evaluation of Alvarado. During this time, Alvarado continued making noises indicating that he was in medical distress.

143.     Upon information and belief, Defendants Flex, Silas, or Goldstein made the decision to place a second spit sock over the first spit sock. Now, Alvarado was subjected to two TARP restraints and two layers of spit sock meshing over his head and face.

144.     Following approximately eight minutes of medical evaluation, Defendants Flex, Silas, and Goldstein concluded that Alvarado was medically stable and did not need to be transported to the hospital.

145.     Almost immediately after Defendants Flex, Silas, and Goldstein packed up their medical equipment and stepped away, Alvarado stopped moving and stopped making noises.

146.     Although Defendants Flex, Silas, and Goldstein had concluded evaluating Alvarado, they did not go far. For approximately five minutes after concluding their medical evaluation of Alvarado, Defendants Flex, Silas, and Goldstein remained

within 50 feet of Alvarado. They were casually chatting with their police officer colleagues about unrelated matters.

147.    For approximately five minutes after Defendants Flex, Silas, and Goldstein concluded their evaluation of Alvarado, Defendants Vance and Durazo continued leaning over a motionless Alvarado. During those five minutes, neither Vance nor Durazo expressed concern that a previously vivacious Alvarado was no longer moving or making noises.

148.    During those approximately five minutes, Defendants Vance and Durazo were within view of Defendants Flex, Silas, and Goldstein who were casually chatting with other police officers. During those five minutes, Defendants Vance and Durazo did not alert the nearby paramedics that Alvarado had stopped moving.

149.    Neither Defendant Durazo nor Defendant Vance was checking for a pulse on Alvarado during those five minutes.

150.    Neither Defendant Durazo nor Defendant Vance was paying attention to Alvarado's breathing or chest movements during those five minutes.

151.    During the same five minutes, Defendants Evans and Santa Maria stood within ten feet of the motionless Alvarado. For much of these five minutes, Defendants Evans and Santa Maria engaged in casual conversation with one another about unrelated matters.

152.     During these five minutes, Defendant Evans – as the highest-ranking officer in the immediate vicinity – gave no instructions and expressed no concerns regarding the motionless Alvarado.

153.     During these five minutes, the other sergeant (Defendant Ellis) was only a few yards away from the motionless Alvarado.

154.     During these five minutes, Defendants Ake, Gamez, Gradias, Solarino, and Yeandle also remained nearby. They were casually talking amongst themselves about unrelated matters, sometimes smiling and joking.

155.     Eventually, it occurred to Defendant Santa Maria that he hadn't seen any movement or heard any noises coming from Alvarado in quite some time. Defendant Santa Maria posed the question to his colleagues: "is he still breathing?" Neither Defendant Durazo nor Defendant Vance raised the concern, despite their crouching next to the passive Alvarado.

156.     Alvarado was dead. He had no pulse, and in fact was not breathing. Alvarado had been asphyxiated.

157.     Alvarado was transported to Banner UMC and pronounced dead shortly after Defendant Santa Maria's inquiry.

## COUNT I
### 42 U.S.C. § 1983 – Fourth Amendment
### Unreasonable Seizure (Excessive Force)
### Against Solarino, Ake, Gamez, Gradias, Yeandle, and Ellis

158.    The allegations above are incorporated by reference in this Count.

159.    Defendant Solarino first seized Alvarado by pulling him off the wall, Tasing him, punching him, and forcing him onto the ground. This alone is excessive force, as Alvarado was an unarmed individual suspected only of a nonviolent misdemeanor offense. A Taser used in the dart mode is (and was at that time) widely accepted to be a lethal use of force when the recipient of the electric charge is high on methamphetamine or cocaine. Upon information and belief, when Defendant Solarino deployed his Taser he already suspected that Alvarado was high, due to Alvarado's behavior and his "superhuman" strength.

160.    Defendant Yeandle and possibly Defendants Solarino and Gamez placed their body weight on top of a prone Alvarado at various points in time as they were placing handcuffs on Alvarado. Again, these Defendants had probable cause to believe only that Alvarado committed a nonviolent misdemeanor offense and they knew him to be unarmed.

161.    Defendant Ake (with Defendant Yeandle's encouragement) kneeled on Alvarado's neck while the others placed handcuffs on Alvarado. This constitutes excessive force under the circumstances, for the same reasons explained above.

