Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
gattonecivilrightslaw@gmail.com
*Attorney for Plaintiff*

## IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irene Briseno, on her own behalf and as the personal representative of the estate of Damien Eryko Alvarado, <br><br> Plaintiff, <br><br> v. <br><br> City of Tucson, et al., <br><br> Defendants. | Case No. 4:22-cv-00132-RCC <br><br><br> **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## LEGAL STANDARD

"Generally, a plaintiff's burden at the pleading stage is relatively light." *Ctr. for Biological Diversity v. Env't Prot. Agency*, 316 F. Supp. 3d 1156, 1163 (N.D. Cal. 2018). At the 12(b)(6) stage, the court takes "all allegations of material fact as true and construe[s] them in the light most favorable" to the plaintiff. *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). A claim survives a 12(b)(6) motion if it contains "enough factual

matter (taken as true) to suggest that" officers violated Mr. Alvarado's clearly established rights. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

A substantial portion of Defendants' motion involves Fourth Amendment excessive force claims. In the Ninth Circuit, courts are to remove this fact-intensive question from the jury only "sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (explaining excessive force cases require factfinders to "sift through disputed factual contentions"); *see also Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir.1997) (as amended) ("the reasonableness of force used is ordinarily a question of fact for the jury."). Excessive force claims that resulted in death, as here, present "a particularly difficult problem" because "the officer defendant is often the only surviving eyewitness." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). In these cases, courts are cautioned against inadvertently drawing inferences in favor of the officers.

## I.   MR. ALVARADO'S MINOR CHILD IS NOT A NECESSARY AND INDISPENSABLE PARTY UNDER RULE 19.

Plaintiff brings nine counts. Seven of them involve constitutional violations that Plaintiff brings solely in her role as the personal representative of the estate. Because 42 U.S.C. § 1983 borrows from state law on the question of who has standing, Arizona law clarifies that the personal representative of the estate has exclusive authority to bring those seven counts. *See, e.g., Lee v. Arizona*, 2010 WL 1948584, at *2 (D. Ariz. May 12, 2010) (observing that in Arizona, "familial ties, without more, are insufficient to confer standing" on a surviving spouse suing under Sec. 1983 and holding that only a personal representative

has such ability); *see also Davis v. City of Tucson*, 2015 WL 5782127, at *3 (D. Ariz. Oct. 5, 2015) (same). Defendants appear to agree that Plaintiff – and only Plaintiff – has standing as to those seven counts.

Instead, Defendants argue that Mr. Alvarado's surviving minor child was improperly omitted as a plaintiff as to Plaintiff's state-law claim found at Count IX.[1] Doc. 49 at 2 (referring to "the decedent's minor child" as a "necessary party"). The parties agree that Mr. Alvarado's child is a beneficiary to this state-law claim. A.R.S. § 12-612(A) ("an action for wrongful death shall be brought . . . for and on behalf of the surviving husband or wife, children or parents"); *see also Wilmot v. Wilmot*, 203 Ariz. 565, 568 (2002) (observing that a deceased's "estranged" child is a beneficiary). The parties also agree that Mr. Alvarado's child <u>could have</u> been a plaintiff to the wrongful death claim. *Benedict v. Total Transit Inc.*, 252 Ariz. 151 (Ct. App. 2021) (noting that a minor child may sue under that statute through an "appropriate representative").

The parties diverge, however, as to whether Mr. Alvarado's child is a "necessary and indispensable party under Rule 19." *Havasupai Tribe v. Anasazi Water Co. LLC*, 321 F.R.D. 351, 354 (D. Ariz. 2017) (outlining the test for determining whether to dismiss an action under Rule 19).[2] Defendants cite the Arizona Court of Appeals case of *Benedict v. Total*

---

[1] Although this detail is not alleged in her complaint, Plaintiff does not dispute Defendants' assertion that Mr. Alvarado left behind one minor child. Plaintiff agrees that judicial notice is appropriate as to the state court filings cited at Doc. 49 at 2.

[2] Rule 19 refers to a non-party who ought to be a party as a "necessary" party. Although the word 'indispensable' was deleted long ago, courts continue to refer to indispensable parties. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 856 (2008) (outlining the history of the rule)

*Transit* for the proposition that a surviving child's absence from a wrongful death claim impairs the child's legal interests. Not so. That case holds merely that "a minor child need not bring a wrongful death action through the personal representative of the decedent, but instead may sue through another appropriate representative." *Benedict,* 252 Ariz. 151. *Benedict* clarifies that a child is *permitted* to sue under Arizona's wrongful death statute; it is silent as to what happens if a minor child is absent from such litigation. As explained below, the child's absence prejudices neither his nor Defendants' interests.

### a. Mr. Alvarado's Minor Child will not Experience an Impairment of his Legally-Protected Interests.

Mr. Alvarado's child is a necessary party only if he has a "legally protected interest" that would "be impaired or impeded by adjudicating the case without [him]," *Paiute-Shoshone Indians of Bishop Cmty. v. Los Angeles*, 637 F.3d 993, 997 (9th Cir. 2011) (internal citations omitted), or if Defendants would be vulnerable to "piecemeal litigation and inconsistent, conflicting judgments." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 872 (2008); *see also* Rule 19(a). Defendants cannot demonstrate that the child's interests will be left to self-interested parties. Nor can they demonstrate that the child's absence will subject them to additional litigation.

"As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999).

