KM

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Irene Briseno, on her own behalf and as the personal representative of the estate of Damien Eryko Alvarado,

Plaintiff,

v.

City of Tucson, et al.,

Defendants.

No.  CV 22-00132-TUC-RCC

**ORDER**

Plaintiff Irene Briseno, on her own behalf and as the personal representative of the estate of Damien Eryko Alvarado, brought this civil rights action pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA) and invoked the Court's supplemental jurisdiction over her state law claim.  Defendants have filed a Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 49.)  The Motion is fully briefed.  (Docs. 54, 57.)  The Court will deny the Motion with respect to Counts One, Three, and Four; the claims against the paramedics in Count Seven; and the request for punitive damages.  The Court will grant the Motion with respect to Counts Two, Five, Six, Eight, and Nine, and claims against the police officers in Count Seven.

## I. Plaintiff's Complaint

Plaintiff names the following Defendants in her nine-count Complaint: the City of Tucson; Tucson Police Department (TPD) Officers Nicolo Solarino, Francisco Santa

Maria, Marco Durazo, Sean Yeandle, Henry Gamez, Donavan Vance, R. Ake, Joseph Gradias; TPD Sergeants Scott Ellis and Eric Evans; Tucson Fire Department (TFD) Paramedics Raymond Flex and Keith Goldstein; TFD Firefighter Silas Spencer; and private citizen Justin Canovali.  Plaintiff seeks money damages.

Plaintiff alleges the following facts. At about 5:15 p.m. on March 22, 2022, Alvarado was driving south on Campbell Avenue in Tucson when he collided with two other vehicles in the intersection at Prince Road.  (Compl., Doc. 1 at 9).  Alvarado exited his vehicle; checked on the wellbeing of the occupants of the other two vehicles; and left the scene on foot, traveling east along Prince Road.  (*Id.*)  Several eyewitnesses called 911 to report the accident, but none of the drivers or bystanders reported injuries to the first responders.  (*Id.*)  TFD personnel independently evaluated the other drivers, determined they were not injured, and reported this information to Defendants Durazo and Gamez, the police officers at the scene.  (*Id.*)  Defendant Gamez reported this information to other officers via radio.  (*Id.* at 10.)  Defendant Solarino "heard this broadcast and was aware that none of the vehicle occupants was injured." (*Id.*)  At this time, the officers were not aware of Alvarado's identity, did not have probable cause to believe he possessed a firearm or other weapon, and only suspected him of the misdemeanor offense of leaving the scene of an accident in which there are no injuries.  (*Id.* at 10–11.)

Defendant Canovali, who is a private citizen, and his son witnessed the accident, and "deputized themselves to investigate the misdemeanor crime that they believed Alvarado to have committed," and "took it upon themselves to canvass the surrounding area and question nearby civilians about Alvarado's whereabouts." (*Id.* at 11.)  They located Alvarado in an alley near Prince Road, lying on the ground and "speaking in an illogical fashion." (*Id.*)  Defendant Canovali "immediately recognized Alvarado's unusual behavior to be consistent with someone who is under the influence of drugs." (*Id.*)

Defendant Canovali spoke with Alvarado for several minutes, in a calm fashion, did not see a weapon on Alvarado, and did not feel threatened by Alvarado.  (*Id.* at 12.)  When Alvarado saw Defendant Solarino's patrol car enter the alley, he stood, ran toward a nearby

block wall, and began to scale the block wall.  (*Id.*)  Defendant Canovali grabbed Alvarado's leg to prevent him from escaping over the wall, as Defendant Solarino began to run toward the wall.  (*Id.*)  When Solarino reach the wall, he grabbed Alvarado's other leg. (*Id.* at 13.)  Defendant Solarino then "coordinated with Defendant Canovali, who was an unknown civilian at this time," and gave Canovali instructions on "how best to achieve their joint objective of pulling Alvarado down from the wall." (*Id.*)

After Solarino and Canovali pulled Alvarado down from the wall, Solarino recognized that Alvarado was under the influence of cocaine or methamphetamine.  (*Id.*) Solarino punched Alvarado three times with a closed fist in an attempt to subdue Alvarado. (*Id.*)  Defendant Canovali "continued collaborating with Defendant Solarino, now with the shared objective of subduing Alvarado on the ground," and "threw Alvarado to the ground" while Solarino readied his taser.  (*Id.* at 13–14.)  Defendant Solarino discharged the taser and two probes landed on Alvarado's bare skin. (*Id.* at 14.)  At this time "it was clear to Solarino that Alvarado did not have a weapon on his person." (*Id.*)

Defendants Yeandle, Gamez, and Ake arrived at the alley and, approximately 90 seconds after Defendant Solarino deployed his taser, Solarino, Yeandle, Ake, and Gamez "succeeded in placing Alvarado on his stomach and handcuffing him behind his back."  (*Id.* at 15.)  Defendants Solarino, Yeandle, Ake, and Gamez "recognized that Alvarado exhibited an unusual degree of strength for someone of Alvarado's size, indicating Alvarado was under the influence of either cocaine or methamphetamine." (*Id.*) Defendant Ake firmly placed his elbow on the back of Alvarado's neck as Alvarado was being handcuffed and then shifted his position to place his right knee on Alvarado's neck. (*Id.*) Ake kept his knee on Alvarado's neck for about a minute and Defendant Yeandle "encouraged Ake to place his knee on Alvarado's neck." (*Id.*)

Defendant Gradias then arrived at the alley, and the other four officers continued to hold Alvarado face down on the ground.  (*Id.* at 16.)  During this time, Alvarado made noises indicating he was in medical distress.  Two and a half minutes after he was placed on his stomach, Alvarado exclaimed "I can't breathe." (*Id.*)  Defendant Solarino, Yeandle,

1    Gamez, Ake, and Gradias heard the statement, and one Defendant responded "yes, you can.

2    You're talking." (*Id.*) Defendants did not adjust their restraint methods. (*Id.*)

3         Thirty seconds after Alvarado's statement, Defendant Gamez expressed concern for

4    Alvarado's wellbeing and said, "he's been in this downward position for a while.  He's

5    probably high, so we gotta get him on his side as soon as we can." (*Id.*)  Defendants Gamez,

6    Gradias, Yeandle, and Ake continued to pin Alvarado face down for an additional 60

7    seconds and further immobilized him with a Total Appendage Restraint

8    Procedure (TARP), which involves restraining a person's arms and legs in a "hogtie"

9    position. (*Id.* at 17.)  One minute after Gamez expressed concern, and 90 seconds after

10    Alvarado said he could not breathe, officers lifted Alvarado and placed him on his

11    side. (*Id.*)  After another minute and a half, Alvarado again exclaimed that he could not

12    breathe. (*Id.*)  Defendant Yeandle responded, "you can breathe just fine," and Solarino

13    said, "if you can complain, you can breathe." (*Id.* at 18.)

