Michelle R. Saavedra
Principal Assistant City Attorney for
Michael G. Rankin
CITY ATTORNEY
P.O. Box 27210
Tucson, AZ 85726-7210
Telephone: (520) 791-4221
Fax: (520) 623-9803
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
*Attorneys for Defendants City of Tucson, Nicolo Solarino, Francisco Santa Maria, Marco Durazo, Sean Yeandle, Henry Gamez, Donovan Vance, Ryan Ake, Joseph Gradias, Eric Evans, Scott Ellis, Raymond Fleck, Silas Spencer, Keith Goldstein (hereafter "City Defendants")*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irene Briseno, on her own behalf and as the personal representative of the estate of Damian Eryko Alvarado,<br><br>Plaintiff,<br><br>vs.<br><br>City of Tucson; Nicolo Solarino (Tucson Police); Francisco Santa Maria (Tucson Police); Marco Durazo (Tucson Police); Sean Yeandle (Tucson Police); Henry Gamez (Tucson Police); Donovan Vance (Tucson Police); R. Ake (Tucson Police); Joseph Gradias (Tucson Police); Eric Evans (Tucson Police); Scott Ellis (Tucson Police); Raymond Flex (Tucson Fire); Silas Spencer (Tucson Fire); Keith Goldstein (Tucson Fire); and Justin Canovali (private citizen), all in their individual capacities,<br><br>Defendants. | No. 4:22-cv-00132-RCC<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to Hon. Raner C. Collins) |

Defendants City of Tucson, Nicolo (aka "Nick") Solarino, Francisco Santa Maria, Marco Durazo, Sean Yeandle, Henry Gamez, Donovan Vance, Ryan Ake, Joseph Gradias, Eric Evans, Scott Ellis, Raymond Fleck, Silas Spencer, and Keith Goldstein (hereinafter "Defendants"), pursuant to Fed. R. Civ. P. 56(a), hereby move for summary judgment. This motion is supported by the following Memorandum of Points and Authorities, and Defendants' Separate Statement of Facts ("DSOF") filed contemporaneously.

1

**Memorandum of Points and Authorities**

**I.      Factual Background**

On March 22, 2020, at around 5:18 p.m., a 911 call reporting a shooting in the area of 2901 E. Fort Lowell Rd., Tucson, Arizona, came in and several Tucson Police Department ("TPD") officers were responding (s*ee* DSOF 6-14, 17, 57, 60, 63, 93, 128-129), to include Nick Solarino ("Solarino"), Ryan Ake ("Ake"), Sean Yeandle ("Yeandle"), and Joseph Gradias ("Gradias"). (*Id.*). Before Solarino could get to the shooting scene, officers were directed to circulate the area because no more officers were needed at the scene. (*See* DSOF 10). Solarino was "in midtown where the shooting occurred," and then began circulating as directed. (DSOF 12). He came upon the car crash, which other TPD officers were responding to at Prince Rd. and Campbell Ave. (*Id.*; *see also* DSOF 15-16, 56, 61, 114, 145). Solarino knew that the fleeing suspect from the shooting incident, now determined to be a homicide, was believed to still be armed. (*See* DSOF 13-14, 17). Solarino had a brief conversation with the officers at the car crash scene. He was trying to figure out "whether or not these two incidents were related." (DSOF 16; *see also* DSOF 12, 15). The descriptions of the fleeing suspects, and the vehicles involved, were similar and the events occurred relatively close in time and proximity. TPD officers believed the incidents could be related. (*See* DSOF 8-17, 57-61, 63-64, 93-97, 114, 164).

Solarino discovered that the fleeing car crash suspect had "taken off running eastbound." (DSOF 15). Solarino arrives in the alleyway nearby where civilians are with the suspect, and he did not wait for backup because he was concerned for the civilian's safety, and "the potential risk to the civilian essentially outweighed [his] safety as a solo Officer to go make contact with [Alvarado]..." (DSOF 256). Solarino runs towards the area and sees the suspect, later discovered to be Damien Alvarado ("Alvarado"), attempting to jump over a brick wall while a civilian is holding his leg. (DSOF 18; *see also* DSOF 278).

