Michelle R. Saavedra
Principal Assistant City Attorney for
Michael G. Rankin
CITY ATTORNEY
P.O. Box 27210
Tucson, AZ 85726-7210
Telephone: (520) 791-4221
Fax: (520) 623-9803
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
*Attorneys for Defendants City of Tucson, Nicolo Solarino, Francisco Santa Maria, Marco Durazo, Sean Yeandle, Henry Gamez, Donovan Vance, Ryan Ake, Joseph Gradias, Eric Evans, Scott Ellis, Raymond Fleck, Silas Spencer, Keith Goldstein (hereafter "City Defendants")*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irene Briseno, on her own behalf and as the personal representative of the estate of Damian Eryko Alvarado,<br><br>Plaintiff,<br><br>vs.<br><br>City of Tucson; Nicolo Solarino (Tucson Police); Francisco Santa Maria (Tucson Police); Marco Durazo (Tucson Police); Sean Yeandle (Tucson Police); Henry Gamez (Tucson Police); Donovan Vance (Tucson Police); R. Ake (Tucson Police); Joseph Gradias (Tucson Police); Eric Evans (Tucson Police); Scott Ellis (Tucson Police); Raymond Flex (Tucson Fire); Silas Spencer (Tucson Fire); Keith Goldstein (Tucson Fire); and Justin Canovali (private citizen), all in their individual capacities,<br><br>Defendants. | No. 4:22-cv-00132<br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to Hon. Raner C. Collins) |

Defendants City of Tucson, Nicolo (aka "Nick") Solarino, Francisco Santa Maria, Marco Durazo, Sean Yeandle, Henry Gamez, Donovan Vance, Ryan Ake, Joseph Gradias, Eric Evans, Scott Ellis, Raymond Fleck, Silas Spencer, and Keith Goldstein (hereinafter collectively "Defendants"), hereby submit their Separate Statement of Facts (hereafter

1

"DSOF") in support of their Motion for Summary Judgment filed contemporaneously with this pleading.

**Nick Solarino's Deposition Testimony**

**DSOF 1**

Solarino has been a TPD officer since 2015, and he was promoted to Sergeant in July 2022. (Nick Solarino's Deposition Testimony Transcript, attached hereto as COTMSJ0001-COTMSJ0076; COTMSJ0002, 4:9-18).

**DSOF 2**

Prior to TPD he was a military law enforcement officer with the Air Force from 2002-2012, then a special agent with the Air Force from 2012-2015, and in 2015 he continued as a reserve officer. (*Id.*, COTMSJ0002-COTMSJ0003, 4:25-5:14).

**DSOF 3**

Solarino testified about his training as a TPD officer, which consisted of attending Southern Arizona Law Enforcement Training Center or SALETC, completing the post basic academy, and successfully completing field training with a senior police officer. (*Id.,* COTMSJ0004-COTMSJ0005, 7:11-8:14).

**DSOF 4**

Solarino testified about his understanding of "positional asphyxia" and the recovery position based on his training, as follows:

> "…positional asphyxia is basically certain body positions will induce unnecessary stress on other parts of the body. The example would be laying somebody face down, putting pressure on their back.··All that could end up collapsing the chest cavity, putting undue pressure on the lungs, heart and those sort of things. That being said, we basically have a position known as the recovery position, putting somebody in the recovery position, which is on their side right side down preferred versus left side down.··That will basically put their side of their body down towards the ground, opening up the left side of their chest cavity to include their lungs." (*Id.*, COTMSJ0006-COTMSJ0007, 9:22-10:12).

**DSOF 5**

Solarino testified about his understanding of what "excited delirium" is based on his training. (*See id.*, COTMSJ0007-COTMSJ0010, 10:22-13:20).

**DSOF 6**

"CAD data…is essentially when somebody creates a 911 call for service, that could be an officer on site and does it themselves on the computer, somebody calls 911, the dispatcher does it because someone's talking on the radio and the dispatcher's creating it. But essentially the end result should be some type internal department data that is created, an event chronology, if you will, of information about what is going on or what happened reference all those things." (*Id.*, COTMSJ0011, 16:6-14; *see also* COTMSJ0077-COTMSJ0143).

**DSOF 7**

The information populated in the event chronology is sometimes read over the radio by dispatch, and sometimes officers are not able to read everything populating because they are focused on driving, or are doing other things while information is coming in. (*See id.* COTMSJ0012-COTMSJ0013, 18:14-19:6).

**DSOF 8**

The event chronology for this incident includes information relating to the homicide shooting and an attempt to locate (ATL) the suspect who fled from the shooting, and also information relating to the car crash at Prince Rd. and Campbell Ave. (*See id.*, COTMSJ0013-COTMSJ0014, 19:7-20:10; *see also* COTMSJ0077-COTMSJ0143).

**DSOF 9**

On March 22, 2020, at around 17:18:40, 911 dispatch received the first call relating to the shooting at Winterhaven Terrace at 2901 E. Fort Lowell Rd., Tucson, Arizona. (*Id.*, COTMSJ0077).

**DSOF 10**

At around 17:26:43, officers were told that enough officers were at the scene of the shooting, and that they should circulate the area. (*See Id.*, COTMSJ0083).

**DSOF 11**

At around 17:32:15, the car crash in the area of Prince Rd. and Campbell Ave. is broadcast over the radio. (*See Id.*, COTMSJ0088).

**DSOF 12**

Solarino was "in midtown where the shooting occurred" and "while [he was] responding to the shooting, which turned into a homicide, other officers had gotten there prior…While [he] was circulating…[he] went west on Fort Lowell to Campbell, turned north on Campbell. When [he] did that, [he] came across a collision that was already -- that other officers were present at. And those would be the west side officers on operation division west side or ODW operating on radio channel 92…And a brief conversation between [him] and them is how [he] became informed that there was a collision nearby the shooting scene." (*Id.*, COTMSJ0015-COTMSJ0016, 23:17-24:10).

**DSOF 13**

At some point, Solarino discovered that the shooting incident was a homicide. (*Id.*, COTMSJ0017, 25:6-11).

**DSOF 14**

Solarino was informed that a vehicle was seen leaving the shooting, which may have been driven by a suspect, and the vehicle was reported to be a Hyundai car, sedan or SUV. (*Id.*, COTMSJ0017, 25:12-20).

**DSOF 15**

When Solarino "spoke to the officers at the collision scene from ODW, they mentioned something to the effect of that, that a vehicle driver of one of the involved parties, one of the involved vehicles had taken off running eastbound into operation division midtown." (*Id.*, COTMSJ0018, 26:1-5).

**DSOF 16**

Solarino was "trying to confer with the other officers on whether or not these two incidents were related." (*Id.*, COTMSJ0019, 28:8-13; see also *Id.*, COTMSJ0020-COTMSJ0021, 29:1-30:25 and COTMSJ0022, 31:14-23).

**DSOF 17**

The event chronology for this incident reflects that at around 17:40:33, officers are informed that the suspect from the shooting incident is still armed. (*See* COTMSJ0091).

**DSOF 18**

Solarino arrives at the scene where two civilians were holding the fleeing suspect from the car crash, who was later discovered to be Damien Alvarado. (COTMSJ0023, 34:5-23).

**DSOF 19**

The event chronology for the incident shows that at around 17:41:32, "fighting with one" is broadcasted over the radio and at 17:47:03 it is broadcasted that the subject in detained. (*See* COTMSJ0092).

**DSOF 20**

When Solarino contacts Alvarado he gives multiple commands, and Alvarado is not complying. Instead, Alvarado continues to resist and struggle with Solarino. (*See* COTMSJ0068,101:3-5 ["stop right there"]; *id.*, COTMSJ0068, 101:9-19 ["get off the wall"]; *id.*, COTMSJ0069-COTMSJ0070, 102:23-103:19 ["get down" or "get down on the ground"]).

**DSOF 21**

Solarino's Body Worn Camera ("BWC") is turned off because the mechanism that activates it and turns it off was broken. (*See id.*, COTMSJ0024, 35:4-25).

**DSOF 22**

Solarino punched Alvarado multiple times in the face during the struggle to get him under control and detained. (*See id.*, COTMSJ0047-COTMSJ0050, 63:23-66:5; *see also id.*, COTMSJ0070, 103:16-19).

**DSOF 23**

Solarino punched Alvarado in the face because he was not complying with commands and was avoiding apprehension. Alvarado had "clenched fist, hundred yard -- thousand yard stare, grinding his teeth, things…consistent with the act of aggression," plus there was "the potential relation that we were evaluating at the time to the homicide call and the

unknowingness of whether he was armed or not also posed a more significant threat…" (*Id.*, COTMSJ0072-COTMSJ0073, 105:5-106:8).

**DSOF 24**

Solarino punched Alvarado because he perceived him to be an active threat, and Solarino was trying to get him to comply. This was prior to the use of the taser and after Alvarado was taken down from the wall. (*See id.*, COTMSJ0056-COTMSJ0057, 72:7-73:12 and COTMSJ0057, 73:22-23).