162. Defendants Ake, Solarino, Gamez, Yeandle, and Gradias placed the TARP restraint on Alvarado. This constitutes excessive force under the circumstances, for the same reasons explained above.

163. Defendant Ellis instructed his subordinates to place a spit sock on Alvarado. This constitutes excessive force under the circumstances. In particular, Alvarado was no longer resisting and did not spit on officers during the approximately 15 minutes leading up to this order.

164. Both the second TARP restraint and the spit sock were forms of force that were imposed at a point in time when Alvarado was not resisting, when Alvarado was verbalizing his pain, and when Alvarado was articulating that he was experiencing a medical emergency. The Defendants named in this Count ignored Alvarado's complaints.

165. The actions of the Defendants named in this Count were intentional, malicious, willful, wanton, and/or callously indifferent for Alvarado's constitutionally protected rights, thereby entitling Plaintiff to an award of punitive damages.

166. Under this Count, Plaintiff is entitled to:

a. compensatory damages;

b. damages for loss of life (also sometimes called hedonic damages);

c. damages for pain and suffering of the decedent prior to death; and

d. punitive damages

**COUNT II**
**42 U.S.C. § 1983 – Conspiracy**
**Violation of Fourth Amendment (Excessive Force)**
**Against Solarino and Canovali**

167.    The allegations above are incorporated by reference in this Count.

168.    At all relevant times, Defendant Solarino acted under the color of state law, as he was wearing a Tucson police uniform, carried a firearm and Taser issued by the Tucson Police Department, and drove a clearly-marked police vehicle owned by the City of Tucson.

169.    At all relevant times, Defendant Canovali was a private citizen.

170.    Defendants Solarino and Canovali conspired to deprive Alvarado of his constitutional rights, namely, his Fourth Amendment right to be free of excessive force.

171.    Despite knowing that Alvarado was suspected only of a misdemeanor offense and despite lacking any evidence indicating he posed a risk of harm to officers or civilians, Canovali and Solarino conspired to cause Alvarado to be subjected to a physical assault that was clearly excessive under the circumstances.

172.    Defendants Canovali and Solarino acted in concert and communicated with one another.

173.    Defendants Canovali and Solarino were in agreement that their shared objective was to bring Alvarado off of the block wall, and to seize him.

174.     Defendants Canovali and Solarino each committed an overt act in furtherance of that shared objective, by each grabbing onto Alvarado.

175.     Neither Canovali nor Solarino suspected Alvarado of having a weapon or of committing any offense other than one non-violent misdemeanor offense described above.

176.     By exerting the level of force they did in effectuating the arrest, they each used force that was excessive under the standards of the Fourth Amendment – and they conspired together to achieve that.

177.     Alvarado immediately called out in distress after being taken to the ground by Defendants Canovali and Solarino.

178.     Within four minutes of being taken to the ground by Defendants Canovali and Solarino, Alvarado was calling out: "I can't breathe." Within 20 minutes of being taken to the ground, Alvarado was dead. This brief conspiracy was a proximate cause of Alvarado's death and of the approximately 20 minutes of pain and suffering he endured.

179.     Under this Count, Plaintiff is entitled to compensatory damages and damages for pain and suffering.

**COUNT III**
**42 U.S.C. § 1983 – *Monell***
**Unconstitutional Policy/Custom in Violation of the Fourth & Fourteenth Amendment
Against City of Tucson**

180.    The allegations above are incorporated by reference in this Count.

181.    At all relevant times, the City of Tucson, through the Tucson Police

Department, maintained a written policy and/or unwritten custom permitting the use

of six distinct procedures that, combined, proximately caused Alvarado's death and

were the moving force in violating his constitutional rights:

    a.  The permitted use of spit socks;

    b.  The permitted use of TARP restraints;

    c.  The permitted use of a Taser on suspects who are believed to be suffering from

        cocaine and/or methamphetamine intoxication;

    d.  The practice/custom of allowing an officer to put body weight on suspects who

        are believed to be suffering from cocaine and/or methamphetamine

        intoxication;

    e.  The practice/custom of kneeling on a suspect's neck;

    f.  The practice/custom of denying or delaying treatment by EMTs and

        paramedics when a suspect is visibly in medical distress, is safely restrained in

        handcuffs, and has the presence of multiple police officers to aid in subduing

        the suspect for immediate medical evaluation.