Because Mr. Alvarado died intestate, Arizona's intestacy statute governs. A.R.S. § 14-2101. Here, Mr. Alvarado's surviving child is the sole heir. A.R.S. § 14-2103 ("the entire intestate estate . . . passes . . . [to] the decedent's descendants"). Plaintiff, in turn, has assumed the relationship of trustee of the estate's (and therefore the child's) legally-protected interests. A.R.S. § 14-3703 (mandating that the personal representative assumes the duty of a "fiduciary who shall observe the standards of care applicable to trustees."); *see also In re Est. of Fogleman*, 197 Ariz. 252, 257 (Ct. App. 2000) ("a personal representative owes a fiduciary duty of fairness and impartiality").

Defendants acknowledge that Mr. Alvarado's child is likely to inherit <u>some</u> portion of any recovery. Nevertheless, Defendants suggest that other family members could crowd in and diminish the child's entitlement. While several adult family members have standing to bring a wrongful death suit (including Plaintiff, as the mother of the deceased), the so-called 'statutory plaintiff' is distinct from a statutory beneficiary. Sometimes the same loved-one occupies both roles. Here, they do not. The statutory plaintiff sues "on behalf of the surviving husband *or* wife, children *or* parents, *or* if none of these survive, on behalf of the decedent's estate." A.R.S. § 12-612(A) (emphasis added). Because there is no surviving spouse, any recovery would be distributed among two sets of beneficiaries. *Begay v. City of Tucson*, 148 Ariz. 505, 508 (1986) ("damages . . . [are] distributed to the parents and children of the deceased in proportion to their damages."). Here, Mr. Alvarado's only surviving parent voluntarily forfeited her share of any recovery under Count IX by choosing to sue

*only* in her role as personal representative. Doc. 49 at 2 (Defendants acknowledge this pleading choice).

Not only is the child's interest adequately represented on account of A.R.S. § 12-612 and the fiduciary protections of Title 14, but also because a wrongful death plaintiff has yet *another* fiduciary duty "in conducting and settling the action and making distribution of proceeds." *Wilmot v. Wilmot*, 203 Ariz. 565, 569 (2002); *see also In re Milliman's Est.,* 101 Ariz. 54, 63 (1966) (noting that a statutory plaintiff acts "as a statutory trustee for the other beneficiaries"). This fiduciary duty is distinct from the fiduciary duties described above. Consequently, it can be said that Plaintiff has a double fiduciary duty to Mr. Alvarado's minor child.

A non-party is not "necessary" under Rule 19 where the non-party is in a trustee relationship with an existing party. *See, e.g., Daley*, 173 F.3d at 1168 (concluding that an Indian tribe is not a necessary party where the United States, which "is the trustee of the Indian tribes' rights," is an existing party); *Alto v. Black*, 738 F.3d 1111, 1127–28 (9th Cir. 2013) (same). Here, the fiduciary relationship between Plaintiff and child requires not only communication with the absent party but also affirmative agreement in any future settlement. *Wilmot v. Wilmot*, 203 Ariz. 565, 569 (2002)*; see also Forbes v. 21st Century Ins. Co.,* 2010 WL 11512381, at *3 (D. Ariz. Jan. 5, 2010) (concluding that decedent's surviving spouse breached her fiduciary duty by not communicating with the other statutory beneficiaries before finalizing a wrongful death settlement).

**b. Defendants Face Zero Risk of Piecemeal Litigation.**

Not only are the child's interests adequately represented but also Defendants will suffer no prejudice. Defendants may harbor concerns that the child, upon achieving the age of majority, will file his own wrongful death action and subject Defendants to multiple judgments years apart from one another. This scenario is foreclosed by Arizona law.

While Arizona's wrongful death statute permits several categories of relatives to file suit (ie, to serve as statutory plaintiffs), only <u>one</u> wrongful death lawsuit may be filed. *See, e.g., Reed v. Frey,* 458 P.2d 386, 388 (Ariz. Ct. App. 1969) (there is "only *one* action for wrongful death brought as to anyone deceased.") (emphasis in original); *Nunez v. Nunez*, 25 Ariz. App. 558, 562 (1976) ("[t]here is also but one plaintiff, one of the persons designated by statute") (internal citations omitted); *Wilmot v. Wilmot*, 203 Ariz. 565, 569 (2002) ("claims by all statutory beneficiaries [are to] be consolidated in a single action."); *Begay v. City of Tucson,* 148 Ariz. 505, 508, 715 P.2d 758, 761 (1986) ("A wrongful death action . . . is one action for damages with one plaintiff and one judgment.").

Indeed, it is likely that – even if Mr. Alvarado's minor child were to seek to intervene – he would be denied. A federal district court recently confronted dueling wrongful death plaintiffs seeking to file separate actions. When one of them sought to intervene in the earlier-filed action, the court denied the motion and ordered the parties to decide which party would act as plaintiff to assert "a wrongful death claim on behalf of both" of them. *Manion v. Ameri-Can Freight Sys. Inc.,* 391 F. Supp. 3d 888, 895 (D. Ariz. 2019)

## II. PLAINTIFF HAS ADEQUATELY PLEADED THAT DEFENDANTS SOLARINO, AKE, GAMEZ, GRADIAS, YEANDLE, AND ELLIS EMPLOYED EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT.

Defendants seek dismissal of Plaintiff's Fourth Amendment excessive force claim at Count I. "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's reasonableness standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774–75 (2014). In evaluating reasonableness of force, courts consider the three *Graham v. Connor* factors: (1) "the severity of the crime" being investigated; (2) "whether the suspect posed an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) ("A Fourth Amendment claim of excessive force is analyzed under the framework set forth by the Supreme Court in *Graham v. Connor*").