14         Defendant Solarino then ordered a second TARP restraint placed on Alvarado;

15    Defendant Yeandle agreed a second TARP restraint was necessary. (*Id.*)  None of the other

16    officers present "expressed concern for the plan to hogtie Alvarado a second time." (*Id.*)

17    As Yeandle and Solarino were applying the second TARP restraint, Alvarado again said,

18    "I can't breathe"; this was the third time Defendants Yeandle, Solarino, Ake, Gradias, and

19    Gamez heard Alvarado say this. (*Id.*)  Defendant Yeandle again told Plaintiff, "you can

20    breathe just fine," and Solarino told him, "stop complaining, stop talking, just start

21    breathing." (*Id.* at 19.)  At this time Defendant Gradias "stood approximately five feet

22    away, casually staring into the screen of his cell phone." (*Id.*)

23         By this time, Defendants Santa Maria, Durazo, and Ellis had arrived on the scene

24    and heard Alvarado's third declaration that he could not breathe; Ellis was the highest-

25    ranking officer present. (*Id.*)  While applying the second TARP restraint, Defendants

26    Yeandle and Solarino forced Alvarado back onto his stomach and Alvarado continued

27    making distress noises. (*Id.*)  Alvarado was not resisting officers in any way. (*Id.*) After

28    the second TARP restraint was applied, Defendant Ellis instructed officers to place a spit

1   sock over Alvarado's head.  (*Id.*)  A spit sock is a mesh cloth hood placed over the entirety
2   of a person's head to prevent the person from biting or spitting at officers.  (*Id.* at 20.)

3           TFD personnel were then permitted to examine Alvarado while he was wearing the
4   spit sock, which prevented them from seeing Alvarado's eyes or facial expressions while
5   evaluating him.  (*Id.*)  Defendants Durazo and Vance were kneeling next to Alvarado
6   during the entire medical evaluation.  (*Id.*)  TFD personnel Defendants Flex, Spencer, and
7   Goldstein evaluated Alvarado and "made the decision to place a second spit sock over the
8   first spit sock."  (*Id.* at 21.)  Alvarado was now in two TARP restraints and had two layers
9   of spit sock mesh over his head and face.  (*Id.*)  After an eight-minute medical evaluation,
10  Defendants Flex, Spencer, and Goldstein concluded Alvarado was medically stable and did
11  not need to be transported to the hospital.  (*Id.*)

12          "Almost immediately after Defendants Flex, [Spencer], and Goldstein packed up
13  their medical equipment and stepped away, Alvarado stopped moving and stopped making
14  noises."   (*Id.*)   Defendants Flex, Spencer, and Goldstein stayed on the scene for
15  approximately five minutes after their examination and "remained within 50 feet of
16  Alvarado," "casually chatting with their police officer colleagues about unrelated
17  matters." (*Id.* at 21-22.)  During this time, Defendants Vance and Durazo were within view
18  of Flex, Spencer, and Goldstein, but did not notify them that Alvarado had stopped moving,
19  did not check Alvarado for a pulse, and were not paying attention to Alvarado's breathing
20  or chest movements.  (*Id.* at 22.)  Defendants Evans and Santa Maria stood within 10 feet
21  of Alvarado, engaged in casual conversation about unrelated matters.  (*Id.*)  Defendants
22  Sergeants Evans and Ellis were in the immediate vicinity and gave no instructions and
23  expressed no concerns regarding Alvarado.  (*Id.*)  Defendants Ake, Gamez, Gradias,
24  Solarino, and Yeandle were nearby, talking about unrelated matters, "sometimes smiling
25  and joking." (*Id.* at 23.)

26          Eventually Defendant Santa Maria asked his colleagues, "is he still breathing?" but
27  neither Durazo nor Vance, who were crouched near Alvarado, had raised the concern.  (*Id.*)
28  Alvarado had no pulse, was not breathing, and had died of asphyxiation.  (*Id.*)  Alvarado

1    was transported to Banner University Medical Center and pronounced dead shortly
2    thereafter.  (*Id*.)

3        In **Count One**, Plaintiff alleges Defendants Solarino, Ake, Gamez, Gradias,
4    Yeandle, and Ellis violated Alvarado's Fourth Amendment rights to be free from excessive
5    force by pulling him off the wall, tasing him, punching him, and forcing him to the
6    ground (Solarino); placing their body weight on top of him when he was in a prone
7    position (Yeandle, Solarino, and Gamez); kneeling on his neck while handcuffing
8    him (Ake and Yeandle); placing a TARP restraint on him (Ake, Solarino, Gamez, Yeandle,
9    and Gradias); calling for the use of a spit sock although Alvarado was no longer resisting
10   and did not spit on officers (Ellis); and placing a second TARP restraint on him (Solarino,
11   Ake, Gamez, Gradias, Yeandle, and Ellis).  (*Id.* at 24–25.)

12       In **Count Two**, Plaintiff claims Defendants Solarino and Canovali conspired to use
13   excessive force on Alvarado, in violation of the Fourth Amendment.  Plaintiff claims
14   Solarino and Canovali acted in concert and communicated with one another, were in
15   agreement that their shared objective was to bring Alvarado off the block wall and seize
16   him; and "each committed an overt act in furtherance of that shared objective, by each
17   grabbing onto Alvarado."  (*Id.* at 27.)  Neither Canovali nor Solarino suspected Alvarado
18   of having a weapon or committing more than a non-violent misdemeanor. (*Id*.)

19       In **Count Three**, Plaintiff claims Defendant City of Tucson violated the Fourth and
20   Fourteenth Amendments by maintaining a "written policy and/or unwritten custom
21   permitting the use of six distinct procedures that, combined, proximately caused Alvarado's
22   death and were the moving force in violating his constitutional rights."  (*Id.* at 28.)  These
23   procedures are: (1) use of spit socks; (2) use of TARP restraints; (3) use of a taser on
24   suspects believed to be suffering from cocaine and/or methamphetamine intoxication; (4)
25   allowing officers to use their body weight on suspects suffering from cocaine and/or
26   methamphetamine intoxication, (5) kneeling on a suspect's neck, and (6) denying or
27   delaying paramedic treatment when the suspect is in visible medical distress and safely
28   restrained in handcuffs.  (*Id.* at 28–29.)

1     Plaintiff claims Defendant City of Tucson and TPD knew of the heightened risks of

2     using tasers, spit socks, and TARP restraints on individuals exhibiting signs of acute

3     methamphetamine and/or cocaine use but did not limit or restrict the use of these devices

4     in situations where a detainee is in medical distress or experiencing cocaine or

5     methamphetamine intoxication. (*Id*. at 29.)   Plaintiff contends the policies were the

6     moving force behind the violations of Alvarado's constitutional rights.  (*Id.* at 30.)

7          In **Count Four**, Plaintiff alleges Defendant City of Tucson and TPD were

8     "subjectively aware in March 2020 that there existed a risk of death among detainees who

9     are tased, forcibly held on the ground, retrained by all four limbs, and forced into a spit

10    sock," and that the risk of death increased for a detainee exhibiting signs of cocaine or

11    methamphetamine intoxication.  (*Id.* at 31.)  Plaintiff asserts that in March 2020, fewer

12    than 10 percent of TPD officers had been trained on "special considerations when detaining

13    an individual visibly showing the signs of cocaine or methamphetamine intoxication," and

14    the training that had been provided was inadequate.  (*Id.*)  Plaintiff argues the need for

15    more training was evident from a sharp increase in methamphetamine-related deaths and

16    the frequency of arrests of people displaying methamphetamine and/or cocaine

17    intoxication. (*Id.* at 33.)