Meanwhile, TPD officers Donovan Vance ("Vance"), Henry Gamez ("Gamez"), and Marco Durazo ("Durazo") who were initially responding to the car crash, are learning about the homicide incident officers are investigating nearby, and then they hear Solarino is

fighting with the fleeing car crash suspect nearby. (*See* DSOF 114-115, 145-147, 149). These TPD officers also believe that there is a potential that the two calls are related. (*Id.*).

Back in the alleyway, Solarino contacts Alvarado and gives multiple commands, such as: "stop right there," "get off the wall," "get down," or "get down on the ground," as Solarino tries to pull Alvarado off the wall, but Alvarado is not complying. Instead, Alvarado continues to resist and struggle. (DSOF 20; *see also* DSOF 21, 278). Solarino announces over TPD's dispatch radio that he is "fighting with one" at around 5:41 p.m. (DSOF 19; *see also* DSOF 6-8, 278). Solarino is concerned for the safety of the two civilians close in proximity and he is also concerned for his own safety. (DSOF 23-24, 255-263). Alvarado had "clenched fist, hundred yard – thousand yard stare, grinding his teeth, things…consistent with the act of aggression," and Solarino quickly discovers that Alvarado "is taller and more physically fit" than him. (DSOF 23). Solarino is thinking that he "had two witnesses…to protect" and there was "the potential relation that we were evaluating at the time to the homicide call and the unknowingness of whether [Alvarado] was armed or not also posed a more significant threat…" (DSOF 251). Solarino punches Alvarado multiple times in the face during the struggle, but that was not effective. (DSOF 22-24). Solarino then used his Taser to try and get control of Alvarado, but this was not effective either. (DSOF 25-27). At some point during the struggle, Alvarado is able to get a gun magazine from Solarino's duty belt, and Solarino is then concerned that Alvarado may use that as a "blunt instrument" against Solarino. (DSOF 28, 259-260). Solarino is struggling to get Alvarado under control as he is continuing to fight, and resist arrest the entire time. (DSOF 29, 257-263, 278). It is not until other officers arrive, which included Yeandle, Ake, Gamez, and Gradias, that Alvarado is finally detained, put in handcuffs, a Total Appendage Restraint Position ("TARP") is loosely applied, and he is put in the recovery position. (*See* DSOF 30-38, 61, 65-77, 94-95, 98-109, 115-118, 134-137; *see also* DSOF 279-284).

Yeandle and Ake arrived to assist at about the same time, Gamez arrived shortly after, and then Gradias. (*Id.*). Multiple TPD Body Worn Camera ("BWC") videos captured the officers' arrivals and the officers' encounter with Alvarado. (DSOF 278-284). The entire

3

time officers are trying to gain control of Alvarado, he is flailing, thrashing, bucking, clenching his arms and fist, yelling, kicking, and being noncompliant. *Id.* TPD Sergeant Scott Ellis ("Ellis") becomes involved in this incident when he hears a call over the radio that multiple officers were fighting with an individual, and that the person was suspected of "[l]eaving the scene of a collision involving injury as well as possibly be[ing] involved in a homicide that occurred [at] Country Club and Fort Lowell..." (DSOF 164). When Ellis arrives on scene, Alvarado is already in handcuffs and the first TARP, but he was still resisting; squirming on the ground, yelling, spitting, cursing. (DSOF 165-166). Ellis directed officers to apply a spit sock because he was concerned "about anything that he might have, be it COVID, be it some other disease." (DSOF 167). All the officers are trained on the use of a spit sock to protect themselves from diseases that can be transmitted through saliva or body fluids, and it was used in this case for that purpose. (DSOF 39, 49-51, 87-92, 123-124, 159, 166; *see also* DSOF 167-168). Officers put Alvarado in the recovery position as soon as it was safe to do so, and they kept him in the recovery position and called for the Tucson Fire Department ("TFD") to check Alvarado.