**DSOF 25**

Solarino used his Taser after Alvarado was taken off the wall. (*Id.*, COTMSJ0025, 38:6-10; *see also id.*, COTMSJ0071, 104:4-25).

**DSOF 26**

The taser probes were discharged, and it was used in drive stun capacity too. (*Id.*, COTMSJ0025, 38:18-25).

**DSOF 27**

Solarino used his Taser because the level of force used had not been effective, and the Taser was also not effective. (*See id.*, COTMSJ0074, 107:4-13).

**DSOF 28**

During the struggle, Alvarado was reaching towards Solarino's duty belt and Solarino's shoulder, and Alvarado had custody of the magazine at some point. It is not clear to Solarino how the magazine got loose. (*See id.*, COTMSJ0058, 74:19-75:1).

**DSOF 29**

Solarino was shown Officer Yeandle's BWC video during the deposition, and he was questioned about what is depicted in said video. (*See id.*, COTMSJ0026; COTMSJ0027-COTMSJ0039, 42:1-43-55:2; COTMSJ0040-COTMSJ0044, 56:2-60:4; COTMSJ0045-COTMSJ0047, 61:11-63:22; COTMSJ0049, 65:9-15; COTMSJ0051-COTMSJ0052, 67:6-68:10; COTMSJ0052, 68:22-25; COTMSJ0053-COTMSJ0054, 69:12-70:13; COTMSJ0055, 71:21-25; COTMSJ0062-COTMSJ0063, 82:10-84:19; COTMSJ0067-COTMSJ0072, 100:22-105:4).

**DSOF 30**

Officers Solarino, Yeandle, Ake and Gamez are all trying to get Alvarado detained, under control, and in handcuffs during the struggle. (*See Id.*; *see also id.*, COTMSJ0059, 75:2-8).

**DSOF 31**

Officers use the minimal amount of force necessary to effect an arrest, and that could depend upon the person's actions during the encounter. (*See id.*, COTMSJ0039-COTMSJ0040, 55:8-56:1).

**DSOF 32**

Solarino used all his body weight and strength when Alvarado "was kicking and trying to buck" Solarino off. (*Id.*, 76:20-24; see *also id.*, COTMSJ0061, 77:11-21).

**DSOF 33**

Solarino did not punch or tase Alvarado after he was in handcuffs. (*See id.*, COTMSJ0074-COTMSJ0075, 107:18-108:9).

**DSOF 34**

No other officer used additional force after Alvarado was placed in handcuffs. (*Id.*, COTMSJ0075, 108:10-11).

**DSOF 35**

After Alvarado was placed in handcuffs the TARP was applied. (*See id.*, COTMSJ0040, 56:7-10).

**DSOF 36**

Before the TARP was applied, Alvarado was "essentially kicking his feet, making statements to the effect he's going to fight officers, still flailing his body around, things of that nature, all of which is conflicting with our goal…which is to detain him and move on with the investigation." (*Id.*, COTMSJ0040-COTMSJ0041, 56:19-57:2).

**DSOF 37**

The application of the second TARP is captured on Yeandle's BWC video at approximately 10:15. (*Id.*, COTMSJ0051, 67:6-14).

**DSOF 38**

More than 10 minutes into Yeandle's BWC video, Alvarado "was still flailing about, moving his body, articulating things to [officers] what he specifically wanted, telling [officers] no, to get off him, those kinds of things, his mannerisms were not consistent with him not being able to breathe at the time…" (*Id.*, COTMSJ0053, 69:6-11).

**DSOF 39**

Solarino observed the spit sock being applied. (*Id.*, COTMSJ0054-COTMSJ0055, 70:14-71:4).

**DSOF 40**

Solarino questioned TFD about evaluating Alvarado, and there was additional concern based on the struggle that occurred when trying to get Alvarado detained. (*See id.*, COTMSJ0062-COTMSJ0064, 82:15-84:19).

**DSOF 41**

Solarino believes that he got on the radio and yelled out for TFD to return after it was discovered that Alvarado stopped breathing. (*See id.*, COTMSJ0065, 86:16-21).

**DSOF 42**

Solarino assisted with removing Alvarado's lower garments and saw TFD transport him to the hospital. (*Id.*, COTMSJ0066, 87:10-13).

**Sean Yeandle's Deposition Transcript**

**DSOF 43**

Sean Yeandle ("Yeandle") is an officer with the Loveland Colorado Police Department and was an officer with TPD for approximately 4 years. (Sean Yeandle's Deposition Transcript, attached as COTMSJ0144-COTMSJ0179; COTMSJ0145, 5:2-10).

**DSOF 44**

Yeandle received training on positional asphyxia, and his "basic understanding is that if somebody's in an excited state for whatever reason the positioning of their body can affect their ability to effectively breathe." (*Id.*, COTMSJ0146, 8:15-19).

**DSOF 45**

TPD touched on positional asphyxia in the academy and during post academy trainings, and "short trainings every so often just in briefings as a function of our daily patrol life." (*Id.*, COTMSJ0146-COTMSJ0147, 8:22-9:2).

**DSOF 46**

"Once it's safe to do so…put them in what's called…the recovery position or on their side essentially." (*Id.*, COTMSJ0147, 9:11-16; *see also id.*, COTMSJ0148, 10:5-9).

**DSOF 47**

Yeandle defined the recovery position as follows:

> "[i]t would just be to roll the subject onto his or her side and maintain that position for them to keep as much pressure as possible off their lungs and then also to keep their airway clear, so like their mouth or throat." (*Id.*, COTMSJ00147, 9:17-22).

**DSOF 48**

Yeandle was trained on excited delirium "[s]imultaneously with the positional asphyxia type training," and described it as "a type of excited state that can alter things such as their, you know, ability to process information and then their physical abilities, such as like the ability to effectively respirate." (*Id.*, COTMSJ00149, 12:6-19).

**DSOF 49**

Yeandle was trained to apply the spit sock if "there might be a risk of any fluids being exchanged…" (*Id.*, COTMSJ0150, 17:3-17).

**DSOF 50**

A spit sock does not impair a person's ability to breathe, and it is still appropriate to use a spit sock even if someone is in an excited or agitated state. (*Id.*, COTMSJ0150, 17:18-25; see *also id.*, COTMSJ0151, 18:23-24 ["the training that I got was that it does not impair breathing at all"]).

**DSOF 51**

Applying two spit socks is appropriate "in the circumstance where one was insufficient for whatever reason. Maybe it was torn, or it had come loose." (*Id.*, COTMSJ0151, 18:1-5).

**DSOF 52**

"The general rule is that people are handcuffed behind their backs for officer safety, but that, I've seen that depend on people's general level of cooperation." (*Id.*, COTMSJ0152, 19:21-23).

**DSOF 53**

A TARP is "a nylon strap with a carabiner at one end and then a loop with kind of a tension device at the other," or a restraint used "to secure the person's ankles to their hands so that they can't, you know, extend their legs." (*Id.*, COTMSJ0153, 20:4-15).

**DSOF 54**

A TARP is used when there is "[e]ither a specific threat of kicking or a high level of resistance or a likelihood of fleeing." (*Id.*, COTMSJ0153-COTMSJ0154, 20:24-21:3).

**DSOF 55**

A person would be on their stomach "[j]ust as long as necessary to apply the device and make sure everybody's safe and then they can be replaced back in the recovery position." (*Id.*, COTMSJ0154, 21:17-20).

**DSOF 56**

Yeandle responded to "a hit and run motor vehicle collision where a suspect had fled on foot from the scene of the crash." (*Id.*, COTMSJ0155, 25:17-23).

**DSOF 57**

The call Yeandle "was originally en route to prior to responding to the motor vehicle accident was a homicide with a handgun that was just a few blocks away from the scene of that collision." (*Id.*, COTMSJ0156, 26:3-9).

**DSOF 58**

Yeandle understood that the suspect in the homicide may have been involved in the motor vehicle accident based on information received over the police radio. (*See id.*, COTMSJ0156, 26:10-16).

**DSOF 59**

The homicide suspect description and the fleeing suspect from the vehicle collision were similar. (*Id.*, COTMSJ0156, 26:17-24).

**DSOF 60**

Yeandle was enroute to the scene of the shooting when the call about the collision came in and then the information about Solarino being in contact and fighting with the person who fled the collision. (*Id.*, COTMSJ0158, 28:14-19).

**DSOF 61**

Yeandle never made it to the scene of the collision because Solarino had located the suspect who fled from the collision and was engaged in a fight with him in the alley in the area, and Yeandle responded to assist. (*See Id.*, COTMSJ0157, 27:2-9).

**DSOF 62**

Yeandle did not have any information regarding whether Alvarado "was suspected of having ingested drugs." (*See Id.*, COTMSJ0159-COTMSJ0160, 29:16-30:5).