182.    At all relevant times, command staff within the Tucson Police Department knew of the heightened risks of the use of Tasers, spit socks, and TARP restraints on individuals, like Alvarado, who presented with signs of acute methamphetamine and/or cocaine use.

183.    Upon information and belief, in March 2020 the City of Tucson maintained a policy allowing its officers to use TARP restraints. The policy did not limit or restrict the use of TARP restraints in situations where the detainee is in medical distress or experiencing cocaine/methamphetamine intoxication.

184.    A written policy allowing the use of TARP devices on individuals visibly experiencing a mental health crisis or intoxication from cocaine or methamphetamine is unconstitutional, as such a policy:

    a.  presents a substantial risk of serious harm to the detained individuals;

    b.  amounts to deliberate indifference to a serious medical need; and

    c.  leads to a Fourth Amendment excessive force violation.

185.    As of March 2020, command staff within the Tucson Police Department were aware that the use of TARP restraints were linked to in-custody deaths throughout the United States. Command staff were aware of at least two such in-custody deaths in their own department.

186.    A written policy allowing the use of Taser devices on individuals visibly experiencing a mental health crisis or intoxication from cocaine or methamphetamine is unconstitutional, as such a policy:

a.  presents a substantial risk of serious harm to the detained individuals;

b.  amounts to deliberate indifference to a serious medical need; and

c.  leads to a Fourth Amendment excessive force violation.

187.    A written policy allowing the use of a spit sock on individuals visibly experiencing a mental health crisis or intoxication from cocaine or methamphetamine is unconstitutional, as such a policy:

a.  presents a substantial risk of serious harm to the detained individuals;

b.  amounts to deliberate indifference to a serious medical need;

c.  leads to a Fourth Amendment excessive force violation.

188.    The maintenance of the above written policies and unwritten customs were the moving forces behind the constitutional violation suffered by Alvarado in March 2020. Individual Defendants followed the policies and customs described above.

189.    Because this is a claim against the municipality, Defendant is not entitled to the defense of qualified immunity as to this Count.

190.    Under this Count, Plaintiff is entitled to:

a.  compensatory damages;

b.  damages for loss of life (also sometimes called hedonic damages); and

c.  damages for pain and suffering of the decedent prior to death

**COUNT IV**
**42 U.S.C. § 1983 –** *Monell & City of Canton*
**Failure to Train**
**Against City of Tucson**

191.     The allegations above are incorporated by reference in this Count.

192.     As described above, the command staff of the Tucson Police Department were subjectively aware in March 2020 that there existed a risk of death among detainees who are Tased, forcibly held on the ground, restrained by all four limbs, and forced into a spit sock.

193.     Additionally, the command staff of the Tucson Police Department were subjectively aware in March 2020 that this risk of death was increased further when a detainee visibly shows signs of cocaine or methamphetamine intoxication. Command staff understood that even <u>one</u> of the above elements, alone, poses a substantial risk of serious harm.

194.     Upon information and belief, the Tucson Police Department consisted of approximately 800 sworn officers in March 2020. Upon information and belief, the Tucson Police Department had trained fewer than 10 percent of those officers about special considerations when detaining an individual visibly showing the signs of cocaine or methamphetamine intoxication.

195.     Upon information and belief, the small number of officers who had received this training by March 2020 were taught merely that officers should avoid placing such detainees in a facedown (prone) position. Upon information and belief, the

training did not address the risks of spit socks, TARP restraints, and Taser deployments on such detainees. Additionally, the training suggested that the risk – if any – could be avoided merely by placing the detainee in a "recovery" position (ie, continuing to pin down the detainee, but no longer facedown).

196.     Upon information and belief, the training did not teach officers to pay attention and *believe* the statements made by detainees visibly experiencing the effects of cocaine and methamphetamine intoxication. For example, sounds of anguish and when a detainee clearly states: "I can't breathe."

197.     During the ten years leading up to Alvarado's death, the need for adequate training related to the detention of methamphetamine and cocaine intoxicated individuals should have been evident.

198.     For example, between 2011 and 2018, deaths among males involving methamphetamines rose from 1.8 to 10.1 per 100,000 population. This represents a more than five-fold increase in seven years.