The Ninth Circuit instructs that the three *Graham* factors are "non-exhaustive." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997). District courts are encouraged to consider "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson,* 630 F.3d 805, 826 (9th Cir.2010) (internal citations omitted). This includes "whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cnty.,* 673 F.3d 864, 872 (9th Cir. 2011) (considering this fourth factor in addition to the three *Graham* factors); *see also Bryan*, 630 F.3d at 829 ("if Officer MacPherson believed Bryan was

mentally disturbed he should have made greater effort to take control of the situation through less intrusive means.")

### a. Officers Suspected Mr. Alvarado Only of Nonviolent Misdemeanors.

At all relevant times, officers suspected Mr. Alvarado of having committed only nonviolent misdemeanors. The complaint specifically states that the *only* crime for which Alvarado was suspected was fleeing the scene of an accident. Doc. 1 at ¶ 67 (identifying the state criminal statute); *Id.* at ¶ 70 (clarifying that officers suspected Alvarado *only* of that one crime); *Id.* at ¶¶ 63-66 (asserting that Defendant officers possessed this information prior to engaging with Alvarado). Nevertheless, Defendants hypothesize that officers *could* have suspected Alvarado of additional crimes. Doc. 49 at 6 ("[a]ny experienced officer . . . would conclude that a person who flees from the scene of a vehicle accident does so for a reason, and several of those possible reasons may constitute felonies."). Defendants hypothesize that Alvarado had previous DUI convictions or perhaps a suspended drivers license, thereby converting an apparent misdemeanor into a felony under state law. The *Graham* factors are assessed on "what the officer knew at the time." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Officers did not know Alvarado's identity. Doc. 1 at ¶¶ 68, 70. Consequently, they did not know his background. Even if officers knew of a lengthy criminal history, such a history is not contained in the complaint. *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) ("In ruling on a motion to dismiss, a court's review is normally limited to the complaint itself.")

Most importantly, this first of the *Graham* factors asks about the "severity" – ie, the level of violence – of the underlying crime that prompted the police involvement in the first place. *See, e.g., Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) (although the suspect had committed three misdemeanors, "none of the offenses . . . is inherently dangerous or violent"). As the Ninth Circuit has explained, "a crime's status as a misdemeanor or felony is not the key question but rather provides a rough proxy for the true object of the court's inquiry: whether a given offense indicates a suspect's potential dangerousness." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1165 n.8 (9th Cir. 2011). Even where a crime involves violence, it does not necessarily "warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious." *Smith v. City of Hemet*, 394 F.3d 689, 702–03 (9th Cir. 2005) (describing use of excessive force where suspect was accused of domestic violence).

**b. Alvarado did not Pose an Immediate Danger to Officers or Civilians.**

"The most important of these three [*Graham*] factors is whether the suspect poses an immediate threat to the safety of the officers or others." *Garlick*, 167 F. Supp. 3d at 1144. Here, any danger that Alvarado may have posed had already dissipated: his vehicle was left behind at the crash scene. This was the only dangerous instrument at his disposal that day. Plaintiff alleges that officers knew almost immediately after engaging with Alvarado that he was unarmed. Doc. 1 at ¶¶ 72, 79, 100. Although Alvarado attempted to flee, he never demonstrated violence toward the officers. *Id.* at ¶ 90; *see, e.g., Davis v. City of Las Vegas*, 478 F.3d 1048, 1055–56 (9th Cir. 2007) ("Davis posed no immediate threat to Officer Miller

or to anyone else [where he] was unarmed, in handcuffs, and never attempted to harm Miller or anyone else in any way."). And even though Alvarado was high on drugs and acting illogically, he was not running into traffic or threatening to cause a safety issue for the general public. *See, e.g., Rascon v. Brookins*, 2018 WL 783675, at *9 (D. Ariz. Feb. 8, 2018) (denying summary judgment to officers who forced a drugged man "flat on his stomach" with officers "applying pressure to his body on all sides" where officers sought to keep the man from continuing to run into traffic).

### c. For Much of the Time that he was Subjected to Significant Force, Alvarado was Not Actively Resisting Arrest.

While the encounter between officers and Mr. Alvarado began with Alvarado actively escaping, much of the force took place at a time when Alvarado was fully secured in handcuffs and leg restraints. For most of the encounter, any apparent resistance – if any – was on account of his grasping for air while being restrained face-down. See, e.g., *Davis v. City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007) (noting that "although Davis was somewhat uncooperative and resisted Officer Miller's attempts to search his pockets," the calculus for officers changed after "he was in handcuffs, surrounded by security guards, and confined"). Indeed, "a failure to fully or immediately comply with an officer's orders" does not automatically justify "the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012). Here, for at least half of the 15 minutes during which Mr. Alvarado was restrained and subject to force, he was completely immobilized and

not offering resistance. Even prior to that, Mr. Alvarado may have been combative but was not violent toward officers.

### d. Defendant Officers used Excessive Force that was Clearly Established.

Since at least 2003, it has been clearly established in the Ninth Circuit that officers violate the Fourth Amendment rights of an unarmed misdemeanant where – in the process of trying to handcuff him –they pile on top of him with their body weight and apply a knee to the back of the neck. *Blankenhorn v. City of Orange*, 485 F.3d 463, 469 (9th Cir. 2007). This right remains clearly established, even where an otherwise non-violent and unarmed suspect refuses to obey a command to get down and where at least one of the suspected crimes is a low-level felony. *Id.* (noting that the officer "asked Blankenhorn to kneel down so he could handcuff him [and] Blankenhorn refused, saying, 'I'm not going to my f* * *ing knees.'").