18         In **Count Five**, Plaintiff raises an ADA claim against Defendant City of Tucson.

19    Plaintiff claims Alvarado had physical and mental impairments, specifically addiction to

20    controlled substances, that substantially limited his major life activities, meaning he was a

21    qualified individual with a disability.  (*Id*. at 35.)  Plaintiff contends that in March 2020,

22    the City of Tucson discriminated against Alvarado on the basis of his disabilities "by

23    forcibly holding him down for more than 15 minutes when it was clear that he was

24    experiencing a mental health emergency and posed no harm to officers or to the public"

25    and by not requesting "assistance from specially[ ]trained mental health professionals,

26    although [TPD officers] had the time and resources to do so."  (*Id.* at 36–37.)

27         In **Count Six**, Plaintiff claims the individual TDP Defendants violated the

28    Fourteenth Amendment by failing to intervene, despite having multiple opportunities to do

so, when Alvarado was making noises indicating medical distress and stating, "I can't breathe," or when Alvarado ceased moving just moments after TFD personnel concluded their medical check. (*Id.* at 37–38.)

In **Count Seven**, Plaintiff alleges all individual TPD and TFD Defendants were deliberately indifferent to a substantial risk of serious harm to Alvarado and to his serious medical needs, in violation of the Fourteenth Amendment.

In **Count Eight**, Plaintiff claims she is the biological mother of Alvarado and claims Defendants violated her Fourteenth Amendment right to familial association.

In **Count Nine**, Plaintiff alleges a state law claim for gross negligence in causing wrongful death, in violation of Arizona Revised Statutes section 12-611.

## II. Defendants' Motion to Dismiss

In their Motion to Dismiss, Defendants contend (1) Plaintiff has failed to include all necessary parties to this action, as required by Rule 19 of the Federal Rules of Civil Procedure and Rule 19 of the Arizona Rules of Civil Procedure; (2) they are entitled to qualified immunity as to Counts One, Two, Six, and Seven; (3) Plaintiff has failed to state a claim as to Counts Three, Four, Five, Eight, and Nine; and (4) Plaintiff is not entitled to punitive damages.

## III. Discussion

### A. Legal Standards

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). A pleading must contain "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted). To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## B.   Necessary Parties

### 1.   Motion to Dismiss

Defendants contend that because Plaintiff brings this action on behalf of Alvarado's estate and on her own behalf, but not on behalf of Alvarado's minor child, she has failed to include all necessary parties to this action, as required by Rule 19 of the Federal Rules of Civil Procedure and Rule 19 of the Arizona Rules of Civil Procedure. Defendants assert that pursuant to Arizona Revised Statutes section 12-612(A), a minor child is a necessary party to a wrongful death action because a minor child has a right, separate and apart from the estate, to bring a claim.

### 2.   Response

Plaintiff contends that while Alvarado's child is a beneficiary to the state law claim, and could have been a plaintiff to the wrongful death claim, the child is not a necessary and indispensable party under Rule 19. Plaintiff contends the minor child's legally protected interest would not be impaired by adjudicating this case without him and Defendants will not be vulnerable to piecemeal litigation. Plaintiff asserts that under Arizona Revised Statutes section 12-612(A), the statutory plaintiff sues "on behalf of the surviving husband or wife, children or parents, or if none of these survive, on behalf of the decedent's estate." (Pl.'s Resp., Doc. 54 at 5.) Plaintiff claims that because there is no surviving spouse, any recovery in this case would be distributed between "two sets of beneficiaries," Alvarado's parents and Alvarado's children. Plaintiff contends that in this

case, "Mr. Alvarado's only surviving parent [Plaintiff] voluntarily forfeited her share of any recovery under Count IX by choosing to sue *only* in her role as a personal representative."[1]   (*Id.* at 6.) Plaintiff also contends the wrongful death plaintiff has a fiduciary duty in "conducting and settling the action and making the distribution of proceeds," and that a non-party is not necessary under Rule 19 where the non-party is in a trustee relationship with an existing party.  (*Id.*)  Plaintiff claims that in this case, the fiduciary relationship between Plaintiff and the child "requires not only communication with the absent party, but also affirmative agreement in any future settlement."  (*Id.*)

Finally, Plaintiff contends that Defendants face no risk of piecemeal litigation because Arizona's wrongful death statutes permits only one action for wrongful death and requires claims by all statutory beneficiaries to be consolidated into a single action.  (*Id.* at 7.)

### 3.   Discussion

Plaintiff brings this action on her own behalf and as the personal representative of Alvarado's estate.  Arizona law creates statutory remedies for claims that survive death (surviving claims) and for wrongful death claims (wrongful death).

Rule 19(a)(1)(B) of the Federal Rules of Civil Procedure requires joinder of a party if:

> that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i)   as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii)  leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

### a.   Counts One Through Seven – Surviving Claims

---

[1] This assertion is not reflected in the Complaint.  In Count Nine, Plaintiff raises a claim for gross negligence causing wrongful death under Arizona Revised Statutes section 12-611 and states, "Plaintiff is entitled to compensatory damages under this Count."  (Doc. 1 at 43.)

The Arizona survival statute provides that a cause of action "shall survive the death of the person entitled thereto . . . and may be asserted by . . . the personal representative of such person."  Ariz. Rev. Stat. § 14-3110.  "Under Arizona law, a claim under the survival statute may be brought only by a decedent's estate."  *Gotbaum v. City of Phoenix*, 617 F. Supp. 2d 878, 883 (D. Ariz. 2008).  The enactment of the survival statute "extended the right of a decedent's personal representative to pursue the decedent's personal injury claim against a tortfeasor."  *Quintero v. Rogers*, 212 P.3d 874, 877 (Ariz. 2009).

Counts One through Seven of the Complaint, which are claims for injury to Alvarado and survive his death, may *only* be brought by Plaintiff as the personal representative of Alvarado's estate.  Alvarado's minor child is not a necessary party to these claims.

### b.      Count Eight – Plaintiff's Familial Association Claim

Plaintiff brings Count Eight in her personal capacity, as Alvarado's mother. Accordingly, Alvarado's minor child is not a necessary party to this claim.

### c.      Count Nine – Wrongful Death Claim

The Arizona courts have explained that "[a] wrongful death action is an original and distinct claim for damages sustained by the statutory beneficiaries and is not derivative of or a continuation of a claim existing in the decedent."  *Barragan v. Super. Ct. of Pima Cnty.*, 470 P.2d 722, 724 (Ariz. Ct. App. 1970).  Such an action "is for the wrong to the beneficiaries, confined to their loss because of the death."  *Id.* at 725.

Under Arizona's wrongful death statute,

> An action for wrongful death shall be brought by and in the name of the surviving husband or wife, child, parent or guardian, or personal representative of the deceased person for and on behalf of the surviving husband or wife, children or parents, **or if none of these survive**, on behalf of the decedent's estate.

Ariz. Rev. Stat. § 12-612(A) (emphasis added).