TFD Raymond Fleck ("Fleck"), Silas Spencer ("Spencer"), and Keith Goldstein ("Goldstein") were first dispatched to the car crash, then to the alleyway to check Alvarado for injuries and check his vitals. TFD applied a second spit sock because the first was not working properly. (*See* DSOF 187-199, 203-228, 232-248). TFD is commonly called to assess individuals that are in TPD's custody and restrained, and their ability to assess a person is not affected by the situation. (DSOF 228, 248). In this case, TFD asked Alvarado if he was hurt, and he said "no." (DSOF 243). TFD checked Alvarado's vitals, and after spending several minutes with him, TFD cleared Alvarado. When TFD decided not to transport Alvarado to the hospital, Alvarado was breathing, and his vitals were not concerning. TPD does not second-guess TFD's decision as they do not have the same medical training. (DSOF 172).

TFD was returning to their truck to leave when officers near Alvarado noticed that he had stopped breathing. TFD was called back. (DSOF 41, 139-140, 151-156, 173, 185,

4

200; *see also* DSOF 111, 125). In the meantime, TPD Officer Francisco Santa Maria started CPR compressions on Alvarado. (DSOF 141). TPD removed the restraints, assisted with removing Alvarado's undergarments and placing him on the gurney, and then TFD took over Alvarado's medical care as they transported him to the hospital. (DSOF 42, 154-155, 157-158, 186, 201-202, 229-231, 249-251). Alvarado's condition did not improve on the way to the hospital, and he passed. (DSOF 231, 252). An autopsy performed on Alvarado determined that the manner of his death was an accident, and that the cause of his death was "sudden cardiac arrest in the setting of acute methamphetamine intoxication and restraint with dilated cardiomyopathy (heart murmur) as a significant contributing condition." (DSOF 277).

Plaintiff brought this lawsuit alleging multiple claims against multiple parties. (Doc. 1). In August 2022, Defendants filed a Motion to Dismiss, which was granted in part, and denied in part. (*See* Doc. 60). As a result, the only claims still pending are as follows: Count I against Solarino, Yeandle, Ake, Gamez, Gradias, and Ellis for alleged excessive force in violation of the Fourth Amendment; Count III against the City alleging a policy or custom as the moving force for the Fourth Amendment violations under *Monell*; Count IV against the City for allegedly failing to train its officers under *Monell*; and Count VII against Fleck, Spencer, and Goldstein for alleged deliberate indifference to a serious medical need in violation of the Fourteenth Amendment[1].

## II. Standard of Review

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the

---

[1] If Plaintiff asserts that there are other defendants, or additional claims, not already dismissed or otherwise resolved, or that are not addressed herein, Defendants hereby reserve their right to respond to those allegations in their Reply.

nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).

To defeat summary judgment, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation marks and emphasis omitted); *see* Fed. R. Civ. P. 56(c)(1). There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50, 106 S.Ct. 2505 (citations omitted). "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. 2505. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255, 106 S.Ct. 2505.

In this case, the material facts are not disputed, and all Defendants are entitled to judgment in their favor as a matter of law for the reasons discussed next.

**III.  Legal Arguments**

   **A. Solarino, Yeandle, Ake, Gamez, Gradias, and Ellis, Are Entitled To Qualified Immunity**

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). "When an officer asserts qualified immunity as a defense, ... [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167,

1174 (9th Cir. 2020) (citation omitted). "Although [courts] must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, [courts] are also limited to considering what facts the officer could have known at the time of the incident." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017). In this case, the remaining individually named TPD officers Solarino, Yeandle, Ake, Gamez, Gradias, and Ellis, are entitled to qualified immunity because they did not use excessive force in violation of the Fourth Amendment, and even if there was a violation, it was not clearly established.

### 1. TPD Officers' Use Of Force Was Reasonable

For an excessive use of force claim in violation of the Fourth Amendment, the first question to be determined is whether the force used was "objectively reasonable," which "is determined by an assessment of the totality of the circumstances." *Green v. City & County of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014). When evaluating the totality of the circumstances, courts must "balance the 'nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "To assess the gravity of the government interests, [courts] have typically considered (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety." *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019). All factors weigh in favor of finding that the officers' use of force in this case was reasonable.