**DSOF 63**

"[T]he call for service for the homicide had come out just minutes prior to the call for service for the motor vehicle accident." (*Id.*, COTMSJ0160, 30:18-21).

**DSOF 64**

When Yeandle arrived on scene, he believed that the vehicle and suspect of the homicide were related to the collision call. (*Id.*, COTMSJ0161, 33:13-22; *see also id.*, COTMSJ0177, 71:12-20 and COTMSJ0178, 78:1-4; *see also id.*, COTMSJ0175-COTMSJ0176, 69:25-70:2 ["Up until it was confirmed that it was unrelated I was still operating under the reasonable suspicion that it was." ]; *see also id.*, COTMSJ0177, 71:8-22 ["I would not say that probable cause existed at the time of the contact, that we were operating under reasonable suspicion if we're talking about the specific charge of homicide."]).

**DSOF 65**

When Yeandle arrives, he sees Solarino physically fighting with a suspect or "facing each other and struggling face to face," and Yeandle attempts to help or assist Solarino with trying to gain control of Alvarado. (*Id.*, COTMSJ0162 34:2-25 and COTMSJ0165, 39:16-21).

**DSOF 66**

Solarino and Alvarado were both on their feet when Yeandle first arrived, and Alvarado "was taken to the ground shortly thereafter and wound up on his stomach." (*Id.*, COTMSJ0163, 35:1-6; *see also id.*, COTMSJ0167, 42:2-6).

**DSOF 67**

They were "struggling to detain him in handcuffs." (*Id.*, COTMSJ0163, 35:7-11).

**DSOF 68**

Yeandle further describes his actions as follows:

> "It was a prolonged fight that lasted multiple minutes, so I guess every part of me got used at some point. My initial involvement I would believe I was off of Mr. Alvarado's left side, and I was attempting to get his left arm out from under his body and into a handcuffing position initially…My body weight would have wound up on him at some point, yes. Most of the imaging you can see where my knees are in use I'm in more of a squatting position than anything, not necessarily with the intent to apply maximum pressure but more as a pivot point in order to get joints manipulated so we can get arms behind backs." (*Id.*, COTMSJ0163-COTMSJ0164, 35:17-36:5).

**DSOF 69**

Yeandle testified that "[i]t would have been impossible to tell on the initial contact" whether Alvarado had ingested drugs, but that "he was particularly aggressive, agitated and particularly strong, so it could have been inferred." (*Id.*, COTMSJ0166, 40:5-9 and COTMSJ0168, 43:7-12).

**DSOF 70**

Yeandle thought to himself that Alvarado must be on something "[p]robably when Officer Gamez had arrived to help and he noted that Mr. Alvarado was probably high." (*Id.*, COTMSJ0168, 43:16-19).

**DSOF 71**

Gamez's comment was made "probably a few minutes into the incident." (*Id.*, COTMSJ0169, 44:2-11).

**DSOF 72**

The use of force was necessary to get him in handcuffs because he was "combative and noncompliant." (*Id.*, COTMSJ0167, 42:18-22).

**DSOF 73**

Yeandle's arm tattoos can be seen on his body worn camera video. (*Id.*, COTMSJ0170, 45:4-11).

**DSOF 74**

At one point, Yeandle's "leg or legs were trapped underneath Mr. Alvarado's body and [he] was more or less stuck in this position…[Yeandle's] leg [was] wrapped underneath Mr. Alvarado and was more or less just stuck in a semi-kneeling, semi-seated position on [his] hip because [Yeandle] couldn't get [his], couldn't get [his] leg free." (*Id.*, COTMSJ0170-COTMSJ0171, 45:19-46:1).

**DSOF 75**

The initial TARP was not applied correctly and would not prevent full body double leg kicks or thrashing, so a second TARP was properly applied to reduce full range of motion and keep it secured to prevent escape. (*Id.*, COTMSJ0172, 63:4-21).

**DSOF 76**

Yeandle did not think Alvarado was having difficulty breathing when he was making comments to that effect because of his observations. That is, "him actually physically breathing and talking and not only talking but yelling and screaming and then still possessing the strength and will power to forcefully resist as opposed to behaving like you were low on

oxygen or energy, things like turning blue, going limp, you know, any evidence to the contrary I guess you could say." (*Id.*, COTMSJ0173-COTMSJ0174, 66:17-67:2).

**DSOF 77**

At one-point, other officers are holding Alvarado's arms so that Yeandle could loosen Alvarado's handcuffs. (*Id.*, COTMSJ0175-COTMSJO176, 69:18-70:8).

**Ryan Ake's Deposition Transcript**

**DSOF 78**

Ryan Ake ("Ake") is currently an officer in Loveland, Colorado, and was previously an officer with TPD from 2017 to 2021. (Ryan Ake Deposition Transcript, attached hereto as COTMSJ0180-COTMSJ0228; COTMSJ0181, 5:2-16).

**DSOF 79**

Ake testified about his training with TPD. (*Id.*, COTMSJ0182-COTMSJ0183, 8:9-9:3).

**DSOF 80**

Ake is familiar with positional asphyxia and knows that it is important to put someone in a recovery position when it is safe to do so. (*See Id.*, COTMSJ0183-COTMSJ0185, 9:4-11:3).

**DSOF 81**

If someone complains that they cannot breathe, he knows to put the person in the recovery position, and in this case, Alvarado was already in the recovery position some of the time he was making that complaint. (*See Id.*, COTMSJ0185-COTMSJ0186, 11:23-12:8).

**DSOF 82**

Alvarado was also making the complaint of not being able to breathe while the officers were still actively fighting with him. (*Id.*, COTMSJ0186, 12:9-12).

**DSOF 83**

Ake understands what excited delirium is and he has a basic understanding of how drugs relate to it. (*See Id.*, COTMSJ0187-COTMSJ0188, 13:18- 14:7).

**DSOF 84**

Ake testified about his training and experience relating to certain drugs, and he said it was his assumption that Alvarado had ingested drugs. (*See Id.*, COTMSJ0188-COTMSJ0189, 14:13-15:24).

**DSOF 85**

A TARP is typically applied while a person is on their stomach and then they are put in the recovery position. (*Id.*, COTMSJ0190-COTMSJ0191, 16:15-17:3).

**DSOF 86**

The TARP was applied after Alvarado was in handcuffs "[b]ecause he was still actively kicking and things of that sort, so we wanted to make sure he was secured before we had med come in and check him out." (*Id.*, COTMSJ0212, 52:22-24 and COTMSJ0213, 53:4-6; *see also id.*, COTMSJ0225, 80:1-3 ["he's still moving his body around, still not complying with us trying to get him in a recovery position, and the need for the TARP was because he was still kicking"]).

**DSOF 87**

Ake had training regarding when to use a spit sock and placing a second is appropriate, if needed. (*See Id.*, COTMSJ0191-COTMSJ0192, 17:7-18:20).

**DSOF 88**

Ake was concerned "[b]ecause [Alvarado] was spitting and making guttural sounds with his mouth while [Ake] was close to his head." (*Id.*, COTMSJ0192-COTMSJ0193, 18:21-19:7; *see also id.*, COTMSJ0221, 70:9-14 and COTMSJ0222, 71:12-14).

**DSOF 89**

Spit socks do not impede someone's ability to breathe whether in "a highly agitated" state or not. (*Id.*, COTMSJ0194, 20:4-10).

**DSOF 90**

Ake applied the first spit sock; it was not applied until approximately 15-20 minutes into the incident and could not be applied sooner because Alvarado was actively fighting with the

officers. (*See Id.*, COTMSJ0194-COTMSJ0195, 20:11-21:25; *see also id.*, COTMSJ0221, 70:4-8).

**DSOF 91**

Ake did not have the spit sock, so he thinks someone gave it to him. (*Id.*, COTMSJ0220-COTMSJ0221, 69:25-70:1).

**DSOF 92**

Another officer had the spit sock and was about to put in on backwards, so Ake took over and put it on correctly. (*See Id.*¸COTMSJ0223, 72:11-19).

**DSOF 93**

Ake was originally responding to the shooting call, which then turned into a suspect fleeing in a vehicle, and then a call that there was a car accident. (*Id.*, COTMSJ0199-COTMSJ0200, 25:24-26:4).

**DSOF 94**

Ake did not make it to the car accident scene because he responded directly to assist Solarino. (*Id.*, COTMSJ0196, 22:9-14).

**DSOF 95**

Ake had information that the person Solarino was struggling with was the same person who fled from the car accident. (*Id.,* COTMSJ0197, 23:13-18).

**DSOF 96**

Ake had information that the car crash was "potentially linked" to the shooting incident, and he switched to respond to the car crash scene "thinking it was related to the shooting." (*See Id.*, COTMSJ0198, 24:15-20; *see also id.*, COTMSJ0199-COTMSJ0200, 25:24-26:4).