199.     Surging methamphetamine usage was not new as of March 2020.

200.     Given this widespread usage, the Tucson Police Department's failure to train all of its approximately 800 officers amounted to an inadequate training of its police force.

201.     The frequency with which Tucson officers, prior to March 2020, attempted to arrest individuals displaying signs of methamphetamine and cocaine intoxication

should have indicated to command staff a certain predictability that any given officer lacking the specific tools to handle the situation will violate citizens' rights.

202.     The City's failure to train amounted to a deliberate indifference to a highly predictable scenario of officers violating citizens' constitutional rights.

203.     The training that *was* given to the small number of Tucson police officers as of March 2020 was inadequate, as it taught trainees only that the "recovery" position was enough to avoid serious health consequences in detainees.

204.     The inadequate training can fairly be said to represent city policy. In short, it amounted to a policy of not taking reasonable steps to train its employees regarding matters that are so obviously likely to result in constitutional violations of a not insubstantial subset of the public with which police come into contact on a daily basis.

205.     The failure to provide mandatory training and the very limited (and inaccurate) training offered to the small number of Tucson officers was the moving force behind the constitutional violation suffered by Alvarado in March 2020.

206.     The deficiency in the training was closely related to the type of constitutional harm suffered by Alvarado. Put differently, the deficient training caused the individual Defendants in March 2020 to be deliberately indifferent to the substantial risk of serious harm to Alvarado and to his serious medical needs.

207.     This training deficiency was a deliberate choice by command staff to follow a course of action.

**COUNT V**
**42 U.S.C. § 12132 (ADA) and 29 U.S.C. § 794 (Section 504)**
**Discrimination on the Basis of Disability**
**Against City of Tucson**

208.    The allegations above are incorporated by reference in this Count.

209.    Defendant City of Tucson is a public entity, per 42 U.S.C. § 12131.

210.    During all relevant times, Defendant City of Tucson received federal financial assistance per 29 U.S.C. § 794.

211.    Both the ADA and Section 504 of the Rehabilitation Act were enacted as remedial statutes, with the goal of promoting the rights of disabled individuals and providing compensation when they experience discrimination.

212.    Both the ADA and Section 504 of the Rehabilitation Act are silent with regard to survivorship of claims seeking compensatory damages for disability discrimination.

213.    Consequently, federal common law provides the rules pertaining to the survivorship of claims brought under the ADA and Section 504 of the Rehabilitation Act for harm suffered by someone who is now deceased. Under the federal common law, federal claims typically survive a decedent's death if they are remedial in nature and not penal. Plaintiff does not seek punitive damages as to this Count.

214.    Claims for non-economic compensatory damages in the form of pain and suffering, emotional distress, and similar such claims are not punitive in nature and therefore survive the decedent's death.

34

215.     Alvarado had physical and mental impairments that substantially limited his major life activities. For example, prior to his death, Alvarado had periodically sought out the treatment of medical professionals for his addictions. Prior to his death, there was a record of his impairment; namely, of his addiction to controlled substances. Additionally, Alvarado was regarded as having such an impairment because he was subjected to discrimination because of an actual or perceived physical or mental impairment. Accordingly, at the time of his death, Alvarado was an individual with a disability as defined by the ADA. 42 U.S.C. § 12102.

216.     Title II of the ADA applies to municipalities and protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs and activities provided by municipalities. 42 U.S.C. §§ 12131-12132.

217.     Such services, programs, and activities include police protection and police services.

218.     At all times relevant herein, Alvarado was a qualified individual with a disability.

219.     The City of Tucson's police services must comply with Title II of the ADA and relevant provisions of the Rehabilitation Act, just as do other municipally-operated programs.

220.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

221.     Pursuant to Title II of the ADA and its implementing regulations, public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

222.     Section 504 states that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 11 C.F.R. § 9420.3.

223.     Defendant City of Tucson is covered within the meaning of Section 504 because it is a municipal government that provides services, programs, and activities and receives federal financial assistance. 29 U.S.C. § 794.

224.     Defendant City of Tucson is required by Section 504 to provide arrestees and detainees who suffer from disabilities with equal access to policing.

225.     In March 2020, Defendant City of Tucson discriminated against Alvarado on the basis of his disabilities by forcibly holding him down for more than 15 minutes

when it was clear that he was experiencing a mental health emergency and posed no harm to officers or to the public.