In *Drummond v. Anaheim*, the Ninth Circuit found that officers violated the clearly established rights of an unarmed schizophrenic man who, "in an agitated state," was at risk of "darting into traffic." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003). One of the officers "knock[ed] [the schizophrenic man] to the ground . . . cuffed his arms behind his back . . . put his knees into [the suspect's] back and placed the weight of his body on him." *Id.* Drummond also established a Fourth Amendment violation where officers "squeez[e] the breath from an individual" after that individual "plead for air." *Slater v. Deasey*, 789 F. App'x 17, 19 (9th Cir. 2019) (analyzing the *Drummond* case). Similarly, in *Arce v. Blackwell*, the Ninth Circuit found a violation of clearly established rights where officers placed a suspect experiencing a drug high "with his chest to the ground

while applying pressure to his back and ignoring pleas that he cannot breathe." *Arce v. Blackwell*, 294 F. App'x 259, 261 (9th Cir. 2008)

### III.  PLAINTIFF ADEQUATELY PLEADED THAT OFFICER SOLARINO CONSPIRED WITH A CIVILIAN TO VIOLATE MR. ALVARADO'S FOURTH AMENDMENT RIGHTS.

Defendants seek dismissal of Plaintiff's Count II, asserting that Defendant Officer Solarino and civilian Justin Canovali conspired "to deprive Alvarado of his constitutional rights, namely, his Fourth Amendment right to be free of excessive force." Doc. 1 at ¶ 170. Defendants assert there was no conspiracy because Defendant Solarino "utilized the assistance of a civilian" in order to "prevent Alvarado's escape." Doc. 49 at 9. It is not the preventing of Alvarado's escape that created the illegal conspiracy, but rather the *manner* of subduing him. Whether characterized as a careful coordination or merely "utilizing the assistance" of a nearby aid, the result is an unlawful conspiracy.

"A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective." *Vieux v. East Bay Reg'l Park Dist.,* 906 F.2d 1330, 1343 (9th Cir.1990) (internal citations omitted). Here, the unlawful objective is using force, the "nature and quality" of which is disproportionate to the "governmental interests at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). Here, "the need for force" actually used was not needed: Alvarado neither posed "an immediate threat" nor was suspected of a violent crime. *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997). Plaintiff alleges that both Officer Solarino and civilian

Canovali recognized this. Doc. 1 at ¶¶ 66-67, 171 (Solarino suspected Alvarado only of fleeing the scene); *Id.* at ¶¶ 71-72, 100 (Solarino did not suspect Alvarado of being armed); *Id.* at ¶¶ 76, 79-80 (Canovali believed Alvarado to be non-dangerous); *Id.* at ¶¶ 73-75, 171 (Canovali suspected Alvarado only of fleeing the scene and being intoxicated).

Both co-conspirators were motivated by the common objective of arresting Mr. Alvarado. *Id.* at ¶¶ 85-86, 172. Notably, Plaintiff also alleges that part of the joint objective included seizing Mr. Alvarado through use of a Taser. Id. at ¶¶ 91-95 (detailing how Mr. Canovali "threw Alvarado to the ground" while Solarino "readied his Taser device"). A conspiracy exists even where some participants are unaware of "the exact details of the plan," so long as the participants "share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1541 (9th Cir.1989) (en banc); *see also Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983) (same). Here, however, both participants <u>are</u> alleged to have understood that they intended to seize Alvarado by forcefully pulling him down from a wall, body slamming him to the ground, and Tasing him. Not only did they jointly understand the goal, they communicated it. Doc. 1 at ¶ 86; *see, e.g., Steel v. City of San Diego*, 726 F. Supp. 2d 1172, 1179 (S.D. Cal. 2010) (finding a likely conspiracy where the co-conspirators "were communicating during the pursuit [and] arrest").

## IV. PLAINTIFF HAS ADEQUATELY PLEADED THAT DEFENDANTS HAD AN OPPORTUNITY TO INTERVENE AND FAILED TO AVAIL THEMSELVES OF THAT OPPORTUNITY.

Defendants challenge Plaintiff's Count VI, asserting liability against the individual Defendant officers on the basis that each of them had a "realistic opportunity to intercede" to

stop "their fellow officers [from] violat[ing] the constitutional rights of a suspect" and failed to do so. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). The Ninth Circuit has clearly established that, "if an officer fails to intercede, the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who performed the offending action." *Tobias v. Arteaga*, 996 F.3d 571, 583–84 (9th Cir. 2021).

This is precisely what Plaintiff alleges here. Doc. 1 at ¶¶ 230-236. Indeed, Defendants do not appear to challenge that the individual officers had an opportunity to intervene or that this obligation was clearly established. Doc. 49 at 9. Instead, Defendants simply re-package their argument that there was no underlying Fourth Amendment violation in the first instance. Their one and only case is unavailing. *Tatum v. San Francisco* involves a Fourth Amendment excessive force claim stemming from officers "simply laying a suspect on his stomach" for approximately 90 seconds. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006). Plaintiff's Count VI, by contrast is premised not only on officers' failure to intervene to stop a *Fourth Amendment* violation but also their failure to stop a *Fourteenth Amendment* Due Process violation. Doc. 1 at p.37 (caption stating a failure to intercede to prevent a "Fourteenth Amendment Due Process Clause" violation). *See, e.g., K.J.P. v. Cnty. of San Diego*, 2016 WL 7385620, at *2 (S.D. Cal. Apr. 29, 2016) (distinguishing *Tatum* because it "was an excessive force case, it did not involve a claim of deliberate indifference.")