Plaintiff, as the personal representative of Alvarado's estate, is statutorily authorized to bring a wrongful death action.  However, Arizona's wrongful death statute requires the

action to be brought "for and on behalf" of the surviving child.  It is only when no spouse, child, or parent survives that the lawsuit may be filed "for and on behalf of" the estate.  *See Watchman-Moore v. United States*, No. CV-17-08187-PCT-BSB, 2018 WL 4522925, at *4 (D. Ariz. Apr. 13, 2018), *report and recommendation adopted*, No. CV-17-08187-PCT-BSB, 2018 WL 3083848 (D. Ariz. Jun. 22, 2018); *see also Bowslaugh v. Bowslaugh*, 617 P.2d 25, 27 (Ariz. 1979) (strictly construing the list of beneficiaries in section 12-612(A) and not allowing estate to bring a wrongful death claim when the decedent's mother survived); *Solomon v. Harman*, 489 P.2d 236, 240 (Ariz. 1971) (holding that the estate is a beneficiary "only if none of those named beneficiaries survive").  Accordingly, Plaintiff is not statutorily authorized to bring a claim on behalf of the estate under section 12-612(A).  The Court must dismiss Count Nine without prejudice.

### C.    Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In deciding if qualified immunity applies, a court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009).  Courts have discretion in deciding which of these two prongs to address first depending on the circumstances.  *Id.*

For a right to be clearly established, there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)).  A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 580 U.S. at 79).  If there is no Supreme Court or Circuit Court precedent, courts

1    "'look to whatever decisional law is available to ascertain whether the law is clearly

2    established' for qualified immunity purposes, 'including decisions of state courts, other

3    circuits, and district courts.'"  *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004)

4    (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003)).

5         Issues of qualified immunity are best resolved at the "earliest possible stage in

6    litigation."  *Pearson*, 555 U.S. at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

7    Whether a reasonable officer could have believed his conduct was proper is a question of

8    law for the Court and should be determined at the earliest possible point in the

9    litigation.  *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 872–73 (9th Cir. 1993).

10   Additionally, the law is well established in the Ninth Circuit that "where it is or should be

11   apparent to the officers that the individual involved is emotionally disturbed [or mentally

12   ill], that is a factor that must be considered in determining . . . the reasonableness of the

13   force employed."  *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).  "Because

14   questions of reasonableness are not well-suited to precise legal determination, the propriety

15   of a particular use of force is generally an issue for the jury."  *Chew v. Gates*, 27 F.3d 1432,

16   1440 (9th Cir. 1994) (citations omitted).

17            **1.    Qualified Immunity – Count One – Excessive Force**

18                 **a.    Motion to Dismiss**

19        Defendants assert they are entitled to qualified immunity with respect to the

20   excessive force claims in Count One and Plaintiff has the burden of proving the officers'

21   fact-specific use of force violated clearly established law.  (Doc. 49 at 5).  Defendants

22   contend that to satisfy the particularity standard, Plaintiff must show clearly established

23   law with facts "sufficiently similar to Defendants' conduct to put the officers on notice that

24   their use of force was unreasonable and would violate Plaintiff['s] constitutional

25   rights."  (*Id.*)

26        Defendants claim first that although the Complaint concludes the officers only

27   pursued Alvarado for a misdemeanor offense because the accident resulted in no reported

28   injuries, this conclusion "disregards the effect Plaintiff's flight would itself have on the

formulation of reasonable suspicion."  (Doc. 49 at 6.)  Defendants contend that any experienced police officer would conclude a person fleeing from an accident scene "does so for a reason" that might constitute a felony such as driving under the influence (DUI) with a suspended license or with previous DUI convictions.  (*Id.*)  Defendants argue the Complaint also fails to consider "the fluid nature of the incident."  (*Id.*)  For example, Defendants claim it is clear from the Complaint that Solarino "did not strike Alvarado three times because he was investigating a misdemeanor," but because, by that time, Alvarado had attempted to flee and was, "apparently, engaged in an active struggle with Officer Solarino and a civilian."  (*Id.* at 7.)

Defendants argue that the reasonableness of the use of force must be evaluated on the totality of the circumstances and that the force used in this case was reasonable.  (*Id.*)  Defendants note that according to the Complaint, Alvarado was engaged "in active flight from police after a traffic accident involving other vehicles"; Defendant Solarino recognized nearly immediately that Alvarado was under the influence of drugs, which would affect the severity of the crime; Alvarado fled upon seeing Solarino's patrol car; Alvarado tried to pull away and escape from Solarino; and Alvarado struggled with Solarino once on the ground.  Defendants contend Solarino used minimal force by seizing Alvarado's leg to prevent his escape and striking him three times during the struggle on the ground.  (*Id.*)  After Defendant Solarino was unable to secure Alvarado during the struggle, he used his taser to deliver two shocks to Alvarado.  Defendants claim use of a taser in that circumstance "reduces the overall amount of force ultimately required to subdue a suspect because it shortens the duration of the encounter."  (*Id.*)

Other uses of force alleged in the Complaint include Defendant Yeandle's use of his body weight to hold Alvarado in place while handcuffing him; Defendant Ake placing his elbow on the back of Alvarado's neck and subsequent shifting to place his right knee on Alvarado's neck; Defendant Gamez helping to hold Alvarado while restraints were applied; and Defendant Ellis telling the officers to place a spit sock on Alvarado's head.  (*Id.* at 8.)

1    Defendants argue the use of TARP restraints does not constitute excessive force

2    when necessary "to restrain a person who physically struggled with police."  (*Id.* (citing

3    *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir 2007)).)  According to the

4    Complaint, suspects under the influence of methamphetamine and/or cocaine often exhibit

5    superhuman strength and, Defendants contend, "[g]iven the difficulty officers had

6    restraining Alvarado, it is reasonable that they would apply the TARP restraint to limit his

7    ability to struggle further" because a struggling handcuffed person poses a threat to officers

8    and to himself.  (*Id.*)  Defendants claim Defendants Gradias, Santa Maria, Durazo, Evans,

9    and Vance are not alleged to have used force against Alvarado and Plaintiff therefore fails

10   to state a claim against them.  (*Id.*)

11                 **b.    Response**

12   Plaintiff contends the Complaint adequately pleads Defendants used excessive force

13   on Alvarado.  Plaintiff argues that the excessive force analysis turns on what officers knew

14   at the time of the incident.  As pleaded in the Complaint, "the only crime for which

15   Alvarado was suspected was fleeing the scene of an accident," and Defendants did not have

16   prior knowledge of Alvarado or any possible criminal history.  (Doc. 54 at 9.)  Plaintiff

17   further asserts that although Alvarado was high on drugs and acting illogically, he was not

18   threatening to cause a safety issue, was unarmed, and did not pose an immediate danger to

19   officers or civilians.  Plaintiff contends that for most of the police encounter, Alvarado was

20   fully secured in handcuffs and restraints and "any apparent resistance . . . was on account

21   of his g[]asping for air while being restrained face-down."  (*Id.* at 11.)