"'The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Kisela v. Hughes*, 584 U.S. 100, 103, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). "'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865).

Alvarado fled from the scene of a serious car crash (*see* DSOF 11-12, 15-18, 56, 93-94, 145-146, 149, 164), he was fighting with a civilian witness (*see* DSOF 18, 133), fighting with officers (resisting arrest) (*see* DSOF 19-36, 38, 65-68, 72-75, 86, 95, 98, 102-105, 115-118, 134-136, 147, 164, 183-184), and the officers reasonably believed he was the armed homicide suspect who fled from a shooting nearby and close in time. (*see* DSOF 58-61, 63-64, 96-97, 114, 129, 164, 255).

Solarino was the first TPD officer to contact Alvarado who was reported to be fighting with civilian witnesses in the alleyway. (DSOF 18). Prior to contacting Alvarado, Solarino was working the shooting case, which he learned was a homicide, and he came upon the car crash that Alvarado fled from. (*see* DSOF 8-15). Solarino was trying to figure out whether the homicide and car crash were related, and he knew that the suspect who fled from the homicide scene was armed. (DSOF 16-17). Alvarado posed an immediate threat to the safety of the civilian witnesses and Solarino. In fact, Solarino did not wait for backup because of his concern for the civilian witness's safety. (DSOF 256). Solarino quickly determined that "the potential risk to the civilian essentially outweighed [his] safety as a solo Officer to go make contact with [Alvarado]." (*Id.*). When Solarino contacts Alvarado he gives multiple commands, such as "stop right there," "get off the wall," "get down" or "get down on the ground," but Alvarado does not comply. He continues to resist and struggle with Solarino. (DSOF 20). Solarino's concern for the safety of the civilians and himself elevates when he realizes that Alvarado was "taller and more physically fit," and the efforts to get control of him were so far ineffective. (DSOF 257).

Solarino punched Alvarado on the side of his face multiple times, but that too was not effective. (*Id.*; DSOF 22-24). "Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (citation omitted). The safety threat rises when Alvarado was able to grab a gun magazine from Solarino's waistbelt. (DSOF 259-260; *see also* DSOF 261). Solarino

8

was concerned that Alvarado could use that object as a "blunt instrument" against Solarino. (DSOF 260). Solarino uses his Taser to try and get Alvarado under control, which was also ineffective. (DSOF 25-28; DSOF 258). The use of a Taser is deemed "considerable force," but it is less than deadly force, and reasonable based on the facts in this case. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (deploying nine five-second shock cycles in probe mode and seven cycles in drive stun mode, while two officers wrestled with plaintiff, was reasonable even though he suffered cardiac arrest and passed).

The entire time, Alvarado continues to fight and resist arrest, and Solarino fears that he may not be able to get Alvarado under control. (DSOF 29; DSOF 262-263). It was not until Yeandle, Ake, Gamez, and Gradias arrived and assisted that they were able to coordinate their efforts and get Alvarado put in handcuffs and loosely apply the first TARP, and shortly later the second TARP is applied, and the handcuffs are loosened. (*See* DSOF 30-39, 65-75, 86, 101-109, 115-118, 134-137, 182-184).

During their struggle to handcuff Alvarado, the officers use their body weight, some attempt to grab Alvarado's hands to put him in handcuffs, and others put their hands on his body and head to keep him from continuing to thrash around. (*Id.*). The Ninth Circuit held that officers "press[ing] their weight on [the suspect's] neck and torso as he lay handcuffed on the ground and begged for air" is a "severe" use of force. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003); *see also Valenzuela v. City of Anaheim*, 20-55372, 2021 WL 3362847, at *1 (9th Cir. Aug. 3, 2021) ("Anaheim police officers kept Valenzuela in multiple, extended choke holds even as he gagged, wheezed, turned purple, and screamed that he could not breathe."). But the facts in this case are distinguishable.