**DSOF 97**

Ake believed Alvarado was the shooting suspect and the hit and run suspect. (*Id.*, COTMSJ0200, 26:11-15; *see also id.*, COTMSJ0204, 44:10-11).

**DSOF 98**

When Ake got to the scene, he could see Solarino "squared up" with Alvarado, they were still standing, and he could see the two civilians nearby, and Yeandle was just a few steps in front of Ake also responding to assist. (*Id.*, COTMSJ0202, 37:10-20).

**DSOF 99**

Upon arriving at the scene, no one told Ake that Alvarado may have ingested drugs, nor does Ake think anyone had knowledge of whether he had, but Ake does remember Gamez making a comment that he was "probably under the influence" based on his strength while fighting. (*Id.*, COTMSJ0201, 36:8-18).

**DSOF 100**

Ake also observed behaviors he considered to be consistent with ingesting of drugs. (*Id.*, COTMSJ0201, 36:19-25).

**DSOF 101**

Ake believes at some point he says, "don't fucking bite me." (*Id.*, COTMSJ0203, 42:2-3)

**DSOF 102**

At one point you can see Ake's forearm, or elbow, on Alvarado's back or upper shoulder area. (*Id.*, COTMSJ0205-COTMSJ0206, 45:5-46:12).

**DSOF 103**

Later Ake is applying his hands to the back of Alvarado's head. (*Id.*, COTMSJ0207, 47:7-9).

**DSOF 104**

At another point, Ake's knee is on Alvarado's upper back and pressure is being applied to Alvarado so that the handcuffs can be put on. (*Id.*, COTMSJ0208, 48:3-25; *see also id.*, COTMSJ0214-COTMSJ0215, 54:21-55:5 and COTMSJ0224, 76:18-19).

**DSOF 105**

Ake used the minimum amount of force required to secure Alvarado. (*Id.*, COTMSJ0226, 90:4-7).

**DSOF 106**

Alvarado says multiple times that he cannot breathe, and Ake tells him he can based on Ake hearing him breathing. (*Id.*¸COTMSJ0209-COTMSJ0210, 49:10-50:9; COTMSJ0188, 14-21).

**DSOF 107**

Ake thinks Gamez told them they needed to get Alvarado on his side because the officers were still struggling with Alvarado and they believed he is probably high, so they want to get him in the recovery position. (*Id.*, COTMSJ0210-COTMSJ0211, 50:22-51:3).

**DSOF 108**

Once Alvarado was detained, he was rolled onto his side. (*See Id.*, COTMSJ0216-COTMSJ0217, 58:10-59:21).

**DSOF 109**

Alvarado was put in the recovery position when it was safe to do so. (*Id.*, COTMSJ0227, 93:1).

**DSOF 110**

Ake was on scene when another officer was yelling "cardiac arrest," and TFD was called back to treat Alvarado, but Ake was not in direct contact with Alvarado at that time. (*Id.*, COTMSJ0218, 63:7-10).

**DSOF 111**

At no time during his contact with Alvarado did Ake think Alvarado could not breathe. (*Id.*, COTMSJ0219, 64:9-10).

**Mike Gamez's Deposition Transcript**

**DSOF 112**

Mike Gamez ("Gamez") has been an officer with TPD since 2006. (Mike Gamez Deposition Transcript, attached hereto as COTMSJ0229-COTMSJ0252; COTMSJ0230, 5:9-11).

**DSOF 113**

Gamez completed TPD's training to become an officer in 2006, in 2010 he became a defensive tactics instructor, in 2011 he became a physical training instructor, in 2012 he

18

became a firearms instructor, in 2016 he became a driving instructor, rifle instructor, and high-risk vehicle stop instructor. He is a subject matter expert in physical training, which is now considered a master instructor at AZPOST (Arizona Peace Officer Standards Training). (*Id.*, COTMSJ0230-COTMSJ0231, 5:21-6:19).

**DSOF 114**

Gamez responded to the collision on Prince Rd. and Campbell Ave., and he also heard that officers in midtown were working a homicide and that the calls were "possibly related." (*Id.*, COTMSJ0232, 10:18-22).

**DSOF 115**

When Gamez heard on the radio that officers were struggling with the suspect who fled the collision, and he realized he was close to them, he ran over to the area to assist. (*Id.*, COTMSJ0233-COTMSJ0234, 15:1-16:8).

**DSOF 116**

Gamez could not locate them at first but when he did, he could see officers Solarino, Yeandle, and Ake still struggling with Alvarado. (*Id.*, COTMSJ0234, 16:13-25 and COTMSJ0235, 17:9-14).

**DSOF 117**

Gamez can be seen in his BWC video putting his hand on Alvarado's head area and Gamez "notice[s] that this struggle doesn't really need any more force. It just needs some communication, some direction and some guidance. So I start basically doing that because adding more force is not going to do any good." (*Id.*, COTMSJ0236-COTMSJ0237, 18:6-19:7).

**DSOF 118**

Gamez is the person who can be heard on his BWC video saying if he was not careful, he will break his arm. (*Id.*, COTMSJ0238-COTMSJ0242, 20:9-24:6).

**DSOF 119**

Gamez is familiar with positional asphyxia and the recovery position. (*Id.*, COTMSJ0243-COTMSJ0244, 25:23-26:23).

**DSOF 120**

Per their training, Gamez knew they needed to get Alvarado in handcuffs as quickly as possible and get him in the recovery position. He communicated that to the other officers, and he believes it was less than a minute that he was put in the recovery position. (*See Id.*, COTMSJ0245-COTMSJ0246, 27:9-28:3).

**DSOF 121**

Gamez has training relating to the ingestion of drugs and the effect of drugs on the person who has ingested them. (*See Id.*, COTMSJ0246, 28:4-22).

**DSOF 122**

Gamez is familiar with excited delirium, and Alvarado was displaying several signs of that happening. (*See Id.*, COTMSJ0246-COTMSJ0247, 28:23-29:14).

**DSOF 123**

Alvarado was spitting and Gamez remembers that someone asked for a spit sock. (*Id.*, COTMSJ0247, 29:15-24).

**DSOF 124**

Gamez was trained in the use of the spit sock, and it does not impede someone's ability to breathe. (*Id.*, COTMSJ0248-COTMSJ0249, 30:23-31:19; *see also id.*, COTMSJ0251, 33:12-16).

**DSOF 125**

After TFD arrived, Gamez had limited contact with Alvarado. (*Id.,* COTMSJ0250-COTMSJ0251, 32:24-33:5).

**Joseph Gradias Deposition Transcript**

**DSOF 126**

Joseph Gradias ("Gradias") is a detective with TPD and has been with the department since January 2013, and he was a patrol officer when the subject incident occurred. (Joseph Gradias Deposition Transcript, attached hereto as COTMSJ0253-COTMSJ0272; COTMSJ0254-COTMSJ0255, 4:21-5:3 and COTMSJ0255-COTMSJ0256, 5:23-6:3).

**DSOF 127**

Gradias went through TPD's training and was a lead police officer before promoting to detective. (*Id.*, COTMSJ0257-COTMSJ0258, 7:12-8:19).

**DSOF 128**

Gradias remembers a call relating to a shooting, or homicide, wherein the suspect described to be a Hispanic male had fled. (*Id.*, COTMSJ0259, 12:5-19).

**DSOF 129**

Gradias believes he was originally responding to the homicide call when the call related to the crash came in and that suspect, a Hispanic male, had fled; Gradias believed the calls to be related. (*Id.*, COTMSJ0260, 13:2-16).

**DSOF 130**

Gradias was trained on what positional asphyxia is and about the recovery position. (*Id.*, COTMSJ0261-COTMSJ0262, 20:9-21:9).

**DSOF 131**

Gradias also knows about excited delirium and how it relates to ingesting drugs. (*See Id.*, COTMSJ0262-COTMSJ0263, 21:16-22:2).

**DSOF 132**

Gradias first contacted the two civilians; he remembers the dad was breathing heavily and could not remember if the son was too. (*Id.*, COTMSJ0264, 23:1-4).

**DSOF 133**

Gradias understood that the two civilians were involved in a struggle with Alvarado. (*Id.*, COTMSJ0264, 23:15-18).

**DSOF 134**

After briefly talking to the civilians, Gradias "called out to [the] officers to see if they had the situation handled. [He] didn't get a response. And [he] ran down to their area and then given all the debris went around the big bush in the middle." (*Id.*, COTMSJ0264, 23:5-8).

**DSOF 135**

There were four officers dealing with Alvarado when Gradias got to the scene, and he assisted with post-handcuffing. (*Id.*, COTMSJ0264-COTMSJ0265, 23:25-24:6).

**DSOF 136**

Gradias remembers Alvarado grabbing one of his arms or hands and Gradias grabbed Alvarado's arm, and a TARP was applied. (*Id.*, COTMSJ0265-COTMSJ0266, 24:25-25:2).

**DSOF 137**

Gradias was not the officer captured in the video saying, "if you complain, you can breathe." (*Id.*, COTMSJ0267, 32:2-13).