226. Tucson officers did not request assistance from specially-trained mental health professionals, although they had the time and resources to do so.

227. Defendant City of Tucson therefore discriminated against Plaintiff on the basis of his disabilities in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

228. Plaintiff is entitled to compensatory damages under this Count.

**COUNT VI**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process Clause**
**Failure to Intervene/Intercede**
**Against All Individual Police Defendants**

229. The allegations above are incorporated by reference in this Count.

230. Each of the Defendants named in this Count had an opportunity to intercede (also sometimes referred to as intervene) at various points throughout the approximately 20 minutes that Alvarado was restrained on the ground and before he stopped breathing.

231. Specifically, the above-named Defendants failed to intercede when their colleagues were exerting excessive force in violation of the Fourth Amendment by holding Alvarado in restraint positions and using restraint devices that were unnecessary given the known facts at the time.

232.    Additionally, the above-named Defendants failed to intercede when, recognizing that Alvarado was making noises indicating he was in medical distress and calling out "I can't breathe", failed to insert themselves into the situation with the objective of changing the course of the police interaction.

233.    Additionally, the above-named Defendants failed to intercede when, recognizing that Alvarado lay motionless in the moments after the TFD personnel concluded their medical check, they failed to check his vital signs again or request others to do so.

234.    Not only did the above officers have a theoretical opportunity to intercede, but they had a realistic opportunity, with several minutes elapsing while Alvarado's constitutional rights were being deprived.

235.    Upon information and belief, each of the above-named Defendants understood in the moment that Alvarado's behaviors were consistent with someone who was feeling the effects of methamphetamine or cocaine.

236.    Alvarado's death happened in slow motion and with ample warning (including Alvarado's own words). His death was not a sudden, immediate incident that bystanders would have been powerless to change.

237.    In March 2020, this duty to intercede in such circumstances was clearly established within the Ninth Circuit.

238.    Plaintiff is entitled to compensatory and punitive damages under this Count.

**COUNT VII**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process Clause**
**Deliberate Indifference to a Substantial Risk of Serious Harm &**
**Deliberate Indifference to a Serious Medical Need**
**Against all Individual Police Defendants and Individual Fire Defendants**

239.     Plaintiff re-alleges each allegation contained in the above paragraphs.

240.     Alvarado became a pretrial detainee in the care and custody of the Tucson

Police Department in the moment that he was seized for purposes of the Fourth

Amendment. This occurred, at the very latest, when Defendants Solarino, Yeandle,

Ake, and Gamez succeeded in handcuffing Alvarado on the ground.

241.     Having become a pretrial detainee in that moment, Alvarado had a

constitutional right from that moment onward to be free from conditions of

confinement that are violative of the minimum standards under the Fourteenth

Amendment Due Process Clause. Put differently, Alvarado had a right to be free from

conditions of confinement that amount to punishment, that are deliberately indifferent,

and that are lacking in legitimate penological justification.

242.     Following the initial seizure, and for approximately the next 20 minutes on the

ground of the alley, the Defendants named in this Count were deliberately indifferent

in two manners:

    a.  Defendants were deliberately indifferent to Alvarado's serious medical needs,

        namely, his chronic addictive disorder, which was readily apparent in the

        moments that Defendants interacted with him;

b.   Defendants were deliberately indifferent to a substantial risk of serious harm to Alvarado, in light of the well-documented, well-known risk of restraining an individual exhibiting signs of methamphetamine and/or cocaine intoxication in the manner described in this Complaint.

243.   In the Ninth Circuit, the Fourteenth Amendment extends a more protective standard to conditions of confinement when a detainee (such as Alvarado) has not been convicted than when a detainee has been convicted. Defendants were required under the Fourteenth Amendment to do more than provide Alvarado the minimal civilized measure of life's necessities.

244.   Many of the forms of restraint, including the two TARPs and the two spit socks, had no reasonable relation to the purpose for which Alvarado was detained. Put differently, the purpose and effect of these forms of restraint were punitive.

245.   The Individual Fire Defendants and Individual Police Defendants were deliberately indifferent to Alvarado's serious medical needs. In particular, the Individual Fire Defendants were subjectively aware of the fact that Alvarado was experiencing a medical emergency and nevertheless recommended to the Individual Police Defendants that he not be transported to a hospital.