Importantly, Plaintiff here does not allege merely that officers laid him on his stomach for 90 seconds. Plaintiff alleges that – for more than 15 minutes – Defendants hogtied him

using two devices, forced his head into two layers of spit socks, placed full body weight on his back, held him face-down with an elbow and then a knee to his neck, and repeatedly refused to place him in a safer "recovery" position. Doc. 1 at ¶¶ 1, 106-109, 112-118, 121-124, 127-129, 135. Courts have distinguished *Tatum* where, as here, officers placed a "spit bag on an unconscious arrestee who is being treated by paramedics." *Rosales v. Cnty. of San Diego*, 511 F. Supp. 3d 1070, 1091–92 (S.D. Cal. 2021). Similarly, courts have distinguished *Tatum* where, for example, the officer not only "placed" the suspect face-down on the ground but also "applied pressure with his bodyweight to the upper half of [the suspect's] body." *Dominguez v. City of Scottsdale*, 2022 WL 943726, at *4 (D. Ariz. Feb. 24, 2022).

## V. PLAINTIFF HAS ADEQUATELY PLEADED THAT THE DEFENDANT OFFICERS ACTED IN A MANNER THAT SHOCKS THE CONSCIENCE.

Citing no case law or authority, Defendants seek dismissal of Plaintiff's Count VIII brought against the Defendant police officers under the Substantive Due Process Clause. Damages under the Substantive Due Process Clause are appropriate where official conduct "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1136-37 (9th Cir. 2008) (citation omitted). Depending on the circumstances of a given case, courts within the Ninth Circuit apply one of two standards of culpability to determine whether an officer's conduct "shocks the conscience." While this standard is often considered to be "more demanding" than deliberate indifference, liability in this particular instance is appropriate with a mere showing of deliberate indifference. *Porter*, 546 F.3d at 1137.

The more demanding standard applies where "an occasion calls[s] for fast action" and where officers must "act decisively" and "in haste." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 852–53 (1998). For example, the Supreme Court has found deliberate indifference to be insufficient to demonstrate conscience-shocking in a high-speed police chase, *Lewis*, 523 U.S. at 854, and in a prison riot. *Whitley v. Albers*, 475 U.S. 312, 314 (1986). Similarly, the Ninth Circuit held that an officer acted "in a fast-paced situation in which actual deliberation [was] not practical" where the officer – acting alone at the scene of a life-threatening vehicle collision – "tended to the unconscious victim, managed the crowd that had gathered, called dispatch several times . . . interviewed witnesses, and prevented the victim's father from retaliating." *Johnson v. City of Unalakleet*, 490 F. App'x 851, 852 (9th Cir. 2012). Although the arrestee was harmed twelve minutes after the officer's arrival, the officer's actions were deemed to be fast-paced for purposes of the Substantive Due Process analysis because the lone officer was forced to split his attention among various urgent tasks. *Id.*

Here, by contrast, Defendants were not acting in a fast-paced situation. Plaintiff alleges that events practically unfolded in slow-motion. There were at least ten police officers on scene during the critical moments, almost all of them with their attention turned toward Mr. Alvarado. Doc. 1 at ¶¶ 81, 101-103, 110, 130, 138. Mr. Alvarado was restrained on the ground for more than 15 minutes before his heart stopped. *Id.* at ¶ 1. Indeed, the complaint elicits specific examples of how many of the Defendant officers stood around with time to deliberate as Mr. Alvarado lay in distress within reach. *Id.* at ¶¶ 129, 147-154. This was not a "rapidly escalating . . . confrontation" between officers and Mr. Alvarado. *Porter*,

546 F.3d at 1137. In fact, it wasn't even a confrontation at all for 75% or more of the police interaction. *See, e.g.,* Doc. 1 at ¶ 134 (noting that "Alvarado was not resisting in any way" while restrained on the ground); *see also Id.* at ¶¶ 111-112 (2 min. and 30 seconds after restraining Alvarado face-first on the ground, he was making sounds consistent with being in medical distress).

Consequently, the higher degree of culpability is not required to be shown here. Plaintiff can prevail on this claim where she demonstrates that the individual officers acted with deliberate indifference – where officers are showing to have recklessly disregarded "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). It is not difficult for Plaintiff to demonstrate this lower threshold. Plaintiff satisfies the "subjective" requirement of the two-prong deliberate indifference standard, *Farmer*, 511 U.S. at 838, by alleging that officers knew that Mr. Alvarado was at risk of positional asphyxia on account of his drug intoxication and manner of restraint. Doc. 1 at ¶¶ 88, 105, 116, 117. Additionally, Plaintiff amply alleges that the individual officers disregarded the known risk to Mr. Alvarado. *Id.* at ¶¶ 112-115, 121-124, 127-129 (officers ignoring on three separate occasions Alvarado's comment: "I can't breathe"); *Id.* at ¶¶ 116-118 (officers ignoring Defendant Gamez's recommendation to place Alvarado in a different position); *Id.* at ¶ 125 (Defendant Gamez ignoring his own prior advice to place Alvarado in a safer position). Plaintiff has adequately pleaded that individual officers were deliberately indifferent and, therefore, acted in a manner that shocks the conscience. Dismissal of this claim is inappropriate, especially

where courts "demand[] an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850.