22   Plaintiff claims clearly established Ninth Circuit law holds officers "violate the

23   Fourth Amendment rights of an unarmed misdemeanant where—in the process of trying

24   to handcuff him—they pile on top of him with their body weight and apply a knee to the

25   back of the neck."  (*Id.* at 12 (citing *Blankenhorn*, 485 F.3d 469).)  Plaintiff contends other

26   Ninth Circuit cases have held similarly.  *See Drummond*, 343 F.3d at 1054; *Slater v.*

27   *Deasey*, 789 F. App'x 17, 19 (9th Cir. 2019); *Arce v. Blackwell*, 294 F. App'x 259, 261 (9th

28   Cir. 2008).

1

### c.   Discussion

2      The use of excessive force by police officers in the course of an arrest can violate

3  the arrestee's Fourth Amendment right to be free from unreasonable seizures.  *See White*

4  *by White v. Pierce Cnty.*, 797 F.2d 812, 816 (9th Cir. 1986).  The Fourth Amendment does

5  not prohibit the use of reasonable force.  *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090,

6  1095 (9th Cir. 2006).  Whether the force was excessive depends on "whether the officers'

7  actions [were] 'objectively reasonable' in light of the facts and circumstances confronting

8  them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490

9  U.S. 386, 397 (1989); *Tatum*, 441 F.3d at 1095; *Lolli v. Cnty. of Orange*, 351 F.3d 410,

10  415 (9th Cir. 2003).  The Court must balance the nature and quality of the intrusion against

11  the countervailing governmental interests at stake.  *Graham*, 490 U.S. at 396;  *Lolli*, 351

12  F.3d at 415.  Moreover,

13
14
15
16

> [t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . .  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.

17  *Graham*, 490 U.S. at 396 (citations omitted).  "Whether a particular use of force was

18  'objectively reasonable' depends on several factors, including the severity of the crime that

19  prompted the use of force, the threat posed by a suspect to the police or to others, and

20  whether the suspect was resisting arrest."  *Tatum*, 441 F.3d at 1095.

21      In the Complaint, Plaintiff contends the force used on Alvarado was objectively

22  unreasonable because Alvarado was suspected of having only committed a misdemeanor

23  offense; he did not pose a threat to officers or others despite the fact that he was fleeing;

24  and the use of force (double restraints and double spit socks) continued after Alvarado was

25  immobilized and no longer resisting.  These allegations are sufficient to state a Fourth

26  Amendment excessive force claim against Defendants Solarino, Ake, Gamez, Gradias,

27  Yeandle, and Ellis.[2]

28

_____

[2] Plaintiff's Complaint does not name the remaining Defendant police officers in

1    Accordingly, the Court next considers whether Defendants are entitled to qualified

2    immunity on this claim.   Both parties cite *Blankenhorn* in support of their positions.

3    Defendants contend *Blankenhorn* holds the use of TARP (or hobble) restraints does not

4    constitute excessive force when necessary to restrain a person who physically struggled

5    with police.  485 F.3d at 479.  Plaintiff claims *Blankenhorn* holds officers violate the Fourth

6    Amendment where, in the process of trying to handcuff an "unarmed misdemeanant," they

7    pile on top of him with their body weight and apply a knee to the back of the neck.  *Id.*

8    at 469.

9    *Blankenhorn* involved the arrest of a man suspected of misdemeanor trespass who,

10   when he refused to kneel and be handcuffed, was immediately tackled by three officers.

11   The man struggled for several moments before officers brought him to the ground, but once

12   on the ground, did not attempt to prevent officers from handcuffing him.   One officer

13   punched him several times, one or more officers pushed his face into the pavement by

14   "shoving a knee into the back of his neck," and the officers then placed "hobble restraints

15   on his ankles, which made it difficult for Blankenhorn to move and breathe."  *Id.* at 478.

16   The Ninth Circuit concluded that if Blankenhorn could "prove the events as set forth above,

17   some or all of the Defendants would probably be liable for excessive force, both in their

18   'gang tackling,' use of hobble restraints, and in [one officer's] punching of

19   Blankenhorn." *Id.*  The Ninth Circuit further found that "in some situations, the need to

20   maintain control of a person who physically struggled while being taken into custody might

21   reasonably call for the use of hobble restraints." *Id.* at 479.  However, it also found that a

22   court must ask whether Defendant officers "acted in bad faith or engaged in 'provocative'

23   conduct when arresting [the suspect]." *Id.*  At this early stage of the case and without a

24   more developed factual record, *Blankenhorn* does not support Defendants' argument for

25   qualified immunity.

26   Further, in *Drummond*, the Ninth Circuit found that kneeling on the back and neck

27   of a compliant detainee, and pressing the weight of two officers' bodies on him even after

28   _____

Count One.

- 17 -

he complained that he was choking and in need of air, violates clearly established law, and that reasonable officers would have been aware that such was the case."  343 F.3d at 1062 (noting prior federal cases describing the dangers of pressure on a prone, bound, and agitated detainee).  While the Complaint states Alvarado initially struggled and attempted to evade the officers, and those circumstances might have rendered the initial use of force reasonable, "it is equally true that even where some force is justified, the amount actually used may be excessive."  *Id.* at 1058.  In this case, Defendants not only applied a TARP restraint to Alvarado and then kept him in a prone position after he stated he could not breathe, but they also allegedly applied a *second* TARP restraint and *two* spit socks over his head.  Construing the facts in the light most favorable to Plaintiff, Defendants are not entitled to qualified immunity on Plaintiff's excessive force claims in Count One.  *See Slater*, 789 F. App'x at 20–21 (finding that application of a second and third hobble restraint to a person who was already "hogtied" was excessive).  The Court will deny the Motion to Dismiss as to Count One.

### 2.    Qualified Immunity – Count Two – Conspiracy

#### a.    Motion to Dismiss

Defendants assert Plaintiff has failed to state a conspiracy claim in Count Two because "the Complaint does not plead sufficient facts to support that Solarino's actions— using a citizen's assistance to prevent Alvarado's escape—constituted a conspiracy with that civilian to violate Alvarado's constitutional rights."  (Doc. 49 at 9.)

#### b.    Response

Plaintiff contends "it is not the preventing of Alvarado's escape that created the illegal conspiracy, but rather the manner of subduing him."  (Doc. 54 at 13.)  Plaintiff asserts a civil conspiracy is a combination of two or more persons who, by concerted action, act to accomplish an unlawful objective.  In this case, Defendants Solarino and (private citizen) Canovali acted together to use force on Alvarado despite both knowing force was unnecessary because they believed Alvarado to be unarmed and non-dangerous.  (*Id.* at 14.)  Plaintiff asserts the co-conspirators were motivated by the common objective of arresting

1    Alvarado and seizing him through use of a taser.

2                              **c.**     **Discussion**

3           To state a § 1983 claim for conspiracy between a private party and state actors, a

4    Plaintiff must allege facts that, if assumed true, demonstrate an agreement or "meeting of

5    the minds" to violate constitutional rights.  *United Steelworkers of Am. v. Phelps Dodge*

6    *Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989); *Fonda v. Gray*, 707 F.2d 435, 438 (9th

7    Cir. 1983).  "To be liable, each participant in the conspiracy need not know the exact details

8    of the plan, but each participant must at least share the common objective of the

9    conspiracy."  *United Steelworkers of Am.*, 865 F.2d at 1541.