Alvarado was aggressively fighting with officers, kicking, attempting to buck, flailing, combative, and noncompliant. In addition, Alvarado's aggressive behavior was considerably greater, and TPD officers' use of force when attempting to handcuff him was far less, than the officers in *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1105 (9th Cir. 2008), wherein the Ninth Circuit held there was no Fourth Amendment violation.

9

The first TARP is put on in an attempt to keep Alvarado from getting up and fighting with officers again, and this first application still allowed Alvarado to fully extend his legs behind him. (DSOF 35-36, 53-55, 85-86, 136, 138; *see also* DSOF 165, 179). The second TARP is applied because the first was not functioning properly, and the officers were concerned that he would continue to struggle, thrash, and kick. (*See* DSOF 37, 75, 182-184). The Ninth Circuit has held that there are "some situations, the need to maintain control of a person who physically struggled while being taken into custody might reasonably call for the use of hobble restraints." *Blankenhorn v. City of Orange*, 485 F.3d 463, 479 (9th Cir. 2007). Alvarado never stopped his aggressive behaviors even when there were multiple officers trying to detain him.

Alvarado was placed in the recovery position as soon as the officers were safely able to do so, and even when he was adjusted for the application of the TARPs, he was put back into the recovery position. This was consistent with all the officers' training relating to positional asphyxia and excited delirium. (*See* DSOF 1, 3-5, 43-48, 55, 78-84, 108-109, 112-113, 119-122, 126-127, 130-131, 142-144, 161-162, 163, 174-178). Even though the officers did not have any knowledge as to whether Alvarado was under the influence of any drugs, some thought he was, and they knew the importance of putting Alvarado in the recovery position and keeping him there based just on the struggle that had occurred. (*See Id.*).

The first spit sock was applied by Ake after Alvarado was handcuffed because the officers were concerned about the potential exposure to infectious diseases, including what was newly known to be the Coronavirus or COVID-19. (*See* DSOF 39, 49-51, 87-92, 123-124, 159, 166-170, 180-181). Spit socks are made of mesh material, are minimally intrusive, and they do not impede a person's ability to breathe. (*Id.*). There is no evidence in this case that the first or even the second spit sock caused breathing issues. (*See Id.*). After Alvarado was detained in handcuffs and TARPs, no additional levels of force were used. (*See* DSOF 278-284).

Officers called for TFD to check Alvarado, and he remained in the recovery position this entire time. (*See Id.*). Alvarado did say he could not breathe during and shortly after

being handcuffed, and the TARPs applied, but officers could hear and see him breathing (DSOF 38, 82, 106, 111; *see also* DSOF 137). Also, TFD arrived several minutes after Alvarado was detained, and they assessed his vitals, and he was breathing. (*See* Section III.B.).

After TFD fully assessed Alvarado, and his vitals were normal, TFD decided not to transport him to the hospital. (*See* Section III.B., below). When TFD was leaving, TPD Sergeant Scott Ellis was getting information about the collision, trying to figure out if Alvarado was related to the homicide call and what actions needed to be taken next, and at some point, the officers near Alvarado notice that he is not breathing. (DSOF 173, 151-152, 185). Officers call TFD back (DSOF 41, 110, 139-140, 153, 156), and TPD officer Santa Maria begins chest compressions (DSOF 141, 153), the restraints are removed as TPD is performing CPR and TFD is returning to where Alvarado is. (DSOF 154-155, 186). TFD then took over efforts to resuscitate Alvarado. (DSOF 229-231, 249-252; *see also* DSOF 42).

Solarino described his struggle with Alvarado as the worst he has ever experienced and "the most like afraid I could I say I've been in, in a situation like that where I couldn't control it, like it, it needed the level, it needed the amount of Officers just to get the control." (DSOF 262). Solarino was used to suspects giving in at some point, but Alvarado just continued fighting the whole time. (*Id.*). Solarino articulated during his post-incident interview, just days later, that he was in fear of not being able to get control of Alvarado. (DSOF 263). This was based on his concern that there were two civilians close by and Solarino's belief that Alvarado could be the homicide suspect that he and other officers were looking for. (*Id.*).