**DSOF 138**

The TARP does not prevent someone from beathing when applied correctly. (*Id.*, COTMSJ0268, 35:18-24).

**DSOF 139**

Gradias thinks he ran and tried to yell out to another officer closer to the ambulance that they needed them to come back because he thought that would be faster than the radio. (*Id.*, COTMSJ0269, 43:2-10).

**DSOF 140**

Gradias said he also looked in a patrol car to see if there was an Automated external defibrillator (AED), but there was not one. (*Id.*, COTMSJ0270, 44:8-20).

**DSOF 141**

Gradias saw that another officer was performing CPR, so he assumed Alvarado was not breathing. (*See Id.*, COTMSJ0271, 45:14-24).

**Donovan Vance Deposition Transcript**

**DSOF 142**

Donovan Vance ("Vance") has been an officer with TPD for four and a half years (when deposed). (Donovan Vance Deposition Transcript, attached hereto as COTMSJ0273-COTMSJ0305; COTMSJ0274, 5:3-6).

**DSOF 143**

Vance completed all of TPD's training requirements to become a sworn police officer. (*See Id.*, COTMSJ0274-COTMSJ0275, 5:15-6:5).

**DSOF 144**

Vance was in field training and just out of the academy a little over a month when this incident occurred. (*Id.*, COTMSJ0276, 8:9-12).

**DSOF 145**

Vance responded to the call for the car accident at Prince Rd. and Campbell Ave. and saw the crashed cars. (*Id.*, COTMSJ0277-COTMSJ0278, 9:16-10:3).

**DSOF 146**

While enroute to the car crash call, Vance heard over the radio that the driver of one of the cars fled the scene and was located in the alleyway east of the intersection. (*Id.*, COTMSJ0278, 10:6-10; *see also id.*, COTMSJ0278-COTMSJ0279, 10:23-11:7).

**DSOF 147**

Vance knew that an officer was "in a struggle with the individual that had fled." (*Id.*, COTMSJ0280, 12:9-11).

**DSOF 148**

When Vance got to the alleyway Alvarado was in handcuffs, on his side with one spit sock on, Vance checked in with a couple of officers, and then he spoke to the civilians involved. (*Id.*, COTMSJ0281-COTMSJ0282, 13:18-14:3 and COTMSJ0282, 14:12-14; *see also id.*, COTMSJ0283, 15:8-14 and COTMSJ0284, 19:18-24).

**DSOF 149**

Based on the information Vance had, the crimes Alvarado committed were fleeing from the scene of the accident and resisting arrest, but there could have been other crimes that Vance did not know of. (*Id.*, COTMSJ0285, 20:11-21).

**DSOF 150**

Vance assisted with holding Alvarado's hip while Ofc. Durazo and Ofc. Santa Maria attempted to locate an identification on Alvarado who was calm and on his side. (*Id.*, COTMSJ0286-COTMSJ0287, 22:21-23:19).

**DSOF 151**

Alvarado did not appear to be in any distress when the officers were looking for his identification. (*Id.*, COTMSJ0304, 41:6-9).

**DSOF 152**

TFD was clearing the scene when Vance heard a gurgling sound come from Alvarado, and this was the first indication that Alvarado was in medical distress. (*Id.*, COTMSJ0287, 23:20-24, COTMSJ0288, 24:15-24, and COTMSJ0304, 41:10-15).

**DSOF 153**

Another officer said to go get TFD, and Vance rolled him onto his back and "attempted the sternum rub to check for responsiveness, and then Officer Santa Maria started compressions." (*Id.*, COTMSJ0289, 25:1-9; *see also id.*, COTMSJ0304, 41:18-21).

**DSOF 154**

Vance removed Santa Maria's glasses, then the officers decided to remove the handcuffs and restraints. (*Id.*, COTMSJ0285, 26:20-24).

**DSOF 155**

Vance and another officer took off the handcuffs and rolled him back onto his side, "which is about the time that whichever officer was able to recontact the paramedic units from the fire department they arrived back into that position and was informed by the personnel with the fire department that we needed to get him to a gurney in order to effect -- to provide better, effective CPR and to transport to the hospital in a quicker manner." (*Id.*, COTMSJ0290-COTMSJ0291, 26:25-27:7; *see also id.*, COTMSJ0292, 28:7-16, COTMSJ0297, 33:19-24, and COTMSJ0298, 34:2-11).

**DSOF 156**

Vance testified that "once we realized that he needed further emergency care we hailed the appropriate units that have training in that." (*Id.*, COTMSJ0293, 29:12-14).

**DSOF 157**

Vance assisted with lifting Alvarado onto the gurney for TFD to resume the CPR. (*Id.*, COTMSJ0293, 29:21-25).

**DSOF 158**

Vance believes that he and another officer removed the spit socks while CPR was in progress "in order to view or to be able to look at his person." (*Id.*, COTMSJ0294, 30:1-22; *see also id.*, COTMSJ0296, 32:4-11).

**DSOF 159**

Vance also received training as to when to use a spit sock, and there is no reason one could not use two because "it doesn't affect your ability to breathe. It's a mesh material that just helps to prevent the biohazard of saliva to be airborne towards individuals." (*Id.*, COTMSJ0295, 31:1-12).

**DSOF 160**

Vance did not have any information relating to whether officers suspected that Alvarado ingested drugs, and Vance has received training relating to the effects of drugs on someone who has ingested them, including methamphetamine. (*Id.*, COTMSJ0296-COTMSJ0297, 32:23-33:14; *see also id.*, COTMSJ0303, 40:12-24).

**DSOF 161**

Vance knows about positional asphyxia and the importance of "quickly as feasibly possible put[ting] them into the recovery position." (*Id.*, COTMSJ0299-COTMSJ0300, 36:21-37:14; *see also id.*, COTMSJ0301, 38:12-13).

**DSOF 162**

Vance is familiar with excited delirium and its impact on someone. (*See Id.*, COTMSJ0302-COTMSJ0303, 39:20-40:11).

**Scott Ellis Deposition Transcript**

**DSOF 163**

Scott Ellis ("Ellis") is currently retired, was with TPD for 22 and a half years, and was a patrol supervisor in operations division west when this incident occurred. (Scott Ellis Deposition Transcript, attached hereto as COTMSJ0306-COTMSJ0323; COTMSJ0307, 4:15-18 and COTMSJ0308, 5:3-4).

**DSOF 164**

Ellis was in the subject area when he heard a call over the radio that multiple officers were fighting with an individual, and that the person was suspected of "[l]eaving the scene of a collision involving injury as well as possibly be[ing] involved in a homicide that occurred [at] Country Club and Fort Lowell..." (*Id.*, COTMSJ0309-COTMSJ0310, 6:13-7:6; *see id.*, COTMSJ0311, 8:3-13 and COTMSJ0317, 16:13-20).

**DSOF 165**

When Ellis arrives on scene, he sees an individual on the ground handcuffed, as he got to where they were he could see that the individual was handcuffed behind his back and a TARP had been applied to his ankles. (*Id.*, COTMSJ0311-COTMSJ0312, 8:20-9:4; *see also id.*, COTMSJ0316, 13:8-10 and COTMSJ0318, 18:3-5).

**DSOF 166**

Alvarado was contained, but still resisting; squirming on the ground, yelling, spitting, cursing. (*Id.*, COTMSJ0312, 9:7-18).

**DSOF 167**

Ellis directed officers to apply a spit sock as he was concerned "about anything that he might have, be it COVID, be it some other disease." (*Id.*, COTMSJ0313, 10:14-23).

**DSOF 168**

The spit sock does not impact a person's ability to breathe. (*Id.*, COTMSJ0313-COTMSJ0314, 10:24-11:5; *see also id.*, COTMSJ0319-COTMSJ0320, 19:20-20:2).

**DSOF 169**

Ellis believes the spit sock officers applied was "older in nature" and TFD applied a "more recent version." (*Id.*, COTMSJ0314, 11:12-18).

**DSOF 170**

The first spit sock was soaked; it was wet from Alvarado's saliva. (*Id.*, COTMSJ0314-COTMSJ0315, 11:22-12:1).

**DSOF 171**

While Ellis was on scene, Alvarado was on his side in the recovery position, but there were times when he would be flailing and, on his back, or stomach, but officers were trying to keep him in the recovery position. (*Id.*, COTMSJ0315-COTMSJ0316, 12:15-13:3).

**DSOF 172**

TFD made the decision not to transport Alvarado, which is always the medical professional's decision, TPD does not second-guess that decision as they do not have the medical training. (*Id.*, COTMSJ0320-COTMSJ0321, 20:14-21:1).

**DSOF 173**

When TFD was leaving, Ellis was getting information about the collision, trying to figure out if Alvarado was related to the homicide call and what actions needed to be taken next, and at some point, they notice Alvarado is not breathing. (*Id.*, COTMSJ0316, 13:11-25 and COTMSJ0321-COTMSJ0322, 21:5-22:22).