246.   Both the Individual Fire Defendants and Individual Police Defendants were subjectively aware of the fact that Alvarado was suffering from the effects of either methamphetamine or cocaine. With the momentary exception of Defendant Gamez,

40

<u>no one</u> among the Defendants treated Alvarado as someone with a serious medical need.

247.     It was clearly established prior to 2020 that Defendants' actions amounted to deliberate indifference to a substantial risk of serious harm and deliberate indifference to a serious medical need. Additionally, it was clearly established prior to 2020 that pretrial detainees such as Alvarado were entitled to more considerate treatment than the conditions of confinement applicable to those who have ben convicted.

248.     The actions of the Defendants named in this Count were intentional, malicious, willful, wanton, and/or callously indifferent for Alvarado's constitutionally protected rights, thereby entitling Plaintiff to an award of punitive damages.

249.     Under this Count, Plaintiff is entitled to:

a. compensatory damages;

b. damages for loss of life (also sometimes called hedonic damages);

c. damages for pain and suffering of the decedent prior to death;

d. punitive damages.

**COUNT VIII**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process Clause**
**Substantive Due Process: Liberty Interest in Familial Association**
**Against all Individual Police Defendants**

250.     Plaintiff re-alleges each allegation contained in the above paragraphs.

251.     Plaintiff is the biological mother of Alvarado. Plaintiff brings this Count in her personal capacity, and not in her capacity as the personal representative of the estate.

252. The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of her child, sometimes referred to as a protected liberty interest in familial association.

253. In the Ninth Circuit, this protected liberty interest is recognized even when the child is an adult at the time of his or her death.

254. For purposes of this protected liberty interest, the facts described in this Complaint did not constitute an emergency situation and did not call for law enforcement to take an emergency action. In the moment that Alvarado was first seized in the alley and for the 20 minutes following the seizure, Alvarado posed no risk of harm to civilians, to officers, or to the general public. Put differently, this was not a situation in which Defendants were forced to make split-second decisions.

255. Each of the Defendants named in this Count acted and failed to act under circumstances in which they had an opportunity for reflection. Put differently, each of the Defendants had an extended opportunity to do better and demonstrated deliberate indifference in failing to adjust their actions over the course of that time period.

256. Defendants' behavior shocks the conscience.

257. Defendants exercised their power in an arbitrary manner.

258. Defendants' shocking behavior in Tasering Alvarado, hogtying him (twice), placing a spit sock on him (twice), holding him face down on the ground while he was obviously in distress and expressing that he couldn't breathe, was the legal, direct, and proximate cause of Alvarado's death.

259.     Plaintiff is entitled to damages for the loss of companionship of her eldest son.

### COUNT IX
### A.R.S. §§ 12-611
### Gross Negligence Causing Wrongful Death
### Against all Individual Police Defendants & Individual Fire Defendants

260.     Plaintiff re-alleges each allegation contained in the above paragraphs.

261.     Under Arizona law, when death of a person is caused by negligence, the persons who would have been liable if death had not ensued, shall be liable in an action for damages.

262.     For the reasons explained in other counts, both the Individual Police Defendants and Individual Fire Defendants were negligent, and grossly negligent. This negligence was the direct, proximate, and legal cause of Alvarado's death.

263.     The Defendants named in this Count are not entitled to state-law qualified immunity because they acted with gross negligence.

264.     Plaintiff is entitled to compensatory damages under this Count.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant her the following relief:

A.  Compensatory damages, including consequential, general, and special damages, in an amount to be determined at trial;

B.  Loss of Life Damages, also called Hedonic damages, as defined by the federal common law and 42 U.S.C. § 1983;

C.  Pain and Suffering damages as permitted under 42 U.S.C. § 1983;

D.  Punitive damages pursuant to 42 U.S.C. § 1988;

E.  Attorney's fees under 42 U.S.C. § 1988 and 29 U.S.C. § 794a;

F.  Costs of this action;

G.  Any other relief that this Court deems appropriate.

Respectfully submitted this 18th day of March, 2022 by:

<u>/s Paul Gattone</u>
Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
Email: <u>GattoneCivilRightsLaw@gmail.com</u>
(520) 623-1922
*Attorney for Plaintiff Irene Briseno*