## VI. DEFENDANTS FAIL TO CHALLENGE PLAINTIFF'S FOURTEENTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM.

At Count VII, Plaintiff brings claims for the officers' and firefighters' deliberate indifference to a substantial risk of serious harm to Mr. Alvarado. In the moments after being handcuffed and subdued by officers on the ground, Mr. Alvarado became not only a suspect but also a pretrial detainee. As a pretrial detainee, Mr. Alvarado was protected from "deprivation of liberty without due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). This liberty interest protects against "those conditions [of confinement that] amount to punishment of the detainee." *Id.* In the Ninth Circuit, "punitive conditions" – ie, those proscribed by the Fourteenth Amendment – exist where "the challenged restrictions are expressly intended to punish" and where "the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose." *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).

Here, Plaintiff claims that hogtying Alvarado, forcing his head into a spit sock, placing body weight on him while face-down, and a failure to consistently place him on his side are all examples of punitive conditions. Plaintiff contends that future discovery will allow a jury to reasonably conclude that such actions were taken with the subjective intent of punishing Alvarado and were therefore completely lacking in penological justification. Defendants simply do not address any of this. *See* Doc. 49 at 10.

## VII.    PLAINTIFF HAS ADEQUATELY PLEADED HER CLAIMS UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT.

Defendants seek dismissal of Plaintiff's Count V, alleging that police officers discriminated against Mr. Alvarado on the basis of his disability by failing to extend a reasonable accommodation to him during the minutes that they forcibly held him down after subduing and handcuffing him, in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.[3] Defendants appear to challenge this Count on two bases: 1) that the disability statutes are not an independent check on officers when an arrest is otherwise "objectively reasonable" under the Fourth Amendment; and 2) that Mr. Alvarado was not a "qualified person with a disability." Doc. 49 at 10-11; *see also* 42 U.S.C. § 12131(2) (defining the term).

### a.  The ADA and the Fourth Amendment are Separate Causes of Action, Each with Its Own Legal Framework and Each Requiring its Own Analysis.

In suggesting that the ADA is rendered impotent where an officer acts in accordance with the Fourth Amendment, Defendants cite one out-of-circuit case for the proposition that courts "need not analyze the alleged ADA violation" where there was no Fourth Amendment violation. Doc. 49 at 10 (*citing Bates ex rel. Johns v. Chesterfield Cnty.*, 216 F.3d 367, 373

---

[3] Plaintiff brings claims under both Section 504 and Title II. Section 504 of the Rehabilitation Act and Title II of the ADA are generally given the same construction. *See, e.g., Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999) ("Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act"); *see also Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (noting that the "same considerations apply to Title II of the ADA" as to Section 504). In this memorandum, Plaintiff refers to both statutes when discussing the ADA.

(4th Cir. 2000). Not so. Just six years after issuing its decision in *Bates v. Chesterfield County*, the Fourth Circuit questioned this proposition. In *Waller v. City of Danville*, an officer shot a mentally ill criminal suspect and the family filed Fourth Amendment and ADA claims. The District Court followed the logic found in *Bates*, dismissing the ADA claim because the officers were found to have acted consistent with the Fourth Amendment. The Fourth Circuit reversed, concluding that there may be a "set of facts from which an ADA violation could be found" even though "there has been no Fourth Amendment violation." *Waller v. City of Danville*, 212 F. App'x 162, 173 (4th Cir. 2006) (concluding that the District Court erred by dismissing the ADA claim "based solely" on the failed Fourth Amendment claim).

Regardless of the Fourth Circuit's current jurisprudence, the Ninth Circuit consistently holds that the ADA acts as an independent check on law enforcement. The Ninth Circuit has held that "Title II of the Americans with Disabilities Act applies to arrests" and that the Fourth Amendment analysis is independent of the ADA analysis. *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232–33 (9th Cir. 2014), *rev'd in part, cert. dismissed in relevant part sub nom*, 575 U.S. 600 (2015) (explaining that the plaintiff has the burden to show "the existence of a reasonable accommodation" and the burden then shifts to the officer to show "that making the modifications would fundamentally alter the nature of the [police] service"). In *Sheehan*, officers fired upon a woman who was experiencing a mental health crisis. *Id.* at 1219. Plaintiff sued under the Fourth Amendment and ADA, and the Supreme Court eventually granted *certiorari* on both claims. After granting *certiorari*,

however, the Supreme Court dismissed the ADA question as "improvidently granted" when it became clear that all parties "argue (or at least accept) that § 12132 [Title II of the ADA] applies to arrests." *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 606 & 610 (2015). On remand, the result was precisely the opposite of what Defendants now advocate: both the Supreme Court and Ninth Circuit acknowledged that the fate of an arrest-related ADA claim is not tied to the fate of the Fourth Amendment claim. *See, e.g., Sheehan v. City & Cnty. of San Francisco*, 793 F.3d 1009 (9th Cir. 2015) (observing that the Supreme Court concluded that "the district court properly granted summary judgment to the defendants on Sheehan's Fourth Amendment claims but . . . erred by granting summary judgment to the defendants on Sheehan's Americans with Disabilities Act" claim).