10          In this case, the key inquiry is whether Defendant Canovali shared a "common

11   objective" with Defendant Solarino to use excessive or unreasonable force against

12   Alvarado.  In the Complaint, Plaintiff states, "Defendants Canovali and Solarino were in

13   agreement that their shared objective was to bring Alvarado off the block wall, and to seize

14   him."  (Doc. 1 ¶ 27.)  Plaintiff further alleges, "Defendants Canovali and Solarino each

15   committed an overt act in furtherance of that shared objective, by each grabbing onto

16   Alvarado."  (*Id.* ¶ 28.)  The "common objective" to seize or subdue Alvarado is insufficient

17   to support a conspiracy claim because seizing or subduing, without the use of unreasonable

18   force, would not violate Alvarado's constitutional rights.  *See Crowe v. Cnty. of San Diego*,

19   608 F.3d 406, 440–41 (9th Cir. 2010).  Plaintiff claims Solarino "coordinated" with and

20   instructed Canovali, but Plaintiff's facts do not support that Canovali shared the common

21   objective of using unreasonable or excessive force.  *See Fonda*, 707 F.2d at 438 (mere

22   acquiescence to government action is insufficient, without more, to establish a conspiracy).

23   Accordingly, Plaintiff fails to state a claim in Count Two and the Court will grant the

24   Motion to Dismiss with respect to Count Two.

25          **3.**     **Qualified Immunity – Count Six – Failure to Intervene**

26                              **a.**     **Motion to Dismiss**

27          Defendants contend that while the officer Defendants were present throughout

28   Alvarado's seizure, Plaintiff has not demonstrated that, at the time of incident, "the law was

clearly established that restraining a suspect in the recovery position pending medical assessment was a violation of Alvarado's constitutional rights." (Doc. 49 at 9.) Defendants argue that, to the contrary, the Ninth Circuit in *Tatum* held it was objectively reasonable for officers to place a suspect on his stomach for approximately 90 seconds before moving him to his side and that the suspect was adequately monitored even though officers did not notice when his breathing ceased. (*Id.* (citing *Tatum*, 441 F.3d at 1097).) Defendants claim they are entitled to qualified immunity for Count Six.

### b.    Response

Plaintiff contends she has adequately pleaded that the Defendant police officers failed to intervene to prevent injury to Alvarado when they were present at the scene for more than fifteen minutes while Alvarado was "hogtied" with two devices, had two layers of spit socks placed on his head, was held facedown with full body weight on his back and/or with an elbow and then a knee to his neck, and was repeatedly denied placement in a safe recovery position. (Doc. 54 at 16.)

### c.    Discussion

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996). Officers can be held liable for failing to intercede only if they had an opportunity to intercede. *See Bruner v. Dunaway*, 684 F.2d 422, 426–27 (6th Cir. 1982) (holding that officers who were not present at the time of the alleged assault could not be held liable in a § 1983 action); *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990) (granting arresting officers' motion for summary judgment because the officers had no "realistic opportunity" to prevent an attack committed by another officer).

Plaintiff's failure to intervene claim is made against "all individual police Defendants," without any factual specificity as to what any particular Defendant did or failed to do. This is insufficient. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)) (upholding

dismissal of *Bivens* complaint that referred to all defendants "generally and categorically" because the plaintiff had failed to "'allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right'"); *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("Given the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed.").

Plaintiff's allegation that the officer Defendants were present and failed to intervene is insufficient to support that *each* officer was aware that the use of force was excessive, and had an opportunity to intervene, but failed to do so.  Plaintiff therefore fails to state a claim in Count Six and the Court will grant the Motion to Dismiss with respect to Count Six.  Because the Court bases this decision only on insufficiencies in pleading, the Court declines to rule on the issue of qualified immunity for these claims.

### 4.      Qualified Immunity – Count Seven – Fourteenth Amendment
#### a.      Motion to Dismiss

Defendants claim TFD personnel Fleck, Spencer, and Goldstein are entitled to qualified immunity because Plaintiff has failed to state a Fourteenth Amendment claim against them for deliberate indifference to Alvarado's serious medical needs.  Defendants note that the Complaint alleges these Defendants spent eight minutes evaluating Alvarado before determining he was stable, but does not allege the medical evaluation indicated Alvarado had a serious medical need or that paramedics were aware Alvarado was in distress but failed to act.  Defendants assert the Complaint alleges, at most, that the paramedics were negligent in failing to notice and investigate the changes in Alvarado's behavior and that negligence "cannot meet the required showing for deliberate indifference."  (Doc. 49 at 4.)  Defendants argue, "vitally, there is no contention that paramedics were incorrect in their medical evaluation; based on the information in the Complaint, Alvarado was medically stable at the time he was evaluated and, at some point within the five minutes following the evaluation, he suffered cardiac arrest."  (*Id.*)

1  Accordingly, Defendants contend Fleck, Spencer, and Goldstein are entitled to qualified

2  immunity.

3      Defendants further argue that under *Tatum*, officers are not deliberately indifferent

4  when they call for medical care, even if they themselves did not provide any treatment.

5  **b.**    **Response**

6      Plaintiff contends she has adequately pleaded the Defendant paramedics were

7  deliberately indifferent to a serious risk of harm to Alvarado under the Fourteenth

8  Amendment and that the Defendant police officers violated her right to be free from

9  punishment as a pretrial detainee.

10  **c.**    **Discussion**

11  **i.**    **Paramedics**

12      The Ninth Circuit has held that "claims for violations of the right to adequate

13  medical care 'brought by pretrial detainees against individual defendants under the

14  Fourteenth Amendment' must be evaluated under an objective deliberate indifference

15  standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (quoting

16  *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016)).  To state a medical care

17  claim, a pretrial detainee must show

18        (i) the defendant made an intentional decision with respect to

19        the conditions under which the plaintiff was confined; (ii) those
      conditions put the plaintiff at substantial risk of suffering

20        serious harm; (iii) the defendant did not take reasonable
      available measures to abate that risk, even though a reasonable

21        official in the circumstances would have appreciated the high

22        degree of risk involved—making the consequences of the
      defendant's conduct obvious; and (iv) by not taking such

23        measures, the defendant caused the plaintiff's injuries.

24  *Id.* at 1125.  "With respect to the third element, the defendant's conduct must be objectively

25  unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each

26  particular case.'"  *Castro*, 833 F.3d at 1071 (quoting *Kingsley v. Hendrickson*, 576 U.S.

27  389, 397 (2015); *Graham*, 490 U.S. at 396).