Based on the foregoing reasons, all of the *Graham* factors weigh in favor of Solarino, Yeandle, Ake, Gamez, Gradias and Ellis. Their use of force was objectively reasonable, and necessary, based on the totality of the circumstances, and they are entitled to judgment in their favor for this reason alone.

### 2. It Was Not Clearly Established That The Officers' Use Of Force Could Be Considered A Constitutional Violation

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' Although [courts] do[] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6, 142 S. Ct. 4, 7–8, 211 L. Ed. 2d 164 (2021) (internal citations omitted).

Even if Plaintiff could establish that the officers used excessive force in violation of Alvarado's Fourth Amendment rights, they are still entitled to qualified immunity because it was not clearly established that their use of force could be considered a constitutional violation. To show a violation of clearly established law, Plaintiff must identify a case that put Solarino, Yeandle, Ake, Gamez, Gradias, and Ellis, on notice that their actions, under the factual circumstances they faced, were unlawful. *Id.* Plaintiff cannot meet this burden.

### B. TFD Personnel Are Entitled To Qualified Immunity

Under Count VII, Plaintiff alleges that TFD personnel Fleck, Goldstein, and Spencer were deliberately indifferent to a serious medical need in violation of Alvarado's Fourteenth Amendment rights. (Doc. 1, 39:1-41:19).

"To prevail on such a claim, [Plaintiff] must prove: '(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.'" *Alexander v. Nguyen,*

78 F.4th 1140, 1144–45 (9th Cir. 2023) (citations omitted). For "the third element: 'mere lack of due care by a state official is not enough to show a constitutional violation. The plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (citations omitted).

TFD personnel Fleck, Spencer, and Goldstein first responded to the car crash call, and then to the alleyway to assess Alvarado for injuries after officers detained him. (*See* DSOF 190-191, 195, 219, 239). TFD knows how to use spit socks, and they use them to protect themselves from contact with saliva, blood, mucus, any sort of by-product, or body fluid. (*See* DSOF 188-189, 197, 212-215, 221, 233-236). In this case TFD applied a second spit sock because "the patient was still spitting, there was mucus still coming out and around, and [they] were concerned for [their] safety." (DSOF 222; *see also* DSOF 192-193, 196, 198-199, 220, 240). The second spit sock did not impede or impact Alvarado's ability to breathe. (DSOF 225, 215, 246). Spencer and Goldstein had primary contact with Alvarado. (DSOF 194). Spencer said he "[w]alked up to the patient, saw him on the ground on the side or, you know, made sure the patient was on its side. Then [he] established that [Alvarado] had a patent airway, he was able to talk, he was breathing. And [Spencer] felt for a pulse. [Alvarado] had circulation. And then [TFD] started taking vital signs." (DSOF 224). Alvarado was "a little agitated" when TFD first approached but as they were taking his vitals, Alvarado "was less agitated." (DSOF 226; *see also* DSOF 245).

Goldstein asked Alvarado if he was hurt anywhere, and Alvarado responded "no." (DSOF 243). Goldstein testified that "[t]here were no obvious injuries or bleeds indicating that he was physically hurt." (DSOF 244). Goldstein completed his assessment of Alvarado, which included taking his blood pressure, pulse, and ox (oxygen saturation level). (DSOF 242). Alvarado's oxygen saturation level was 94 and that level did not, and does not, cause Goldstein any concern. (DSOF 247; *see also* DSOF 207-208 and DSOF 237). Fleck did not recall seeing symptoms that would indicate Alvarado "must be under the influence of drugs." (DSOF 203). Spencer did not observe any behaviors that would indicate Alvarado consumed illegal drugs or that concerned Spencer. (DSOF 227).