**Marco Durazo Deposition Transcript**

**DSOF 174**

Marco Durazo ("Durazo") is currently a detective with the Pima County Sheriff's Department, was a TPD officer for two years, and a patrol officer when this incident occurred. (Marco Durazo Deposition Transcript, attached hereto as COTMSJ0324-COTMSJ0347; COTMSJ0325-COTMSJ0326, 5:10-6:19 and COTMSJ0327, 8:19-22).

**DSOF 175**

Durazo completed the training at the academy, post basic, and field training as a TPD officer. (*Id.*, COTMSJ0328, 9:7-15).

**DSOF 176**

Durazo knows what positional asphyxia is and the recovery position's importance. (*Id.*, COTMSJ0329-COTMSJ0330, 10:6-11:1).

**DSOF 177**

Durazo is familiar with the concept of excited delirium and its causes. (*Id.*, COTMSJ0330, 11:2-14).

**DSOF 178**

Durazo received training relating to the ingestion of drugs and the impact of drugs on the body. (*Id.*, COTMSJ0330-COTMSJ0331, 11:16-12:20).

**DSOF 179**

By the time Durazo responds to the alleyway scene, Alvarado was thrashing around, but already in handcuffs, and he had the initial TARP on. (*Id.*, COTMSJ0332-COTMSJ0333, 19:23-20:9).

**DSOF 180**

Durazo saw TPD put the first spit sock, and he knew that TFD applied the second one. (*See Id.*, COTMSJ0333-COTMSJ0335, 20:13-22:9).

**DSOF 181**

Durazo is trained on the use of spit socks, and they do not restrict air flow or restrict a person's ability to breathe; not one or two. (*Id.*, COTMSJ0335, 22:10-15; *see also id.*, COTMSJ0342-COTMSJ0343, 44:23-45:1).

**DSOF 182**

Durazo assisted with applying the second TARP because the first was not working properly. (*See Id.*, COTMSJ0336, 24:12-25).

**DSOF 183**

Alvarado kicked Durazo pushing him back. (*Id.*, COTMSJ0337-COTMSJ0338, 27:22-28:7; *see also id.*, COTMSJ0339, 40:18-20 and COTMSJ0340-COTMSJ0341, 41:17-42:4).

**DSOF 184**

At some point, Durazo had his hand "slightly on [Alvarado's] shoulder and slightly over his head" to try to prevent him from injuring himself because before that he thrashed forward when TFD was trying to check his vitals, and he smacked his head against the wall. (*Id.*, COTMSJ0343-COTMSJ0344, 45:25-46:13; *see also id.*, COTMSJ0345, 47:1-9).

**DSOF 185**

Durazo believed it was less than a minute after TFD left that Alvarado stopped breathing. (*Id.*, COTMSJ0346, 49:2-12).

**DSOF 186**

TPD took the restraints (handcuffs and TARP) off and started doing compressions. (*Id.*, COTMSJ0346, 49:13-20).

**Raymond Fleck's Deposition Testimony**

**DSOF 187**

Raymond Fleck ("Fleck") was employed by Tucson Fire Department ("TFD") for 20 years and was a paramedic. (Raymond Fleck's Deposition Transcript, attached hereto as COTMSJ0348-COTMSJ0378; COTMSJ0349, 5:9-10, COTMSJ0349-COTMSJ350, 5:18-6:4).

**DSOF 188**

Fleck testified that a spit sock is appropriate "when the patient gives us reason to believe that we are at risk for being exposed to bodily fluids…Spit, vomit mostly…" (*Id.*, COTMSJ0351, 14:5-11).

**DSOF 189**

Fleck guesses he used a spit sock on someone "dozens of times over the course of 20 years." (*Id.*, COTMSJ0351, 14:18-24; *see also id.*, COTMSJ0353-COTMSJ0354, 18:24-19:5).

**DSOF 190**

He remembers first responding to a car accident in the area and then the parking lot. (*Id.*, COTMSJ0355, 25:4-7).

**DSOF 191**

There were police officers and civilians at the scene and TFD was directed down an alley area to the patient. (*Id.*, COTMSJ0355, 25:8-13).

**DSOF 192**

He observed a spit sock on the patient, which he believed to be on loosely. (*Id.*, COTMSJ0356, 26:14-18; *see also id.*, COTMSJ0359, 31:5-7, 17-18; *see also id.*, COTMSJ0358, 30:22-24 ["it appeared to be so loose that it wasn't really effective or in our way"]; *id.*, 31:1-2 ["it didn't appear to be inhibiting his ability to spit at us."]; *id.*, COTMSJ0361-COTMSJ0362, 33:24-34:2 ["it didn't look to me like it was going to be effective in preventing the potential of exposure." ]).

**DSOF 193**

The spit sock was moving around, "that's why we applied the other one." (*Id.*, COTMSJ0359-COTMSJ0360, 31:24-32:2).

**DSOF 194**

Paramedics Goldstein and Spencer had primary contact with Alvarado and Paramedic Goldstein attempted to speak with him. (*Id.*, COTMSJ0363-COTMSJ0364, 36:19-37:1).

**DSOF 195**

TFD was there to assess Alvarado for injuries. (*Id.*, COTMSJ0357, 27:4-7).

**DSOF 196**

TFD personnel said another spit sock should be applied, and TFD applied the second spit sock, which did go over the head, over the first spit sock. (*Id.*, COTMSJ0365, 38:1-18).

**DSOF 197**

TFD is "trained to treat all bodily fluid as potentially infectious." (*Id.*, COTMSJ0366, 43:13-14, 18-19).

**DSOF 198**

Fleck believed that the second spit sock "was going to be effective in preventing [them] from being exposed to communicable diseases." (*Id.*, COTMSJ0367, 44:1-6).

**DSOF 199**

Fleck was concerned about HIV, Hepatitis C, and COVID (coronavirus). (*Id.*, COTMSJ0377, 75:3-18).

**DSOF 200**

TFD Engine 20 crew were walking back to the TFD truck when they were called back. (*See id.*, COTMSJ0368-COTMSJ0369, 46:22-47:17).

**SOF 201**

"In order to provide resuscitative efforts, we would have had to have gotten him out of the restraints, but I don't remember who or when made that decision, who made that decision or when it was made." (*Id.*, COTMSJ0370, 48:8-11).

**DSOF 202**

Fleck "drove the ambulance to the hospital while resuscitative efforts were continued in the back." (*Id.*, COTMSJ0371, 54:22-24).

**DSOF 203**

Fleck does not "recall seeing symptoms that told [Fleck] the patient must be under the influence of drugs." (*Id.*, COTMSJ0372, 59:19-20).

**DSOF 204**

TFD did a full vitals assessment. (*See id.*, COTMSJ0373, 63:11-25).

**DSOF 205**

When TFD made the decision not to transport Alvarado to the hospital he was still breathing. (*Id.*, COTMSJ0374, 71:19-22).

**DSOF 206**

If there is concern about someone's ability to breathe, TFD would listen to their lungs and check their oxygen levels. (*Id.*, COTMSJ0375, 73:16-20).

**DSOF 207**

Alvarado's pulse oxygen level was checked and was 94 percent. (*Id.*, COTMSJ0375, 73:21-25).

**DSOF 208**

Nothing about Alvarado's oxygen level or any of the vitals caused Fleck to be alarmed or believe he needed immediate medical attention. (*Id.*, COTMSJ0376, 74:4-10).

**Silas Spencer's Deposition Transcript**

**DSOF 209**

Silas Spencer ("Spencer") was an EMT in San Diego, a paramedic in Escondido, CA, and then a paramedic for TFD from 2015 to 2022, then he was a paramedic in Idaho, and is currently a paramedic in Flagstaff, Arizona. (Silas Spencer Deposition Transcript, attached hereto as COTMSJ0379-COTMSJ0406; COTMSJ0380-COTMSJ0381, 5:9-6:25).

**DSOF 210**

"EMTs are basic life support providers as opposed to a paramedic with the extended and scope of practice you receive you are now advanced life support provider." (*Id.*, COTMSJ0382, 7:21-24).

**DSOF 211**

"Every state you work in you have to get licensed through that state… every two years you have to re-up your license." (*Id.*, COTMSJ0383, 11:12-18).

**DSOF 212**

"A spit sock is a net that limits the mucus from coming into contact with providers." (*Id.*, COTMSJ0384, 12:16-17).

**DSOF 213**

Spencer was "taught…from EMT school that any time you come into contact with saliva, blood, any sort of by-product or body fluid from a patient that you want to minimize your exposure and contact. So a spit sock provides you the ability to limit that." (*Id.*, COTMSJ084-COTMSJ0385, 12:23-13:2).

**DSOF 214**

"Occasionally if one [spit sock] is not working effectively or in terms of the effect that you would like you can apply a second." (*Id.*, COTMSJ0385, 13:14-16).