Since *Sheehan*, the Ninth Circuit evaluates Title II claims arising from an arrest separately from the related excessive force claim. *See, e.g., Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (upholding the district court's summary judgment decision on Fourth Amendment excessive force and separately reversing the district court's summary judgment decision under the ADA). Similarly, district courts, presented with motions to dismiss, analyze each claim separately. *See, e.g., C.B. v. Moreno Valley Unified Sch. Dist.,* 544 F. Supp. 3d 973 (C.D. Cal. 2021) (denying officers' motion to dismiss an ADA claim and separately assessing the Fourth Amendment claim); *see also Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1042 (D. Ariz. 2019), *aff'd sub nom.* 798 F. App'x 1015 (9th Cir. 2020) (same). Regardless of the fate of Plaintiff's Fourth Amendment claim, the ADA

claim should stand so long as she has adequately pleaded the unique elements demanded of

that statute. As shown below, she has done precisely this.

### b. Plaintiff Adequately Pleaded that Alvarado was a Qualified Person with a Disability.

Without discussion, Defendants obliquely suggest that Plaintiff inadequately pleaded

that Mr. Alvarado was a "qualified person with a disability." Doc. 49 at 11. The Complaint is

replete with detailed facts demonstrating that Mr. Alvarado suffered from a precarious

physical and mental condition that "substantially limit[ed] one or more major life activities."

42 U.S.C.§ 12102 (defining the term 'disability'). For example, Plaintiff alleges that

moments before being seized by police, Mr. Alvarado was found "lying on the ground in an

illogical fashion," Doc. 1 at ¶ 75, that during his arrest Mr. Alvarado exclaimed that he could

not breathe, *Id.* at ¶¶ 112, 121, 127, and that Mr. Alvarado "continued making noises of

distress" throughout the arrest. *Id.* at ¶ 134. Additionally, Plaintiff alleges that – among other

things – Mr. Alvarado struggled with a long-term drug addiction. *Id.* at 215 (noting that the

drug addiction is only one "example" of his major life impairments).

Drug addiction is a disability under the ADA to the extent that it limits a major life

activity. 28 C.F.R. § 35.108 ("disability means . . . a physical or mental impairment" and a

mental impairment "includes, but is not limited to . . . drug addiction."); *see also Thompson*

*v. Davis*, 295 F.3d 890, 894 (9th Cir. 2002) (reversing dismissal of an ADA claim alleging

that an agency was "categorically denying" a service on account of their "drug addiction");

*see also Strickland v. Delaware Cnty.*, 2022 WL 1157485, at *3 (E.D. Pa. Apr. 19, 2022)

(concluding that plaintiff was a qualified individual with a disability where he struggled

"with long-time opioid use disorder").

Importantly, the ADA imposes on courts an "obligation" to determine the existence of a disability on a "case-by-case basis." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999). Where, as here, Plaintiff has put forward specific facts identifying a specific ailment, the court need not probe more deeply at the 12(b)(6) stage. *See, e.g., Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 24 (1st Cir. 2002) (observing that the evidence to establish a disability need not include "excruciating details as to how the plaintiff's capabilities have been affected by the impairment."). Put differently, a plaintiff must at least plead that he suffered from symptoms on more than just "a single day." *Bresaz v. Cnty. of Santa Clara*, 136 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015). There must be evidence of a "specific, recognized mental or physical illness." *Id*. As shown above, Plaintiff has done this.

## VIII.   PLAINTIFF HAS ADEQUATELY DEMONSTRATED THAT THE INDIVIDUAL DEFENDANTS ACTED WITH GROSS NEGLIGENCE.

Defendants argue that they are entitled to state-law qualified immunity at this early stage of litigation because Plaintiff has failed to demonstrate the heightened culpability of gross negligence. A.R.S. 12-820.02 (imposing immunity on public employees except where their actions amount to gross negligence). Yet dismissal on state-law qualified immunity grounds is rarely appropriate at the 12(b)(6) stage. "A court may withdraw the issue of gross negligence from the jury only when no evidence is introduced that would lead a reasonable person to find gross negligence." *Walls v. Arizona Dep't of Pub. Safety*, 170 Ariz.

591, 595 (Ct. App. 1991). When the plaintiff presents *some* evidence going to gross negligence, divesting the jury of the opportunity to weigh the issue is reversible error. *See, e.g., Noriega v. Town of Miami*, 243 Ariz. 320, 329 (Ct. App. 2017) (concluding that "there is sufficient evidence from which a jury could conclude that the Town was grossly negligent"); s*ee also Smith v. Chapman,* 115 Ariz. 211, 214 (1977) (same).

Here, Plaintiff has pleaded that the individual officers and firefighters had "reason to know facts which would lead a reasonable person to realize that his conduct . . . involves a high probability that substantial harm will result." *Luchanski v. Congrove*, 193 Ariz. 176, 180 (Ct. App. 1998). Put differently, Plaintiff pleaded enough to demonstrate that Mr. Alvarado's death was "the likely and not improbable result of the wrongful act." *Womack v. Preach*, 63 Ariz. 390, 397 (Ariz. 1945). For example, gross negligence has been found where first responders fail to take reasonable steps to ensure the safety of an arrestee. *See, e.g., Lerma v. City of Nogales*, 2014 WL 4954421, at *21 (D. Ariz. Sept. 30, 2014) (finding gross negligence where paramedics ignored the fact that arrestee had recently suffered a seizure). In other contexts, Arizona courts have found gross negligence under less extreme circumstances. *See, e.g., Allen v. Town of Prescott Valley*, 244 Ariz. 288, 292 (Ariz. Ct. App. 2018) (concluding that a reasonable juror could find gross negligence where a town failed to repair lights at a public park).