28      The "'mere lack of due care by a state official' does not deprive an individual of life,

- 22 -

liberty, or property under the Fourteenth Amendment." *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)).  A plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*  A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

Plaintiff alleges that during the course of their medical evaluation, during which time Alvarado indicated he was in medical distress, Defendants Fleck, Spencer, and Goldstein "made the decision to place a second spit sock over the first spit sock." (Doc. 1 ¶ 143.)  Plaintiff also claims Defendants Fleck, Spencer, and Goldstein "were subjectively aware of the fact that Alvarado was experiencing a medical emergency and nevertheless recommended to the Individual Police Defendants that he not be transported to a hospital." (*Id.* ¶ 245).  These allegations indicate the paramedic Defendants made an intentional decision that may have placed Plaintiff at substantial risk of suffering serious harm and failed to take action to abate the risk. Therefore, these allegations are sufficient to state a Fourteenth Amendment claim.  Whether the placement of a second spit mask on Alvarado and refusal to transport him to the hospital were objectively unreasonable in light of the circumstances are questions of fact and cannot be resolved at this early stage.  With respect to qualified immunity, neither Plaintiff nor Defendants address whether application of a second spit sock violates clearly established the law.  The Court therefore finds Defendants Fleck, Spencer, and Goldstein are not entitled to qualified immunity at this time.

The Court will deny the Motion to Dismiss as to Defendants Fleck, Spencer, and Goldstein in Count Seven.

### ii.    Police Officers

With respect to the Defendant police officers, the Ninth Circuit has concluded that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment." *Tatum*, 441 F.3d at 1099.  Plaintiff

1    has therefore failed to state a claim in Count Seven with respect to the Defendant police

2    officers' provision of medical care.

3           Plaintiff also alleges in Count Seven that not only did the officers fail to provide

4    adequate medical care, but they also subjected Alvarado—who Plaintiff contends became

5    a pretrial detainee the moment he was seized—to two TARP restraints and a spit sock with

6    "the subjective intent of punishing Alvarado" and without a legitimate penological

7    justification.

8           Caselaw is clear that the Fourteenth Amendment applies to pretrial incarceration

9    after arrest, *Gordon*, 888 F.3d at 1124–25, and that claims excessive force during arrest are

10   evaluated only under the Fourth Amendment, *Graham*, 490 U.S. at 395 ("[A]ll claims that

11   law enforcement officers have used excessive force . . . in the course of an arrest,

12   investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

13   Amendment and its 'reasonableness' standard.").

14          As an initial matter, it is unclear whether, or at what point, Alvarado was arrested.

15   While the Ninth Circuit has not addressed whether the Fourth Amendment extends past the

16   point of arrest, other courts have determined that "it is appropriate to use a Fourth

17   Amendment framework to analyze excessive force claims arising out of incidents occurring

18   shortly after arrest" because those incidents "occur in the course of a seizure of a free

19   citizen." *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011) (quotations omitted);

20   *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008) (applying the Fourth Amendment

21   to analyze whether, after the threat of serious physical harm had passed, officers'

22   application of weight to arrestee's upper torso was constitutionally unreasonable).

23   Accordingly, the Defendant police officers' continued restraint of Alvarado throughout the

24   encounter are part of the Fourth Amendment excessive force claim and not a separate

25   Fourteenth Amendment claim.

26          The Court will therefore grant the Motion with respect the Defendant police officers

27   in Count Seven.

28          **D.    Failure to State a Claim**

- 24 -

1          **1.     Counts Three and Four – City of Tucson**

2          Defendant City of Tucson claims it is entitled to judgment on Plaintiff's *Monell*

3    claims in Count Three (policies allowing the use of TARP restraints) and Count Four

4    (failure to train) because there is no underlying constitutional violation.  (Doc. 49 at 13.)

5    Because the Court will deny the Motion to Dismiss as to Plaintiff's excessive force claims

6    in Count One, the Court will also deny the Motion with respect to Counts Three and Four.

7          **2.     Count Five - ADA**

8               **a.     Motion to Dismiss**

9          Defendants argue Plaintiff fails to state an ADA claim in Count Five against

10   Defendant City of Tucson. Defendants assert the Tenth Circuit Court of Appeals has

11   identified two types of ADA claims related to arrest: law enforcement conduct that

12   mistakes the effects of a disability for criminal conduct, and the failure to accommodate a

13   disability during the course of arrest.  Defendants claim neither applies to this case because

14   there is no indication officers were aware of Alvarado's addiction or familiar with Alvarado

15   before the incident, and because "the way that officers interacted with Alvarado was

16   objectively reasonable." (Doc. 49 at 11.)

17              **b.     Response**

18         Plaintiff argues the Fourth Amendment and ADA provide separate bases for relief

19   and, even if officers are found to have acted reasonably under the Fourth Amendment, an

20   ADA claim could still be found because the "Supreme Court and Ninth Circuit

21   acknowledged that the fate of an arrest-related ADA claim is not tied to the fate of the

22   Fourth Amendment claim." (Doc. 54 at 22 (citing *Sheehan v. City & Cnty. of San*

23   *Francisco*, 793 F.3d 1009 (9th Cir. 2015)).)  Plaintiff further contends she has adequately

24   pleaded an ADA claim because Alvarado was a "qualified person with a disability" that

25   substantially limited one or more major life activities.  (*Id.*)  Plaintiff claims Alvarado was

26   found lying on the ground in an illogical fashion, exclaimed he could not breath, made

27   noises of distress throughout the arrest, and struggled with long-term drug addiction, which

28   qualifies as a disability under the ADA.  (*Id.* (citing *Thompson v. Davis*, 295 F.3d 890, 894

(9th Cir. 2002)).)  Plaintiff asserts that at this stage of the litigation, she is required to allege facts identifying a specific aliment but is not required to provide evidence that includes "excruciating details as to how the plaintiff's capabilities have been affected by the impairment."  (*Id.* at 24 (citing *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 24 (1st Cir. 2002)).)  Plaintiff contends "there must be evidence of a 'specific, recognized mental or physical illness,'" and she is only required to plead that Alvarado "suffered from symptoms on more than just a single day."  (*Id.* (citing *Breasaz v. Cnty. of Santa Clara*, 136 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015)).)

### c.    Discussion

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Assuming without deciding that Plaintiff has adequately alleged Alvarado suffered from a qualifying disability, namely drug addiction, Plaintiff does not allege facts supporting that any of the officers were aware of Alvarado's condition or need for accommodations.  *See Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (9th Cir. 2007) ("Before a public entity can be required under the ADA to provide a disabled individual an auxiliary aid or service, a public entity must have knowledge of the individual's disability and the individual's need for an accommodation" either because "that disability is obvious or because the individual (or someone else) has informed the entity of the disability.").  Plaintiff alleges officers encountered Alvarado in a state of drug intoxication but offers no facts showing officers were aware Alvarado was suffering the physical and mental effects of long-term drug addiction, or that he required specific accommodations for that disability.  To the extent Plaintiff claims the failure to provide Alvarado with adequate medical care for drug intoxication violates the ADA, this allegation fails to state a claim because "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability."  *Simmons v. Navajo Cnty.*, 609 F.3d

1011, 1022 (9th Cir. 2010), *overruled in part on other grounds by Castro*, 833 F.3d at 1060.  Moreover, Plaintiff does not allege the officers intentionally discriminated against Alvarado *because of* his disability.  *See Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998) (in order to state a claim for damages, the plaintiff must also show discriminatory intent on the part of the defendants).

Plaintiff has failed to state an ADA claim and the Court will grant the Motion to Dismiss with respect to Count Five.