13

Both Spencer and Goldstein have provided treatment to individuals in police custody in the past. (DSOF 217-218, DSOF 238). Spencer testified that being restrained with hands and feet behind the back does not impact TFD's ability to evaluate someone, nor would it impact the person's ability to breathe. (DSOF 228). Goldstein also testified that he has provided medical assistance in the past to someone in TPD custody and restraints, and it does not affect his ability to assess or provide assistance, it is just done differently. (DSOF 248).

If Goldstein believed, based on Alvarado's vital signs, that Alvarado was suffering from a serious medical condition, Goldstein would have transported him to the hospital. (DSOF 253). Alvarado's vitals were normal, and when TFD made the decision not to transport Alvarado to the hospital he was still breathing. (DSOF 204-205).

It was not until TFD was preparing to leave the scene and they were walking back to their truck that officers noticed he was not breathing, and they called TFD back. (DSOF 200). Spencer testified that after getting back to the scene "…we saw Tucson Police Department doing compressions on the patient. From [his] recollection [he] was the first firefighter there, felt for a pulse, checked. [Alvarado] wasn't breathing, had no pulse. And then [Spencer] started compressions." (DSOF 229). Restraints would have been removed to provide resuscitative efforts, but Fleck could not remember who or when that decision was made. (DSOF 201; *see also* DSOF 250). Fleck "drove the ambulance to the hospital while resuscitative efforts were continued in the back." (DSOF 202). Alvarado was treated just like any patient who was in cardiac arrest, and TFD's actions were standard for that situation. (DSOF 230). Alvarado was given IV access, epinephrine, Narcan, and endotracheal intubation, high flow oxygen, and CPR efforts were continued (DSOF 249, 251), but he remained pulseless and apneic on the way to the hospital. (DSOF 252; *see also* DSOF 231).

TFD's treatment of Alvarado was reviewed by TFD's Medical Director, Joshua Gaither, M.D., and his opinions regarding TFD's response and treatment of Alvarado support granting summary judgment. (DSOF 264-276). In his professional opinion, "[p]aramedics quickly assessed Mr. Alvarado and obtained a set of vital signs from him,

14

including his respiratory rate, blood pressure, heart rate, and pulse oxygen level. Both Mr. Alvarado's blood pressure and pulse oxygen levels were within the expected norm. Mr. Alvarado's respiratory rate and heart rate were both slightly elevated, and the paramedics reasonably concluded that the slight elevations were consistent with someone who had been physically exerting himself." (DSOF 272). Dr. Gaither, also opined that "[o]nce Mr. Alvarado went into cardiac arrest and paramedics returned to the scene, they performed exceptionally well." (DSOF 274). "Paramedics promptly took over CPR from the on-scene officer. They obtained intraosseous access within two minutes and provided the first dose of epinephrine within three minutes. Paramedics intubated Mr. Alvarado within eight minutes (and for context, the standard is nine minutes). Paramedics took all appropriate life-saving measures before and during their transport of Mr. Alvarado to the hospital." (DSOF 275). In conclusion, Dr. Gaither opined that "[b]ased on the totality of the circumstances, including but not limited to Mr. Alvarado's expressed refusal of care, and the applicable standard of care in March 2020, it was reasonable for the paramedic crew to determine that Mr. Alvarado did not require medical transport." (DSOF 276).

Based on the foregoing, Plaintiff cannot establish a Fourteenth Amendment violation against Fleck, Spencer, or Goldstein. Even if a constitutional violation could be found, Dr. Gaither's opinions alone proves that it was not clearly established that TFD's treatment of Alvarado could be considered a constitutional violation. As such, they are entitled to qualified immunity protection. (*See* Section III.A.2, above).

### C. Plaintiff Cannot Establish A *Monell* Claim Against The City

Under Count III, Plaintiff alleges that the City maintained a "written policy and/or unwritten custom permitting the use of six distinct procedures that, combined, proximately caused Alvarado's death and were the moving force in violating his constitutional rights." (Doc. 1, 28:1-30:22). And, under Count IV, Plaintiff alleges a *Monell* claim against the City for failure to train. (*Id.*, 31:1-33:25). Plaintiff's *Monell* claims against the City fail as a matter of law because Plaintiff cannot establish a constitutional violation. (*See* Sections III.A. and III.B., above). Additionally, the *Monell* claims fail for the additional reasons discussed next.