**DSOF 215**

Using two spit socks, or "a double" does not impede a person's ability to breath, nor would it exacerbate respiratory issues. (*Id.*, COTMSJ0386, 14:13-18).

**DSOF 216**

Being "highly agitated" does not impede someone's ability to breathe through a spit sock. (*See id.*, COTMSJ0392-COTMSJ0393, 29:25-30:3).

**DSOF 217**

Spencer has seen individuals in police custody who were restrained with their handcuffs and legs connected "countless times." (*Id.*, COTMSJ0387, 20:6-11).

**DSOF 218**

During his time with TFD he "fairly often" provided medical assistance to people in police custody. (*Id.*, COTMSJ0387, 20:16-21).

**DSOF 219**

Spencer recalls first responding to a car accident and then to a call to assess someone in police custody. (*Id.*, COTMSJ0388-COTMSJ0389, 24:2-25:17).

**DSOF 220**

TFD was able "to see him still spitting through his spit sock" as they "could see spit coming from out of the spit sock while he was talking." (*Id.*, COTMSJ0390, 27:10-21; *see also id.*, COTMSJ0396, 33:3-12).

**DSOF 221**

TFD applies spit socks to protect them from exposure from diseases like HIV, Hepatitis C, and at this time COVID. (*See id.*, COTMSJ0391, 28:11-15).

**DSOF 222**

Spencer testified that the second spit sock was applied because "the patient was still spitting, there was mucus still coming out and around, and we were concerned for our safety." (*Id.*, COTMSJ0395, 32:2-8).

**DSOF 223**

Spencer could not recall what he said to Alvarado or what, if anything, he said to Spencer. Spencer testified that he would have to review the body worn footage. (*Id.*, COTMSJ0393, 30:7-17; *see also id.*, COTMSJ0399, 39:21-22).

**DSOF 224**

Spencer described his evaluation of Alvarado when they arrived as follows:

> "Walked up to the patient, saw him on the ground on the side or, you know, made sure the patient was on its side. Then I established that he had a patent airway, he was able to talk, he was breathing. And I felt for a pulse. He had circulation. And then we started taking vital signs." (*Id.*, COTMSJ0394, 31:6-13).

**DSOF 225**

When the second spit sock was applied, there was no reason to believe that Alvarado was having trouble breathing. (*Id.*, COTMSJ0396-COTMSJ0397, 33:23-34:1).

**DSOF 226**

"At first when [TFD] approached him he was a little agitated. Once [TFD] started taking vital signs he was able to recognize that we were there to evaluate him, and his demeanor then -- he was less agitated with us." (*Id.*, COTMSJ0397, 34:11-14).

**DSOF 227**

Spencer did not observe any behaviors indicating Alvardo had consumed illegal drugs or that concerned Spencer. (*See id.*, COTMSJ0398, 37:19-22 and COTMSJ0400, 40:5-7).

**DSOF 228**

Being restrained with hands and feet behind the back does not impact TFD's ability to evaluate someone, nor would it impact that person's ability to breathe. (*Id.*, COTMSJ0399, 39:4-10).

**DSOF 229**

After being called back: "When we made it to the scene, we saw Tucson Police Department doing compressions on the patient. From my recollection I was the first firefighter there, felt for a pulse, checked. He wasn't breathing, had no pulse. And then I started compressions."

(*Id.*, COTMSJ0401, 45:12-16; *see also id.*, COTMSJ0402, 47:17-21 and COTMSJ0403, 48:24-25 ["The patient was not breathing and did not have a pulse."])

**DSOF 230**

Alvarado was then treated just like any patient who was in cardiac arrest, and TFD's actions were standard for that situation. (*See id.*, COTMSJ0402-COTMSJ0403, 47:22-48:8).

**DSOF 231**

Spencer traveled with Alvarado to the hospital and his condition while being treated by TFD up until when he was transferred to the hospital's care never changed. (*See id.*, COTMSJ0404-COTMSJ0405, 49:16-50:9).

**Keith Goldstein Deposition Transcript**

**DSOF 232**

Keith Goldstein ("Goldstein") has been employed as a Paramedic with TFD since 2006. (Keith Goldstein Deposition Transcript, attached here as COTMSJ0407-COTMSJ0441; COTMSJ0408, 5:5-24; COTMSJ0409, 6:6-8).

**DSOF 233**

Was trained in the use and application of the spit sock. (*Id.*, COTMSJ0410, 10:2-8; *see also id.*, COTMSJ0420, 29:13-16).

**DSOF 234**

A spit sock is used to prevent biting and spitting. (*Id.*, COTMSJ0410, 10:11-13, 22-24 and COTMSJ0411, 12:2-5).

**DSOF 235**

Spit socks were routinely used during COVID. (*Id.*, COTMSJ0412, 13:22-24).

**DSOF 236**

Goldstein agrees that spit socks are a tool used to prevent the transmission of communicable diseases. (*Id.*, COTMSJ0439, 63:3-23).

**DSOF 237**

Oxygen saturation at 92 or higher is healthy or normal, anything under 88 is concerning and under 80 is dangerous. (*Id.*¸COTMSJ0413-COTMSJ0414, 16:10-17:8).

**DSOF 238**

Goldstein has treated people in police custody and restrained by police many times. (*Id.*, COTMSJ0415 18:10-18 and COTMSJ0416, 19:16-19).

**DSOF 239**

Goldstein remembers responding to a dispatch in the area of Prince Rd. and Campbell Ave. down an alley where police were, and a person was in custody on the ground. (*Id.*, COTMSJ0417, 24:1-9).

**DSOF 240**

In his post-incident interview Goldstein said that he assumed the second spit sock was applied due to concerns about HIV and Hepatitis C, but he did not recall saying that when deposed. (*See id.*, COTMSJ0418-COTMSJ0419, 26:21-27:4).

**DSOF 241**

Goldstein does not have an independent memory, but he does rely on what he said during the post-incident interview as to him and Paramedic Spencer having primary contact with Alvarado. (*Id.*, COTMSJ0421-COTMSJ0422, 30:25-31:6).

**DSOF 242**

He was able to complete his assessment of Alvarado, which included taking his blood pressure, pulse, and ox (oxygen saturation level). (*Id.*, COTMSJ0422, 31:15-21 and COTMSJ0428, 44:5-16).

**DSOF 243**

Goldstein remembers asking Alvarado if he was hurt anywhere and he responded "no." (*Id.*, COTMSJ0423, 32:9-15).

**DSOF 244**

"There were no obvious injuries or bleeds indicating that he was physically hurt." (*See Id.*, COTMSJ0426, 42:5-14 and COTMSJ0427, 43:12-13).

**DSOF 245**

Goldstein described Alvarado as combative, fighting the restraints, and pretty vocal, but that he calmed down when TFD was interacting with him. (*Id.*, COTMSJ0423, 32:19-25 and COTMSJ0425, 37:2-13).

**DSOF 246**

Goldstein does not believe that the second spit sock impeded Alvarado's ability to breathe. (*Id.*, COTMSJ0424, 36:16-20).

**DSOF 247**

Goldstein read that Alvarado's oxygen saturation level was 94 in the report, and that level did not, and does not, cause him any concern. (*Id.*, COTMSJ0426, 42:15-21).

**DSOF 248**

Goldstein has provided medical assistance in the past to someone in TPD custody and restraints, and it does not affect his ability to assess or provide assistance, it is just done differently. (*Id.*, COTMSJ00429-COTMSJ0430, 45:25-46:7; *see also id.*, COTMSJ0437, 56:13-24 and COTMSJ0438, 59:11-13).

**DSOF 249**

Alvarado was given IV access, epinephrine, Narcan, and endotracheal intubation, high flow oxygen, and CPR efforts were continued after TFD returned to him after police waved them down because Alvarado had stopped breathing. (*Id.*, COTMSJ0431-COTMSJ0433, 49:14-51:19).

**DSOF 250**

It is normal practice for TFD to have restrains removed if someone needed to be resuscitated. (*Id.*, COTMSJ0434, 53:17-24).

**DSOF 251**

Goldstein also went with Alvarado to the hospital, and he was the one who started the IO (intraosseous vascular access) and gave him epinephrine. He could not recall if he gave the Narcan. (*Id.*, COTMSJ0435-COTMSJ0436, 54:18-55:1).

**DSOF 252**

Alvarado remained pulseless and apneic on the way to the hospital. (*Id.*, COTMSJ0436, 55:9-12).

**DSOF 253**

If he believed based on Alvarado's vital signs that Alvarado was suffering from a serious medical condition, Goldstein would have transported him to the hospital. (*Id.*, COTMSJ0440, 64:22-25).

**Nick Solarino's Post-Incident Interview on March 24, 2020**

**DSOF 254**

Solarino's training for the TASER included classroom training, a written examination, application at the police academy, and annual recertification or qualifications. (Nick Solarino Interview Excerpts, attached hereto as COTMSJ0442-COTMSJ0451, at COTMSJ0443, 20-39).