## IX. PLAINTIFF APPROPRIATELY SEEKS PUNITIVE DAMAGES AS TO HER SECTION 1983 COUNTS.

Defendants argue that punitive damages are inappropriate because there were several details indicating that Defendants acted in a compassionate and responsive manner, including that "officers called for medical assistance," paramedics "determined [Alvarado] was stable," and one of the Defendant officers – Gamez – "instructed officers to move Alvarado to the recovery position as soon as possible." Doc. 49 at 12. Defendants conveniently overlook a host of additional details alleged by Plaintiff: that one Defendant officer placed his knee on Alvarado's neck for a minute with Alvarado face-down, Doc. 1 at ¶¶ 107-08, that a second Defendant officer encouraged this behavior, *Id.* at ¶ 109, and that at least two officers responded dismissively when Alvarado pleaded "I can't breathe." *Id.* at ¶¶ 112-114, 121, 122, 127, 128. Notably, even Defendant Officer Gamez, who recognized that Mr. Alvarado was at heightened risk if restrained face-down, later remained silent as he observed his colleagues force Alvarado face-down a second time. *Id.* at ¶¶ 132-134.

As Plaintiff thoroughly alleges*, even after* officers heard Defendant Officer Gamez express his concern for Mr. Alvarado's wellbeing, several of the officers continued restraining Alvarado on his stomach. *Id.* at ¶ 116-118. Defendants held Alvarado in the unsafe prone position for at least three minutes before placing him in a "recovery" position*. Id.* at ¶ 112 (2 min. and 30 seconds); *Id.* at ¶ 116 (additional 30 seconds). This recovery position didn't last long: three minutes after placing Alvarado onto his side, officers *returned* Alvarado to the prone position. *Id.* at ¶¶ 132-133. Despite Alvarado warning that he could

not breathe on three occasions, several officers (including a sergeant) agreed to place two spit socks over Alvarado's head. Id. at ¶¶ 135, 137, 143. This is two layers of mesh material restricting Alvarado's ability to breathe.

Punitive damages have been upheld or otherwise allowed to proceed under similar circumstances. In *Swans v. City of Lansing,* for example, a suspect died after being restrained face-down in a hogtie fashion. Following the suspect's death, the jury awarded $3.1 million in punitive damages. The Court denied a motion to set aside the verdict and denied the request for a remittitur. *Swans v. City of Lansing*, 65 F. Supp. 2d 625, 631–32 (W.D. Mich. 1998). Closer to home, Judge Campbell allowed the question of punitive damages to be decided at trial where officers tased a man for 17 seconds, threw him to the ground after he exclaimed "I can't breathe," and briefly held him face-down with a knee pressed into his neck. *Mbegbu v. City of Phoenix*, 2017 WL 4679260, at *1–2 (D. Ariz. Oct. 18, 2017). Unlike here, Mr. Mbegbu was held face-down for a matter of seconds, not minutes. Even still, Judge Campbell determined that a jury could conclude "that the officers' conduct involved a 'reckless or callous indifference' to Mbegbu's constitutional rights." *Mbegbu*, 2017 WL 4679260, at *11 (*quoting Davis v. Mason Cnty.,* 927 F.2d 1473, 1485 (9th Cir. 1991)). Similarly, Judge Tuchi allowed a jury to consider punitive damages on a Fourth Amendment excessive force claim stemming from officers' tasing and restraint of a man who was high on methamphetamine and running in and out of traffic on a busy Phoenix street. *Rascon v. Brookins*, 2018 WL 783675, at *22 (D. Ariz. Feb. 8, 2018).

Defendants also argue that punitive damages should be stricken because the mere presence of this form of relief will "operate to make the discovery process lengthier and more intrusive." Doc. 49 at 12. "[T]he deterrence of future abuses of power by persons acting under color of state law is an important purpose of § 1983." *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 268 (1981); *see also Owen v. City of Independence,* 445 U.S. 622, 651 (1980) ("§ 1983 was intended . . . to serve as a deterrent"). Deterrence is especially important where, as here, Plaintiff has pleaded a long history of similar constitutional violations by the same agency. *See, e.g.,* Doc. 1 at ¶¶ 38-51. Defendants do not explain why the potential burden of future discovery precludes punitive damages at the 12(b)(6) stage. Defendants merely suggest that it would allow plaintiff's to discover details of each officer's personal finances. Should Plaintiff's discovery requests prove not to be "proportional to the needs of the case" or require Defendants to incur expenses that "outweighs its likely benefit," Defendants will avail themselves of the appropriate discovery tools. Fed. R. Civ. P. 26(b)(1). Dismissal is not appropriate simply because there exists a specter of future discovery burdens.

**X.     THE CITY OF TUCSON IS NOT ENTITLED TO SOVEREIGN IMMUNITY.**

Without explanation, Defendants assert that the City is entitled to sovereign immunity. To the extent that Defendants invoke the Eleventh Amendment, it does not apply to municipalities. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989) ("States are protected by the Eleventh Amendment while municipalities are not"). To the extent that Defendants invoke state-law sovereign immunity, the legislature partially waived the state's

immunity to the extent that a public employee's behavior "was grossly negligent." A.R.S. § 12-820.02. As explained above, Plaintiff has adequately pleaded gross negligence.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that Defendants' motion to dismiss be denied as to all counts.

Submitted this 27th day of August, 2022.

*/s Paul Gattone*
Paul Gattone
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2022, I electronically transmitted the attached document to the Clerk's office using the ECF system, which will automatically transmit the document to all counsel of record.

/s Paul Gattone