### 3.     Count Eight – Fourteenth Amendment Substantive Due Process

#### a.     Motion to Dismiss

In Count Eight, Plaintiff raises a substantive due process claim on her own behalf, claiming that the "Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of her child."  (Doc. 1 at 42.)  Defendants argue that while the Ninth Circuit has recognized a liberty interest in Plaintiff's relationship with Alvarado, her son, that may be vindicated through a § 1983 claim, the Seventh Circuit has since determined "there is no such interest absent a state action aimed specifically at interfering with the relationship." (Doc. 49 at 11 (citing *Russ v. Watts*, 414 F.3d 783, 787 (7th Cir. 2005)).)  Defendants further assert that even if Plaintiff can bring the claim on her own behalf, the conduct at issue does not shock the conscience.  Finally, Defendants claim that if Count Eight goes forward, Alvarado's minor son is a necessary party because "as with Plaintiff's wrongful death claim, it would be prejudicial to Defendants and, potentially the minor child, to adjudicate this matter without his participation." (*Id.* at 12.)  Defendants contend that they "should not be left in a position to wait for a future, identical claim to be brought by a minor," who may be entitled to a tolling period due to his age, and that "the minor's rights might be affected by a judgment on the merits that has the effect of res judicata." (*Id.*)

#### b.     Plaintiff's Response

Plaintiff asserts she has adequately pleaded that Defendants' actions shocked the conscience.  According to Plaintiff, there are two tests for determining whether an officer's

1    conduct shocks the conscience.  The "more demanding" test applies where the incident
2    calls for fast, decisive action.  The other test applies where, as in this case, the incident in
3    question was not fast paced and did not require hasty decision-making by Defendants.  To
4    the contrary, Plaintiff argues, the situation unfolded slowly over 15 minutes, with "at least
5    ten police officers on scene during critical moments, almost all of them with their attention
6    turned toward Mr. Alvarado."  (Doc. 54 at 17.)  Plaintiff argues that she can prevail on her
7    claims by demonstrating that the individual officers acted with deliberate indifference to a
8    substantial risk of serious harm and their actions therefore shocked the conscience.

9                              **c.    Discussion**

10         The Ninth Circuit has recognized a Fourteenth Amendment liberty interest to
11   familial association and the Court is bound by that precedent.  *See Porter v. Osborn*, 546
12   F.3d 1131, 1137 (9th Cir. 2008); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir.
13   1991) ("[A] parent has a constitutionally protected liberty interest under the Fourteenth
14   Amendment in the companionship and society of his or her child.").  Only conduct that
15   "shocks the conscience" is cognizable as a due process violation.  *See Porter*, 546 F.3d at
16   1137.  Where officers face quickly evolving situations that present competing public safety
17   obligations, the Court applies a "purpose to harm standard" in which the officer's conduct
18   shocks the conscience only where the officer acted with a "purpose to harm . . . that was
19   unrelated to legitimate law enforcement objectives." *Id*.  In circumstances where "extended
20   opportunities to do better are teamed with protracted failure even to care," then
21   "indifference is truly shocking" and the family members need only plead deliberate
22   indifference to state a due process claim for loss of familial association.  *Id.* at 1139.
23   Deliberate indifference requires that "the official must both be aware of facts from which
24   the inference could be drawn that a substantial risk of serious harm exists, and he must also
25   draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

26         In this case, Plaintiff alleges that each of the Defendant police officers "failed to act
27   under circumstances in which they had an opportunity for reflection." (Doc. 1 ¶ 255.)  Like
28   Plaintiff's failure to intervene claims in Count Six, Plaintiff has failed to allege with

1  specificity what each individual Defendant did or failed to do that constituted deliberate
2  indifference to a substantial risk of harm to Alvarado.  Plaintiff alleges there were "at least
3  10 police officers on scene during the critical moments, almost all of them with their
4  attention turned toward Mr. Alvarado," but Plaintiff does not allege that each officer was
5  both actually aware of Alvarado's distress and failed to act.  Plaintiff's allegations are
6  insufficient to demonstrate deliberate indifference for each Defendant police officer and
7  therefore do not support the claim that each Defendant's actions shocked the conscience,
8  as necessary for her to maintain a Fourteenth Amendment claim for loss of familial
9  association.  The Court will grant the Motion to Dismiss with respect to Count Eight.

10              **4.       Count Nine**

11      Defendants contend Plaintiff fails to state a claim for gross negligence, as required
12  to state a wrongful death claim under Arizona law, and that Defendant City of Tucson is
13  entitled to sovereign immunity on the wrongful death claim.  Because the Court has already
14  determined Plaintiff cannot raise this claim, the Court need not address this argument.

15          **E.      Punitive Damages**

16              **1.      Motion to Dismiss**

17      Defendants argue Plaintiff is not entitled to punitive damages because Plaintiff does
18  not demonstrate the conduct at issue was malicious, wanton, or oppressive.  (Doc. 49 at 12
19  (citing *Dang v. Cross*, 422 F.3d 800, 808–09 (9th Cir. 2005)).)  Defendants contend the
20  officers called for medical assistance, paramedics assessed Alvarado and determined he
21  was stable, Defendant Gamez instructed officers to move Alvarado to the recovery position
22  "as soon as possible," and officers stayed with Alvarado after the conclusion of the medical
23  assessment.  Defendants assert that addressing punitive damages at this early juncture is
24  appropriate because the Complaint fails to make a case for malicious or wanton conduct
25  and Defendants are entitled to qualified immunity.

26              **2.      Response**

27      Plaintiff asserts she has alleged sufficient facts to support a claim for punitive
28  damages.  Plaintiff notes one Defendant officer placed his knee on Alvarado's neck for one

minute while Alvarado was face down; a second officer encouraged this behavior; two officers responded dismissively when Alvarado pleaded, "I can't breath"; officers remained silent when Alvarado was forced into a face down position a second time; officers continued to restrain Alvarado on his stomach even after Defendant Gamez expressed concern for Alvarado's well-being; Alvarado was held in the unsafe prone position for three minutes before being placed in a recovery position; Alvarado was only in the recovery position for three minutes before being returned to the prone position; and, despite Alvarado twice stating he could not breath, officers agreed to place two spit socks over his head, further restricting his ability to breathe.  Plaintiff cites several cases in which punitive damages were awarded or the question of punitive damages was presented to the jury.

### 3.  Discussion

The Court finds a decision on punitive damages is inappropriate at this early stage and cannot be made without a more fully-developed factual record.  The Court will deny the Motion to Dismiss as to punitive damages.

Accordingly,

**IT IS ORDERED:**

(1)   Defendants' Motion to Dismiss (Doc. 49) is **DENIED IN PART** as to Counts One, Three, and Four; the claims against Defendants Fleck, Spencer, and Goldstein in Count Seven; and Plaintiff's request for punitive damages.

(2)   Defendants' Motion to Dismiss (Doc. 49) is **GRANTED IN PART** as to Counts Two, Five, Six, Eight, and Nine; and the claims against the Defendant police officers in Count Seven.  These portions of the Complaint (Doc. 1) are **DISMISSED WITHOUT PREJUDICE.**

Dated this 2nd day of March, 2023.

Honorable Raner C. Collins
Senior United States District Judge