"[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker. It is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. A plaintiff must also 'show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link' between the municipal policy or custom and the deprivation of federal rights." *Jessen v. Cnty. of Fresno*, 808 Fed. Appx. 432, 434–35 (9th Cir. 2020) (internal citations omitted).

Here, Plaintiff alleges the City (TPD) has a written policy or unwritten custom "permitting the use of six distinct procedures that, combined, proximately caused Alvarado's death and were the moving force in violating his constitutional rights." Those are: the spit socks, TARP, Taser, body weight "on suspects who are believed to be suffering from cocaine and/or methamphetamine intoxication," "kneeling on a suspect's neck," and "denying or delaying treatment by EMTs and paramedics." (*See* Doc. 1, 28:10-24).

TPD permits the use of spit socks, TARPs, Tasers, and body weight to control and detain or arrest a suspect, but officers are taught to use only the level of force that is necessary based on the totality of the circumstances. "The mere fact that [the City/TPD] authorized the operation and had policies relevant to the operation in place does not render [the City] liable for any and all constitutional violations committed during the operation at issue." *Jessen v. Cnty. of Fresno,* 808 Fed. Appx. At 434–35 *citing Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 407–08, 117 S. Ct. 1382, 1390, 137 L. Ed. 2d 626 (1997). All levels of force used in this case were necessary and reasonable based on the totality of the circumstances. (*See* Section III.A., above).

There is no evidence that Solarino, Yeandle, Ake, Gamez, Gradias, or Ellis had any knowledge that Alvarado was "suffering from cocaine and/or methamphetamine intoxication." No officer kneeled on Alvarado's neck, and no officer denied or delayed TFD's treatment. There is no evidence to support Plaintiff's *Monell* claim based on policy or custom against the City for TPD's actions.

Regarding the failure to train claim, in *Canton v. Harris*, 489 U.S. 378 (1989), the U.S. Supreme Court concluded that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." *Id.* (citations omitted). But Plaintiff would need to show that there was a deficient training program that did "not prevent constitutional violations," which would have effectually put municipal decisionmakers on notice that "a new program is called for." *Id.* Plaintiff needs to show that the City knew or should have known that its training was deficient, and that the City (TPD) was "deliberately indifferent" to the need for a change or additional training. *Id.*

In this case, all TPD officers were trained to use reasonable force when detaining and arresting suspects, they were all trained and are familiar with positional asphyxia, excited delirium and the relationship between the ingestion of drugs and their effect on a person, and the use of the recovery position. None of the officers knew whether Alvarado had ingested any drugs, but they knew the importance of getting him in the recovery position as soon as it was safe to do so, and they did just that. Plaintiff cannot establish a *Monell* claim against the City for failure to train.

### Conclusion

For all the foregoing reasons, Plaintiff cannot show that a constitutional violation occurred, and all Defendants are entitled to judgment in their favor based on this alone. Even if Plaintiff could establish a Fourth Amendment violation (by TPD Officers Solarino, Ake, Yeandle, Gamez, Gradias, Ellis), or a Fourteenth Amendment violation (by TFD Fleck, Spencer, or Goldstein), these individually named defendants are still entitled to qualified immunity because it was not clearly established that their actions could be considered to be constitutional violations under the facts in this case.

The City must also be granted judgment in its favor because there is no evidence to support a claim against it under *Monell* for either a policy or custom claim or a failure to train claim.

///

///

DATED: August 15, 2024.

                          MICHAEL G. RANKIN
                          City Attorney

        By    <u>/s/ Michelle R. Saavedra</u>
               Michelle R. Saavedra
               Principal Assistant City Attorney

# CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul Gattone
Law Office of Paul Gattone
301 South Convent
Tucson, Arizona 85701
gattonecivilrightslaw@gmail.com
    *Attorney for Plaintiff*

By M. Piper/rdv