**DSOF 255**

Solarino knew that the person shot had passed, the suspect that fled the shooting was likely armed, and he believed that the person civilians were fighting with was possible the same suspect from the shooting. (*See Id.*, COTMSJ0444, 15:1-44).

**DSOF 256**

Solarino did not wait for backup because he was concerned for the civilian's safety, and "the potential risk to the civilian essentially outweighed [his] safety as a solo Officer to go make contact with [Alvarado] at the time right." (*Id.* COTMSJ0444, 15:32-34).

**DSOF 257**

Very quickly after engaging Alvarado, Solarino realizes that "[Alvarado] was taller and more physically fit" than him, and he is thinking that he "had two witnesses…to protect" and himself. (*Id.*, COTMSJ0445, 12-15).

**DSOF 258**

After the deployment of the TASER is ineffective, Solarino is still concerned for the safety of the two civilians he knows are still in close proximity, and he is trying to get control over Alvarado. (*Id.*, COTMSJ0446, 18-25).

**DSOF 259**

As they are struggling, Alvarado grabs for Solarino's waistbelt and is able to grab a gun magazine from Solarino's belt. (*Id.,* COTMSJ0446-COTMSJ0447, 20:33-21:7).

**DSOF 260**

Solarino was concerned that Alvarado would use the gun magazine as a "blunt instrument" to attack Solarino, and the TASER was not effective, so Solarino delivers two to three closed fist strikes to the left side of Alvarado's face. (*Id.*, COTMSJ0447, 1-16).

**DSOF 261**

Solarino articulated the escalation in Alvarado's level of resistance from the time he first saw him up until when he delivered the strikes to Alvarado's face during his interview. (*Id.*, COTMSJ0448).

**DSOF 262**

Solarino described the struggle with Alvarado as the worst he has ever experienced and "the most like afraid I could I say I've been in, in a situation like that where I couldn't control it, like it, it needed the level, it needed the amount of Officers just to get the control." Solarino said he was used to suspects giving in at some point and Alvarado just continued fighting the whole time. (*Id.*, COTMSJ0449, 28-37).

**DSOF 263**

Later, Solarino says, "like I said I had the level of fear that I wasn't able to…I was not going to be able to control this guy um, and with everything going on and then with the other civilians witnesses that were nearby and the type of incident that I thought this guy was involved in I felt, I thought I was gonna end up having to shoot this guy." (*Id.*, COTMSJ0450, 7-11).

**Joshua Gaither, M.D.**

**DSOF 264**

On April 29, 2024, Dr. Joshua Gaither provided a Declaration wherein he discussed his review of TFD's response and treatment during the subject incident, and he expressed his opinions regarding said medical treatment "to a reasonable degree of medical and professional certainty and [] based on the nationally accepted standard of care in March 2020." (Declaration of Dr. Joshua Gaither, attached here to as COTMSJ0452-COTMSJ0454; COTMSJ0454, ¶ 16).

**DSOF 265**

Joshua Gaither, M.D. has been TFD's Medical Director since January 2020. (*Id*, COTMSJ0452, ¶ 3).

**DSOF 266**

Part of Dr. Gaither's job "is to ensure that the training and protocols utilized by Tucson Fire Department paramedics and EMS personnel are consistent with best practices." (*Id.*, COTMSJ0453, ¶ 5).

**DSOF 267**

In 2021, Dr. Gaither "implemented quality control and review procedures for the care of patients in the custody of law enforcement officers" and although these were not implemented when this incident occurred, he "had the opportunity to review patient care provided by [the] same paramedic crew that attended to Mr. Alvarado, and it is a high-performing crew." (*Id.* COTMSJ0453, ¶ 6).

**DSOF 268**

When the subject incident occurred, "there were no concerns about the performance of these paramedics." (*Id.* COTMSJ0453, ¶ 7).

**DSOF 269**

Dr. Gaither "reviewed the patient care provided to Mr. Alvarado during this incident, including a review of his vital signs," and his opinion based on his review, training and

experience, is "the paramedics provided appropriate care to Mr. Alvarado." (*Id.* COTMSJ0453, ¶ 8).

**DSOF 270**

Dr. Gaither noted that during their treatment "Mr. Alvarado articulated to paramedics that he was not injured." (*Id.* COTMSJ0453, ¶ 9).

**DSOF 271**

Dr. Gaither further noted, "Mr. Alvarado also made statements like 'get away from me,' that, in March 2020, were taken as a refusal of further care." (*Id.* COTMSJ0453, ¶ 10).

**DSOF 272**

Dr. Gaither noted, "[p]aramedics quickly assessed Mr. Alvarado and obtained a set of vital signs from him, including his respiratory rate, blood pressure, heart rate, and pulse oxygen level. Both Mr. Alvarado's blood pressure and pulse oxygen levels were within the expected norm. Mr. Alvarado's respiratory rate and heart rate were both slightly elevated, and the paramedics reasonably concluded that the slight elevations were consistent with someone who had been physically exerting himself." (Id. COTMSJ0453, ¶ 11).

**DSOF 273**

Dr. Gaither opined that "[a]t all times, the paramedics were professional with Mr. Alvarado." (*Id.* COTMSJ0453, ¶ 12).

**DSOF 274**

Dr. Gaither further opined that "[o]nce Mr. Alvarado went into cardiac arrest and paramedics returned to the scene, they performed exceptionally well." (*Id.* COTMSJ0454, ¶ 13).

**DSOF 275**

Dr. Gaither noted that "[p]aramedics promptly took over CPR from the on-scene officer. They obtained intraosseous access within two minutes and provided the first dose of epinephrine within three minutes. Paramedics intubated Mr. Alvarado within eight minutes (and for context, the standard is nine minutes). Paramedics took all appropriate life-saving measures before and during their transport of Mr. Alvarado to the hospital." (*Id.* COTMSJ0454, ¶ 13).

**DSOF 276**

In conclusion, Dr. Gaither opined that "[b]ased on the totality of the circumstances, including but not limited to Mr. Alvarado's expressed refusal of care, and the applicable standard of care in March 2020, it was reasonable for the paramedic crew to determine that Mr. Alvarado did not require medical transport." (*Id.* COTMSJ0454, ¶ 15).

**DSOF 277**

An autopsy performed on Alvarado determined that the manner of his death was an accident and that the cause of his death was "sudden cardiac arrest in the setting of acute methamphetamine intoxication and restraint with dilated cardiomyopathy (heart murmur) as a significant contributing condition." (OME Report, attached hereto as COTMSJ0455-COTMSJ0456).

**TPD Body Worn Camera videos**

**DSOF 278**

Beginning at around the 19:18 timestamp, Nick Solarino's BWC video depicts Solarino running towards the block wall where the civilian was holding Alvarado's leg to keep him from going over and up until Solarino is about to use his Taser. This video corroborates Solarino's deposition testimony. (*See* Solarino's BWC video (redacted), attached hereto as COTMSJ0457).

**DSOF 279**

Sean Yeandle's BWC video begins when he is running down the alleyway to assist Solarino. This video corroborates Yeandle's deposition testimony. (Yeandle's BWC video (redacted), attached hereto as COTMSJ0458).

**DSOF 280**

Ryan Ake's BWC video begins when he is approaching the alleyway to assist Solarino, and this video corroborates Ake's deposition testimony. (Ake's BWC video (redacted) attached hereto as COTMSJ0459).

**DSOF 281**

Mike Gamez's BWC video begins with him responding to the car crash at Prince Rd. and Campbell Ave., and at around timestamp 20:50, Gamez can be seen running towards the alleyway to assist officers with Alvarado. This video corroborates Gamez's deposition testimony. (Gamez's BWC video (redacted), attached hereto as COTMSJ0460).

**DSOF 282**

Joseph Gradias' BWC video depicts him arriving in the alleyway and the assistance he provided in getting Alvarado detained. This video corroborates Gradias' deposition testimony. (Gradias' BWC video (redacted), attached hereto as COTMSJ0461).

**DSOF 283**

Donovan Vance's BWC video, starting at around 5:10 timestamp, depicts him arriving in the alleyway where the other officers were dealing with Alvarado. (Vance's BWC video (redacted), attached hereto as COTMSJ0462).

**DSOF 284**

Marco Durazo's BWC video begins with him responding to the car crash scene at Prince Rd. and Campbell Ave, and at around 21:20 timestamp he is arriving near the alleyway and running to assist officers. (Durazo's BWC video (redacted), attached hereto COTMSJ0463).

      DATED: August 15, 2024.

                                      MICHAEL G. RANKIN
                                      City Attorney

               By      /s/ Michelle R. Saavedra
                      Michelle R. Saavedra
                      Principal Assistant City Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul Gattone
Law Office of Paul Gattone
301 South Convent
Tucson, Arizona 85701
gattonecivilrightslaw@gmail.com
    *Attorney for Plaintiff*

By M. Piper/rdv