IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                    )
                                  )
                Plaintiff,        )
                                  )
            vs.                   )        No. CV22-00132-RCC
                                  )
City of Tucson, et al.,           )
                                  )
                Defendants.       )
_____   )

DEPOSITION OF NICK SOLARINO

Tucson, Arizona

April 12, 2024

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

NICK SOLARINO
4/12/2024

```
 1                       NICK SOLARINO,
 2   having been called as an adverse party on cross-examination,
 3   having been first duly sworn to state the truth, the whole
 4   truth and nothing but the truth, testified on his oath as
 5   follows:
 6
 7                       CROSS-EXAMINATION
 8   BY MR. GATTONE:
 9        Q.    Sir, could you please state your name for the
10   record?
11        A.    Yes.   Nicholas Solarino, S-O-L-A-R-I-N-O.   Payroll
12   Number one hundred nine six two.   I'm a sergeant with the
13   Tucson Police Department.
14        Q.    Sure.   How long have you been employed with the
15   Tucson Police Department?
16        A.    Since 2015.
17        Q.    And how long have you had the rank of sergeant?
18        A.    Since approximately July of 2022.
19        Q.    And in March of 2020 you didn't have the rank of
20   sergeant; correct?
21        A.    Correct.
22        Q.    Dumb question, but as I just said, you were
23   employed by the TPD on 3/22 of '20; correct?
24        A.    Yes.
25        Q.    Did you have any law enforcement experience before
```

COTMSJ0002

NICK SOLARINO
4/12/2024

1   you worked for TPD?

2       A.   Yes.   Before that I was in the military.

3   Specifically I was with the Air Force.  I was the

4   equivalency of military law enforcement or military police

5   from approximately 2002 to 2012.

6       Q.   Okay.

7       A.   In 2012 to 2015 I transferred into a detective

8   role with the office of special investigations or OSI.

9   Specifically my classification there was as a special agent.

10          Since 2015 when I left active duty and came here

11  to TPD I transferred into a reserve function where I still

12  am currently serving in that facet as a special agent with

13  OSI or military detective work until approximately August

14  when I retire.

15      Q.   From the military?

16      A.   From the military.

17      Q.   Sir, on 3/22 of '20 what was your duty assignment?

18      A.   So I was assigned as an officer, patrol officer to

19  operation division midtown, which is affectionately known as

20  team three or ODM.  There, again, I was assigned as a patrol

21  officer to squad eight.  Squad eight was, if I remember

22  correctly, Thursday to Sunday 17:00 to 3:00 A.M.

23      Q.   And sir, with that team what channel were you

24  listening to?

25      A.   So it would be 93 or operation division midtown

NICK SOLARINO
4/12/2024

1 be more versed in it to be honest than I would.

2      Q.   The what?

3      A.   I said you'd probably be more versed in it than I

4 specifically would.

5      Q.   But you understand it's a wrongful death case?

6      A.   Yeah.  That I understand, yeah.

7      Q.   And you have read the complaint?

8      A.   Filed by your office?

9      Q.   Yes, sir.

10      A.   Yes.

11      Q.   All right.  Can you give us a thumbnail sketch of

12 the training that you had to be a TPD officer?

13      A.   Sure.  Again, things have changed a little bit

14 since my time when I went through the academy.  But

15 specifically I went through the Southern Arizona Law

16 Enforcement Training Center or SALETC.  There we partake in

17 essentially state law enforcement training where we are

18 versed in state laws and such.

19          Following that academy and graduation we moved to

20 a post basic academy.  Essentially it's on the same grounds.

21 It's at the same location, it's just across the hall, if you

22 will, where we go from the state training with multiple

23 agencies to again across the hall where it's just Tucson

24 police officers in training and we are a little more

25 well-versed or trained, if you will, in Tucson specific laws

NICK SOLARINO
4/12/2024

1   and procedures.
2        Q.    And after that what do you do?
3        A.    Following the academy we go out to the respective
4   divisions, wherever they assign us to.  I was assigned to
5   operation division midtown at that time and following the
6   academy where I was still at during the date of this
7   incident assigned.
8             Once there I participate in field training as an
9   officer with a senior officer as my field training officer.
10  My job as the officer in training is basically to apply the
11  things that I've learned both in the state level and the
12  local level academies, and basically while under the
13  supervision of a senior officer apply those things and learn
14  as we go essentially on the job training, if you will.
15       Q.   Great.  I assume you had some training in law
16  enforcement when you were in the Air Force?
17       A.   Correct.
18       Q.   Similar?  You do a training -- I mean obviously
19  you have to do the basic training, I'm certain, but was
20  there some special training for your law enforcement part of
21  your job?
22       A.   Yeah.  So back to my military police time in 2002,
23  again, something similar to an academy followed by assigning
24  you to your location, your base and some on the job
25  training.

COTMSJ0005

NICK SOLARINO
4/12/2024

```
 1          Again, when I became the equivalency of a
 2  detective or investigator, same thing, federal level
 3  training at the academy in Georgia and then followed by some
 4  on the job specific trainings.
 5          Again, those are very timely based where they have
 6  a time period to them but, as you know, training doesn't
 7  stop just because you're done with that piece so.
 8      Q.   Sure.  Sir, have you had any -- well, as part of
 9  your TPD training and I assume your training for the
10  military you had some first aid training, basic first aid
11  training?
12      A.   Yes.
13      Q.   No medical training other than that?
14      A.   No.  Nothing advanced.  Just basic lifesaver
15  military training and then same thing with the police
16  department.
17      Q.   No EMT training?
18      A.   No.  Correct.
19      Q.   All right.  Sir, we're going to talk about a few
20  things.  Before we get into -- I guess we're going to start
21  with the CAD data now.
22          Can you tell us in your training and experience
23  have you ever learned anything about positional asphyxia?
24      A.   Yes.  So my understanding of positional asphyxia
25  is basically certain body positions will induce unnecessary
```

NICK SOLARINO
4/12/2024

1   stress on other parts of the body.

2           The example would be laying somebody face down,

3   putting pressure on their back.  All that could end up

4   collapsing the chest cavity, putting undue pressure on the

5   lungs, heart and those sort of things.

6           That being said, we basically have a position

7   known as the recovery position, putting somebody in the

8   recovery position, which is on their side right side down

9   preferred versus left side down.  That will basically put

10  their side of their body down towards the ground, opening up

11  the left side of their chest cavity to include their lungs

12  and heart.

13      Q.  And so based on that, based on that a person

14  should only be down on their stomach for -- not for an

15  extended period of time; correct?

16      A.  Yeah.  But you know, extended period of time, I --

17      Q.  I'm sorry?

18      A.  I mean however you want to quantify that, yeah.

19      Q.  Sure.  Now in March of 2020 did you have the same

20  understanding of the concept of positional asphyxia?

21      A.  Yes.

22      Q.  How about the issue of excited delirium?  Have you

23  had any training on that?

24      A.  Yes.

25      Q.  And if you could explain to me what your

NICK SOLARINO
4/12/2024

1   understanding of that concept is?

2        A.   Sure.  I guess the easy way for me would be to

3   compare it to normal activity, such as sports or, you know,

4   running.  Basically when a person exerts some kind of

5   physical stress, if you will, excuse me, that stimuli will

6   cause their body to have some type of internal chemical and

7   physiological reactions that will allow them to essentially

8   come up, perform that task, and then once that task is over

9   or that stimuli is over they will then start to come back

10  down.

11          So that excitement will essentially ramp up for a

12  temporary period of time and then come back down.  The case

13  is when fighting also.

14          Essentially in the excited delirium aspect

15  whatever that extent or stimuli that is prompting that

16  person, usually most commonly an intoxicating substance,

17  such as methamphetamine, will cause that person to come up

18  and they stay up.

19          That stimuli continues to, I guess, interact with

20  them, causing them to stay up in an excited state for an

21  extended period of time, longer than what could be argued as

22  normal for like again running, fighting, that kind of

23  exercise or that period.

24        Q.   Sure.  So the ingestion of maybe meth or other

25  illegal drugs in your understanding and training can impact

COTMSJ0008

NICK SOLARINO
4/12/2024

1  the respiratory system?

2       A.   Exactly what systems I don't know but.

3       Q.   But it can impact your ability to breathe, your

4  heart rate, et cetera?

5       A.   That's a fair understanding.

6       Q.   Now sir, the rule about learning the time that

7  someone should be on their stomach --

8       A.   Sure.

9       Q.   -- is that regardless of whether they've consumed

10 substances that impair them?

11           MS. WATERS:  Object to form.

12           But you may answer.

13           THE WITNESS:  So I know that there's different

14 schools of thought on it; right?  One is obviously the

15 public perception.  Leaving somebody face down in the dirt,

16 right, when we're dealing with them as law enforcement for

17 an extended period of time does not look well to the outside

18 perspective; right?

19      Q.   Uh-huh.

20      A.   Also, what is the intended purpose for doing that,

21 right, would be the question that needs to be answered on

22 our side; right?  That's not humane, if you will, to just

23 leave somebody laying face down on the dirt for an extended

24 period of time; right?

25           To kind of quantify, like you were talking about

COTMSJ0009

NICK SOLARINO
4/12/2024

1   the extended period of time, there is a period that is

2   essentially allowed, if you will, when we're taking certain

3   steps or performing law enforcement actions.  And that would

4   include in this case handcuffing or detaining them.

5            And then once those things are done, once the law

6   enforcement contact, if you will, concludes, right, whatever

7   it is that we're doing to get them -- that we require them

8   to be face down, move them into some other position.

9        Q.   Okay.  Would you agree, though, that you should

10  limit the time that they're on their stomach to prevent

11  issues with their breathing?  Correct?

12       A.   I would agree with that, yes.

13       Q.   All right.  Now you indicated that if their face

14  is in the dirt or something would that have any impact on

15  their -- would that make it even more imperative that they

16  not spend time on their stomach?

17       A.   I mean if someone's face down in certain types of

18  materials on the ground, such as fine dust or something like

19  that, and maybe they have allergies, sure.  Those things

20  could have some respiratory impact.

21       Q.   All right.  Now sir, have you ever been the

22  subject of an office of professional standards or internal

23  affairs investigation?

24       A.   Yes.

25       Q.   All right.  Did you have any -- was there any

NICK SOLARINO
4/12/2024

```
1              But you may answer.
2              THE WITNESS:  That is one of several different
3    types of causes of language, yes.
4         Q.   All right.  Can we -- now tell me what CAD data
5    is.
6         A.   So CAD data, my understanding is essentially when
7    somebody creates a 911 call for service, that could be an
8    officer on site and does it themselves on the computer,
9    somebody calls 911, the dispatcher does it because someone's
10   talking on the radio and the dispatcher's creating it.
11             But essentially the end result should be some type
12   of internal department data that is created, an event
13   chronology, if you will, of information about what is going
14   on or what happened reference all those things.
15        Q.   And that's to inform officers in the field about
16   the nature of the calls that are coming in?
17        A.   Yes.  If it comes through 911 or from the
18   dispatcher, yes.
19             MR. GATTONE:  Could we put up the CAD data,
20   please?
21             MS. WATERS:  And that's Exhibit D?
22             MR. GATTONE:  Sure.
23             (Whereupon Deposition Exhibit D was marked for
24   identification.)
25        Q.   So sir, you said team three.  Is that the same
```

COTMSJ0011

NICK SOLARINO
4/12/2024

1          MS. WATERS:  Object to form.

2          But you may answer.

3          THE WITNESS:  Looking at it point blank black and

4    white as that statement reads, yes, that's potentially

5    accurate.

6          MR. GATTONE:  Can we go to 17:21:24?  24.  Okay.

7    That's the one.

8      Q.   It says event remark, specific location of the

9    injured person behind the white SUV.

10         Did I read that correctly?

11     A.   Yes.

12     Q.   All right.  Thank you.

13         19:25:15.

14         Oh.  Do you -- officers see these at the time

15   they're coming in; correct?

16     A.   Yes.  There could be obvious reasons why some

17   things are missed, officers out of their vehicles, officers

18   driving expeditiously to a call for service, things like

19   that.

20         Essentially, like we kind of talked about earlier,

21   this information gets populated in the chronology of an

22   event.  We do have or we used to dispatchers would read a

23   lot of this information as it was coming in to kind of keep

24   officers informed as a situation is evolving, again, because

25   some of those reasons; right?  The computer doesn't work,

NICK SOLARINO
4/12/2024

1    you're out of your car, driving fast, things that would

2    limit your ability to read this and perform your other

3    duties at the same time.

4         Q.   But if you're in your vehicle when this comes in,

5    you would see it?

6         A.   To some extent, yes.   It's reasonable.

7         Q.   Let's look at 19:25:17.   It says it's talking --

8    now this is all about a homicide that took place in the

9    general location of this incident; correct?

10        A.   Yes.   That's my understanding of this call text.

11        Q.   It says the white -- I'm just going to read it.

12   WHI, I'm assuming that's white, 2014 Ford Fiesta.   It has a,

13   it looks like -- I don't believe -- that may be a license

14   plate number.   Driver involved in a shooting.

15             What does LSH mean?   Do you know?

16        A.   Last seen headed.

17        Q.   Okay.   Last seen headed westbound.   Only

18   description driver wearing a red hat and armed.

19             Did I read that correctly?

20        A.   Red hat and armed, yes.

21        Q.   So what they're indicating is that the driver of

22   the vehicle that allegedly left the scene of the homicide

23   was driving what looked to be a whitish or white Ford Fiesta

24   and was wearing a red hat; correct?

25        A.   So to be more accurate in this that's actually a

RAYNBO COURT REPORTING, LTD.

COTMSJ0013

NICK SOLARINO
4/12/2024

1    cancellation notice.  The comment line right above

2    everything you read --

3         Q.    Okay.

4         A.    -- canceled per 9 David 53.  That would be a

5    detective unit canceled this attempt to locate or ATL.

6         Q.    But at some point this would have come out;

7    correct?

8         A.    Yes.  At some point that would have been an ATL

9    that was out there floating around in the ether for officers

10   to attempt to locate, yes.

11        Q.    Let's go to -- oh, I'm sorry.

12              Let's see.  It says it was canceled, actually, the

13   following day; right?  3/23/20, the cancellation, can you

14   see the bottom?

15        A.    Yes.

16        Q.    So it was not canceled on the date of the

17   incident, the 22nd of -- March 22nd, 2020; correct?

18        A.    I guess to clarify this point I would have to

19   default to a dispatcher or somebody more versed in the CAD

20   system.  I'm not sure why it says canceled above but then

21   canceled at the bottom, also, with a different time.

22        Q.    But can we agree that at the bottom it says

23   canceled at 3/23/20, 3:21:09, and then it has somebody's

24   number?  I'm assuming that's a badge number or payroll

25   number?

COTMSJ0014

NICK SOLARINO
4/12/2024

1  Hyundai.  Is that -- read that correctly?

2      A.   Yes.  And then 3 Adam 86.

3           MR. GATTONE:  Let's go to -- can we go to his

4  body-worn camera, please?

5           MS. WATERS:  Yes.

6           (Whereupon Deposition Exhibit A was marked for

7  identification.)

8           MS. WATERS:  Do you want to start at the

9  beginning?  Or do you have a time stamp?

10      Q.   Let's start at -- well, let's do this.  Let's

11  start at -- well, let me ask a question before we start off

12  on your body-worn camera.

13           At some point on 3/22/20 you were responding to a

14  car accident at Prince and Campbell; correct?

15      A.   No.  I was actually in midtown where the shooting

16  occurred that we were just going over the chronology on.

17      Q.   But you knew -- you had heard something about a

18  car accident in the general area; correct?

19      A.   No.  So while responding to the shooting, which

20  turned into a homicide, other officers had gotten there

21  prior to my arrival.  I don't recall who exactly, but over

22  the radio, police radio they essentially said no more units

23  here, units can go start circulating the general area.

24           While I was circulating, and I forget the address

25  this was at, I think it was 2901 East Fort Lowell on the CAD

COTMSJ0015

NICK SOLARINO
4/12/2024

1   data, but I went west on Fort Lowell to Campbell, turned

2   north on Campbell.

3           When I did that, I came across a collision that

4   was already -- that other officers were present at.  And

5   those would be the west side officers on operation division

6   west side or ODW operating on radio channel 92.

7       Q.   Okay.

8       A.   And a brief conversation between myself and them

9   is how I became informed that there was a collision nearby

10  the shooting scene.

11      Q.   And you get some information about the shooting

12  that turned into a homicide?

13      A.   From being on operation division midtown, working

14  that call, listening on the radio and communicating with

15  officers, yes.

16      Q.   Is Fort Lowell and Country Club in the midtown

17  region or another division?

18      A.   Midtown.

19      Q.   And how about Prince and Campbell?

20      A.   Technically the border of Campbell is the eastern

21  border of the west side and the western border of midtown,

22  so effectively right up the middle of Campbell.  Some of

23  it's west side.  Some of it's midtown.  And depending on

24  intersections and such our department has a way that they've

25  distinguished that if something happens here or here it's

NICK SOLARINO
4/12/2024

1   theirs or here and here it's ours.

2           But that would --

3   Q.   Sure.

4   A.   -- default on somebody else to have a little more

5   clarification on that.

6   Q.   Sure.  So at some point you got some information

7   about the shooting that turned into a homicide; correct?

8   A.   Yes.

9   Q.   And your information was that obviously there was

10  this shooting and somebody had died?

11  A.   Right.

12  Q.   And that there was a vehicle seen leaving the area

13  that might have been driven by a suspect in this shooting;

14  correct?

15  A.   Correct.

16  Q.   And the information you got was that it was a

17  Hyundai car, sedan or an SUV; correct?

18  A.   If I recall, I believe that to be accurate.

19  Q.   And it said Hyundai, not BMW; correct?

20  A.   I'll take your word for it, yeah.

21  Q.   Well, we won't go to your body-worn camera because

22  we've already agreed that that's the information you got.

23          Now my understanding is that there's this accident

24  and you understood that somebody from that accident took off

25  running; correct?  Did you get that information?

COTMSJ0017

NICK SOLARINO
4/12/2024

1     A.    Yes.   When I spoke to the officers at the

2  collision scene from ODW, they mentioned something to the

3  effect of that, that a vehicle driver of one of the involved

4  parties, one of the involved vehicles had taken off running

5  eastbound into operation division midtown.

6     Q.    And the indication was that, the information you

7  got was that that person that took off running was driving a

8  white SUV, correct, BMW?

9     A.    That seems accurate, yeah.

10    Q.    It's also my understanding that the description

11 that you initially got, well, the person that ran, the

12 description I believe that you got was that it was a person,

13 Hispanic male maybe 20 to 30 wearing a plaid type,

14 multicolored plaid shirt.  Does that sound about right?

15    A.    That seems accurate, yes.

16    Q.    And the information you got about the suspect from

17 the homicide was wearing a red hat; correct?

18          MS. WATERS:  Object to form.

19          But you may answer.

20          THE WITNESS:  I don't recall exactly the details

21 of the suspect information from the homicide but.

22    Q.    We can look at your body cam video where they're

23 talking about the person who ran away and you said did he

24 have a red hat?  Does that strike you -- is that familiar in

25 any way?

COTMSJ0018

NICK SOLARINO
4/12/2024

```
 1   roll it.
 2           MS. WATERS:  Okay.  8:20.
 3           (Whereupon a video was played.)
 4           MR. GATTONE:  Stop, please.
 5      Q.   So you did -- when they said the description, you
 6   asked did he have a red hat; correct?
 7      A.   Yes.
 8      Q.   And so you were trying to confirm whether the
 9   description of the person who fled from the scene of the
10   accident had a red hat on; correct?
11      A.   Yes.  In that clip of body camera essentially I
12   was trying to confer with the other officers on whether or
13   not these two incidents were related.
14           MR. GATTONE:  Could we -- ah, I went a little bit
15   ahead of myself.  Could we go to 14:26, please?  And just we
16   stopped at 8:32.
17           MS. WATERS:  8:32.
18           MR. GATTONE:  All right.
19           MS. WATERS:  And you said 14:26?
20           MR. GATTONE:  Yes, please.  Oh, I guess I didn't
21   go backwards.
22           MS. WATERS:  How about 14:22?
23           MR. GATTONE:  Perfect.
24           (Whereupon a video was played.)
25           MR. GATTONE:  Okay, please.
```

COTMSJ0019

NICK SOLARINO
4/12/2024

1    Q.   So when you say theirs, you mean the accident
2    people, the one where the individual had fled from; correct?
3    A.   Yeah.  So based on the context here, I would be on
4    operation division midtown radio from the sounds of it
5    coordinating the two scenes and what their, operation
6    division west collision scene vehicle information would have
7    been.
8    Q.   Because the description of the white vehicle that
9    the homicide suspect fled in and the accident vehicle that
10   the person fled from were different; correct?
11           You were trying to coordinate whether they were
12   the same?
13           MS. WATERS:  Object to form.
14           But you may answer.
15           THE WITNESS:  So I was trying to clarify either
16   way, whether they were related, similar or different.
17           Based on, based on my training and experience some
18   things that have basically become a realization, if you
19   will, is identification of different types of vehicles,
20   SUVs, cars, sedans, brands, BMW, Hyundai, Chevrolet even or
21   colors, a lot of times through traumatic events or people's
22   interpretation of what they believe they're seeing could
23   offer some similarities but also some differences.
24   Q.   Sure.
25   A.   So that was essentially what we're trying -- what

COTMSJ0020

NICK SOLARINO
4/12/2024

1    I was trying to do here is take the commonalities between

2    both incidents and weigh whether or not they were accurate

3    or different.

4         Q.   Because you were aware at the time that the

5    description of the vehicle that the homicide, the alleged

6    homicide suspect fled in was a white Hyundai sedan; correct?

7         A.   I don't recall if it was a sedan, but I do

8    recognize the Hyundai portion of it, yes.

9         Q.   Now could we go -- well, we can go to 17:15.

10             But at some point you ask can you do me a favor

11   and text me a picture.  Do you remember that?

12        A.   Yes.

13        Q.   Is this of the BMW SUV that was involved in the

14   accident that you recall asking for?  Do you recall?

15        A.   I don't recall but specifically which portion of

16   the video that you'd be referring to --

17        Q.   Sure.

18        A.   -- who I was asking --

19        Q.   Sure.

20        A.   -- but I do recall basically that I was trying to

21   compare, if you will, information from both scenes.

22             So since the collision scene was the only scene

23   with a vehicle it would be consistent that I was asking for

24   pictures from the collision scene to potentially compare

25   against video from the homicide scene if they had any.

NICK SOLARINO
4/12/2024

1      Q.    Again, how close to the accident collision scene
2  did you get?

3      A.    Personally did I?

4      Q.    Yes, sir.

5      A.    I drove right up to it or right past it.

6      Q.    And you saw the white SUV; correct?

7      A.    I don't recall, but that would be a fair
8  statement, yes.

9      Q.    And so you saw the white SUV.  So were you asking
10 if they could text you a picture of that white SUV or a
11 different picture?

12           MS. WATERS:   Object to form.

13           You may answer.

14           THE WITNESS:   So since in the homicide scene the
15 vehicle was gone, right, and we were trying to find a
16 suspect in a vehicle, it would be logical for I guess what
17 you're asking in this sense that I was asking, excuse me,
18 for a picture from the collision scene of that vehicle,
19 again so that I can kind of act as the funnel to get
20 information exchanged between both scenes, the collision
21 scene photographs to the homicide scene and then the
22 homicide scene, potentially surveillance photos or images
23 back to the collision scene.

24      Q.    Now what inter -- do you have any idea what
25 intersection you were at right at this point in the video?

NICK SOLARINO
4/12/2024

1              THE WITNESS:  Potentially if it was sent to me,
2    yes.
3              MR. GATTONE:  19 -- what did I say?  Let's go from
4    here.
5              MS. WATERS:  You said 19:23.  I've got 19:20.
6              MR. GATTONE:  Perfect.  Let's roll.
7              (Whereupon a video was played.)
8              MR. GATTONE:  If you could stop.
9         Q.   This is part of your body-worn camera footage
10   where you just got to the scene where the person who fled
11   from the accident was supposed to have been located;
12   correct?
13        A.   Yes.  That's accurate.
14        Q.   And right at that point we see someone on the
15   fence and then some civilians holding that person's legs;
16   correct?
17        A.   That's accurate, yes.
18        Q.   Now the person that they were holding the legs on
19   you came later to know that it was Damien Alvarado; correct?
20        A.   I believe that's correct, yes.
21        Q.   Can we also agree that the person who died in
22   custody that day was also Damien Alvarado?
23        A.   Yes.  That's correct.
24        Q.   Sir, have you ever had anyone die in police
25   custody before for an incident that you were involved in?

COTMSJ0023

NICK SOLARINO
4/12/2024

1      A.    No, sir.

2      Q.    This was the first time?

3      A.    Yes.

4      Q.    All right.  Hopefully the only time, but okay.

5            How come your video -- your video went off shortly

6   after this.  How come it went off?

7      A.    So I believe it had something to do with the type

8   of body camera that we had at the time.  The body camera,

9   there are other images of it when I conducted my review,

10  still images you can see of another officer wearing their

11  body camera.  This camera was a plastic shell similar in

12  shape to a square.

13            On the top was a manual switch that slid side to

14  side, which would power it on or power it off.  If that

15  switch was inadvertently moved while it was actively

16  recording or on and slid into the off position, it would

17  cease the recording.

18            I believe, if my memory serves me well, that

19  following this incident I noted that the switch actually was

20  broken.  There's a spring with a plastic detent in there, I

21  guess, that had become broken, so my switch started to

22  freely flow left and right, on and off, and it was replaced.

23     Q.    So it turned itself off is what you're saying?

24     A.    Essentially the short answer is yes by some

25  external input, whoever involved in this, yes.

COTMSJ0024

NICK SOLARINO
4/12/2024

1    Q.   All right.  And his is obviously more complete

2  than yours was because of the issues with your camera?

3    A.   His is a longer video.  I'd have to --

4    Q.   A longer video?

5    A.   Yes.

6    Q.   All right.  Can we -- now at some point -- we'll

7  look at Yeandle's video in a minute -- you used your Taser

8  with Mr. Alvarado sometime after you got him off the fence;

9  correct?  Or off the wall; is that correct?

10   A.   Yes.

11   Q.   And so I know that there's two ways to apply the

12 Taser.  One is it shoots.  And the other is you do what they

13 call a drive stun; isn't it?  My understanding is the TPD

14 one only shoots; correct?  And I'm sure I am not using the

15 correct terminology but.

16        MS. WATERS:  Object to form.

17        But you can answer.

18        THE WITNESS:  So at this time this specific Taser

19 that was deployed in the field that I had that was used in

20 this incident can perform both tasks to your question.  It

21 could discharge probes, which is, as you refer to, shoot

22 them, and also it can do a drive stun, which is a manual

23 activation for contact.

24   Q.   How did you use it with Mr. Alvarado?

25   A.   Both.

COTMSJ0025

NICK SOLARINO
4/12/2024

1                (Whereupon a video was played.)

2                MR. GATTONE:  So Officer Yeandle -- stop, please.

3        Q.   Officer Yeandle comes up.  My understanding is

4   that's his, those are his arms with the tattoos; correct?

5        A.   Yes.  This is Officer Yeandle's body camera

6   depicting his arms and his tattoos on his arms, yes.

7        Q.   And where are you in connection with this video?

8        A.   This specific moment I don't know where I would

9   be.  I'd have to watch a couple more seconds at least.

10               MR. GATTONE:  Sure.  Let's go a couple more

11  seconds from 1:23.

12               (Whereupon a video was played.)

13       Q.   Was that you?

14       A.   No.  That was Officer Ake, who's down in the

15  bottom left of your video right here.

16       Q.   Saying don't you fucking bite me?

17       A.   Correct.

18       Q.   Do you know where you are --

19       A.   Yeah.

20       Q.   -- in connection right now?

21               Where are you?

22       A.   To answer that question somewhere towards the legs

23  or behind, this video behind Officer Yeandle.  If I could

24  point out the body camera, that would be a good still image

25  like I was talking about earlier.

COTMSJ0026

NICK SOLARINO
4/12/2024

1      Q.   Great.  So they're pushing -- this is Officer
2   Gamez to the right?
3      A.   Correct.
4      Q.   And they're pushing down on him using some force
5   to try to hold him down I'm assuming so he can be
6   handcuffed; correct?
7      A.   That's accurate, yes.
8      Q.   And you're holding Mr. Alvarado's legs?
9      A.   I believe so.
10      Q.   Likewise using some level of force trying to hold
11   him in place?
12      A.   That would be accurate, yes.
13      Q.   And he's on his stomach at the time?  Do you
14   recall that?
15      A.   I don't recall exactly.  It's not on this image.
16   But there were periods that he was on his stomach so that we
17   can perform those tasks, yes.
18      Q.   And he would be on his stomach to try to handcuff
19   him; correct?
20      A.   Yes.
21           MR. GATTONE:  Could we roll just a little more?
22           (Whereupon a video was played.)
23      Q.   So this, again, is still officer -- now who is
24   there to the left?  Is that you?
25      A.   No.  That's Officer Ake.

NICK SOLARINO
4/12/2024

1     Q.    Oh, Ake, Gamez, Yeandle, whose hands are right
2  here?

3     A.    Correct.

4     Q.    And you're holding the legs?

5     A.    Somewhere in that vicinity, yes, would be
6  accurate.

7     Q.    All right.  Can we agree that he was on his
8  stomach at 1:40 because the handcuffs are just being
9  applied?

10     A.    I can't see based on the obscure image from
11  everybody else there, but that would be a natural assumption
12  based on what is actively going on by the officers, yes.

13          MR. GATTONE:  Can we just back up to 1:30?  I know
14  we just saw 1:35.  This is 1:40.  We're going back to 1:30.

15          MS. WATERS:  How about 1:28?

16          MR. GATTONE:  Perfect.

17          (Whereupon a video was played.)

18     Q.    So you saw his shoulder, Mr. Alvarado's shoulder?
19  He was on the ground on his stomach; correct?  You said that
20  was a fair assumption?

21     A.    If you're asking me observations in the video, I'd
22  have to watch it again.  I wasn't specifically looking for
23  his shoulder.  I wasn't sure what you were going to ask so.

24     Q.    Let's back it up again from 1:37, please.

25     A.    I'll make a point to --

NICK SOLARINO
4/12/2024

1    Q.    Please.

2    A.    -- look for the shoulder, yes.

3          MS. WATERS:  1:24.

4          (Whereupon a video was played.)

5    Q.    Did you see there was a brief second in the video

6  where his face was on the side on the ground and you saw

7  that he was on his stomach?

8    A.    Yes.  Yes.

9          MR. GATTONE:  And can we look at 1:57, please?

10         MS. WATERS:  1:53.

11         MR. GATTONE:  Okay.

12         (Whereupon a video was played.)

13   Q.    Can you see whether he's still on the ground at

14  this point?

15   A.    No.  It's not clear in this image.

16   Q.    Is that a fair assumption, though?

17   A.    It would be a fair assumption based on what is

18  currently still going on, that he's still being combative

19  and officers still don't have adequate control over him.

20   Q.    Who said shut up, shut the fuck up?

21   A.    I think there was a couple.  I can try to hear

22  more accurately if we play it again --

23   Q.    Sure.

24   A.    -- but I believe there was at least two voices.

25         MS. WATERS:  From 1:44.

COTMSJ0029

NICK SOLARINO
4/12/2024

1              (Whereupon a video was played.)

2      Q.    You can see there his face is still down on the

3   ground; correct?  Or at least his head is turned to the

4   side.  We can assume his face is on the ground?

5      A.    Yeah.  That's accurate.

6      Q.    And the ground there is like stone and dirt;

7   correct?

8      A.    It appears accurate, yes.

9      Q.    All right.

10             MS. WATERS:  That's at 1:47 --

11             MR. GATTONE:  Please.

12             MS. WATERS:  -- the time stamp.

13             (Whereupon a video was played.)

14             THE WITNESS:  So to clarify your question, again,

15   there was a couple.  It sounded like all three potentially

16   were talking, myself, Officer Yeandle, Officer Ake, at

17   almost the same time.  I think specifically to your point --

18             MR. GATTONE:  Carrie's very persistent.

19             MS. WATERS:  She is.

20      Q.    Go ahead, please.  I'm sorry to cut you off.

21      A.    That's okay.

22             So it sounds like all three of us might have been

23   talking about -- at the same time or overtalking each other

24   in certain pieces of it.  It sounded like Officer Ake said

25   shut up.  Officer Yeandle is talking.  I don't know exactly

NICK SOLARINO
4/12/2024

1   what again.  I think to your point who specifically said

2   shut the fuck up --

3        Q.    Yes, sir.

4        A.    -- that would be my statement.

5        Q.    Yourself?

6        A.    I believe so based on hearing my voice.

7             MR. GATTONE:  Okay.  Great.

8             Now let's go to 2:10, please.  Where are we at

9   now?

10            MS. WATERS:  We are at 2:00.

11            MR. GATTONE:  Let's just roll it.

12            (Whereupon a video was played.)

13       Q.    Do you know who that is that's just placing his

14   knee in the upper torso, lower neck position there on

15   Mr. Alvarado?

16       A.    Yeah.  So based on the video here the person

17   you're referring to at the top of the screen that would be

18   Officer Ake.  From if we play a few more seconds of the

19   video, to me it looks like he's trying to shift his body

20   weight around --

21       Q.    Okay.

22       A.    -- to allow easier access for Officer Yeandle and

23   Officer Gamez to get in and continue handcuffing.

24       Q.    Okay.

25       A.    It appears to me as if he is looking for a place

COTMSJ0031

NICK SOLARINO
4/12/2024

1   to put his body weight using his knees --

2       Q.    Okay.

3       A.    -- in order to have a better hold, but it also

4   looks like he hesitates and isn't quite sure where to put

5   his knee and intentionally bypasses the head, the neck, to

6   go to the upper back/shoulder area a few more seconds later.

7           MR. GATTONE:   Sure.   Let's look a few seconds

8   later and see where it is.

9           MS. WATERS:   So I'll play from 2:13.

10          (Whereupon a video was played.)

11      Q.    That looks like it's on his neck; would you agree?

12      A.    So based on this still image, no, I would not

13  agree.   If you look where his fingers are to the right,

14  where the handcuffs are and the distance between that and

15  where his knee would be, I would argue that his knee -- and

16  you saw him shift his weight up -- that his knee is not even

17  on Mr. Alvarado's person at this point.

18      Q.    Okay.

19      A.    Again, this would be the hesitation period where

20  he's trying to transition, find a place to put it.

21          MS. WATERS:   Begin play at 2:15.

22          MR. GATTONE:   Please.

23          (Whereupon a video was played.)

24      Q.    It looks awfully close to his head; would you

25  agree?

COTMSJ0032

NICK SOLARINO
4/12/2024

1      A.   I agree it does look awfully close to the head --

2      Q.   Okay.

3      A.   -- but I would argue that that would be based on

4  camera angles and such.  Just before it was paused you could

5  see where he did commit to, again, that transition and

6  applying the knee to the upper shoulder/back area.

7          MR. GATTONE:  So we're at 2:19.  Let's roll just a

8  little bit more.

9          (Whereupon a video was played.)

10     Q.   And at least we can see -- you said that that was

11  Officer Ake with his knee on him; correct?

12     A.   Correct.  At the top of this frame in all blue

13  that is Officer Ake, and to the left that face and traffic

14  vest that's Officer Gamez.

15     Q.   Can we agree that Officer Ake is also using his

16  right hand to press down close or at least on or close to

17  Mr. Alvarado's neck?  Correct?

18     A.   Based on that image it does appear that his hand

19  is close or in that proximity, yes.

20     Q.   So at least at this point -- and he's still on his

21  stomach, Mr. Alvarado; correct?

22     A.   That would be a fair assessment, yes.

23     Q.   And there's at least three officers, maybe four

24  are holding him down; correct?  Well, at least three

25  officers?

COTMSJ0033

NICK SOLARINO
4/12/2024

1      A.    Yeah.   In what would be reasonable in this still
2  image that Officer Ake has hands on, Officer Gamez
3  presumably does, also, same thing with Officer Yeandle, at
4  least three but, again, it's camera angles and such.
5      Q.    Where are you?
6      A.    I believe I would still be somewhere towards the
7  feet, but I'm not depicted in this camera angle to confirm
8  that.
9          MR. GATTONE:   Can we go to two -- let's go to
10  2:47.  I want 2:49, but let's go to 2:47.  Oops.  Too far.
11          Let's go there.  Sure.
12          (Whereupon a video was played.)
13      Q.    Are the cuffs on at this point?
14      A.    Yes.  He is wearing a set of handcuffs at this
15  point.
16      Q.    And he's still on his stomach?
17      A.    Correct.  From that still image that just
18  transferred over before the pause that appears correct.
19      Q.    Sure.  And it looks like that's Ake right there;
20  correct?
21      A.    Correct.
22      Q.    He still has his knee on his neck; correct?
23          MS. WATERS:  Object to form.
24          THE WITNESS:  I don't know where the knee is based
25  on this still image.  I believe just before the pause it was

COTMSJ0034

NICK SOLARINO
4/12/2024

1  still somewhere in the upper shoulder/back area.  I'd have
2  to watch it again for accuracy.
3              MR. GATTONE:  Sure.  Let's back up 10 seconds.
4              MS. WATERS:  2:37.
5              (Whereupon a video was played.)
6      Q.   It looks like his leg is on his neck; would you
7  agree?
8              MS. WATERS:  Object to form.
9              THE WITNESS:  No.  I would disagree.  I would say
10 based on camera angle and depth perception that it appears
11 that way in this still image but I would argue that it is
12 not.
13     Q.   But you agree that in this still image it looks
14 like it?
15             MS. WATERS:  Object to form.
16             THE WITNESS:  I believe that you can draw
17 conclusions in a still image, but I disagree that it is.
18             MR. GATTONE:  Let's go to three -- I'm on 3:50,
19 but let's go to like 3:48.
20             MS. WATERS:  3:46.
21             MR. GATTONE:  There we go.
22             (Whereupon a video was played.)
23     Q.   He's still on his stomach at 3:50; correct?
24     A.   That appears accurate, yes.
25             MR. GATTONE:  We can go, please.

COTMSJ0035

NICK SOLARINO
4/12/2024

```
 1              (Whereupon a video was played.)
 2              MR. GATTONE:  Oh.  Can we back up a little bit?  I
 3   missed.  I was talking --
 4              MS. WATERS:  Yes.  Remember there's about a two
 5   second gap when I hit play before the volume starts again.
 6              MR. GATTONE:  So let's go back to 2:45 -- I mean
 7   3:45.
 8              MS. WATERS:  All right.  3:33.
 9              (Whereupon a video was played.)
10       Q.   So you heard him there say I can't or Mr. Alvarado
11   say I can't breathe?
12       A.   Yes.
13       Q.   And he's still on his stomach at this point?
14       A.   Yes.
15       Q.   And it looks like he's handcuffed at this point;
16   correct?
17       A.   Yes.
18              MR. GATTONE:  And could we roll a little bit more?
19              (Whereupon a video was played.)
20       Q.   You heard the response that yes, you can breathe,
21   you're talking.
22       A.   It was cut up because of the pause, but I believe
23   if we play it through that's what the response was, yes.
24       Q.   Does that seem appropriate to you when someone is
25   indicating they can't breathe?
```

COTMSJ0036

NICK SOLARINO
4/12/2024

1          A.    So --

2          Q.    I'm sorry.  I just --

3          A.    That's okay.

4          Q.    -- asked is it reasonable, yes or no if it's

5    reasonable?

6                MS. WATERS:  Object to form.

7                You may answer.

8                THE WITNESS:  So if I refer back to my example

9    between the sports or physical activity and the excited

10   delirium piece, for somebody that goes through that excited

11   period where they come up and then they're on their way

12   down, in sports specifically or when I was in the military,

13   also, anything that I would participate in, the appropriate

14   application I guess that one can do the activity to

15   essentially catch your breath and calm yourself down may be

16   more intently, more -- and quicker than normal or fighting

17   it would essentially be expand your lungs and focus on your

18   breathing, not to talk, not to speak, not do those things.

19   Just essentially focus on those things to calm yourself down

20   intently.

21         Q.    So but we can agree that he said I can't breathe,

22   he's still on his stomach on the dirt and there's still

23   officers applying force to him; correct?

24         A.    Yes.  All that seems accurate, yes.

25                MS. WATERS:  We paused at 3:57.

COTMSJ0037

NICK SOLARINO
4/12/2024

1          MR. GATTONE:  Let's go to, well, let's go to 4:10.

2          MS. WATERS:  I enjoy seeing how close I can get to

3  it.

4          MR. GATTONE:  I'm sorry.  Let's just roll it.

5          MS. WATERS:  I bumped it to 4:06.  Is that going

6  to be okay?

7          MR. GATTONE:  Yes.  Sure.

8          (Whereupon a video was played.)

9          MR. GATTONE:  Keep going, please.

10         (Whereupon a video was played.)

11         MS. WATERS:  Sorry.  You raised your hand.  I

12 thought --

13     Q.   So at this point he's still on his stomach;

14 correct?

15     A.   Based on Officer Gamez's statement I believe that

16 to be accurate.

17     Q.   And he indicated that, he said he's probably high;

18 correct?

19     A.   Yes.  That's what he said.

20     Q.   Did you agree that, that Mr. Alvarado was

21 displaying symptoms of someone who might be high on some

22 sort of illegal substance?

23     A.   It's possible.  If you play it a couple more

24 seconds, you can hear my response that I essentially

25 factually state that he's at least 10-41, which is a police

NICK SOLARINO
4/12/2024

1   radio code for drunk or under the influence of intoxicating

2   substance such as alcohol.

3           MR. GATTONE:  I have a lot more questions.  Could

4   we take a few minutes break?

5           MS. WATERS:  We can.

6           (Whereupon a recess was taken from 11:50 A.M. to

7   12:03 P.M.)

8       Q.   So sir, as far as the application of force is

9   concerned, do you treat someone differently who's accused of

10  a misdemeanor than someone who's accused of a serious

11  felony?

12      A.   So to answer your question I would refer to

13  essentially our general orders, basically the minimum force

14  necessary to effect an arrest.

15           Yes.  We would take certain things in mind, like

16  safety resources, those kinds of things that we would bring

17  to that situation.  Whether that person is inside, outside,

18  in a car, in a house, all those things, yes, potentially

19  weigh on different types of equipment, if you will, or

20  tactics that we would employ.

21           However, the actual specific act of how we would

22  treat that person would be situation dependent again and

23  would be again the minimum force necessary to effect that

24  arrest.

25           So a lot of that would have to do with that person

COTMSJ0039

NICK SOLARINO
4/12/2024

1   specifically during that encounter.

2            MR. GATTONE:  Let's see where we were at.

3            I think we -- can I see what the time is?

4            MS. WATERS:  4:22.

5            MR. GATTONE:  Let's just roll for a little bit.

6            (Whereupon a video was played.)

7       Q.   So here he doesn't appear to be flailing or

8   kicking, you're applying the TARP; correct?

9       A.   Yes.  That's an accurate depiction of this segment

10  of the video.

11           MS. WATERS:  We paused at five minutes.

12           Do you want me to play?

13           MR. GATTONE:  Yes, please.

14           (Whereupon a video was played.)

15      Q.   So at this point he appears to be under control;

16  correct?

17           MS. WATERS:  Object to form.

18           But you may answer.

19           THE WITNESS:  So what I would go back to is prior

20  to this.  And if we were to play, from my recollection

21  watching this video after this he is still showing signs of

22  defiance or noncompliance, essentially kicking his feet,

23  making statements to the effect he's going to fight

24  officers, still flailing his body around, things of that

25  nature, all of which is conflicting with our goal here, if

COTMSJ0040

NICK SOLARINO
4/12/2024

1   you will, which is to detain him and move on with the

2   investigation.

3        Q.   Would you agree with the assertion that he's

4   subdued at this point?  He's got -- and I don't mean his

5   demeanor.  I mean he's cuffed and TARP'd?

6        A.   I would say that based on this segment of video,

7   yes.  He does -- he is wearing a set of handcuffs and a TARP

8   is applied.

9        Q.   And at least at this point he appears to still be

10  on his stomach; correct?

11       A.   Yes.  That looks accurate.

12       Q.   And at this point technically he's arrested;

13  right?  He's cuffed?  He's TARP'd?  He's ready to go?

14       A.   So there is a difference between different levels

15  of investigations to include whether someone is under arrest

16  or not.

17            At this point it would be not accurate to say he's

18  under arrest.  We would still need to further the

19  investigation, confirm he's the driver of that vehicle

20  and/or the shooter from the other scene.  Again, that was

21  the basis that we were working on.

22            Until those two things can be clarified it would

23  be not accurate to say he's under arrest.  He would be more

24  in the realm of detained under police custody but not

25  necessarily arrest.

COTMSJ0041

NICK SOLARINO
4/12/2024

1        Q.    So we can agree that he's detained at this point?

2        A.    He is detained in a set of handcuffs and wearing a

3   TARP, yes.

4        Q.    Probably about as detained as you can get; right?

5        A.    I mean we could put him in a car.   There are some

6   other steps, but yes.

7              MR. GATTONE:   Could we go to -- let's go to 5:58.

8   I'm sorry.   One second.

9        Q.    Oh.   You see that up at the top at the side of his

10  body?  Would that be where the Taser went in?  Do you see it

11  looks like a little hole there, right there?

12       A.    I'm not sure if that's a Taser probe mark or if

13  that's another injury.   I think at some point in this video

14  you'll see me remove at least one of the prongs, but I'm not

15  sure what -- if you're referring to just right there where

16  the mouse is pointing?

17       Q.    Yeah.

18       A.    I'm not sure what exactly that injury would be

19  consistent with.

20       Q.    Previously there were some wires in the scene.

21  Those would have been the Taser cord; correct?

22       A.    Yes.   And they're still visible here.   Actually,

23  the pointer's pointing at them mixed with the TARP rope

24  right there.   And then there's some more wires over here by

25  his hand towards the right side of the image.   And yes,

NICK SOLARINO
4/12/2024

1    those appear to be accurate or consistent with the Taser

2    probe wires.

3                MR. GATTONE:   Okay.  We're at 5:08.  Could we go

4    to 5:58, please?

5                MS. WATERS:   5:52.

6                MR. GATTONE:   Right there would be fine.

7                (Whereupon a video was played.)

8        Q.   So is that you saying wake up, breathe to him?

9        A.   No.   That's Officer Ake right there.  And then

10   we're still watching Officer Yeandle's body camera, so that

11   would be these two right here within immediate proximity.

12       Q.   Where were you?  Do you know?

13       A.   No.   I don't know.  I'd have to see myself in one

14   of these images.

15       Q.   But at least one of the officers is making a

16   statement we can assume to Mr. Alvarado saying wake up,

17   breathe?

18       A.   Yeah.   That, based on what we just watched that

19   clip that would have been Officer Ake it sounded like.

20               MR. GATTONE:   Let's go to 6:25.

21               MS. WATERS:   How about 6:20?

22               (Whereupon a video was played.)

23       Q.   So again, Mr. Alvarado is making a statement that

24   he can't breathe; correct?

25       A.   Yeah.   That sounds like what he said, yes.

NICK SOLARINO
4/12/2024

1    Q.   And someone is saying you can breathe just fine,

2    shut the fuck up.   Do you have any idea who made those

3    statements?

4    A.   That sounded like Officer Yeandle.

5    Q.   Reasonable response when someone is saying they

6    can't breathe, shut the fuck up?

7              MS. WATERS:   Object to form.

8              But you may answer.

9              THE WITNESS:   So going back to my scenario with

10   the heightened activity period, maybe the form is a little

11   out of left field, I guess, for lack of a better term, but

12   essentially Mr. Alvarado appears a couple of seconds before

13   this when we were watching some video that he was in a

14   recovery position laying on his side.   It looked like he was

15   right side down, heart side up, left side up, and

16   essentially Officer Yeandle would be trying to apply that

17   principle, focus on your breathing --

18   Q.   I understand that --

19   A.   -- but --

20   Q.   -- but my question was --

21   A.   Sorry.

22   Q.   -- is it a reasonable response to someone who says

23   they can't breathe to tell them to shut the fuck up?

24             MS. WATERS:   Object to form.

25             But you may answer.

COTMSJ0044

NICK SOLARINO
4/12/2024

```
 1            THE WITNESS:  I think defining reasonable, you
 2   would have to define reasonable.  I think it's accurate to
 3   the scenario for the heightened activity to focus on his
 4   breathing.
 5       Q.   So under the circumstances saying shut the fuck up
 6   is appropriate?
 7            MS. WATERS:  Object to form.
 8            But you may answer.
 9            THE WITNESS:  I believe under these circumstances
10   it would be reasonable.
11            MR. GATTONE:  Could we go to, let's go to 7:55.
12            MS. WATERS:  7:50.
13            MR. GATTONE:  Good.
14            (Whereupon a video was played.)
15       Q.   I think we missed it, but didn't he say I can't
16   breathe again?  Did you hear that?
17            MS. WATERS:  Object to form.
18            But you may answer.
19            THE WITNESS:  I'm not sure.  There was a lot of
20   things going on.  Mr. Alvarado was making some moans,
21   statements.  I'd have to listen to it again.  I wasn't
22   focused specifically on his statements.
23       Q.   Would you agree that he said I can't breathe
24   multiple times?
25       A.   If you'd like to play it again, I can accurately
```

NICK SOLARINO
4/12/2024

1   answer your question.

2       Q.   We saw at least two instances previously where he

3   said I can't breathe; correct?

4       A.   Yes.   That would be accurate, yes.

5       Q.   Do you recall how many times he said I can't

6   breathe?

7       A.   No.

8       Q.   It was more than -- it was at least two times,

9   maybe more?

10      A.   At least two that we discussed, potentially more.

11  Again, I'd have to listen more intently.

12          MR. GATTONE:  Let's back up a little bit.  Let's

13  back up a little bit if we could.

14          MS. WATERS:  7:59.

15          (Whereupon a video was played.)

16          MR. GATTONE:  I think we got to go to like 7:55.

17          MS. WATERS:  Okay.  How about 7:46?

18          MR. GATTONE:  Sure.

19          (Whereupon a video was played.)

20      Q.   Did you hear there?

21      A.   I heard something consistent with I can't breathe,

22  but it was hard to tell with the other officers talking over

23  him.

24      Q.   And would you agree that he seemed short of breath

25  at that point?

NICK SOLARINO
4/12/2024

1          MS. WATERS:  Object to form.

2          But you may answer.

3          THE WITNESS:  I don't know exactly what

4  Mr. Alvarado's state of physical fitness was to be able to

5  make an accurate assumption or statement whether he's short

6  of breath or exhibiting something else.

7      Q.   But at least the sound of his breathing was --

8      A.   He is breathing, yes.

9      Q.   But he's breathing -- well, he's moaning at this

10  point; correct?

11      A.   I can listen to it more accurately --

12      Q.   Sure.

13      A.   -- to try and give you a description of that.

14          MR. GATTONE:  Let's move back 10 seconds.

15          MS. WATERS:  7:41.

16          MR. GATTONE:  Okay.

17          (Whereupon a video was played.)

18      Q.   Okay.

19      A.   So to answer your question, yes, it does sound

20  consistent that he's moaning in between some words there.

21      Q.   And labored breathing?

22      A.   I, I can't accurately answer that.

23      Q.   Do you know if any of the officers on scene

24  punched Mr. Alvarado?

25      A.   So I know that I did multiple times.  I don't know

NICK SOLARINO
4/12/2024

1  if anyone else did.

2      Q.   Did you punch him in the face?

3      A.   Yes.

4      Q.   Multiple times?

5      A.   Multiple times during the entirety of the

6  encounter, yes.

7      Q.   Is that a reasonable application of force?

8          MS. WATERS:  Object to form.

9          But you may answer.

10         THE WITNESS:  So referring back to how we

11 discussed the minimum force necessary to effect an arrest,

12 based on at the time when I used different levels of force,

13 specifically in this case punching him, at the time earlier,

14 and we didn't watch specifically my body camera when that

15 would have been depicted, but based on Mr. Alvarado's level

16 of noncompliance or risk to himself, the greater public and

17 myself that he was displaying, punching him was reasonable

18 under those circumstances at that time.

19     Q.   And you punched him like three times; correct?

20         MS. WATERS:  Object to form.

21         But you may answer.

22         THE WITNESS:  I don't recall exactly how many.

23 I'd have to refer to my video.  I think -- that seems in the

24 ballpark.

25     Q.   We can listen to part of the video here, but where

NICK SOLARINO
4/12/2024

1   you say how many times, but you agree it was three sounds,

2   in the ballpark?

3        A.   Yeah.   It sounds in the ballpark.   If there's

4   video specifically capturing it more consistent with four

5   years ago, then yeah.   I would refer to my body camera or

6   the body camera that captured that.

7        Q.   Would you like to see it?

8        A.   Yes.

9             MR. GATTONE:   Sure.   Let's go to -- where are we

10   now?

11            MS. WATERS:   Eight minutes.

12            MR. GATTONE:   First let's go to -- oh, I missed

13   one.   Let me go to eight -- let's just keep rolling.

14            MS. WATERS:   Okay.

15            (Whereupon a video was played.)

16        Q.   So you're saying I punched him multiple times in

17   the face?

18        A.   I think the quote would be I punched him a couple

19   times in the face, nonspecific at that point.   Officer, lead

20   officer at the time, now he's a detective, Gradillas, who I

21   was conversing with, trying to tell him to make sure that he

22   takes specific photos which would include Mr. Alvarado's

23   face for the contusion or injuries if he sustained any.

24            I think later on there might have been a snippet

25   of video where I try to quantify what a couple is more

NICK SOLARINO
4/12/2024

1   accurately to a supervisor that showed up.

2       Q.   Do you think it might be right here or later on?

3       A.   I think it was later on in Officer Yeandle's video

4   or when I turned my camera back on that second time.  It's

5   one of those points.

6            MR. GATTONE:  Gosh, I think I would like to go

7   back to 8:28.  And I apologize for that.  I think that's

8   what I want.

9            MS. WATERS:  8:19.

10           MR. GATTONE:  Sure.

11           (Whereupon a video was played.)

12       Q.   Never mind.  I think we already heard what I

13   wanted.

14           Did you hear anyone in response to him saying I

15   can't breathe say if you can complain you can breathe?

16       A.   I think somewhere during my review of the

17   body-worn camera that sounds consistent with a statement

18   that was made.

19       Q.   Who made that statement?  Do you know?

20       A.   No.  I don't recall.

21       Q.   Does that seem a reasonable response?

22           MS. WATERS:  Object to form.

23           But you may answer.

24           THE WITNESS:  I would refer back to kind of what

25   we already talked about with, again, if you can focus on

COTMSJ0050

NICK SOLARINO
4/12/2024

1   your breathing, focus on deescalating, right, relaxing,

2   bringing himself back down to a normal state from that

3   excited period.  So again, maybe just not the most clearest

4   guidance but again in that ballpark of trying to give him

5   instructions to focus on his breathing and deescalate.

6           MR. GATTONE:  Okay.  Let's go to 10:15, please.

7           That should be good.

8           MS. WATERS:  10:02.

9           (Whereupon a video was played.)

10      Q.   Now my understanding is that the TARP was

11   reapplied or a second one was applied; correct?

12      A.   Yes.

13      Q.   All right.

14      A.   Second one was applied.

15      Q.   Second one was applied.

16           And would you agree that he's back on his stomach

17   at this point?

18      A.   I don't think that's accurate for this still

19   image.  I think he's still partially on his side.  I don't

20   think he's completely face down in this still image, but

21   that is the potential.  Maybe if we played it a little more

22   that did occur to re -- apply the second TARP rather.

23           MR. GATTONE:  Sure.  Please.

24           (Whereupon a video was played.)

25      Q.   So he was on his stomach.  He rolled himself to

RAYNBO COURT REPORTING, LTD.

NICK SOLARINO
4/12/2024

1  his side.  You all put him back on his stomach; correct?

2           MS. WATERS:  Object to form.

3           But you may answer.

4           THE WITNESS:  So in, again, attempting to apply

5  the second TARP I don't believe he, I don't think he was

6  actually fully on his stomach.  I think as officers were

7  trying to apply the second TARP he started to resist again

8  and kicked himself back onto his side, which caused officers

9  to then roll him back down to the stomach for the

10 appropriate TARPing position.

11      Q.   Do you remember in response to him saying I can't

12 breathe have someone -- someone responded if you have this

13 much strength you can breathe?  Do you recall someone saying

14 that?

15      A.   No, I don't.  I'd have to refer to the body camera

16 if it's potentially on there somewhere.

17           MR. GATTONE:  I had it at 10:20.  Let's see if

18 we --

19           MS. WATERS:  Do you want me to go back?

20           MR. GATTONE:  Yes.

21           MS. WATERS:  10:04?

22           MR. GATTONE:  Let's start at 10:04.

23           (Whereupon a video was played.)

24      Q.   So do you know who made that statement?

25      A.   Yeah.  That was me.

COTMSJ0052

NICK SOLARINO
4/12/2024

1          Q.    It was you?  Okay.

2                So again, you were just -- obviously you didn't

3    believe that he couldn't breathe?

4                MS. WATERS:  Object to form.

5                But you may answer.

6                THE WITNESS:  Based on all the things that were

7    presenting itself, right, Mr. Alvarado was still flailing

8    about, moving his body, articulating things to us what he

9    specifically wanted, telling us no, to get off him, those

10   kinds of things, his mannerisms were not consistent with him

11   not being able to breathe at the time, yes.

12               MR. GATTONE:  Can we go to 11:15 -- or let's go to

13   11:10.

14               MS. WATERS:  For the record we paused at 10:26.

15               MR. GATTONE:  All right.

16               MS. WATERS:  And I'll go to 11:10.

17               MR. GATTONE:  That's good.

18               MS. WATERS:  11:04.

19               (Whereupon a video was played.)

20        Q.    So he was still on his stomach at that point;

21   correct?

22        A.    I wasn't looking for that, if we can replay that

23   segment.

24               MR. GATTONE:  Can we go back to 11:10?

25               MS. WATERS:  11:04 again.

RAYNBO COURT REPORTING, LTD.

NICK SOLARINO
4/12/2024

```
 1              MR. GATTONE:  All right.
 2              (Whereupon a video was played.)
 3      Q.   Did you notice there?
 4      A.   Yeah.  It appears accurate.
 5      Q.   Now at some point -- so he's under control here.
 6  You guys said he's good, he's all TARP'd up, he's all cuffed
 7  up; correct?
 8      A.   Yes.  He's at this time wearing one set of
 9  handcuffs, two TARPs, and I believe there was also some
10  articulation by Officer Yeandle a few minutes back in the
11  video of double locking the handcuffs specifically, which
12  would keep them at whatever tightness that they are and not
13  overtighten them.
14      Q.   Now at some point do you recall a spit sock being
15  applied to Mr. Alvarado?
16      A.   Yes.
17      Q.   And that was around -- that was after he was
18  TARP'd and after he was cuffed; correct?
19      A.   Yes.
20      Q.   And was he spitting at the time?  Do you recall?
21      A.   I don't recall.
22      Q.   But nonetheless a spit sock was applied to him?
23      A.   Yes.
24      Q.   Did you make that decision?  Who made that
25  decision?
```

COTMSJ0054

NICK SOLARINO
4/12/2024

1        A.    I don't know.  I'd have to refer to the body
2   camera.   Potentially it was recorded.
3        Q.    But at some point a spit sock was applied?
4        A.    Yes.
5        Q.    And my understanding or recollection is that when
6   the TFD personnel came on the scene they applied a second
7   spit sock; correct?
8        A.    I don't recall.
9              MR. GATTONE:  All right.  Let's go to -- gosh.
10  Where was that?  I had 11:15.  Let's roll a little bit and
11  see if we can see it.
12             MS. WATERS:  We probably have time for one more
13  clip and the questions that go with it, and then we will
14  need to give up the conference room for the lunch break.
15             MR. GATTONE:  Literally I have like three more
16  questions.
17             MS. WATERS:  For the total deposition?
18             MR. PEARD:  No.  No.
19             MR. GATTONE:  Okay.  We'll do it because I'm sure
20  I'll think up some more.
21             MS. WATERS:  I'll hit play at 11:15.
22             (Whereupon a video was played.)
23        Q.    So he's on his stomach, someone said spit sock
24  him, and now they're going to roll him to his side; correct?
25        A.    That appears consistent with the video, yes.

COTMSJ0055

NICK SOLARINO
4/12/2024

```
1              MR. GATTONE:  We can stop there for now.
2              (Whereupon a recess was taken from 12:28 P.M. to
3    1:13 P.M.)
4         Q.   We're back after the lunch break.
5              Let me back up a little bit.  We were talking
6    before about the punching, you punching Damien.
7              Do you recall what Damien was doing when you
8    punched him?
9         A.   Yes.  So yeah.  So it was shortly after I went on
10   scene with him and what we referred to earlier as Civilian
11   B, which would be the older, heavier set male.  We didn't
12   review that portion of the body camera, but we referred to
13   that, also, saying that some of that was captured there.
14             Specifically after we were able to collectively
15   pull Mr. Alvarado off the wall we did see a still image of
16   that as he was on top of the wall there.  He was
17   simultaneously doing a couple of things.
18             One, he was trying to pull his pants up, also
19   articulating things to the effect of something like let me
20   go, let me pull my pants up, and also grabbing with his left
21   arm over to my right shoulder area.
22             So all of these things, again, levels of
23   noncompliance, him trying to do certain things, to me that
24   was essentially allowed me to perceive that he was an active
25   threat, if you will.  So those types of things combined
```

COTMSJ0056

NICK SOLARINO
4/12/2024

1    essentially resulted in me punching him several times in the

2    face as a means of compliance.

3        Q.   That was the only time during the incident that

4    you punched him?

5        A.   During that encounter that period of me attempting

6    to detain him would have been the only time that I punched

7    him.  I don't recall exactly how long that period was or how

8    many times.  Again, we talked earlier three seems to be

9    about the right ballpark.  I don't recall if I punched him

10   again after.  Like you mentioned earlier, there's a moment

11   when my body camera turns off before Officer Yeandle gets

12   there.  But I don't believe that would have occurred again.

13       Q.   How many times in your career with TPD have you

14   punched someone that you were attempting to arrest or

15   detain?

16       A.   I, I can't quantify that.  Has it happened?  Yes.

17       Q.   Yes.

18       A.   Is Mr. Alvarado likely to be the only one?  No.

19   But I can't give you an accurate answer.

20       Q.   But it's happened more than once?

21       A.   That would be fair, yes.

22       Q.   You punched Mr. Alvarado in the face; correct?

23       A.   Yes.

24       Q.   How often in those other times that you punched

25   someone has it been in the face?

COTMSJ0057

NICK SOLARINO
4/12/2024

1    A.    Again, I can't quantify it.  I can recall one

2  specific example, one that comes to mind over the gray area

3  of a number of other times.  And that one, yes, it was I

4  punched that person in the face as well.

5    Q.    Just before I finish and forget, my understanding

6  is that a clip, a gun clip fell off your belt onto the

7  ground; correct?

8    A.    Yes.  At some point one of my magazines from my

9  backup pouch ended up on the ground.

10    Q.    It didn't fall from Mr. Alvarado because he was

11  not armed; correct?

12    A.    That is correct.  My understanding I don't believe

13  we ever found a gun or magazines or any of those things

14  within Mr. Alvarado's person.

15         However, at some point he did have custody of that

16  magazine.  So at some point it was mine, came from my

17  person, but also there's a portion of the video when he does

18  have custody of it or control of it.

19    Q.    Do you know -- well, he didn't pull the magazine

20  out of your belt, it just dropped because of the commotion?

21    A.    That in itself is not particularly clear to my

22  recollection.  He was reaching towards my duty belt.  He was

23  reaching towards my shoulder.  And at some point he did have

24  custody of my magazine.  Whether he specifically took it

25  from my person or he picked it up, I'm not clear on that

COTMSJ0058

NICK SOLARINO
4/12/2024

1  detail.

2      Q.   So let me just see.  Now we've seen in the videos

3  you and others, potentially three to four officers at one

4  time pushing down on Mr. -- on Damien, correct, in an

5  attempt to cuff him and TARP him?

6      A.   Yeah.  That's fair.  I don't recall exactly how

7  many, but yes, there was at times more than, more than

8  others, other officers, yeah.

9      Q.   Any idea how much you weighed at the time of the

10  incident?

11      A.   Relatively close to what I do now.  I kind of

12  maintain.  I vary between 165 and 180, so in that ballpark.

13      Q.   So at some point there was multiple grown men

14  applying force to Damien in an attempt to subdue and detain

15  him; correct?

16      A.   Yes.

17          MR. GATTONE:  And let's go -- can we get the video

18  again?

19          MS. WATERS:  Yes.  It will take just a second.

20      Q.   So in regards to my last question so, again, there

21  were three to four grown men putting their force of their

22  bodies, body weight down on him; correct?

23          MS. WATERS:  Object to form.

24          But you may answer.

25          THE WITNESS:  Kind of like we talked about.  At

COTMSJ0059

NICK SOLARINO
4/12/2024

1    certain points in the videos that we watched, yes, there was

2    numerous officers, I think there was at times we watched

3    three, at times four so that portion would be accurate,

4    attempting to use force to subdue Mr. Alvarado for the

5    purposes of detaining him in handcuffs and TARP.

6          What I would I guess clarify the point of even

7    though officers numerous at those times were putting certain

8    parts of their bodies or body weight on him, it would be

9    fractional to their total body weight, kind of like you

10   asked me.

11         I wasn't actually standing on him, right, so

12   there's only a fractional portion of my body weight

13   technically that I can apply to another person.  What

14   fraction I don't know.  That's some science and math and

15   stuff but.

16   Q.   Applying a significant amount of force in an

17   attempt to hold him down; correct?

18         MS. WATERS:  Object to form.

19         But you may answer.

20         THE WITNESS:  At times when it was relevant, like

21   particularly on my side when I was on his legs and he was

22   kicking and trying to buck me off, I was trying to use my,

23   my all, right, use my whole body, use my, all my strength,

24   however you want to put it, yes.

25         MR. GATTONE:  Where did we leave off?  And at some

NICK SOLARINO
4/12/2024

 1  point --

 2           MS. WATERS:  I'm sorry.  Is it the Yeandle video

 3  that you want?

 4           MR. GATTONE:  Give me one second.  I think we have

 5  another question before we go to the video.

 6      Q.   So you said you were giving it your all.  So at

 7  some point people were needing to use their full body weight

 8  to hold him down; correct?

 9           MS. WATERS:  Object to form.

10           But you may answer.

11           THE WITNESS:  So like I mentioned, right, I was

12  intentionally trying not to lose the fight, if you will;

13  right?  So I was doing everything within my power, right, to

14  win and effect that arrest.

15           So yes, I was using my body weight trying to

16  manipulate my person, manipulate his person to apply certain

17  positional hold techniques, if you will; right?

18           But again, it's only fractional based on your

19  entire body weight, right, without actually standing on him.

20  So how much of my body weight I don't -- I can't answer that

21  accurately but.

22      Q.   But again, multiple officers at some point were

23  applying force to him in an attempt to subdue him?

24      A.   Yes.

25      Q.   Let's go -- do you recall were you there when the

COTMSJ0061

NICK SOLARINO
4/12/2024

```
 1    applied?
 2              MS. WATERS:  Object to form.
 3              But you can answer.
 4              THE WITNESS:  Again, I was within the area.  I
 5    can't recall exactly observing him with it and how it
 6    appeared.
 7         Q.  But officers, including you, are trained to put on
 8    the spit socks; correct?
 9         A.  Yes.
10              MR. GATTONE:  All right.  13 -- where are we at
11    now?
12              MS. WATERS:  I've got it at 13:28.
13              MR. GATTONE:  Sure.  Let's roll from there.
14              (Whereupon a video was played.)
15         Q.  Who was that that said is he going to die on the
16    way?
17         A.  So on the right of your screen that's me standing
18    there with the TFD personnel.  The statements that you're
19    referring to that was me basically conversing with TFD.
20    Essentially, if I recall, the topic of conversation was what
21    is the intended outcome, right, from TFD to us, what is our
22    intended outcome?  And I was explaining to them essentially
23    what the end game would be.
24              Specifically the comment that you're talking about
25    I was letting them know that basically it's their job to get
```

COTMSJ0062

NICK SOLARINO
4/12/2024

1  us from point A to point B, so make sure, you know, check

2  him, if you got to transport him, transport him.  We just

3  don't want him to die on the way to jail.

4      Q.   So you had some concerns about his health at that

5  point?

6      A.   So to the point of that we just fought with this

7  guy for however long we did, tased him, punched him, all

8  those things, yes, there is a potential that, right, that I

9  am -- he is in my custody.  It is my, part of my duties now

10 to care for him and to get him the adequate proper care as

11 necessary.

12     Q.   And you were telling them that he's going to go to

13 jail so you were concerned that he didn't die or have some

14 other health issues on the way there?

15     A.   That's fair, yes.

16     Q.   TFD was able to conduct their evaluation; correct?

17     A.   Yes.

18     Q.   And at some point they were -- is that something

19 you usually ask that question to TFD after?  Or is that a

20 question you usually ask after the application of force on a

21 suspect?

22          MS. WATERS:  Object to form.

23          But you may answer.

24          THE WITNESS:  You're specifically referring to the

25 statement about making sure he's not going to die --

NICK SOLARINO
4/12/2024

```
 1                  MR. GATTONE:  Yes.
 2                  THE WITNESS:  -- before then?
 3                  No.  That's probably infrequent to frame it that
 4    way.  Yes.
 5          Q.   But just based on the specifics of this incident
 6    you had some concerns?
 7                  MS. WATERS:  Object to form.
 8                  But you may answer.
 9                  THE WITNESS:  Again, like we talked about, this
10    was not the routine call for TFD to evaluate somebody before
11    we go to jail.
12          Q.   Okay.
13          A.   The level of noncooperation that he presented, the
14    amount of time it took us to deal with him, the level of
15    force which included the Taser, the punching, the
16    handcuffing, the TARP, all of those things combined, yes,
17    you can say put a little bit more of a concern that we need
18    to make sure that he is going to be okay so that we can get
19    to the end game, like I said, which is to get him to jail.
20          Q.   Do you have any training or experience whether the
21    use of the Taser can have an impact on someone's heart?
22          A.   Yes.
23          Q.   And what's that?
24          A.   So as part of our, as part of our department's
25    training specifically for Taser, it's very regulated by the
```

COTMSJ0064

NICK SOLARINO
4/12/2024

 1  correct?

 2       A.   Yes.

 3       Q.   Where were you when you found out that he might

 4  not be breathing?

 5       A.   Again, I know I was in the area around where he

 6  was at.  I -- exactly where in proximity, again, I would

 7  have to refer to body camera, but I know I was in the area.

 8       Q.   Did you hear the officers asking if he was

 9  breathing?

10       A.   Yes.  I believe an officer asked that and then I

11  see CPR beginning.

12       Q.   So it was pretty quickly after the TFD were

13  leaving that they had to be called back because Damien had

14  stopped breathing?

15       A.   Yes.

16       Q.   Do you know who called them back?

17       A.   Excuse me.  I believe that I got on the radio

18  about it, and I think I actually yelled towards them.  And

19  they would have been specifically based on this angle that

20  we're looking at over to the right, which would have been

21  towards the north or Prince.

22       Q.   Did you check his pulse or did any of the officers

23  check his pulse to see if he indeed had a pulse?

24       A.   I don't recall.  I don't believe I did.  I don't

25  know if anyone else did.

COTMSJ0065

NICK SOLARINO
4/12/2024

1      Q.   So they were applying CPR.  He's dead.  He's
2  deceased.  His body is not functioning properly; correct?
3           MS. WATERS:  Object to form.
4           But you may answer.
5           THE WITNESS:  I didn't apply any instruments or
6  anything to confirm or check whether he was deceased or not.
7  I know that based on my observations people were attempting
8  life-saving measures, including CPR, like I saw another
9  officer doing.  I don't recall which one.
10           I did assist with removing his garments to include
11  his pants and lower garments.  And TFD did transport him
12  away from the scene.  Generally TFD would not transport
13  somebody that is confirmed deceased to the hospital.
14      Q.   But they were also likewise trying to resuscitate
15  him?
16      A.   Exactly what they did I don't know.
17      Q.   But they were doing CPR?
18      A.   I believe that they took over CPR, yes, from the
19  police officer.
20      Q.   I think -- I'm sorry to dwell on the punching, but
21  you said there were other times when you punched other
22  people.
23           Do you remember the reason why you punched other
24  people?  Were they likewise resisting?  Were they -- I mean
25  Damien was struggling.  He wasn't punching you.  But were

NICK SOLARINO
4/12/2024

1  incidents punching them would be what could be defined as a

2  deescalation or a lower level of force or response from

3  myself towards both of those individuals.

4       Q.   I understand.

5            And if you utilized force when taking someone into

6  custody or detaining them, does every one of those uses of

7  force get reviewed at least by your chain of command?

8       A.   Yes.  And there's different levels of force which

9  create different levels of paperwork on the back end.  But

10 either way, no matter which type, they all end up in a

11 review process by a supervisor at the minimum.

12      Q.   I would like to go briefly back to your body-worn

13 camera footage, which is Exhibit A, and I'd like to play the

14 beginning of your interaction with Mr. Alvarado.  And I want

15 you to focus on the application of facial strikes to

16 Mr. Alvarado.

17           And after we play this, I'm going to ask you if

18 you can articulate your rationale for the use of force.

19      A.   Okay.

20           MS. WATERS:  I'm going to get to the right spot,

21 though.  A lot of time in the car.

22           (Whereupon a video was played.)

23      Q.   All right.  So I'm starting your video at

24 19 minutes and 20 seconds.  It looks like you are running

25 down the alley; is that accurate?

COTMSJ0067

NICK SOLARINO
4/12/2024

1    A.   Yes.

2         (Whereupon a video was played.)

3    Q.   Between 19:20 and 19:26 we heard you saying stop

4    right there.  Was that a command directed at Mr. Alvarado?

5    A.   Correct.

6    Q.   Did Mr. Alvarado stop in response to your command?

7    A.   No.

8         (Whereupon a video was played.)

9    Q.   There right before 19:34 where I've paused the

10   video you gave Mr. Alvarado a command twice to get off the

11   wall; is that correct?

12   A.   Correct.

13   Q.   Did Mr. Alvarado get off the wall?

14   A.   No.

15   Q.   What did he do instead?

16   A.   Based on his level of resistance, and we're still

17   trying to pull him over and he was still pulling away, it

18   was apparent that he was still trying to successfully go

19   over the wall to the other side.

20   Q.   And at this point we see that both Civilian A and

21   Civilian B have grabbed onto Mr. Alvarado to try to keep him

22   from escaping over the wall; is that right?

23   A.   Correct.  Civilian A to the left, Civilian B to

24   the right as we defined them earlier.

25        (Whereupon a video was played.)

COTMSJ0068

NICK SOLARINO
4/12/2024

1       Q.   We've paused at 19:54.

2            There was some jarring motion in your body-worn

3   camera right before this.  Was that reflective of you

4   engaged in some kind of combat with Mr. Alvarado?

5       A.   Yes.

6       Q.   Did it show you striking him, not show you

7   striking him but was the movement consistent with you

8   striking him?

9       A.   I'd have to watch it again if that's particularly

10  the time or not.

11      Q.   Okay.

12      A.   I can explain what happened here with the hands.

13      Q.   Yes.  So it looks like at 19 minutes and

14  54 seconds you have one hand wrapped around Mr. Alvarado's

15  left wrist with his hand pinned to the ground?

16      A.   Right.

17      Q.   And he's in kind of a squatting position, is that

18  right, or a bent position?

19      A.   Right.  And just before you paused it you could

20  see where he was grabbing at my chest area, which probably

21  made me grab his hand and pull him down as you see there.

22           (Whereupon a video was played.)

23      Q.   I paused at 20 minutes.  You just commanded

24  Mr. Alvarado to get down.  Did he get down?

25      A.   No.

COTMSJ0069

NICK SOLARINO
4/12/2024

1    Q.    What did he do instead?

2    A.    I mean based on this super blurry image he stood

3  up.  And if you'd like to go back, as you were referring to,

4  that engagement, that possibly is where I punched him, but

5  I'd have to see it again.

6    Q.    Let's play it through --

7    A.    Okay.

8    Q.    -- and then if we need to go back and identify it,

9  we can.

10    A.    Okay.

11        (Whereupon a video was played.)

12    Q.    I've paused it at 20:12.  At this point you've

13  told Mr. Alvarado several more times to get down on the

14  ground; is that right?

15    A.    Yes.

16    Q.    Did he get down on the ground?

17    A.    No.  And based on the body camera that is clearly

18  when I punched him several times, delivered several strikes

19  to the face.

20    Q.    And at this point it looks like Civilian B has

21  hands on Mr. Alvarado and is trying to hold him; is that

22  right?

23    A.    He had him in a quasi bear hug, and I think he

24  ends up doing a takedown.  I'm not sure if he's trying to

25  necessarily hold him or if this is just pausing in that

COTMSJ0070

NICK SOLARINO
4/12/2024

 1  moment.

 2        Q.    Of trying to get him to the ground?

 3        A.    Right.

 4        Q.    And here at 20 minutes and 12 seconds is this your

 5  Taser that we see in your right hand?

 6        A.    Yes, which is, and I'll point to the knee, most

 7  likely in the on position with the red dot on his knee

 8  unless that is some weird camera thing where it's creating

 9  an image that's not there.

10        Q.    So when you point the Taser, does it actually

11  place a laser dot on the place where the probe is going to

12  deploy --

13        A.    Yes.

14        Q.    -- or how does that work?

15        A.    Yes.  It will, if it's in the on position, it will

16  place the laser like you see as an aiming guide.  So unless

17  this is some weird camera thing, that is likely to be what

18  we're seeing there, which is the aiming point.

19              And I think if you look at the very top of the

20  screen, the Taser safety appears to be in the up position,

21  which is the on position versus the off position.

22        Q.    All right.  So in all likelihood your Taser is in

23  the on position and this red dot that we see on

24  Mr. Alvarado's knee is the aiming point for the Taser?

25        A.    Yes.

RAYNBO COURT REPORTING, LTD.

COTMSJ0071

NICK SOLARINO
4/12/2024

1                    (Whereupon a video was played.)

2        Q.   And your video ended just as Mr. Alvarado and the

3   Civilian B fell over to the ground together; is that right?

4        A.   Right.

5        Q.   Having watched this body-worn camera video

6   through, can you articulate for me the reason why you

7   punched Mr. Alvarado in the face?

8        A.   Sure.  So as we're watching it, right, just to

9   define some terms, act of aggression essentially would be

10  Mr. Alvarado not complying with commands and also taking

11  steps to avoid apprehension.

12            So in this case when you see when he's standing up

13  with both my -- within proximity of myself and Civilian B

14  grabbing at my person, those acts along with the other

15  information, right, the statements he's making, clenched

16  fist, hundred yard -- thousand yard stare, grinding his

17  teeth, things that aren't necessarily reflected here because

18  of the blurs or they're just off camera, consistent with the

19  act of aggression, like I said, is technically a step higher

20  than the physical application of strikes that I applied.

21            Again, those come into play per general orders

22  with defensive resistance, which defensive resistance is

23  defined as simply not following commands but not necessarily

24  taking steps to avoid that apprehension.

25            So the situation would be sit down and they just

1  stand there and don't do anything else or stand up and they

2  sit there and don't do anything else.

3          But those other indicators that we talked about

4  would bring this up to another level and would also throw in

5  there again the fact that the potential relation that we

6  were evaluating at the time to the homicide call and the

7  unknowingness of whether he was armed or not also posed a

8  more significant threat versus less likely.

9      Q.   All right.  And you're taking all those factors

10  into consideration as you're choosing how to interact with

11  Mr. Alvarado and respond to his actions?

12      A.   Correct.

13      Q.   You obviously had pulled out your Taser and you'd

14  aimed it in this video.  We know from subsequent videos you

15  deployed the Taser; is that right?

16      A.   Right.

17      Q.   Can you articulate for me the rationale for

18  deploying the Taser?

19      A.   So again, talking about the general orders, like

20  we did act of aggression, Taser is an appropriate, as far as

21  the general orders is concerned, level of force to meet with

22  act of aggression or deadly force.

23          Presented with a deadly force scenario I think it

24  would be not the most appropriate level of force.  So if

25  someone's pointing a gun at you, why would you pull your

COTMSJ0073

NICK SOLARINO
4/12/2024

1    Taser at them?  However, per general orders it is

2    technically a suitable means of force against that level of

3    threat.

4              Since we're, like I said, defined in this category

5    as the act of aggression stage, applying a lesser means of

6    force that was ineffective, delivering strikes, trying

7    manipulative techniques that aren't working, then the next

8    rationale would be to move to a higher means of force, which

9    would be the Taser in that instance based on what I had

10   available to me on my person.

11        Q.   Were you able to to gain Mr. Alvarado's compliance

12   by using the Taser?

13        A.   No.

14        Q.   And ultimately it looked from the video like it

15   took several officers working together to gain physical

16   control over Mr. Alvarado; is that right?

17        A.   Correct.

18        Q.   After you gained physical control over

19   Mr. Alvarado, would you describe him at that point as

20   compliant?

21        A.   No.

22        Q.   Once you gained physical control over Mr. Alvarado

23   did you ever punch him?

24        A.   No.

25        Q.   Did you ever tase him?

COTMSJ0074

NICK SOLARINO
4/12/2024

1      A.    No.

2      Q.    Did you ever utilize any force against him other

3 than like holding him in place to apply the TARP or

4 handcuffs?

5      A.    No.  Any of those things to a handcuffed prisoner

6 would potentially push in the realm of unreasonable or

7 excessive.

8      Q.    But you didn't do any of those things?

9      A.    Correct.

10      Q.    Did you see any other officer do those things?

11      A.    No.

12      Q.    Okay.  Oh, I do have, I'm sorry, one last thing.

13           Obviously the information you provide during a

14 deposition is based on the questions you're asked; correct?

15      A.    Correct.

16           MR. GATTONE:  I have -- oh.  Go ahead.

17           MS. WATERS:  I'm almost done.

18      Q.    Correct?

19      A.    Correct.

20      Q.    If you were asked different questions, might you

21 remember additional information?

22      A.    Correct.  I did not come here with thoughts in

23 mind specific that I would provide, so yes.  I'm essentially

24 answering what I'm asked.

25           MS. WATERS:  I have no additional questions for

COTMSJ0075

NICK SOLARINO
4/12/2024

```
 1                          CERTIFICATE

 2   STATE OF ARIZONA      )
                           )
 3   COUNTY OF PIMA        )

 4          BE IT KNOWN that the foregoing deposition was
     taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
 5   No. 50014 in the State of Arizona; that NICK SOLARINO was
     duly sworn by me according to law; that the proceedings were
 6   taken down by me and reduced to writing under my direction;
     that the preparation, production and distribution comply
 7   with law and code; that the foregoing 111 pages are a full,
     true and accurate record, all done to the best of my skill
 8   and ability.

 9          I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
10   outcome hereof.

11          (XX) Review and signature was waived.

12          (  ) Review and signature was requested.

13          (  ) Review and signature was not requested.

14          I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206 (F)(3) and
15   ACJA 7-206(J)(1)(g)(1) and (2).

16          DATED this 24th day of April, 2024.

17

18          _____
            RAYNBO SILVA, RPR, CR
19          Certified Reporter
            Arizona CR No. 50014
20

21          I CERTIFY that RAYNBO COURT REPORTING, LTD., has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24          _____
            RAYNBO COURT REPORTING, LTD.
25          Registered Reporting Firm
            Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

COTMSJ0076

**Intergraph® I/NetViewer®**

Search: Enter ID#   GO ›   

Main    Events    Units    Messages    Lineups    Inquiry    Configure

**E200820748 - SHOOTING - SHOOTING**
**2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE**

| Overview | **Chronology** | Event Unit | View Map | Event Details | Event Calls (6) |

☑ System Comments

| | |
|---|---|
| 03/22/20 17:18:40<br>Terminal: ct17<br>Operator: 0 | **ANI/ALI**<br>**Phone:** (520) 373-3824<br>**Lat:** +32.255892<br>**Lon:** -110.920587<br>**Call ID:** 2020032200001070133 |
| 03/22/20 17:18:42<br>Terminal: ct7<br>Operator: 0 | **ANI/ALI**<br>**Phone:** (520) 471-7808<br>**Lat:** +32.263702<br>**Lon:** -110.928183<br>**Call ID:** 2020032200001070134 |
| 03/22/20 17:20:43<br>Terminal: north<br>Operator: 53732 | **EVENT CREATED**<br>**Type:** SHOOTING - SHOOTING<br><br>**LOCATION:**<br>2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br><br>**Agency:** TPD<br>**Group:** T3<br>**Beat:** T301<br>**Status:** P<br>**Priority:** 1 |
| 03/22/20 17:20:43<br>Terminal: north<br>Operator: 53732 | **INITIAL CALL**<br>**Call Source:** PHONE<br>**Caller Name:**<br>**Caller Phone Number:**<br>**Caller Address:** |
| 03/22/20 17:20:43<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>BEHIND THE SUV, WHITE SUV, BELIEVES HE WAS IN SHOOTING, NOT MOVING |
| 03/22/20 17:20:43<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>** ECBD STARTED |
| 03/22/20 17:20:44<br>Terminal:<br>vmcadcompd<br>Operator: 53732 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:20:44 |
| 03/22/20 17:20:46<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>Anyone injured?:: 1 |
| 03/22/20 17:20:49<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>What kind of weapon was used/seen?:: UNKNOWN |

COTMSJ0077    20-387COT0003

| | |
|---|---|
| 03/22/20 17:21:03<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>What are the injuries (condition/extent)?:: UNKNOWN, MALE ON GROUND - NOT MOVING, HAS TWO PEOPLE OVER HIM<br>-------------------------------------------------------------- |
| 03/22/20 17:21:10<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>How many injured?:: ASSUMED TO BE 1<br>-------------------------------------------------------------- |
| 03/22/20 17:21:16<br>Terminal: ct17<br>Operator: 0 | **ANI/ALI**<br>**Phone:** (520) 904-1099<br>**Lat:** +32.265601<br>**Lon:** -110.927947<br>**Call ID:** 2020032200001070150 |
| 03/22/20 17:21:24<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>Specific location of the injured person(s)?:: BEHIND THE WHITE SUV<br>-------------------------------------------------------------- |
| 03/22/20 17:21:26<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>Suspect description?:: UNKNOWN<br>-------------------------------------------------------------- |
| 03/22/20 17:21:32<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Total Assigned Units:** 1<br>-------------------------------------------------------------- |
| 03/22/20 17:21:32<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**First Unit Dispatched Time:** 03/22/20 17:21:32<br>-------------------------------------------------------------- |
| 03/22/20 17:21:32<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 102554<br>-------------------------------------------------------------- |
| 03/22/20 17:21:34<br>Terminal: $3X87<br>Operator: 100962 | **EVENT UPDATED**<br>**Total Assigned Units:** 2<br>-------------------------------------------------------------- |
| 03/22/20 17:21:34<br>Terminal: $3X87<br>Operator: 100962 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 100962<br>-------------------------------------------------------------- |
| 03/22/20 17:21:36<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>HEARD 4 SHOTS APPROX 5 MINS AGO<br>-------------------------------------------------------------- |
| 03/22/20 17:21:38<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Total Assigned Units:** 3<br>-------------------------------------------------------------- |
| 03/22/20 17:21:38<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101844 |

COTMSJ0078

| | |
|---|---|
| 03/22/20 17:21:40<br>Terminal: d4<br>Operator: 53785 | **EVENT REMARK**<br>****TFD HOLD OFF TFD F200820164****<br>-------------------------------------------------------- |
| 03/22/20 17:21:43<br>Terminal: $3A87<br>Operator: 101689 | **EVENT UPDATED**<br>Total Assigned Units: 4<br>-------------------------------------------------------- |
| 03/22/20 17:21:43<br>Terminal: $3A87<br>Operator: 101689 | **UNIT UPDATED**<br>Unit: 3A87<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101689 |
| 03/22/20 17:21:44<br>Terminal: $3X61<br>Operator: 103053 | **EVENT UPDATED**<br>Total Assigned Units: 5<br>-------------------------------------------------------- |
| 03/22/20 17:21:44<br>Terminal: $3X61<br>Operator: 103053 | **UNIT UPDATED**<br>Unit: 3X61<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 103053 |
| 03/22/20 17:21:45<br>Terminal: $3A86<br>Operator: 101844 | **EVENT UPDATED**<br>First Unit Enrouted Time: 03/22/20 17:21:45<br>-------------------------------------------------------- |
| 03/22/20 17:21:45<br>Terminal: $3A86<br>Operator: 101844 | **UNIT UPDATED**<br>Unit: 3A86<br>Status: ER<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101844 |
| 03/22/20 17:21:51<br>Terminal: $3A65<br>Operator: 101845 | **EVENT UPDATED**<br>Total Assigned Units: 6<br>-------------------------------------------------------- |
| 03/22/20 17:21:51<br>Terminal: $3A65<br>Operator: 101845 | **UNIT UPDATED**<br>Unit: 3A65<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101845 |
| 03/22/20 17:21:58<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>COMP IS CALLING FROM THE APARTMENT COMPLEX, CANNOT SEE FROM HE IS<br>-------------------------------------------------------- |
| 03/22/20 17:22:01<br>Terminal: $3A84<br>Operator: 100739 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 17:22:01<br>Total Assigned Units: 7<br>-------------------------------------------------------- |
| 03/22/20 17:22:01<br>Terminal: $3A84<br>Operator: 100739 | **UNIT UPDATED**<br>Unit: 3A84<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 100739 |

COTMSJ0079

20-387COT0005

| | |
|---|---|
| 03/22/20 17:22:07<br>Terminal: $3A84<br>Operator: 100739 | **UNIT UPDATED**<br>**Unit:** 3A84<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 100739<br>-------------------------------------------------- |
| 03/22/20 17:22:13<br>Terminal: ct25<br>Operator: 0 | **ANI/ALI**<br>**Phone:** (520) 275-2577<br>**Lat:** +32.261825<br>**Lon:** -110.928869<br>**Call ID:** 2020032200001070154<br>-------------------------------------------------- |
| 03/22/20 17:22:28<br>Terminal: $3L8<br>Operator: 53657 | **EVENT UPDATED**<br>**Total Assigned Units:** 8<br>-------------------------------------------------- |
| 03/22/20 17:22:28<br>Terminal: $3L8<br>Operator: 53657 | **UNIT UPDATED**<br>**Unit:** 3L8<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 53657<br>-------------------------------------------------- |
| 03/22/20 17:22:39<br>Terminal: $3L8<br>Operator: 53657 | **UNIT UPDATED**<br>**Unit:** 3L8<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 53657<br>-------------------------------------------------- |
| 03/22/20 17:22:42<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3U6 COPIED<br>-------------------------------------------------- |
| 03/22/20 17:22:45<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>DID NOT SEE SHOOTING SPECIFICALLY CAN ONLY SEE ASSUMED VICTIM<br>-------------------------------------------------- |
| 03/22/20 17:22:53<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A81 -- WILL HAVE IC<br>-------------------------------------------------- |
| 03/22/20 17:22:57<br>Terminal: $3A83<br>Operator: 101978 | **EVENT UPDATED**<br>**Total Assigned Units:** 9<br>-------------------------------------------------- |
| 03/22/20 17:22:57<br>Terminal: $3A83<br>Operator: 101978 | **UNIT UPDATED**<br>**Unit:** 3A83<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101978<br>-------------------------------------------------- |
| 03/22/20 17:22:58<br>Terminal: $3A85<br>Operator: 101973 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 17:22:58<br>**Total Assigned Units:** 10<br>-------------------------------------------------- |
| 03/22/20 17:22:58<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101973 |

COTMSJ0080

20-387COT0006

| 03/22/20 17:23:01<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>APPEARS THAT VICTIM NOW HAS HEAD COVERED WITH TOWEL |
| 03/22/20 17:23:19<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>ADDTL PEOPLE ARE NOW STANDING OVER APPEARED |
| 03/22/20 17:23:31<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>VICTIM APPEARS TO BE BREATHING NOW FROM ANOTHER PARTY |
| 03/22/20 17:24:13<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>BELIEVED TO HAVE BEEN SHOT IN THE FLANK AREA |
| 03/22/20 17:24:17<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>APPLYING PRESSURE TO WOUND |
| 03/22/20 17:24:20<br>Terminal: ct12<br>Operator: 0 | **ANI/ALI**<br>**Phone:** (520) 549-9898<br>**Lat:** +32.266438<br>**Lon:** -110.928204<br>**Call ID:** 2020032200001070161 |
| 03/22/20 17:24:52<br>Terminal: north<br>Operator: 53732 | **UPDATED/ADDITIONAL CALL**<br>**Call Source:** PHONE<br>**Caller Name:** DAVID GARMARNIK<br>**Caller Phone Number:** (520) 971-5711<br>**Caller Address:** 2901 E FORT LOWELL |
| 03/22/20 17:24:53<br>Terminal: north<br>Operator: 53732 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 17:24:53<br>**Has Informer Loi Data:** True<br>**Zip Code:** 85716 |
| 03/22/20 17:25:21<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>USE THE CARWASH ENTRANCE OFF OF FT LOWELL |
| 03/22/20 17:25:28<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>LARGE AMOUNT OF PEOPLE WITH PT NOW |
| 03/22/20 17:25:45<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A81 -- 45 AT COUNTRY CLUB/FORT LOWELL |
| 03/22/20 17:25:46<br>Terminal: north<br>Operator: 53732 | **EVENT REMARK**<br>NEAREST TO THE VACUUMS AT THE CARWASH |
| 03/22/20 17:25:55<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A87 -- ENOUGH UNITS ON SCENE WILL MOVE IN |

COTMSJ00081

| | |
|---|---|
| 03/22/20 17:26:20<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A87 -- LOOKS LIKE IT WILL BE IN FRONT OF A CARWASH<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **UPDATED/ADDITIONAL CALL**<br>**Call Source:** ANI/ALI<br>**Caller Name:** SONYA KOVAR<br>**Caller Phone Number:** (520) 904-1099<br>**Caller Address:** 2901 E FORT LOWELL RD,617<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Duplicate Event:Location = 2901 E FORT LOWELL RD TUC, 617 : @WINTERHAVEN TERRACE, Cross Street 1 = N CHRISTMAS AV, Cross Street 2 = N COUNTRY CLUB RD, Ty<br>NOTIFICATION, Caller Name = SONYA KOVAR, Caller Ph Number = (520) 904-1099, Caller Address = 2901 E FORT LOWELL RD,617, Call Source = ANI/ALI, Alarm Level = T<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>WPH2 88 -110.927947 +32.265601<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** ECBD STARTED<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:21:49<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Anyone injured?:: MALE SHOT<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>HEARD 5 SHOTS<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>CARWASH NEXT TO CIRCLE K<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>COMP NOT SURE OF CARWASH 20 OR NAME<br>------------------------------------------------- |
| 03/22/20 17:26:38<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>NW SIDE OF CIRCLE K<br>------------------------------------------------- |
| 03/22/20 17:26:39<br>Terminal: supv2<br>Operator: 33119 | **EVENT CROSS-REFERENCED**<br>E200820751 W104143<br>------------------------------------------------- |
| 03/22/20 17:26:39<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>NW QUAD W OF CIRCLE K****<br>------------------------------------------------- |
| 03/22/20 17:26:39<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** Event Location changed from "2900 E FORT LOWELL RD TUC" to "2901 E FORT LOWELL RD,617: @WINTERHAVEN TERRACE" at: 03/22/20 17:26:33<br>------------------------------------------------- |
| 03/22/20 17:26:39<br>Terminal: supv2 | **EVENT REMARK**<br>** >>>? by: 103 662 n terminal: ct17 |

COTMSJ0082

20-387COT0008

| | |
|---|---|
| Operator: 33119 | -------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:39<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:26:33<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:39<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>End of Duplicate Event data<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:39<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** Cross Referenced to Event # E200820751 at: 03/22/20 17:26:39<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:39<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** > > > > by: 33119 on terminal: supv2<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:43<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- ENOUGH UNITS ON SCENE...REST OF THE UNITS CIRC<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **UPDATED/ADDITIONAL CALL**<br>**Call Source:** ANI/ALI<br>**Caller Name:** SAVANNAH SAYERS<br>**Caller Phone Number:** (520) 549-9898<br>**Caller Address:** 2901 E FORT LOWELL RD<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **EVENT REMARK**<br>Duplicate Event:Location = N COUNTRY CLUB RD/E FORT LOWELL RD TUC, Cross Street 1 = N COUNTRY CLUB RD, Cross Street 2 = E FORT LOWELL RD, Caller Name = S/<br>Address = 2901 E FORT LOWELL RD, Call Source = ANI/ALI, Alarm Level = 1 |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **EVENT REMARK**<br>WPH2 46 -110.928204 +32.266438<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **EVENT REMARK**<br>HEARD 6 GUN SHOTS<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **EVENT REMARK**<br>SAW ONE PERSON ON THE GROUND AND PEOPLE RUSHING TO THAT PERSON<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **EVENT REMARK**<br>DID NOT SEE WHO SHOT<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **EVENT REMARK**<br>OCC'D APPROX 10 MINS AGO<br><br>**Priority :** Normal<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:51<br>Terminal: ct12<br>Operator: 102847 | **EVENT REMARK**<br>End of Duplicate Event data<br>-------------------------------------------------- |

| | |
|---|---|
| 03/22/20 17:26:56 | **EVENT UPDATED**<br>First Unit Arrived Time: 03/22/20 17:26:56 |

COTMSJ0083

20-387COT0009

| | |
|---|---|
| Terminal: d3<br>Operator: 54065 | **Rms Transfer Time:** 03/22/20 17:26:56<br>-------------------------------------------- |
| 03/22/20 17:26:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101844<br>-------------------------------------------- |
| 03/22/20 17:26:59<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 103053<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **UPDATED/ADDITIONAL CALL**<br>**Call Source:** ANI/ALI<br>**Caller Name:** DEBRA MILON<br>**Caller Phone Number:** (520) 471-7808<br>**Caller Address:** 3120 N TERRELL<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT CROSS-REFERENCED**<br>E200820745 |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Duplicate Event: TUC, Cross Street 1 = N COUNTRY CLUB RD, Cross Street 2 = E FORT LOWELL RD, Type = SHOTSHD SHOTS HEARD, Caller Name = DEBRA MILON, Caller<br>TERRELL, Call Source = ANI/ALI, Alarm Level = 1 |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>WPH2 14 -110.928183 +32.263702<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** ECBD STARTED<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>SHOTS HEARD<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>How many shots seen/heard?:: 6 OR 8 SHOTS<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:19:29<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Anything else seen or heard?:: NO<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>End of Duplicate Event data<br>-------------------------------------------- |
| 03/22/20 17:27:05<br>Terminal: supv2 | **EVENT REMARK**<br>** Cross-referenced to Event E2...... at 03/22/20 17:2... |

COTMSJ0084   20-387COT0010

Operator: 33119

---

03/22/20 17:27:05
Terminal: supv2
Operator: 33119

**EVENT REMARK**

** > > > > by: 33119 on terminal: supv2

------------------------------------------------

---

03/22/20 17:27:06
Terminal: ct25
Operator: 103969

**UPDATED/ADDITIONAL CALL**

**Call Source:** ANI/ALI
**Caller Name:** AMANDA STOLKIN
**Caller Phone Number:** (520) 275-2577
**Caller Address:** 3102 N COUNTRY CLUB RD SW 05C39-02, TUCSON

------------------------------------------------

---

03/22/20 17:27:06
Terminal: ct25
Operator: 103969

**EVENT REMARK**

Duplicate Event:Location = E FORT LOWELL RD/N COUNTRY CLUB RD TUC, Cross Street 1 = E FORT LOWELL RD, Cross Street 2 = N COUNTRY CLUB RD, Caller Name = A
Address = 3102 N COUNTRY CLUB RD SW 05C39-02, TUCSON, Call Source = ANI/ALI, Alarm Level = 1

---

03/22/20 17:27:06
Terminal: ct25
Operator: 103969

**EVENT REMARK**

WPH2 149 -110.928869 +32.261825

------------------------------------------------

---

03/22/20 17:27:06
Terminal: ct25
Operator: 103969

**EVENT REMARK**

COMP HEARD SHOTS FIRED 5AGO

------------------------------------------------

---

03/22/20 17:27:06
Terminal: ct25
Operator: 103969

**EVENT REMARK**

NE OF LISTED, 2-3, THEN 4-5 SHOTS IN BURSTS. NO SOUNDS OF DISTRESS FOLLOWING

------------------------------------------------

---

03/22/20 17:27:06
Terminal: ct25
Operator: 103969

**EVENT REMARK**

20 3028 E PRESIDIO RD TUC

------------------------------------------------

---

03/22/20 17:27:06
Terminal: ct25
Operator: 103969

**EVENT REMARK**

End of Duplicate Event data

------------------------------------------------

---

03/22/20 17:27:22
Terminal: d3
Operator: 54065

**EVENT REMARK**

3A86 -- SHOOTER RED HAT TOOK OFF W/B ON A HUNDAI.....TIME ELEMENT.

------------------------------------------------

---

03/22/20 17:27:27
Terminal: supv2
Operator: 33119

**UPDATED/ADDITIONAL CALL**

**Call Source:** ANI/ALI
**Caller Name:** ALLISON PETRO
**Caller Phone Number:** (520) 373-3824
**Caller Address:**

------------------------------------------------

---

03/22/20 17:27:27
Terminal: supv2
Operator: 33119

**EVENT CROSS-REFERENCED**

E200820746

------------------------------------------------

---

03/22/20 17:27:27
Terminal: supv2
Operator: 33119

**EVENT REMARK**

Duplicate Event: TUC, Cross Street 1 = E GLENN ST, Cross Street 2 = N SPARKMAN BL, Type = SHOTSHD SHOTS HEARD, Caller Name = ALLISON PETRO, Caller Ph Numbe

------------------------------------------------

---

03/22/20 17:27:27
Terminal: supv2
Operator: 33119

**EVENT REMARK**

WPH2 36 -110.920587 +32.255892

------------------------------------------------

---

03/22/20 17:27:27

**EVENT REMARK**

COTMSJ0085

20-387COT0011

| | |
|---|---|
| Terminal: supv2<br>Operator: 33119 | ** ECBD STARTED |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>HEARD 5 GUNS |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Just Occurred |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Weapon(s) not seen |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Unknown if suspect still there |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:19:40 |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>Direction of travel?:: N OF SPARKMAN |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>NOTHING SEEN/ONLY HEARD |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>CORRECTION 5 GUNSHOTS*** |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>CONTACT VIA 21 IF NEEDED |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>End of Duplicate Event data |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** Cross Referenced to Event # E200820746 at: 03/22/20 17:27:27 |

| | |
|---|---|
| 03/22/20 17:27:27<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>** >>>> by: 33119 on terminal: supv2 |

| | |
|---|---|
| 03/22/20 17:27:39<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A84<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 100739 |

| | |
|---|---|
| 03/22/20 17:27:46<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- 2013 WHI HYUNDAI |

COTMSJ0086
20-387COT0012

| | |
|---|---|
| 03/22/20 17:28:08<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>***SEDAN<br>------------------------------------------------ |
| 03/22/20 17:28:23<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A87<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101689<br>------------------------------------------------ |
| 03/22/20 17:28:26<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101844<br>------------------------------------------------ |
| 03/22/20 17:28:27<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A65<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101845<br>------------------------------------------------ |
| 03/22/20 17:29:01<br>Terminal: supv2<br>Operator: 33119 | **EVENT REMARK**<br>AIR WAITING FOR TFO AND DOING PREFLIGHT PROCEDURE, ETA 30 TO LAUNCH<br>------------------------------------------------ |
| 03/22/20 17:29:57<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- AC<br>------------------------------------------------ |
| 03/22/20 17:30:08<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 17:30:08<br>**Total Assigned Units:** 11<br>------------------------------------------------ |
| 03/22/20 17:30:08<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 51910<br>------------------------------------------------ |
| 03/22/20 17:30:08<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 51910<br>------------------------------------------------ |
| 03/22/20 17:30:45<br>Terminal: $3X61<br>Operator: 103053 | **EVENT REMARK**<br>Ifak applied<br>------------------------------------------------<br>**Priority :** Normal<br>------------------------------------------------ |
| 03/22/20 17:31:09<br>Terminal: $3U6<br>Operator: 51910 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 51910<br>------------------------------------------------ |

COTMSJ0087

| | |
|---|---|
| 03/22/20 17:32:15<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** ER<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 100962 |
| 03/22/20 17:32:15<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** CL<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 100962 |
| 03/22/20 17:32:15<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** AS<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 100962 |
| 03/22/20 17:32:15<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:32:15 |
| 03/22/20 17:32:39<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- HAVE THE WPN THAT WAS USED. |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Total Assigned Units:** 10 |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 17:33:01<br>**Total Assigned Units:** 11 |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** ER<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 101973 |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** CL<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 101973 |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** AS<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 101973 |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A83<br>**Status:** UC<br>**Location:**<br>**Employees:** 101978 |

| | |
|---|---|
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A83<br>**Status:** AM<br>**Location:**<br>**Employees:** 101978 |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A83<br>**Status:** DP<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 101978 |
| 03/22/20 17:33:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A83<br>**Status:** ER<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 101978 |
| 03/22/20 17:33:01<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:33:01 |
| 03/22/20 17:35:31<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3X87 -- QUADS FOR THE 52 PRINCE/TUCSON....FORT LOWELL/CAMPBELL |
| 03/22/20 17:35:57<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- WITNESS SAID COMPACT NEWER MODEL HYUNDAI |
| 03/22/20 17:36:25<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- WORKING GETTING WITNESS OUT OF THE SCENE |
| 03/22/20 17:36:32<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** ER<br>**Location:** E PRINCE RD/N TUCSON BL TUC<br>**Employees:** 100962 |
| 03/22/20 17:36:32<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** CL<br>**Location:** E PRINCE RD/N TUCSON BL TUC<br>**Employees:** 100962 |
| 03/22/20 17:36:33<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** AS<br>**Location:** E PRINCE RD/N TUCSON BL TUC<br>**Employees:** 100962 |
| 03/22/20 17:36:33<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:36:33 |
| 03/22/20 17:36:59 | **UNIT UPDATED** |

COTMSJ0089 ...0-387COT0015

| | |
|---|---|
| Terminal: ct18<br>Operator: 0 | Unit: 3X61<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 103053<br>------------------------------------------------------------ |
| 03/22/20 17:37:24<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3L8<br>Status: ER<br>Location: E FORT LOWELL RD/N TUCSON BL TUC<br>Employees: 53657<br>------------------------------------------------------------ |
| 03/22/20 17:37:24<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3L8<br>Status: CL<br>Location: E FORT LOWELL RD/N TUCSON BL TUC<br>Employees: 53657<br>------------------------------------------------------------ |
| 03/22/20 17:37:24<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3L8<br>Status: AS<br>Location: E FORT LOWELL RD/N TUCSON BL TUC<br>Employees: 53657<br>------------------------------------------------------------ |
| 03/22/20 17:37:24<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:37:24<br>------------------------------------------------------------ |
| 03/22/20 17:37:39<br>Terminal: ct18<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3A84<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 100739<br>------------------------------------------------------------ |
| 03/22/20 17:38:23<br>Terminal: ct21<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3A87<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101689<br>------------------------------------------------------------ |
| 03/22/20 17:38:26<br>Terminal: ct9<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3A86<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101844<br>------------------------------------------------------------ |
| 03/22/20 17:38:27<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3A65<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101845<br>------------------------------------------------------------ |
| 03/22/20 17:39:37<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- ONE 10-7<br>------------------------------------------------------------ |
| 03/22/20 17:39:42<br>Terminal: $3U6<br>Operator: 51910 | **UNIT UPDATED**<br>Unit: 3U6<br>Status: ~ |

COTMSJ0090

20-387COT0016

Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 51910
----------------------------------------------------------------

| | |
|---|---|
| 03/22/20 17:39:50<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: ER<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101973<br>---------------------------------------------------------------- |
| 03/22/20 17:39:50<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: CL<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101973<br>---------------------------------------------------------------- |
| 03/22/20 17:39:50<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:39:50<br>---------------------------------------------------------------- |
| 03/22/20 17:40:03<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A87 -- TFD CONF 1 10-7<br>---------------------------------------------------------------- |
| 03/22/20 17:40:33<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- FIREARM BELONGS TO VIC...SUSP STILL ARMED<br>---------------------------------------------------------------- |
| 03/22/20 17:40:51<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A83<br>Status: ER<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101978<br>---------------------------------------------------------------- |
| 03/22/20 17:40:51<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A83<br>Status: CL<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101978<br>---------------------------------------------------------------- |
| 03/22/20 17:40:51<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:40:51<br>---------------------------------------------------------------- |
| 03/22/20 17:41:03<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A65<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101845<br>---------------------------------------------------------------- |
| 03/22/20 17:41:03<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A84<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 100739<br>---------------------------------------------------------------- |
| 03/22/20 17:41:04<br>Terminal: d3 | **UNIT UPDATED**<br>Unit: 3A66 |

COTMSJ0091
20-387COT0017

| | |
|---|---|
| Operator: 54065 | **Status:** CU<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101844 |
| 03/22/20 17:41:05<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A87<br>**Status:** CU<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 101689 |
| 03/22/20 17:41:06<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** CU<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 103053 |
| 03/22/20 17:41:27<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- LOOKING FOR A HOMELESS MALE WITH RED HAT THAT SAW EVERYTHING |
| 03/22/20 17:41:32<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A83 -- FIGHTING WITH ONE |
| 03/22/20 17:42:07<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>***CORRECTION 3X87 FIGHTING WITH ONE*** |
| 03/22/20 17:42:44<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3X87 -- STILL FIGHTING |
| 03/22/20 17:42:45<br>Terminal: d2<br>Operator: 53786 | **EVENT REMARK**<br>2t7 |
| 03/22/20 17:42:53<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT UPDATED**<br>**First Viewed Time:** 03/22/20 17:42:53<br>**Rms Transfer Time:** 03/22/20 17:42:53 |
| 03/22/20 17:42:53<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>** Event E200820748 was viewed at: 03/22/20 17:42:53 ** > > > > by: 39654 on terminal: ptrc1 |
| 03/22/20 17:45:04<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3X87 -- F200820168 |
| 03/22/20 17:46:33<br>Terminal: ct21<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** ~<br>**Location:** E PRINCE RD/N TUCSON BL TUC<br>**Employees:** 100962 |
| 03/22/20 17:47:03<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3X87 -- SUBJ DETAINED |

COTMSJ0092

03/22/20 17:47:24
Terminal: ct18
Operator: 0

**UNIT UPDATED**
Unit: 3L8
Status: ~
Location: E FORT LOWELL RD/N TUCSON BL TUC
Employees: 53657

---

03/22/20 17:48:03
Terminal: $3A81
Operator: 102554

**UNIT UPDATED**
Unit: 3A81
Status: DC
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 102554

---

03/22/20 17:48:03
Terminal: $3A81
Operator: 102554

**UNIT UPDATED**
Unit: 3A81
Status: DC
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 102554

---

03/22/20 17:48:13
Terminal: d3
Operator: 54065

**EVENT REMARK**
3X87 -- AC...

---

03/22/20 17:48:15
Terminal: $3A81
Operator: 102554

**UNIT UPDATED**
Unit: 3A81
Status: AS
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 102554

---

03/22/20 17:48:18
Terminal: $3T63
Operator: 103816

**EVENT UPDATED**
Total Assigned Units: 12

---

03/22/20 17:48:18
Terminal: $3T63
Operator: 103816

**UNIT UPDATED**
Unit: 3T63
Status: DP
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 49045, 103816

---

03/22/20 17:48:21
Terminal: $3A81
Operator: 102554

**CASE NUMBER ASSIGNED**
P2003220122

---

03/22/20 17:48:21
Terminal: $3A81
Operator: 102554

**DISPOSITION ASSIGNED**
ASSNCASE

---

03/22/20 17:48:21
Terminal: $3A81
Operator: 102554

**EVENT UPDATED**
Primary Employee Id: 102554
Primary Unit Id: 3A81
Rms Transfer Time: 03/22/20 17:48:21

---

03/22/20 17:48:21
Terminal: $3A81
Operator: 102554

**EVENT REMARK**
** Case number P2003220122 has been assigned to event E200820748

---

03/22/20 17:48:21
Terminal: $3A81
Operator: 102554

**EVENT REMARK**
** >>>> by: 102554 on terminal: $3A81

---

COTMSJ0093
20-387COT0019

| | |
|---|---|
| 03/22/20 17:48:57<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3L8<br>**Status:** CU<br>**Location:** E FORT LOWELL RD/N TUCSON BL TUC<br>**Employees:** 53657<br>------------------------------------------------ |
| 03/22/20 17:48:57<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** CU<br>**Location:** E PRINCE RD/N TUCSON BL TUC<br>**Employees:** 100962<br>------------------------------------------------ |
| 03/22/20 17:49:42<br>Terminal: d1<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** ~<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 51910<br>------------------------------------------------ |
| 03/22/20 17:49:51<br>Terminal: d3<br>Operator: 54065 | **ADD SUPPLEMENTAL**<br>**Revision Number:** 1<br>**Supplemental Type:** Vehicle<br>**License:** CTY9963<br>**Model Year:** 0<br>**Unit ID:** 3A86<br>------------------------------------------------ |
| 03/22/20 17:49:51<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 17:49:51<br>------------------------------------------------ |
| 03/22/20 17:49:51<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844<br>------------------------------------------------ |
| 03/22/20 17:49:51<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844<br>------------------------------------------------ |
| 03/22/20 17:49:51<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844<br>------------------------------------------------ |
| 03/22/20 17:49:51<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** VEH search completed at 03/22/20 17:49:51<br>------------------------------------------------ |
| 03/22/20 17:51:36<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3U6 -- WILL HAVE IC AT THE S2<br>------------------------------------------------ |
| 03/22/20 17:52:02<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** ER<br>**Location:** 3801 E FORT LOWELL RD TUC: @MAGIC WAND CAR WA... |

COTMSJ0094

20-387COT0020

Employees: 102554

---

| 03/22/20 17:52:02<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** CL<br>**Location:** 3001 E FORT LOWELL RD TUC: @MAGIC WAND CAR WASH<br>**Employees:** 102554 |

---

| 03/22/20 17:52:02<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** AS<br>**Location:** 3001 E FORT LOWELL RD TUC: @MAGIC WAND CAR WASH<br>**Employees:** 102554 |

---

| 03/22/20 17:52:02<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:52:02 |

---

| 03/22/20 17:52:25<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>PER 2A16 NEED SGT FOR TAZER AND TARP |

---

| 03/22/20 17:52:33<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** CU<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 51910 |

---

| 03/22/20 17:53:22<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** ER<br>**Location:** 1990 E FORT LOWELL RD TUC<br>**Employees:** 51910 |

---

| 03/22/20 17:53:22<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** CL<br>**Location:** 1990 E FORT LOWELL RD TUC<br>**Employees:** 51910 |

---

| 03/22/20 17:53:22<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 17:53:22 |

---

| 03/22/20 17:53:56<br>Terminal: d3<br>Operator: 54065 | **MESSAGE SENT**<br>**CALL BACK!**<br>CALL BACK: DAVID GARMARNIK, (520) 971-5711, 2901 E FORT LOWELL, SHOOTING, E200820748 : PLS TRY AND FIND A 21 FOR 2910 E FORT LOWELL |

---

| 03/22/20 17:53:56<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>** CALL BACK MESSAGE #20042130 initiated at 03/22/20 17:53:56 from d3 |

---

| 03/22/20 17:53:57<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>CALL BACK: DAVID GARMARNIK, (520) 971-5711, 2901 E FORT LOWELL, SHOOTING, E200820748 : PLS TRY AND FIND A 21 FOR 2910 E FORT LOWELL |

20-387COT0021

| 03/22/20 17:54:40<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3A86 -- WILL HAVE IC<br>------------------------------------------------------- |
|---|---|
| 03/22/20 17:54:55<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* UTILITIES AT 2910 E FORT LOWELL, DANNY'S LOUNGE, LIST 21 AS 795-3178, OR RP 327-4472<br><br>**Priority :** Normal<br>------------------------------------------------------- |
| 03/22/20 17:55:18<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* CHECKED FOR RP INFO FOR 3055 N COUNTRY CLUB - NO UTILITIES THERE, NO OWNER LISTED IN PIMA COUNTY GIS...<br>------------------------------------------------------- |
| 03/22/20 17:58:56<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* CLOSEST CAR WASH TO THAT INTERSECTION I SEE IS SELF CAR WASH AT 3001 E FORT LOWELL, 881-0414<br>------------------------------------------------------- |
| 03/22/20 17:59:16<br>Terminal: ct2<br>Operator: 102868 | **EVENT REMARK**<br>SEARCHING<br>------------------------------------------------------- |
| 03/22/20 18:02:02<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: ~<br>Location: 3001 E FORT LOWELL RD TUC: @MAGIC WAND CAR WASH<br>Employees: 102554<br>------------------------------------------------------- |
| 03/22/20 18:02:45<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* CASE #1908100054 LISTS A CALLER FROM 3001 E FORT LOWELL, MAGIC WAND CAR WASH, CALLER WAS CLEANING THE PARKING LOT (NOT SURE HIS RELATIO...<br>100958, 631-9317<br>------------------------------------------------------- |
| 03/22/20 18:03:36<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* UTILITIES AT 3001 E FORT LOWELL ARE UNDER RUSSELL C MOORE, 349-8442<br>------------------------------------------------------- |
| 03/22/20 18:06:37<br>Terminal: ct2<br>Operator: 102868 | **EVENT REMARK**<br>PER PSIS DESK ONLY FOUND 21 FOR STAFF MEMBER KIM IRELAND 520-591-4837 AND 520-409-6569<br>------------------------------------------------------- |
| 03/22/20 18:06:42<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: CU<br>Location: 3001 E FORT LOWELL RD TUC: @MAGIC WAND CAR WASH<br>Employees: 102554<br>------------------------------------------------------- |
| 03/22/20 18:07:15<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* REFERENCE R.O. OF CTY9963 - RETURNS TO CYNTHIA LAMAY 080593. ADDRESS ON HER 27 APPEARS OLD, SHE HAS CURRENT ACTIVE UTILITIES AT 2503 E LIN...<br>------------------------------------------------------- |
| 03/22/20 18:07:41<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* LAST CONTACT W LAMAY IN LINX WAS IN 2016, OLD ADDRESS, 21 AT THAT TIME WAS 278-3612<br>------------------------------------------------------- |
| 03/22/20 18:08:05<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>3X87 -- F200820174<br>------------------------------------------------------- |
| 03/22/20 18:10:58 | **EVENT REMARK**<br>*TRACC* LAMAY'S EMPLOYER LISTED AS AZ COMMUNITY PHYSICIAN... |

COTMSJ0096

20-387COT0022

| | |
|---|---|
| Terminal: ptrc1<br>Operator: 39654 | Priority : Normal |

| | |
|---|---|
| 03/22/20 18:15:13<br>Terminal: supv1<br>Operator: 50656 | **EVENT REMARK**<br>CS PER 3U6 TO 3001 E FT LOWELL REF A SHOOTING. CASE 0122 |

| | |
|---|---|
| 03/22/20 18:15:45<br>Terminal: $3T63<br>Operator: 103816 | **UNIT UPDATED**<br>**Unit:** 3T63<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 49045, 103816 |

| | |
|---|---|
| 03/22/20 18:15:48<br>Terminal: $3T63<br>Operator: 103816 | **UNIT UPDATED**<br>**Unit:** 3T63<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 49045, 103816 |

| | |
|---|---|
| 03/22/20 18:19:07<br>Terminal: ptrc1<br>Operator: 39654 | **EVENT REMARK**<br>*TRACC* UTILITIES AT 3141 E FORT LOWELL, CHRISTIE'S APPLIANCE, LIST 21 AS 326-7129. RP GREG WRIGHT, HOME 21 296-7218<br><br>Priority : Normal |

| | |
|---|---|
| 03/22/20 18:25:48<br>Terminal: ct21<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 3T63<br>**Status:** ~<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 49045, 103816 |

| | |
|---|---|
| 03/22/20 18:28:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3T63<br>**Status:** CU<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 49045, 103816 |

| | |
|---|---|
| 03/22/20 18:29:07<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** AS<br>**Location:** 1990 E FORT LOWELL RD TUC<br>**Employees:** 51910 |

| | |
|---|---|
| 03/22/20 18:29:10<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A83<br>**Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101978 |

| | |
|---|---|
| 03/22/20 18:29:12<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101973 |

| | |
|---|---|
| 03/22/20 18:33:06<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** UC<br>**Location:** |

COTMSJ0097

20-387COT0023

Employees: 102554

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| 03/22/20 18:33:06<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** UC<br>**Location:**<br>**Employees:** 102554<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:33:06<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** UC<br>**Location:**<br>**Employees:** 102554<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:37:58<br>Terminal: $3A64<br>Operator: 102304 | **EVENT UPDATED**<br>**Total Assigned Units:** 13<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:37:58<br>Terminal: $3A64<br>Operator: 102304 | **UNIT UPDATED**<br>**Unit:** 3A64<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 102304<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:38:03<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 18:38:03<br>**Total Assigned Units:** 14<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:38:03<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 1A72<br>**Status:** DP<br>**Location:** 1990 E FORT LOWELL RD TUC<br>**Employees:** 101290<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:38:03<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 1A72<br>**Status:** ER<br>**Location:** 1990 E FORT LOWELL RD TUC<br>**Employees:** 101290<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:38:07<br>Terminal: $3A64<br>Operator: 102304 | **UNIT UPDATED**<br>**Unit:** 3A64<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 102304<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:38:10<br>Terminal: $1A72<br>Operator: 101290 | **UNIT UPDATED**<br>**Unit:** 1A72<br>**Status:** ER<br>**Location:** 1990 E FORT LOWELL RD TUC<br>**Employees:** 101290<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:38:27<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Total Assigned Units:** 15<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - |
| 03/22/20 18:38:27 | **UNIT UPDATED** |

COTMSJ0098

20-387COT0024

| | |
|---|---|
| Terminal: d3<br>Operator: 54065 | Unit: 1A75<br>Status: DP<br>Location: 1990 E FORT LOWELL RD TUC<br>Employees: 53354<br>------------------------------------------------ |
| 03/22/20 18:38:27<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A75<br>Status: ER<br>Location: 1990 E FORT LOWELL RD TUC<br>Employees: 53354<br>------------------------------------------------ |
| 03/22/20 18:38:36<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Total Assigned Units: 16<br>------------------------------------------------ |
| 03/22/20 18:38:36<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: DP<br>Location: 1990 E FORT LOWELL RD TUC<br>Employees: 102557<br>------------------------------------------------ |
| 03/22/20 18:38:36<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: ER<br>Location: 1990 E FORT LOWELL RD TUC<br>Employees: 102557<br>------------------------------------------------ |
| 03/22/20 18:38:52<br>Terminal: $3A67<br>Operator: 101582 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 18:38:52<br>Total Assigned Units: 17<br>------------------------------------------------ |
| 03/22/20 18:38:52<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>Unit: 3A67<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 101582<br>------------------------------------------------ |
| 03/22/20 18:38:52<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: ER<br>Location: 1990 E FORT LOWELL RD TUC<br>Employees: 102557<br>------------------------------------------------ |
| 03/22/20 18:39:07<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3U6<br>Status: ~<br>Location: 1990 E FORT LOWELL RD TUC<br>Employees: 51910<br>------------------------------------------------ |
| 03/22/20 18:39:10<br>Terminal: tac2<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3A83<br>Status: ~<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101978<br>------------------------------------------------ |
| 03/22/20 18:39:12<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: |

COTMSJ0099

20-387COT0025

Location: 1990 E PRINCE RD TUC
Employees: 101973

------------------------------------------------

| 03/22/20 18:39:47<br>Terminal: $1A75<br>Operator: 53354 | **UNIT UPDATED**<br>Unit: 1A75<br>Status: ER<br>Location: 1990 E FORT LOWELL RD TUC<br>Employees: 53354 |

------------------------------------------------

| 03/22/20 18:41:12<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3U6<br>Status: ER<br>Location: 1990 E PRINCE RD TUC<br>Employees: 51910 |

------------------------------------------------

| 03/22/20 18:41:12<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3U6<br>Status: CL<br>Location: 1990 E PRINCE RD TUC<br>Employees: 51910 |

------------------------------------------------

| 03/22/20 18:41:12<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3U6<br>Status: AS<br>Location: 1990 E PRINCE RD TUC<br>Employees: 51910 |

------------------------------------------------

| 03/22/20 18:41:12<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 18:41:12 |

------------------------------------------------

| 03/22/20 18:41:23<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A75<br>Status: ER<br>Location: 1990 E PRINCE RD TUC<br>Employees: 53354 |

------------------------------------------------

| 03/22/20 18:41:23<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A75<br>Status: CL<br>Location: 1990 E PRINCE RD TUC<br>Employees: 53354 |

------------------------------------------------

| 03/22/20 18:41:23<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 18:41:23 |

------------------------------------------------

| 03/22/20 18:41:28<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: ER<br>Location: 1990 E PRINCE RD TUC<br>Employees: 102557 |

------------------------------------------------

| 03/22/20 18:41:28<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: CL<br>Location: 1990 E PRINCE RD TUC |

COTMSJ0100

20-387COT0026

Employees: 102557

---

| 03/22/20 18:41:28<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 18:41:28 |

---

| 03/22/20 18:41:32<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A72<br>Status: ER<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101290 |

---

| 03/22/20 18:41:32<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A72<br>Status: CL<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101290 |

---

| 03/22/20 18:41:32<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 18:41:32 |

---

| 03/22/20 18:41:54<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A67<br>Status: ER<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101582 |

---

| 03/22/20 18:41:54<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A67<br>Status: CL<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101582 |

---

| 03/22/20 18:41:54<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 18:41:54 |

---

| 03/22/20 18:44:33<br>Terminal: d3<br>Operator: 54065 | **ADD SUPPLEMENTAL**<br>Revision Number: 1<br>Supplemental Type: Person<br>Age: 0<br>DOB: ███████<br>Height: 0<br>Name: DOMINGUEZ,JESSE<br>Race: U<br>Sex: M<br>Unit ID: 3X61<br>Weight: 0 |

---

| 03/22/20 18:44:34<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 18:44:34 |

---

| 03/22/20 18:44:34<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3X61<br>Status: UC<br>Location |

Employees: 103053

---

| | |
|---|---|
| 03/22/20 18:44:34<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |

---

| | |
|---|---|
| 03/22/20 18:44:34<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |

---

| | |
|---|---|
| 03/22/20 18:44:34<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |

---

| | |
|---|---|
| 03/22/20 18:44:34<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** PER search completed at 03/22/20 18:44:34 |

---

| | |
|---|---|
| 03/22/20 18:45:09<br>Terminal: $3X61<br>Operator: 103053 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |

---

| | |
|---|---|
| 03/22/20 18:45:49<br>Terminal: $3A64<br>Operator: 102304 | **UNIT UPDATED**<br>**Unit:** 3A64<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 102304 |

---

| | |
|---|---|
| 03/22/20 18:46:08<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 18:46:08<br>**Total Assigned Units:** 18 |

---

| | |
|---|---|
| 03/22/20 18:46:08<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 41537 |

---

| | |
|---|---|
| 03/22/20 18:46:08<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 41537 |

---

| | |
|---|---|
| 03/22/20 18:46:16<br>Terminal: $3X61<br>Operator: 103053 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |

| | |
|---|---|
| 03/22/20 18:46:16<br>Terminal: $3X61<br>Operator: 103053 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |
| 03/22/20 18:46:16<br>Terminal: $3X61<br>Operator: 103053 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |
| 03/22/20 18:48:12<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>HTTP://162.59.200.85/HOME/INDEX/D0763180711853771<br>**Priority :** Normal |
| 03/22/20 18:48:51<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>**Unit:** 3A67<br>**Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101582 |
| 03/22/20 18:49:14<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A83<br>**Status:** CU<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101978 |
| 03/22/20 18:49:15<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** CU<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101973 |
| 03/22/20 18:49:15<br>Terminal: $3X61<br>Operator: 103053 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |
| 03/22/20 18:50:23<br>Terminal: $1A72<br>Operator: 101290 | **UNIT UPDATED**<br>**Unit:** 1A72<br>**Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101290 |
| 03/22/20 18:50:53<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 102557 |
| 03/22/20 18:51:12<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:**<br>**Location:** 1990 E PRINCE RD TUC |

COTMSJ0103

20-387COT0029

Employees: 51910

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 18:53:26<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** CU<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 51910 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 18:55:40<br>Terminal: $3X61<br>Operator: 103053 | **UNIT UPDATED**<br>**Unit:** 3X61<br>**Status:** UC<br>**Location:**<br>**Employees:** 103053 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 18:55:49<br>Terminal: d2<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 3A64<br>**Status:** ~<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 102304 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 18:56:17<br>Terminal: $1A75<br>Operator: 53354 | **UNIT UPDATED**<br>**Unit:** 1A75<br>**Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 53354 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 18:58:51<br>Terminal: ct9<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 3A67<br>**Status:** ~<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101582 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 19:00:23<br>Terminal: d2<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 1A72<br>**Status:** ~<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 101290 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 19:00:53<br>Terminal: ct21<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** ~<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 102557 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 19:00:53<br>Terminal: d2<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** ~<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 102557 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 19:01:15<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 19:01:15<br>**Total Assigned Units:** 19 |
| --- | --- |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| 03/22/20 19:01:15<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D42<br>**Status:** |
| --- | --- |

20-387COT0030

Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 48373

------------------------------------------------

| | |
|---|---|
| 03/22/20 19:01:15<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D42<br>Status: AS<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 48373<br><br>------------------------------------------------ |
| 03/22/20 19:05:43<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D44<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 41238<br><br>------------------------------------------------ |
| 03/22/20 19:05:43<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D44<br>Status: ER<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 41238<br><br>------------------------------------------------ |
| 03/22/20 19:05:44<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 19:05:44<br>Total Assigned Units: 20<br><br>------------------------------------------------ |
| 03/22/20 19:06:17<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 1A75<br>Status: ~<br>Location: 1990 E PRINCE RD TUC<br>Employees: 53354<br><br>------------------------------------------------ |
| 03/22/20 19:07:45<br>Terminal: $DIST43<br>Operator: 102567 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 19:07:45<br>Total Assigned Units: 21<br><br>------------------------------------------------ |
| 03/22/20 19:07:45<br>Terminal: $DIST43<br>Operator: 102567 | **UNIT UPDATED**<br>Unit: DIST43<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 102567<br><br>------------------------------------------------ |
| 03/22/20 19:08:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A72<br>Status: CU<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101290<br><br>------------------------------------------------ |
| 03/22/20 19:08:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A75<br>Status: CU<br>Location: 1990 E PRINCE RD TUC<br>Employees: 53354<br><br>------------------------------------------------ |
| 03/22/20 19:08:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: CU<br>Location: 1990 E PRINCE RD TUC |

COTMSJ0105

20-387COT0031

Employees: 102557

--------------------------------------------------

| 03/22/20 19:08:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A64<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 102304 |
| --- | --- |
| 03/22/20 19:08:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A67<br>Status: CU<br>Location: 1990 E PRINCE RD TUC<br>Employees: 101582 |
| 03/22/20 19:08:05<br>Terminal: $DIST43<br>Operator: 102567 | **UNIT UPDATED**<br>Unit: DIST43<br>Status: ER<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 102567 |
| 03/22/20 19:09:42<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: AS<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 41537 |
| 03/22/20 19:11:15<br>Terminal: ct25<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D42<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 48373 |
| 03/22/20 19:11:22<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D42<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 48373 |
| 03/22/20 19:11:55<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 19:11:55<br>Total Assigned Units: 22 |
| 03/22/20 19:11:55<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 51569 |
| 03/22/20 19:11:55<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: AS<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 51569 |
| 03/22/20 19:12:23<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D44<br>Status: |

COTMSJ0106

20-387COT0032

Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 41238

-------------------------------------------------------------

| | |
|---|---|
| 03/22/20 19:14:53<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 19:14:53<br>Total Assigned Units: 23<br>------------------------------------------- |
| 03/22/20 19:14:53<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees:<br>------------------------------------------- |
| 03/22/20 19:14:53<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: AS<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees:<br>------------------------------------------- |
| 03/22/20 19:18:41<br>Terminal: d3<br>Operator: 54065 | **ADD SUPPLEMENTAL**<br>Revision Number: 1<br>Supplemental Type: Vehicle<br>License: T4008<br>Model Year: 0<br>Unit ID: 3A84<br>------------------------------------------- |
| 03/22/20 19:18:41<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** VEH search completed at 03/22/20 19:18:42<br>------------------------------------------- |
| 03/22/20 19:18:42<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A84<br>Status: UC<br>Location:<br>Employees: 100739<br>------------------------------------------- |
| 03/22/20 19:18:42<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A84<br>Status: UC<br>Location:<br>Employees: 100739<br>------------------------------------------- |
| 03/22/20 19:18:42<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A84<br>Status: UC<br>Location:<br>Employees: 100739<br>------------------------------------------- |
| 03/22/20 19:18:48<br>Terminal: $DIST43<br>Operator: 102567 | **UNIT UPDATED**<br>Unit: DIST43<br>Status: AS<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 102567<br>------------------------------------------- |
| 03/22/20 19:18:56<br>Terminal: d3<br>Operator: 54065 | **ADD SUPPLEMENTAL**<br>Revision Number: 1<br>Supplemental Type: |

COTMSJ0107

20-387COT0033

License: T4000
**Model Year:** 0
**Unit ID:** 3A84

-----------------------------------------------------

| | |
|---|---|
| 03/22/20 19:18:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A84<br>**Status:** UC<br>**Location:**<br>**Employees:** 100739<br>----------------------------------------------------- |
| 03/22/20 19:18:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A84<br>**Status:** UC<br>**Location:**<br>**Employees:** 100739<br>----------------------------------------------------- |
| 03/22/20 19:18:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A84<br>**Status:** UC<br>**Location:**<br>**Employees:** 100739<br>----------------------------------------------------- |
| 03/22/20 19:18:56<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** VEH search completed at 03/22/20 19:18:56<br>----------------------------------------------------- |
| 03/22/20 19:19:42<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** ~<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 41537<br>----------------------------------------------------- |
| 03/22/20 19:19:49<br>Terminal: d3<br>Operator: 54065 | **ADD SUPPLEMENTAL**<br>**Revision Number:** 1<br>**Supplemental Type:** Vehicle<br>**License:** T4008<br>**Model Year:** 0<br>**Unit ID:** 3A86<br>----------------------------------------------------- |
| 03/22/20 19:19:49<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844<br>----------------------------------------------------- |
| 03/22/20 19:19:49<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844<br>----------------------------------------------------- |
| 03/22/20 19:19:49<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844<br>----------------------------------------------------- |
| | EVENT REMARK |

COTMSJ0108

| 03/22/20 19:19:49<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | ** VEH search completed at 03/22/20 19:19:49<br>-------------------------------------------------- |
| --- | --- |
| 03/22/20 19:20:20<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: UC<br>Location:<br>Employees: 101973<br>-------------------------------------------------- |
| 03/22/20 19:20:57<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: UC<br>Location:<br>Employees: 101973<br>-------------------------------------------------- |
| 03/22/20 19:20:57<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: UC<br>Location:<br>Employees: 101973<br>-------------------------------------------------- |
| 03/22/20 19:20:57<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: UC<br>Location:<br>Employees: 101973<br>-------------------------------------------------- |
| 03/22/20 19:20:57<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: UC<br>Location:<br>Employees: 101973<br>-------------------------------------------------- |
| 03/22/20 19:21:55<br>Terminal: ct25<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 51569<br>-------------------------------------------------- |
| 03/22/20 19:22:23<br>Terminal: ct1<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D44<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 41238<br>-------------------------------------------------- |
| 03/22/20 19:24:31<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: UC<br>Location:<br>Employees: 101973<br>-------------------------------------------------- |
| 03/22/20 19:24:31<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>Unit: 3A85<br>Status: UC<br>Location:<br>Employees: 101973<br>-------------------------------------------------- |

20-387COT0035

| | |
|---|---|
| 03/22/20 19:24:31<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** UC<br>**Location:**<br>**Employees:** 101973 |
| 03/22/20 19:24:31<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** UC<br>**Location:**<br>**Employees:** 101973 |
| 03/22/20 19:24:53<br>Terminal: ct1<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** ~<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** |
| 03/22/20 19:25:13<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** UC<br>**Location:**<br>**Employees:** 101973 |
| 03/22/20 19:25:13<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** UC<br>**Location:**<br>**Employees:** 101973 |
| 03/22/20 19:25:13<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** UC<br>**Location:**<br>**Employees:** 101973 |
| 03/22/20 19:25:13<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** UC<br>**Location:**<br>**Employees:** 101973 |
| 03/22/20 19:25:17<br>Terminal: d3<br>Operator: 54065 | **BROADCAST SENT**<br>**211608 - ATL**<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Comment:** CANX PER 9D53<br>WHI 2014 FORD FIESTA AZ/T4008<br>DRIVER INVOLVED IN A SHOOTING....LSH WB..<br>ONLY DESC DRIVER WEARING A RED HAT AND ARMED<br>RTNS TO 7584 E FAIR MEADOW LOOP<br>Cancelled at 03/23/20 03:21:09 by 101711 on d1 |
| 03/22/20 19:25:17<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>** Broadcast Reference Number 211608 at 03/22/20 19:25:17 |
| 03/22/20 19:25:29<br>Terminal: d3<br>Operator: 54065 | **EVENT REMARK**<br>ATL BC #211608 |

COTMSJ0110
20-387COT0036

| | |
|---|---|
| 03/22/20 19:27:13<br>Terminal: $3C2<br>Operator: 45650 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 19:27:13<br>Total Assigned Units: 24 |
| 03/22/20 19:27:13<br>Terminal: $3C2<br>Operator: 45650 | **UNIT UPDATED**<br>Unit: 3C2<br>Status: DP<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 45650 |
| 03/22/20 19:28:28<br>Terminal: $3A86<br>Operator: 101844 | **UNIT UPDATED**<br>Unit: 3A86<br>Status: UC<br>Location:<br>Employees: 101844 |
| 03/22/20 19:28:48<br>Terminal: supv5<br>Operator: 0 | **UNIT UPDATED**<br>Unit: DIST43<br>Status: ~<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 102567 |
| 03/22/20 19:29:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: |
| 03/22/20 19:29:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 51569 |
| 03/22/20 19:29:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D44<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 41238 |
| 03/22/20 19:29:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 41537 |
| 03/22/20 19:29:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: DIST43<br>Status: CU<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Employees: 102567 |
| 03/22/20 19:29:01<br>Terminal: $3A86<br>Operator: 101844 | **UNIT UPDATED**<br>Unit: 3A86<br>Status: UC<br>Location:<br>Employees: 101844 |

COTMSJ0111

| 03/22/20 19:29:01<br>Terminal: $3A86<br>Operator: 101844 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844 |
| --- | --- |
| 03/22/20 19:29:01<br>Terminal: $3A86<br>Operator: 101844 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844 |
| 03/22/20 19:29:01<br>Terminal: $3A86<br>Operator: 101844 | **UNIT UPDATED**<br>**Unit:** 3A86<br>**Status:** UC<br>**Location:**<br>**Employees:** 101844 |
| 03/22/20 19:30:33<br>Terminal: $3A85<br>Operator: 101973 | **UNIT UPDATED**<br>**Unit:** 3A85<br>**Status:** UC<br>**Location:**<br>**Employees:** 101973 |
| 03/22/20 19:42:38<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** ER<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 51569 |
| 03/22/20 19:42:38<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** CL<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 51569 |
| 03/22/20 19:42:38<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** AS<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 51569 |
| 03/22/20 19:42:38<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 19:42:38 |
| 03/22/20 19:42:48<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** ER<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** |
| 03/22/20 19:42:48<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** CL<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** |

COTMSJ0112

20-387COT0038

| 03/22/20 19:42:48<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** AS<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:**<br>-------------------------------------------------- |
| 03/22/20 19:42:48<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 19:42:48<br>-------------------------------------------------- |
| 03/22/20 19:44:44<br>Terminal: $3C2<br>Operator: 45650 | **UNIT UPDATED**<br>**Unit:** 3C2<br>**Status:** AS<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 45650<br>-------------------------------------------------- |
| 03/22/20 19:52:38<br>Terminal: ct1<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** ~<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:** 51569<br>-------------------------------------------------- |
| 03/22/20 19:52:48<br>Terminal: ct1<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** ~<br>**Location:** N CAMPBELL AV/E PRINCE RD TUC<br>**Employees:**<br>-------------------------------------------------- |
| 03/22/20 19:54:44<br>Terminal: south<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 3C2<br>**Status:** ~<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 45650<br>-------------------------------------------------- |
| 03/22/20 19:55:35<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A64<br>**Status:** ER<br>**Location:** 1937 E GREENLEE RD TUC<br>**Employees:** 102304<br>-------------------------------------------------- |
| 03/22/20 19:55:35<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A64<br>**Status:** CL<br>**Location:** 1937 E GREENLEE RD TUC<br>**Employees:** 102304<br>-------------------------------------------------- |
| 03/22/20 19:55:35<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 19:55:35<br>-------------------------------------------------- |
| 03/22/20 19:55:36<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A64<br>**Status:** AS<br>**Location:** 1937 E GREENLEE RD TUC<br>**Employees:** 102304<br>-------------------------------------------------- |

COTMSJ0113

20-387COT0039

| | |
|---|---|
| 03/22/20 19:59:40<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** UC<br>**Location:**<br>**Employees:** 102554 |
| 03/22/20 19:59:42<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** UC<br>**Location:**<br>**Employees:** 102554 |
| 03/22/20 20:01:42<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 20:01:42<br>**Total Assigned Units:** 25 |
| 03/22/20 20:01:42<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 4D43<br>**Status:** DP<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 54165 |
| 03/22/20 20:01:42<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 4D43<br>**Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 54165 |
| 03/22/20 20:02:53<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Total Assigned Units:** 26 |
| 03/22/20 20:02:53<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 44603 |
| 03/22/20 20:02:53<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 44603 |
| 03/22/20 20:03:11<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 20:03:11<br>**Total Assigned Units:** 27 |
| 03/22/20 20:03:11<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D57<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 48029 |
| 03/22/20 20:03:11<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D57<br>**Status:** ER<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE |

20-387COT0040

Employees: 48029

---

03/22/20 20:03:45
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 3C2
Status: CU
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 45650

---

03/22/20 20:03:45
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 9D41
Status: CU
Location: N CAMPBELL AV/E PRINCE RD TUC
Employees:

---

03/22/20 20:03:45
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 9D43
Status: CU
Location: N CAMPBELL AV/E PRINCE RD TUC
Employees: 51569

---

03/22/20 20:05:36
Terminal: ct9
Operator: 0

**UNIT UPDATED**
Unit: 3A64
Status: ~
Location: 1937 E GREENLEE RD TUC
Employees: 102304

---

03/22/20 20:05:56
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 3A64
Status: CU
Location: 1937 E GREENLEE RD TUC
Employees: 102304

---

03/22/20 20:07:18
Terminal: d3
Operator: 54065

**EVENT REMARK**
3C2 -- WILL BE INCIDENT COMMAND

---

03/22/20 20:11:32
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 9D56
Status: AS
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 44603

---

03/22/20 20:11:42
Terminal: meds
Operator: 0

**UNIT UPDATED**
Unit: 4D43
Status: ~
Location: 1990 E PRINCE RD TUC
Employees: 54165

---

03/22/20 20:14:12
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 4D43
Status: CU
Location: 1990 E PRINCE RD TUC
Employees: 54165

---

03/22/20 20:16:17
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 9D57
Status: AS
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE

COTMSJ0115
20-387COT0041

Employees: 48029

---

03/22/20 20:21:32
Terminal: meds
Operator: 0

**UNIT UPDATED**
Unit: 9D56
Status: ~
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 44603

---

03/22/20 20:24:17
Terminal: $3A81
Operator: 102554

**UNIT UPDATED**
Unit: 3A81
Status: UC
Location:
Employees: 102554

---

03/22/20 20:24:17
Terminal: $3A81
Operator: 102554

**UNIT UPDATED**
Unit: 3A81
Status: UC
Location:
Employees: 102554

---

03/22/20 20:24:17
Terminal: $3A81
Operator: 102554

**UNIT UPDATED**
Unit: 3A81
Status: UC
Location:
Employees: 102554

---

03/22/20 20:24:41
Terminal: $3A81
Operator: 102554

**UNIT UPDATED**
Unit: 3A81
Status: UC
Location:
Employees: 102554

---

03/22/20 20:26:17
Terminal: meds
Operator: 0

**UNIT UPDATED**
Unit: 9D57
Status: ~
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 48029

---

03/22/20 20:30:15
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 9D56
Status: CU
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 44603

---

03/22/20 20:30:15
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 9D57
Status: CU
Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE
Employees: 48029

---

03/22/20 20:54:54
Terminal: $1A75
Operator: 53354

**EVENT UPDATED**
Rms Transfer Time: 03/22/20 20:54:54
Total Assigned Units: 26

---

03/22/20 20:54:54
Terminal: $1A75
Operator: 53354

**UNIT UPDATED**
Unit: 1A75
Status: ~



COTMSJ0116                    20-387COT0042

| | |
|---|---|
| | Location:<br>Employees: 53354 |
| 03/22/20 20:56:49<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: UC<br>Location:<br>Employees: 102554 |
| 03/22/20 20:56:49<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: UC<br>Location:<br>Employees: 102554 |
| 03/22/20 20:56:49<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: UC<br>Location:<br>Employees: 102554 |
| 03/22/20 20:56:49<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: UC<br>Location:<br>Employees: 102554 |
| 03/22/20 21:00:02<br>Terminal: $3T63<br>Operator: 103816 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 21:00:02<br>Total Assigned Units: 25 |
| 03/22/20 21:00:02<br>Terminal: $3T63<br>Operator: 103816 | **UNIT UPDATED**<br>Unit: 3T63<br>Status: AM<br>Location:<br>Employees: 49045, 103816 |
| 03/22/20 21:04:09<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>Unit: 3A67<br>Status: UC<br>Location:<br>Employees: 101582 |
| 03/22/20 21:04:09<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>Unit: 3A67<br>Status: UC<br>Location:<br>Employees: 101582 |
| 03/22/20 21:04:09<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>Unit: 3A67<br>Status: UC<br>Location:<br>Employees: 101582 |
| 03/22/20 21:04:09<br>Terminal: $3A67 | **UNIT UPDATED**<br>Unit: 3A67 |

COTMSJ0117

20-387COT0043

| | |
|---|---|
| Operator: 101582 | Status: UC<br>Location:<br>Employees: 101582 |
| 03/22/20 21:05:31<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** UC<br>**Location:**<br>**Employees:** 102557 |
| 03/22/20 21:05:32<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** UC<br>**Location:**<br>**Employees:** 102557 |
| 03/22/20 21:18:44<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** UC<br>**Location:**<br>**Employees:** 102557 |
| 03/22/20 21:30:05<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** UC<br>**Location:**<br>**Employees:** 102554 |
| 03/22/20 21:30:06<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>**Unit:** 3A81<br>**Status:** UC<br>**Location:**<br>**Employees:** 102554 |
| 03/22/20 22:23:49<br>Terminal: $1A72<br>Operator: 101290 | **UNIT UPDATED**<br>**Unit:** 1A72<br>**Status:** AM<br>**Location:**<br>**Employees:** 101290 |
| 03/22/20 22:23:50<br>Terminal: $1A72<br>Operator: 101290 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 22:23:50<br>**Total Assigned Units:** 24 |
| 03/22/20 22:33:29<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>**Unit:** 3A67<br>**Status:** UC<br>**Location:**<br>**Employees:** 101582 |
| 03/22/20 22:33:29<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>**Unit:** 3A67<br>**Status:** UC<br>**Location:**<br>**Employees:** 101582 |
| 03/22/20 22:33:29 | **UNIT UPDATED** |

COTMSJ0118

20-387COT0044

Terminal: $3A67
Operator: 101582

Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:33:29
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:35:24
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:35:24
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:35:24
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:35:24
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:43:41
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:43:41
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:43:41
Terminal: $3A67
Operator: 101582

**UNIT UPDATED**
Unit: 3A67
Status: UC
Location:
Employees: 101582

---

03/22/20 22:51:49
Terminal: d3
Operator: 54065

**UNIT UPDATED**
Unit: 9D42
Status: ER
Location: 270 S STONE AV TUC: @C19
Employees: 48373

COTMSJ0119

20-387COT0045

| 03/22/20 22:51:49<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D42<br>**Status:** CL<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 48373 |
|---|---|
| 03/22/20 22:51:49<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D42<br>**Status:** AS<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 48373 |
| 03/22/20 22:51:51<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 22:51:51 |
| 03/22/20 22:55:07<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D44<br>**Status:** ER<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41238 |
| 03/22/20 22:55:07<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D44<br>**Status:** CL<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41238 |
| 03/22/20 22:55:07<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D44<br>**Status:** AS<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41238 |
| 03/22/20 22:55:08<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 22:55:08 |
| 03/22/20 23:01:49<br>Terminal: ct8<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D42<br>**Status:** ~<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 48373 |
| 03/22/20 23:05:07<br>Terminal: meds<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D44<br>**Status:** ~<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41238 |
| 03/22/20 23:06:12<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D42<br>**Status:** CU<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 48373 |

COTMSJ0120

20-387COT0046

| | |
|---|---|
| 03/22/20 23:06:13<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D44<br>**Status:** CU<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41238 |
| 03/22/20 23:32:59<br>Terminal: d4<br>Operator: 53785 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 23:32:59<br>**Total Assigned Units:** 23 |
| 03/22/20 23:32:59<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D44<br>**Status:** AV<br>**Location:**<br>**Employees:** 41238 |
| 03/22/20 23:34:54<br>Terminal: $3A67<br>Operator: 101582 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/22/20 23:34:54<br>**Total Assigned Units:** 22 |
| 03/22/20 23:34:54<br>Terminal: $3A67<br>Operator: 101582 | **UNIT UPDATED**<br>**Unit:** 3A67<br>**Status:** AM<br>**Location:**<br>**Employees:** 101582 |
| 03/22/20 23:55:59<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** ER<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 44603 |
| 03/22/20 23:55:59<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** CL<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 44603 |
| 03/22/20 23:55:59<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** AS<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 44603 |
| 03/22/20 23:55:59<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 23:55:59 |
| 03/22/20 23:56:29<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** ER<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 51569 |
| 03/22/20 23:56:29<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** |

COTMSJ0121

20-387COT0047

| | |
|---|---|
| | Location: 270 S STONE AV TUC: @C19<br>Employees: 51569<br>------------------------------------------------- |
| 03/22/20 23:56:29<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: AS<br>Location: 270 S STONE AV TUC: @C19<br>Employees: 51569<br>------------------------------------------------- |
| 03/22/20 23:56:29<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/22/20 23:56:29<br>------------------------------------------------- |
| 03/22/20 23:56:38<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 23:56:38<br>Total Assigned Units: 23<br>------------------------------------------------- |
| 03/22/20 23:56:38<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 4A94<br>Status: DP<br>Location: E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>Employees: 102437<br>------------------------------------------------- |
| 03/22/20 23:56:38<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 4A94<br>Status: ER<br>Location: E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>Employees: 102437<br>------------------------------------------------- |
| 03/22/20 23:56:53<br>Terminal: $4A94<br>Operator: 102437 | **UNIT UPDATED**<br>Unit: 4A94<br>Status: ER<br>Location: E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>Employees: 102437<br>------------------------------------------------- |
| 03/22/20 23:59:39<br>Terminal: d4<br>Operator: 53785 | **EVENT UPDATED**<br>Rms Transfer Time: 03/22/20 23:59:39<br>Total Assigned Units: 24<br>------------------------------------------------- |
| 03/22/20 23:59:39<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: DP<br>Location: E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>Employees: 101975<br>------------------------------------------------- |
| 03/22/20 23:59:53<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: ER<br>Location: E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>Employees: 101975<br>------------------------------------------------- |
| 03/23/20 00:00:30<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: ER<br>Location: 270 S STONE AV TUC: @C19<br>Employees: |

COTMSJ0122

20-387COT0048

| | |
|---|---|
| 03/23/20 00:00:30<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** CL<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:**<br>------------------------------------------------ |
| 03/23/20 00:00:30<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** AS<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:**<br>------------------------------------------------ |
| 03/23/20 00:00:30<br>Terminal:<br>vmcadcompd<br>Operator: 101515 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 00:00:30<br>------------------------------------------------ |
| 03/23/20 00:05:59<br>Terminal: supv5<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** ~<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 44603<br>------------------------------------------------ |
| 03/23/20 00:06:29<br>Terminal: supv5<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** ~<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 51569<br>------------------------------------------------ |
| 03/23/20 00:06:47<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** CU<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 51569<br>------------------------------------------------ |
| 03/23/20 00:06:47<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** CU<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 44603<br>------------------------------------------------ |
| 03/23/20 00:10:30<br>Terminal: d2<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 9D41<br>**Status:** ~<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:**<br>------------------------------------------------ |
| 03/23/20 00:10:50<br>Terminal: $4A94<br>Operator: 102437 | **UNIT UPDATED**<br>**Unit:** 4A94<br>**Status:** AS<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 102437<br>------------------------------------------------ |
| 03/23/20 00:11:10<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>**Unit:** 4A95<br>**Status:** AS<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 101975<br>------------------------------------------------ |

COTMSJ0123

| 03/23/20 00:13:39<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:13:39<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:13:39<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:14:46<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:14:46<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:14:46<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:14:50<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:14:50<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:14:50<br>Terminal: pld88323<br>Operator: 43002 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees:<br>------------------------------------- |
| 03/23/20 00:19:56<br>Terminal: d4<br>Operator: 53785 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 00:19:56<br>Total Assigned Units: 25 |

COTMSJ0124                    20-387COT0050

| 03/23/20 00:19:56<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** DP<br>**Location:** 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>**Employees:** 51916 |
|---|---|
| 03/23/20 00:20:00<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** ER<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 51916 |
| 03/23/20 00:20:00<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** CL<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 51916 |
| 03/23/20 00:20:00<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** AS<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 51916 |
| 03/23/20 00:20:00<br>Terminal:<br>vmcadcompd<br>Operator: 53785 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 00:20:00 |
| 03/23/20 00:20:04<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** ER<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 44603 |
| 03/23/20 00:20:04<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** CL<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 44603 |
| 03/23/20 00:20:04<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** AS<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 44603 |
| 03/23/20 00:20:04<br>Terminal:<br>vmcadcompd<br>Operator: 53785 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 00:20:04 |
| 03/23/20 00:20:50<br>Terminal: d2<br>Operator: 0 | **UNIT UPDATED**<br>**Unit:** 4A94<br>**Status:** ~<br>**Location:** E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>**Employees:** 102437 |

COTMSJ0125
20-387COT0051

| 03/23/20 00:21:10<br>Terminal: d2<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: ~<br>Location: E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>Employees: 101975 |
|---|---|
| 03/23/20 00:21:30<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: ER<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 00:21:30<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: CL<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 00:21:30<br>Terminal:<br>vmcadcompd<br>Operator: 101975 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 00:21:30 |
| 03/23/20 00:21:34<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: AS<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 00:22:58<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 4A94<br>Status: CU<br>Location: E FAIR MEADOWS LP/E SYCAMORE PARK BL TUC<br>Employees: 102437 |
| 03/23/20 00:22:59<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: CU<br>Location: 270 S STONE AV TUC: @C19<br>Employees: |
| 03/23/20 00:29:36<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 00:29:36<br>Total Assigned Units: 24 |
| 03/23/20 00:29:36<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3X61<br>Status: UC<br>Location:<br>Employees: 103053 |
| 03/23/20 00:29:36<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3X61<br>Status: AM<br>Location:<br>Employees: 103053 |
| 03/23/20 00:30:00 | **UNIT UPDATED** |

COTMSJ0126

| | |
|---|---|
| Terminal: d2<br>Operator: 0 | Unit: 9D53<br>Status: ~<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 51916 |
| 03/23/20 00:30:04<br>Terminal: ct8<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D56<br>Status: ~<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 44603 |
| 03/23/20 00:30:35<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 00:30:35<br>Total Assigned Units: 25 |
| 03/23/20 00:30:35<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A07<br>Status: DP<br>Location: 1937 E GREENLEE RD TUC<br>Employees: 103502 |
| 03/23/20 00:30:35<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A07<br>Status: ER<br>Location: 1937 E GREENLEE RD TUC<br>Employees: 103502 |
| 03/23/20 00:31:34<br>Terminal: ct8<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: ~<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 00:31:54<br>Terminal: $3A64<br>Operator: 102304 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 00:31:54<br>Total Assigned Units: 24 |
| 03/23/20 00:31:54<br>Terminal: $3A64<br>Operator: 102304 | **UNIT UPDATED**<br>Unit: 3A64<br>Status: AM<br>Location:<br>Employees: 102304 |
| 03/23/20 00:32:01<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: DC<br>Location: 1990 E PRINCE RD TUC<br>Employees: 102557 |
| 03/23/20 00:32:01<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: DC<br>Location: 1990 E PRINCE RD TUC<br>Employees: 102557 |
| 03/23/20 00:32:21<br>Terminal: $1A76 | **UNIT UPDATED**<br>Unit: 1A76 |

COTMSJ0127

| | |
|---|---|
| Operator: 102557 | **Status:** AS<br>**Location:** 1990 E PRINCE RD TUC<br>**Employees:** 102557 |
| 03/23/20 00:33:37<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/23/20 00:33:37<br>**Total Assigned Units:** 23 |
| 03/23/20 00:33:37<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A07<br>**Status:** UC<br>**Location:**<br>**Employees:** 103502 |
| 03/23/20 00:33:37<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 3A07<br>**Status:** AM<br>**Location:**<br>**Employees:** 103502 |
| 03/23/20 00:34:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 4A95<br>**Status:** CU<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 101975 |
| 03/23/20 00:34:01<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** CU<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 51916 |
| 03/23/20 00:34:02<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D56<br>**Status:** CU<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 44603 |
| 03/23/20 00:36:07<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** UC<br>**Location:**<br>**Employees:** 102557 |
| 03/23/20 00:36:07<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** UC<br>**Location:**<br>**Employees:** 102557 |
| 03/23/20 00:36:07<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>**Unit:** 1A76<br>**Status:** UC<br>**Location:**<br>**Employees:** 102557 |
| 03/23/20 00:36:07 | **UNIT UPDATED** |

03/23/20 00:36:37
Terminal: $3A86
Operator: 101844
EVENT UPDATED
Rms Transfer Time: 03/23/20 00:36:37
Total Assigned Units: 22

03/23/20 00:36:37
Terminal: $3A86
Operator: 101844
UNIT UPDATED
Unit: 3A86
Status: AM
Location:
Employees: 101844

03/23/20 00:42:21
Terminal: tac1
Operator: 0
UNIT UPDATED
Unit: 1A76
Status: -
Location: 1990 E PRINCE RD TUC
Employees: 102557

03/23/20 00:44:11
Terminal: d3
Operator: 54065
EVENT UPDATED
Rms Transfer Time: 03/23/20 00:44:11
Total Assigned Units: 23

03/23/20 00:44:11
Terminal: d3
Operator: 54065
UNIT UPDATED
Unit: 3163
Status: DP
Location: 1990 E PRINCE RD TUC
Employees: 49045, 103816

03/23/20 00:44:11
Terminal: d3
Operator: 54065
UNIT UPDATED
Unit: 3163
Status: ER
Location: 1990 E PRINCE RD TUC
Employees: 49045, 103816

03/23/20 00:44:22
Terminal: 103816
Operator: 103816
UNIT UPDATED
Unit: 3163
Status: ER
Location: 1990 E PRINCE RD TUC
Employees: 49045, 103816

03/23/20 00:45:57
Terminal: d3
Operator: 54065
UNIT UPDATED
Unit: 1A76
Status: CU
Location: 1990 E PRINCE RD TUC
Employees: 102557

03/23/20 00:53:32
Terminal: d3
Operator: 54065
ADD SUPPLEMENTAL
Revision Number: 1
Supplemental Type: Person
Age: 0
Height: 0
DOB: █████
Name: LOPEZ,CEZAR
Race: H
Sex: M
Unit ID: 9053
Weight: 0

Terminal: $1A76
Operator: 102557
Unit: 1A76
Status: UC
Location:
Employees: 102557

| | |
|---|---|
| 03/23/20 00:53:32<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** UC<br>**Location:**<br>**Employees:** 51916 |
| 03/23/20 00:53:32<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** PER search completed at 03/23/20 00:53:32 |
| 03/23/20 00:53:33<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** UC<br>**Location:**<br>**Employees:** 51916 |
| 03/23/20 00:53:33<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** UC<br>**Location:**<br>**Employees:** 51916 |
| 03/23/20 00:53:33<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** UC<br>**Location:**<br>**Employees:** 51916 |
| 03/23/20 00:54:10<br>Terminal: $3U6<br>Operator: 51910 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/23/20 00:54:10<br>**Total Assigned Units:** 22 |
| 03/23/20 00:54:10<br>Terminal: $3U6<br>Operator: 51910 | **UNIT UPDATED**<br>**Unit:** 3U6<br>**Status:** AM<br>**Location:**<br>**Employees:** 51910 |
| 03/23/20 01:08:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** ER<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41537 |
| 03/23/20 01:08:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** CL<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41537 |
| 03/23/20 01:08:56<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** AS<br>**Location:** 270 S STONE AV TUC: @C19<br>**Employees:** 41537 |

COTMSJ0130

| | |
|---|---|
| 03/23/20 01:08:57<br>Terminal:<br>vmcadcompd<br>Operator: 54065 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 01:08:57 |
| 03/23/20 01:18:56<br>Terminal: tac1<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: ~<br>Location: 270 S STONE AV TUC: @C19<br>Employees: 41537 |
| 03/23/20 01:20:51<br>Terminal: $1A76<br>Operator: 102557 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:20:51<br>Total Assigned Units: 21 |
| 03/23/20 01:20:51<br>Terminal: $1A76<br>Operator: 102557 | **UNIT UPDATED**<br>Unit: 1A76<br>Status: AM<br>Location:<br>Employees: 102557 |
| 03/23/20 01:21:26<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:21:26<br>Total Assigned Units: 20 |
| 03/23/20 01:21:26<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 4D43<br>Status: UC<br>Location:<br>Employees: 54165 |
| 03/23/20 01:21:26<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 4D43<br>Status: AV<br>Location:<br>Employees: 54165 |
| 03/23/20 01:24:02<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: DC<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 01:24:02<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: DC<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 01:24:25<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: AS<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 01:25:09<br>Terminal: $4A95 | **UNIT UPDATED**<br>Unit: 4A95 |

COTMSJ0131

20-387COT0057

| | |
|---|---|
| Operator: 101975 | Status: UC<br>Location:<br>Employees: 101975 |

---

| | |
|---|---|
| 03/23/20 01:25:16<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: CU<br>Location: 270 S STONE AV TUC: @C19<br>Employees: 41537 |

---

| | |
|---|---|
| 03/23/20 01:27:00<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

---

| | |
|---|---|
| 03/23/20 01:28:27<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

---

| | |
|---|---|
| 03/23/20 01:28:44<br>Terminal: $3T63<br>Operator: 103816 | **UNIT UPDATED**<br>Unit: 3T63<br>Status: UE<br>Location: 1990 E PRINCE RD TUC<br>Employees: 103816 |

---

| | |
|---|---|
| 03/23/20 01:30:02<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

---

| | |
|---|---|
| 03/23/20 01:30:02<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

---

| | |
|---|---|
| 03/23/20 01:30:03<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

---

| | |
|---|---|
| 03/23/20 01:30:03<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

---

| | |
|---|---|
| 03/23/20 01:30:24<br>Terminal: $3A85<br>Operator: 101973 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:30:24<br>Total Assigned Units: 19 |

---

| | |
|---|---|
| 03/23/20 01:30:24 | **UNIT UPDATED** |

COTMSJ0132

| | |
|---|---|
| Terminal: $3A85<br>Operator: 101973 | Unit: 3A85<br>Status: AM<br>Location:<br>Employees: 101973 |

| | |
|---|---|
| 03/23/20 01:31:08<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

| | |
|---|---|
| 03/23/20 01:31:08<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

| | |
|---|---|
| 03/23/20 01:31:09<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

| | |
|---|---|
| 03/23/20 01:31:09<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

| | |
|---|---|
| 03/23/20 01:32:06<br>Terminal: $3T63<br>Operator: 103816 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:32:06<br>Total Assigned Units: 18 |

| | |
|---|---|
| 03/23/20 01:32:06<br>Terminal: $3T63<br>Operator: 103816 | **UNIT UPDATED**<br>Unit: 3T63<br>Status: UC<br>Location:<br>Employees: 103816 |

| | |
|---|---|
| 03/23/20 01:32:06<br>Terminal: $3T63<br>Operator: 103816 | **UNIT UPDATED**<br>Unit: 3T63<br>Status: AM<br>Location:<br>Employees: 103816 |

| | |
|---|---|
| 03/23/20 01:33:05<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

| | |
|---|---|
| 03/23/20 01:33:39<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

| | |
|---|---|
| | **UNIT UPDATED** |

COTMSJ0133

20-387COT0059

| 03/23/20 01:33:39<br>Terminal: $4A95<br>Operator: 101975 | Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
|---|---|
| 03/23/20 01:33:39<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:33:40<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:34:25<br>Terminal: d2<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: ~<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 01:38:19<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:38:19<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:38:19<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:38:19<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:39:36<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:39:36<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |

COTMSJ0134

| 03/23/20 01:39:36<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
|---|---|
| 03/23/20 01:39:36<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:40:22<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:40:24<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:40:25<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: UC<br>Location:<br>Employees: 101975 |
| 03/23/20 01:41:37<br>Terminal: $3C2<br>Operator: 45650 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:41:37<br>Total Assigned Units: 17 |
| 03/23/20 01:41:37<br>Terminal: $3C2<br>Operator: 45650 | **UNIT UPDATED**<br>Unit: 3C2<br>Status: AM<br>Location:<br>Employees: 45650 |
| 03/23/20 01:41:49<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: CU<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 101975 |
| 03/23/20 01:41:58<br>Terminal: $CS50<br>Operator: 46521 | **EVENT REMARK**<br>** Situation found 0101 |
| 03/23/20 01:45:41<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:45:41<br>Total Assigned Units: 16 |
| 03/23/20 01:45:41<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A87<br>Status: |

COTMSJ0135

20-387COT0061

Location:
Employees: 101689

-------------------------------------------------

| 03/23/20 01:45:41<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 3A87<br>Status: AM<br>Location:<br>Employees: 101689 |

-------------------------------------------------

| 03/23/20 01:46:57<br>Terminal: $3A84<br>Operator: 100739 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:46:57<br>Total Assigned Units: 15 |

-------------------------------------------------

| 03/23/20 01:46:57<br>Terminal: $3A84<br>Operator: 100739 | **UNIT UPDATED**<br>Unit: 3A84<br>Status: AM<br>Location:<br>Employees: 100739 |

-------------------------------------------------

| 03/23/20 01:47:56<br>Terminal: $DIST43<br>Operator: 102567 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:47:56<br>Total Assigned Units: 14 |

-------------------------------------------------

| 03/23/20 01:47:56<br>Terminal: $DIST43<br>Operator: 102567 | **UNIT UPDATED**<br>Unit: DIST43<br>Status: AM<br>Location:<br>Employees: 102567 |

-------------------------------------------------

| 03/23/20 01:53:56<br>Terminal: $3A65<br>Operator: 101845 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 01:53:56<br>Total Assigned Units: 13 |

-------------------------------------------------

| 03/23/20 01:53:56<br>Terminal: $3A65<br>Operator: 101845 | **UNIT UPDATED**<br>Unit: 3A65<br>Status: AM<br>Location:<br>Employees: 101845 |

-------------------------------------------------

| 03/23/20 02:01:58<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: ER<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees: |

-------------------------------------------------

| 03/23/20 02:01:58<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: CL<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees: |

-------------------------------------------------

| 03/23/20 02:01:58<br>Terminal:<br>vmcadcompd<br>Operator: 101515 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 02:01:58 |

-------------------------------------------------

COTMSJ0136

| | |
|---|---|
| 03/23/20 02:02:08<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** ER<br>**Location:** 17220 S PAINTED VISTAS WY PC<br>**Employees:** 51569<br>------------------------------------------------- |
| 03/23/20 02:02:08<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>**Unit:** 9D43<br>**Status:** CL<br>**Location:** 17220 S PAINTED VISTAS WY PC<br>**Employees:** 51569<br>------------------------------------------------- |
| 03/23/20 02:02:08<br>Terminal:<br>vmcadcompd<br>Operator: 101515 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 02:02:08<br>------------------------------------------------- |
| 03/23/20 02:03:52<br>Terminal: $3X87<br>Operator: 100962 | **UNIT UPDATED**<br>**Unit:** 3X87<br>**Status:** AM<br>**Location:**<br>**Employees:** 100962<br>------------------------------------------------- |
| 03/23/20 02:03:53<br>Terminal: $3X87<br>Operator: 100962 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/23/20 02:03:53<br>**Total Assigned Units:** 12<br>------------------------------------------------- |
| 03/23/20 02:08:29<br>Terminal: $3L8<br>Operator: 53657 | **UNIT UPDATED**<br>**Unit:** 3L8<br>**Status:** AM<br>**Location:**<br>**Employees:** 53657<br>------------------------------------------------- |
| 03/23/20 02:08:30<br>Terminal: $3L8<br>Operator: 53657 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/23/20 02:08:30<br>**Total Assigned Units:** 11<br>------------------------------------------------- |
| 03/23/20 02:25:54<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** ER<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 41537<br>------------------------------------------------- |
| 03/23/20 02:25:54<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** CL<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 41537<br>------------------------------------------------- |
| 03/23/20 02:25:54<br>Terminal:<br>vmcadcompd<br>Operator: 53785 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 02:25:54<br>------------------------------------------------- |
| 03/23/20 02:25:58<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>**Unit:** 9D50<br>**Status:** AS<br>**Location:** 7584 E FAIR MEADOWS LP TUC<br>**Employees:** 41537 |

COTMSJ0137

20-387COT0063

| 03/23/20 02:26:34<br>Terminal: $3A83<br>Operator: 101978 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 02:26:34<br>Total Assigned Units: 10 |
|---|---|
| 03/23/20 02:26:34<br>Terminal: $3A83<br>Operator: 101978 | **UNIT UPDATED**<br>Unit: 3A83<br>Status: AM<br>Location:<br>Employees: 101978 |
| 03/23/20 02:29:33<br>Terminal: d4<br>Operator: 53785 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 02:29:33<br>Total Assigned Units: 9 |
| 03/23/20 02:29:33<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>Unit: 9D42<br>Status: AV<br>Location:<br>Employees: 48373 |
| 03/23/20 02:30:54<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: AS<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees: |
| 03/23/20 02:31:13<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: AS<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees: 51569 |
| 03/23/20 02:35:58<br>Terminal: ct1<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: ~<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 41537 |
| 03/23/20 02:38:23<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: CU<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 41537 |
| 03/23/20 02:40:54<br>Terminal: d3<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: ~<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees: |
| 03/23/20 02:41:14<br>Terminal: d3<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: ~<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees: 51569 |

COTMSJ0138

20-387COT0064

| 03/23/20 02:44:11<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: CU<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees:<br>------------------------------------------------- |
| 03/23/20 02:44:11<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: CU<br>Location: 17220 S PAINTED VISTAS WY PC<br>Employees: 51569<br>------------------------------------------------- |
| 03/23/20 02:44:21<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: AS<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 41537<br>------------------------------------------------- |
| 03/23/20 02:54:21<br>Terminal: d4<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: ~<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 41537<br>------------------------------------------------- |
| 03/23/20 03:00:34<br>Terminal: $3A81<br>Operator: 102554 | **DISPOSITION ASSIGNED**<br>A |
| 03/23/20 03:00:34<br>Terminal: $3A81<br>Operator: 102554 | **EVENT UPDATED**<br>Situation Found Type: 0101<br>------------------------------------------------- |
| 03/23/20 03:00:34<br>Terminal: $3A81<br>Operator: 102554 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 03:00:34<br>Total Assigned Units: 8<br>------------------------------------------------- |
| 03/23/20 03:00:34<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: SF<br>Location: 3001 E FORT LOWELL RD TUC: @MAGIC WAND CAR WASH<br>Employees: 102554<br>------------------------------------------------- |
| 03/23/20 03:00:34<br>Terminal: $3A81<br>Operator: 102554 | **UNIT UPDATED**<br>Unit: 3A81<br>Status: AM<br>Location:<br>Employees: 102554<br>------------------------------------------------- |
| 03/23/20 03:00:34<br>Terminal: $3A81<br>Operator: 102554 | **EVENT REMARK**<br>** Situation found 0101<br>------------------------------------------------- |
| 03/23/20 03:01:20<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: CU<br>Location: 7584 E FAIR MEADOWS LP TUC<br>Employees: 41537<br>------------------------------------------------- |

COTMSJ0139

20-387COT0065

| | |
|---|---|
| 03/23/20 03:19:59<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** ER<br>**Location:** W 44TH ST/S ENCHANTED HILLS DR TUC<br>**Employees:** 51916<br>------------------------------------------- |
| 03/23/20 03:19:59<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** CL<br>**Location:** W 44TH ST/S ENCHANTED HILLS DR TUC<br>**Employees:** 51916<br>------------------------------------------- |
| 03/23/20 03:19:59<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** AS<br>**Location:** W 44TH ST/S ENCHANTED HILLS DR TUC<br>**Employees:** 51916<br>------------------------------------------- |
| 03/23/20 03:19:59<br>Terminal:<br>vmcadcompd<br>Operator: 101711 | **EVENT REMARK**<br>** LOI search completed at 03/23/20 03:19:59<br>------------------------------------------- |
| 03/23/20 03:20:08<br>Terminal: d1<br>Operator: 101711 | **ADD SUPPLEMENTAL**<br>**Revision Number:** 1<br>**Supplemental Type:** Vehicle<br>**License:** T4008<br>**Model Year:** 0<br>**Unit ID:** 9D53<br>------------------------------------------- |
| 03/23/20 03:20:08<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** UC<br>**Location:**<br>**Employees:** 51916<br>------------------------------------------- |
| 03/23/20 03:20:08<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** UC<br>**Location:**<br>**Employees:** 51916<br>------------------------------------------- |
| 03/23/20 03:20:08<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>**Unit:** 9D53<br>**Status:** UC<br>**Location:**<br>**Employees:** 51916<br>------------------------------------------- |
| 03/23/20 03:20:08<br>Terminal:<br>vmcadcompd<br>Operator: 101711 | **EVENT REMARK**<br>** VEH search completed at 03/23/20 03:20:08<br>------------------------------------------- |
| 03/23/20 03:25:31<br>Terminal: d4<br>Operator: 53785 | **EVENT UPDATED**<br>**Rms Transfer Time:** 03/23/20 03:25:31<br>**Total Assigned Units:** 7<br>------------------------------------------- |
| 03/23/20 03:25:31<br>Terminal: d4 | **UNIT UPDATED**<br>**Unit:** 9D56 |

COTMSJ0140

20-387COT0066

| | |
|---|---|
| Operator: 53785 | Status: AV<br>Location:<br>Employees: 44603 |
| 03/23/20 03:25:42<br>Terminal: d2<br>Operator: 101515 | **EVENT UPDATED**<br>Total Assigned Units: 6 |
| 03/23/20 03:25:42<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: UC<br>Location:<br>Employees: |
| 03/23/20 03:25:42<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D41<br>Status: AV<br>Location:<br>Employees: |
| 03/23/20 03:25:46<br>Terminal: d2<br>Operator: 101515 | **EVENT UPDATED**<br>Total Assigned Units: 5 |
| 03/23/20 03:25:46<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: UC<br>Location:<br>Employees: 51569 |
| 03/23/20 03:25:46<br>Terminal: d2<br>Operator: 101515 | **UNIT UPDATED**<br>Unit: 9D43<br>Status: AV<br>Location:<br>Employees: 51569 |
| 03/23/20 03:26:21<br>Terminal: $4A95<br>Operator: 101975 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 03:26:21<br>Total Assigned Units: 4 |
| 03/23/20 03:26:21<br>Terminal: $4A95<br>Operator: 101975 | **UNIT UPDATED**<br>Unit: 4A95<br>Status: AM<br>Location:<br>Employees: 101975 |
| 03/23/20 03:26:56<br>Terminal: d4<br>Operator: 53785 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 03:26:56<br>Total Assigned Units: 3 |
| 03/23/20 03:26:56<br>Terminal: d4<br>Operator: 53785 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: AV<br>Location:<br>Employees: 41537 |
| 03/23/20 03:27:59 | **EVENT UPDATED** |

COTMSJ0141

| | |
|---|---|
| Terminal: d1<br>Operator: 101711 | Rms Transfer Time: 03/23/20 03:27:59<br>Total Assigned Units: 4<br>------------------------------------------- |
| 03/23/20 03:27:59<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: DP<br>Location: W 44TH ST/S ENCHANTED HILLS DR TUC<br>Employees: 41537<br>------------------------------------------- |
| 03/23/20 03:27:59<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: ER<br>Location: W 44TH ST/S ENCHANTED HILLS DR TUC<br>Employees: 41537<br>------------------------------------------- |
| 03/23/20 03:29:59<br>Terminal: east<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D53<br>Status: ~<br>Location: W 44TH ST/S ENCHANTED HILLS DR TUC<br>Employees: 51916<br>------------------------------------------- |
| 03/23/20 03:32:00<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D53<br>Status: CU<br>Location: W 44TH ST/S ENCHANTED HILLS DR TUC<br>Employees: 51916<br>------------------------------------------- |
| 03/23/20 03:34:54<br>Terminal: $4A94<br>Operator: 102437 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 03:34:54<br>Total Assigned Units: 3<br>------------------------------------------- |
| 03/23/20 03:34:54<br>Terminal: $4A94<br>Operator: 102437 | **UNIT UPDATED**<br>Unit: 4A94<br>Status: AM<br>Location:<br>Employees: 102437<br>------------------------------------------- |
| 03/23/20 03:46:23<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>Unit: 9D53<br>Status: AS<br>Location: W 44TH ST/S ENCHANTED HILLS DR TUC<br>Employees: 51916<br>------------------------------------------- |
| 03/23/20 03:56:23<br>Terminal: ct1<br>Operator: 0 | **UNIT UPDATED**<br>Unit: 9D53<br>Status: ~<br>Location: W 44TH ST/S ENCHANTED HILLS DR TUC<br>Employees: 51916<br>------------------------------------------- |
| 03/23/20 04:03:38<br>Terminal: d1<br>Operator: 101711 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 04:03:38<br>Total Assigned Units: 2<br>------------------------------------------- |
| 03/23/20 04:03:38<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>Unit: 9D53<br>Status: AV<br>Location |

COTMSJ0142

20-387COT0068

Employees: 51916

| | |
|---|---|
| 03/23/20 04:29:38<br>Terminal: d1<br>Operator: 101711 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 04:29:38<br>Total Assigned Units: 1 |
| 03/23/20 04:29:38<br>Terminal: d1<br>Operator: 101711 | **UNIT UPDATED**<br>Unit: 9D50<br>Status: AV<br>Location:<br>Employees: 41537 |
| 03/23/20 05:06:06<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Total Assigned Units: 0 |
| 03/23/20 05:06:06<br>Terminal: d3<br>Operator: 54065 | **EVENT CLOSED**<br>: |
| 03/23/20 05:06:06<br>Terminal: d3<br>Operator: 54065 | **EVENT UPDATED**<br>Rms Transfer Time: 03/23/20 05:06:06 |
| 03/23/20 05:06:06<br>Terminal: d3<br>Operator: 54065 | **UNIT UPDATED**<br>Unit: 9D57<br>Status: AV<br>Location:<br>Employees: 48029 |
| 03/23/20 05:31:53<br>Terminal: phra7<br>Operator: 53358 | **BROADCAST SENT**<br>**211635 - WANTED **TWX ONLY**<br>Location: 2901 E FORT LOWELL RD TUC: @WINTERHAVEN TERRACE<br>Comment: CANCEL PER SCHNEDEN 100507<br>10-82 PROBATION VIOLATION/PERSON OF INTEREST 01.01<br>JUAN MANUEL MERCADO<br>AKA JUANITO DIAZ<br>H/M, 6'01, 170, BRO, BRO<br>DOB █████████<br>1241 W ROGER RD #13<br>VEHICLE: WHITE FORD FIESTA UOFA PLATE T4008 (RECOVERED)<br>CLOTHING: GRAY HOODED SWEATSHIRT<br>REMARKS: DIAZ HAS A PROBATION VIOLATION. HE IS ALSO INVOLVED IN A HOMICIDE<br>THAT OCCURRED AT 3001 E FORT LOWELL. DIAZ WAS A PASSENGER IN THE ABOVE VEHICLE<br>THAT AGREED TO MEET THE VICTIM AT THE CAR WASH. DIAZ AND THE VICTIM EXCHANGED<br>GUNFIRE. UNKNOWN IF DIAZ WAS STRUCK BUT THE VEHICLE SHOULD HAVE DAMAGE<br>CONSISTENT. IF CONTACTED CONFIRM WARRANT, COLLECT ANY PHONES, SECURE VEHICLE<br>AND ANY RESIDENCE WHERE HE IS FOUND. DO NOT MENTION HOMICIDE.<br>OFC SAFETY ARMED WITH A SEMI-AUTOMATIC POSTOL NOT RECOVERED/HISTORY OF<br>BARRICADING.<br>PLEASE CONTACT SGT HAYNES 589-8937, DET OROZCO 965-7685, DET KLEINLEIN 589-8921<br>Cancelled at 04/06/20 23:09:03 by 53358 on phra7 |

COTMSJ0143

20-387COT0069

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA


Irene Briesno,                    )
                                  )
                 Plaintiff,       )
                                  )
            vs.                   )      No. CV22-00132-RCC
                                  )
City of Tucson, et al.,           )
                                  )
                 Defendants.      )
_____  )




VIDEOCONFERENCE DEPOSITION OF SEAN YEANDLE

April 5, 2024








RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169


Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

SEAN YEANDLE
4/5/2024

1    or, you know, add to the answer.

2             Sir, how are you employed?

3    A.    I'm currently employed with the Loveland Colorado

4    Police Department.

5    Q.    And how long have you been there?

6    A.    It will be three years here in just a few weeks.

7    Q.    And you were with TPD before that?

8    A.    Yes, I was.

9    Q.    How many years were you with TPD?

10   A.    Approximately four years.

11   Q.    All right.  What did you do before you went to

12   work for TPD?

13   A.    Prior to that I was in school, and I held down a

14   couple of odd jobs, worked teaching some firearms classes at

15   a local shooting range, worked at a few pawn shops,

16   construction jobs.  And then prior to that I was in the

17   military.

18   Q.    How long were you in the military?

19   A.    Five years.

20   Q.    What branch?

21   A.    Marine Corps.

22   Q.    Now sir, you left TPD in like 2021?

23   A.    Yes.

24   Q.    Can I ask why you left TPD?

25   A.    It was mostly a family and financial decision.  A

COTMSJ0145

SEAN YEANDLE
4/5/2024

```
 1  through the military, which is based on like combat casualty
 2  care and first aid, that type of thing.
 3       Q.   And that's some part of the overall training you
 4  had with the military?
 5       A.   That's correct.
 6       Q.   And I'm assuming that during your training as for
 7  the TPD you had some sort of first aid training, pseudo
 8  medical training; is that correct?
 9       A.   Yes.  We had some basic, basic life-saving
10  training.
11       Q.   During the course of your training have you ever,
12  did you ever have any training or familiarity with the issue
13  of positional asphyxia?
14       A.   Yes.  We were trained on positional asphyxia.
15       Q.   All right.  Can you tell me what your
16  understanding is of positional asphyxia?
17       A.   My basic understanding is that if somebody's in an
18  excited state for whatever reason the positioning of their
19  body can affect their ability to effectively breathe.
20       Q.   I'm sorry.  When were you first trained on the
21  concept of positional asphyxia?
22       A.   If I remember correctly, we touched on it in the
23  academy.  And then in like post academy trainings, you know,
24  we got short trainings every so often just in briefings as a
25  function of our daily patrol life.  I'm relatively certain
```

COTMSJ0146

SEAN YEANDLE
4/5/2024

1   that one or two of those trainings came around during my
2   tenure there.
3          Q.   How about in your EMT training with Pima College
4   did they talk about positional asphyxia?
5          A.   Not that I recall.  Not specifically, no.
6          Q.   I'm sorry.  So you were indicating that if a
7   person is in an excited state there's certain positions that
8   are better than others for them to facilitate their
9   breathing; is that correct?
10         A.   That's my understanding, yes.
11         Q.   So if a person's in an excited state, what's the
12   best way to have them positioned if, say, they were on the
13   ground?
14         A.   Once it's safe to do so to put them in what's
15   called like the recovery position or on their side
16   essentially.
17         Q.   Can you give us a definition in your mind of the
18   recovery position?
19         A.   Yes.  It would just be to roll the subject onto
20   his or her side and maintain that position for them to keep
21   as much pressure as possible off their lungs and then also
22   to keep their airway clear, so like their mouth or throat.
23         Q.   Now if a person -- you said if they're in an
24   excited condition.  What about if they're, they've ingested
25   some illegal substances, some narcotic drugs, would that

SEAN YEANDLE
4/5/2024

1  also play into what position would be easier for them to be

2  able to breathe?

3      A.   Certainly illicit substances, yes, can cause like

4  a more excited state.

5      Q.   So in your mind if a person is in an excited state

6  it's better to have them in the recovery position on their

7  side rather than on their stomach?

8      A.   Yes.  That would be the preferred position once

9  it's safe to get them there.

10     Q.   Sir, other than this event -- and you certainly

11  know the event we're talking about; correct?

12     A.   Yes, I do.

13     Q.   Prior to this event have you ever placed an

14  arrestee in a recovery position due to concerns about

15  asphyxia?

16     A.   I couldn't recall a particular incident for you,

17  but I'm certain that I have, yes.

18     Q.   So you don't have any specific recollection, but

19  it's your belief that at some point you put someone in a

20  recovery position based on concerns regarding asphyxia?

21     A.   That's correct.

22     Q.   Sir, I forgot to ask you what did you to prepare

23  for today's deposition?

24     A.   I just I reviewed body-worn camera footage from

25  the incident.  I reviewed a diagram that I drew and an

SEAN YEANDLE
4/5/2024

```
1        Q.   So you lost a piece of equipment, and they put a
2   letter or something in your file saying, you know, he lost a
3   piece of equipment, he should be more careful in the future,
4   something along those lines?
5        A.   That's correct.
6        Q.   Sir, going back to what we were talking about,
7   have you ever received any training on excited delirium?
8        A.   Yes.  Simultaneously with the positional asphyxia
9   type training.
10       Q.   Now could you describe that for me, what excited
11  delirium is?
12       A.   My understanding of it is similar to what I said
13  before.  It's that whether it's through some kind of
14  ingested substance or just a particular person's condition,
15  you know, such as running, fighting, et cetera, they're in a
16  type of excited state that can alter things such as their,
17  you know, ability to process information and then their
18  physical abilities, such as like the ability to effectively
19  respirate.
20       Q.   Sir, is there a difference in your understanding
21  between positional asphyxia and excited delirium?
22       A.   My understanding is that positional asphyxia is
23  directly related to somebody's, you know, physical position,
24  such as their orientation on the ground, and that excited
25  delirium is more of a physiological state, like what's
```

COTMSJ0149

SEAN YEANDLE
4/5/2024

1   if you will.  But that's just in my own personal experience
2   and recollection.
3         Q.   So in your training and experience when is it
4   appropriate to apply a spit sock to a person?
5         A.   Well, obviously any time there's actual spitting
6   occurring or any time just based on the circumstance you
7   would believe that that's a risk.
8         Q.   You mean a risk that they might spit or a risk of
9   something being contracted by the officers from the spit?
10        A.   I would say both.  It's a minimally --
11        Q.   I'm sorry?
12        A.   Sorry.  I would say both would apply.  Based on,
13   again, my training and experience it's a minimally invasive
14   tool that doesn't cause -- you know, there's no down sides
15   to it.  So if based on the totality of the circumstances you
16   think there might be a risk of any fluids being exchanged,
17   to just go ahead and apply it.
18        Q.   Can a spit sock impair a person's ability to
19   breathe?
20        A.   I don't believe so, no, and I was never taught
21   that.
22        Q.   What if they're in a particularly excited or
23   agitated state, would it be appropriate to put a spit sock
24   on them?
25        A.   I believe it would, yes.

COTMSJ0150

SEAN YEANDLE
4/5/2024

1    Q.   All right.  In your training and experience is it
2  ever appropriate to apply two spit socks to a person?
3    A.   I would say only in the circumstance where one was
4  insufficient for whatever reason.  Maybe it was torn or it
5  had come loose.
6    Q.   So I'm assuming that when you were preparing to
7  work for TPD that you had some training on the use of a spit
8  sock, when it's appropriate and how you put it on?
9    A.   Yes.
10    Q.   All right.  Generally can you describe that
11  training for me?
12    A.   Sure.  Most of the training on Tucson specific,
13  you know, issued equipment, including spit socks, came
14  during the FTO training, and that would just fall in with
15  all of the rest of the on the job training.
16         So it would go something like, you know, here's
17  this, this is what the spit sock is, this is when we use it
18  and this is how most people carry it.
19    Q.   And what if a person is already having difficulty
20  breathing, is it appropriate to apply a spit sock?
21    A.   I would say if the circumstances warrant the
22  application of the spit sock, their ability to breathe
23  wasn't a consideration because the training that I got was
24  that it does not impair breathing at all.
25         However, you wouldn't apply a spit sock just

COTMSJ0151

SEAN YEANDLE
4/5/2024

```
 1  because of somebody's inability to breathe.
 2       Q.   So if someone is telling you, someone that you're
 3  attempting to restrain says I can't breathe, it still might
 4  be appropriate to put a spit sock on them or to leave a spit
 5  sock on them?
 6       A.   As long as the totality of the circumstances
 7  warrant the application of the spit sock and continued
 8  application of it I would say yes.
 9       Q.   Now sir, let's talk about some of the restraints
10  that you are familiar with and that TPD applies to people
11  who are being put under arrest.
12            I'm assuming that the basic level of restraints is
13  handcuffs?
14       A.   That's correct.
15       Q.   And is it the general rule at TPD that you apply
16  handcuffs with a person's hands behind their back?
17       A.   Yes, it is.
18       Q.   Is there ever any consideration for whether a
19  person is having trouble breathing as to whether you would
20  put the handcuffs in the front or the back?
21       A.   The general rule is that people are handcuffed
22  behind their backs for officer safety, but that, I've seen
23  that depend on people's general level of cooperation.
24            If somebody is extremely old or young or infirm
25  and very cooperative, then I've seen handcuffs placed in the
```

COTMSJ0152

SEAN YEANDLE
4/5/2024

1   front.  But that was more of a case by case basis and was

2   always based on an extreme level of comfort from the officer

3   and cooperation by the individual being handcuffed.

4        Q.   Sir, are you familiar with what is generally

5   called a TARP?

6        A.   Yes, I am.

7        Q.   And can you tell us what that is?

8        A.   It is essentially a nylon strap with a carabiner

9   at one end and then a loop with kind of a tension device at

10  the other.

11       Q.   And if I understand correctly, that's to restrain

12  both their hands and their feet and they're connected

13  together; correct?

14       A.   Yes.  It's to secure the person's ankles to their

15  hands so that they can't, you know, extend their legs.

16       Q.   When a person is in a TARP position, would they

17  generally be on the ground?

18       A.   Yeah.  Are you saying during the application of

19  the TARP?

20       Q.   Yes, sir.

21       A.   Yes.  The application of the TARP is typically

22  done right after handcuffing or whenever that level of

23  resistance is received.

24       Q.   So is that when you would typically use a TARP is

25  if a person is presenting a high level of resistance or

RAYNBO COURT REPORTING, LTD.

COTMSJ0153

SEAN YEANDLE
4/5/2024

1   agitation?

2        A.   Yes.  Either a specific threat of kicking or a

3   high level of resistance or a likelihood of fleeing.

4        Q.   So when you apply the TARP, the person is on their

5   stomach; correct?

6        A.   Typically yes because their ankles need to be

7   brought close to their hands.

8        Q.   All right.  And how long, in your general training

9   and experience how long is it appropriate to leave the

10  person who's TARP'd on their stomach on the ground?

11       A.   Just for as long as necessary to apply the device

12  and make everybody safe.

13       Q.   So it should be for a limited period of time?

14       A.   Yes.  And when you say on the ground, you mean

15  directly on their stomach or do you just mean on the ground

16  completely?

17       Q.   On their stomach on the ground.

18       A.   Yes.  Just as long as necessary to apply the

19  device and make sure everybody's safe and then they can be

20  replaced back in the recovery position.

21       Q.   And let me ask you another kind of general

22  question.

23            If a person is having trouble breathing, would it

24  be appropriate for, say, an officer to apply pressure to

25  them by either holding them down or putting your body parts

SEAN YEANDLE
4/5/2024

```
 1  recall responding to a call regarding an incident at the
 2  intersection of Prince and Campbell?
 3      A.   Yes.
 4      Q.   All right.  Let me back up for a second.
 5           Sir, regarding radio channels, which one is
 6  assigned to team three?
 7      A.   I believe they called it 93.  I can't remember
 8  exactly, but each team had its own radio channel.
 9      Q.   All right.  But could you hear other radio
10  channels other than your team's channel?
11      A.   It depended on how you had your individual radio
12  set up.  You could scan other channels so that you could
13  hear them all.  I did not have mine set to scan, if I recall
14  correctly.  Other officers may have.  But typically
15  information would be relayed between the teams via
16  dispatchers.
17      Q.   Now sir, you said that at some point you responded
18  to a call at the intersection of Prince and Campbell.  Do
19  you have any recollection of what the nature was of that
20  call?
21      A.   The original nature of that call was a, I believe
22  it was a hit and run motor vehicle collision where a suspect
23  had fled on foot from the scene of the crash.
24      Q.   So what your understanding is that the call there
25  was only about an auto accident where a person may have fled
```

SEAN YEANDLE
4/5/2024

1   the scene?

2        A.   That specific call, yes.

3        Q.   Did you receive any other calls regarding an

4   incident that took place relatively close to the accident

5   call in the same general area?

6        A.   Yes.  The call I was originally en route to prior

7   to responding to the motor vehicle accident was a homicide

8   with a handgun that was just a few blocks away from the

9   scene of that collision.

10       Q.   So your understanding was that the person

11  suspected in the homicide may have been involved in the

12  accident itself?

13       A.   That's correct.

14       Q.   And again, you got that information over the

15  radio?

16       A.   That's correct.

17       Q.   Did the call tell you whether or give you any

18  indication as to whether the alleged murder suspect was the

19  person who fled from the scene?

20       A.   We were given, regarding the homicide we were

21  given the vehicle description of a white SUV and a suspect

22  description of a Hispanic male wearing a plaid shirt, and a

23  similar description was given at the scene of the motor

24  vehicle collision.

25       Q.   When you got to the motor vehicle collision, what

SEAN YEANDLE
4/5/2024

1  did you see?

2      A.   I never arrived directly at the scene of the motor

3  vehicle collision.  A squad mate of mine, Officer Solarino,

4  had responded to the area prior to my arrival and had

5  located the suspect from the motor vehicle collision and

6  engaged in a fight with him in an alley in the area.

7          So I responded directly to the area that Officer

8  Solarino was fighting in.  I never went to the scene of the

9  motor vehicle collision.

10     Q.   So it was your understanding that Officer Solarino

11 may have been struggling or fighting with --

12     A.   I'm sorry, sir.  I think I lost you about halfway

13 through there.

14          (Whereupon a discussion was held off the record.)

15     Q.   Officer Yeandle, can you hear me?

16     A.   Yes, I can now.

17     Q.   All right.  So the information that you received

18 was that the person that Officer Solarino was struggling

19 with or fighting with may have been the person who fled from

20 the scene of the motor vehicle accident?

21     A.   That's correct.

22          (Whereupon a discussion was held off the record.)

23     Q.   Sir, you said you never went to the intersection

24 of Prince and Campbell.

25          Sir, how far was it from the intersection of

SEAN YEANDLE
4/5/2024

1   Prince and Campbell to the location where Officer Solarino

2   was struggling with someone?

3        A.   Not far.  I can't remember the exact distance, but

4   the address of the church that the lot was in where Officer

5   Solarino was was 1990 East Prince.  So Prince and Campbell,

6   if I recall correctly, would have been the 1900 block of

7   East Prince, so it would have been about a city block.

8        Q.   And how long did it take you to get to the scene

9   where Officer Solarino was?

10       A.   Just like from the police station?

11            I'm not sure if this will answer your question but

12   we were --

13       Q.   I'm sorry?

14       A.   I said I'm not sure if this will answer your

15   question, but I was already en route to the scene of the

16   shooting, and while en route to that call I received the

17   information about the motor vehicle collision and then

18   information about Officer Solarino being in contact and

19   fighting with that person.

20            And so it was just a straight drive from my

21   starting point, which would have been the midtown

22   substation, up to 1990 East Prince.

23       Q.   Did the call for assistance come from Officer

24   Solarino himself or from someone else?

25       A.   I don't remember exactly how the radio traffic

COTMSJ0158

SEAN YEANDLE
4/5/2024

1  came through, whether it was dispatch that advised us or

2  whether I had heard Officer Solarino directly calling for

3  help.

4      Q.   Sir, I had used name Damien Alvarado.

5           Can we agree that's the name of the person that

6  Officer Solarino was attempting to subdue?

7      A.   Yes.

8      Q.   I'm assuming that you didn't know his name at the

9  time that you were responding but you may have learned it

10 later; is that correct?

11     A.   I may have learned it later on during the course

12 of the investigation, but I don't recall getting that

13 information at any point in the beginning, no.

14     Q.   I'm sorry.  Can I have one second, please?

15          I think -- well, one other question.

16          Did anyone give you any information on whether

17 Mr. Alvarado was suspected of having ingested drugs?

18     A.   I didn't have that information prior to the

19 initial response to the scene if that's what you're asking.

20     Q.   Can you explain that to me?

21     A.   I believe your question was did anyone give me any

22 information that Mr. Alvarado had potentially ingested

23 drugs.  And I didn't have that information during the

24 initial response, if that's your question.

25          So when driving up and then running up and making

RAYNBO COURT REPORTING, LTD.

SEAN YEANDLE
4/5/2024

1  the contact with him and the officers, I didn't have that
2  information on hand.  And it wouldn't have been until later
3  and after the struggle and everything that I would have
4  learned that that was possibly in play at least from an
5  outside source.
6      Q.   So I'm going to show you -- can we agree today
7  that despite that initial call there was never an indication
8  or any proof that Mr. Alvarado was involved with that
9  homicide?
10     A.   Well, there's not any proof ever until after an
11  investigation.  We were acting on reasonable suspicion based
12  on the circumstances at hand.
13     Q.   But again, it was never determined when
14  investigating the homicide that he indeed was the person
15  involved in the -- let me ask the question again.
16          So I'm assuming that the homicide was
17  investigated?
18     A.   It was being actively investigated.  It had come
19  out, the call for service for the homicide had come out just
20  minutes prior to the call for service for the motor vehicle
21  accident.
22     Q.   All right.  Let's go to the video if we can.  I'm
23  going to share my screen with you so that we can look at
24  your body-worn camera footage.
25          I'm sorry.  Give me a second.  I'm going to mute

SEAN YEANDLE
4/5/2024

```
1              MS. WATERS:  Objection, misstates the exhibit.
2         But you can answer.
3              THE WITNESS:  I'm trying to think of an answer to
4    this question.
5              The homicide suspect based on the radio traffic
6    was described as driving a compact Hyundai, and then the
7    vehicle involved in the nearby collision was described as a
8    white SUV.
9         Q.   So what radio traffic were you listening to
10   en route?
11        A.   Based on my recollection I would have been
12   listening to team three's radio channel.
13        Q.   So no one corrected you that the white SUV was
14   associated with the person who fled from the accident, not
15   with the homicide suspect?
16             MS. WATERS:  Object to form.
17             But you may answer.
18             THE WITNESS:  If you say corrected me, the
19   information was broadcast.  I don't recall either hearing or
20   perceiving the information that they were not at all
21   related.  When I arrived on scene, it was still my belief
22   that this was a related vehicle and suspect.  But we're
23   driving code three.  There's a lot to listen to and a lot to
24   look at.
25        Q.   Now sir, you get to the scene, and what do you
```

COTMSJ0161

SEAN YEANDLE
4/5/2024

1   see?

2       A.   I exit my car, and I see Officer Solarino's patrol

3   vehicle parked somewhere between 50 and 100 yards down a

4   dirt alley with its emergency equipment on.  There's, I

5   think, one or two civilians in the area, and Officer

6   Solarino is physically fighting with the suspect.

7       Q.   Now he's struggling with him?  They're trading

8   blows?  Describe the fighting.

9       A.   On my initial approach, I was about 50 to

10  100 yards away, but I could tell that they were facing each

11  other and struggling face to face.

12      Q.   Now is Officer Solarino the same rank as you or is

13  he a different rank?

14      A.   We were both officers at the time.  Officer

15  Solarino had more tenure than I did, and he was a field

16  training officer, so in a sense he was higher up than me,

17  but we were on the same pay scale.

18      Q.   Did he say anything to you when you got there?  Or

19  did you just see this struggle?

20      A.   He was, if I recall correctly, giving commands to

21  the subject and that fight was going on, so we didn't

22  exchange any direct communication upon arrival, no.

23      Q.   You just joined in his efforts to subdue the

24  individual?

25      A.   That's correct.

COTMSJ0162

SEAN YEANDLE
4/5/2024

1    Q.   All right.  Can we agree that when you were
2  attempting to subdue the individual that he was on his
3  stomach or initially?
4    A.   Initially during my approach to the scene they
5  were both on their feet fighting.  He was taken to the
6  ground shortly thereafter and wound up on his stomach.
7    Q.   All right.  And then while he's on the ground
8  Officer Solarino is actively applying pressure to him to
9  keep him down or attempt to subdue him; is that correct?
10    A.   Yes.  We were, yes, struggling to detain him in
11  handcuffs.  That's correct.
12    Q.   And at some point -- so describe to me exactly
13  what you're doing.  You come in.  I mean I've seen the
14  video, and we're going to look at the body-worn camera in a
15  minute.  But you, did you use your hands?  Did you use your
16  legs?  What did you do to subdue him?
17    A.   It was a prolonged fight that lasted multiple
18  minutes, so I guess every part of me got used at some point.
19  My initial involvement I would believe I was off of
20  Mr. Alvarado's left side, and I was attempting to get his
21  left arm out from under his body and into a handcuffing
22  position initially.
23    Q.   At some point during the struggle you placed your
24  knee or your body weight on his back; is that correct?
25    A.   My body weight would have wound up on him at some

COTMSJ0163

SEAN YEANDLE
4/5/2024

1  point, yes.  Most of the imaging you can see where my knees

2  are in use I'm in more of a squatting position than

3  anything, not necessarily with the intent to apply maximum

4  pressure but more as a pivot point in order to get joints

5  manipulated so we can get arms behind backs.

6       Q.   And now you -- at least one officer that you saw

7  was kneeling on Damien's neck area.  Do you recall that?

8       A.   I believe at some point, yes, somebody had a knee

9  around his neck.  I couldn't gauge, you know, anything past

10  it being in the same area.  Me not being him I don't know

11  what kind of pressure was being applied or not.

12       Q.   But you did see someone put their knee on his neck

13  area?

14       A.   Yes.  Upper body.  It may have been between his

15  shoulder and his neck.

16       Q.   Did you ever put your knee in that area that you

17  can recall?

18       A.   Without running through the video again, not that

19  I can recall specifically.  I can only say that the commonly

20  used position was to angle -- was to basically straddle a

21  person's arm or shoulder at a 45-degree angle and direct,

22  you know, knees inwards towards their body to act, again, as

23  like a pivot and control point for that person's arm or

24  shoulder.  So it's possible we wound up in those positions

25  because it was a commonly used one.

COTMSJ0164

SEAN YEANDLE
4/5/2024

1    A.   Yes.   That technique would be used for people in

2  the prone position to get them into a handcuffing hands

3  behind the back position.

4    Q.   And what if a person is, I meant to qualify, if a

5  person is flat on the ground on their stomach, you were

6  trained that it's okay to use that technique?

7    A.   Yes.   That technique is specifically for people in

8  the prone position, so face down on the ground in order to

9  gain control of and elevate the arm to place it in a prone

10  handcuffing position.

11    Q.   Sir, so your recollection is that you were the

12  second officer on the scene?

13    A.   If the question is was I the second officer on the

14  scene, I believe myself and Officer Ake arrived almost

15  simultaneously, so second or third, yes.

16    Q.   And now what did you do when you first came on the

17  scene in relation to Mr. Alvarado?

18    A.   Well, I parked my car, ran down the alley towards

19  where Officer Solarino and Mr. Alvarado were and then just

20  immediately began assisting Officer Solarino trying to gain

21  control of Mr. Alvarado.

22    Q.   And would you agree that he was in an agitated

23  state?

24    A.   Yes.   There appeared to be a physical fight going

25  on, lots of yelling, screaming.

RAYNBO COURT REPORTING, LTD.

SEAN YEANDLE
4/5/2024

1    Q.   Did you have any belief at that point -- I'm

2    sorry.  Give me one second.

3         Did you have any reason to believe at that point

4    that he was -- maybe had ingested drugs?

5         Sir, did you have any reason to believe at that

6    point that Mr. Alvarado may have ingested drugs or been

7    manifesting drug -- actions consistent with drug use?

8         A.   It would have been impossible to tell on the

9    initial contact.

10   Q.   Now sir, when you first got there, you saw this

11   struggle, and you didn't see Mr. Alvarado with a weapon;

12   correct?

13   A.   Not directly.  There was a loose pistol magazine

14   on the ground near where the two of them were struggling,

15   but I didn't see on initial contact any, any weapons, no.

16   Q.   Now so but you had no -- you didn't see a gun

17   anywhere on his person or in the area?

18   A.   No.  I mean I saw the indicia of the firearm in

19   the form of the loose magazine in the dirt, but I don't -- I

20   did not see anyone in possession of a handgun.

21   Q.   Certainly you didn't see any handgun in the ground

22   in the general area?

23   A.   No.  Not, not upon initial contact, no.

24   Q.   Did you ever see a weapon on his person or in the

25   general area, let's say, after the struggle had already been

RAYNBO COURT REPORTING, LTD.

COTMSJ0166

SEAN YEANDLE
4/5/2024

1    Q.    Yes.

2    A.    He was taken into a prone position pretty much

3  almost immediately upon my initial contact if I remember the

4  video correctly.  He was in the process of being taken to

5  the ground pretty much as soon as I came into, into contact

6  distance with him and Officer Solarino.

7    Q.    So you get him to the ground, and at least three

8  officers are actively involved in attempting to hold him on

9  the ground so the cuffs can be applied; is that correct?

10   A.    Yes.  That's correct.

11   Q.    I'm sorry.  Now he's on the ground.  He's on his

12  stomach.  And you finally -- how long did it take from your

13  recollection to get the handcuffs on him?

14   A.    The video will give you an exact time stamp, but

15  it was at least multiple minutes, probably between three and

16  five minutes from when he was taken to the ground to the

17  complete application of the handcuffs.

18   Q.    Now it's safe to say that based on the nature of

19  his agitation that it was necessary to apply force to him to

20  try to get the handcuffs on?

21   A.    Yes.  It was necessary to apply force.  He was

22  combative and noncompliant.

23   Q.    Now we indicated that you -- awhile ago we were

24  talking about you said that you had training to recognize

25  the signs and symptoms of someone who may have ingested

COTMSJ0167

SEAN YEANDLE
4/5/2024

```
 1   drugs?
 2       A.   Yes.
 3       Q.   And would that, again, would that apply to someone
 4   who had ingested methamphetamines?
 5       A.   Is the question his agitation, would that indicate
 6   the use of methamphetamines?
 7       Q.   No.  The question was did you see any signs or
 8   symptoms with Mr. Alvarado that might indicate to you that
 9   he had ingested drugs?
10       A.   Yes.  I mean obviously nothing's definitive, but
11   he was particularly aggressive, agitated and particularly
12   strong, so it could have been inferred.
13       Q.   Do you recall saying at some point this guy must
14   be on something?
15       A.   I don't recall saying that specifically.
16       Q.   Did you ever -- at what point did you think to
17   yourself that this guy must be on something?
18       A.   Probably when Officer Gamez had arrived to help
19   and he noted that Mr. Alvarado was probably high.
20       Q.   Did you agree with that assessment?
21       A.   It was certainly possible.  I mean I was very
22   consciously focused on the fight that I was engaged in, and
23   I wasn't involved in a lot of deeper thought.  But when he
24   remarked that the person was probably high, I didn't, I
25   didn't have any thoughts to the contrary if that answers
```

COTMSJ0168

SEAN YEANDLE
4/5/2024

1   your question.

2        Q.    From what you can recall Officer Gamez made that

3   statement that he must be on something or he must be high

4   after the struggle had already been going on for some period

5   of time?

6        A.    Yes.

7        Q.    Three minutes, five minutes the struggle had been

8   going on at the point where Officer Gamez made that

9   statement?

10       A.    That's correct.  It was probably a few minutes

11   into the incident.

12       Q.    And now, again, you indicated that Officer Ake

13   arrived essentially at the same time as you?

14       A.    Yes.  He would have been right behind me.

15       Q.    And he actively participated in the application of

16   force in attempting, being used to attempt to restrain

17   Damien?

18       A.    Yes.  He, yes, he was participating in the arrest,

19   that's correct.

20       Q.    Did you ever give any guidance or suggestions to

21   Officer Ake as to what to do or what level of force to apply

22   to him?

23       A.    Not that I recall in regards to what level of

24   force.  If I gave him any instructions, it would have, it

25   would have just been what we needed in order to effect the

SEAN YEANDLE
4/5/2024

1  arrest, such as here's this arm or, you know, give me his

2  hand for handcuffing.

3          Does that answer your question?

4      Q.   All right.  Let's look at the video now to try and

5  clarify a few things.  Let me see if we can get it up and

6  share the screen.

7          I think we're going to pull it off.

8          Now let me ask before we look at the video.

9          So sir, this is your body-worn camera.  Can we

10  agree that the arm there with the tattoos is your arm?

11     A.   Yes.  That's me.

12     Q.   Okay.  And what are you doing at this particular

13  point?  It appears you're touching your leg.  You're kind of

14  squatted down.  Is that correct?

15     A.   I believe that's actually Officer Ake's back

16  underneath me.

17     Q.   And so you are pushing on his back and he's

18  pushing on Damien?

19     A.   If I recall specifically, in this moment my leg or

20  legs were trapped underneath Mr. Alvarado's body and I was

21  more or less stuck in this position.

22          Officer Ake I again believe was attempting to gain

23  control of an arm.  I had had my leg wrapped underneath

24  Mr. Alvarado and was more or less just stuck in a

25  semi-kneeling, semi-seated position on my hip because I

SEAN YEANDLE
4/5/2024

1   couldn't get my, couldn't get my leg free.

2        Q.   So let's start up the video and make sure it's

3   going to play while I've got my sound on.

4             I'm sorry.  I have to mute myself so this can run,

5   and I will unmute myself obviously when I have a question.

6        A.   Okay.

7             (Whereupon a video was played.)

8        Q.   So sir, at some point someone is telling him to

9   shut up, shut the fuck up.  Do you know who that was?

10       A.   I believe it was Officer Solarino.

11       Q.   Now at this point do you know who the officer is

12   who you can see in the picture?

13       A.   The one right in front of my camera there?

14       Q.   Yes, sir.

15       A.   I believe that's Officer Ake still.

16       Q.   And I can see from here that he apparently has his

17   knee on the upper part of Damien's back.  Is that correct?

18       A.   It appears that way in this picture, yes.

19       Q.   And it appears to be pretty high up on his back.

20   Would you agree with that?

21       A.   It look -- I mean yeah.  Just looking at the

22   picture it looks to be about equidistant from where his arm

23   folded behind his back would lay, so upper third.

24       Q.   Upper third?  Okay.

25       A.   Just judging off this screen I have in front of

COTMSJ0171

SEAN YEANDLE
4/5/2024

1   and he had bouts of yelling, screaming, hard struggling

2   throughout this period of time.  There was no consistent

3   period where he remained calm.

4       Q.   What was the purpose of the second TARPing?

5       A.   The first TARP was applied inefficiently

6   essentially.  In order for it to remain secure the method it

7   has to be applied is ankles first with the strap looped

8   through the ankles and then secured to the wrist or the

9   wrists rather.

10          The friction device on the loop end of the TARP

11  really doesn't maintain the tightness of the strap at all.

12  And the length of the TARP, the length of the TARP without

13  it being wrapped is long enough to allow somebody to fully

14  extend their legs.

15          So the initial TARP was applied carabiner first

16  and then the loop was put over the ankles, which may

17  temporarily secure the ankles together but would not prevent

18  full body double leg kicks or thrashing.

19          The second one was applied properly to reduce the

20  full range of motion and keep it secured to prevent escape

21  from it since we had the time do so.

22      Q.   Did you agree with this decision?

23      A.   The decision made to apply the second TARP

24  properly?

25      Q.   Yes.

COTMSJ0172

SEAN YEANDLE
4/5/2024

```
1       Q.   Now do you remember at what point the spit sock
2   was applied?  Was it before or after his multiple statements
3   that he couldn't breathe?
4       A.   I believe at this point, and we'll have to check
5   the video just to make sure, but I believe at this point it
6   still has yet to be applied, so therefore he would have made
7   complaints prior to the spit sock being applied.
8       Q.   Right.  Now let's -- hang on one second.  We're
9   going to move on.
10          Sir, I'm sorry.  Before we move on, so you said
11  that you didn't receive any training that would indicate to
12  you whether a person was lying or exaggerating when they say
13  they can't breathe; is that correct?
14      A.   I can't recall any specific training focused on
15  determining whether or not somebody was being dishonest in
16  this regard.
17      Q.   What did you do to determine whether or not he was
18  or was not experiencing pulmonary difficulties?
19      A.   It was just a moment by moment observation, again,
20  based on the totality of the circumstances.  Just
21  observations of being in proximity to him and him actually
22  physically breathing and talking and not only talking but
23  yelling and screaming and then still possessing the strength
24  and will power to forcefully resist as opposed to behaving
25  like you were low on oxygen or energy, things like turning
```

COTMSJ0173

SEAN YEANDLE
4/5/2024

1    blue, going limp, you know, any evidence to the contrary I

2    guess you could say.

3        Q.    Did you ever, during the time that you were there

4    did you ever see Mr. Alvarado stop talking?

5        A.    There were periods of time where he ceased

6    talking, yes.

7        Q.    I'm sorry?

8        A.    There were periods --

9        Q.    Could you repeat your answer?

10       A.    Yes.  Absolutely.  During the video there were

11   periods of time where he was not talking.

12       Q.    All right.  Let's move on.  Let's roll it just a

13   little bit.

14            (Whereupon a video was played.)

15       Q.    We're going to stop it for a second and then move

16   on to the next segment I want to ask about.  Hold on one

17   second.

18            Sir, could you confirm that at this point he's

19   still on his stomach, 10:50?

20       A.    Yes.  10:50 into the video he's on his stomach

21   while I'm loosening his handcuffs.

22       Q.    We're going to move it onto the next point I want

23   to talk about.

24            Sir, before I move on, officers are actively

25   pushing down on him still at this point; correct?

SEAN YEANDLE
4/5/2024

1      Q.    And the officer was concerned about his health

2   during either of those scenarios; correct?

3      A.    Yes.  Yeah.  Any time force is used the medical

4   evaluation is required.

5      Q.    At this moment did you have any concerns that he

6   might die?

7      A.    No, I did not.

8      Q.    Hang on one second.  One second.

9           Sir, you've been on the scene for a period of time

10  now.  Would you agree that none of the officers here have

11  mentioned anything about a homicide?

12     A.    The only reference that was made to the two scenes

13  being related was earlier in the video when I believe I made

14  a remark similar to like watch this not be related.  And

15  what I meant by that was watch this not be related to the

16  homicide because, like I'd stated earlier, I was still under

17  the impression that it was.

18     Q.    But you had some concerns that it was -- had no

19  relation to that homicide incident?

20     A.    Well, you're just never sure until you're sure.

21     Q.    But at this point you had some doubts that it was

22  related to the homicide?

23           MS. WATERS:  Objection, misstates the testimony.

24           But you can answer.

25           THE WITNESS:  Yes.  Up until it was confirmed that

```
 1    it was unrelated I was still operating under the reasonable
 2    suspicion that it was.
 3         Q.   Now do you remember any other officers making
 4    comments to you about him potentially being involved in a
 5    homicide?
 6         A.   The information I had was what I had going in
 7    prior to the call, and that remark was made between Officer
 8    Solarino and I earlier in the video.  I don't remember the
 9    exact time stamp --
10         Q.   Okay.
11         A.   -- whether or not --
12         Q.   Let me clarify.  Let me understand.  The comment
13    you're talking about is you said to Officer Solarino watch
14    this not be connected to the homicide?
15         A.   That was, yes, not specifically, but that was the
16    gist of it, yes.
17         Q.   So can we agree that at no point during this time
18    in conversations you had with other officers did the topic
19    of this potentially being involved in the homicide come up?
20         A.   Not during the initial fight, detention.  And
21    then, you know, it's possible it came up after we were
22    having discussions once we were away from the struggle, if
23    you will, but I don't recall it specifically occurring
24    outside of that comment up until that point.
25         Q.   So you don't recall anybody saying anything about
```

COTMSJ0176

SEAN YEANDLE
4/5/2024

1   the homicide other than you making the statement watch this

2   not be connected to the homicide?

3        A.   Yeah.   Up until that point that was the first

4   commentary exchanged on the homicide.

5        Q.   Now you used the term reasonable suspicion.

6             Did you have probable cause to believe that he was

7   involved with the homicide?

8        A.   No.   I would not say that probable cause existed

9   at the time of the contact, that we were operating under

10  reasonable suspicion if we're talking about the specific

11  charge of homicide.

12       Q.   And just backing up a little bit, can you list all

13  of the factors that in your mind somehow connected Damien to

14  the homicide?

15       A.   So the information from the homicide that we had

16  at the time I believe the suspect description was given out

17  as a Hispanic male in plaid driving a white car.   And then

18  the information given from the crash was similar in both

19  proximity, in time and location and also involved a

20  similarly described male and vehicle.

21       Q.   So other than -- and this was what you termed the

22  reasonable suspicion; am I correct?

23       A.   All those factors I mentioned, yes.

24       Q.   So let's move on a little bit.

25             Now would you agree with me that at this point

SEAN YEANDLE
4/5/2024

1   but based on my best recollection of the incident and what I

2   was perceiving coming in was that the person involved in the

3   motor vehicle accident was matching or at least closely

4   matching in clothing and vehicle description.

5           MR. GATTONE:  I have no further questions.

6           MS. WATERS:  So Officer Yeandle, normally you have

7   the option to either read and sign your deposition to verify

8   that the questions and your responses were taken down

9   correctly by the court reporter, alternatively you can do

10  what's called waiving signature where you trust that the

11  court reporter took everything down correctly.

12          I normally advise clients to waive.  This

13  deposition was a little choppy, so if you prefer -- because

14  of connection issues, not anything else -- so if you would

15  prefer to read and sign you can, or you can waive signature.

16  The choice is ultimately yours.

17          THE WITNESS:  I'll waive.  I trust Raynbo.

18          MS. WATERS:  All right.  Very good.

19          (Whereupon a discussion was held off the record.)

20          MR. GATTONE:  We heard Exhibit A, which was the

21  radio, the audio of the radio chatter, and B was the

22  officer's body-worn camera video.

23          (Whereupon a discussion was held off the record.)

24          MR. GATTONE:  I'm assuming this is okay, Renee.

25  We're stipulating that the two exhibits that we were

SEAN YEANDLE
4/5/2024

```
 1                          CERTIFICATE

 2   STATE OF ARIZONA      )
                           )
 3   COUNTY OF PIMA        )

 4           BE IT KNOWN that the foregoing videoconference
     deposition was taken before me, RAYNBO SILVA, RPR, CR,
 5   Certified Reporter No. 50014 in the State of Arizona; that
     SEAN YEANDLE was duly sworn by me according to law; that the
 6   proceedings were taken down by me and reduced to writing
     under my direction; that the preparation, production and
 7   distribution comply with law and code; that the foregoing
     79 pages are a full, true and accurate record, all done to
 8   the best of my skill and ability.

 9           I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
10   outcome hereof.

11           (XX) Review and signature was waived.

12           (  ) Review and signature was requested.

13           (  ) Review and signature was not requested.

14           I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206 (F)(3) and
15   ACJA 7-206(J)(1)(g)(1) and (2).

16           DATED this 11th day of April, 2024.

17

18
                                RAYNBO SILVA, RPR, CR
19                              Certified Reporter
                                Arizona CR No. 50014
20

21           I CERTIFY that RAYNBO COURT REPORTING, LTD., has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                              RAYNBO COURT REPORTING, LTD.
                                Registered Reporting Firm
25                              Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

COTMSJ0179

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                        )
                                      )
                    Plaintiff,        )
                                      )
            vs.                       )      No. CV22-00132-RCC
                                      )
City of Tucson, et al.,               )
                                      )
                    Defendants.       )
_____)

VIDEOCONFERENCE DEPOSITION OF RYAN AKE

April 8, 2024

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

RYAN AKE
4/8/2024

1   to your attorney, let me know.  We'll take a break.

2            Sir, how are you presently employed?

3       A.   I work for the Loveland Police Department in

4   Loveland, Colorado.

5       Q.   I think the other officer was in Colorado, too,

6   but --

7       A.   Yeah.  We work together now.

8       Q.   Oh, Yeandle; right?  He's in Colorado, too.  All

9   right.

10           Sir, you previously were employed by the Tucson

11  Police Department; is that correct?

12      A.   I was, yes.

13      Q.   How long were you with the TPD?

14      A.   Approximately four years.  I started in 2017.

15      Q.   And you went until when?  2024?  2023?

16      A.   March of I believe it was 2021.

17      Q.   So how long have you been there with Loveland?

18  Three years?

19      A.   Yeah.  It will be three years this week, actually.

20      Q.   Why did you leave TPD?

21      A.   Just better working environment, smaller

22  department, better pay.

23      Q.   All of that.  And did you have any law enforcement

24  experience prior to working for TPD?

25      A.   No, I didn't.

RYAN AKE
4/8/2024

1   is Damien Alvarado?

2        A.   Yes, sir.

3        Q.   And you've heard that name before?

4        A.   I have.

5        Q.   And your understanding is that he's the person

6   that died in police custody and he's the reason why we're

7   here today?

8        A.   Correct.

9        Q.   All right.  Sir, can you -- let's talk a little

10  bit about your training.  Can you give me a thumbnail sketch

11  of the training you received to become a TPD officer?

12       A.   I attended the Southern Arizona Law Enforcement

13  Training Center or their basic academy.  It's hosted by the

14  Tucson Police Department.

15            Upon graduation at that point, still at the same

16  training center I went through an eight week post academy,

17  which is Tucson police specific, and then an extensive field

18  training program put on by Tucson police, which is another

19  approximate 17 weeks prior to being an individual officer.

20       Q.   All right.  Now did you have any medical training

21  during your TPD training?

22       A.   Just basic first aid and things and CPR and that

23  sort.

24       Q.   So you never had any other medical training other

25  than that?

RYAN AKE
4/8/2024

1        A.    No.  No advanced medical training.

2        Q.    Sure.  And you don't have any EMT training?

3        A.    No, I don't.

4        Q.    Sir, let's go into some specifics.  As we're

5   sitting here today can you describe your understanding of

6   the concept of positional asphyxia?  Do you know what that

7   is?

8        A.    My understanding of it?

9        Q.    Please.

10        A.    To the point where someone is put in a position as

11   to it affects their breathing.

12        Q.    And what position would affect their breathing?

13   Is there one specific or a couple specific positions?

14        A.    I guess it would depend on the situation, but

15   mainly probably down on their stomach or somewhere where

16   their face is obstructed.

17        Q.    Would you agree that probably you should limit the

18   time that they're on their stomach or their face is

19   obstructed?

20        A.    To the best of our ability, yes.

21        Q.    Sure.  And do you understand what the recovery

22   position is?

23        A.    I do.

24        Q.    What is that?

25        A.    Generally it's someone on their side, whether it

COTMSJ0183

RYAN AKE
4/8/2024

1   be left or right, with an arm, if able, to be above their

2   head and their legs tucked in closer to their chest to keep

3   them from rolling back onto either their back or their

4   front.

5       Q.   When a suspect is in a prone position, what about

6   if another person's body weight is on top of that person?

7   Does that have some effect on them and their ability to

8   breathe?

9       A.   It could, yes.

10      Q.   All right.  Is there a specific in your mind of

11  how much weight can be applied to an individual who's on

12  their stomach prior to the time -- prior to having an impact

13  on their breathing?

14      A.   I couldn't put a number on that, no.

15      Q.   Is positional asphyxia more or less of a danger

16  when someone is on certain types of drugs?

17      A.   I would say probably more of a danger.

18      Q.   Do you know in what way?

19      A.   Drugs affect the body in different ways, so it

20  depends what drug they're on, but it could potentially slow

21  their breathing or in the opposite speed up their breathing

22  based on stress and things of that nature that come with

23  using drugs.

24      Q.   And you haven't attended any other training on

25  positional asphyxia, just what you received as a training to

RAYNBO COURT REPORTING, LTD.

RYAN AKE
4/8/2024

1  be a police officer?

2      A.   Yes.  Nothing specific to positional asphyxia, but

3  it was touched on in the academy.

4      Q.   Sure.  Do you recall reading any directives or

5  orders on the topic of positional asphyxia that were issued

6  after 3/22 of '20?

7      A.   Like by the department?

8      Q.   Yes, sir.

9      A.   I don't recall.

10     Q.   So you don't recall?  You can't say today whether

11 they did or didn't?

12     A.   Correct.

13     Q.   But you would agree that if there were any

14 directives that you would be subject to abiding by them;

15 correct?

16     A.   That's correct.

17     Q.   All right.  Now let's talk a little bit -- can we

18 agree today that during the incident Mr. Alvarado said I

19 can't breathe?

20     A.   Yes, he did multiple times.

21     Q.   All right.  And you heard those?

22     A.   Yes, I did.

23     Q.   And prior to the incident did you ever receive any

24 training as to how to respond when a restrained person

25 and/or detainee says I can't breathe or other similar

RYAN AKE
4/8/2024

1   phrase?

2        A.   How I was trained to respond you said?

3        Q.   Yes, sir.  How were you trained to respond?

4        A.   Address their concern.

5        Q.   So what would you do?

6        A.   We would generally put them in the recovery

7   position, but he was already in that position when he was

8   making some of those complaints.

9        Q.   But he was also making some of those complaints

10  when he was on his stomach; correct?

11       A.   Yes.  Probably while we were actively fighting him

12  still.

13       Q.   Prior to this incident on 3/22/20 have you ever

14  been restraining or arresting a suspect when they said I

15  can't breathe?

16       A.   I can't recall.

17       Q.   So you don't know how many times that might have

18  happened or what your response may have been?

19       A.   Correct.

20       Q.   Have you ever been trained on whether, how you can

21  determine if a detained suspect is being sincere when they

22  say I can't breathe?

23       A.   I'm sorry.  Could you repeat that question?

24       Q.   Sure.  Have you ever been trained on whether

25  you're able to determine if a detained suspect is telling

RYAN AKE
4/8/2024

1   the truth when they say I can't breathe?

2       A.   No, but I wish I had because I'd be a much better

3   person at my job if I could tell when people were telling

4   the truth.

5       Q.   All right.  Right on.

6            Can we agree that it's possible that a person's

7   breathing can be restricted, yes, they are technically

8   breathing or get some breath in?

9       A.   I'm sorry.  Could you repeat that?

10      Q.   Sure.  Can we agree that it's possible that a

11  person's breathing can be restricted yes, they're still --

12  yet they're still technically breathing?

13      A.   Yes.

14      Q.   So a person could be telling you I can't breathe

15  and even though there's some breath going in, they may be

16  restricted; is that something you agree with?

17      A.   Yes.  I could agree with that.

18      Q.   As we sit here today what's your understanding of

19  excited delirium?

20      A.   That's that someone's body is in a state to where

21  they're overworking their internal organs and primary brain

22  function.  Whether that's chemically induced or mental --

23  what's the phrase I'm looking for -- or mental health issue,

24  things of that sort.

25      Q.   So there is some relationship between excited

RYAN AKE
4/8/2024

1   delirium and drug use; correct?

2       A.   Absolutely.

3       Q.   Are there specific types of drugs that are related

4   to this phenomenon?

5       A.   Generally your uppers, so whether that be PCP,

6   methamphetamine, any sort of cocaine or any subvariant or

7   combination of those.

8       Q.   Do you know how the concept of excited delirium is

9   related to positional asphyxia?

10      A.   Their relation?  No, I do not.

11      Q.   You've never had any training on that?

12      A.   I can't tell you.

13      Q.   Have you had any training on how to detect if

14  someone might be under the influence of some sort of

15  narcotic drug, illegal drug?

16      A.   Not as far as being a drug recognition expert, but

17  there are signs that were touched on and things to look for.

18      Q.   What might those be?

19      A.   Depends on the drug.

20      Q.   How about what would the behavior, specific

21  behaviors be, if you can tell us, if they're on -- if

22  they've ingested methamphetamine?

23      A.   Talking about specific behaviors, but based on my

24  experience and my training I would say that they're having

25  trouble sitting still, they get very focused on a task or an

RYAN AKE
4/8/2024

1  object, their speech is generally faster, along with their

2  breathing and their heart rate as well.

3       Q.   When someone has, in quotes, superhuman strength

4  does that mean in your mind that's likely drug use or

5  induced by drug use?

6       A.   I think it's definitely a factor.  I don't know

7  his gym routine, but I would say that drugs probably play a

8  part in that.

9       Q.   Do you know what drugs might affect that?

10      A.   It depends on the person and how that drug affects

11  them, but I would say probably an upper, whether it be PCP

12  or methamphetamine or the things that I mentioned before.

13      Q.   And when someone's on meth, they eventually come

14  down; correct?

15      A.   Eventually, hopefully, yeah.

16      Q.   While you were interacting with Mr. Alvarado did

17  you perceive that he had ingested some drugs or was on

18  drugs?

19      A.   That was my assumption, yes.

20      Q.   Why?  What signs or symptoms gave you that

21  impression?

22      A.   Like you just said, his superhuman strength, along

23  with his erratic behavior, and then just general

24  uncooperativeness in general.

25      Q.   Sir, did you ever speak with the civilians on the

RYAN AKE
4/8/2024

1 scene, the two individuals that had been involved initially

2 with Mr. Alvarado?

3        A.    No, I didn't.

4        Q.    You never got their impression of what had

5 happened or of Mr. Alvarado?

6        A.    I just want to clarify.  We're talking about the

7 two people that were fighting him before we got there?

8        Q.    Yes.  The father and son.

9        A.    Yeah.  No.  I didn't have any -- I didn't ask them

10 any questions.

11        Q.    Let's talk about the restraints.  Now initially

12 the initial form of restraint that TPD uses is handcuffs;

13 correct?

14        A.    Yes.

15        Q.    All right.  And what about the TARP restraint?

16 Can you describe to us what that is?

17        A.    You just want like what it's made out of or like

18 its function?

19        Q.    Its function.

20        A.    Generally it's just a strap that goes around the

21 ankles and then attaches to the handcuffs as well, and it's

22 to prevent people from kicking.

23        Q.    Now we're going to talk more, but have you ever

24 been trained on, well, if that has any relationship to

25 positional asphyxia whether someone's in a TARP position

RYAN AKE
4/8/2024

1  because obviously they're on their stomach?

2      A.   Well, generally we apply it while they're on their

3  stomach and then roll them to the recovery position.

4      Q.   What about a spit sock?  You've had training on

5  the use of a spit sock; is that correct?

6      A.   Yes, sir.

7      Q.   During the training have you ever had, have you

8  ever been trained on when it's appropriate to apply a spit

9  sock?

10     A.   Yes.  When they are spitting or making efforts of

11  doing so.

12     Q.   So whether they're actively spitting or there's

13  some manifestation that they may be about to spit or eject

14  some sort of bile matter?

15     A.   Correct.  We would like to get it on before that

16  takes place generally.

17     Q.   How about is it appropriate to double layer spit

18  socks?

19     A.   It could be, yes.

20     Q.   When would that be?

21     A.   If the first one isn't working.

22     Q.   All right.  You mean if it's on inappropriately or

23  it's just not stopping the spit or other bile matter?

24     A.   It could be both.

25     Q.   All right.  Now do you know, can you describe to

RYAN AKE
4/8/2024

1   us the type of spit sock that TPD uses?

2        A.   I don't know the specific brand, but it's

3   generally like a fine mesh bag if I had to describe it.

4        Q.   It goes over the whole head?

5        A.   Correct.

6        Q.   And obviously you've had training on how to

7   properly secure a spit sock on someone's head?

8        A.   Correct.

9        Q.   Did you have some training on when to use a spit

10  sock specifically during the COVID pandemic?

11       A.   I don't know the relation between the COVID and

12  spit sock, no.

13       Q.   Now have you ever had any training or ever seen

14  two layers of spit socks used before on a person who was in

15  custody?

16       A.   Have I?

17       Q.   Yes, sir.

18       A.   I don't know.

19       Q.   Not that you can recall?

20       A.   Correct.

21       Q.   Now do you know in this specific situation with

22  Mr. Alvarado did you have any specific concerns about being

23  contaminated by his spit or other bodily fluids?

24       A.   Yes, I did.

25       Q.   And what might those concerns be?

RYAN AKE
4/8/2024

1    A.    Which bodily fluid or my concerns with them?  I'm
2  sorry.
3    Q.    Spit?
4    A.    Yes, it was spit.  I was worried about the spit.
5    Q.    And why?
6    A.    Because he was spitting and making guttural sounds
7  with his mouth while I was close to his head.
8    Q.    So it was actively spitting or spit was coming out
9  when he was talking?  Or can you describe that?
10    A.    I don't know his disposition, but I know that
11  stuff was coming out of his mouth while I was in close
12  proximity to it.
13    Q.    And did you have any specific concerns about any
14  specific diseases that you might catch because of the spit?
15    A.    Ones that anybody could carry.
16    Q.    What about HIV?  Can you contract HIV through
17  spit?
18    A.    Yes.
19    Q.    And you've had some training that indicates that
20  you can contract HIV through spit?
21    A.    I don't know if I've had specific training, but I
22  don't want people's spit who have HIV on me.
23    Q.    Do you know if a spit sock can impede a person's
24  ability to breathe?
25    A.    No, I don't.

COTMSJ0193

RYAN AKE
4/8/2024

| | |
|---|---|
| 1 | Q.   All right.  How about -- I'm sorry.  Can I have |
| 2 | just one second? |
| 3 | A.   Sure. |
| 4 | Q.   Do you know if a spit sock can impair the ability |
| 5 | to breathe of a person who's highly agitated? |
| 6 | A.   No.  A spit sock does not impede breathing. |
| 7 | Q.   What about a person who's in medical distress of |
| 8 | some sort? |
| 9 | A.   Spit sock does not impede breathing regardless of |
| 10 | anybody's condition.  It's not designed to do so. |
| 11 | Q.   Do you recall how far you were from Mr. Alvarado |
| 12 | when the spit sock was applied? |
| 13 | A.   If I recall correctly, I believe I applied one of |
| 14 | them. |
| 15 | Q.   I'm sorry? |
| 16 | A.   I said if I recall correctly I applied one of |
| 17 | them.  I was in very close proximity. |
| 18 | Q.   You applied the first one? |
| 19 | A.   Okay. |
| 20 | Q.   Yes?  So you applied the first one; yes? |
| 21 | A.   Yes. |
| 22 | Q.   Now at some point there was a second spit sock was |
| 23 | applied; is that correct? |
| 24 | A.   I would have to -- I don't recall if there was one |
| 25 | or two. |

COTMSJ0194

RYAN AKE
4/8/2024

1        Q.   If I told you that one was, a second one was

2   applied by fire department personnel, do you recall that?

3        A.   I don't.

4        Q.   All right.  So you wouldn't be able to tell me

5   what position Mr. Alvarado was in when the second spit sock

6   was applied?

7        A.   That's correct.

8        Q.   And but you were near him when he had a second

9   spit sock on?  Or do you just not recall that?

10       A.   Well, if the fire department applied it, I was

11   around while the fire department was there, but I wasn't

12   directly involved with Mr. Alvarado at that point.  And then

13   after they had left I made my way back closer to him.

14            But I wasn't privy to -- I wasn't really paying

15   attention to what the fire department was doing while they

16   were there.

17       Q.   And you only applied the spit sock after Damien

18   was handcuffed; correct?

19       A.   That's correct.

20       Q.   All right.  So how long were you on the scene

21   before you applied the spit sock?

22       A.   If I had to estimate, I would say about 15 to

23   20 minutes.

24       Q.   Why didn't you apply it sooner?

25       A.   I was actively fighting him.

COTMSJ0195

RYAN AKE
4/8/2024

1        Q.   All right.  And you -- no one tried to apply the
2    spit sock during the struggle itself?
3        A.   No.  Generally we wait until it's a controlled
4    environment to do that.
5        Q.   All right.  Sitting here today my understanding is
6    that Damien may have been involved in a car accident at
7    Campbell and Prince that day; is that correct?
8        A.   That's correct.
9        Q.   And were you ever on the scene of the collision?
10   Or did you go directly to the scene of the fighting between
11   the officers and Mr. Alvarado?
12       A.   My initial intention was to go to the crash, but
13   then no, I never made it to the crash scene.  I went
14   straight to Officer Solarino.
15       Q.   So you wouldn't know if there was any injuries
16   reported in connection with the car accident?
17       A.   Not at the time I was responding, no.
18       Q.   Did you get any information regarding what
19   Mr. Alvarado may have done in connection with the car crash?
20       A.   I believe he was, I was told he was the driver
21   that ran from one of the vehicles after the collision.
22       Q.   Did they tell you what direction he had run in?
23       A.   I don't recall specifically, no.
24       Q.   And then your attention was turned towards the
25   separate event, Officer Solarino or someone calling for

RYAN AKE
4/8/2024

```
 1  help; correct?
 2       A.   I'm sorry.  I don't understand your question.
 3       Q.   Sure.  You said initially you were responding to
 4  the car crash, the car accident, but you never made it
 5  there.  You answered the call to the incident with Officer
 6  Solarino and Mr. Alvarado?
 7       A.   Correct.
 8       Q.   Now at the time you were -- I'm sorry.  One
 9  second.
10            Oh.  I need to make my phone call in about two
11  minutes, so I'll ask a couple more questions and then we'll
12  take a break.
13            Sir, did you have any information in your radio
14  call that it might have been the same individual involved in
15  the car crash that was involved with Officer Solarino?
16       A.   Yes.
17       Q.   And that was your understanding from the call?
18       A.   Yes.
19       Q.   All right.  Now in March of 2020 where were you
20  assigned?  What was your assignment?
21       A.   Operation -- I'm sorry.  Operation division
22  midtown.
23       Q.   All right.  Were you in a patrol vehicle by
24  yourself that day or did you have someone else with you?
25       A.   That day I was by myself, yes.
```

COTMSJ0197

RYAN AKE
4/8/2024

1        Q.    Now in general do you know who your sergeant was,

2   recall who your sergeant was in the midtown station?

3        A.    At that time I believe it was Sergeant Da Cruz.

4        Q.    And was he on the scene of the incident with

5   Officer Solarino and Mr. Alvarado?

6        A.    No.  I believe Sergeant Chlopowicz was the one

7   that responded.

8        Q.    Do you know if your division has a dedicated

9   police radio channel?

10       A.    Yes, it did.

11       Q.    What was that?

12       A.    It's called team three, I believe.

13       Q.    And so that day were you just listening to that

14   radio channel or were you listening to others?

15       A.    I believe while we were en route to the car crash,

16   which was also potentially linked to a shooting that we had

17   just had in our division, that we requested that team two,

18   which was the west side, and team three, which was my

19   division, be patched together so we could listen to each

20   other.

21       Q.    So you were listening to other than your channel

22   when you got the call about the incident with Officer

23   Solarino?

24       A.    I believe so, yes.  I think they were patched by

25   that time.

COTMSJ0198

RYAN AKE
4/8/2024

```
 1              MR. GATTONE:  All right.  You all, I'm going to

 2    sign off for five minutes.  Can we go off the record until I

 3    get back?

 4              (Whereupon a recess was taken from 10:16 A.M. to

 5    10:26 A.M.)

 6       Q.   Let's move on a little bit.  There we go.  Now I

 7    can hear.  Let's move on to the incident itself.

 8              When you were en route to the car crash, tell me

 9    again when you learned that there might have been a fight

10    between an officer and a suspect.

11       A.   I, I'd like to answer your question.  I just want

12    to make sure I'm understanding it correctly.

13              Are you saying like where in proximity in like the

14    city or where I was, like where I was at?

15       Q.   In relation to the car crash.

16       A.   I was still in midtown.  I believe my route of

17    travel was north on Alvernon to Fort Lowell and then west on

18    Fort Lowell to which was going to be Prince and Fort Lowell.

19       Q.   And when you were en route to the that initial

20    call, the car crash, and you get the call about this

21    incident with Officer Solarino, did anyone give you any

22    information about whether Damien was suspected of criminal

23    activity?

24       A.   So I just want to clarify first.  I was initially

25    en route to a shooting, which then turned into the suspect
```

RYAN AKE
4/8/2024

1  vehicle fleeing from there being described as a white SUV

2  which was then involved in the car crash.  And that's when I

3  switched to responding to the car crash thinking it was

4  related to the shooting.

5          And then at that point we received information

6  that the driver from the white SUV involved in the crash ran

7  from the scene, which was described as Mr. Alvarado.

8      Q.   So where did you get that information from?  From

9  the radio?

10     A.   Yes.

11     Q.   All right.  Now tell me any other crimes that he

12  may have been suspected of prior to this incident with

13  Officer Solarino.

14     A.   So to my understanding he was a shooting suspect

15  and then a hit and run suspect.

16     Q.   So in your recollection did he fit the description

17  of the shooting suspect and did his vehicle match the

18  description of the vehicle driven by the shooting suspect?

19     A.   His vehicle matched, and I don't know if we had a

20  suspect description for the shooting at that time.

21     Q.   Okay.

22     A.   I just had a suspect description of the driver

23  that ran from the car crash.

24     Q.   We're going to go to the CAD data, so we can kind

25  of narrow down what the description was of the alleged

COTMSJ0200

RYAN AKE
4/8/2024

1      A.   Correct.

2      Q.   So it's one or the other?

3           Let's go a little bit -- oh, when you arrived on

4  the scene or before arriving on the scene, did you have any

5  information that the individual that Officer Solarino was

6  struggling with may have ingested illegal drugs?

7      A.   Not that I knew specifically, no.

8      Q.   And when you arrived on the scene, did any

9  officers tell you right there that they suspected that he

10  may have ingested illegal drugs?

11     A.   When I first arrived, no.

12     Q.   Now when did you -- when did someone tell you that

13  he was suspected of ingesting illegal drugs?

14     A.   I don't know if anybody said that he directly

15  ingested or had any knowledge that he did, but I know

16  Officer Gamez at one point did make the comment that he was

17  probably under the influence just based on his strength that

18  we were dealing with while we were fighting with him.

19     Q.   Now based on your training and experience did you

20  note any behaviors with Mr. Alvarado that might indicate

21  that he ingested or consumed illegal drugs?

22     A.   Yes.

23     Q.   And what were those?

24     A.   His erratic decision-making, his strength, also,

25  his, you know, breathing patterns and things of that sort.

RYAN AKE
4/8/2024

1          MR. GATTONE:  So now we're going to move on to

2   your body-worn camera footage.  And I guess we'll call this

3   A then, Raynbo.

4          (Whereupon Exhibit A was marked for

5   identification.)

6          MR. GATTONE:  Let's go to the body-worn camera if

7   we can.

8          (Whereupon a discussion was held off the record.)

9     Q.   So let me ask a question.  Well, let me ask a

10  general question.  What did you see when you first arrived

11  on the scene?

12    A.   Officer Solarino kind of squared up with the

13  suspect.  They were both standing at that time.

14    Q.   And what was your perception of what was going on?

15    A.   That they were in an active fight.

16    Q.   And was it just Officer Solarino at the time?

17    A.   And Officer Yeandle was a few steps in front of

18  me.  And then there was Mr. Alvarado.  And then there were

19  the two civilians that were still in close proximity to them

20  as well.

21    Q.   Sure.  And then you -- well, I'll ask you some

22  questions without showing the body-worn camera, and we'll

23  see if you recall them, and then we'll go to the body-worn

24  camera.

25          So you were maybe third-ish, but you and Officer

RYAN AKE
4/8/2024

1     A.   Yes, I did.

2     Q.   All right.  Do you recall generally what you said?

3     A.   I think at one point I said don't fucking bite me.

4     Q.   So obviously the officers were worked up; correct?

5     A.   100 percent.

6     Q.   And were you at all or any of the officers

7 investigated by the office of professional standards or IA

8 for the use of this language?

9     A.   Yes.

10    Q.   And so you were investigated for the use of this

11 language?

12    A.   Yes, in conjunction with this case.

13    Q.   Were you reprimanded or punished in any way for

14 using foul language?

15    A.   Yes.

16    Q.   And what was the result of the investigation?

17    A.   It was a 20 hour suspension.

18    Q.   Without pay or with pay?

19    A.   Without.

20    Q.   All right.  And that was because of the foul

21 language and not because of any other actions?

22    A.   Correct.

23    Q.   So had you ever, just while we're talking about

24 it, had you ever been -- did you ever -- have you ever been

25 reprimanded or punished before because of an OPS or IA

COTMSJ0203

RYAN AKE
4/8/2024

1  struggle did you see the black object on the ground?

2      A.   How soon?

3      Q.   Yes, sir.

4      A.   I don't know.  Within the first couple of minutes.

5      Q.   And it was apparent to you right from the start

6  that it was a gun magazine?

7      A.   Correct.

8      Q.   Now you weren't given any indication prior to the

9  struggle that Mr. Alvarado was armed; is that correct?

10     A.   Other than the fact that I was under the

11  impression that he was a shooting suspect.

12     Q.   You didn't see any weapons on his person or in the

13  area; correct?

14     A.   Not while I was dealing with him, no.

15     Q.   At any point did you find a weapon on his person

16  or in the general area?

17     A.   No.

18     Q.   And just to confirm from the video there

19  Mr. Alvarado was wearing a plaid shirt; correct?

20     A.   Yes.

21     Q.   No gray hooded sweatshirt or red cap on him or in

22  the area?

23     A.   No.

24     Q.   All right.  Now let's move -- now at some point do

25  you recall having your knee on Mr. Alvarado's body?

COTMSJ0204

RYAN AKE
4/8/2024

1          A.   Yes.

2               MR. GATTONE:  Let's look at specifically some of

3     the video footage, 2:32.

4               (Whereupon a video was played.)

5          Q.   At this point you appear to have your at least

6     forearm or elbow up in the neck area of Mr. Alvarado;

7     correct?

8          A.   I can't see directly, but if I -- that's his back,

9     then yeah, it's probably on his back somewhere.

10         Q.   And his face was on the ground; correct?

11         A.   Yes.

12         Q.   And the ground was dirt and stones?

13         A.   Yup.

14         Q.   And he was on his stomach at this point?

15         A.   Okay.

16         Q.   I'm sorry.  Yes or no, he was on his stomach?

17         A.   I mean I can't see with just what I'm looking at

18    right here.  He might have been either on his side or his

19    stomach or a combination.

20         Q.   But you indicated that you were pushing his face

21    into the ground with your elbow there?

22         A.   I wasn't pushing his face into the ground.  I had

23    my elbow on his back.

24         Q.   And you were --

25         A.   It was not my intention to push his face into the

COTMSJ0205

RYAN AKE
4/8/2024

1   ground.

2          Q.    Sure.  It may not have been your intention, but

3   you were applying force to that area of his body; correct?

4          A.    Correct.

5                MR. GATTONE:  Let's go to 2:48.

6                (Whereupon a video was played.)

7          Q.    Does that clarify for you that your elbow was on

8   his neck?

9          A.    It's not on his neck, no.

10         Q.    Where do you say it is?

11         A.    I would say it's on his upper shoulder, kind of

12   the base of his neck, but it's not on his neck.

13         Q.    You can see the collar of his shirt there, and

14   part of your arm is above the collar; correct?

15         A.    Yes.

16                MS. WATERS:  Object to form and description.

17                But you may answer.

18         Q.    Go ahead.

19         A.    So yes, there is a collar of his shirt, but his

20   clothes are disheveled.

21         Q.    Let's move on.

22                Now you're -- go ahead.  Let's go on.

23                (Whereupon a video was played.)

24         Q.    Now right there it appears that part of your arm

25   is on his head.  Am I seeing that correctly?

COTMSJ0206

RYAN AKE
4/8/2024

 1      A.   Yes.

 2      Q.   All right.  And there was no spit sock on

 3 Mr. Alvarado at this point; correct?

 4      A.   That's correct.

 5           MR. GATTONE:  And let's move on.

 6           (Whereupon a video was played.)

 7      Q.   And at this point you appear to be applying your

 8 hands on his head; correct?

 9      A.   Yup.  Just on the back of his head there.

10      Q.   And does this clarify that he was on his stomach

11 at this point?

12      A.   At this point, yeah.

13      Q.   All right.  Now how many officers were pressing on

14 him at this point if you can, if you recall?

15      A.   I know there's -- I believe I just heard Mike's

16 voice, so at this point there was probably four officers in

17 contact with him.

18      Q.   And I'm sorry.  I didn't read the time for the

19 record.  Right now we're at 2:49; correct?

20      A.   Yes.

21      Q.   And just to clarify, the other things that we

22 looked at for the record is your elbow on his upper body or

23 neck was 2:32 and pressing down on his head was 2:48.

24           MS. WATERS:  Object to form.

25           But you may answer.

RYAN AKE
4/8/2024

```
 1                THE WITNESS:  Yes.
 2       Q.    Yeah.  I'm just noting that for the record.
 3             Now at some point you had your knee on his upper
 4  back; is that correct?
 5       A.    Yes.
 6       Q.    And from the timing it appeared to be there close
 7  to one minute.  Does that sound about right?
 8       A.    What we just watched?
 9       Q.    No.  I'm just asking your independent
10  recollection.  Do you recall your knee being on him for,
11  say, a minute?
12       A.    I don't know the time frame, but yes, my knee was
13  on him.
14       Q.    But for some period of time --
15       A.    Yes.
16       Q.    -- correct?
17             And now when you're there with your knee on top of
18  him, you would have been pushing down with your body weight;
19  correct?
20       A.    Not all of it, but yes, there was some pressure
21  involved.
22       Q.    But you're pressing on him hard enough to keep
23  him, try to keep him on the ground so they can put on the
24  handcuffs; correct?
25       A.    Yes.
```

COTMSJ0208

RYAN AKE
4/8/2024

```
 1      Q.   And let's go to -- sir, how much did you weigh at
 2  the time?  Do you recall?
 3      A.   I don't know.  Probably about 150 to 160,
 4  somewhere in there.
 5      Q.   And again, at that point there are other officers
 6  who are pressing on him also?
 7      A.   Yes.
 8           MR. GATTONE:  And let go to 4:25.
 9           (Whereupon a video was played.)
10      Q.   Now you heard Mr. Alvarado make the statement I
11  can't breathe --
12      A.   Yes.
13      Q.   -- and someone says yes, you can?
14      A.   Yes.  I said that.
15      Q.   And he again reiterated no, I can't; correct?
16      A.   Yes.
17      Q.   All right.  And you indicated that multiple times
18  he said I can't breathe?
19      A.   Yes.
20           MR. GATTONE:  And again, that was at 4:25.
21           Let's go to 5:03.  Okay.  Go.
22           (Whereupon a video was played.)
23      Q.   So during this time he said I can't breathe but
24  you all were still applying pressure to him; correct?
25      A.   Yes.
```

RYAN AKE
4/8/2024

1       Q.   And it appears at this point after he said I can't
2  breathe you were pushing on him with your hands; correct?
3       A.   Yes.
4       Q.   And now and who made that comment yes, you can
5  when he said I can't breathe?
6       A.   That was me.
7       Q.   So you obviously did not believe him when he said
8  he couldn't breathe?
9       A.   Correct because I could hear him breathing.
10      Q.   Didn't we indicate -- didn't we agree before that
11  there could be a time when someone's able to talk and they
12  still can't fully breathe?
13      A.   Yes.
14      Q.   And that I think I said for the record that the I
15  can't breathe was at 4:25, and then we had the officer's
16  response, yes, you can; correct?  And that was your
17  response?
18      A.   Yes, it was.
19      Q.   Let's go -- I may have asked, but you indicated
20  that he said multiple times I can't breathe?
21      A.   Yes.
22      Q.   And why -- someone said we need to get him on his
23  side.  Who said that?
24      A.   That was Officer Gamez.
25      Q.   And do you know why he made -- he said that?

RYAN AKE
4/8/2024

1     A.   Because we were struggling with him.  And he made,

2  also made the comment that he's probably high and so we need

3  to get him into a recovery position.

4     Q.   Let's see.  I'm looking at four -- 5:01.  Can we

5  agree that that's most likely the time when the statement

6  was made to roll him on his side or put him in the recovery

7  position?

8     A.   Yeah.  I don't know if that was the decision being

9  made at that time, but it was just something we needed to be

10  mindful of at that time.

11     Q.   At least five minutes and one second into the

12  struggle he had been on his stomach?

13     A.   Well, no because we didn't -- you know, the first

14  however minute or so we're still running up to him and

15  things of that sort, so it's not the full five minutes that

16  he was in that prone position.

17     Q.   So four minutes?  Three minutes?

18     A.   All right.  We'll go with three.

19     Q.   Let's move on to 5:03, coming right up if you'll

20  listen.

21     A.   Okay.

22     (Whereupon a video was played.)

23     MR. GATTONE:  We're going to go back a little bit

24  because I think we missed it.

25     Go ahead.

COTMSJ0211

RYAN AKE
4/8/2024

1           (Whereupon a video was played.)

2     Q.   Did you hear Mr. Alvarado say I'm dying?

3     A.   To me it sounded like he said I'm tired.

4     Q.   Oh, well, let's go back again.

5     A.   Okay.

6           (Whereupon a video was played.)

7     Q.   So your indication is you believe he said I'm

8 tired, not I'm dying?

9     A.   Correct.

10     Q.   But either way you continued to push on him;

11 correct?

12     A.   Correct.

13     Q.   All right.  So we're in a disagreement as to

14 whether he said I'm tired or I'm dying.  Your perception is

15 he said, may have said I'm tired or -- and my indication is

16 that he said I'm dying; correct?

17     A.   Yeah.  Based on that snippet that's what I hear.

18     Q.   And how was he restrained at that point?  Just

19 with handcuffs or handcuffs and the TARP?  Do you know?

20     A.   I think at this point we were still trying to get

21 him in the handcuffs.

22     Q.   When was, do you recall when the TARP was applied?

23     A.   It was after he was in handcuffs, shortly

24 thereafter.

25     Q.   Why was that?  Do you know why he was put in a

COTMSJ0212

RYAN AKE
4/8/2024

1    TARP?

2         A.    Why the TARP was applied?

3         Q.    Yes, sir.

4         A.    Because he was still actively kicking and things

5    of that sort, so we wanted to make sure he was secured

6    before we had med come in and check him out.

7         Q.    Let's use this.  And again, we can see that his

8    face is in the dirt or dirt and rocks; correct?

9         A.    Yeah.  It looks like it's turned to the side

10   there --

11        Q.    Okay.

12        A.    -- the back of his head.

13        Q.    It's still at least the side of his face, and we

14   don't know how much of his mouth is in the dirt, too;

15   correct?

16        A.    Correct.  We can't see that.

17        Q.    Right now do you consider this, what you saw right

18   now in the video, for him to be fighting?

19        A.    Yes.

20        Q.    And tell me all the things you see right here that

21   indicate that he's fighting.

22        A.    The things that I see is that, you know, I'm still

23   putting downward pressure on him, still trying to maintain

24   control.  And then as far as what I was feeling at this

25   point his body was still tense and things of that sort.  So

RYAN AKE
4/8/2024

```
 1  he was still not, you know, complying with what we were
 2  trying to accomplish.
 3       Q.   Obviously he's not in a position right here to
 4  swing his arms at anybody?
 5       A.   At this current --
 6            MS. WATERS:   Object to form.
 7            But you may answer.
 8       A.   At this current position no.
 9       Q.   And you said that, so you said his body was tense.
10  That indicates to you that he was fighting?
11       A.   He's still trying to make an attempt, yeah.
12       Q.   So is it possible -- well, scratch that question.
13            So what other indicators, are there any other
14  indicators other than the tense body that he's, he was still
15  fighting or that you feel he was still fighting?
16       A.   Yeah.  And his general noncompliance with us,
17  still asking him, you know, to give us his hands and things.
18       Q.   Let's look at 60.
19            Before we move on, let me look at my notes.  I
20  have one more question here.
21            Now you indicated that when you were pushing down
22  on him you were not using your full strength?
23       A.   No.  I was just using enough to maintain control.
24       Q.   75 percent?  80 percent?  90 percent?  What do you
25  think?
```

RAYNBO COURT REPORTING, LTD.

RYAN AKE
4/8/2024

1    A.    Just enough to maintain control.  I couldn't put a
2 number on it.
3    Q.    So enough to keep him down so they could apply the
4 handcuffs?
5    A.    Correct.
6    Q.    And now so tell me -- let me back up for a second.
7 Is there a difference between what you consider resistance
8 and what you consider fighting?
9    A.    Yes.
10    Q.    And what would that be?
11    A.    Resistance would be something that he was doing to
12 prevent us from putting him in handcuffs, whereas fighting
13 would be like an active attempt to try and cause us harm.
14    Q.    Right now what was he doing to try and cause you
15 harm?
16    A.    He was still trying to remove his hands from our
17 control --
18    Q.    All right.
19    A.    -- which could eventually turn into him using them
20 against us.
21    Q.    But weren't officers holding his arms at this
22 point?
23    A.    At this direct point I don't know.  I would
24 have -- I can't see where we're at.  But I think officers
25 were still trying to gain control of his hands at this

COTMSJ0215

RYAN AKE
4/8/2024

```
 1            He was just on his stomach, but you indicated you
 2  think that you were rolling him on his side at this point?
 3       A.   Yeah.   I actually stood up, and it looked like
 4  Sean was reaching over, I'm sorry, Officer Yeandle was
 5  reaching over and rolling him.
 6       Q.   Let's roll the video and see if we can clarify
 7  that.
 8       A.   Okay.
 9            (Whereupon a video was played.)
10       Q.   At least at -- you just heard someone say, it's at
11  6:01, say get him on his side; correct?
12       A.   Yes.
13       Q.   So at least six minutes into the incident they're
14  just rolling him on his side?
15       A.   Yup.
16       Q.   Let's go -- I'm sorry.   I'm trying to coordinate
17  between two people.
18            And you said that maybe the first couple of
19  minutes he wasn't on his stomach.   So then we can assume
20  that at least four or five minutes into it he's been on his
21  stomach?
22            MS. WATERS:   Object to form.
23            You may answer if you know the answer.
24            THE WITNESS:   Yeah.   I'd say that's an approximate
25  estimation.
```

COTMSJ0216

RYAN AKE
4/8/2024

1    Q.   Again, this is the first time that anyone has

2    decided at 6:01 that he needs to be rolled to his side?

3            MS. WATERS:   Form.

4            You may answer.

5            THE WITNESS:   That was the ultimate goal, yeah, to

6    get him on his side.

7    Q.   But I'm sorry.   My question was this was the first

8    time that anyone directed the other officers to roll him on

9    his side; correct?

10           MS. WATERS:   Object to form.

11           You may answer.

12           THE WITNESS:   Yeah.   I mean I think it was a

13   couple of minutes before that.   That's when Officer Gamez

14   said that we needed to be mindful of it, but we still needed

15   to get him detained before we were able to accomplish that.

16   Q.   So again, 6:01, it may have been even later than

17   6:01 when he was actually rolled on his side?

18   A.   Correct.

19   Q.   Now at this point is he still fighting or do you

20   still believe that he's fighting?

21   A.   No.   At this point he was detained.

22   Q.   And was the TARP on him at this point, if you

23   recall?

24   A.   I don't.   I don't know if it was or not.

25   Q.   All right.   Do you still consider him to being

RYAN AKE
4/8/2024

1  come and they start to clear the premises or they start to

2  clear the scene; correct?

3      A.   Yeah.  After they check him out, work on him.

4      Q.   But at some point after they leave Mr. Alvarado's

5  condition deteriorates; is that correct?

6      A.   Yes.

7      Q.   And were you there when he started, his condition

8  started to deteriorate?

9      A.   I was still on scene, but I don't believe I was in

10  direct contact with him at that point.

11      Q.   When did you find out that his condition was

12  deteriorating?

13      A.   Once Nick started yelling cardiac arrest.

14      Q.   And how soon was that, if you know, between the

15  time the paramedics left and when he went into cardiac

16  arrest?

17      A.   I think it was only, you know, a minute or two.

18      Q.   So pretty shortly after they started leaving he --

19  his heart was stopping?

20      A.   Correct.

21      Q.   And do you know if he was breathing at this point?

22      A.   When his heart was stopping?

23      Q.   Yes, sir.

24      A.   I don't.

25      Q.   And again, you didn't believe him that last time

RAYNBO COURT REPORTING, LTD.

COTMSJ0218

RYAN AKE
4/8/2024

1   he said or any of the times he said I can't breathe;
2   correct?
3       A.   I didn't believe that -- I'm sorry.  Can you
4   repeat the question?
5       Q.   Sure.  He indicated at least one last time before
6   his condition deteriorated that he couldn't breathe, but
7   obviously you didn't believe, you didn't believe that he was
8   telling the truth?
9       A.   When I was in contact with him, no, I didn't
10  believe that he couldn't breathe.
11      Q.   All right.  As we sit here today can we agree that
12  he did have difficulty breathing that day?
13           MS. WATERS:  Object to form.  Calls for
14  speculation.
15           But you can answer.
16           THE WITNESS:  Okay.  Sorry.
17      Q.   Your perception, can we agree today that Damien
18  was having difficulty breathing at some point during the
19  interaction with the police?
20           MS. WATERS:  Objection to form.
21           But you may answer.
22           THE WITNESS:  Yes.  I do.
23      Q.   I'm sorry.  What basis do you say that you agree
24  with me that he couldn't breathe that day?
25           MS. WATERS:  Object to form.  Misstates what he

COTMSJ0219

RYAN AKE
4/8/2024

```
 1              THE WITNESS:  I mean throughout my career I've
 2   been to other calls where people may have had cardiac
 3   arrest, but they weren't anything like this, if that's what
 4   you're asking.
 5        Q.   Yes, sir.
 6        A.   Okay.
 7        Q.   Now I think I'm just about finished.  Oh.  I got a
 8   couple more questions.  Hang on.  Okay.
 9              Sir, I'm sorry.  I forgot to ask you, you said
10   that you placed the spit sock on his head; correct?
11        A.   Yes.
12        Q.   What was his demeanor at the time that you placed
13   the spit sock on his head?
14        A.   I don't recall his direct demeanor.  Do we have
15   that video by chance?
16        Q.   Sure.  We can go back to the video.
17              Let's see if we can find where you put the spit
18   sock on his head.  Sorry.  We're looking.
19        A.   Okay.
20        Q.   Let me ask a couple of questions while we're
21   looking for that video.
22              Do you -- and so you made the decision to put the
23   spit sock on?  Or did someone direct you to put the spit
24   sock on?
25        A.   I know I didn't have it on my person, so I think
```

RYAN AKE
4/8/2024

1   someone gave it to me.

2          MR. GATTONE:  Let's go ahead and roll the video.

3          (Whereupon a video was played.)

4      Q.   So you saw yourself applying the spit sock?

5      A.   Yup.

6      Q.   And again, now you applied the spit sock

7   12 minutes and 22 seconds into the incident; correct?

8      A.   Yes.

9      Q.   And why did you make the decision at that point,

10  at that late part of the struggle to put the spit sock on?

11     A.   As you can see there, meds are starting to get

12  there and they're going to be in close proximity with him,

13  and in a couple of seconds right before you paused it there

14  you can hear him spit.

15         MR. GATTONE:  Let's go back a little bit to see if

16  we can hear that.

17         (Whereupon a video was played.)

18     Q.   At least from what you can see, what you can hear

19  the spit sock was on when he made the spitting sound;

20  correct?

21     A.   Right, which was the purpose of the spit sock.

22     Q.   And that was the first time that he had spit or

23  made a spitting sound; correct?

24         MS. WATERS:  Object to form.

25         But you may answer.

COTMSJ0221

RYAN AKE
4/8/2024

```
 1              THE WITNESS:  That we can hear, yeah, that's the
 2    first time.
 3        Q.   And now so that was the first time that we hear
 4    him spitting.  Could we agree that you didn't hear him
 5    spitting before 12:22?
 6        A.   I would not agree with that, no.
 7        Q.   But that's the first time you can recall him
 8    spitting was once the spit sock was applied?
 9        A.   That's the first time I can hear it on the video.
10        Q.   It's the first time that you recall?  How about
11    from your independent recollection?
12        A.   I would say the decision was made to put it on him
13    because he was either spitting or things were coming from
14    his mouth prior to us putting it on.
15        Q.   That's your assumption; correct?
16              MS. WATERS:  Object to form.
17              You may answer, though.
18              THE WITNESS:  That's my recollection, yes.
19        Q.   Now he wasn't fighting at this point other than
20    verbally; correct?
21        A.   At this point, no.  He was detained.
22        Q.   And we can agree that he stopped fighting several
23    minutes before you put the spit sock on?
24        A.   Yes.
25        Q.   I'm not wrapping up.  Then -- I'm sorry.
```

RYAN AKE
4/8/2024

1          Who told you to put the spit sock on again?
2     A.    It sounded like Officer Solarino.
3     Q.    Did he say this guy -- I didn't hear him say this
4  guy's spitting or there's something coming from his mouth?
5     A.    No.  He said sock him, which refers to the spit
6  sock.
7     Q.    And who gave you the spit sock?
8     A.    I don't know that officer's name that was holding
9  it and trying to apply it.  He didn't work in my division,
10  but that's who had it.
11     Q.    Did you apply the spit sock in compliance with how
12  you'd been trained?
13     A.    Yes.  I corrected him from doing it because he was
14  about to put it on backwards.
15     Q.    You corrected it?  You put it on correctly?
16     A.    Yes.
17     Q.    And at the point you put it on it was on
18  appropriately; correct?
19     A.    Yes.
20     Q.    At that point you said after you put it on we
21  heard him spitting.  So if he had spit after the spit sock
22  was on, it would have been blocked; correct?
23     A.    Correct.
24     Q.    But then at some point when the TFD personnel come
25  they apply a second spit sock.  Did you see that?

COTMSJ0223

RYAN AKE
4/8/2024

1   still trying to move.

2        Q.   Now you said something akin to you better not

3   fucking bite me.

4             Did he have make any actions that indicated that

5   he was going to bite you or trying to bite you?  Or --

6        A.   Yeah.  My arm was kind of laid across his

7   shoulder, and my hand was down in front of my face, and he

8   was doing (indicating) kind of that motion.  So I don't know

9   if he was just moving his mouth, but I was just telling him

10  not to bite me.

11            MR. GATTONE:  Go ahead.

12            (Whereupon a video was played.)

13       Q.   Now who is, do you know which officer right there

14  has his knee on Damien's neck?

15            MS. WATERS:  Object to form.  His knee is not his

16  on his neck.

17            But you can answer the question.

18            THE WITNESS:  Yeah.  It's my knee on his back

19  there.

20       Q.   Go ahead.  Oh, hang on.

21            Right now the time marker there is two minutes and

22  16 seconds.  All right.  Continue.  Go ahead.

23            Oh, so did someone ask you to put your knee there?

24  Or did you just determine that was necessary?

25       A.   No.  It was the appropriate position for what we

RYAN AKE
4/8/2024

 1      A.   Well, he's still moving his body around, still not
 2   complying with us trying to get him in a recovery position,
 3   and the need for the TARP was because he was still kicking.
 4      Q.   But you told me before that some officer or
 5   officers had their hands on his legs?
 6      A.   Yes.
 7      Q.   But he was still physically able to try to kick
 8   with officers holding his legs down?
 9      A.   Yes.
10      Q.   Now at some point -- okay.  So they go to put the
11   TARP on.  And again, his hands are behind his back.  And if
12   I understand correctly, the TARP connects the handcuffs to
13   his legs; correct?
14      A.   Yes.
15      Q.   And at this point there's still people pushing
16   down on him with their body weight; correct?
17      A.   Yes.  To maintain control.
18      Q.   Do you know how many officers were doing that at
19   this point?
20      A.   I don't.  I don't know the proximity of everybody
21   else there.
22      Q.   All right.  So give me one minute to confer, and
23   I'll get right back to you.
24      A.   Okay.
25           (Whereupon a discussion was held off the record.)

COTMSJ0225

RYAN AKE
4/8/2024

 1      Q.   You were asked questions about your application of
 2   body weight or pressure on Mr. Alvarado's upper back in
 3   order to hold him still.
 4           During the time you were applying pressure to
 5   Mr. Alvarado were you using the minimum force required to
 6   secure him?
 7      A.   Yes.
 8      Q.   When we were watching Officer Yeandle's body-worn
 9   camera, toward the end at three minutes and 10 seconds when
10   you were able to remove your knee from Mr. Alvarado's upper
11   back Mr. Gattone asked you why would you say he's still
12   resisting at that point.
13           Do you remember that series of questions?
14      A.   Yes.
15      Q.   At that point if officers had simply turned
16   Mr. Alvarado loose, did you have any reason to believe he
17   would have complied with your instructions at that point?
18      A.   No.
19           MR. GATTONE:   Objection.
20      Q.   You said no?
21      A.   Correct.
22      Q.   And was that based on the behavior he displayed up
23   until that point?
24      A.   Yes.
25      Q.   You were asked questions about whether you

COTMSJ0226

RYAN AKE
4/8/2024

1          A.    Yes.   Once it was safe to do so.

2                MR. GATTONE:   I think that I'm done.

3                MS. WATERS:   All right.   Officer Ake, you have the

4    right to do what's called read and sign your deposition.

5    That is to say the court reporter prepares a preliminary

6    transcript and you review it to ensure that she took down

7    all the questions and your responses accurately.

8                Alternatively you can do what's called waiving

9    signature where you trust the court reporter took your

10   responses down correctly and you sign it by waiver.

11               I generally find court reporters to be accurate,

12   but ultimately the decision is yours.   If you prefer to read

13   and sign, you can.   Otherwise I usually recommend people

14   just waive signature.

15               THE WITNESS:   I will elect to waive my signature.

16               MS. WATERS:   All right.   Thank you so much for

17   your time.

18               (Whereupon a discussion was held off the record.)

19               MR. GATTONE:   Exhibits A, B and D will not be

20   attached.

21               (Whereupon the deposition was concluded at

22   12:13 P.M., and signature was waived.)

23

24                           *  *  *  *

25

COTMSJ0227

RYAN AKE
4/8/2024

```
 1                          CERTIFICATE

 2  STATE OF ARIZONA      )
                          )
 3  COUNTY OF PIMA        )

 4          BE IT KNOWN that the foregoing videoconference
    deposition was taken before me, RAYNBO SILVA, RPR, CR,
 5  Certified Reporter No. 50014 in the State of Arizona; that
    RYAN AKE was duly sworn by me according to law; that the
 6  proceedings were taken down by me and reduced to writing
    under my direction; that the preparation, production and
 7  distribution comply with law and code; that the foregoing
    93 pages are a full, true and accurate record, all done to
 8  the best of my skill and ability.

 9          I CERTIFY that I am in no way related to any of
    the parties hereto, nor am I in any way interested in the
10  outcome hereof.

11          (XX) Review and signature was waived.

12          (  ) Review and signature was requested.

13          (  ) Review and signature was not requested.

14          I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206 (F)(3) and
15  ACJA 7-206(J)(1)(g)(1) and (2).

16          DATED this 12th day of April, 2024.

17

18          _____
            RAYNBO SILVA, RPR, CR
19          Certified Reporter
            Arizona CR No. 50014
20

21          I CERTIFY that RAYNBO COURT REPORTING, LTD., has
    complied with the ethical obligations set forth in
22  ACJA 7-206 (J)(1)(g)(1) through (6).

23
            _____
24          RAYNBO COURT REPORTING, LTD.
            Registered Reporting Firm
25          Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                    )
                                  )
                    Plaintiff,    )
                                  )
          vs.                     )       No. CV22-00132-RCC
                                  )
City of Tucson, et al.,           )
                                  )
                    Defendants.   )
_____  )

DEPOSITION OF MIKE GAMEZ

Tucson, Arizona

April 11, 2024

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

COTMSJ0229

MIKE GAMEZ
4/11/2024

1  so what we'll do is I'll ask you questions.  If you answer

2  them the way they're posed, it would be awesome.

3          What we have to do is try not to talk over each

4  other.  So if you would wait for me to finish my question, I

5  will wait for you to finish your answer before I ask another

6  question so we don't mess up Raynbo.

7      A.   I understand.

8      Q.   Sir, I mixed up my questions.

9           Mike, how long have you been with TPD?

10     A.   I've been with the Tucson Police Department since

11  October of 2006.

12     Q.   2006.  Okay.  What did you do before that?

13     A.   I was a college student, a college athlete.

14     Q.   Where did you go to school?

15     A.   Southern Arkansas University.

16     Q.   You played football?

17     A.   Baseball.

18     Q.   Oh, you're a big guy, so I was going to guess

19  football.

20     A.   I wasn't always this big.

21     Q.   Oh, okay.  Can you give me a little thumbnail

22  sketch of your training in order to become an officer with

23  the Tucson Police Department?

24     A.   Yes, sir.  So I attended, obviously, the basic

25  training academy in 2006.  After that I attended post basic

MIKE GAMEZ
4/11/2024

1   in 2007.  After that I attended, completed field training in

2   operations division south.  I served there for about eight

3   years.

4           After those eight years was assigned to the

5   training academy as a staff officer where I was in charge of

6   conducting the basic training curriculum.  Staff officer, so

7   I was basically in charge of coordinating basically all the

8   basic training curriculum, defensive tactics, physical

9   fitness and basically the 585 hours that's required for new

10  police officers to graduate.  Did that for about four years.

11          After that, excuse me, I was in charge of

12  defensive tactics for about a year.  During that time I

13  gained several certifications.  I became a defensive tactics

14  instructor in 2010, became a physical training instructor in

15  2011.  I became a firearms instructor I believe in 2012, a

16  driving instructor 2016, a rifle instructor 2016, high risk

17  vehicle stop instructor 2016.  Subject matter expert in

18  physical training, which is now considered a master

19  instructor at the AZPOST.

20          Well, I'll speak to a little bit further on that

21  because I believe it's pertinent in this case.

22      Q.   Okay.

23      A.   Through the department I have attained, in the

24  physical training capacity I'm a certified, a certified

25  personal trainer through the NSCE, a certified tactical

MIKE GAMEZ
4/11/2024

```
 1   point on your duty that day you went to a car accident at
 2   Prince and Campbell; is that correct?
 3        A.   Yes, sir.
 4        Q.   And tell me about the call, the initial call that
 5   you got for the accident itself.
 6        A.   I was basically asked to stay over because I
 7   believe the sergeant that was working that shift was
 8   shorthanded, so I volunteered to stay.
 9             So I was basically working beyond my duty hours
10   that day.  Got dispatched to a call, what we call a 1052, so
11   an accident with injury.  And I basically got there.  At
12   that point learned it to be a hit and run accident.  It was
13   at the intersection of Campbell and Prince.
14             And from what I remember and after watching my
15   body-worn camera it was basically right in the middle of the
16   intersection, I believe, two SUVs.  The vehicle in question
17   was white in color.
18             Later discovered to be there was a call in midtown
19   that they were working that was a homicide.  And the vehicle
20   that was involved in that collision that I was investigating
21   matched the vehicle that they were working in midtown of
22   possibly being related to the homicide suspect.
23        Q.   We'll talk about the description of the vehicle in
24   a little bit.
25             My understanding is that there were no injuries at
```

COTMSJ0232

MIKE GAMEZ
4/11/2024

```
 1        A.   So based on memory and, again, I'd have to
 2   probably go back, and I don't even know how we'd discover
 3   this, but based on memory I switched my frequency to go --
 4   so I could give information over to midtown.
 5            And based on memory I remember hearing officers
 6   involved in a struggle just -- what would that have been --
 7   southeast of my location.  And I realized that they were
 8   not -- they were basically within running distance of where
 9   I was positioned.  I realized the urgency of the situation.
10            And I just realized there was an officer that was
11   at the scene could hold that scene and, sorry, excuse me,
12   those other officers needed, they needed more people.  They
13   needed more assistance than what they had.
14        Q.   Okay.
15        A.   So to answer --
16        Q.   Go ahead.
17        A.   -- your question --
18        Q.   Please.
19        A.   -- I switched frequencies, discovered by switching
20   frequencies that they were in a struggle with basically what
21   I assumed the person that fled the scene from the car
22   accident.
23        Q.   So what I recall from the body-worn camera is you
24   hustled over there, you ran over there?
25        A.   Yes, sir.
```

COTMSJ0233

MIKE GAMEZ
4/11/2024

1      Q.   It was maybe two blocks, three blocks away, pretty
2  close?
3      A.   Yeah.  It wasn't maybe a quarter of a mile, maybe
4  a little less.
5      Q.   And obviously, as you said, they were calling for
6  assistance, they needed more officers to deal with the
7  situation?
8      A.   Yes, sir.
9           MR. GATTONE:  Could we queue up the video, please?
10  Are you ready with the video?
11           (Whereupon Exhibit A was marked for
12  identification.)
13      Q.   Before we start can you tell me, describe to me
14  what you recall seeing as you arrived over at the scene?
15      A.   Yes, sir.  Initially when I got there, I did not
16  know where they were.  So I was calling to them because I
17  remember hearing them saying they were basically in the
18  parking lot of that church.  And then when I got there I
19  could not hear and I could not see them, so I was walking
20  around a little bit.
21           Then I believe I continued walking southeast.  And
22  then I discovered like an easement alleyway.  And then I saw
23  basically the struggle occurring.  And then I saw basically
24  like, you know, I think, I believe it was three officers and
25  then Mr. -- I'm sorry -- is that Mr. Alvarado?

COTMSJ0234

MIKE GAMEZ
4/11/2024

1      Q.   Yes.

2      A.   Mr. Alvarado involved in a struggle maybe

3  three-quarters of the way down that alleyway.  You know,

4  basically they were all covered in dirt, and there was a lot

5  of dust kicked up in the air.  Yeah.

6      Q.   Do you know the names of the officers that were

7  there when you got there?

8      A.   I do.

9      Q.   Who are they, please?

10     A.   At that time officer now Sergeant Solarino,

11  Officer Ake and Officer Yeandle.

12     Q.   And you see them struggling with an individual

13  that we now know to be Damien Alvarado?

14     A.   Correct.

15     Q.   You didn't know anything about him at the time

16  except that he may have been the person that fled from the

17  scene of the accident?

18     A.   Yes, sir.

19     Q.   Is that correct?  Okay.

20          MR. GATTONE:  Can we have the video please, 22:05?

21          Let's go from there, please.

22          MS. WATERS:  All right.  21:52.

23          MR. GATTONE:  Yes.

24          (Whereupon a video was played.)

25     Q.   So this is you running down --

COTMSJ0235

MIKE GAMEZ
4/11/2024

```
1              MS. WATERS:  Do you want to ask the question?  Or
2    do you want me to hit play?
3              MR. GATTONE:  Go.  Play, please.
4              (Whereupon a video was played.)
5              MR. GATTONE:  Okay.  Stop, please.
6         Q.   So this is your arm right here to the right?
7              You put your hands on to help hold him down while
8    they're trying to subdue him; correct?
9         A.   Yes, sir.
10        Q.   And can you tell us where your hand is?  It looks
11   like it's at the base of his head; does that seem about
12   right?
13        A.   Yes, sir.
14        Q.   Near his neck?  On his neck?
15        A.   Yes, sir.
16        Q.   Are you using one hand or two at this point?  I
17   only see one hand.
18        A.   I would say one.  That's a fair statement.
19        Q.   Describe to me what Damien's doing at the time.
20        A.   He is face down.  He basically is constricting
21   both of his arms.
22             At this point there's a force model that we have
23   or elements of force, I should say, ability, opportunity,
24   jeopardy and preclusion.
25             At this point, as I noted in my OPS statement,
```

RAYNBO COURT REPORTING, LTD.

COTMSJ0236

MIKE GAMEZ
4/11/2024

1  ability is way down.  Opportunity is low.  I should say they

2  were lower.  Ability is lower.  Opportunity is lower.  And

3  jeopardy is lower.  All right.

4        So I notice that this struggle doesn't really need

5  any more force.  It just needs some communication, some

6  direction and some guidance.  So I start basically doing

7  that because adding more force is not going to do any good.

8        Q.   But you do add some --

9        A.   Soft, empty hands.  Soft empty hands.

10       Q.   But you did assist in holding him down some?

11       A.   Yes.

12       Q.   And you indicated that he was on his stomach at

13  the time?

14       A.   Correct.

15       Q.   And it looks like his face was at least sideways

16  on the ground; is that correct?

17       A.   Correct.

18       Q.   All right.  And it's dirt and stones there;

19  correct?

20       A.   Sure.  Yes.

21            MR. GATTONE:  Can you just keep rolling?

22            MS. WATERS:  Sure.

23            MR. GATTONE:  I want like 23:35.

24            MS. WATERS:  All right.

25            (Whereupon a video was played.)

MIKE GAMEZ
4/11/2024

```
 1              MR. GATTONE:  We stopped at 22:21.
 2      Q.   Do you know who said that about biting them?
 3      A.   From just because I have worked around these guys
 4  from the voice it sounded like officer now Sergeant
 5  Solarino.
 6              MR. GATTONE:  Go ahead, please.
 7              (Whereupon a video was played.)
 8              MR. GATTONE:  Can we stop for a second?
 9      Q.   Now we're stopped at 22:26.  It looks like -- is
10  that Officer Solarino on the stop there?  Or who is that
11  whose face we can see?  Do you know?
12      A.   I believe that is Officer Ake.
13      Q.   And it looks like he has his elbow on the upper
14  body or lower neck of Mr. Alvarado?  Does that look about
15  right?
16      A.   Yes.
17              MR. GATTONE:  Go ahead, please.
18              (Whereupon a video was played.)
19      Q.   Now that person that we saw briefly, that was one
20  of the civilians that was on the scene; correct?
21      A.   I believe so.  I didn't have a lot of contact with
22  them, but I believe that was.  I believe that is accurate.
23      Q.   Did you get any information about these civilians
24  getting involved with him or being involved with the
25  struggle at some point?
```

RAYNBO COURT REPORTING, LTD.

MIKE GAMEZ
4/11/2024

1      A.   After the fact, yes, but not during, you know.  I

2  became aware of that later, I should say.  I did not know

3  that at the time, yeah.

4           MR. GATTONE:  Go, please.

5           MS. WATERS:  That was 22:35 where we paused.

6           MR. GATTONE:  All right.

7           (Whereupon a video was played.)

8      Q.   We stopped at 22:50.

9           Now is there more officers there or still the

10  three officers that you indicated were there when you first

11  arrived on the scene?

12     A.   Based on what I can see I think it's just still

13  the three.

14     Q.   Plus you?

15     A.   Yeah.  Yes.

16     Q.   And all of them have their hands in an attempt to

17  cuff him and subdue him; correct?

18     A.   Yes, sir.

19           MR. GATTONE:  Could you proceed, please?

20           (Whereupon a video was played.)

21           MR. GATTONE:  Oh, I'm sorry.  Could we back up,

22  please?

23           MS. WATERS:  Sure.

24           MR. GATTONE:  We're at 22:56.  I wanted to go back

25  a little bit.

COTMSJ0239

MIKE GAMEZ
4/11/2024

```
 1              MS. WATERS:  Like 10 seconds?  20?  How far?
 2              MR. GATTONE:  15 seconds.  I know you can't do
 3  that but.
 4              MS. WATERS:  I'll do my best.
 5              MR. GATTONE:  All right.
 6              Okay.  That should do it.
 7              MS. WATERS:  22:21.
 8              (Whereupon a video was played.)
 9      Q.    Now do you know who made that statement, shut the
10  fuck up?
11      A.    Again, from voice recognition just working around
12  these guys it sounded like Officer Solarino.
13      Q.    And that was at 22:43.
14              And at this point now you moved around to it looks
15  like near the legs or feet of Mr. Alvarado and you're
16  helping in an attempt to cuff him?
17      A.    Yes.
18      Q.    All right.  And at this point he's still on his
19  stomach?
20      A.    He is.
21      Q.    Again, you and three other officers are actively
22  involved in this effort?
23      A.    Correct.
24              MR. GATTONE:  Okay.  Can we go to 20?  Where are
25  we at?  20 -- let's go to 25, please.
```

COTMSJ0240

MIKE GAMEZ
4/11/2024

```
 1              MS. WATERS:  All right.  24:45.

 2              MR. GATTONE:  Perfect.

 3              (Whereupon a video was played.)

 4         Q.   So 25:04, I believe we stopped at 25:05, but I

 5    believe it was at 25:04 someone -- who says that he's

 6    probably high?  Was that you or someone else?

 7         A.   That was me.

 8         Q.   So you have some -- what was your indication that

 9    he might be high?

10         A.   Just, you know, at that point I guess that was

11    2020, so I'm at 14 years of experience.  His mannerisms, the

12    way he's behaving, some of his statements, general

13    experience.  I just I can tell he's under the influence of

14    either drugs or alcohol.

15         Q.   Alcohol?  Drugs?  Did you --

16         A.   Just something, some substance.

17         Q.   Now you just got that information from your

18    perception, but you didn't receive it from anyone else?

19         A.   No, sir.

20         Q.   Someone indicates when they're trying to cuff him

21    that if he's not careful they'll break his arm?  Was that

22    you?  Did you make that statement?  Or do you recall someone

23    making that statement?

24         A.   Yes, sir.  I did.

25         Q.   That was you?
```

COTMSJ0241

MIKE GAMEZ
4/11/2024

1      A.    Yeah.

2      Q.    Because you're struggling with him, et cetera?

3      A.    Are you asking -- is that a yes or no question?

4 Or --

5      Q.    Yes.

6      A.    I made the statement, yes.

7      Q.    I don't know if we need to go to it, but at some

8 point it may be you that indicated that you needed to call

9 the sergeant because of the use of a tailor -- Taser and

10 application of a TARP?

11      A.    Yes, sir.

12      Q.    Because it's a heightened use of force, a

13 heightened application of force so you need to have --

14 report it?  Why did you need to call a sergeant?

15      A.    It's required per policy.

16      Q.    Because?

17      A.    Just that level of force.  Application of a Taser

18 is required per policy that a sergeant be notified, respond

19 to the scene and paramedics be called.

20      Q.    How did you know that a Taser had been applied?

21      A.    I remember hearing it either on the radio or -- it

22 must have been on the radio as I was running over there, I

23 believe.

24           MR. GATTONE:  Can we go to 30 -- let's just go to

25 40, 30:40, please.

MIKE GAMEZ
4/11/2024

```
 1              MS. WATERS:  30:40.

 2              MR. GATTONE:  Right now we're at 25:05.

 3              THE WITNESS:  And again, my last thing, that's

 4    from memory.  That's the best that I can remember.  I

 5    remember hearing it somewhere.  And maybe I remember seeing

 6    the prong somewhere so I knew a Taser had been used at some

 7    point, so I knew it was appropriate to call a sergeant,

 8    yeah.

 9         Q.   So -- oh, I'm sorry.  Again, you saw the prong so

10    that the Taser would have been applied from some distance?

11    Isn't that usually when the prongs go out instead of being

12    dry stunned?

13              MS. WATERS:  Object to form.

14              But you may answer.

15              THE WITNESS:  They're, they're -- if it's dry

16    stunned, the Taser that we had at that point no matter how

17    it's applied they're discharged.

18         Q.   They come out?

19         A.   Yeah.

20              MS. WATERS:  So we're at 30:37.

21              MR. GATTONE:  All right.

22              (Whereupon a video was played.)

23         Q.   Do you know how long -- so the recovery position

24    has some connection to the topic of positional asphyxia;

25    correct?
```

RAYNBO COURT REPORTING, LTD.

COTMSJ0243

MIKE GAMEZ
4/11/2024

1      A.    Yes.

2      Q.    And can you give me -- you've had some training in

3  that, in this topic of positional asphyxia?

4      A.    Just based on my defensive tactics training,

5  instructing, yeah.  Yes, sir.

6      Q.    Can you describe to me your understanding of that

7  concept?

8      A.    Of positional asphyxia?

9      Q.    Yes, please.

10      A.    So it varies.  So dependent -- there's variables

11  present, obviously.  Depending on the person's body mass

12  index, the position that they're placed in, compression on

13  the organs, if someone's heavier body mass index, if they're

14  face down for an extended period of time, the compression on

15  their heart, their lungs could restrict breathing.  It could

16  restrict blood flow.

17          Even someone who is very high body mass index if

18  they're in a seated position, because of the way their body

19  is shaped, it could compress their organs and impede blood

20  flow to the heart, the lungs and could have a potential

21  life-threatening impact on them.

22          So we don't want to keep them in that position for

23  an extended period of time.

24      Q.    Sure.  And you told sergeant -- was it Sergeant

25  Ellis?  He was the higher ranked individual, Officer Ellis,

COTMSJ0244

MIKE GAMEZ
4/11/2024

1   that you were talking to; correct?

2       A.   Yes, sir.

3       Q.   He's a sergeant?

4       A.   He is.

5       Q.   So he was the sergeant that responded when you

6   said get a sergeant here because of the Taser and the TARP?

7       A.   I do believe he was the first sergeant on the

8   scene, yes.

9       Q.   Do you know how long he was on his, he was on his

10  stomach before you suggested that he be placed in the

11  recovery position?

12      A.   It wasn't very long.  I mean we struggled with him

13  for -- granted I don't know how long he was in the face down

14  position before I arrived.  But we got him cuffed relatively

15  quickly, which also is based on the AZPOST lesson plan for

16  in custody death.  It indicates that we should cuff as

17  quickly as possible and then get him in the recovery

18  position.  So I tried to do that.  We got him cuffed

19  quickly, and I wanted to make sure that we got him cuffed

20  quickly.

21          And then I wanted to make sure that I got good

22  communication towards the rest of the team and made sure

23  that they knew that he was under the influence of drugs and

24  that we needed to get him into that recovery position as

25  quickly as possible.

COTMSJ0245

MIKE GAMEZ
4/11/2024

1          So I would have to go look at the body-worn camera
2    from when we got him cuffed to when we got him there, but I
3    would guess maybe less than a minute.
4       Q.   Now if a person is high on drugs, it could have
5    some impact on their respiratory or pulmonary system;
6    correct?  Is that your understanding?
7       A.   Potentially, yeah.
8       Q.   Do you know how it may impact their, let's say
9    their respiratory system, ability to breathe?
10      A.   It would just -- I mean it would vary from drug to
11   drug.  There's depressant drugs.  There's stimulant drugs.
12   So define what you mean.
13      Q.   How about meth?  How would meth -- do you know how
14   methamphetamines would impact their ability to breathe?
15      A.   So meth would -- meth is a stimulant, so it would
16   elevate your heart rate.  So it could potentially have -- it
17   could maybe raise their blood pressure and make it more
18   difficult for them to breathe.
19          That's beyond my scope of knowledge.  I'm just
20   guessing.
21      Q.   All right.
22      A.   Yeah.
23      Q.   Did you -- and how about do you know anything
24   about the topic of excited delirium?
25      A.   I do.

MIKE GAMEZ
4/11/2024

1      Q.    What's that, please?

2      A.    So that is basically a phenomenon where basically

3  there's four factors, pharmacological, psycho -- sorry --

4  pharmacological, bacterial, psychological and what's the

5  other one?  I can't remember.

6            But basically a person exhibiting behavior outside

7  of the norm, disrobing, violence toward inanimate objects,

8  elevated heart rate, basically hallucinations, violent

9  behavior, erratic behavior, and Mr. Alvarado was exhibiting

10 many of those signs.

11     Q.    And obviously that's something you have to be

12 concerned about if he's on his stomach for an extended

13 period of time; correct?

14     A.    Correct.

15     Q.    All right.  Tell me at this point did you see

16 Alvarado spitting at all or anything, bodily fluids

17 projecting from his mouth?

18     A.    Based on memory I do believe he was like, he was

19 spitting, yes.

20     Q.    Is that why you would ask for a spit sock or

21 someone asked for a spit sock at some point?

22     A.    I don't remember who asked for it, if it was me.

23 I would have to go back and look at the body-worn, but I do

24 remember a spit sock being called for.

25            MR. GATTONE:  Can we go to -- this is 30:55.  Can

COTMSJ0247

MIKE GAMEZ
4/11/2024

 1  we just let it roll, please?

 2          MS. WATERS:  Yes.

 3          (Whereupon a video was played.)

 4      Q.   And so this is 31:33.

 5          So first off, there was some indication from

 6  Mr. Alvarado that at least a statement that he couldn't

 7  breathe; correct?

 8      A.   Yes.  Based on the camera, yes.

 9      Q.   And he made that statement multiple times during

10  the interaction; is that correct?

11      A.   Yes.

12      Q.   All right.  And now did you get some -- it appears

13  that you're going to get a spit sock; is that -- am I

14  correct in that assumption?

15      A.   Based on that right there, yes.

16      Q.   Did you -- after seeing the body-worn camera,

17  could you recognize the voice that said to go get a spit

18  sock or that a spit sock was necessary?

19      A.   I couldn't really, I couldn't really pick it out,

20  sir, yes -- no.

21      Q.   Somebody did?

22      A.   Somebody did, yes.

23      Q.   All right.  Now you've had some training and

24  experience in the application of a spit sock; is that

25  correct?

COTMSJ0248

MIKE GAMEZ
4/11/2024

1    A.   During the basic academy.  I mean it's, it's not
2  extensive training.  Yeah.
3    Q.   And I assume you've used spit socks at some point
4  during your extensive career?
5    A.   Yes, sir.
6    Q.   And so it is appropriate to apply a spit sock when
7  someone actively is spitting or maybe some other bodily
8  fluid is coming from their mouth?
9    A.   Yes.
10   Q.   Is it ever the case that a spit sock could impede
11 somebody's ability to breathe properly?
12   A.   From my experience no.  It's pretty porous.
13   Q.   And what if a person is having trouble breathing
14 or indicating that they can't breathe?  Would that be some
15 concern on your part?
16   A.   I wouldn't think so because I mean those things
17 are pretty porous.  It's not -- I wouldn't see how it would
18 impede breathing.  It's, it's, it's basically a big piece of
19 mesh.
20   Q.   And now the spit sock that you -- did you put the
21 spit sock on?  Or who put it on?  Do you recall?
22   A.   I don't recall.  Yeah.
23   Q.   But somebody did?
24   A.   Yeah.  I mean he had, he had one on at some point,
25 yeah.

COTMSJ0249

MIKE GAMEZ
4/11/2024

```
1        Q.    Did you see, did you see how it was applied?  Or
2   did you see it after it had been applied?
3        A.    I don't, I don't recall.
4        Q.    All right.  So you would not be able to tell us if
5   it appeared to be applied appropriately?
6        A.    If I saw the camera, then I could probably tell
7   you, but I don't recall from memory.
8              MR. GATTONE:  Let's roll a little bit and see if
9   we can see the spit sock itself, how it's being put on.
10             (Whereupon a video was played.)
11       Q.    This is 31:44.
12             You're asking someone, one of the other officers,
13  if they have a spit sock?  Is that you?
14       A.    Yes.  I believe I was calling a fire -- I believe
15  I was calling it to TFD.
16       Q.    Oh, you were calling it to TFD?
17       A.    Because they usually have them, yeah.
18       Q.    So my understanding, and we can look at the video,
19  is that when the TFD came with a spit sock there already was
20  a TPD spit sock on him.  Do you recall that?
21       A.    I don't, yeah.
22             MR. GATTONE:  Maybe we could roll a little bit.
23             (Whereupon a video was played.)
24       Q.    So it doesn't look like maybe you ever -- you did
25  not see the TFD people apply a spit sock?
```

MIKE GAMEZ
4/11/2024

1        A.   I think after this point from memory I had pretty
2   limited contact with him because I remember talking to
3   Sergeant Evans, and then I think I had pretty limited
4   contact with him after that until I think until he passed.
5   Yeah.
6        Q.   So you had limited contact with Alvarado?
7        A.   Correct.
8        Q.   All right.  Sir, in your training and experience
9   is it ever appropriate to apply two spit socks?
10            MS. WATERS:  Object to form.
11            But you may answer.
12            THE WITNESS:  I mean I don't -- I can't recall how
13   many times that's happened in my training and experience,
14   but I, I don't know what -- I don't see how that could cause
15   any harm because it's basically it's -- they're porous.  I
16   mean it's not going to impede any breathing.
17        Q.   So in your mind it's reasonable to apply, to apply
18   more than one spit sock?
19            MS. WATERS:  Object to form.
20            But you may answer.
21            THE WITNESS:  So I mean I don't know reasonable.
22   I don't know if that's a correct term.  If one was -- had
23   been faulty and you needed to apply another one to prevent
24   that, to prevent him spitting through the one that was not
25   working, that might be a reason.  But I don't know because I

COTMSJ0251

43

MIKE GAMEZ
4/11/2024

```
 1                        CERTIFICATE

 2   STATE OF ARIZONA      )
                          )
 3   COUNTY OF PIMA        )

 4          BE IT KNOWN that the foregoing deposition was
     taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
 5   No. 50014 in the State of Arizona; that MIKE GAMEZ was duly
     sworn by me according to law; that the proceedings were
 6   taken down by me and reduced to writing under my direction;
     that the preparation, production and distribution comply
 7   with law and code; that the foregoing 41 pages are a full,
     true and accurate record, all done to the best of my skill
 8   and ability.

 9          I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
10   outcome hereof.

11          (XX) Review and signature was waived.

12          (  ) Review and signature was requested.

13          (  ) Review and signature was not requested.

14          I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206 (F)(3) and
15   ACJA 7-206(J)(1)(g)(1) and (2).

16          DATED this 16th day of April, 2024.

17

18                       _____
                         RAYNBO SILVA, RPR, CR
19                       Certified Reporter
                         Arizona CR No. 50014
20

21          I CERTIFY that RAYNBO COURT REPORTING, LTD., has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                       _____
                         RAYNBO COURT REPORTING, LTD.
25                       Registered Reporting Firm
                         Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                    )
                                  )
                Plaintiff,        )
                                  )
          vs.                     )      No. CV22-00132-RCC
                                  )
City of Tucson, et al.,           )
                                  )
                Defendants.       )
_____ )

DEPOSITION OF JOSEPH GRADIAS

Tucson, Arizona

April 9, 2024

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

COTMSJ0253

| 1 | JOSEPH GRADIAS, |
|---|---|
| 2 | having been called as an adverse party on cross-examination, |
| 3 | having been first duly sworn to state the truth, the whole |
| 4 | truth and nothing but the truth, testified on his oath as |
| 5 | follows: |
| 6 | |
| 7 | CROSS-EXAMINATION |
| 8 | BY MR. GATTONE: |
| 9 | Q.   Sir, can you give us your name for the record? |
| 10 | A.   Yes.  My name is Joseph Gradias, G-R-A-D-I-A-S. |
| 11 | Q.   Have you ever had your deposition taken before? |
| 12 | A.   Yes. |
| 13 | Q.   What kind of case was it in?  Criminal?  Civil? |
| 14 | A.   Civil portion, but I guess related to a criminal |
| 15 | investigation. |
| 16 | Q.   Were you a defendant in that one or just a |
| 17 | witness? |
| 18 | A.   Witness. |
| 19 | Q.   Do you remember what the nature of the case was? |
| 20 | A.   It was a drowning at the Doubletree in Tucson. |
| 21 | Q.   Oh, okay.  All right.  And you're presently |
| 22 | employed by TPD? |
| 23 | A.   I am. |
| 24 | Q.   How long? |
| 25 | A.   January of 2013, so just over 11 years. |

COTMSJ0254

JOSEPH GRADIAS
4/9/2024

1      Q.   All right.  Great.  You said that now you're a

2  detective.  How long have you been in that position?

3      A.   I think close to three years.

4      Q.   Do you have any other law enforcement experience

5  other than TPD?

6      A.   Direct law enforcement, no.  I worked with law

7  enforcement, but that's not an official capacity.

8      Q.   How did you -- where was that?

9      A.   I was a, I guess, a student, I think I was in high

10  school, working for the counter narcotic -- I can't remember

11  the acronym, but it was for the attorney general's office.

12  I went undercover to purchase tobacco products while an

13  officer, while an undercover officer would observe the

14  transaction and cite the businesses that would fail to

15  comply with the law.

16      Q.   And that was here in Tucson?

17      A.   That was in Yuma, Arizona.

18      Q.   How long did you do that?

19      A.   I think at least two sessions.

20      Q.   So was it a school thing?  You got grades?

21      A.   It was like a volunteer thing.

22      Q.   Volunteer.  Great.

23          So based on what you told me, you were employed by

24  TPD on 3/22 of '20?

25      A.   Yes.

COTMSJ0255

JOSEPH GRADIAS
4/9/2024

 1        Q.    Not in the capacity as a detective but patrol duty
 2   at that time?
 3        A.    Correct.   Patrol officer.
 4        Q.    Do you recall what your shift was that day?
 5        A.    I believe it was seventeen hundred zero three.   I
 6   don't recall which days I was on and which I was off.
 7        Q.    Obviously you were on duty that day?
 8        A.    Correct.
 9        Q.    All right.  Have you read the complaint in this
10   matter, the lawsuit?
11        A.    I believe I've reviewed it once.
12        Q.    So you know what the case is about?
13        A.    Yes.
14        Q.    What's your understanding of what the lawsuit is
15   about?
16        A.    The lawsuit is against the officers and Tucson
17   Fire Department in the death of Mr. Alvarado.
18        Q.    Great.  So we understand his name, we're going to
19   be talking about Damien Alvarado --
20        A.    Okay.
21        Q.    -- as the deceased.  So sometimes I might say the
22   deceased.  Sometimes I might say Damien.  And we understand
23   who we're talking about; correct?
24        A.    Correct.
25        Q.    What did you do to prepare for today's deposition?

JOSEPH GRADIAS
4/9/2024

1        A.   I've just reviewed some of those documents that

2   have been related to this nature.   That includes, you know,

3   office of professional standards reports, documents I've

4   signed, documents that have been addressed to me, I think

5   transcripts of some of those documents.

6        Q.   Did you review your body-worn camera footage?

7        A.   I had a chance to review it last week.

8        Q.   Great.   Because we're going to talk about it today

9   and roll through it --

10       A.   Okay.

11       Q.   -- so I'm glad you had a chance to look it over.

12            Can you give us a thumbnail sketch of the training

13   you received to be a TPD officer?

14       A.   I'm sorry.   A thumbnail sketch?

15       Q.   Of your training in order to become a TPD officer?

16       A.   Just my training and experience?

17       Q.   Please.

18       A.   Okay.   I applied for the Tucson Police Department,

19   had passed their examinations.   Upon being hired I went

20   through their 16 week basic academy at the Southern Arizona

21   Law Enforcement Training Center.   I completed that.

22            I also completed a post basic training that was

23   consistent with Tucson Police Department specifically since

24   the original academy was for AZPOST certification, Arizona

25   police officer training.

JOSEPH GRADIAS
4/9/2024

1          Since then after the academy session I was in

2   patrol at a field training in the midtown division,

3   completed the field training.  I was able to practice and

4   administer my training through the academy for that.  Passed

5   the training session.  Was patrol officer for a brief stint.

6          Then after my probationary period I was prisoner

7   transport for approximately six months.  And after that I

8   returned to a patrol capacity at midtown.  And then from

9   there up until the event I believe I was a lead police

10  officer for my squad --

11      Q.   Okay.

12      A.   -- and division.

13      Q.   I'm sorry.  I cut you off.

14      A.   Lead police officer in my squad for that division,

15  midtown division.

16      Q.   Did that change after the incident?

17      A.   I don't believe so.  I believe I maintained that

18  capacity until a detective test opened and I applied and

19  passed.

20      Q.   What are you doing as a detective?

21      A.   I am currently assigned to the neighborhood crimes

22  section on the south side.  So right now that can involve

23  gun pointings, animal abuse or cruelty calls, organized

24  retail theft cases, burglaries, auto thefts.

25          Occasionally I've handled domestic violence

JOSEPH GRADIAS
4/9/2024

```
 1  cover two divisions at once.
 2       Q.   Do you know what channel you were listening to
 3  when you received the information about this incident?
 4       A.   I was, I believe I was on my midtown radio.
 5       Q.   Can you give me an idea of everything you heard on
 6  the radio when you were en route to the incident?
 7       A.   To my best memory there was a shooting on
 8  Fort Lowell and a white vehicle, I believe the initial
 9  description was a Hyundai vehicle, had left the scene of
10  that shooting.  And I believe I received updates that the
11  person that was shot in that incident was dead at the scene.
12       Q.   So someone was dead at the scene?
13       A.   Yes.
14       Q.   They gave you a description of the alleged
15  suspect?
16       A.   I believe there was a description.  I can't recall
17  the particulars as far as clothing, but I think a Hispanic
18  male was alleged to be described as the suspect at that
19  time.
20       Q.   Anything about a red hat or a gray hoody that you
21  recall?
22       A.   Not that I directly recall, but I'm sure there
23  would be radio transmissions to help refresh my memory if
24  that came to it.
25       Q.   So you get this call.  Tell me about were you --
```

JOSEPH GRADIAS
4/9/2024

1   there was an accident also.

2          Were you going to the accident?  Were you going to

3   the incident scene where the officers were?  Where were you

4   headed?

5       A.   Got you.  So I think I was initially responding to

6   assist with the homicide.  And I can't recall how the

7   information came or at what point in time, but there was

8   information that there was a white vehicle involved in an

9   accident on the border of our division and the west side

10  division on, I believe it was on Campbell.

11      Q.   Anything else about that incident you heard?

12      A.   Again, I don't recall since having -- knowing most

13  of the details at what specific time but that I think a

14  Hispanic male I think some sort of plaid shirt had fled from

15  the collision scene.  And at the time it was believed that

16  it could have possibly been related to the homicide.

17      Q.   It might have been related?

18      A.   Yes.  That was our understanding at the time.

19      Q.   So when you get the call -- and then you received

20  another call saying come to the alley behind the church,

21  there's something going on there?

22      A.   So I can probably give you some context.

23      Q.   Sure.  That would be great.

24      A.   So I believe from some of the documents I reviewed

25  I had checked a local park to see if the homicide suspect

JOSEPH GRADIAS
4/9/2024

1        A.   It could alter the blood chemistry.  It could

2   elevate the heart rates.  It could, you know, give them a,

3   you know, strength beyond their normal measure, itchiness,

4   irritability.

5        Q.   Can it impact their respiratory system, their

6   breathing?

7        A.   It's possible.

8        Q.   So I'm sorry.  Give me one second.

9             Have you ever heard or had training on the topic

10  of asphyxial --

11       A.   Positional asphyxia?

12       Q.   Yes.  I was about to say asphyxial position.  I've

13  said that so many times the last few days I got confused,

14  but thank you for correcting me.

15            Have you had any training on that?

16       A.   Yes.

17       Q.   What's your understanding of what that -- what's

18  the meaning of that term?

19       A.   I guess one core concept of that is, you know, you

20  know, being able to breathe and the positioning of the body

21  could affect one's breathing.  So whether someone's

22  breathing, you know, upside down, on their stomach, on their

23  side, standing up, seated, you know, laying down, all that

24  can depend upon their body, body positioning and that, you

25  know, the recovery position, which I would best describe it

JOSEPH GRADIAS
4/9/2024

 1   as maybe like a fetal position, you know, on their side, you

 2   know, legs slightly bent, that's one of the, I guess, best

 3   positions if someone's on the ground --

 4        Q.    Right.

 5        A.    -- to assist them with the breathing.

 6        Q.    So being on your stomach or in a prone position

 7   would be more difficult to breathe than being in the

 8   recovery position?

 9        A.    Yes.

10        Q.    Correct?

11              All right.  And how about if someone is pressing,

12   a person is on their stomach and people are applying weight

13   or weight is being applied to that person?  Could that also

14   affect their ability to breathe?

15        A.    Yes.  That can affect it.

16        Q.    All right.  What is your understanding of the term

17   excited delirium?

18        A.    I guess that's a, how I would describe it would be

19   more of a state of mind where I guess other factors, I

20   think, from my training it's been usually from some sort of

21   a drug affecting the person's ability to think, breathe or

22   heart rate, you know, give them an exceptional strength and

23   more or less, you know, less focus, I guess, or inability

24   to -- how am I phrasing this?

25        Q.    But it can affect their breathing or their

COTMSJ0262

JOSEPH GRADIAS
4/9/2024

1  ability -- their respiratory system?

2       A.   Yes.

3            MR. GATTONE:  Maybe we could start with the video.

4            Just let me check one thing.  We can start with

5  the video, please.

6            This is his body-worn camera.  I guess that would

7  be Exhibit A.

8            (Whereupon Exhibit A was marked for

9  identification.)

10           MS. WATERS:  Do you have a time stamp you want me

11 to --

12           MR. GATTONE:  Let's get to the point where he

13 first arrives, please.

14           MS. WATERS:  All right.

15           MR. GATTONE:  So if you could stop it there.

16           MS. WATERS:  Do you want me to go back because I

17 think he's already --

18           MR. GATTONE:  A little bit, if you would, please.

19           MS. WATERS:  It's not showing me, so I'm going to

20 have to keep hitting play until we find the right spot.

21           MR. GATTONE:  This is good.

22           MS. WATERS:  Okay.

23      Q.   So at this point you come on the scene, and

24 there's officers already there attempting to subdue

25 Mr. Alvarado; correct?

COTMSJ0263

JOSEPH GRADIAS
4/9/2024

1        A.   Correct.  And just before that I briefly checked

2   with the citizens involved.  I remember the dad breathing

3   heavily, bent over trying to catch his breath.  I can't

4   remember if the son was also out of breath, too.

5             I called out to my officers to see if they had the

6   situation handled.  I didn't get a response.

7             And I ran down to their area and then given all

8   the debris went around the big bush in the middle.

9        Q.   Now it was your understanding that -- did you get

10  information about these civilians pursuing Mr. Alvarado from

11  the accident scene?  Did you have any information about that

12  before you got there?

13       A.   Not other than I think what was originally relayed

14  over the radio.

15       Q.   So it was your understanding, though, that these

16  individuals may have been involved with a struggle with

17  Mr. Alvarado?

18       A.   Yes.

19       Q.   And I'm assuming these people were fine except the

20  father appeared to be out of breath?

21       A.   Yes.

22       Q.   Did you see any visible injuries on them?

23       A.   Not that I saw, but I think my interaction with

24  them was very brief.

25       Q.   My perception is that you're more watching the

JOSEPH GRADIAS
4/9/2024

1   scene and not necessarily taking part in the subduing; is

2   that a fair assumption?

3        A.   Yes.   Part of that is, you know, I had what, four

4   officers there by the time I got there, and I think he had

5   just been handcuffed prior to me physically getting to him.

6   So kind of trying to assist post handcuffing.

7        Q.   So he was in cuffs at that point when you first

8   came?

9        A.   He either was or was just barely getting into

10  cuffs.

11       Q.   All right.   Would you consider him to have been

12  subdued at that point?   He's on the ground.   There's

13  officers holding him down and he's in cuffs?

14            MS. WATERS:   Object to form.

15            But you may answer.

16            THE WITNESS:   What is your definition of subdued?

17  Just --

18       Q.   Obviously they had control of him?

19       A.   Most control, yes.

20       Q.   Do you see anything that would indicate to you

21  that he was still resisting?

22       A.   From this point in the video or just from my

23  knowledge?

24       Q.   From your recollection?

25       A.   I remember him, I think, either grabbing my arm or

RAYNBO COURT REPORTING, LTD.

COTMSJ0265

JOSEPH GRADIAS
4/9/2024

1  one of my hands and me grabbing his arm to prevent him from

2  grabbing around.   And then later we applied the TARP.

3      Q.   But obviously he's in cuffs, he's not able to

4  swing at the officers or attempt to hit the officers?

5      A.   Not swing.   I think his feet were moving around,

6  but I can't remember that all too well.

7      Q.   And you said there's at least three or four

8  officers on top of him or holding him down?

9           MS. WATERS:   Object to form.

10          But you may answer.

11          THE WITNESS:   I think they were all around him.   I

12  think one may have been more on top of him, but not everyone

13  was on top.

14     Q.   And he's on his stomach on the ground?

15     A.   Yes.

16          MR. GATTONE:   All right.   Can we go to 1:47,

17  please, or just a little bit before 1:47?

18          MS. WATERS:   I think so.   So close.   How about

19  1:43?

20          MR. GATTONE:   That's fine.

21          (Whereupon a video was played.)

22     Q.   You hear him -- can you stop it?

23          You hear him at that point say I can't breathe; is

24  that correct?

25     A.   Yes.

COTMSJ0266

JOSEPH GRADIAS
4/9/2024

```
 1              MS. WATERS:  It's okay.
 2         Q.   You heard him say I can't breathe?
 3         A.   Yes.
 4         Q.   And then the response was if you can complain you
 5    can breathe.  Am I correct in that?  Do you recall that?
 6         A.   Correct.
 7         Q.   Does that seem like a reasonable response to you?
 8              MS. WATERS:  Object to form.
 9              You may answer.
10              THE WITNESS:  I would say no.
11         Q.   And obviously you didn't make that statement?
12         A.   No.  I believe I saw in the lawsuit mentioned me
13    saying that, but I believe that was wrong.
14         Q.   We'll check on that.
15              I'm sorry.  Is this 6:55?  Could we go to 7:20?
16              MS. WATERS:  I think so.
17              MR. GATTONE:  That should do it.  I think it's --
18              MS. WATERS:  Okay.  7:15.
19              (Whereupon a video was played.)
20         Q.   So you heard him again indicate he couldn't
21    breathe?
22         A.   Correct.
23         Q.   And you heard the officer's responses?
24         A.   Yes.
25         Q.   Did that seem reasonable to you?
```

COTMSJ0267

JOSEPH GRADIAS
4/9/2024

1          THE WITNESS:  I think so given what was taking

2     place at that time.

3     Q.   Was he still, do you still consider him to be

4     under control at this point?

5     A.   Under control, no.  I think something happened to

6     where he needed to -- I guess something needed to change to

7     get him under some control.  I think, I think this was

8     the -- I don't know if this was a reapplication of the TARP

9     or not.

10    Q.   I'm not certain, but let's talk about that for a

11    minute.  So do you know when the TARP was applied?

12    A.   I don't recall particular times.  I think

13    initially when I responded I believe we had used the TARP.

14    It may have been my TARP.  I usually kept mine around my

15    belly, kind of like a belt, it was a little bit higher, just

16    for ease of access.  Some officers have it in their pocket.

17    Some have it wrapped around their leg.

18    Q.   Do you believe it was appropriate or reasonable to

19    apply a TARP to someone who indicated multiples times that

20    they couldn't breathe?

21          MS. WATERS:  Object to form.

22          You may answer.

23          THE WITNESS:  Yes.  I don't believe the TARP is

24    preventing any of the breathing if administered properly.

25    Q.   Was he on his stomach at the time?

COTMSJ0268

JOSEPH GRADIAS
4/9/2024

1   recall getting on the radio to advise meds to return.

2              However, I also, I think, ran and tried to yell

3   out to, I think, another officer that was nearest to the

4   ambulance that was, you know, like half a block away to tell

5   them to come back because doing that would probably be a

6   little faster than having like whoever's listening to the

7   radio to interpret that, to switch to their frequency, to

8   contact fire and figure out, you know, which unit that is

9   that they need to contact and then relay that information

10   for them to understand it and come back.

11       Q.   So tell me how that happened.  You're about a car

12   length away.  You're talking to other officers.

13            Did someone say hey, there's a problem, hey, he

14   stopped breathing?  How do you find that out?

15       A.   I think I overheard one of the officers say he's

16   not breathing from other officers that were watching

17   Mr. Alvarado and then attempted to act once that information

18   came.

19       Q.   And this happened pretty quickly after the

20   firefighters starting to leave, started to leave the scene

21   that first time; correct?

22       A.   Yes.

23       Q.   Matter of minutes?  A matter of a minute?  Can you

24   give us some idea?  It seems pretty quick.

25       A.   Maybe a minute.  I don't recall those details.

COTMSJ0269

JOSEPH GRADIAS
4/9/2024

1        Q.    Do you have any indication as to why his medical

2   situation deteriorated so quickly?

3        A.    I do not, no.

4        Q.    And he was under control at the time?

5        A.    Yes.

6        Q.    No more resisting?

7        A.    No.

8        Q.    So you run to get the firefighters.  What happens

9   next?

10       A.    I think I checked one of the vehicles that had

11   been brought closer to the scene, the scene being where this

12   is, this is at on the camera view, to see if there was an

13   AED inside that vehicle, but there wasn't one.

14       Q.    ADD is?

15       A.    AED.

16       Q.    AED?

17       A.    Automated external defibrillator.

18       Q.    Right.  To jump start his heart or whatever

19   they --

20       A.    Yes.

21       Q.    -- they do?

22            So someone indicates he's not breathing.  Did they

23   indicate anything about could they detect a heartbeat, a

24   pulse?

25       A.    That I'm not sure.  I think at that point had

JOSEPH GRADIAS
4/9/2024

1  tried to have meds do what they can since they had better

2  equipment.

3       Q.   And it's your, from your position you could see

4  him, I'm assuming, not moving, Mr. Alvarado?

5       A.   Yes.

6       Q.   And is he turning blue?  Is he -- does he look

7  normal to you?  Or is there something that makes you think

8  that there's something seriously wrong?

9       A.   I can't remember as far as, you know, color

10  complexion.  I think I at least remember him not moving.

11       Q.   And at least not breathing?

12       A.   I don't think I was close enough to tell if he was

13  breathing, but I think I could assume no.

14       Q.   Because the officer was applying CPR or was doing

15  CPR to him?

16       A.   Yes.

17       Q.   And in your training and experience when would you

18  do CPR?

19       A.   Typically when someone's not breathing or I can't

20  feel a pulse.

21       Q.   So we could assume that one or both of those

22  conditions were present in order for the officers to feel

23  they needed to perform CPR?

24       A.   Correct.

25            MR. GATTONE:  All right.  One minute, please.  I

COTMSJ0271

JOSEPH GRADIAS
4/9/2024

```
1                          CERTIFICATE

2    STATE OF ARIZONA      )
                           )
3    COUNTY OF PIMA        )

4           BE IT KNOWN that the foregoing deposition was
     taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
5    No. 50014 in the State of Arizona; that JOSEPH GRADIAS was
     duly sworn by me according to law; that the proceedings were
6    taken down by me and reduced to writing under my direction;
     that the preparation, production and distribution comply
7    with law and code; that the foregoing 46 pages are a full,
     true and accurate record, all done to the best of my skill
8    and ability.

9           I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
10   outcome hereof.

11           (XX) Review and signature was waived.

12           (  ) Review and signature was requested.

13           (  ) Review and signature was not requested.

14           I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206 (F)(3) and
15   ACJA 7-206(J)(1)(g)(1) and (2).

16           DATED this 15th day of April, 2024.

17

18                          _____
                            RAYNBO SILVA, RPR, CR
19                          Certified Reporter
                            Arizona CR No. 50014
20

21           I CERTIFY that RAYNBO COURT REPORTING, LTD., has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23
                            _____
24                          RAYNBO COURT REPORTING, LTD.
                            Registered Reporting Firm
25                          Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA


Irene Briesno,                        )
                                      )
                Plaintiff,            )
                                      )
          vs.                         )        No. CV22-00132-RCC
                                      )
City of Tucson, et al.,               )
                                      )
                Defendants.           )
_____)




DEPOSITION OF DONOVAN VANCE

Tucson, Arizona

April 8, 2024








RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169


Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

COTMSJ0273

DONOVAN VANCE
4/8/2024

1          Q.    -- because it makes Raynbo's job easier and makes

2     her mad.

3                Sir, how are you employed?

4          A.    With the Tucson Police Department.

5          Q.    How long have you been with TPD?

6          A.    Four and a half years now.

7          Q.    What did you do before that?

8          A.    I worked or went to college and then worked in

9     customer service at restaurants and such.

10         Q.    No prior law enforcement experience?

11         A.    No.

12         Q.    I'm sorry.  Did I ask you how long you've been

13    with TPD?

14         A.    Yes.

15         Q.    And sir, can you give me just a thumbnail sketch

16    of your training?

17         A.    I was hired in September of 2019 where I attended

18    the Southern Arizona Law Enforcement Training Center or the

19    academy where, you know, over the course of six months

20    trained on Arizona Revised Statutes, constitution, basic

21    first aid and other various topics throughout the course of

22    the academy.

23         Q.    And then you get a job with TPD.  You ride along

24    with someone for awhile, a training officer?

25         A.    Yeah.  And so --

DONOVAN VANCE
4/8/2024

1      Q.   And then you get to do it yourself?

2      A.   Correct.

3      Q.   So you said at the academy you had some basic

4   first aid?

5      A.   Yes.

6      Q.   Have you had any other medical training beyond

7   that?

8      A.   No.

9      Q.   You're not a -- you've never taken an EMT course?

10     A.   No EMT.

11     Q.   Now do you know why we're here today?

12     A.   Yes.

13     Q.   What did you do to prepare for today's deposition?

14     A.   I reviewed my body-worn camera, my supplement, in

15   addition to the interview that I provided to the detective

16   that arrived that day.

17     Q.   Great.  And do you know when that happened in

18   relation to the incident?

19     A.   When did what happen?  I'm sorry.

20     Q.   Your interview?

21     A.   Interview with the detective --

22     Q.   Yes.

23     A.   -- was within a few hours of the actual incident

24   taking place.

25     Q.   Sir, have you ever been the subject of an OPS or

COTMSJ0275

DONOVAN VANCE
4/8/2024

1      Q.   What kind of things have you been reprimanded for,

2   if you recall?

3      A.   For not notifying a supervisor, for losing

4   property or basic collisions while on duty.

5      Q.   Nothing juicy; huh?

6      A.   No.

7      Q.   You're no fun.  So you were -- I'm sorry.  Let me

8   back up for a second.

9           You were with TPD on March 22nd of 2020?

10      A.   I was.  I was in field training at the time.  I

11   had graduated from the academy in February of 2020, so I was

12   about a little over a month removed from graduating academy.

13      Q.   And who was your training officer?

14      A.   On that day?

15      Q.   Yes.

16      A.   It was Officer John Jackson.  My assigned field

17   training officer was absent that day, and so that was

18   Officer Bogee (phonetic), which I had provided that

19   information to the detective as well.  But my primary

20   training officer was not there that day, so I was with

21   another field training officer.

22      Q.   And how does that work?  You just ride around with

23   them?  You're doing the things they do?  You answer

24   complaints or calls and pretty much do normal stuff but just

25   with someone else there?

COTMSJ0276

DONOVAN VANCE
4/8/2024

1      A.    Yes.   Another officer that's providing supervision

2  to me during the course of the learning process of becoming

3  a police officer.

4      Q.    Because you're a newbie, so they have someone

5  watching you?

6      A.    Right.   Got it.

7      Q.    I guess you would say a rookie but --

8      A.    Yeah.

9      Q.    So you're at -- where were you stationed at the

10  time of this incident?

11      A.    Stationed with the operations divisions west,

12  which is 1310 West Miracle Mile.

13      Q.    And what team is that?

14      A.    Team two.

15      Q.    Team two.   Okay.

16          Now on 3/22 of '20 you were on duty with Officer

17  Jackson that day.   And do you get -- sometime there was --

18  prior to the incident, you know, the incident we're talking

19  about with Mr. Alvarado, did you receive a call for

20  assistance?

21      A.    There was a call for service for reference a motor

22  vehicle accident that had occurred at Prince and Campbell.

23      Q.    Did you go to the scene?

24      A.    I did.

25      Q.    And what did you see when you got there?

DONOVAN VANCE
4/8/2024

1    A.   When I arrived at Prince and Campbell, there was

2  vehicles parked in the -- or not parked but they were

3  crashed in the intersection with an officer conducting point

4  control of making sure that no other vehicles collide with

5  those two vehicles.

6         And then while en route there was information that

7  there was a reporting party, someone calling 911 saying that

8  one of the individuals had fled from the accident and that

9  they were located in the alleyway kind of just east of that

10  intersection.

11    Q.   What kind of -- did you see at the scene what kind

12  of vehicle the person that ran away was driving?

13    A.   I can't recall at this time.  If I were to review

14  potentially the public record evidence and things like that,

15  I could -- I would know.

16    Q.   Would it be -- would it refresh your recollection

17  if I say it was a white SUV?  Does that strike anything in

18  your memory?

19    A.   I believe so.

20    Q.   So you get over to the accident.  How long are you

21  at the accident before you hear about the other incident in

22  the alley?

23    A.   It was at the same time, excuse me, that it was,

24  as I was responding.  And I kind of come through the

25  intersection, observe the vehicles and prior to actually,

DONOVAN VANCE
4/8/2024

1  you know, arriving to that intersection is when the

2  information is broadcast that the officers were with the

3  additional person that called --

4      Q.   Okay.

5      A.   -- that they were with them in the alleyway with

6  the driver that fled.  And so I didn't stay at the actual

7  collision scene very long, if that makes sense.

8      Q.   Could you see if there were any injured people at

9  the scene of the accident?

10      A.   It appeared to be a very significant collision

11  with the two vehicles involved.  At the time I didn't stop

12  long enough to actually evaluate and see the other drivers

13  to determine their extent of injuries.

14      Q.   So you hear that there's this broadcast, it's a

15  civilian is making a call that there's an officer involved

16  with a struggle or something with someone; correct?

17      A.   Correct.

18      Q.   So officer needs help?

19      A.   Correct.

20      Q.   So you cruise through the -- you made it through,

21  you went through the intersection.  And you're not far from

22  the scene of the call; correct?

23      A.   Correct.

24      Q.   Now tell me that was the only thing that you knew

25  was that they thought that the individual that Officer

COTMSJ0279

DONOVAN VANCE
4/8/2024

1  Solarino was struggling with was the individual who ran from

2  the scene of the accident?

3      A.   I'm sorry.  Could you repeat that question?

4      Q.   Sure.  So they call.  There's a call over the

5  radio, and it says that Officer Solarino needs help and that

6  he's in -- it might be, he might be struggling with the

7  person who ran away from the accident; correct?  Or that he

8  was?

9      A.   Correct.  I couldn't tell you his designator at

10 the time, but I knew that an officer was in a struggle with

11 the individual that had fled.

12     Q.   And that's the information that they got from the

13 civilians?

14     A.   Correct.

15     Q.   Now did you hear any other calls for service or

16 calls regarding anything else, anything else occurring in

17 that area?

18     A.   Not to my recollection.

19     Q.   So no -- so the only thing at least you knew that

20 the individual who ran from the scene was maybe guilty of

21 was leaving the scene of an accident; correct?

22     A.   To my knowledge at that point, yes.

23     Q.   How long does it take you to get to the scene of

24 the incident?

25     A.   Of which incident?

DONOVAN VANCE
4/8/2024

1          Q.    Where the officers were struggling with

2    Mr. Alvarado?

3          A.    Between the collision and the alleyway where the

4    struggle had occurred --

5          Q.    Uh-huh.

6          A.    -- it was within two minutes.  It was just mostly

7    trying to locate where they were.

8          Q.    So two blocks?  Three blocks?  Pretty close?

9          A.    Yes.

10         Q.    Now I keep saying Mr. Alvarado.  Can we agree that

11    the individual we are talking about, the deceased, his name

12    was Damien Alvarado?

13         A.    Yes.

14         Q.    You're aware of that?

15              You probably didn't know his name, you learned his

16    name later, I'm assuming?

17         A.    Correct.

18         Q.    So you rush over to the scene.  What do you see

19    when you get there?

20         A.    When I get there, there's officers from operations

21    division midtown, ODM, that had already placed Mr. Alvarado

22    into handcuffs.  And I responded pretty -- I was actually

23    pretty far away, I'd say like 30 yards from where

24    Mr. Alvarado was physically detained and checked in with a

25    couple of officers and then proceeded over to speak with one

RAYNBO COURT REPORTING, LTD.

COTMSJ0281

DONOVAN VANCE
4/8/2024

1   of the callers that reported that they had located him in

2   the alleyway and went to proceed to speak with that

3   individual and his father.

4        Q.   So how many officers were there when you got

5   there?

6        A.   From my recollection on the interview with the

7   detective it was at least five.

8        Q.   What was -- and you got a look at Mr. Alvarado or

9   the person that they detained or were detaining?

10       A.   From a distance, yes.

11       Q.   What did you see?  Was he cuffed?  Was he TARP'd?

12       A.   He from what I -- my recollection was he was

13   handcuffed on his side and then had one of the spit socks

14   on.

15       Q.   Did you get close enough to see whether he was

16   talking or yelling or doing anything along those lines?

17       A.   At that point no.

18       Q.   So you didn't see him fighting or struggling?

19   What was he doing?  Just laying there when you saw him?

20       A.   I was more focused on speaking with the other

21   officers that were a little distance away to ensure that

22   they were okay before proceeding to the witness and involved

23   citizens.

24       Q.   But you don't recall any -- nothing comes to your

25   memory about him fighting or yelling or cursing, anything

DONOVAN VANCE
4/8/2024

```
 1   along those lines?
 2       A.   Not to my recollection.
 3       Q.   Now sir, when you saw Mr. -- did Mr. Alvarado have
 4   the TARP on?  Was he TARP'd at that time?
 5           I may have already asked this question.  I'm
 6   sorry.
 7       A.   I was too far away to be able to see that.
 8       Q.   But at least at the time you got there he was
 9   under the officers' control?
10       A.   Correct.
11       Q.   You didn't see anyone struggling with him or
12   fighting with him?  You just saw him cuffed or at least
13   cuffed and on his side?
14       A.   Correct.
15       Q.   You wouldn't know how long he had been on his side
16   or if he had been on his stomach before then?
17       A.   No.
18       Q.   So you get there.  You see the officers there.
19           Is the Tucson Fire Department personnel there when
20   you first get there?
21       A.   When I first get there, no.
22       Q.   When do they come?
23       A.   I would say approximately five, between five
24   minutes from my arrival to the actual scene in the alleyway
25   there.  From my body-worn camera you can see as the
```

DONOVAN VANCE
4/8/2024

1      A.   Is what Jayce had disclosed, yes.

2      Q.   So he indicates that they're circling around.  The

3  father has a feeling.  They went back there.  They saw --

4  describe from there what he told you, if you recall.

5      A.   That Jayce explained that his father had -- was

6  trying to speak with Mr. Alvarado to figure out what was

7  occurring, if you will, that there was some back and forth

8  between them.

9           And then it was very shortly after this that

10 officers arrived and Mr. Alvarado attempted to escape.  And

11 so Jayce, his father and that officer, the three of them

12 attempted to gain control of Mr. Alvarado, who he says was

13 trying to jump over a wall in the alleyway.

14     Q.   All right.  And my understanding is that the

15 officer was Officer Solarino?

16     A.   I would have to review in order to know exactly

17 who it was.

18     Q.   Sure.  Again, by the time you got to the scene it

19 was -- he was under control, Mr. Alvarado was under control

20 and was on his side?

21     A.   Correct.

22     Q.   You didn't see any struggling or fighting that was

23 apparently took place before you got there; correct?

24     A.   At that time, correct.

25     Q.   All right.  How long did you stay with the

DONOVAN VANCE
4/8/2024

```
 1  civilians?
 2      A.   Possibly five or 10 minutes of just speaking with
 3  them to understood -- to ensure that I had an understanding
 4  of what they had perceived and what had occurred.
 5      Q.   They certainly weren't charged with anything;
 6  correct?
 7      A.   Not to my knowledge.
 8      Q.   All right.  When you were there, did you -- so all
 9  you knew was that Mr. Alvarado apparently left the scene of
10  an accident.
11           Did you ever learn anything about any other crimes
12  that he may have been suspected of?
13      A.   Based on what the officers were telling me on the
14  scene was that he had resisted, and based on what Jayce had
15  told me he was attempting to resist arrest by jumping over a
16  wall to escape.
17      Q.   So resisting arrest and fleeing the scene of an
18  accident, that would be the only crimes that you know or
19  believe that Mr. Alvarado committed?
20      A.   Those are the ones that I were aware of, but there
21  could have been others that I did not know of.
22      Q.   No one ever suspected other criminal activity on
23  his part?
24           MS. WATERS:  Object to form.
25           If you know, you may answer.
```

RAYNBO COURT REPORTING, LTD.

DONOVAN VANCE
4/8/2024

1   his legs, Mr. Alvarado's legs, at least from the body-worn

2   camera you can see it, and then while the officers searched

3   him for some sort of ID or something; correct?

4        A.   It was his hip.  My right hand was on

5   Mr. Alvarado's hip.  I wouldn't say it was necessarily leg.

6   So no.  It's kind of higher.

7        Q.   Who told you to do that?

8        A.   Sergeant Evans.

9        Q.   And he was the highest ranking officer on the

10  scene?

11       A.   The highest ranking that I observed.  And he had

12  directed me to take over control of Mr. Alvarado.

13       Q.   How many officers were actively involved in

14  holding him -- so you're holding him just so that nothing

15  happens while the officers search him for his ID?

16       A.   Correct.

17       Q.   And you were the only officer doing that?  Or were

18  there other officers that were holding some part of --

19       A.   There's other officers as well.

20       Q.   How many?

21       A.   Officer Durazo was on the other side of

22  Mr. Alvarado while Officer Santa Maria was attempting to

23  locate identification.

24       Q.   So there's two officers.  You and Durazo are hands

25  on him?

DONOVAN VANCE
4/8/2024

1        A.    Correct.

2        Q.    All right.  What is, what is Mr. Alvarado doing at

3   this point?  He's calm?

4        A.    At this point he's calm and laying on his side.

5        Q.    You told the investigator that he wasn't saying

6   anything, he was just laying there?

7        A.    Correct.

8        Q.    Did he appear normal?  Did he appear to be

9   breathing?  Or what was his -- besides being compliant and

10  not making noise or anything how did he look to you?

11       A.    He appeared like dusty, if you will, from the dirt

12  in the alleyway as if he were involved in a struggle

13  previously and otherwise was laying on his side.

14       Q.    He's just laying there, not cursing, not -- you

15  told --

16       A.    At that point.

17       Q.    -- you told the investigators he didn't say

18  anything?

19       A.    At that point, correct.

20       Q.    Now you also told the investigator that as TFD was

21  clearing the scene you were holding him or assisting to hold

22  him and that you heard a gurgling sound coming from

23  Mr. Alvarado; did I get that correct?

24       A.    Correct.

25       Q.    Silly, but can you describe the sound?

DONOVAN VANCE
4/8/2024

1        A.   Like it appeared that like a difficulty to breath,

2   if you will, but.

3        Q.   So the gurgling at least in your training and

4   experience indicated that he might be having trouble

5   breathing?

6        A.   At that point correct.

7        Q.   Had you been there at any point where Mr. Alvarado

8   was still talking and moving around where he said he could

9   not breathe?

10       A.   No.

11       Q.   Did any other officers indicate to you that

12   Mr. Alvarado had said multiple times that he can't breathe

13   or he couldn't breathe?

14       A.   No.

15       Q.   So at this point you hear him gurgling.  It

16   appears that he, at least from your perception, he was

17   having difficulty breathing?

18       A.   Correct.

19       Q.   So sort of like (indicating)?  Something along

20   those -- I'm sorry.  You can't get that on the record.

21       A.   I was like -- correct.

22       Q.   I just made a noise kind of like sucking in

23   partial air.  That's kind of what it sounded like?

24       A.   Yes.

25       Q.   At that point did you call TFD back, personnel

DONOVAN VANCE
4/8/2024

1  back?  Or who said go get them?

2       A.   Another officer.  I don't believe that I did to my

3  memory.

4       Q.   You're still, you're still doing what you were

5  doing?

6       A.   I -- at that point we rolled him onto his back.  I

7  believe I attempted the sternum rub that they teach in the

8  academy to check for responsiveness, and then Officer

9  Santa Maria started compressions.

10       Q.   So you're doing a chest rub, he's unresponsive?

11       A.   Correct.

12       Q.   So it indicates in your -- what does it indicate

13  in your mind or from your training?

14       A.   That CPR needed to be started because there's some

15  sort of potential cardiac emergency.

16       Q.   Did you -- did anybody check to see if he was

17  breathing at the time?

18       A.   I believe that officers checked for a pulse and

19  then immediately went to compressions.

20       Q.   Do you know who checked for the pulse?

21       A.   I'd have to review my body-worn camera to --

22       Q.   Do you know if they indicated to you that there's

23  no pulse, something along those lines?  Did you hear that?

24       A.   I believe so.

25       Q.   And what do you do at that point?

COTMSJ0289

DONOVAN VANCE
4/8/2024

1        A.    At that point I, as best I can, attempt to assist

2   Officer Santa Maria, who initiated the CPR, the chest

3   compressions.

4        Q.    When you roll him on your back -- or his back,

5   he's still restrained?

6        A.    Yes.

7        Q.    Does he still have the TARP on and the handcuffs?

8   Or --

9        A.    Correct.

10        Q.    So he's laying, his torso's on the ground, but his

11   legs would be up; correct?  Do you know what I'm getting to?

12        A.    No, I don't.  I'm sorry.

13        Q.    So if he's TARP'd, his legs would be up towards

14   his head; correct?

15        A.    No because I was on his side or on his right side,

16   if you will, and his back was flat and his feet were, were

17   below his hips if that makes --

18        Q.    Officer Santa Maria starts doing chest

19   compressions.  So what do you do?

20        A.    After watching body-worn, you know, I remove his

21   glasses because they're starting to fall off because he was

22   actively providing CPR.  We make the determination to take

23   the handcuffs and the restraints off to help assist with

24   effective compressions.

25              So myself and another officer take the handcuffs

DONOVAN VANCE
4/8/2024

1    off and roll him back onto his side, which is about the time
2    that whichever officer was able to recontact the paramedic
3    units from the fire department they arrived back into that
4    position and was informed by the personnel with the fire
5    department that we needed to get him to a gurney in order to
6    effect -- to provide better, effective CPR and to transport
7    to the hospital in a quicker manner.

8        Q.    So did someone direct you to take off the
9    restraints or you just decided on your own that that's what
10   needed to be done?

11       A.    I, I can't recall.

12       Q.    So either someone told you or you just --

13       A.    Or --

14       Q.    -- decided look, we got, I got to do this?

15       A.    Yes.   Wanted to.

16       Q.    My understanding is so someone takes the cuffs
17   off?

18       A.    I did, yes.

19       Q.    And you cut the -- I think you or someone else cut
20   the cord, so to speak, the cord that's holding his legs to
21   the cuffs?   Am I mistaken?

22       A.    What do you mean by the cord?

23       Q.    How did you get the TARP off?

24       A.    Another officer was the one that -- my primary
25   focus and role at that point was the handcuffs so.

COTMSJ0291

DONOVAN VANCE
4/8/2024

1       Q.   So you take off the handcuffs.  I'm assuming he's

2   still unresponsive?

3       A.   Correct.

4       Q.   All right.  Are the chest compressions still being

5   done by Officer Santa Maria before the -- when the

6   firefighters get there?

7       A.   If -- I would have to refer to my body-worn

8   camera, but I believe that the timing was that we were able

9   to remove the restraints and roll him back onto his back is

10  about the time that the first personnel from the fire

11  department arrived in a closer proximity.  And that's where

12  it was designated we needed to pick him up out of that alley

13  spot because there was very minimal space for anyone because

14  there was kind of a con, or not concrete but construction

15  box that was in the immediate vicinity that made it

16  difficult for more than three or four people to be there.

17      Q.   Excuse me.  All right.

18           So let's talk about time frame.  How long do you

19  think it was between the time you came and were holding him

20  by the hip and the time when he went into cardiac arrest?

21      A.   I would have to review my body-worn camera for

22  that.

23      Q.   It was pretty quick?

24      A.   Correct.

25      Q.   And shortly after the TFD personnel left it was

DONOVAN VANCE
4/8/2024

1  clear he was in medical distress?  Does that make sense?

2      A.   No.  I'm sorry.  Can you repeat that?

3      Q.   So the TFD people are clearing the scene.  You're

4  holding him there.  It becomes clear pretty quick that he

5  needs -- that he's in trouble, that he's maybe in cardiac

6  arrest; is that correct?

7          MS. WATERS:  Object to form.

8          But you can answer.

9          THE WITNESS:  To my understanding of the question

10 is that once I, you know, hands on, as you referenced

11 earlier, that the paramedics were leaving and had conducted

12 their evaluations, and then once we realized that he needed

13 further emergency care we hailed the appropriate units that

14 have training in that.

15     Q.   And all that happened pretty quickly after the

16 firefighters left or the initial time when they were

17 clearing the scene?

18     A.   Correct.

19     Q.   All right.  The firefighters come back, and what

20 do you do?

21     A.   I assist to lift Mr. Alvarado.  I grab him by the

22 right arm in order to help move him over to the gurney,

23 again, based on the terrain of the construction box that was

24 right there, and place him onto the gurney where the

25 personnel from the fire department resume the CPR.

COTMSJ0293

DONOVAN VANCE
4/8/2024

1    Q.   When you first came over and you were holding him
2    by the hip there, did he have a spit sock or spit socks on
3    him?

4    A.   He had, yes.

5    Q.   Do you know if there was one or two?

6    A.   I don't.

7    Q.   But this was before, he had them on before you
8    heard the gurgling?

9    A.   Correct.

10   Q.   All right.  Did anyone ever take them off him?

11   A.   Yes.

12   Q.   Who took them off?  Do you remember?

13   A.   I would have to review the body-worn camera again,
14   but I believe I may have and maybe with assistance of
15   another officer.

16   Q.   Why did you take them off?

17   A.   It was as CPR was in progress.

18   Q.   And you were afraid that they would keep him from
19   being able to breathe properly or to --

20   A.   No.  It was just one of those things to have one
21   less thing in order to view or to be able to look at his
22   person.

23   Q.   And you've had training in the application and use
24   of spit socks?

25   A.   Correct.

COTMSJ0294

DONOVAN VANCE
4/8/2024

1    Q.   In your understanding when is it appropriate to

2  apply a spit sock to someone?

3    A.   When an individual is either spitting at officers

4  or other people or biting.

5    Q.   And then you put the spit sock on?

6    A.   Yes, if they are.

7    Q.   And is it ever appropriate to apply two spit

8  socks?

9    A.   There's no reason why you couldn't because there's

10  no -- it doesn't affect your ability to breathe.  It's a

11  mesh material that just helps to prevent the biohazard of

12  saliva to be airborne towards individuals.

13    Q.   When you got there, did anyone indicate to you

14  that he had been spitting or throwing up or anything that

15  they were concerned about?

16    A.   By the very nature of the spit sock being applied

17  I had made the assumption.  I don't recall it being ever

18  explicitly expressed to me.

19    Q.   Have you ever applied a spit sock to anyone?

20    A.   I believe so.

21    Q.   Have you ever applied two spit socks to anyone?

22    A.   No.

23    Q.   At least from your perspective did you pull one

24  off and then the other?  Or did you pull them both off at

25  once?

DONOVAN VANCE
4/8/2024

```
 1        A.   What do you --
 2             MS. WATERS:  Objection.
 3        Q.   The spit socks.  So did you -- there's two on him.
 4   Did you take one off and then take the other one off or just
 5   pull them both off together, if you recall?
 6        A.   If memory serves correctly, both because they were
 7   both on.
 8        Q.   You took them both off at once?
 9        A.   Correct.
10        Q.   Did they both appear to be properly applied?
11        A.   I didn't inspect them at all.
12        Q.   And my understanding is that both of them were
13   those over the head ones that have like a piece that blocks
14   the mouth and nose to keep stuff from coming out; is that
15   correct?
16        A.   I guess I just don't understand what you mean by
17   locks the mouth and nose.
18        Q.   Let's not worry about that.  But it's the kind
19   that goes over their head?
20        A.   Correct.
21        Q.   And that's standard TPD issued?
22        A.   At the time it was, yes.
23        Q.   Did anyone give you any information that he may
24   have -- they had suspected he may have been -- he had
25   ingested drugs prior to that or he displayed any symptoms
```

COTMSJ0296

DONOVAN VANCE
4/8/2024

1   that may be consistent with drug ingestion?

2       A.   At the time of holding physical control of him,

3   no.

4       Q.   No one said anything?  Did anyone -- so but if

5   you -- in your training and experience if someone has

6   ingested certain illegal drugs it could have an impact on

7   their cardiovascular or pulmonary system; is that -- am I

8   correct?

9       A.   Yes.

10      Q.   What effect does methamphetamine have on the human

11  body, if you know?

12      A.   It heightens the blood pressure.  It causes the

13  heart to beat and increase along with other physiological

14  effects.

15      Q.   If a person is in medical distress, should they

16  still be restrained in the way he was?

17          MS. WATERS:  Object to form.

18          But you can answer.

19          THE WITNESS:  Once we figured out that he was in

20  medical distress we moved pretty quickly in order to attempt

21  to either, one, the primary focus was to initiate CPR,

22  resuscitation efforts, and then remove those items of the

23  handcuffs and what have you once it was -- we knew that the

24  paramedics were coming back.

25      Q.   And what do you see when the paramedics come back

DONOVAN VANCE
4/8/2024

```
 1   to the scene?
 2           Were you still -- the paramedics come back.  He's
 3   now on his back and Santa Maria is doing chest compressions.
 4   What do you see when -- do you step away when the paramedics
 5   come back?  Do you stay in that general vicinity?
 6       A.   As the paramedics came back, as I mentioned, I
 7   physically helped assist --
 8       Q.   Oh.  Right.
 9       A.   -- and pick up Mr. Alvarado onto the gurney and
10   observed the personnel from the fire department reinitiate
11   the CPR.
12       Q.   And at that point I'm assuming he was
13   unresponsive?
14       A.   Correct.
15       Q.   Sort of like a dead weight?
16       A.   Correct.
17       Q.   Do you know if he -- and you can assume he was not
18   breathing and he had no heart activity at that point?
19       A.   I am not trained in the medical field.  I haven't
20   taken any EMT or other courses.
21       Q.   But what is the reason in your training and
22   experience for doing CPR?
23       A.   To attempt to restart the heart is the layman's, I
24   guess, terms for it.
25       Q.   So by extension it would appear that because they
```

COTMSJ0298

DONOVAN VANCE
4/8/2024

1      Q.   Oh, my.  Can you give us a little bit of the
2  details?
3      A.   The subject had a firearm, refused to exit the
4  residence and emerged with the firearm, had it pointed at
5  officers --
6      Q.   Okay.
7      A.   -- and was struck by officers' gunfire.
8      Q.   So certainly a different situation from the
9  situation with Mr. Alvarado?
10      A.   Correct.
11      Q.   I mean yeah.  I assume getting hit with a bullet
12  is medical distress, but it's very different from
13  Mr. Alvarado's situation?
14      A.   Correct.
15      Q.   I'm sorry about that.  Was that your bullet or
16  someone else's bullet?
17      A.   Someone else's.
18      Q.   I think I almost might be done.  Let me just look
19  over the notes.
20           Oh, right.  A couple of things.
21           I've asked all the officers.  Sir, do you know
22  what positional asphyxia is?
23      A.   Yes.
24      Q.   What is your understanding of that concept?
25      A.   It is the compression of someone's diaphragm,

DONOVAN VANCE
4/8/2024

```
 1   their chest and lungs where with each exhale it shortens the
 2   amount of space in the lungs.
 3         Q.   And that would inhibit their ability to breathe
 4   normally?
 5         A.   Correct.
 6         Q.   How long should someone be on their stomach before
 7   they should be put in a recovery position?
 8         A.   Well --
 9              MS. WATERS:   Object to form.
10              But you can answer.
11         A.   As long as it is necessary in order to either
12   detain that person or that they're no longer a danger to
13   self or others or as quickly as feasibly possible put them
14   into the recovery position.
15         Q.   How about if a number of people are applying force
16   to the individual in an attempt to restrain him, could that
17   impact the issue of positional asphyxia or could that make
18   it harder for someone to breathe?
19              MS. WATERS:   Object to form.
20              But you can answer.
21              THE WITNESS:   If the amount of force is that
22   enough to, you know, be similar to gravity on the person's
23   chest, yes.  But if it's holding other areas, such as arms,
24   legs, potentially it wouldn't have that same effect on the
25   ability to breathe.
```

COTMSJ0300

DONOVAN VANCE
4/8/2024

```
 1        Q.   So if someone has their knee on his torso, it
 2   might be the sort of pressure that may inhibit their ability
 3   to breathe?
 4              MS. WATERS:  Object to form.
 5              You can answer.
 6              THE WITNESS:  It may affect it but not to the same
 7   extent as if someone were laying on their stomach, if you
 8   will.
 9        Q.   In your mind is there any set time limit that
10   someone should be on their stomach and not -- before they're
11   put in the recovery position?
12        A.   I mean as soon as reasonably possible to put them
13   into the recovery position.
14        Q.   If someone indicated to you that they couldn't
15   breathe, what would you do?
16              MS. WATERS:  Object to form.
17              But you may answer.
18              THE WITNESS:  If they were telling me that they
19   could not breathe, I would instruct them to continue to
20   attempt, you know, to take deep breaths, such as if you
21   were, you know, to run a mile right now you would have that
22   feeling and say that I couldn't breathe.
23              Even the most in shape person would still have a,
24   you know, lessened ability to have that oxygen because they
25   just exerted in a physical activity, if you will.
```

RAYNBO COURT REPORTING, LTD.

DONOVAN VANCE
4/8/2024

```
1              So with the time, as time passes, your body
2    returns to normal.  So in that instance I would instruct
3    someone to continue to take deep breaths in order to
4    increase their intake of oxygen in order to slow down their
5    heart rate and things of that nature.
6         Q.   What if they indicate to you multiple times that
7    they can't breathe, would that concern you?
8         A.   The fact that they're able to vocalize that I
9    would still seek further expertise from paramedics or other
10   medical professionals as such is appropriate.
11        Q.   So in your opinion if someone can talk they can
12   breathe?
13             MS. WATERS:  Object to form.
14             But you can answer.
15             THE WITNESS:  Their ability is enough to exhale,
16   you know, breath and the fact that they're able to utter
17   those words, whereas if there was the guttural breathing, as
18   you demonstrated earlier, then it's a better example that
19   they may not actually be physically able to breathe.
20        Q.   Sir, do you know the concept of excited delirium?
21        A.   Yes.
22        Q.   And what is that?
23        A.   In most cases it could be induced by drug related
24   issues in which the person has an elevated heart rate and
25   such and that they're unable to take control or their
```

COTMSJ0302

DONOVAN VANCE
4/8/2024

1   physiological response to either drug use or otherwise has

2   inhibited their ability to regulate their body temperature

3   and other things.  They sweat profusely.  Their

4   decision-making may be compromised, things of that nature.

5       Q.   Could -- oh, I'm sorry.  I cut you off.

6       A.   No.

7       Q.   Could it impact their ability to breathe?

8       A.   It could potentially based on the fact that their

9   heart rate is elevated, their physiological response, as I

10   mentioned, their body may not be in tune as it would be if

11   they were not experiencing that situation.

12       Q.   In your training and experience can the ingestion

13   of methamphetamine impact the functioning of your body?

14       A.   Yes.

15       Q.   How?

16       A.   In the ways that I mentioned as far as the

17   increased heart rate, inability to regulate body temperature

18   and such.

19       Q.   Ability -- does it impact your respiratory system,

20   too?

21       A.   It could have those effects on that.

22       Q.   So potentially it could inhibit your ability to

23   breathe normally?

24       A.   It could.

25           MR. GATTONE:  I think I may be done.  That was a

COTMSJ0303

DONOVAN VANCE
4/8/2024

1   quick one.

2

3                        EXAMINATION

4   BY MS. WATERS:

5        Q.   I only have a couple.

6             Officer Vance, when you first took over standing

7   by plaintiff and you had your hand on his hip, did he appear

8   to be in any medical distress to you at that point?

9        A.   At that point no.

10       Q.   What was your first indication that he was in

11  medical distress?

12       A.   The first indication was the guttural breathing as

13  we discussed earlier.

14       Q.   Is that what you described as gurgling?

15       A.   The gurgling, yeah.

16       Q.   Once you noticed the gurgling how quickly did you

17  and other officers react?

18       A.   I would say almost immediately.  And like, as I

19  mentioned, I attempted the sternum rub to check for

20  responsiveness, and then very shortly thereafter was the

21  life-saving efforts initiated.

22            MS. WATERS:  No additional questions.

23            MR. GATTONE:  Just one.

24  . . . .

25  . . . .

DONOVAN VANCE
4/8/2024

```
 1                          CERTIFICATE

 2   STATE OF ARIZONA      )
                           )
 3   COUNTY OF PIMA        )

 4            BE IT KNOWN that the foregoing deposition was
     taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
 5   No. 50014 in the State of Arizona; that DONOVAN VANCE was
     duly sworn by me according to law; that the proceedings were
 6   taken down by me and reduced to writing under my direction;
     that the preparation, production and distribution comply
 7   with law and code; that the foregoing 43 pages are a full,
     true and accurate record, all done to the best of my skill
 8   and ability.

 9            I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
10   outcome hereof.

11            (XX) Review and signature was waived.

12            (  ) Review and signature was requested.

13            (  ) Review and signature was not requested.

14            I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206 (F)(3) and
15   ACJA 7-206(J)(1)(g)(1) and (2).

16            DATED this 12th day of April, 2024.

17

18                        _____
                          RAYNBO SILVA, RPR, CR
19                        Certified Reporter
                          Arizona CR No. 50014
20

21            I CERTIFY that RAYNBO COURT REPORTING, LTD., has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                        _____
                          RAYNBO COURT REPORTING, LTD.
25                        Registered Reporting Firm
                          Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                        )
                                      )
                 Plaintiff,           )
                                      )
          vs.                         )      No. CV22-00132-RCC
                                      )
City of Tucson, et al.,               )
                                      )
                 Defendants.          )
_____)

DEPOSITION OF SCOTT ELLIS

Tucson, Arizona

April 10, 2024

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

SCOTT ELLIS
4/10/2024

```
 1                         SCOTT ELLIS,

 2   having been called as an adverse party on cross-examination,

 3   having been first duly sworn to state the truth, the whole

 4   truth and nothing but the truth, testified on his oath as

 5   follows:

 6

 7                      CROSS-EXAMINATION

 8   BY MR. GATTONE:

 9        Q.   Sir, can you give us your name please?

10        A.   Scott Ellis.

11        Q.   And sir, how are you employed?

12        A.   I'm not.

13        Q.   Oh, you're not.  Okay.  Are you retired?

14        A.   Yes.

15        Q.   All right.  Did you retire from TPD?

16        A.   Yes.

17        Q.   How long were you with TPD?

18        A.   22 and a half years.

19        Q.   Wow.  Congratulations.

20        A.   Thank you.

21        Q.   How's your retirement going?

22        A.   Good.

23        Q.   All right.  Awesome.  When did you start working

24   with TPD?

25        A.   1998.
```

SCOTT ELLIS
4/10/2024

1      Q.   All right.  And you retired?

2      A.   '20.

3      Q.   '20.  Okay.  What was your last position with TPD?

4      A.   Patrol supervisor in operations division west.

5      Q.   And did you have any -- well, 22 years with TPD.

6   Did you have any other law enforcement experience before

7   that?

8      A.   No.

9      Q.   Sir, were you in that same position on 3/22 of

10  2020?

11     A.   Yes.

12     Q.   Sir, what did you do to prepare for your

13  deposition today?

14     A.   I reviewed my report.

15     Q.   Did you get a chance to look at your body-worn

16  camera?

17     A.   I did not.

18     Q.   Have you ever read the complaint in this case?

19     A.   No.  I believe it was provided.  But did I read

20  the whole thing?  No.

21     Q.   But you have an understanding of what the lawsuit

22  is about?

23     A.   Suing me and others and the City for the death of

24  Mr. Alvarado.

25     Q.   Yes, sir.  So that's the other thing.  We can

SCOTT ELLIS
4/10/2024

1  agree that his name was Damien Alvarado, so we won't refer

2  to the deceased.  I may refer to him by name but.

3          Sir, let's jump right to the incident date, the

4  3/22 of 2020.

5          What brought you to the scene where Mr. Alvarado

6  and officers were dealing with Mr. Alvarado?

7      A.   Heard it on the radio.

8      Q.   And was it your -- what radio channel do you know

9  it was?

10     A.   It's referred to as 92 in cop lingo.

11     Q.   But it's the midtown?  Did you -- I can't --

12     A.   West side.

13     Q.   West side.  Okay.  Did you -- was your initial

14  call about that?  Or did you have any other calls for

15  service in the area that day?

16     A.   There was another call for service at the

17  intersection of Campbell and Fort Lowell.  It was a traffic

18  collision.

19     Q.   Did you make it to that one?

20     A.   I was in the area, but I was trying to find the

21  officers because I understood that multiple officers were in

22  a fight with an individual or multiple persons.  I wasn't

23  sure.

24          It took some time to discern what was happening.

25     Q.   Did they say anything else about the individual

SCOTT ELLIS
4/10/2024

1  they were involved with, whether the person was suspected in

2  any criminal activity?

3      A.   Yes.   Leaving the scene of a collision involving

4  injury as well as possibly be involved in a homicide that

5  occurred Country Club and Fort Lowell area on 93 where

6  division's midtown.

7      Q.   Did they give you a description of this individual

8  before you got to the scene?

9      A.   They gave a description of the vehicle.

10     Q.   And what was the vehicle?

11     A.   White SUV, I believe.

12     Q.   Do you remember what the description was of the

13  vehicle that the homicide suspect was in?

14     A.   White SUV.

15     Q.   It was a white SUV?

16     A.   I thought it was a white SUV.  It was a white

17  vehicle.  I wasn't listening to 92 --

18     Q.   Okay.

19     A.   -- or 93.

20     Q.   So where were you when you got the call?  Oh, you

21  were on your way to the -- were you on your way to the

22  accident when you got the call?

23     A.   I wasn't dispatched to the call initially.

24     Q.   Okay.

25     A.   Once I heard multiple things going on -- because I

COTMSJ0310

SCOTT ELLIS
4/10/2024

1  was on an unrelated call at another location.

2       Q.   Okay.

3       A.   I heard there were multiple incidents possibly

4  connected, one being a traffic collision, another being one

5  of the drivers running from the traffic collision, citizens

6  chasing the driver, officers responding.

7            And then because I believe it was Sergeant Evans

8  was listening to 93, they -- somehow he was informed,

9  perhaps I was, too, I'm not sure, that there was a homicide

10 in midtown in the area of Country Club and Fort Lowell.  And

11 the vehicle involved in the collision at Campbell and

12 Fort Lowell was similar in description of the suspect

13 vehicle.

14      Q.   They were both white vehicles?

15      A.   Correct.  I don't remember what kind.

16      Q.   Did they have a description of the individual who

17 may have been the homicide suspect?

18      A.   I don't recall.  I wasn't, I wasn't paying

19 attention to that as much as maybe Sergeant Evans was.

20      Q.   What did you see when you got to the scene where

21 Mr. Alvarado was with the officers?

22      A.   I saw a couple of officers talking to a couple of

23 male citizens.  And then I looked down the alleyway some

24 distance, and I saw some police vehicles, and I saw either

25 three or four officers, I thought it was four dealing with

SCOTT ELLIS
4/10/2024

1   an individual that was on the ground handcuffed.

2           And by the time I got over there I noticed that

3   the individual was handcuffed behind his back and a TARP had

4   been applied to his ankles.

5       Q.   So by the time you got over there would you agree

6   that he was subdued at least because he was --

7       A.   He was contained.  I would hesitate to use the

8   word subdued.

9       Q.   Still animated in some fashion?

10      A.   He was very animated.

11      Q.   Anything that you would consider resisting at the

12  time?

13      A.   He was resisting everything.

14      Q.   Go ahead and describe to me or tell me everything

15  that indicates to you that he was still resisting.

16      A.   Even though he was handcuffed behind his back and

17  a TARP applied to his legs, to his ankles, he was still

18  squirming on the ground, yelling, spitting, cursing.

19      Q.   Did you actually see him spitting?

20      A.   He was spitting into everybody.

21      Q.   And you saw that?  I mean how did you find out he

22  was spitting at everyone?  Could you see that?  Did someone

23  tell you that?

24      A.   I'm pretty sure people told me, and I believe I

25  witnessed it myself because on this date I believe -- was

SCOTT ELLIS
4/10/2024

1    this a Sunday?

2            MS. WATERS:  I'm not sure.

3        Q.   I don't think so but --

4        A.   Perhaps a Saturday.

5            MS. WATERS:  It was March 20th; right?

6        A.   20th or 22nd?

7        Q.   22 of '20.

8            MR. FELLOWS:  It was a Sunday.

9            MS. WATERS:  22.  So it was a Sunday.

10            THE WITNESS:  It was either the next day or the

11   week after that on Monday the government implemented COVID

12   lockdowns.  And prior to that we were aware of COVID

13   spreading and it was airborne.

14       Q.   So you were concerned about COVID that day; is

15   that --

16       A.   I was concerned about anything that he might have,

17   be it COVID, be it some other disease.

18       Q.   All right.  So they applied the spit sock.  Did

19   you see them applying the spit sock?

20       A.   I'm pretty sure I did because I told them to.

21       Q.   Oh, okay.  You gave them the directive to apply

22   the spit sock?

23       A.   Yes.

24       Q.   Now eventually was -- your understanding does the

25   spit sock have any impact on a person's ability to breathe?

SCOTT ELLIS
4/10/2024

1        A.    No.

2        Q.    How about if they're saying that they're having

3   trouble breathing, would that --

4        A.    We'll put them in a recovery position.  The spit

5   sock has no bearing on that.

6        Q.    Sir, during the time you were there did you ever

7   hear Mr. Alvarado indicate that he couldn't breathe?

8        A.    Not that I recall.

9        Q.    So if it's on other body-worn camera -- oh, you

10  haven't had a chance to look at body-worn camera so?

11       A.    No.

12       Q.    And so the firefighters came, and they applied a

13  second spit sock; is that correct?

14       A.    I believe so.  I believe the one that we had was

15  old --

16       Q.    Okay.

17       A.    -- older in nature, and they applied a more recent

18  version.

19       Q.    All right.  Did the one that you all applied seem

20  to be applied properly?

21       A.    Yes, as far as I know.

22       Q.    So was it somehow failing or not serving its

23  purpose?  How come they needed to put a second one on?  Do

24  you know?

25       A.    Because it was soaked.  It was wet from his spit,

COTMSJ0314

SCOTT ELLIS
4/10/2024

1    his saliva.

2        Q.   And the firefighters came, and they were able to

3    complete their evaluation?

4        A.   To my knowledge, yes.

5        Q.   Would you consider Mr. Alvarado to still be

6    resisting at that point?

7        A.   Very much so.

8        Q.   In what way?

9        A.   Attempting to get out of the handcuffs even though

10   they're behind his back.  He was aggressive towards the

11   firefighters.

12        It would be difficult for me to really describe

13   because once they arrived I backed away.  He was aggressive

14   towards them even though he was still detained.

15        Q.   What position was Mr. Alvarado in during the time

16   that you saw him?

17        A.   In what we call a recovery position --

18        Q.   Uh-huh.

19        A.   -- because there were times where he would in his,

20   for lack of a better term, flailing to get away from

21   officers and to escape his containment he would roll himself

22   over.  And there were times he was on his back, times he was

23   on his stomach.

24             And I specifically remember Officer Santa Maria

25   assaying get him in the recovery position, keep him in the

SCOTT ELLIS
4/10/2024

1   recovery position.  And he would resist that and go to his
2   back or go to his stomach.  He wouldn't stay in one
3   position.
4        Q.   Was there any time that the officers had him, had
5   placed him on his stomach?  Did you see that?
6        A.   Perhaps in the beginning, but that was before I
7   was there.
8        Q.   At what point -- you said that when you got there
9   he was already handcuffed and TARP'd; correct?
10       A.   Correct.
11       Q.   All right.  And my understanding is that the
12   firefighters at some point did their evaluation and start to
13   leave; correct?
14       A.   Correct.
15       Q.   What happens next?
16       A.   I continued to think about things that needed to
17   be done because there were multiple officers involved.  I
18   was trying to get information from the scene of the
19   collision, trying to determine from midtown if this person
20   was related to the homicide.
21            There were multiple things going on.  And at some
22   point in my report I said we noticed, I don't know who
23   noticed first that he wasn't breathing because there were
24   two officers near him trying to contain him after the
25   firefighters left.

COTMSJ0316

SCOTT ELLIS
4/10/2024

1     Q.   Was any of them involving the application of a

2   spit sock?

3     A.   No.  Not that I recall.

4     Q.   Let's see.  So let's just back up one second.

5         So you're en route to this call, and you

6   receive -- I'm sorry.  There are many things going on you

7   said in the general area.  You head towards the incident

8   with the officers and what you came to know as Mr. Alvarado.

9         Again, you said the crimes he may have been

10  involved in was leaving the scene of the accident and

11  potentially this homicide; correct?

12    A.   Yes.

13    Q.   And you don't know if he matched the description

14  of the homicide suspect, just that he was driving a white

15  vehicle or he may have been driving --

16    A.   He was involved -- a white vehicle was involved,

17  and these incidents were very similar in time frame, within

18  minutes.  And the fact that Mr. Alvarado ran was indicative

19  to us that he was more possibly involved.  The likelihood

20  was greater because he fled the scene of a collision.

21    Q.   Prior to arriving on the scene where Mr. Alvarado

22  was with the officers anyone said that we believe this guy

23  ingested illegal drugs or they have any indication that he

24  did?

25    A.   I don't recall, I don't recall anybody

SCOTT ELLIS
4/10/2024

1      Q.   Let me see.  I told you this is going to be a

2   quick one.

3           Were you aware that they reapplied the TARP?  Or

4   did you just -- he was TARP'd when you got there?

5           A.   He was TARP'd when I got there.

6      Q.   All right.

7      A.   I don't, I don't know if we loosened the TARP for

8   paramedics.  Normally we will, but he continued to fighting

9   with the paramedics.

10          I don't remember the specifics of the TARP after

11  that.

12     Q.   All right.  Were the TARPs ever removed when he

13  started to go into cardiac arrest or he stopped breathing?

14  Do you remember that?

15     A.   I believe it was because he was no longer

16  resisting, he wasn't breathing, so we were going to remove

17  the TARP.  And they might have removed his handcuffs as

18  well.  I don't recall.

19          MR. GATTONE:  We're going to step out for a

20  second.  Be right back.

21          (Whereupon a recess was taken from 1:18 P.M. to

22  1:20 P.M.)

23     Q.   All right.  Sir, do you remember an IA or OPS

24  investigation regarding an individual named Carlos Moreno?

25     A.   No.

SCOTT ELLIS
4/10/2024

```
 1      Q.   All right.  You don't remember involving the use
 2  of a spit sock on an individual?
 3      A.   No.
 4      Q.   And you don't recall ever being disciplined or
 5  have any other action taken against you because of an
 6  incident involving the application of a spit sock?
 7      A.   No.  I don't remember Carlos Moreno.  And I, I
 8  don't recall how many IA investigations I had.  If one
 9  involved a spit sock, it's in my distant memory if I have
10  any memory of it at all.
11      Q.   Do you know if after this incident with Mr. Moreno
12  or any others after this that the use of the policy
13  regarding the use of the spit sock was changed?
14      A.   Mr. Moreno?
15      Q.   No.  I'm talking about Mr. Alvarado.  Do you know
16  if after this incident that the policy regarding the use of
17  the spit sock was changed?
18      A.   I don't recall that it was.  If it was, I don't
19  remember.
20      Q.   You said that you thought that the first spit sock
21  was soaked through.  Would that impede someone's ability to
22  breathe if the spit sock is very wet?
23      A.   They're still portions of it that's not wet, so
24  there's air still getting through there.
25      Q.   So if I put a second one over a soaked spit sock,
```

RAYNBO COURT REPORTING, LTD.

SCOTT ELLIS
4/10/2024

1   it wouldn't impact their ability to breathe?

2        A.   It shouldn't, no.  They're both mesh.

3        Q.   Sorry to keep asking, but do you recall ever OPS

4   or an IA investigation where someone under your chain of

5   command was disciplined for inappropriate application of a

6   spit sock?  Does that strike any memory for you?

7        A.   It sure doesn't.

8             MR. GATTONE:  All right.  I'm done.

9             MS. WATERS:  I have a couple questions, not too

10  many, and then we'll let you get back to being retired.

11

12                        EXAMINATION

13  BY MS. WATERS:

14       Q.   You indicated that you had some conversation with

15  paramedics; is that correct?

16       A.   Yes.

17       Q.   Do you know whether the paramedics made a decision

18  about whether to transport Mr. Alvarado?

19       A.   They chose not to transport him.

20       Q.   And was that their decision to make or TPD's

21  decision?

22       A.   That's always the medical professional.

23       Q.   Would it have been the job of anyone from TPD to

24  second-guess the paramedics' decision not to transport

25  Mr. Alvarado?

SCOTT ELLIS
4/10/2024

1       A.    No.  We don't have their training.

2       Q.    Were you provided that information after

3  paramedics did their assessment of Mr. Alvarado?

4       A.    Yes, I was.

5       Q.    From the time the paramedics finished their

6  assessment of Mr. Alvarado and decided not to transport him

7  to the time period Mr. Alvarado stopped breathing do you

8  know what was happening during that time period?

9       A.    With Mr. Alvarado?  Or --

10       Q.    Or at the scene generally?

11       A.    By that point we were trying to determine how to

12  transport him to Pima County Jail or if we were going to

13  need to perform a show up from the scene of the homicide

14  because at that point we had not determined if he was

15  involved or if he was not.

16           So there was some -- there were a lot of decisions

17  that had to be made in this short period of time before he

18  was transported.  But we were trying to determine which

19  vehicle would be most appropriate for him given his level of

20  resistance.

21           And by that time the paramedics had walked, I

22  don't know, 30 yards, 20, 30 yards, and we were calling them

23  back.  So there wasn't a lot of time.  It was two, three

24  minutes.  Somewhere under five minutes is my best

25  recollection because they had not walked very far.

SCOTT ELLIS
4/10/2024

 1          And I'm sure you have some type of a map or video

 2    of where they parked their fire rigs to where he was, and it

 3    wasn't a very long distance, maybe 20, 30 yards.

 4       Q.   So during that time where on the videos we see

 5    Mr. Alvarado is still on the ground and officers are waiting

 6    with him after the paramedic assessment TPD is actively

 7    trying to make decisions about his transport and whether he

 8    needs to go to jail or he needs to go to the shooting scene

 9    first?

10       A.   We would always bring a witness to the suspect

11    instead of transporting them to the shooting scene.

12       Q.   So you were holding him where he was in case a

13    witness needed to come view him?

14       A.   Yes.   Those were decisions we were still trying to

15    make because at that time I was operating on 92.   We were

16    dealing with the collision, the fighting with the citizens

17    and fighting with the officers, and the homicide situation

18    was taking place on another channel, which other people were

19    making decisions about that.

20          And so it was difficult to -- it took time to --

21    for everybody to link up and communicate all right, this is

22    what we have, this is what you have, are they related.

23          MS. WATERS:   And then if I could have just a

24    minute, I'm going to step out, and I'll be right back.   And

25    that's probably all I have, but let me just double-check

SCOTT ELLIS
4/10/2024

```
 1                          CERTIFICATE

 2   STATE OF ARIZONA      )
                           )
 3   COUNTY OF PIMA        )

 4          BE IT KNOWN that the foregoing deposition was
     taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
 5   No. 50014 in the State of Arizona; that SCOTT ELLIS was duly
     sworn by me according to law; that the proceedings were
 6   taken down by me and reduced to writing under my direction;
     that the preparation, production and distribution comply
 7   with law and code; that the foregoing 25 pages are a full,
     true and accurate record, all done to the best of my skill
 8   and ability.

 9          I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
10   outcome hereof.

11          (XX) Review and signature was waived.

12          (   ) Review and signature was requested.

13          (   ) Review and signature was not requested.

14          I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206 (F)(3) and
15   ACJA 7-206(J)(1)(g)(1) and (2).

16          DATED this 16th day of April, 2024.

17

18                        _____
                          RAYNBO SILVA, RPR, CR
19                        Certified Reporter
                          Arizona CR No. 50014
20

21          I CERTIFY that RAYNBO COURT REPORTING, LTD., has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23

24                        _____
                          RAYNBO COURT REPORTING, LTD.
                          Registered Reporting Firm
25                        Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                    )
                                  )
                Plaintiff,        )
                                  )
          vs.                     )      No. CV22-00132-RCC
                                  )
City of Tucson, et al.,           )
                                  )
                Defendants.       )
_____ )

DEPOSITION OF MARCO DURAZO

Tucson, Arizona

April 10, 2024

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

MARCO DURAZO
4/10/2024

1  would appreciate that.  It will make things move easier.

2          If there is an objection, your lawyer will make

3  that objection, but then you answer the question unless

4  you're instructed otherwise.

5          If you would wait until I finish answering the

6  question or asking the question before you answer, I will

7  wait to ask another question until you're finished answering

8  so we're not talking over each other.  It makes it easier

9  for Raynbo to take this down.

10          Sir, you're presently employed by the Tucson

11  Police Department?

12      A.   No, sir.

13      Q.   Where are you employed now?

14      A.   Pima County Sheriff's Department.

15      Q.   Oh, I can see.

16          How long have you been with Pima County Sheriff's

17  Department?

18      A.   Since January of 2021.

19      Q.   And what's your responsibilities there?

20      A.   I'm a detective.

21      Q.   All right.  And do you have a specific area that

22  you're a detective for?

23      A.   I'm currently assigned to community problems.

24      Q.   I'm sorry?

25      A.   I'm currently assigned to community problems.

COTMSJ0325

MARCO DURAZO
4/10/2024

1      Q.   Can you give us a little bit of what that entails?

2      A.   Thefts, trespass, court ordered violations.

3      Q.   Misdemeanors?  Felonies?

4      A.   Both.

5      Q.   And you worked for TPD before that?

6      A.   Yes, sir.

7      Q.   Was there any reason why you switched over?

8      A.   I started -- before TPD I was a corrections

9   officer with Pima County Sheriff's Department, so it always

10  seemed like that was my home --

11     Q.   Okay.

12     A.   -- so.

13     Q.   So you switched over?

14     A.   I went back, yeah.

15     Q.   I'm sorry.  I forgot to ask you how long you were

16  with TPD?

17     A.   Two years.

18     Q.   From?  When did you start?

19     A.   January of '19.

20     Q.   Did you have any law enforcement experience before

21  that?

22     A.   Not as a police officer.  As a corrections officer

23  with the Pima County Sheriff's Department.

24     Q.   Oh, right.  Of course.  You worked at the jail,

25  transported people, et cetera?

COTMSJ0326

MARCO DURAZO
4/10/2024

1      Q.   Yes, sir.

2      A.   I don't recall if I read the complaint.

3           Did I get the complaint?

4           MS. WATERS:  You received a copy.

5      A.   Okay.

6           MS. WATERS:  I obviously don't know whether you

7  read it.

8      Q.   All right.  So did you watch the body-worn camera

9  from any other officers from that day?

10     A.   I believe I saw bits and pieces of the incident.

11     Q.   So what's your understanding of this lawsuit?

12     A.   Their family's suing for the death of

13  Mr. Alvarado.

14     Q.   Damien, yes.  Can we agree then that the

15  deceased's name was Damien Alvarado?

16     A.   Yes.

17     Q.   So I'll refer to him either as Damien or

18  Mr. Alvarado.

19          What was your, what was your work assignment on

20  3/22 of 2020, if you recall?

21     A.   I was a patrol officer for operations division

22  west.

23     Q.   And operations division west what is its basic

24  boundaries?

25     A.   I want to say River and Campbell all the way to

MARCO DURAZO
4/10/2024

1  Starr Pass.

2       Q.   Pretty big?

3       A.   It's a big area.

4       Q.   And you were on general patrol duty that day and

5  serving calls for service, et cetera?

6       A.   Yes.

7       Q.   All right.  Can you give me a thumbnail sketch of

8  the training you received to become a TPD officer?

9       A.   I attended a 23 week academy where we learned law

10 enforcement material, laws, firearm proficiency, driving.

11      Q.   Did you have to go through additional training to

12 work for the sheriff's department in the position you're in

13 now?

14      A.   I went through a four week post basic and field

15 training.

16      Q.   Do you have any medical training other than what

17 you received from TPD or the sheriff's department?

18      A.   No.

19      Q.   And so I'm assuming you have some basic first aid

20 knowledge?

21      A.   Yes.

22      Q.   And you never had any EMT training; is that

23 correct?

24      A.   No, I have not.

25      Q.   No paramedic training?

COTMSJ0328

MARCO DURAZO
4/10/2024

```
 1        A.    No.
 2        Q.    Sir, let me ask a little bit.  Do you have any
 3   knowledge of or understanding of the concept of positional
 4   asphyxia?
 5        A.    Can you repeat that question?
 6        Q.    Do you understand, do you have any knowledge of
 7   the concept positional asphyxia?
 8        A.    I know what it is, yes.
 9        Q.    Can you tell us what it is or at least your
10   understanding of what it is?
11        A.    It's when someone is placed in a position that I
12   guess makes it hard for them to breathe.
13        Q.    Do you know what the recovery position is?
14        A.    Yes.
15        Q.    What's that?
16        A.    It's when you place somebody on their side.
17        Q.    Because it's easier to breathe that way?
18        A.    Yes.
19        Q.    So the difficult -- a position where it might be
20   difficult to breathe is if someone's on their stomach?
21        A.    Yes.
22        Q.    And how about if someone or some persons are
23   applying pressure on that person's body, do you believe that
24   that would make it more difficult to breathe if they're on
25   their stomach?
```

COTMSJ0329

MARCO DURAZO
4/10/2024

```
 1        A.   Yes.
 2        Q.   And do you have any understanding of the topic,
 3   the concept of excited delirium?
 4        A.   I'm familiar with it.
 5        Q.   Sure.  What's that?
 6        A.   It can be caused by drug, drug/alcohol use after a
 7   struggle.
 8        Q.   And does that have any impact on someone's
 9   respiratory system or functioning of their heart?
10        A.   I believe it does.
11        Q.   What sort of things in your understanding can
12   bring on excited delirium?
13        A.   Adrenaline dump, a struggle, drug/alcohol
14   intoxication.
15        Q.   Have you ever received -- never mind.
16             Did you receive some training on the impact that
17   certain drugs can have on a person's physiology?
18        A.   I'm sorry.  Can you repeat that?
19        Q.   You've had some training on how illegal drugs can
20   affect the functioning of a person's body?
21        A.   Yes.
22        Q.   How about methamphetamines?  What sort of impact
23   will that have on a person's body?
24        A.   It can give them obviously elevated heart rate,
25   gets them moving pretty quick.
```

MARCO DURAZO
4/10/2024

1     Q.   Can it have any impact on their respiratory system
2  or their ability to breathe?

3     A.   I'm not in the medical field.  I don't know
4  exactly what it can do medically to them.  I just know that
5  it does elevate like heart rate, possible superhuman
6  strength, kind of violent tendencies and irritable.

7     Q.   All right.  How about cocaine?  Do you know what
8  impact that could have on a person's functioning of their
9  body?

10     A.   I believe it's more of like a depressant.

11     Q.   Do you have training in recognizing how a person
12  might be acting if they've ingested illegal drugs?

13     A.   Can you repeat that question?

14     Q.   Sure.  Do you have any training or experience in
15  recognizing physical manifestations of the ingestion of
16  illegal drugs?

17     A.   I believe the training we get is pretty much out
18  doing the job.  We can't have training in the classroom
19  where somebody's under the influence of drugs, illegal drugs
20  because it's illegal.

21     Q.   Let's talk a little bit about -- so you initially
22  had a call to an accident scene; correct?

23     A.   Yes.

24     Q.   On 3/22/20.

25          And my understanding is that the accident scene

MARCO DURAZO
4/10/2024

1  I took his vehicle because mine was blocked on the west side

2  of Campbell from the collision.  I get in his car, and I

3  actually -- I don't know the midtown area.

4         I drove past where they were, and I had to turn

5  around after I got the information of where it was at.  And

6  I get there on the scene.

7     Q.   What do you do when you get there?

8     A.   I go up to -- I originally didn't see where

9  exactly they were.  It was like a parking lot with an alley.

10        I get out.  I notice there was patrol vehicles

11  east of me.  And as I approached, I can see them, so I ran

12  over there.  And they told me to get a vehicle.

13    Q.   Get a vehicle?

14    A.   Yeah.

15    Q.   Why?  To transport this person?  Or --

16    A.   They just said get a vehicle.  I didn't stand by

17  there long enough for them to tell me why they needed a

18  vehicle.

19    Q.   How many officers were involved with the

20  individual?

21    A.   To my recollection I believe three, maybe four.

22  I'm not sure.

23    Q.   Were they actively attempting to subdue the

24  person?  Or was he already under their control?

25    A.   I believe he was already under their control.

MARCO DURAZO
4/10/2024

1      Q.   So at least your perception when he got there --

2   when you got there was that the person was no longer

3   resisting?

4      A.   He was still thrashing around.

5      Q.   But he was under their control?

6      A.   He was, he was in handcuffs.

7      Q.   Were you there when they put any TARPs on the

8   individual?

9      A.   I didn't see them put the initial TARP on.

10     Q.   When you say you didn't see them put the initial

11  TARP on, they put a second one on; correct?

12     A.   Yes.

13     Q.   All right.  Now eventually when you got there, at

14  least I saw from your body-worn camera, that they applied

15  what's called a spit sock to Mr. Alvarado?

16     A.   Uh-huh.

17     Q.   And what training have you had with spit socks?

18     A.   We used them at the jail.  It's to prevent bodily

19  fluid, somebody spitting at you.  It's just a mesh net that

20  blocks spit.

21     Q.   And you had been there for some time before they

22  applied the spit sock; correct?

23     A.   I wouldn't say some time.  It was, it seemed like

24  it was pretty quick.

25     Q.   Do you know how long they had been involved with

COTMSJ0333

MARCO DURAZO
4/10/2024

1   him before the spit sock was applied?

2         A.   I don't recall.

3         Q.   So when you were there before they applied the

4   spit sock, did you see the individual spitting or anything

5   coming from his mouth?

6         A.   I personally didn't see him spitting.

7         Q.   And you didn't hear anything that would indicate

8   that he was spitting?

9         A.   I was kind of off to the side (indicating) in the

10  distance.  I wasn't directly where he was at.

11        Q.   So you certainly didn't hear any officer say hey,

12  this guy's spitting or throwing up or whatever, let's put on

13  a spit sock?

14        A.   Huh-uh.

15        Q.   All right.  In your training is it ever

16  appropriate to apply two spit socks?

17            MS. WATERS:  Object to form.

18            But you may answer.

19            THE WITNESS:  I believe we didn't put two spit

20  socks.  I believe TFD put one on.

21        Q.   I understand.  But I'm just saying in your

22  training is it appropriate to apply a second spit sock to an

23  individual?

24            MS. WATERS:  Object to form.

25            You may answer.

COTMSJ0334

MARCO DURAZO
4/10/2024

1        THE WITNESS:  If, obviously, if one is not on all

2   the way or it's coming off, they could put a second one on.

3   It's not going to restrict any air flow.

4        Q.   That first spit sock that you saw, did you see the

5   officers apply it?

6        A.   I believe so.

7        Q.   And did it appear to be correctly applied to you?

8        A.   To my knowledge it looked, it looked like it was

9   applied but.

10       Q.   So in your understanding a spit sock does not

11   restrict the air flow, does not restrict the person's

12   ability to breathe?

13       A.   No.

14       Q.   How about two spit socks?

15       A.   No.

16       Q.   All right.  Now when you first came on the scene,

17   what position was Mr. Alvarado in, if you can recall?

18       A.   When I arrived there, I was there for a split

19   second before they told me to get a vehicle.  When I went

20   and grabbed the vehicle and came back, I believe he was on

21   his stomach.

22       Q.   And do you know how long he had been on his

23   stomach prior to the time that you arrived?

24       A.   It couldn't have been too long.  A couple, a few

25   minutes, a couple minutes, if that.

MARCO DURAZO
4/10/2024

1      A.   He was still, I believe, kicking his legs and
2  trying to move around.
3      Q.   All right.  You said that the officers were not on
4  top of him at that point?
5      A.   I don't believe they were on top of him, like
6  maybe on the sides.  That may be about it.  I don't recall
7  them being on top of him.
8      Q.   And obviously since his hands were in cuffs he
9  wasn't able to swing at them or hurt them with his arms;
10  correct?
11      A.   No.
12      Q.   And were you there when they applied the TARP to
13  him?
14      A.   I don't believe I was -- I saw the first, when
15  they first put it on.  I know it didn't seem like it was
16  utilized properly.
17      Q.   You didn't see them put the first one on, but did
18  you see them replace it or do something to make it correct?
19      A.   Yeah.
20      Q.   What did they do?
21      A.   So while he was there he was still kicking his
22  legs.  I tried grabbing his -- when I got there to help them
23  with putting it on correctly, I grabbed his ankles and just
24  pressed them forward so they can tighten it up a little to
25  not allow him to injure any officers or himself.

COTMSJ0336

MARCO DURAZO
4/10/2024

1    Obviously his, Mr. Alvarado's demeanor had changed

2  from when you first saw him; correct?

3    A.   Yes.

4    Q.   All right.  Did anyone there give you any

5  information about whether he -- they suspected that he had

6  ingested drugs?

7    A.   No.

8    Q.   Did you see anything that would indicate to you

9  that he had ingested drugs?

10    A.   I hadn't really seen his face or anything at the

11  time.

12    Q.   So he's under the officers' control here.  And at

13  least from what we see from your body-worn camera there's

14  one, two, three, four, five officers there besides you.

15    So then there's six with you?

16    A.   Uh-huh.

17    Q.   Were there any other officers on the scene that

18  you were aware of other than the ones, you and the ones in

19  your body-worn camera?

20    A.   I don't recall if there was more at that time or

21  not.

22    Q.   So you didn't really put your hands on him in any

23  way?  You were just -- oh, except when you said that you

24  helped them to cinch up the TARP or tighten up the TARP?

25    A.   Yeah.  When he kicked me back.

RAYNBO COURT REPORTING, LTD.

COTMSJ0337

MARCO DURAZO
4/10/2024

1       Q.   I'm sorry?

2       A.   When he kicked me back.

3       Q.   He kicked you back?

4       A.   Yeah.  Kicked like, kicked --

5       Q.   Pushed?

6       A.   -- with his feet that kicked me and pushed me

7  back, yeah.

8       Q.   All right.  This was before right now; correct?

9       A.   What's that?

10      Q.   Did it take place before this scene we're looking

11 at now that you know of, that you know?

12      A.   I would have to see the footage to see if it was

13 before or after.  I couldn't tell you by just looking at

14 this.

15           MR. GATTONE:  Can we roll it back a few minutes,

16 please?

17           MS. WATERS:  Yes.  What do you want?  22 minutes?

18           MR. GATTONE:  Sure.

19           MS. WATERS:  20 -- okay.

20           MR. GATTONE:  Let's see if we can see that.

21           (Whereupon a video was played.)

22           MR. GATTONE:  Maybe we went -- let's just watch

23 and see if we can see that.

24      Q.   So where are you going right now?

25      A.   To grab a vehicle because I just got there and

MARCO DURAZO
4/10/2024

1      Q.    Yes?

2      A.    Yes.

3            MR. GATTONE:  Go ahead, please.

4            MS. WATERS:  And we're at 27:48.

5            MR. GATTONE:  Thank you.

6            (Whereupon a video was played.)

7      Q.    Again, at like 29 maybe eight or 10 again he said

8  I can't breathe?  Did I hear that correctly?

9      A.    I didn't hear that.

10           MR. GATTONE:  Can we roll back a little bit?

11  We're at 29:12 right now.

12           MS. WATERS:  And you're still waiting, you're

13  still expecting him to tell you when he believes Alvarado

14  kicks; right?

15           MR. GATTONE:  Yes.

16           THE WITNESS:  Well, he already did once.

17     Q.    You saw him kick at you?

18     A.    Yeah.  When -- if you rewind it, you'll see like

19  when I pick his legs up and you see me get pushed back and

20  his legs.

21     Q.    Okay.

22     A.    And I have an officer, I don't know who was next

23  to me, like kind of grab me.

24           MR. GATTONE:  Let's see if we can see that.

25           MS. WATERS:  So do you want me to go back far

MARCO DURAZO
4/10/2024

```
1   enough to capture the kick?

2              MR. GATTONE:  Yes.

3              MS. WATERS:  So not just the I can't breathe but

4   the kick before?

5              MR. GATTONE:  The kick.

6              MS. WATERS:  All right.

7              MR. GATTONE:  Start with the kick.

8              MS. WATERS:  All right.  It may take -- I'm going

9   to play with it to find the right spot.

10             (Whereupon a video was played.)

11             MS. WATERS:  So we're going to start at 28:38.

12             MR. GATTONE:  All right.

13             (Whereupon a video was played.)

14             MS. WATERS:  I'm sorry.  I may not have gone back

15   far enough.  That's my bad.  28:01.

16             (Whereupon a video was played.)

17             THE WITNESS:  So right there when he pushed back

18   is when he kicked me, right there.

19        Q.   So you indicated that at like 28:45 that he kicked

20   at you --

21        A.   Yeah.

22        Q.   -- and pushed you back?

23        A.   He pushed me back, yeah.

24        Q.   More of a push or a kick?  Describe it.

25        A.   Well, he like came back towards me.  Like his legs
```

RAYNBO COURT REPORTING, LTD.

MARCO DURAZO
4/10/2024

1 | came back, obviously threw me off balance, and it did strike

2 | my chest.

3 |    Q.    Did it hurt you in any way?

4 |    A.    No.  It hit the vest.

5 |         MR. GATTONE:  Can we go again, please?  Or can we

6 | continue?

7 |         MS. WATERS:  Yes.  We paused at 28:48, and I'm

8 | hitting play now.

9 |         (Whereupon a video was played.)

10 |    Q.    At this point would you consider him under

11 | control?

12 |    A.    Under control?

13 |    Q.    Or is he still resisting?

14 |    A.    Possibly.

15 |    Q.    So tell me all the reasons why you believe right

16 | now that he's still resisting.

17 |    A.    For the fact that, you know, he's still moving

18 | around and kind of fighting with us to take control of him.

19 | They're trying to loosen up the handcuffs on him to make it

20 | a little more comfortable.

21 |         MR. GATTONE:  Can we roll, please?  We're at 29:08

22 | right now.

23 |         MS. WATERS:  Yeah.

24 |         (Whereupon a video was played.)

25 |         THE WITNESS:  He kicked me right there.

RAYNBO COURT REPORTING, LTD.

MARCO DURAZO
4/10/2024

```
 1   he's spitting at us, let's put on a spit sock?
 2        A.   To my recollection, no.
 3             MR. GATTONE:  Can we go forward, please?
 4             MS. WATERS:  Just hit play at 29:50?
 5             MR. GATTONE:  Yes.  That would be great.
 6             (Whereupon a video was played.)
 7        Q.   So sir, do you have any -- you indicated that from
 8   your perception the first spit sock appeared to be applied;
 9   correctly?
10        A.   I would have to see the video.
11             MR. GATTONE:  Can we roll?
12             MS. WATERS:  Just hit play at 30:19?
13             MR. GATTONE:  Yes, please.
14             (Whereupon a video was played.)
15        Q.   Can you see it now?
16        A.   Just the bottom, but it looks like it's on
17   correctly.
18             MR. GATTONE:  Please roll it.  We're at 30:25.
19             (Whereupon a video was played.)
20        Q.   So at this point, 30:54, the firefighters are
21   applying that second spit sock; correct?
22        A.   That's what it looks like.
23        Q.   And you've indicated that in your training and
24   experience two spit socks cannot impede somebody's ability
25   to breathe?
```

RAYNBO COURT REPORTING, LTD.

COTMSJ0342

MARCO DURAZO
4/10/2024

1       A.   No.

2       Q.   What if they're in medical distress somehow, would

3   that change your opinion?

4            MS. WATERS:  Object to form.

5            But you may answer.

6            THE WITNESS:  I don't know.  I'm not in the

7   medical profession.  I don't know with if somebody's in

8   medical distress if --

9       Q.   Well, I'm not asking you to guess.  I'm saying,

10  I'm asking you in your training and experience would a

11  second spit sock impede the breathing of someone who is in

12  medical distress?

13      A.   I do not believe so.

14           MR. GATTONE:  Can we go to 36:54?  Or let's go to

15  36:50.

16           MS. WATERS:  36:45.

17           MR. GATTONE:  Yup.  Great.

18           (Whereupon a video was played.)

19      Q.   Now at that point you could hear him moaning?

20      A.   Uh-huh.

21      Q.   All right.  And you're close enough that you can

22  hear him moaning; correct?

23      A.   Yes.  I can hear him moaning.  I can hear him

24  breathing.

25      Q.   All right.  Is this you with your hand on him?

COTMSJ0343

MARCO DURAZO
4/10/2024

 1   Or --

 2          A.   Yeah.   It's slightly on his shoulder and slightly

 3   over his head.

 4          Q.   He's still -- would you consider him not to be

 5   resisting at this point?

 6          A.   He was still thrashing around.   That's why we were

 7   there sitting, kneeling in front of him because in part of

 8   the body camera that you didn't watch he does thrash forward

 9   when TFD's trying to check his vitals and he smacks his head

10   against the wall.   And that's why we positioned ourself

11   there to prevent him from injuring himself.

12          Q.   But that's not right at this point?

13          A.   It was before that.

14               MR. GATTONE:   Could we roll, please?

15               MS. WATERS:   Yeah.   We paused at 36:51, and I'm

16   hitting play at that point.

17               (Whereupon a video was played.)

18               MR. GATTONE:   So where are we at?   Can we go to, I

19   think, can we go to 43:00?   43?

20               MS. WATERS:   Yes.

21               The witness would like to take a two minute break.

22   I can get this cued up.

23               MR. GATTONE:   Sure.

24               (Whereupon a recess was taken from 10:35 A.M. to

25   10:41 A.M.)

COTMSJ0344

MARCO DURAZO
4/10/2024

1      Q.   So sir, before we start, you're kind of kneeling

2 down and you have your hand on his shoulder; is that

3 correct?

4      A.   Yes.

5      Q.   And this is while the paramedics are evaluating

6 him?

7      A.   Yes.

8      Q.   And you -- is he still moving at this point?

9      A.   Yes.

10      Q.   But they were able to do what they needed to do,

11 the paramedics; correct?

12      A.   Yes.

13      Q.   And so the other officers are around the scene

14 just kind of talking and doing whatever; correct?

15           You're involved with him.  The paramedics are

16 involved with him.  Was there another officer that was

17 holding -- who is that officer right there in the top of the

18 scene?

19      A.   I believe that's Donovan Vance.

20      Q.   And the others are standing around doing whatever

21 they're doing?

22      A.   Yes.

23           MR. GATTONE:  Can we roll, please?  We're at 43,

24 43 minutes.

25           (Whereupon a video was played.)

COTMSJ0345

MARCO DURAZO
4/10/2024

```
 1              MS. WATERS:  This is 43:23.
 2         Q.   All right.  So at this point do you know whether
 3    he was breathing or not?
 4         A.   At this point?
 5         Q.   Yes, sir.
 6         A.   I do not believe he was breathing.
 7         Q.   And how long was this after the fire department
 8    personnel had left or were starting to leave the scene?
 9         A.   I would have to say less, less than a minute or
10    so.
11         Q.   So it happened pretty quickly?
12         A.   Yes.
13         Q.   Now do you know if they ever took the restraints
14    off of him so that they can do what they needed to do to try
15    to revive him?
16         A.   Can you clarify that?  Like who?  TFD or us?
17         Q.   No.  You all, TPD.
18         A.   They, they do take the restraints off.  They start
19    doing compressions, and then they start taking the handcuffs
20    and RIPP restraint or TARP.
21         Q.   So you would do chest compressions when they're
22    not -- their heart is not beating; correct?
23         A.   Correct.
24         Q.   And if they're not breathing; correct?
25         A.   Correct.
```

COTMSJ0346

MARCO DURAZO
4/10/2024

```
                          CERTIFICATE

STATE OF ARIZONA      )
                      )
COUNTY OF PIMA        )

        BE IT KNOWN that the foregoing deposition was
taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
No. 50014 in the State of Arizona; that MARCO DURAZO was
duly sworn by me according to law; that the proceedings were
taken down by me and reduced to writing under my direction;
that the preparation, production and distribution comply
with law and code; that the foregoing 55 pages are a full,
true and accurate record, all done to the best of my skill
and ability.

        I CERTIFY that I am in no way related to any of
the parties hereto, nor am I in any way interested in the
outcome hereof.

        (XX) Review and signature was waived.

        (  ) Review and signature was requested.

        (  ) Review and signature was not requested.

        I CERTIFY that I have complied with the ethical
obligations set forth in ACJA 7-206 (F)(3) and
ACJA 7-206(J)(1)(g)(1) and (2).

        DATED this 16th day of April, 2024.


                      _____
                      RAYNBO SILVA, RPR, CR
                      Certified Reporter
                      Arizona CR No. 50014


        I CERTIFY that RAYNBO COURT REPORTING, LTD., has
complied with the ethical obligations set forth in
ACJA 7-206 (J)(1)(g)(1) through (6).


                      _____
                      RAYNBO COURT REPORTING, LTD.
                      Registered Reporting Firm
                      Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

COTMSJ0347

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA


Irene Briesno,                    )
                                  )
                Plaintiff,        )
                                  )
            vs.                   )      No. CV22-00132-RCC
                                  )
City of Tucson, et al.,           )
                                  )
                Defendants.       )
_____    )




DEPOSITION OF RAYMOND FLECK

Tucson, Arizona

March 14, 2024








RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169


Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

COTMSJ0348

RAYMOND FLECK
3/14/2024

1   until I finish asking, and I'll do my best to not ask a

2   question until you're finished answering.

3           Sometimes if you take a breath or something, I'll

4   think you're done, but I'll do my best today.

5       A.   Okay.

6       Q.   Sir, how are you employed?

7       A.   Right now I work for SMG, which is the group that

8   operates the Tucson Convention Center.

9       Q.   Oh, okay.  So you left the Tucson Fire Department?

10      A.   I retired, yes.

11      Q.   What are you doing now over there?

12      A.   I'm a Zamboni driver.

13      Q.   Okay.  How's that going?

14      A.   Very well.

15      Q.   Had you had any Zamboni experience before you

16  started working there?

17      A.   No.

18      Q.   Oh, okay.  Then but you were, if I understand

19  correctly, you were employed by the Tucson Fire Department

20  for a number of years; is that correct?

21      A.   Yes, sir.

22      Q.   How many years?

23      A.   20.

24      Q.   When did you start with TFD?

25      A.   In July of 2000.

RAYMOND FLECK
3/14/2024

1      Q.    And 2020 you were retired or?

2      A.    I believe it was January, 2021.

3      Q.    And you're a paramedic?

4      A.    I was, yes.

5      Q.    Sir, help me out here.  What's the difference

6  between a paramedic and an EMT?

7      A.    A paramedic is still an EMT but it's a more

8  advanced level than an EMT basic.  There are a few

9  different, a few more things that a paramedic can do than an

10  EMT basic can do.

11      Q.    Like?

12      A.    Like, shoot.  I've been retired for a couple of

13  years.  I'll try to remember this.  But reading EKGs,

14  starting IVs, endotracheal intubation, and there are more

15  medications that a paramedic can administer.

16      Q.    All right.  So did you do anything before you

17  started working for TFD?

18      A.    Just college jobs at that time.

19      Q.    Sir, can you give us a thumbnail sketch of the

20  training you received to become a paramedic?

21      A.    In order to become a paramedic everyone had to

22  already be an EMT basic and then went to paramedic school,

23  which was in my case seven months of training, partially in

24  the classroom and partially in the field getting hands-on

25  experience or clinicals at hospitals.

COTMSJ0350

RAYMOND FLECK
3/14/2024

1  if you think it's appropriate?

2      A.   Yes.

3      Q.   When is it appropriate in your understanding of

4  applying a spit sock?

5      A.   In my understanding when it is appropriate is when

6  the patient gives us reason to believe that we are at risk

7  for being exposed to bodily fluids.

8      Q.   You mean spit or vomit or --

9      A.   Blood.

10     Q.   -- something along those lines?

11     A.   Spit, vomit mostly, yes.

12     Q.   Do you have any estimation of how many times

13  you've been involved with the application of a spit sock on

14  a I'll use the term patient.

15         You use the term patient for someone that you're

16  providing medical assistance to; is that correct?

17     A.   Yes.

18     Q.   Do you have any recollection of how many times you

19  may have been involved with applying a spit sock to a

20  patient?

21     A.   It would just be a guess, but if I'm allowed to do

22  that.

23     Q.   Go ahead.  Please.

24     A.   Dozens of times over the course of 20 years.

25     Q.   And who -- do you coordinate with the Tucson

RAYMOND FLECK
3/14/2024

1   on how to provide medical care to someone who is in police

2   custody or who may be restrained?

3       A.   Possibly.  I think so.  We don't carry handcuffs

4   on any fire department trucks, so we would use different

5   types of restraints when we needed to, but and we had

6   training on how to apply our equipment.

7            But as far as actual training on, okay, this is

8   how you take care of a patient in handcuffs, I don't

9   remember anything like that.

10      Q.   So TFD has their own supply of restraints?  You

11  have restraints on the truck?

12      A.   Yes.

13      Q.   All right.  In your training and experience when

14  would it be appropriate to restrain, have TFD restrain

15  someone?

16      A.   When they were combative and appeared to be a

17  danger to themselves or to us.

18      Q.   So it's a sort of a subjective determination?  If

19  you feel threatened, if they're saying I'm going to fight

20  you, I'm going to hurt you, you would put them in

21  restraints?

22      A.   Yes.

23      Q.   All right.  Who makes that determination?  The

24  individual firefighter or the top ranked person on the

25  scene?

COTMSJ0352

RAYMOND FLECK
3/14/2024

1    A.    I don't remember if there is a specific assignment

2    for that decision.   I mean I, I don't know if I can answer

3    that.

4    Q.    What kind of restraints does Tucson Fire

5    Department have or employ?

6    A.    We had what we called soft restraints, which were

7    strips of foam that could be wrapped around the patient's

8    wrists, ankles, and they could be -- they had straps to

9    where they could be tied to the gurney or a spine board

10   after they were applied.

11   Q.    So that's the primary time that you would apply

12   restraints is when they're on a gurney or a backboard?

13   A.    Yes.   Otherwise we would not have anything to

14   secure them to.

15   Q.    Sometimes if you're applying medical assistance

16   right there on the sidewalk, on the ground or whatever,

17   would you ever restrain them at that point?

18   A.    Possibly.

19   Q.    So you restrain them to the gurney or the

20   backboard so they can't get up, so they can't hit you, they

21   can't maybe take out an IV, those sort of things?

22   A.    That is, those are reasons for restraining people,

23   yes.

24   Q.    So I don't know if I asked this, but how many

25   times have you actually been involved with the application

RAYMOND FLECK
3/14/2024

1  of a spit sock over the 20 years?

2      A.   I couldn't say for certain but I, again, I would,

3  if I were to guess, I would say dozens.

4      Q.   Maybe even more?

5      A.   Maybe.

6      Q.   In your training and experience does the

7  application of restraints or can the application of

8  restraints have a negative impact on a person who's in

9  medical distress?

10          MS. WATERS:  Object to form.

11          You may answer.

12          THE WITNESS:  Are you asking does the application

13  of restraints make the patient's condition worse?  Is that

14  what you're asking me?

15      Q.   Yes.

16      A.   I don't think it should --

17      Q.   All right.

18      A.   -- if it's done properly.

19      Q.   What if a person is having -- and I don't

20  necessarily mean your restraints.  I mean you come upon

21  times when Tucson police already have the person in

22  restraints.  Do you believe in your training and experience

23  that that would have any impact on someone who's having a

24  hard time breathing?

25          MS. WATERS:  Object to form.

COTMSJ0354

RAYMOND FLECK
3/14/2024

1      Q.    And the scene at Prince and Campbell was close to

2  the scene of the car accident that you responded to?

3      A.    Fairly close, yes.

4      Q.    So you're at the car accident scene.  You're done

5  there.  Nobody needs medical attention.  You receive a

6  second call to go to the Prince and Campbell area?

7      A.    Yes.

8      Q.    All right.  And tell me what you saw when you

9  first got on the scene.

10      A.    Again, my, my memory's a bit foggy but, as I

11  recall, we got off the truck, and there were civilians and

12  police officers around, and they directed us down an alley

13  where the patient was.

14      Q.    And do you recall how many police officers were

15  there?

16      A.    No.

17      Q.    One or two?  Maybe five or six?

18      A.    I would --

19             MS. WATERS:  Objection, form.  Asked and answered.

20             You can answer.

21      A.    I believe it was more than a dozen.

22      Q.    Did they indicate what officers may have been

23  involved in the initial incident that led to the person

24  needing medical attention?

25      A.    No one ever told me anything about that.

COTMSJ0355

RAYMOND FLECK
3/14/2024

```
 1        Q.   So the patient is restrained at the time; correct?

 2        A.   Yes.

 3        Q.   Do you remember how exactly he was restrained?

 4        A.   No, I don't.

 5        Q.   So just in handcuffs?

 6        A.   I mean I --

 7        Q.   In handcuffs and leg restraints?

 8        A.   I, I mean exactly I, I have a vague recollection

 9   of him being restrained, but I couldn't say exactly like,

10   like you described earlier, with his feet and hands tied.  I

11   don't remember if he was in cuffs.  I just I'm not familiar

12   with the police equipment.  There --

13        Q.   I'm just -- oh, go ahead.

14        A.   -- was some sort of spit sock which they appeared

15   to have applied which just covered his mouth and possibly

16   his nose.  It didn't, it didn't seem like it was applied

17   very -- it seemed like it was applied very loosely, and it

18   wasn't a piece of equipment I had seen before.

19        Q.   Well, we'll talk about that in a little bit, but

20   did you ever learn the name of the patient?

21        A.   I don't remember.

22        Q.   Subsequently have you learned that his name was

23   Damien Alvarado?

24        A.   I believe I have heard that, yes.

25        Q.   So maybe instead of patient I'll refer to him by
```

COTMSJ0356

RAYMOND FLECK
3/14/2024

1  name, but you know who we're talking about?

2      A.    Okay.

3      Q.    All right.  What did the -- oh, I'm sorry.

4            What was your understanding of what the medical

5  needs were?

6      A.    My understanding of the medical needs were that we

7  were there to assess for injuries.

8      Q.    Why, did anyone tell you why he might be injured,

9  what led to his potential injuries?

10     A.    I don't remember what information we had before

11 patient contact.

12     Q.    All right.  So in your interview you said that he

13 was very animated, correct, moving around?  Being -- was he

14 verbalizing things?

15     A.    Yes.  I, I did read that.  As I recall, most of

16 what he said indicated he wanted to be unrestrained and let

17 go.  But I don't remember anything specific.  Like I said in

18 there, I don't remember specific sentences.  He just he did

19 not appear to be happy about being restrained.

20     Q.    Do you talk with him?  Do you say how are you

21 feeling?  Anything wrong?

22     A.    I don't remember I specifically had that kind of

23 conversation with him, but that is typically what someone on

24 the crew would do, yes.

25     Q.    Do you recall anyone on the crew saying he's

RAYMOND FLECK
3/14/2024

```
 1   that truck.
 2        Q.   So you said there's six individuals.  You,
 3   Spencer, Goldstein, Ford and Gaudioso?  I can't --
 4        A.   Gaudioso.
 5        Q.   Any others?
 6        A.   DeCastro.
 7        Q.   So that's six?
 8        A.   I think so.
 9        Q.   Did you say who was in charge or who was the
10   highest officer on the scene?
11        A.   Captain Ford.
12        Q.   And was he your immediate, the person that you
13   answered to?  Or did you answer to someone and then they
14   answered to him?
15        A.   He was my supervisor, yes.
16        Q.   So you looked to him for directions or orders,
17   things along those lines?
18        A.   Yes.
19        Q.   So you see the individual with the spit sock on.
20   Did you or any of those other firefighters ever say remove
21   this so we can take care of him?
22        A.   No.  As, again, memory's a bit foggy, but as I
23   recall, it appeared to be so loose that it wasn't really
24   effective or in our way.
25        Q.   Why do you say it wasn't effective?
```

COTMSJ0358

RAYMOND FLECK
3/14/2024

1      A.   Because it didn't appear to be inhibiting his

2    ability to spit at us.

3      Q.   But just a second ago you said that the spit sock

4    covered his mouth and nose; correct?

5      A.   But as I recall it was loosely fitted.  Like,

6    again, I'm not familiar with that piece of equipment.  It

7    didn't look like it was applied effectively.

8      Q.   But at least from your description the only part

9    that wasn't covered was maybe his chin?  Or was it all the

10   way down to his neck?

11     A.   I can't remember how far down it extended.  I --

12   it didn't cover his eyes but.

13     Q.   It did cover his eyes?

14     A.   Did it?  No.  I don't think, no, it didn't.

15     Q.   Well, how could it cover his mouth if it didn't

16   cover his eyes?

17     A.   Well, it just, it was just covering the lower part

18   of his face and loosely at that as I recall.

19     Q.   So it was the type of spit sock not that went over

20   his head but that went around his mouth?

21     A.   That's what it appeared to be.

22     Q.   Or nose and mouth?

23     A.   Yes.  That's what it appeared to be.

24     Q.   Now was it dropping?  You said it was loose.  Was

25   it dropping?  Was it moving around?

RAYMOND FLECK
3/14/2024

1       A.   I can't remember specifically, but I, I seem to
2   recall that it was and that's why we applied the other one.
3       Q.   So in your training and experience can a spit sock
4   ever impede a person's ability to breathe?
5            MS. WATERS:  Object to form.
6            But you may answer.
7            THE WITNESS:  In my training and experience no.
8       Q.   So what about the point where a person is, if a
9   person is having trouble breathing, would it exacerbate
10  that?
11           MS. WATERS:  Object to form.
12           You may answer.
13           THE WITNESS:  I mean there are different
14  etiologies for people having difficulty breathing.  I mean
15  does it restrict the air flow or make it physically more
16  difficult for them to breathe?  I don't, I don't see how it
17  would.
18      Q.   I'm going to show you a diagram.
19           I'm going to show him this.  I'm not entering it
20  into evidence.  I just want to --
21           MS. WATERS:  From the complaint?
22           MR. GATTONE:  Yes.
23           MS. WATERS:  Okay.
24      Q.   All right.  Sir, I'm going to show you a diagram
25  that's on page 20 of the complaint that he filed.

RAYMOND FLECK
3/14/2024

1          It appears to be a diagram of a spit sock;

2    correct?

3          A.   Yes.

4          Q.   That's not the type of spit sock that you say that

5    Mr. Alvarado was equipped or fitted with when you saw him?

6          A.   Correct.

7          Q.   But the one that you -- I'm not understanding.

8    Maybe you have to explain to me again how the spit sock

9    could cover his mouth and nose but not his eyes.

10         A.   It didn't look like that one.  I mean if you

11   imagine I had a handkerchief and put it around my face

12   (indicating), something similar to --

13         Q.   Something similar to that?

14         A.   To that.

15         Q.   So just for the record you've taken a handkerchief

16   out of your pocket and you've situated it over your nose and

17   mouth and hanging a little bit below your chin.

18              Was that what you remember?

19         A.   That's what I remember seeing when I arrived.

20         Q.   So you said it didn't look proper to you or it

21   didn't look like it was put on him properly?

22              MS. WATERS:  Object to form.

23              But you may answer.

24              THE WITNESS:  It didn't look to me like, again,

25   not being familiar with the piece of equipment it didn't

RAYMOND FLECK
3/14/2024

1    look to me like it was going to be effective in preventing
2    the potential of exposure.
3         Q.   But it's your understanding that that spit sock
4    had been applied by the officers prior to your arriving on
5    the scene?
6         A.   That's my understanding, yes.
7         Q.   And if a person in your training and experience is
8    talking, does that mean they're breathing?
9         A.   Yes.
10        Q.   So if I can talk, you're of the belief that if I
11   can talk I can breathe?
12        A.   I am of the belief that if you can talk you can
13   breathe.
14        Q.   What if my words are I can't breathe?
15        A.   It's, my understanding is it's physically
16   impossible to vocalize anything without movement of air for
17   breathing.
18        Q.   So you, as you sit here today, you believe that if
19   I'm saying to you I can't breathe I'm not telling the truth
20   or it's impossible for that to be true?
21        A.   I think we're talking about semantics here.  I
22   mean someone saying I can't breathe, my understanding is
23   physically that's, that sentence is not -- in order to speak
24   you have to be moving air and breathing.
25             But could you be having difficulty breathing and

RAYMOND FLECK
3/14/2024

1       A.   (No audible response.)

2       Q.   Did you have any indication that the person was

3   spitting, actively spitting at the time you approached him?

4       A.   I can't remember.

5       Q.   So you didn't see any other bodily fluids coming

6   out of his mouth, vomit or whatever?

7       A.   I can't remember.

8       Q.   But again, in your understanding a spit sock is

9   meant to prevent them from discharging bodily fluid in your

10  direction?

11      A.   Yes.

12      Q.   Is it your understanding that a spit sock can be

13  applied preemptively if you think someone is animated and

14  they might do that?

15      A.   It could be, yes.

16      Q.   So if you have some fear or concern that that

17  might happen, you can apply a spit sock?

18      A.   Yes.

19      Q.   In your interview you indicated that Paramedics

20  Goldstein and Spencer had primary contact with Mr. Alvarado

21  and that Paramedic Goldstein attempted to speak with him; is

22  that correct?

23      A.   Yes.

24      Q.   And was Paramedic Goldstein able to talk to

25  Mr. Alvarado?

COTMSJ0363

RAYMOND FLECK
3/14/2024

1        A.    Yes.

2        Q.    Did you ever get any information from Paramedic

3   Goldstein that he's saying my chest hurts, I can't breathe,

4   something along those lines?

5        A.    I can't remember.

6        Q.    So you at least weren't party to that?

7        A.    No.  Not that I recall.  I was within a few feet

8   of him.  I mean presumably if he -- you know, I -- the

9   questions and answers I for the most part unless I was

10  turned away to get a piece of equipment or whatever I, I

11  would have heard the questions and answers just from the

12  proximity, but I can't remember specifically what was said.

13       Q.    So my understanding is that at some point a second

14  spit sock was applied by TFD personnel?

15       A.    Yes.

16       Q.    It was your -- in your interview you said that you

17  thought Paramedic Goldstein may have applied the second spit

18  sock?

19       A.    Did I say that in the interview?

20       Q.    That's what I heard.

21       A.    I couldn't, I guess, without referring to it if --

22       Q.    So you don't know if --

23       A.    I can't --

24       Q.    You can't recall saying that?

25       A.    I can't remember.

RAYMOND FLECK
3/14/2024

1       Q.    But somebody in your group of TFD personnel said

2    we need to apply a second spit sock?

3       A.    Yes.

4       Q.    And somebody in your group then put it on him?

5       A.    Yes.

6       Q.    And you were like three feet, a few feet away when

7    that was done?

8       A.    I think so.

9       Q.    And did it look like the second spit sock was like

10   this one I showed you that went over the head or was it

11   different?

12      A.    It was like the one you showed me.

13      Q.    So the one that fits all the way over his head,

14   comes down to his neck?

15      A.    Yes.

16      Q.    But he still had that first spit sock on when the

17   second one was applied?

18      A.    Yes.

19      Q.    And did anyone object to that?  Did anyone in your

20   company say we shouldn't do that, that's a problem or

21   anything along those lines?

22      A.    I don't recall anyone saying that.

23      Q.    Did any of the police personnel say hey, don't do

24   that, that could be a problem?

25      A.    I don't recall.

COTMSJ0365

RAYMOND FLECK
3/14/2024

1        A.    I don't.

2        Q.    Now, again, I think you said it some today but in

3   your post interview, post event interview you said you

4   assume that the second spit sock was applied out of TFD's

5   personnel concern about the transmission of HIV and

6   Hepatitis C.

7              Do you remember making that statement?

8        A.    Yes.

9        Q.    And in your training and experience is it your

10  understanding that you can contract HIV from saliva?

11       A.    That is my understanding.

12       Q.    And that's something you were trained?

13       A.    We were trained to treat all bodily fluid as

14  potentially infectious.

15       Q.    In your training and experience can you contract

16  Hepatitis C from saliva?

17       A.    My -- I can't remember specifically what

18  Hepatitis C training I've had.  Again, we were trained to

19  treat all bodily fluids as potentially infectious.

20       Q.    All right.  And you agree with that assertion that

21  the second spit sock was necessary to prevent the

22  transmission of either HIV or Hepatitis C to the TFD

23  personnel?

24       A.    Those were just examples of communicable diseases

25  that came to the top of my head during that interview.  But

COTMSJ0366

RAYMOND FLECK
3/14/2024

1   to answer your question, which your question is do I believe
2   the second spit sock was going to be effective in preventing
3   us from being exposed to communicable diseases?  That's your
4   question?
5        Q.   Yes, sir.
6        A.   Yes.
7        Q.   But again, you said this was the first time you
8   ever recall putting a second or putting a spit sock on
9   someone or was it a second spit sock?
10       A.   The first time I recall putting a second one, yes.
11       Q.   Would you say that's something that you routinely
12  do, put a spit sock on someone to prevent the transmission
13  of communicable diseases?
14       A.   When it's indicated, yes.
15       Q.   All right.  Did the police officer say look, this
16  guy's been spitting at us, this guy has been vomiting, any
17  of those things when you first came up?
18       A.   I can't remember.
19       Q.   But it was just -- and you weren't told at
20  dispatch saying this guy's vomiting, this guy's spitting at
21  people just so that you would know it?
22       A.   I can't remember what dispatch information we had.
23       Q.   I can't recall if I asked, but did any of the
24  police personnel object to the application of the second
25  spit sock?

COTMSJ0367

RAYMOND FLECK
3/14/2024

```
 1   came on the scene until when you were ready to leave the
 2   scene?
 3        A.   I seem to recall that but I, again, my memory's --
 4        Q.   And at that point he still had the two spit socks
 5   on?
 6        A.   I believe so.
 7        Q.   You didn't remove the second spit sock when you
 8   were leaving?
 9        A.   I don't remember doing that.
10        Q.   You didn't ask police to do it?
11        A.   I don't remember doing that.
12        Q.   And the police didn't say to you take the spit
13   sock off now since you're leaving?
14        A.   I don't remember that.
15        Q.   All right.  Now you also indicated in your
16   post-incident interview that as the paramedics were about to
17   leave the scene Mr. Alvarado's condition deteriorated; is
18   that correct?
19        A.   Yes.
20        Q.   Where were you -- oh, do you know who gave you
21   this information that his situation had deteriorated?
22        A.   I don't remember, excuse me, specifically, but
23   having read that it appears that the Engine 20 crew had been
24   walking back to our truck, and I believe the police observed
25   it, relayed the information to the paramedics who were
```

RAYMOND FLECK
3/14/2024

1   closer to the patient at the time and they notified us by

2   radio.

3         Q.   What did they say?  He's not moving?  He's not

4   breathing?  He --

5         A.   I can't remember specifically what was said.

6         Q.   But some indication that things weren't good?

7         A.   That some indication that we were needed back at

8   the scene, yes.

9         Q.   And then tell me -- and you come back.  What do

10  you see?  Well, let me back up for a second.

11            You said that you were almost to your truck or you

12  were driving away when the police indicated that there was a

13  potential life-threatening situation?

14        A.   Almost back to the truck.

15        Q.   And the radio comes on.  It says hey, things are

16  different, this guy's not moving, whatever.  You head back?

17        A.   Yes.

18        Q.   How did he appear to you when you got back to

19  where Mr. Alvarado was?

20        A.   I don't -- when we got back to where the patient

21  was, I don't remember first seeing him.  I mean he was, I

22  know he was pulseless, apneic and unresponsive, but I don't,

23  I don't have a clear visual memory of right when I got back

24  to the scene.

25        Q.   Was he still restrained?

RAYMOND FLECK
3/14/2024

1        A.   I can't remember.

2        Q.   All right.  But you indicated that at no point did

3   any TFD personnel say please take the restraints off?

4        A.   I can't remember.

5        Q.   But you certainly never did?

6        A.   I couldn't speak to that either.  I mean, again,

7   like I said, I can't remember.

8             In order to provide resuscitative efforts we would

9   have had to have gotten him out of the restraints, but I

10  don't remember who or when made that decision, who made that

11  decision or when it was made.

12       Q.   All right.  How much time elapsed between -- so

13  you said that somebody, Paramedic Goldstein or someone says

14  this guy's okay.  You start to leave.  They call you to come

15  back, say his situation is deteriorated.  How much time

16  elapsed between those events?

17       A.   I couldn't say specifically.

18       Q.   A minute?  Two minutes?  Five minutes?

19            MS. WATERS:  Object to form.

20       Q.   Go ahead if you would.

21       A.   A few minutes would be my guess.

22       Q.   All right.  So he deteriorated rather quickly?

23       A.   Yes.

24       Q.   Between the time that you guys said he's okay and

25  when by the time a few minutes later when you got to your

RAYMOND FLECK
3/14/2024

1   have been placed on a spine board and then on the gurney to

2   be transported.

3       Q.   So two of them?

4       A.   What?

5       Q.   The two of them, a spine board and a gurney?  He

6   was on the board that was on the gurney?

7       A.   He was on the board that was on the gurney, yes.

8       Q.   You say he's having cardiac arrest, meaning his

9   heart beating has stopped?

10      A.   Yes.

11      Q.   Is that to say he was having a heart attack?  Or?

12      A.   No.

13      Q.   It's different?

14      A.   Yes.

15      Q.   A heart attack the heart still would be beating

16  but there would be something wrong?

17      A.   That's generally accurate.

18      Q.   And his situation was no heartbeat?

19      A.   Correct.

20      Q.   My understanding is that you accompanied him in

21  the ambulance to the hospital?

22      A.   Yeah.  Reading the interview I, I drove the

23  ambulance to the hospital while resuscitative efforts were

24  continued in the back.

25      Q.   So you, excuse me, you were not taking part in the

RAYMOND FLECK
3/14/2024

1        A.   I don't remember.

2        Q.   Did you have any belief when you came on the scene

3   that he might be under the influence of any narcotics?

4        A.   I don't remember.

5        Q.   Do you have any training in how to deal with a

6   person who may be experiencing the influence of illegal

7   drugs?

8        A.   There are symptoms associated with certain drugs

9   and, you know, the symptoms are managed differently

10  depending on what they are.  But I mean --

11       Q.   Independently did you have any --

12       A.   -- I'm --

13       Q.   Oh, I'm sorry.  I cut you off again.

14       A.   I'm not sure I understand the question.

15       Q.   Sure.  So when you got on there, did you see any,

16  you personally see any of those symptoms that you said wow,

17  this guy must be experience influence -- under the influence

18  of drugs?

19       A.   I didn't see, I don't recall seeing symptoms that

20  told me the patient must be under the influence of drugs.

21       Q.   Did any of the officers indicate to you that they

22  thought that this person was on drugs or experiencing the

23  influence of drugs?

24       A.   I don't remember if any of the officers said

25  anything like that.

COTMSJ0372

RAYMOND FLECK
3/14/2024

1      Q.   So let's spend a few minutes talking about all the
2   diagnostic steps that you and your colleagues took before
3   you made a determination that he had no life-threatening
4   conditions.
5            Tell me what you do, what you were able to do or
6   what you did with Mr. Alvarado before that determination was
7   made.
8      A.   Vital signs were obtained.  Patient contact was
9   made.  Patient was asked if he was injured or needed medical
10  assistance.
11     Q.   Did you do everything, all the -- did you take
12  all -- were you able to take all the diagnostic steps in
13  regards to Mr. Alvarado that you would normally take for any
14  patient?
15     A.   Yes.  Having read the patient care report, there
16  are a few different ways to obtain blood pressure and vital
17  signs.  And I remember reading initially I guess we had some
18  trouble with the blood pressure cuff on the monitor not
19  necessarily working the way it normally would, but
20  Firefighter Spencer was able to get a manual blood pressure.
21            There's not any indication from when I've read,
22  from what I've read that there was any reason why we
23  couldn't do a full assessment.
24     Q.   So you did do a full assessment?
25     A.   To the best of my memory.

COTMSJ0373

RAYMOND FLECK
3/14/2024

```
1   training you received on the application of the spit sock
2   did you nevertheless know how and why you would use it?
3        A.   Yes.
4        Q.   During COVID did you apply spit socks more often
5   than you had previously?
6        A.   I don't remember.
7        Q.   And this incident happened on March 22nd of 2020;
8   is that right?
9        A.   Yes.
10       Q.   And that's about 10 days after the City sent all
11   their nonessential personnel home for COVID?
12       A.   Yes.
13       Q.   But you guys didn't get to go home; did you?
14       A.   No.
15       Q.   Did they have PPE for all the firefighters at that
16   point yet?  And by that I don't mean the normal PPE that you
17   guys had prior to COVID.  I mean the COVID specific PPE.
18       A.   No.
19       Q.   When the decision was made by TFD not to transport
20   Mr. Alvarado, to the best of your recollection was he still
21   breathing at that time?
22       A.   Yes.
23            MR. GATTONE:  I'm sorry.  What was the question?
24            MS. WATERS:  At the time the decision was made by
25   TFD not to transport Mr. Alvarado, to the best of your
```

RAYNBO COURT REPORTING, LTD.

RAYMOND FLECK
3/14/2024

1      Q.   Is there anything in it that you as you sit here

2   today you believe is inaccurate or incorrect?

3      A.   No.

4      Q.   You indicated that Paramedic Spencer had to get a

5   manual blood pressure from Mr. Alvarado; is that right?

6      A.   Yes.

7      Q.   Is that something that you guys are trained as a

8   paramedic to do?

9      A.   As EMT basics, yes.

10      Q.   So even EMTs can do that?

11      A.   Yes.

12      Q.   Are manual blood pressures accurate?

13      A.   As accurate as they can be, yes.  That is, manual

14   blood pressures are the standard.  I mean that's the most

15   accurate you're going to get.

16      Q.   You told Mr. Gattone that if you want to know

17   whether someone is able to breathe you would listen to their

18   lungs and check their o2 levels.

19           Do you remember saying that?

20      A.   Yes.

21      Q.   Were Mr. Alvarado's pulse oxygen levels checked

22   here?

23      A.   Yes.

24      Q.   What was his level?

25      A.   94 percent.

RAYMOND FLECK
3/14/2024

```
 1        Q.   Is that within the normal range that you would
 2   anticipate?
 3        A.   Yes.
 4        Q.   Anything about that that made you concerned for
 5   his welfare or well-being?
 6        A.   No.
 7        Q.   Looking at his other vital signs, is there
 8   anything about them that made you alarmed or feel like he
 9   was in need of immediate medical attention?
10        A.   No.
11        Q.   If there had been, would you guys have transported
12   him?
13        A.   Yes.
14        Q.   I know you don't remember all of your training,
15   but if TFD has records of your trainings you participated
16   in, would you expect those to be accurate?
17        A.   Yes.
18        Q.   And did you fulfill all of your training and
19   continuing education requirements for the entire time you
20   were a paramedic up through this incident?
21        A.   Yes.
22             MS. WATERS:  That's all I have.
23   . . . .
24   . . . .
25   . . . .
```

COTMSJ0376

RAYMOND FLECK
3/14/2024

```
 1                    RECROSS-EXAMINATION
 2   BY MR. GATTONE:
 3        Q.    There's nothing in your interview, post-incident
 4   interview saying that you were concerned about COVID.  You
 5   indicated HIV and Hepatitis C.  Do you recall that?
 6        A.    Yeah.  I read that, yes.
 7        Q.    So you didn't say we were concerned about COVID?
 8        A.    I think I did say that.  Can I review?
 9        Q.    You said that you recall that you didn't just say
10   Hepatitis C, and Hepatitis C and HIV?
11        A.    I seem to recall COVID being mentioned as well.
12   May I check?
13        Q.    Sure.
14        A.    I remember the first part of my response was HIV
15   and COVID or, I'm sorry, HIV and hepatitis as well as the
16   coronavirus.
17        Q.    Okay.
18        A.    It specifically says that.
19        Q.    But you didn't have any -- during the time that
20   you were working when the coronavirus was still -- during
21   the pandemic did you use spit socks for everybody?
22        A.    No.
23        Q.    So routinely you weren't saying -- hey, there's no
24   directive saying during COVID put spit socks on everybody?
25        A.    There was not a directive that said during COVID
```

RAYMOND FLECK
3/14/2024

CERTIFICATE

STATE OF ARIZONA       )
                       )
COUNTY OF PIMA         )

BE IT KNOWN that the foregoing deposition was taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter No. 50014 in the State of Arizona; that RAYMOND FLECK was duly sworn by me according to law; that the proceedings were taken down by me and reduced to writing under my direction; that the preparation, production and distribution comply with law and code; that the foregoing 77 pages are a full, true and accurate record, all done to the best of my skill and ability.

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

(  ) Review and signature was waived.

(XX) Review and signature was requested.

(  ) Review and signature was not requested.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206 (F)(3) and ACJA 7-206(J)(1)(g)(1) and (2).

DATED this 21st day of March, 2024.

_____
RAYNBO SILVA, RPR, CR
Certified Reporter
Arizona CR No. 50014

I CERTIFY that RAYNBO COURT REPORTING, LTD., has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

_____
RAYNBO COURT REPORTING, LTD.
Registered Reporting Firm
Arizona RRF No. R1002

COTMSJ0378

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                    )
                                  )
                Plaintiff,        )
                                  )
          vs.                     )    No. CV22-00132-RCC
                                  )
City of Tucson, et al.,           )
                                  )
                Defendants.       )
_____)

DEPOSITION OF SILAS SPENCER

Tucson, Arizona

March 15, 2024

RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169

Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

SILAS SPENCER
3/15/2024

1          When I ask a question, if you'll wait to answer,

2    and when you're answering, I'll wait to ask another question

3    just so we don't talk over each other.

4          All responses have to be out loud so we can get it

5    on the record.

6          A.   Okay.

7          Q.   Okay?

8          A.   Yes, sir.

9          Q.   So you're working -- are you a paramedic with

10   Flagstaff?

11         A.   Yes, sir.

12         Q.   How long have you been with Flagstaff?

13         A.   Coming up it will be a year April 17th.

14         Q.   And you were with Tucson Fire Department before

15   that?

16         A.   I worked for the City of Meridian in Idaho before

17   that.

18         Q.   When did you start with TFD?

19         A.   In 2015.

20         Q.   And you were there until?

21         A.   Summer of 2022.

22         Q.   You went to Meridian, California.  What were you

23   doing --

24         A.   Meridian, Idaho.

25         Q.   -- there?

SILAS SPENCER
3/15/2024

```
 1        A.   I'm sorry.
 2        Q.   Meridian, Idaho.  Wrong state.
 3        A.   I didn't mean to talk over you.
 4        Q.   What were you doing there?
 5        A.   I was a firefighter paramedic.
 6        Q.   For how long?
 7        A.   Approximately six months.
 8        Q.   And you came back to Arizona, and now you're in
 9   Flagstaff?
10        A.   Yes, sir.
11        Q.   Same thing?  Firefighter paramedic?
12        A.   Yes, sir.
13        Q.   All right.  In 2020 you were working for the City
14   of Tucson, in March of 2020; is that correct?
15        A.   Yes, sir.
16        Q.   And just give me a thumbnail sketch of your
17   training, if you would.
18             I'm assuming the training is still the same.
19   Whatever training you went through was applicable in
20   Meridian and in Flagstaff, but give me a little thumbnail of
21   your training, please.
22        A.   Yes, sir.  I started EMT school in 2011.
23        Q.   Where was that with?
24        A.   San Diego.  That was a city.  I worked as an EMT
25   in San Diego for various ambulance companies.
```

COTMSJ0381

SILAS SPENCER
3/15/2024

```
 1        Q.    Okay.
 2        A.    Then I went to paramedic school in 20 -- I'm
 3   sorry -- 2014.
 4        Q.    Where?
 5        A.    It was called Palomar Community College --
 6        Q.    Okay.
 7        A.    -- located in San Diego.
 8        Q.    Okay.
 9        A.    I started working for the Escondido Fire
10   Department as a paramedic and then transitioned in 2015 to
11   the City of Tucson.
12        Q.    So how long did you work for Escondido?
13        A.    A little less than a year.
14        Q.    My understanding is that a paramedic is a more,
15   for lack of a better term, advanced position than an EMT?
16        A.    Yes, sir.
17        Q.    My understanding is that a paramedic can do more
18   things, administer medications that an EMT can't.
19             What else is the difference between an EMT and
20   paramedic?
21        A.    Yes, sir.  So EMTs are basic life support
22   providers as opposed to a paramedic with the extended and
23   scope of practice you receive you are now advanced life
24   support provider.
25        Q.    How long did you -- how long was your paramedic
```

SILAS SPENCER
3/15/2024

1      Q.   Well, that's a lot.

2      A.   Each department.

3      Q.   Each department.  And how about more paramedic

4  training?  Does it carry over?  Or --

5      A.   Yeah.  So each area that you practice paramedicine

6  you have a different set of protocols, so you're continually

7  learning the new kind of standard in each area.

8      Q.   That's something I forgot to ask, too, is that do

9  you have to get licensed or certified by any organization or

10  entity, the state, whatever, in order to become or to be a

11  practicing paramedic?

12      A.   Yes.  Every state you work in you have to get

13  licensed through that state.

14      Q.   So you were licensed in California.  You got

15  licensed here, in Idaho.  And you didn't have to get

16  licensed here again.  You were already licensed?

17      A.   I was already licensed, but every two years you

18  have to re-up your license.

19      Q.   And I'm assuming you've done that?

20      A.   Uh-huh.

21      Q.   Do you have to take any tests?  Do you have to do

22  anything in order to get relicensed or just apply?

23      A.   Those CE hours, continuing education hours that I

24  mentioned, you have to hit a certain benchmark and then send

25  all your certificates to the state showing that you were

SILAS SPENCER
3/15/2024

1   able to complete the required CE hours.

2       Q.   And if so, you get your license renewed?

3       A.   Yes, sir.

4       Q.   All right.  I'm assuming there's fees or something

5   associated with that?  There always is.

6       A.   Yeah.  There's administrative fees that you have

7   to pay.

8       Q.   Sir, during the course of your multiple training

9   sessions have you had any training on the use and

10  application of what's called a spit sock?

11      A.   Yes, sir.

12      Q.   Do you know what that is?

13      A.   Yes, sir.

14      Q.   What is your understanding of what a spit sock is

15  and what it's for?

16      A.   A spit sock is a net that limits the mucus from

17  coming into contact with providers.

18      Q.   Like what?  Spit?  Saliva?  Vomit?  Things along

19  those lines?

20      A.   Yes, sir.

21      Q.   All right.  What is your training and

22  understanding of when it's appropriate to use a spit sock?

23      A.   You're taught as a all the way from EMT school

24  that any time you come into contact with saliva, blood, any

25  sort of by-product or body fluid from a patient that you

SILAS SPENCER
3/15/2024

1  want to minimize your exposure and contact.  So a spit sock

2  provides you the ability to limit that.

3      Q.   So you certainly don't put one on in every

4  occasion?  You put one on when you have some reason to

5  believe that you're going to come in contact with saliva or

6  other bodily fluids?

7      A.   Yes.

8      Q.   All right.  And I'm assuming that every department

9  you've been with has that as a standard issued piece of

10 equipment?

11     A.   Yes.

12     Q.   In your training and experience is it ever

13 appropriate to apply two spit socks?

14     A.   Occasionally if one is not working effectively or

15 in terms of the effect that you would like you can apply a

16 second.

17     Q.   During the time that you've been a firefighter

18 paramedic how many, well, how many times do you think you've

19 applied a spit sock?  More than you can count?  Or can you

20 give us an estimate?

21     A.   More than I can count.

22     Q.   But it's not something you do every time, it's

23 something you do when the circumstances warrant it?

24     A.   Yes.

25     Q.   How many times do you think you've put a double

14

SILAS SPENCER
3/15/2024

```
 1   spit sock on a patient?
 2        A.   To be honest I don't know the exact number.   It
 3   would be over 20.
 4        Q.   So in your years it doesn't happen very often;
 5   would you agree with that assessment?
 6        A.   Yes.
 7        Q.   Because you put spit socks on hundreds of times
 8   but only like 20 times have you doubled the spit sock?
 9        A.   Correct.
10        Q.   Do you know if a spit sock can impair a person's
11   ability to breathe?
12        A.   It cannot.
13        Q.   How about a double spit sock?
14        A.   It cannot.
15        Q.   Could that depend on the individual?  Or is it
16   just your general belief that the one spit sock or double
17   spit sock wouldn't impair breathing?
18        A.   A double spit sock cannot impair breathing.
19        Q.   What if a person is already having respiratory
20   issues, would it exacerbate those issues?
21        A.   No.
22        Q.   When you were with TFD, were there any directives
23   or orders on when it was appropriate to use a spit sock?
24        A.   There were administrative guidelines on when it
25   was appropriate to use a spit sock.
```

COTMSJ0386

SILAS SPENCER
3/15/2024

1  talked about taking vital signs with patients in handcuffs.

2      Q.   And you were taught how to do that?

3      A.   Yes, sir.

4      Q.   What about if they're in more restraints than just

5  handcuffs?

6          Have you ever seen restraints where they're

7  handcuffed and their legs are connected, their legs are also

8  restrained and the cuffs and leg restraints are connected?

9      A.   Yes, I have seen that.

10      Q.   All right.  How often have you seen that?

11      A.   Countless times.

12      Q.   I'm assuming that there was multiple times when

13  you've had to provide medical assistance to someone who was

14  detained by the police?

15      A.   Yes.

16      Q.   How many times during the course of your, let's

17  just focus on TFD, how many times during your time with TFD

18  have you provided medical assistance to someone who's in

19  police custody?

20      A.   I'm not sure off the top of my head but fairly

21  often.

22      Q.   Have you ever been in a situation where the

23  police, particularly TPD, tells you to hold off on treating

24  a patient?

25      A.   No.  They're very -- we work together well

COTMSJ0387

SILAS SPENCER
3/15/2024

1        A.    Perfect.  I was a firefighter on Engine 20.

2        Q.    On that day at some point did you receive a call

3   out to an auto accident?

4        A.    Yes.

5        Q.    I believe it was in the intersection of Campbell

6   and Prince.  Do you recall that?

7        A.    Yes.

8        Q.    And describe what you encountered when you first

9   got there, if you recall.

10        A.    I just remember going to a car accident.  I can't

11   remember the specific details of that accident.

12        Q.    So there were no fatalities at that accident;

13   correct?

14        A.    I can't recall.

15        Q.    No injuries that you recall?

16        A.    No, sir.

17        Q.    Do you recall speaking to anyone who was involved

18   in the accident?

19        A.    I'm not sure.  There were police department

20   personnel there who might have body cam footage.  If I can

21   review that, I might be able to also help jostle my memory.

22        Q.    But in any case you don't recall if you or your

23   colleagues transported anyone to the hospital as a result of

24   that car accident?

25        A.    No, sir.  I can't recall.

COTMSJ0388

SILAS SPENCER
3/15/2024

```
 1        Q.   So do you recall if any of the involved parties

 2   said take me to the hospital, I need to go?

 3        A.   I'm not sure.

 4        Q.   Then at some point you got called to another

 5   incident in the general area.  Do you recall that?

 6        A.   Yes.  We did get called to another call in that

 7   area.

 8        Q.   Do you remember what that call was about?

 9        A.   I believe it was the call that we're discussing

10   right now.

11        Q.   So a call for assistance to a person who was in

12   custody of the Tucson police?

13        A.   Yes, sir.

14        Q.   Did they indicate to you if that person had any

15   injuries or just generally come out and assess them?

16        A.   It was, from my recollection it was to come and

17   assess somebody in custody.

18        Q.   And when you got to the scene, what did you see?

19        A.   Using that body cam footage I was able to remember

20   walking up to the patient and seeing him in police custody.

21        Q.   How many police officers did you see there with

22   the patient?

23        A.   I can't give you an exact number.  I'm not sure.

24        Q.   More than, more than a couple?

25        A.   More than two, yes.
```

COTMSJ0389

SILAS SPENCER
3/15/2024

1   is on their side.

2       Q.   Now when you got there, you said that the -- well,

3   his name was Damien Alvarado.  Can we agree to that?

4       A.   Yes, sir.

5       Q.   All right.  And when you got there, did the police

6   officers give you any indication as to what alleged crime he

7   may have been involved with?

8       A.   That was not my interaction with the police

9   department.

10      Q.   When you got there, did the police say this guy's

11  a spitter, he's been spitting at us or coughing at us or

12  anything along those lines?

13      A.   No.  We were able to see him still spitting

14  through his spit sock, so we were able to see that

15  ourselves.

16      Q.   So when he got there, you -- describe that to me.

17           Was it just he was talking and saliva was coming

18  out?  Was he actively, you know, in the action of spitting,

19  you know, (indicating) expelling saliva from his mouth?

20      A.   You could see spit coming from out of the spit

21  sock while he was talking.

22      Q.   And he had a spit sock on at the time?

23      A.   I believe so, yes.

24      Q.   And do you know if TPD or who may have put the

25  spit sock on him?

RAYNBO COURT REPORTING, LTD.

COTMSJ0390

SILAS SPENCER
3/15/2024

1       A.   I'm not sure.  I would assume it was TPD.

2       Q.   Do you have any recollection of what the spit sock

3  looked like?

4       A.   I do not.

5       Q.   You don't remember if it was a full head covering

6  or just his mouth and nose?

7       A.   I believe it was just his mouth and nose.

8       Q.   But in any case his mouth and nose were covered by

9  a spit sock when you first came on the scene?

10      A.   I believe so.

11      Q.   Did you have any -- one of your colleagues

12  indicated that they assumed that the spit sock was applied

13  out of TFD's personal concern or personnel concern about HIV

14  and Hepatitis C.  Was that your concern?

15      A.   As well as COVID.

16      Q.   And did you tell the -- in your post-interview

17  that you were concerned about COVID?

18      A.   I would need to review what exactly I said in my

19  statement with TPD.

20      Q.   So do you, in your training and experience do

21  you -- well, do you know if anyone in Tucson Fire Department

22  has ever contracted HIV as a result of someone spitting?

23      A.   I'm not sure.

24      Q.   But you never have obviously?

25      A.   I have never contracted HIV.

COTMSJ0391

SILAS SPENCER
3/15/2024

1     Q.   And no one in your company ever contracted HIV

2 from someone spitting as far as you know?

3     A.   As far as I know.

4     Q.   How about Hepatitis C?  You've never contracted

5 Hepatitis C from coming in contact with a person who may be

6 expelling bodily fluids?

7     A.   I do not believe so.

8     Q.   How about people in your company, as far as you

9 know they haven't?

10     A.   I'm not sure.

11     Q.   Can you contract HIV from saliva?

12     A.   I would need to look at the exact research, but I

13 believe any sort of mucus membrane coming in contact with

14 another mucus membrane poses a risk.

15     Q.   You're certain it's not just sexually transmitted,

16 it can be transmitted by bodily fluids?

17     A.   Yes.

18     Q.   How about Hepatitis C?  It could be transmitted,

19 to the best of your knowledge and training, it could be

20 transmitted through bodily fluids?

21     A.   Yes.

22     Q.   Now what if a person is highly -- you indicated

23 that you didn't think a spit sock could impede a person's

24 ability to breathe.

25        What about if they were in a highly agitated

SILAS SPENCER
3/15/2024

 1   state, would that have any effect on their ability to
 2   breathe through a spit sock?
 3        A.   No.
 4        Q.   All right.  Now who -- did you ever come -- did
 5   you ever attempt to speak to the patient?
 6        A.   I believe so.
 7        Q.   And what was the extent of your conversation with
 8   him, if you recall?
 9        A.   I would need to review the body cam footage to see
10   exactly what was said.
11        Q.   Do you recall him ever saying that he couldn't
12   breathe?
13        A.   I do not recall.
14        Q.   Do you recall if anybody from the Tucson police
15   said hey, this guy's saying that he can't breathe?
16        A.   Not that I remember, but I would need to review
17   that body cam footage to --
18        Q.   And if I recall correctly, Captain Ford was your
19   immediate supervisor?
20        A.   Yes.
21        Q.   And he was, he was on the scene at the time?
22        A.   Yes.
23        Q.   And you were answering to him.  Was he giving
24   directions on what to do?  Or you just went in and did what
25   you usually do?

COTMSJ0393

SILAS SPENCER
3/15/2024

1        A.    We went and did what we usually did.

2        Q.    And so you said -- did you talk to the police at

3   all?

4        A.    Not that I can recall but, once again, I would

5   need to see my exact interaction from that body cam footage.

6        Q.    Do you recall -- and tell me what you did in order

7   to evaluate the patient's health, if you recall.  What steps

8   did you take?

9        A.    Walked up to the patient, saw him on the ground on

10  the side or, you know, made sure the patient was on its

11  side.  Then I established that he had a patent airway, he

12  was able to talk, he was breathing.  And I felt for a pulse.

13  He had circulation.  And then we started taking vital signs.

14       Q.    And you were able to do what you needed to do with

15  the patient?

16       A.    Yes.

17       Q.    Now who made the decision to apply the second spit

18  sock?

19       A.    I do not recall.

20       Q.    Did you -- and do you know who applied the second

21  spit sock?

22       A.    I would have to review that body cam footage to

23  give you the answer.

24       Q.    It wasn't you?

25       A.    I'm not sure off the top of my head.  I would need

COTMSJ0394

SILAS SPENCER
3/15/2024

1   to --

2      Q.   Do you know why the decision was made to apply the

3   second spit sock?

4      A.   Yes.

5      Q.   Why was that?

6      A.   I think we all could agree that the patient was

7   still spitting, there was mucus still coming out and around,

8   and we were concerned for our safety.

9      Q.   So you had concerns that the initial spit sock was

10  not doing what it's designed to do?

11     A.   Yes.

12     Q.   All right.  Have you ever seen that kind of spit

13  sock, the half one that covers the mouth and nose?

14     A.   I do not recall.

15     Q.   You do not recall if you've seen it before?  Or

16  you do not recall that that's the kind of spit sock that was

17  on?

18     A.   That was the spit sock that was on.  I would need

19  to look back and figure out how many times I've seen that

20  spit sock.

21     Q.   And the spit sock that you all put on was the one

22  that covers the entire head; is that correct?

23     A.   Yes.

24     Q.   In one of the interviews there was an indication

25  that it looked like the spit sock was prone to failure.  Do

COTMSJ0395

SILAS SPENCER
3/15/2024

1   you agree with that assessment?  I mean the initial spit

2   sock.

3        A.   There was still spit coming up and around.  I

4   don't know exactly how that manufacturer's specific spit

5   sock was supposed to --

6        Q.   So it's your --

7        A.   -- function.

8        Q.   Oh, go ahead.  It's your recollection that spit

9   was coming through the spit sock?

10       A.   It was -- I would need to review that body cam

11  footage once again, but there was spit coming out from

12  around the spit sock and I believe through.

13       Q.   Even though you indicated that the initial spit

14  sock covered his nose and his mouth?

15       A.   Yes.

16       Q.   Did it have a gap that you recall?  Was it tight

17  on his face?

18       A.   I do not recall.

19       Q.   All right.  Do you recall if it was hanging down

20  or if it was connected by a cord or anything around his

21  neck?  Do you recall that?

22       A.   I do not recall.

23       Q.   So at any point during the application of the

24  second spit sock did you have any reason to believe that

25  Mr. Alvarado was having trouble breathing?

COTMSJ0396

SILAS SPENCER
3/15/2024

1       A.   No.

2       Q.   Do you recall him ever saying I can't breathe?

3       A.   I do not recall.

4       Q.   Did his demeanor ever change during the time that

5  you were providing or evaluating his health?

6       A.   Can you say that one more time?

7       Q.   I don't even remember what the question was.

8            MS. WATERS:   Whether his demeanor changed during

9  the course of the assessment.

10      Q.   Right.

11      A.   At first when we approached him he was a little

12  agitated.  Once we started taking vital signs he was able to

13  recognize that we were there to evaluate him, and his

14  demeanor then -- he was less agitated with us.

15      Q.   Did his responses to your questions seem normal?

16  Did he seem, you know, not responding appropriately?  How

17  was that?

18      A.   His responses seemed typical for somebody who had

19  just it sounded like gotten in a scuffle.

20      Q.   Got in a scuffle with who?

21      A.   The police department.

22      Q.   Did they tell you that when you arrived, that they

23  were struggling with him or that they had a fight or

24  something with him?

25      A.   No, but we saw multiple cops winded and we saw

SILAS SPENCER
3/15/2024

```
 1              MS. WATERS:   Sorry.

 2       A.   Sorry.

 3       Q.   Did Mr. Alvarado say anything about ingesting

 4  illegal drugs?

 5       A.   Not that I can recall.

 6       Q.   Is there a certain way that people act if they're

 7  hyped up, if they're high?  Is there a certain way that they

 8  act in your training and experience?

 9       A.   Yes.

10       Q.   And how is that?

11       A.   Typically not able to be consoled, increasingly

12  agitated without the possibility of calming down from my

13  assessment is a good indicator.

14       Q.   What do you mean couldn't be consoled?

15       A.   Sorry.  That was a poor word choice.  Not able to

16  be holding a conversation and talked to.  Like I'm trying to

17  help them, and typically they're able to then settle down

18  and let us do our job.

19       Q.   Based on your training and experience did you note

20  any behaviors in Mr. Alvarado suggesting that he may have

21  consumed illegal drugs?

22       A.   No.

23       Q.   And none of the officers held you or your

24  colleagues back from treating Mr. Alvarado out of safety

25  concerns?
```

COTMSJ0398

SILAS SPENCER
3/15/2024

```
1        A.   I remember his hands being behind his back.  I
2   would need to review that body cam footage to tell you
3   exactly how he was being restrained.
4        Q.   If a patient is reviewed -- is restrained hands
5   and feet together behind his back, would that impact your
6   ability to provide an evaluation?
7        A.   No.
8        Q.   Would that have any impact on that person's
9   ability to breathe?
10       A.   No.
11       Q.   What if the person is already having respiratory
12   issues, could that exacerbate them?
13       A.   Being on their side is the proper position for
14   someone on the ground.
15       Q.   Being on their stomach is not the appropriate or
16   ideal position?
17       A.   Correct.
18       Q.   Did you -- I think I may have asked if you ever
19   spoke to him, and you indicated you don't recall speaking
20   with Mr. Alvarado?  Or did you speak with him?
21       A.   I would need to review the body cam footage to
22   exactly know for certain what or if.  I did not say.
23       Q.   But you recall having some conversation with him?
24       A.   I do not recall at this time.
25       Q.   Who may have had conversation with him?
```

COTMSJ0399

SILAS SPENCER
3/15/2024

1      A.   One of the other firefighter paramedics.

2      Q.   How close were you?  You were right on him when

3  you were providing an evaluation; correct?

4      A.   Yes.

5      Q.   And did you -- was there anything about his

6  behavior or demeanor that concerned you?

7      A.   No.

8      Q.   Was there anything about his behavior or demeanor

9  that caused you to have some safety concerns?

10      A.   Yes.

11      Q.   What was that?

12      A.   The patient was spitting.

13      Q.   Did anyone say to you, any of the TPD personnel

14  say hey, don't put that second spit sock on, that's a

15  problem?

16      A.   Not that I recall.

17      Q.   And did Captain Ford or anyone in your company say

18  hey, don't put that second spit sock on, that's a problem?

19      A.   I do not recall.

20      Q.   So they just at least agreed or acquiesced to the

21  application of the second spit sock?

22      A.   Yes.

23      Q.   Do you recall what his oxygen saturation level

24  was?

25      A.   I would need to review the patient care report

SILAS SPENCER
3/15/2024

1   vehicle.  I mean trapeze or something, apparatus.

2          So you're on your way back to the engine.  And

3   when do you first get information that there might be a

4   problem with Mr. Alvarado?

5      A.   We were in the engine, and I forgot how our

6   captain was notified but he let us know that the patient

7   needed our help again.

8      Q.   And what did you all do?

9      A.   We hustled over there.

10     Q.   And tell me what you saw when you were hustling

11  over there, when you made it to the scene.

12     A.   When we made it to the scene, we saw Tucson Police

13  Department doing compressions on the patient.  From my

14  recollection I was the first firefighter there, felt for a

15  pulse, checked.  He wasn't breathing, had no pulse.  And

16  then I started compressions.

17     Q.   So between the time that you were packing up your

18  gear and the time you got to the engine his situation had

19  deteriorated significantly?

20     A.   I do not recall.  I'm so -- can you?

21     Q.   Sure.  You're packing up your gear, you're going

22  to the engine, and in that time period is when his health

23  deteriorated?

24     A.   Yes.

25     Q.   And how long was it, if you can recall, between

SILAS SPENCER
3/15/2024

1        A.   I do not recall.

2        Q.   You don't know -- well, you don't recall who may

3   have taken off the restraints?

4        A.   I would need to review that body cam footage to.

5        Q.   So he's not breathing.  There's no pulse rate.  Do

6   you have any indication as to why his, his condition

7   deteriorated so quickly?

8        A.   No.

9        Q.   So no, no belief as to why it did, just it did?

10       A.   Yes.

11       Q.   So you're there.  You're assessing him.  There's a

12   problem.  What happens next?

13            Oh, I'm sorry.  Let me back up.

14            What did you all do to -- you said the police were

15   doing chest compressions.  What did you do in an attempt to

16   resuscitate the patient?

17       A.   As I previously mentioned, I walked over, checked

18   for the pulse, saw the patient was not breathing, and then I

19   continued chest compressions.  Then we took the patient into

20   the ambulance, and then we worked on trying to resus this

21   patient.

22       Q.   What else did you do in response to his condition?

23   Did you administer an IV?  Did you administer any drugs or

24   anything along those lines?

25       A.   Yes.  We treated this patient like anyone else who

COTMSJ0402

SILAS SPENCER
3/15/2024

1   was in cardiac arrest.  We put a tube into their trachea to

2   breathe for them.  We then continued chest compressions

3   trying to circulate blood throughout the body.  We also

4   established access, I believe, I'd have to look at my PCR,

5   but I'm pretty sure it was intraosseous, and we administered

6   epinephrine per our protocols.

7        Q.   And that's standard?

8        A.   Yes.

9        Q.   And did he respond at all to your efforts?

10       A.   From what I can recall, no, but I would need to

11   look at my health care report.

12       Q.   But you don't recall him while he improved, his

13   heart started beating, he started breathing, anything along

14   those lines?

15       A.   The patient remained in CPR status.

16       Q.   Meaning he needed CPR to try to keep him alive?

17       A.   He needed CPR in order to have blood circulating

18   through his body.

19       Q.   But at that point he's deceased, you're just

20   trying to resuscitate him?

21       A.   Correct.

22       Q.   And I'm sorry.  He was essentially deceased when

23   you first came on the scene and you evaluated him?

24       A.   The patient was not breathing and did not have a

25   pulse.

COTMSJ0403

SILAS SPENCER
3/15/2024

1       Q.    So essentially he was dead?

2             MS. WATERS:   Object to form.

3             But you can answer.

4       Q.    Go ahead.

5       A.    Yes.

6       Q.    When you got back, did you see anything that would

7   indicate to you that there was a further struggle with him

8   or any sort of -- was he -- yeah.

9             Did you have any information received that there

10  was a struggle or other situation like that between the time

11  you were leaving and the time you needed to respond?

12      A.    No.

13      Q.    What happens next?  He's transported to the

14  hospital?

15      A.    Correct.

16      Q.    And you continue resuscitation efforts?

17      A.    Yes.

18      Q.    Did you travel with the patient, with Mr. Alvarado

19  to the hospital?

20      A.    Yes.

21      Q.    And who else was there?

22      A.    I would need to look at the patient care report to

23  tell you the people who were in the back of the ambulance,

24  but I believe Keith Goldstein was in the back with me.  And

25  I do not recall the other two TFD members' names off the top

SILAS SPENCER
3/15/2024

1    of my head.

2        Q.    And apparently his condition didn't improve on the

3    trip to the hospital that you recall?

4        A.    Correct.  The patient remained in the status that

5    we found him in.

6        Q.    When you get to the hospital, what do you do?

7        A.    We turn the patient over to the hospital staff,

8    and then they go through their protocol of resuscitation

9    efforts.

10       Q.    Do you stay at the hospital for awhile?  Do you

11   get an updated report on his status?

12       A.    I remember just taking out the gurney and cleaning

13   up and getting ready for the next call.

14       Q.    All right.  At some point you learned that he was

15   not resuscitated, that he was deceased?

16       A.    Yes.

17       Q.    How did you learn that?  How did you get that

18   information?

19       A.    I do not recall.

20       Q.    And so you wouldn't know when he may have been

21   declared dead?

22       A.    Correct.

23       Q.    Did you -- have you ever had any involvement in

24   other police custody situations where a person has died?

25       A.    No, sir.

SILAS SPENCER
3/15/2024

```
1                          CERTIFICATE

2   STATE OF ARIZONA      )
                          )
3   COUNTY OF PIMA        )

4          BE IT KNOWN that the foregoing deposition was
    taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
5   No. 50014 in the State of Arizona; that SILAS SPENCER was
    duly sworn by me according to law; that the proceedings were
6   taken down by me and reduced to writing under my direction;
    that the preparation, production and distribution comply
7   with law and code; that the foregoing 53 pages are a full,
    true and accurate record, all done to the best of my skill
8   and ability.

9          I CERTIFY that I am in no way related to any of
    the parties hereto, nor am I in any way interested in the
10  outcome hereof.

11         (  ) Review and signature was waived.

12         (XX) Review and signature was requested.

13         (  ) Review and signature was not requested.

14         I CERTIFY that I have complied with the ethical
    obligations set forth in ACJA 7-206 (F)(3) and
15  ACJA 7-206(J)(1)(g)(1) and (2).

16         DATED this 22nd day of March, 2024.

17
                         _____
18                       RAYNBO SILVA, RPR, CR
19                       Certified Reporter
                         Arizona CR No. 50014
20

21         I CERTIFY that RAYNBO COURT REPORTING, LTD., has
    complied with the ethical obligations set forth in
22  ACJA 7-206 (J)(1)(g)(1) through (6).

23
                         _____
24                       RAYNBO COURT REPORTING, LTD.
                         Registered Reporting Firm
25                       Arizona RRF No. R1002
```

RAYNBO COURT REPORTING, LTD.

COTMSJ0406

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Irene Briesno,                      )
                                    )
                    Plaintiff,      )
                                    )
            vs.                     )      No. CV22-00132-RCC
                                    )
City of Tucson, et al.,             )
                                    )
                    Defendants.     )
_____)


DEPOSITION OF KEITH GOLDSTEIN

Tucson, Arizona

March 14, 2024


RAYNBO COURT REPORTING, LTD.

3625 West Gailey Drive
Tucson, Arizona   85741
(520)349-0169


Reported by:  Raynbo Silva, RPR, CR
              Certified Reporter No. 50014

COTMSJ0407

KEITH GOLDSTEIN
3/14/2024

1   you'll wait to answer until I get my question out, and I'll

2   wait for another question until you get your answer out.

3   Okay?

4        A.   Yes, sir.

5        Q.   Sir, how are you presently employed?

6        A.   I'm employed with the City of Tucson.

7        Q.   I'm sorry?

8        A.   I'm employed with the City of Tucson.

9        Q.   Fire department?

10       A.   Yes, sir.

11       Q.   And what's your position there?

12       A.   Firefighter paramedic.

13       Q.   And so you are a paramedic, not an EMT?

14       A.   Correct.

15       Q.   We learned earlier today about some of the

16   training that you have to go through to become a paramedic.

17            Did you do the Pima class?  Or did you go through

18   some other way?

19       A.   It was sponsored by the City of Tucson through

20   Pima.

21       Q.   Great.  So you went through the Pima course.  Like

22   I think that Paramedic Fleck took the same thing.

23            Is that generally where the people get their

24   paramedic education from with the City of Tucson?

25       A.   I don't know how they did it before I went through

KEITH GOLDSTEIN
3/14/2024

1   it, but since I've been through it I know they've all been

2   out at Pima.

3       Q.   Great.  His was a seven month training.  How long

4   was yours?

5       A.   I believe it was six.

6       Q.   Sir, I forgot to ask.  How long have you been with

7   the fire department?

8       A.   I've been employed since 2006.

9       Q.   Did you have any employment before then?

10      A.   Yes.

11      Q.   What did you do?

12      A.   I was the parts manager at a Yamaha Suzuki

13  dealership in Colorado.

14      Q.   In Colorado.

15           Sir, are you aware of what the lawsuit is about,

16  what this lawsuit is about?

17      A.   I have read through it, and I have an

18  understanding of what I believe it's about.

19      Q.   So you've read the complaint?

20      A.   Yes, sir.

21      Q.   All right.  What is your, what's your

22  understanding of what the lawsuit is about?

23      A.   I would have to reread it thoroughly to give you a

24  solid answer to be honest.

25      Q.   Do you remember it enough that it has to do with

COTMSJ0409

KEITH GOLDSTEIN
3/14/2024

1    As far as I mean I know how to put one on and take it off.

2        Q.    Somewhere in your education to become a paramedic

3    did you learn about the use and application of a spit sock?

4        A.    Yes.

5        Q.    Did you learn -- you learned how to put it on?

6        A.    Yes.

7        Q.    Did you learn when it's appropriate to put one on?

8        A.    Yes.

9        Q.    And what's your understanding of when it's

10   appropriate to put a spit sock on an individual?

11       A.    To my recollection what we were taught is if the

12   patient is spitting or biting it's to protect individuals on

13   the crew.

14       Q.    Sir, how often would you say that you or -- off

15   the record.

16             (Whereupon a discussion was held off the record.)

17       Q.    Sorry about that interruption.

18             So you were saying that you had some education on

19   the use and when it's appropriate to apply a spit sock; is

20   that correct?

21       A.    Yes.

22       Q.    And you said that a spit sock is appropriate when

23   a person is spitting or biting; correct?

24       A.    Yes.

25       Q.    How about have you been trained on when it might

KEITH GOLDSTEIN
3/14/2024

 1  someone if they weren't actively spitting or biting?

 2       A.    Sometimes patients will make that, make a motion

 3  like they're going to spit on.  You know, they'll

 4  (indicating) snort their nose or gather spit, and it's a

 5  risk that is easily mitigated.

 6       Q.    But absent that and absent active spitting and

 7  biting it wouldn't be appropriate to put a spit sock on;

 8  correct?

 9            MS. WATERS:  Object to form.

10            You may answer.

11            THE WITNESS:  It's also appropriate if you believe

12  they may spit or bite.

13       Q.    So isn't it possible that everybody could spit?

14       A.    Yes.

15       Q.    But you said you put it on if there's spitting or

16  biting and if they're doing (indicating) like they're going

17  to spit.  So those are three circumstances when you would

18  put a spit sock on someone; correct?

19       A.    Yes.

20       Q.    All right.  Do you know what model spit sock the

21  fire department has?

22       A.    I do not.

23       Q.    Do you know if it's the same spit sock that the

24  police department uses?

25       A.    I do not know.

COTMSJ0411

KEITH GOLDSTEIN
3/14/2024

1        Q.    Do you know if there's different models of spit
2    sock?
3        A.    I do not know.
4        Q.    And have you ever learned how to properly secure a
5    spit sock on someone's head?
6        A.    I guess I would need definition of secure.  It's
7    a --
8        Q.    Well, do you just pull it over their head?  Do you
9    make sure it's on there properly?  Do you make sure that
10   they still can't spit or bite?
11       A.    It's a, it's basically a fine mesh with elastic at
12   the bottom --
13       Q.    Okay.
14       A.    -- and there's, there's nothing that secures it to
15   anything.  It's just held by the loose elastic band.
16       Q.    That's as secure as it gets; correct?
17       A.    Correct.
18       Q.    All right.  And so that would be secure.  If it's
19   on properly, the elastic would be on the neck, it would be
20   over their head; correct?
21       A.    Yes.
22       Q.    Now were spit socks routinely used during the
23   COVID pandemic?
24       A.    For -- yes.
25       Q.    For everyone?

KEITH GOLDSTEIN
3/14/2024

1              THE WITNESS:  As far as?

2         Q.   The normal operation of someone's heart?

3         A.   I know it creates tachycardia.  That's all I know.

4         Q.   Rapid beating of the heart?

5         A.   Correct.

6         Q.   What about, describe to me what an oxygen

7    saturation level is.

8         A.   The level of oxygen being, the percentage of

9    oxygen being carried on hemoglobin.

10            Q.   Is there an oxygen saturation level that's

11   considered to be within a healthy range?

12            A.   Yes.

13            Q.   Is there a range that you consider to be

14   concerning?

15            A.   Yes.

16            Q.   Is there a range that you consider to be a danger

17   zone range?

18            A.   Yes.

19            Q.   So what is normal in your understanding or

20   training and experience?

21            A.   92 percent or higher.

22            Q.   I'm sorry?

23            A.   92 percent or higher.

24            Q.   And how about concerning range?  What would that

25   be?

COTMSJ0413

KEITH GOLDSTEIN
3/14/2024

 1       A.   There's a lot of variables there, but I'll answer
 2   it the best I can.
 3       Q.   Okey-doke.  That's all we can ask.  Go ahead.
 4       A.   Below, below 88 would be where I start to get
 5   concerned.
 6       Q.   And how about the danger zone?  What is that?
 7       A.   Again, a lot of variables here, but below 80 I
 8   would say starts to get dangerous.
 9       Q.   Now let's talk about in your training and
10   experience are there situations where you transported a
11   patient to the hospital without verbal consent?
12       A.   Yes.
13       Q.   And when would that be?
14       A.   When there's implied consent.
15       Q.   A person says take me or the person -- if the
16   person's unconscious, you obviously you would take them to
17   the hospital?
18       A.   Yeah.  Implied consent, yes.
19       Q.   What else would be implied consent?
20       A.   Altered mental status.
21       Q.   I'm sorry?
22       A.   Altered mental status --
23       Q.   Okay.
24       A.   -- inability to make a medical decision on their
25   own.

COTMSJ0414

KEITH GOLDSTEIN
3/14/2024

```
 1        Q.    How about if they were on drugs?  Would that
 2   somehow be an altered medical state?
 3        A.    That's -- yes.
 4        Q.    Now you understand that this case is about someone
 5   who was in the police custody; correct?
 6        A.    Yes.
 7        Q.    And how many times have you provided medical
 8   assistance to someone who was in police, in police custody?
 9        A.    Many.
10        Q.    Many times I'm assuming over the course of your
11   career?
12        A.    Yes.
13        Q.    So you have -- how about you've provided medical
14   services to people who were restrained by the police; is
15   that correct?
16        A.    I have.
17        Q.    Probably more than once?
18        A.    Yes.
19        Q.    And have you ever been trained in adequate versus
20   inadequate signs of breathing?
21        A.    Yes.
22        Q.    What are they?
23        A.    Of which end?
24        Q.    I'm sorry?
25        A.    Would you like adequate or inadequate or both?
```

COTMSJ0415

KEITH GOLDSTEIN
3/14/2024

1      Q.   Both, please.

2      A.   Okay.  Equal rise and fall of the chest per side.

3  If they rise equally and fall equally, that's an indication

4  of adequate.  If one falls and the other doesn't, it could

5  indicate inadequate.

6          If lung sounds -- lung sounds can indicate a

7  problem.  The pulse ox can indicate inadequate respirations.

8      Q.   Anything else?

9      A.   Sometimes patients will be in what's called a

10  tripod position.

11      Q.   What does that mean?

12      A.   They will have their hands on their knees --

13      Q.   Uh-huh.

14      A.   -- and kind of be up straight.  So it's a tripod

15  with their back.  It helps open the airway.

16      Q.   Now a couple minutes ago you told me that many

17  times you've provided medical assistance to someone who was

18  in police custody; correct?

19      A.   Yes.

20      Q.   And have you ever been told by TPD to hold off on

21  treatment or wait a minute or this person doesn't need

22  treatment, anything along those lines?

23          MS. WATERS:  Object to form.

24          But you can answer.

25          THE WITNESS:  I don't recall.  I don't believe so,

COTMSJ0416

KEITH GOLDSTEIN
3/14/2024

1    Q.   And so you went there to the scene at Campbell and

2    Prince.  What did you see when you arrived on scene?

3        A.   Clarification, please.  The first dispatch or

4    second?

5        Q.   The second dispatch.

6        A.   Okay.  I remember driving down the alley, a dusty

7    driveway.  I don't recall if it was an alley or a driveway.

8    But and there were police on scene prior to our arrival and

9    they had an individual in custody on the ground.

10       Q.   Was he in restraints?

11       A.   I believe so, but I don't recall.

12       Q.   Was he in restraints similar to the one I showed

13   you the picture of?

14       A.   I don't recall.

15       Q.   All right.  Now you get there.  You see this

16   individual being detained.  And was he wearing a spit sock

17   at the time?

18       A.   I believe so.

19       Q.   All right.  And did any of the TPD personnel when

20   you got there say watch out, this guy's spitting, watch out,

21   this guy's pretending he's going to spit?  Anything along

22   those lines?

23       A.   I don't remember.

24       Q.   How about did you see the patient spitting during

25   the time that when you first approached?

KEITH GOLDSTEIN
3/14/2024

1  recall how it was covering his face?

2       A.   I don't.

3       Q.   Now you said you would use a spit sock if there's

4  spitting or pretending to spit or they're biting.

5            Did you have any specific concerns about being

6  contaminated by bodily fluids on this occasion?

7       A.   I can't recall how I felt about that situation

8  right now.

9       Q.   But at some point you or someone in your group

10 applied a second spit sock; correct?

11      A.   I did not.

12      Q.   Did you see who did?

13      A.   I don't recall.  I didn't do it.

14      Q.   But you are aware that a second spit sock was

15 applied to Mr. Alvarado?

16      A.   I am at this point.

17      Q.   And you didn't see who did it?

18      A.   Not that I recall.

19      Q.   So at that point you don't recall if you were

20 concerned about being contaminated by bodily fluids.

21            In your post-incident interview you assumed that

22 the second, you said you assumed that the second spit sock

23 was applied out of TFD's personnel concerns about HIV and

24 Hepatitis C training.

25            Do you recall saying that?

COTMSJ0418

KEITH GOLDSTEIN
3/14/2024

1       A.   No.

2       Q.   All right.  Would you believe me if I told you

3  that it was in your interview?

4       A.   Yes.

5       Q.   And in your training and experience can you

6  contact HIV from saliva?

7       A.   I can't say definitively a hundred percent you

8  can't.

9       Q.   What is your understanding or your belief?

10       A.   That it's a very -- it's a low likelihood of

11  transmission.

12       Q.   Through saliva?

13       A.   Correct.

14       Q.   What about Hepatitis C?

15       A.   That is, that is -- that's through blood.

16       Q.   I'm sorry?

17       A.   Through blood.

18       Q.   I couldn't hear you.

19       A.   It's through blood.

20       Q.   All right.  So you, so at least you didn't have

21  any concerns that day about contamination with bodily

22  fluids?

23            MS. WATERS:  Objection, misstates the testimony.

24            You can answer.

25            THE WITNESS:  Oh.  Say it one more time if you

COTMSJ0419

KEITH GOLDSTEIN
3/14/2024

1      A.   I have not seen -- no.

2      Q.   No.  You're saying that a spit sock cannot impede

3  someone's ability to breathe; is that correct?

4           Let me back up.  I said, I asked you do you know

5  if a spit sock can impede a person's ability to breathe and

6  you said no.

7           So you don't know if a spit sock could or a spit

8  sock cannot?

9      A.   I don't -- I haven't seen studies.

10     Q.   So you're not aware if a spit sock could impede a

11 person's ability to breathe?

12     A.   No.

13     Q.   Have you ever been trained on the use of a spit

14 sock?

15     A.   I think, I think I said earlier I was trained on

16 application, donning and doffing.

17     Q.   In your training did they indicate as to whether a

18 spit sock could impede someone's ability to breathe?

19     A.   Not that, not that I recall.

20     Q.   So you indicated to me that at least in your

21 understanding there's three situations where a spit sock is

22 appropriate, spitting, preparing to spit or biting; correct?

23     A.   Yes.

24     Q.   Can you think of any other circumstances besides

25 those three when it may be appropriate to put on a spit

KEITH GOLDSTEIN
3/14/2024

1  sock?

2      A.   Those are the three I can think of.

3      Q.   So except for those three circumstances you would

4  not employ a spit sock on a patient?

5      A.   Not necessarily.

6      Q.   Well, just tell me some other circumstances in

7  which other than those three where you might employ a spit

8  sock.

9      A.   I can't think of any at this moment --

10     Q.   Okay.

11     A.   -- but --

12     Q.   All right.

13     A.   -- there may be.

14     Q.   So when you -- you indicated, in your interview

15  you indicated that you and Paramedic Goldstein had primary

16  contact with Mr. Alvarado and that you attempted to speak

17  with and conduct an assessment of Mr. Alvarado; is that

18  correct?

19     A.   Just a quick correction.  I'm Goldstein.

20          MS. WATERS:  Object to form.

21          MR. GATTONE:  Who did I say?

22     A.   You said Goldstein.

23          MS. WATERS:  Are you looking at the right

24  interview?

25     Q.   I think I meant that.  You indicated that you and

KEITH GOLDSTEIN
3/14/2024

1   Paramedic Spencer had primary contact with Mr. Alvarado and

2   that you attempted to speak and conduct an assessment of

3   Mr. Alvarado; is that correct?

4        A.   I can't dispute what's written.  I don't recall,

5   but if that's the written statement from the police, I

6   probably said it.

7        Q.   Do you know if you were able -- well, when you had

8   contact with him and saw him, was he actively spitting?

9        A.   I don't recall.

10        Q.   Was he actively biting?

11        A.   I don't recall.

12        Q.   Was he activity doing, making preparatory noises,

13   too, as if he was going to spit?

14        A.   I don't recall.

15        Q.   All right.  Now were you able to complete your

16   assessment of Mr. Alvarado?

17        A.   Yes.

18        Q.   And so you went through the whole normal regimen

19   of what you do to assess a person's medical condition;

20   correct?

21        A.   I believe so, but I'm certain we did.

22        Q.   There was some point during the interaction when

23   either you or someone else in your group may have put an

24   additional spit sock on Mr. Alvarado.

25             Did you witness that taking place?

KEITH GOLDSTEIN
3/14/2024

1        A.   I don't remember seeing it happen.

2        Q.   But you're aware that it did happen?

3        A.   After reading the report.

4        Q.   Did you do that?  Or did someone else?

5        A.   I can tell you I did not do that.

6        Q.   If Paramedic Fleck thought it was you, would he be

7   mistaken?

8        A.   Yes.

9        Q.   Did you ask Mr. Alvarado any questions?

10        A.   Yes.

11        Q.   What did you ask him?

12        A.   The question I can remember asking him was are you

13   hurt anywhere?

14        Q.   Was he able to answer?

15        A.   He did say no.

16        Q.   All right.  Did you ask him if he needed to go to

17   the hospital?

18        A.   I don't recall.

19        Q.   What was Mr. Alvarado's demeanor at the time you

20   were talking to him?

21        A.   I believe it was combative.

22        Q.   In what way?  Do you recall?

23        A.   He was fighting, fighting the restraints --

24        Q.   Okay.

25        A.   -- and I believe he was pretty vocal.

COTMSJ0423

KEITH GOLDSTEIN
3/14/2024

 1        A.   I could only make assumptions.  I don't know.  I
 2   don't know.
 3        Q.   What's your assumption?
 4             MS. WATERS:  No.  He's not going to assume.  He's
 5   not going to speculate.  He's told you four times he doesn't
 6   know, he doesn't know.
 7        Q.   But you were close to Mr. Alvarado; can we agree
 8   on that?
 9        A.   I was close to him.
10        Q.   As a matter of fact, you were talking to him?
11        A.   Uh-huh.  Yes.
12        Q.   All right.  And you certainly wouldn't know if or
13   do you know if the application of the second spit sock
14   impaired Mr. Alvarado's ability to breathe?
15        A.   Do you mind saying that one more time?
16        Q.   Sure.  Do you know if the second spit sock
17   impaired Mr. Alvarado's ability to breathe?
18        A.   I don't believe it did.
19        Q.   I'm sorry?
20        A.   I do not believe it did.
21        Q.   All right.  Did you have any training and
22   experience indicating that two spit socks might impede the
23   ability of a patient to breathe?
24        A.   No.
25        Q.   All right.  So you're first with Mr. Alvarado.

COTMSJ0424

KEITH GOLDSTEIN
3/14/2024

1   You said that he was agitated.

2            Did his demeanor ever change during the time when

3   you had contact with him?

4        A.   Yes.

5        Q.   How did it change?

6        A.   He calmed down.

7        Q.   And that was when you were still interacting with

8   him?

9        A.   I, I don't a hundred percent recall the timeline,

10   but I believe so.

11        Q.   So he no longer was kicking or screaming or

12   fighting against the restraints?

13        A.   Correct.

14        Q.   What station were you assigned to in March of

15   2020?  Do you recall?

16        A.   Station 8.

17        Q.   All right.  Oh, you had said that already.

18            And so you indicated that you didn't receive the

19   communication from dispatch, someone else in your company

20   did; correct?

21            MS. WATERS:  Objection.  Misstates the testimony.

22            But you can answer the question.

23            THE WITNESS:  I don't recall whether my partner

24   was driving that day or I was driving.

25        Q.   All right.

COTMSJ0425

KEITH GOLDSTEIN
3/14/2024

1   situation.

2        Q.   And you don't recall whether they did that in this

3   instance?

4        A.   I don't recall.

5        Q.   All right.  So you interacted with Mr. Alvarado.

6   You don't recall what the conversation was?  Or can you

7   describe the conversation in general?

8        A.   The thing I recall is I asked him if he was

9   injured.

10       Q.   If he was injured?

11       A.   Uh-huh.

12       Q.   And what did he recall -- or what do you recall

13   him saying?

14       A.   That he was not injured.

15       Q.   Do you recall what Mr. Alvarado's oxygen

16   saturation level was?

17       A.   I read in the report that it was 94.

18       Q.   Did that cause you any concern?

19       A.   No.

20       Q.   In hindsight does it cause you any concern?

21       A.   No.

22       Q.   Do you recall what his blood pressure was during

23   the medical evaluation?

24       A.   I believe it was 137 over something.

25       Q.   But you recall that pretty specific?

COTMSJ0426

KEITH GOLDSTEIN
3/14/2024

1      A.    Only because I read the report.  Not from four

2   years ago.

3      Q.    Great.  Was there anything about his behavior or

4   demeanor that concerned you?

5      A.    Can you be more specific?

6      Q.    Sure.  You said there must be some indication that

7   the person's in serious, seriously injured or in a very

8   serious -- has a negative medical condition.

9            Was there anything in his demeanor that gave you

10   concern that he might be hurt or he might have some other

11   medical situation that needed to be tended to?

12      A.    There were no obvious injuries or bleeds

13   indicating that he was physically hurt.

14      Q.    Did you fear for your safety while you were

15   evaluating Mr. Alvarado's health condition?

16      A.    I don't recall.

17      Q.    So you can't recall if you felt unsafe or whether

18   you felt he was a threat to you or anybody in your company?

19      A.    I don't recall what I was feeling at that moment.

20      Q.    Do you recall if you see him taking any actions

21   that posed a risk to you or people in your company?

22      A.    Not that I recall.

23      Q.    All right.  Could you see his facial expressions

24   while you were evaluating his health condition?

25      A.    Sir, I don't recall.

COTMSJ0427

KEITH GOLDSTEIN
3/14/2024

1        Q.   All right.  You agree that you were interacting
2   with him?  You do recall that; correct?
3        A.   Yes.
4        Q.   All right.  Let me back up a minute.
5             Do you know which diagnostics you and your group
6   performed?
7        A.   As far as vital signs?
8        Q.   Yes, sir.
9        A.   There was blood pressure.  Blood pressure, pulse
10  ox.  I would have to, I would have to reference the report,
11  but I believe, I believe all vital signs were assessed.
12        Q.   And what evaluation devices do you recall using to
13  assess those vital signs?
14        A.   I believe the report said we used a manual blood
15  pressure cuff.  We obviously used a stethoscope and a pulse
16  oximeter.
17        Q.   Are those all normal devices?
18        A.   I'm sorry?
19        Q.   Normal devices are they?
20        A.   Yeah.  Yes, sir.
21        Q.   So Captain Ford was there, and he was the
22   commander on the scene; correct?
23        A.   Yes.
24        Q.   Did he ever express any concern about the use of
25   the spit sock, the second spit sock?

COTMSJ0428

KEITH GOLDSTEIN
3/14/2024

1        A.    Not that I recall.

2        Q.    Do you recall anything that you could have done

3   differently to change the outcome for the patient?

4        A.    At that time, no.

5        Q.    How about now?

6              MS. WATERS:  Object to form.  Calls for

7   speculation.

8              But you can answer.

9              THE WITNESS:  I would probably do it differently

10  today.

11       Q.    What would you do differently today?

12       A.    I would, if I see a combative patient, I would

13  give Versed.

14       Q.    I'm sorry?

15       A.    I would give Versed for a combative patient.

16       Q.    That's to calm them down?

17       A.    Uh-huh, yes.

18       Q.    That's the only thing you would have done

19  differently?

20             MS. WATERS:  Object to form.

21             But you can answer.

22             THE WITNESS:  No, sir.  Once Versed is given

23  that's an ALS patient requiring transport and I would have

24  transported right then.

25       Q.    Have you ever provided medical assistance in the

KEITH GOLDSTEIN
3/14/2024

1    past to someone who's had restraints applied by TPD?

2         A.   Yes.

3         Q.   And does this affect your ability to assess and

4    provide assistance to those people in the restraints?

5         A.   Not necessarily.  You just do it differently.

6         Q.   But you're still able to do it?

7         A.   Yes.

8         Q.   Do you have any training, experience as to whether

9    the application of restraints can have a negative effect on

10   a person who may be in medical distress?

11             MS. WATERS:  Object to form.

12             But you can answer.

13             THE WITNESS:  I'm sure there, I'm sure there are

14   medical conditions that restraints would, would hinder their

15   outcome.

16        Q.   Even exacerbate some medical condition?

17             MS. WATERS:  Object to form.

18             But you may answer.

19             THE WITNESS:  Is it possible that there's a

20   restraint that might -- yeah.  Yes.  It's possible.

21        Q.   Do you know if the restraints can impact the

22   person's ability to breathe?

23        A.   It's possible.

24        Q.   Have you ever had any training that someone in

25   restraints may not be able to breathe properly?

COTMSJ0430

KEITH GOLDSTEIN
3/14/2024

1        Q.   And what did you do then at that point?

2        A.   Left the scene.

3        Q.   How long did that take you to pack up all your

4   gear and leave the scene?

5        A.   I don't, I don't know the time frame.

6        Q.   But was it short?  Long?

7        A.   That's relative.  Long to what?

8        Q.   Okay.  Long is like an hour --

9        A.   No.

10        Q.   -- half hour?

11        A.   It was short.

12        Q.   A few minutes?

13        A.   Then it was a few minutes.

14        Q.   So my understanding is that you are walking to

15   your truck when you get some information that Mr. Alvarado's

16   health or his health had deteriorated; correct?

17        A.   I believe we were, we were in the truck backing

18   out.

19        Q.   All right.  And what happened?

20        A.   We were flagged down.

21        Q.   By who?

22        A.   I believe it was a TPD officer.

23        Q.   And do you remember did you have any contact with

24   him?  Do you remember what he may have said?

25        A.   No.  I think Ryan spoke with him, and I don't

KEITH GOLDSTEIN
3/14/2024

1   remember hearing what he said --

2       Q.   All right.

3       A.   -- but --

4       Q.   What was your understanding of what he said?

5       A.   That he had stopped breathing.

6       Q.   And now you get back there.  Could you see Mr.,

7   the patient, Mr. Alvarado?

8       A.   Yes.

9       Q.   And what kind of condition was he in at the time?

10      A.   When we returned?

11      Q.   Yes, sir.

12      A.   I believe he was pulseless and apneic at that

13  time, not breathing.

14      Q.   So he wasn't moving around?  He was just laying

15  there?

16      A.   Correct.

17      Q.   And how did you determine that he was not

18  breathing?

19      A.   I believe -- oh, boy.  Let's see.  I believe

20  Spencer was first back on scene --

21      Q.   Uh-huh.

22      A.   -- and that that determination had already been

23  made.

24      Q.   Did you see any of the Tucson Police Department

25  personnel attempting to resuscitate this individual?

KEITH GOLDSTEIN
3/14/2024

1        A.   I read it in the report, but I don't recall it.

2        Q.   You don't recall seeing that?

3        A.   No.

4        Q.   You read in the report that they were doing it?

5   Or --

6        A.   Yes.  Yes.

7        Q.   But you don't recall seeing it?

8        A.   No.

9        Q.   All right.  So you in your interview you said that

10  the paramedics conducted resuscitation efforts on

11  Mr. Alvarado; is that correct?

12       A.   We did.

13       Q.   And what sort of resuscitation efforts did you

14  use?

15       A.   He, he was given, he was given IV access.

16  Epinephrine was given.  Narcan was given.  He received

17  endotracheal intubation, high flow oxygen.

18       Q.   Anything else?

19       A.   Oh.  CPR efforts were continued.

20       Q.   Why was he administered Narcan?

21       A.   At that time it was part of protocol.

22       Q.   Just to do it routinely?  Or when there's some

23  reason to believe --

24       A.   Routinely.

25       Q.   -- that they'd ingested illegal drugs?

KEITH GOLDSTEIN
3/14/2024

1  application of the second spit sock?

2          MS. WATERS:  Object to form.

3          But you may answer.

4          THE WITNESS:  No.

5      Q.   You don't believe that it was exacerbated or

6  caused by the application of the second spit sock?

7      A.   I don't believe that.

8      Q.   So you don't recall when you returned if he had

9  two spit socks on or one?

10     A.   I do not recall.

11     Q.   All right.  So when you returned, was Mr. Alvarado

12  still in restraints?

13     A.   I don't recall.

14     Q.   So you don't recall asking the police to remove

15  the restraints?

16     A.   I don't recall that.

17     Q.   Would it be normal practice for the fire

18  department if a person is needing resuscitation to have any

19  restraints removed?

20     A.   Yes.

21     Q.   All right.  So it stands to reason that in this

22  instance you had asked or the restraints were removed so you

23  could resuscitate this person or attempt to resuscitate this

24  person?

25     A.   I don't recall, but that would make sense.

RAYNBO COURT REPORTING, LTD.

COTMSJ0434

KEITH GOLDSTEIN
3/14/2024

1      Q.   Do you know who removed the restraints?

2      A.   No, sir.  I don't.

3      Q.   I'm sorry?

4      A.   No, sir.  I don't.

5      Q.   And so you were taking part in the resuscitation

6  efforts?

7      A.   We all had a role in it, yes, sir.

8      Q.   So you and Fleck and Ford and Spencer.  Did I miss

9  anybody?

10     A.   DeCastro.

11     Q.   I'm sorry?

12     A.   DeCastro.

13     Q.   DeCastro.  You were all taking part.

14          What were the -- do you recall what the officers

15  were doing during the time that you all were attempting the

16  resuscitation efforts?

17     A.   No.

18     Q.   Did you accompany Mr. Alvarado to the hospital?

19     A.   Yes.

20     Q.   And what did you do while he was being -- what was

21  your role?

22     A.   From reading the report I know I started the IO

23  and I gave epinephrine --

24     Q.   Okay.

25     A.   -- en route.  I don't recall if I gave the Narcan

KEITH GOLDSTEIN
3/14/2024

1   or not.

2       Q.    Okay.  But the epinephrine and the Narcan, that
3   would be the second time that the epinephrine was
4   administered?

5       A.    Without the report I don't know if I gave the
6   first one or the second one.

7       Q.    But as far as you know it was twice?

8       A.    Yes.

9       Q.    And did Mr. Alvarado's condition improve on the
10  way to the hospital?

11      A.    It did not change.  He remained pulseless and
12  apneic.

13      Q.    So he was still dead?

14            MS. WATERS:  Object to form.

15            But you can answer.

16            THE WITNESS:  There were not signs of life.

17      Q.    Safe to say then the resuscitation efforts were
18  not successful?

19      A.    Correct.

20      Q.    So just so we understand a timeline, he was
21  deceased before being transported and during transport he
22  was still no signs of life; correct?

23            MS. WATERS:  Object to form.

24            But you can answer.

25            THE WITNESS:  I believe that's correct.

COTMSJ0436

KEITH GOLDSTEIN
3/14/2024

1      Q.   How long did you stay at the hospital?

2      A.   I have no idea.

3      Q.   Did you receive any information about

4  Mr. Alvarado's condition once you brought him to the

5  hospital?

6      A.   I don't recall.

7      Q.   But it's your understanding now that he died?

8      A.   Yes.

9      Q.   Do you know where you got that information from?

10     A.   I don't recall where I heard it first.

11     Q.   But you heard it from someone?

12     A.   Yes.

13     Q.   All right.  How many times -- you said that many

14  times you've responded to provide medical evaluation to a

15  patient who's in police custody.

16         Am I recalling that correctly?

17     A.   Yes, sir.

18     Q.   And that this wasn't the first time that you

19  provided treatment to someone who was in police restraints?

20     A.   Certainly evaluation, if not treatment.

21     Q.   So I guess the answer is yes, this was not the

22  first time that you provided evaluation and treatment to

23  someone who was in police restraints?

24     A.   Correct.

25     Q.   Have you ever been in -- had a situation where you

KEITH GOLDSTEIN
3/14/2024

1      Q.   Or maybe they were -- he was overly restrained?

2      A.   I, I don't recall having those thoughts.

3      Q.   How many times have you seen the patients in that

4  TARP restraint, you know, with their hands and arms behind

5  their back?

6      A.   I don't know.

7      Q.   You don't recall?

8      A.   No, I don't.

9      Q.   I assume this was not the first time?

10     A.   Probably not, but I couldn't tell you an incident.

11     Q.   Does that restraint, does that keep you from doing

12  your job if they're in those restraints?

13     A.   It just needs to be done differently.

14     Q.   But earlier you said you've seen people in those

15  restraints before; correct?

16     A.   I believe so.  I couldn't tell you which incident,

17  but I believe so.

18     Q.   But more than this one?

19     A.   I believe so.

20     Q.   Let's talk about the Versed.  You said that you

21  were trained in the use of Versed after this incident?

22     A.   Yes.

23     Q.   Was it in any way in response to this incident?

24     A.   I don't know.

25     Q.   Or in response to the other incident, the in

RAYNBO COURT REPORTING, LTD.

KEITH GOLDSTEIN
3/14/2024

1    application of a spit sock?

2         A.   I would say so.

3         Q.   Other airborne pathogens also a good reason to use

4    a spit sock?

5         A.   Potentially, yes.

6         Q.   Are you required to wait and let people spit on

7    you?

8         A.   No.

9              MR. GATTONE:   Object to form.

10        Q.   Or is the spit sock a tool at your disposal so

11   that you can reduce a mitigatable (sic) risk of communicable

12   diseases while you're doing your job?

13             MR. GATTONE:   Object as to form.

14        Q.   You can still answer.

15        A.   I already forgot the question.  One more time,

16   please.

17        Q.   It's okay.  Is the spit sock a tool that you are

18   permitted to use in order to reduce the risk of transmission

19   of a communicable disease to you during the performance of

20   your duties as a paramedic?

21        A.   I was waiting for the objection.

22             MR. GATTONE:  Same objection.

23        A.   Yes, it is.

24        Q.   You were asked some questions about what, if

25   anything, you knew about what Mr. Alvarado was suspected of

KEITH GOLDSTEIN
3/14/2024

1  in terms of criminal conduct.

2          Does it matter to you when you go to a scene like

3  this what a person is suspected of doing?

4      A.   It would not change my treatment algorithm at all.

5      Q.   Do you treat someone who's a murder suspect the

6  same way you treat any other person?

7      A.   Yes.

8      Q.   You were asked a series of questions about the

9  decision to leave the scene and what you did after that.

10          Does it take a few minutes to pack up your

11  equipment after you finish an assessment?

12      A.   Yes.

13      Q.   And here did you also give peroxide to a couple of

14  police officers?

15      A.   Yes.

16      Q.   Were all of those things done after the decision

17  had been made that Mr. Alvarado did not require transport?

18      A.   Yes.

19      Q.   And you weren't sure how long that took.  You said

20  it wasn't a long time.  Did it take at least a few minutes?

21      A.   Yes.  At least five I would guess.

22      Q.   If you'd believed based on Mr. Alvarado's vital

23  signs that he was suffering from a serious medical

24  condition, would you have transported him to the hospital?

25      A.   Yes.

KEITH GOLDSTEIN
3/14/2024

```
 1                           CERTIFICATE

 2   STATE OF ARIZONA      )
                           )
 3   COUNTY OF PIMA        )

 4           BE IT KNOWN that the foregoing deposition was
     taken before me, RAYNBO SILVA, RPR, CR, Certified Reporter
 5   No. 50014 in the State of Arizona; that KEITH GOLDSTEIN was
     duly sworn by me according to law; that the proceedings were
 6   taken down by me and reduced to writing under my direction;
     that the preparation, production and distribution comply
 7   with law and code; that the foregoing 65 pages are a full,
     true and accurate record, all done to the best of my skill
 8   and ability.

 9           I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
10   outcome hereof.

11           (  ) Review and signature was waived.

12           (XX) Review and signature was requested.

13           (  ) Review and signature was not requested.

14           I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206 (F)(3) and
15   ACJA 7-206(J)(1)(g)(1) and (2).

16           DATED this 21st day of March, 2024.

17
18                          _____
                            RAYNBO SILVA, RPR, CR
19                          Certified Reporter
                            Arizona CR No. 50014
20

21           I CERTIFY that RAYNBO COURT REPORTING, LTD., has
     complied with the ethical obligations set forth in
22   ACJA 7-206 (J)(1)(g)(1) through (6).

23
24                          _____
                            RAYNBO COURT REPORTING, LTD.
25                          Registered Reporting Firm
                            Arizona RRF No. R1002
```

COTMSJ0441

**OFFICER NICOLO SOLARINO**                          **CASE # 20-0133**
**PAGE 1**
**Q = SGT. KNIGHT**                          **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                          **A1 = SERGEANT STEVE ERDMAN**

1    *************************************************************************************
2    THIS IS SERGEANT BRIAN KNIGHT WITH OPS. REFERENCE OPS NUMBER
3    20-0133. TODAY IS MARCH 24TH AT 2020 HOUR, OR MARCH 24TH, 2020 AT
4    0959 HOURS. I WILL BE CONDUCTING AN INTERVIEW WITH UH, THREE
5    PEOPLE IN THE ROOM, THE FIRST PERSON, THE FOCUS OFFICER IS
6    GONNA BE, WELL FOUR PEOPLE INCLUDING MYSELF, SO WE'RE
7    ROUNDING UP.
8    *************************************************************************************
9
10   Q     So uh, could you start with your, your name and your badge number
11         NICK?
12   A     Officer uh, NICOLO SOLARINO, S-O-L-A-R-I-N-O, 100962, I go by NICK
13         for ease.
14
15   Q     Is it alright if I call you NICK?
16   A     Yes it is.
17
18   Q     Okay and also with me is Sergeant AL MESA.
19   Q1    Uh, Sergeant MESA, M-E-S-A, 50466.
20
21   Q     And with TPOA.
22   A1    Uh, Sergeant STEVE ERDMAN, badge number 28219 and we're
23         recording.
24
25   Q     Okay, I'm also recording this interview. Um, what we're gonna do is we're
26         gonna, this is reference Tucson Police Department case number
27         2003220124 uh, reference an in-custody death of a DAMIEN ALAVARDO.
28         Uh, NICK have you had the opportunity to review the Notice of uh,
29         Administrative Internal Investigation, this form that I'm showing to you
30         now?
31   A     I have.
32
33   Q     Had, did, did you read the form?
34   A     Yes.
35
36   Q     Okay cool, did you go over the form with your T, TPOA representative?
37   A     Yes.
38
39   Q     Okay. Do you have any questions about this at all?
40   A     No sir.
41
42   Q     Okay if you could, if you could, you got a pen, if you could uh, sign and PR
43         and date and then I will be the person notice of serve. (Pause) I'll initial
44         that and then I will get ya a copy of this afterwards.

COTMSJ0442

**OFFICER NICOLO SOLARINO**                          **CASE # 20-0133**
**PAGE 7**
**Q = SGT. KNIGHT**                         **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                    **A1 = SERGEANT STEVE ERDMAN**

1       that are in there, so I have two hard plates front and back um, uh, the
2       word POLICE is uh, on front and back uh, a badge, cloth badge over my
3       left shoulder um, on the vest itself I have (pause) so if, I'm trying to go left
4       to right again…
5

6    Q    Okay.
7    A    ...um, (pause) radio, (pause) admin area where I have my notepad and my
8       pen um, actually have a rifle magazine tucked down in there since I'm a
9       rifle operator um, (pause) sorry…
10

11   Q    That's alright.
12   A    ...trying to think of all my stuff, how it's laid out. My cell phone's on the
13       right-side um, (pause) body worn camera goes directly in the center
14       roughly center mass um, (pause).
15

16   Q    That, that's alright so you, so clearly your uniform is you're clearly
17       identifiable as a Law Enforcement Officer uh, if anyone was to see you?
18   A    Yes, yes, yeah.
19

20   Q    Okay. Uh, and ri (ph), you said that you uh, you had a TASER on your
21       belt, can you tell me a little bit about your training and experience uh, in
22       reference to the, the Ta (ph), the TASER specifically?
23   A    Right um, so we go through the uh, annual recertification with the TASER
24       which includes um, a several hour classroom portion followed by a, um, a
25       written exam and a um, an application uh, a training world application at
26       the Academy itself.
27

28   Q    Uh-huh.
29   A    Um, where we deploy the TASER and uh, try to understand the
30       capabilities of it.
31

32   Q    (Pause) okay and are uh, current and valid on, on your training as far as
33       your recerts and, and how often do you, are you required to recertify?
34   A    Yes. Um, currently qualified um, annually so the last annual qualification I
35       would've went through which would be the 2019 session um, and 2020
36       sessions are um, around the corner actually.
37

38   Q    Okay.
39   A    Upcoming.
40

41   Q    Alright cool. As far as training and experience and anything do you have…
42   Q1   No.
43

**OFFICER NICOLO SOLARINO**                    **CASE # 20-0133**
**PAGE 15**
**Q = SGT. KNIGHT**                    **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                    **A1 = SERGEANT STEVE ERDMAN**

1  Q   ...what did you know, what were your concerns about uh, this particular
2      person?
3  A   Okay um, so bef (ph), between all of this going on um, after I'd received
4      the information to go start canvasing for the suspect vehicle and the
5      suspect um, originally they found a weapon at the scene, a firearm and
6      they, somebody stated over the radio that it was probably the suspects
7      gun left behind at first and then prior to this I believe they said actually
8      that's the victims gun, the suspect should, might possibly still be armed
9      um, which we gave that information to the crash scene to start looking if
10     there was a gun in the car left behind um, I don't believe the decision was
11     provided whether they found one or not and uh, right before I made
12     contact with him I learned that the shooting victim had now passed and
13     was currently dead.
14
15 Q   So someone had been shot and killed?
16 A   Someone was shot and killed by the time I made contact with this guy
17     here.
18
19 Q   Okay.
20 A   Um, first it was just a shooting victim and then he died on scene.
21
22 Q   Okay.
23 A   Um, so…
24
25 Q   And you had all that information prior to making…
26 A   Yes.
27
28 Q   ...a visual of this suspect?
29 A   Yes.
30
31 Q   Okay so go ahead.
32 A   So still, so still keeping, so not only now was he potentially a shooting
33     suspect but now he was a potential homicide suspect at the time that I
34     was going to make contact with him. Um, and because the information
35     came that he was actively fighting with a civilian is the reason why I made
36     the call to try to go and encounter him by myself and not wait for backup
37     um, because the potential risk to the civilian essentially outweighed my
38     safety as a solo Officer to go make contact with him at the time right.
39
40 Q   Okay.
41 A   So um, as I get out of my vehicle and I start to approach him um, I believe
42     throughout the encounter I was giving some commands of you know
43     "Police, stop" you know things along those lines um, I don't recall what
44     exactly those commands were or when they were given.

**OFFICER NICOLO SOLARINO**                          **CASE # 20-0133**
**PAGE 18**
**Q = SGT. KNIGHT**                          **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                          **A1 = SERGEANT STEVE ERDMAN**

1        face with him and being able to get a quick visual overview of him I
2        realized that he was bear (ph), bigger than me in both size and stature.
3        Um, he was taller than me, more muscular um, looked like a pretty athletic
4        fit muscular person um, so I had that in my head that…
5

6  Q1    Can you describe his height and his weight?
7  A     Um, I estimated, taller than me, I'm about 5' 8", 5' 9" um, taller than me,
8        less than six feet um, I'm about 165 – 70 um, so again heavier than I was,
9        probably closer to 200.
10

11  Q1   Go ahead.
12  A    Alright. Um, so I made the, the you know that understanding that he was
13       taller and more physically fit than me it, it appeared um, now knowing that
14       I had two witnesses to essentially that I have to protect um, and myself
15       with now him. Um, so I tried some leg sweeps, those were not effective
16       um, I tried to do a chin scoop to push his head back uh, to try to get some
17       pressure points towards the, the (pause) um, behind the ear, back of the
18       neck um, those were not effective, I, I wasn't able to reach them um, while
19       I was trying to chin scoop, leg sweep kinda at the same time um, (pause) I
20       also in the back of my head thought how that might not look good um,
21       because my hands were in proximity of his neck um, not that I was trying
22       to grab his neck or do any of that but I had that thought that it didn't
23       appear good um, (pause) so we're face to face um, I noticed as he' was
24       breathing on me um, an odor of intoxicants coming from his breath,
25       alcohol, um, so I believe now he's under the influence of at least that um,
26       of a some type of intoxicating alcoholic substance um, trying to give him
27       some commands which again are not effective I'm unable to get him to
28       break his plain um, he, he said something about pulling up his pants um,
29       because I think when we were doing the whole thing on the wall his pants
30       got pulled at least somewhat down exposing at least his rear end when he
31       was on the wall um, later his front end, I noticed too when we were on the
32       ground later after the fact. Um, so as we're facing here I also recognized
33       that his right hand was going towards his waistband um, his left hand was
34       coming towards my waistband so as we're facing each other his left hand
35       um, which would be my gun on hi (ph), my right side so his left hand is in
36       proximity of my, my firearm area um, (pause) so I transition to start
37       delivering strikes with my left hand to his face while trying to protect my
38       right side and my gun with my right hand so kinda doing one of these um, I
39       deliver approximately if I remember right two to three strikes to the face
40       which essentially appear to just bounce off of him um he just stared right
41       through me um, real wide-eyed uh, redness to his skin um, wide lips uh,
42       clenched teeth um, it just appeared as if when I was hitting him it was just
43       making him madder.
44

**OFFICER NICOLO SOLARINO**                           **CASE # 20-0133**
**PAGE 20**
**Q = SGT. KNIGHT**                         **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                          **A1 = SERGEANT STEVE ERDMAN**

1   Q1   Okay. And when you deployed it the previous time did you achieve the
2        NMI?
3   A    No.
4
5   Q1   Okay. (Pause).
6   A    Any deploy uh, TASER deployment to include the last TASER I have not
7        had a, an NMI.
8
9   Q1   Okay. At, at training have you seen what the effects look like when you
10       achieve it?
11  A    Yes both uh, in the Academy with proper NMI and not myself but other
12       Officers in the field who have obtained NMI…
13
14  Q1   Mm-hm.
15  A    ...yes I've seen that. Um, but not me personally.
16
17  Q1   Okay.
18  A    Have any applications. Um, so knowing that I didn't get the resir (ph), the
19       desired effect which is the NMI uh, knowing that civilians are still within
20       proximity um, knowing that um, and with the application towards the left
21       butt cheek um, I believe he started yelling something to the effect of "stop
22       TASING me" or something to uh, to know that it wasn't effective so I
23       decided to move in to him to try to grab him to then try to get some type of
24       hold or um, positive control over him 'cause so far we didn't have it, myself
25       the, or either of the witnesses that were within proximity. Um, (pause) I
26       noted and I noted that the five seconds that I moved in prior to that
27       because I ended up electrocuting myself too um, so I know that the
28       TASER was still actively within that five second window of, of going um, so
29       I went in and between me grabbing at him, the TASER going off and
30       witness two being behind him somehow I was able to or all of us
31       collectively were able to then go down to the ground which was the at that
32       point the intended effect um, to try to again establish some type of control.
33       Um, knowing I wasn't gonna get it while we were standing. Uh, as we go
34       down to the ground, or sorry, back to being up um, and him grabbing
35       towards my waistband um, as we are falling to the ground one of my
36       magazines from my magazine holder ended up coming out um, I believe
37       at his, that he ended up grabbing onto it and pulling it out um, because as
38       we landed on the ground um, he ended up landing on his side, I tried to
39       get on top of him to start getting some positive control, my magazine fell to
40       the ground just in front of him between his hands and his head would be
41       um, so kinda like on the side so within essentially kinda my hand to where
42       your radio is, or your microphone here is, like within several inches um, at
43       some point he ended up grabbing ahold of my magazine and having it in
44       his hand um, which I then also proceeded to take that as um, that he was

**OFFICER NICOLO SOLARINO**                                **CASE # 20-0133**
**PAGE 21**
**Q = SGT. KNIGHT**                                **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                                **A1 = SERGEANT STEVE ERDMAN**

1        gonna use that as blunt instrument to then begin attacking me um, while
2        we were on the ground he's uh, he was flailing his arm, his left arm around
3        trying to grab the magazine with his right arm. I had the TASER in my right
4        hand still maintaining control of that um, not getting the desired effect to
5        be able to detain him that I wanted, I then delivered a couple strikes,
6        approximately two to three again with my left hand to this time the left side
7        of his face based on the way we were laying.

8

9    Q    Can you describe the strikes?
10   A    Again closed fist.

11

12   Q    Closed fist okay. (Pause) and what hand did you deliver those with?
13   A    My left hand…

14

15   Q    Okay.
16   A    ...onto what I estimate would be the left side of his face.

17

18   Q    Okay. (Pause) go ahead.
19   A    Um, (pause) some, at some point in this uh, now while I'm trying to
20        maintain positive or obtain positive control of his upper body uh, witness
21        two I believe was attempting to main (ph), uh, obtain positive control of the
22        lower half um, again I'm not sure where witness one ended up in this
23        whole thing um, (pause) during, during this interaction on the ground I
24        believe is when the other Officer began arriving um, and I started to make
25        the transition away from the upper half um, but I still at the time wasn't
26        able to achieve again the desired effect to detain him and the
27        Neuromuscular incapacitation that I was looking for. Um, I attempted to
28        achieve it as we're still on the ground and he's still throwing his hands
29        about um, and by taking the TASER and pushing the reactivate button on
30        the side and placing it towards his lower back um, which would be the
31        upper atmosphere of the line um, assuming that the ll (ph) the prongs
32        were still embedded and the wire was still intact um, I don't believe looking
33        back at it now um, that neuromuscular incapacitation was achieved
34        because he was still yelling, still able to utilize his arms and his legs um,
35        and after everything was all over I was able to look at the TASER and
36        noticed that the wires were snapped so um, I don't believe the
37        neuromuscular inpa (ph), capa (ph), incapacitation um, was achieved
38        based on all that. Um…

39

40   Q1   So can, can we take a little break uh, right now and then we'll start from
41        essentially when the other Officers get on scene…
42   A    Okay.

43

44   Q1   ...'cause that, they're arriving now correct…

**OFFICER NICOLO SOLARINO**                    **CASE # 20-0133**
**PAGE 27**
**Q = SGT. KNIGHT**                          **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                          **A1 = SERGEANT STEVE ERDMAN**

1  Q   (Pause) I don't what (inaudible, pause) like in section 2041 of our General
2      Order on page 4, do you have that?
3  A   Yes.
4
5  Q   Okay. If you could just sorta go through the, your levels of resistance and
6      uh, and describe for me uh, when you first make contact uh, where you
7      feel that the uh, levels of resistance were um, through the, through the,
8      through the process of dealing with the subject.
9  A   Okay. Um…
10
11 Q   You can take your time to look through it and…
12 A   Mm-hm.
13
14 Q   …just whenever you're ready. (Pause)
15 A   Um, (pause) so I would say probably when, when he was sitting and I first
16     got there and he was behind the bush I would I mean if you wanna put
17     something to it I would say passive resistance um, not, not really doing
18     much, I, I was still away obviously um, the defensive resistance when he's
19     trying to go over the wall um, an actual action taken to prevent control
20     without making direct harm um, I would say the defensive resistance to
21     active aggression um, as we were standing and he was not complying and
22     trying to grab at me um, (pause) I noted with his, his demeanor and the
23     look in his face and all that um, essentially the uh, where it says prepares
24     to strike um, even though he made no motion with hands or gestures or
25     that while we were standing um, based on the way I described his face
26     earlier with the, the menacing look the, the teeth clenched and things like
27     that um, he had what I would describe the, the, the, the facial features of
28     which.
29
30 Q   Okay.
31 A   Um, (pause) and then particularly again when he had my magazine when
32     we were on the ground um, and he had control of it again that was uh, um,
33     my understanding that that then would end up being a tool a blunt
34     instrument to be then used against me or someone else that was there
35     um, and again noting that I had the, the marks towards my eye and not
36     knowing exactly at which point I got them um, it was either obviously from
37     the magazine or from him, from his nails or something.
38
39 Q   Okay.
40 A   (Pause) and then the understanding that he potentially was our shooter
41     slash murder homicide suspect from the scene the deadly force aspect
42     from prior to my um, (pause) contact with him.
43

COTMSJ0448

OFFICER NICOLO SOLARINO                                      CASE # 20-0133
PAGE 30
Q = SGT. KNIGHT                                      A = OFFICER N. SOLARINO
Q1 = SGT. MESA                                    A1 = SERGEANT STEVE ERDMAN

1   A    I don't know. So after my interaction with them letting 'em know the intent
2        like we wanted to take him to jail…
3
4   Q1   Mm-hm.
5   A    Treat him if you guys need to, I don't know what happened.
6
7   Q1   Okay and do you know if a, AKE uh, if he got, if he was actually bit?
8   A    I don't know.
9
10  Q1   You don't know, okay.
11
12  Q    Um, do, do you remember specifically what you told the TFD people uh,
13       about the incident and what had occurred or do you remember uh…?
14  A    Uh, I, if I told 'em it would be a quick summarized version, this guy ran
15       from the, the vehicle collision, we fought um, TASER deployment and
16       check him out um, I think I may have said something to the effect of I need
17       you guys to make sure he's not gonna die…
18
19  Q    Okay.
20  A    …um, and if there's any indication that he needs treatment you need to
21       take him.
22
23  Q    Okay. I don't have any other questions at this point, what I am gonna do is
24       I'm gonna give you…
25  A    Okay, could I make a statement?
26
27  Q    Yeah, go right ahead.
28  A    To, um, so of, of all the use of force incidents that I've been in essentially
29       just fighting with people um, this was the extreme example I could say in
30       my career like the probably the worst fight, the, the most like afraid I could
31       say I've been in, in a situation like that where I couldn't control it, like it, it
32       needed the level, it needed the amount of Officers just to get the control,
33       the desired effect like the last incident I was in where I ended up tasing
34       somebody the, with this TASER specifically that person even though he
35       attacked me and I tasered him he allowed me essentially to detain him
36       right after the fact before everyone else got there, this guy fought the
37       whole time.
38
39  Q    So, so when you speak about your feeling uh, can, can you sort of
40       articulate to me uh, what feeling did you, what were you feeling when uh,
41       when you came off the wall, you all went to the ground and if have any of
42       this wrong please correct me uh, and you went to the ground and then
43       you're face to face and…
44  A    Mm-hm.

0-387COT4989

**OFFICER NICOLO SOLARINO**                                    **CASE # 20-0133**
**PAGE 31**
**Q = SGT. KNIGHT**                                    **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                                    **A1 = SERGEANT STEVE ERDMAN**

| | | |
|---|---|---|
| 1 | | |
| 2 | Q | …uh, you had said that, that he had, he was trying to grab for your uh, |
| 3 | | looked the witness two had him from behind, his right arm was down to his |
| 4 | | right side and his left was reaching towards your gun so can you sorta, |
| 5 | | can you describe I mean how you, how that made you feel and what your, |
| 6 | | what… |
| 7 | A | Yeah so um, it, so like I said I had the level of fear that I wasn't able to, gu |
| 8 | | (ph), I was not going to be able to control this guy um, and with everything |
| 9 | | going on and then with the other civilians witnesses that were nearby and |
| 10 | | the type of incident that I thought this guy was involved in I felt, I thought I |
| 11 | | was gonna end up having to shoot this guy, I thought that's where it was |
| 12 | | gonna go um, as soon as he essentially started like you know internally |
| 13 | | drawing that line in his hand if you will um, if he turned the magazine |
| 14 | | towards me and started beating with it, beating me with it um, I don't know |
| 15 | | if I said this when were on the ground and I had the TASER and had |
| 16 | | positive control of it still trying to hold on to it, he was trying towards, to |
| 17 | | reach towards that and grab that um, if he turned the TASER towards me |
| 18 | | um, (pause) that I thought it was gonna result in a shooting um… |
| 19 | | |
| 20 | Q | Okay. |
| 21 | A | …I was kind of relieved that everyone got there when they did and it did |
| 22 | | not. |
| 23 | | |
| 24 | Q | (Pause) okay so what I'm gonna do uh, do you have anything else that |
| 25 | | you'd like to add right now? |
| 26 | A | No sir. |
| 27 | | |
| 28 | Q | Okay. Sergeant MESA? |
| 29 | | |
| 30 | Q1 | No. |
| 31 | | |
| 32 | Q | STEVE do you have anything to clarify? |
| 33 | A1 | No sir I do not. |
| 34 | | |
| 35 | Q | Alright so let me find the Right to View (pause, papers shuffling) there it is, |
| 36 | | okay so what this is (pause) is a use of, uh, this is a use of force incident |
| 37 | | report and you were served a notice uh, reference uh, ARS uh, Title 38 |
| 38 | | uh, your right to review body worn uh, camera. Have you had an |
| 39 | | opportunity to review this form prior to the interview? |
| 40 | A | Yes. |
| 41 | | |
| 42 | Q | And did you go over it with your union rep? |
| 43 | A | Yes. |
| 44 | | |

20-387COT4990

**OFFICER NICOLO SOLARINO**                    **CASE # 20-0133**
**PAGE 35**
**Q = SGT. KNIGHT**                    **A = OFFICER N. SOLARINO**
**Q1 = SGT. MESA**                    **A1 = SERGEANT STEVE ERDMAN**

| | | |
|---|---|---|
| 1 | | facedown in the sand um, the, the area that we were in the, the soil was |
| 2 | | essentially equivalent to like sand like a beach um, (pause) so essentially |
| 3 | | that would, that position then would help allow his body to have the |
| 4 | | opportunity to relax even though it, it, you know he was making |
| 5 | | statements and still trying to physically not uh, relax. |
| 6 | | |
| 7 | Q | Thank you. |
| 8 | A | Um, and that would help prevent essentially what happened in this case. |
| 9 | | |
| 10 | Q | Okay. Alright I think that's clear for me. Any other questions. |
| 11 | | |
| 12 | Q1 | No I don't have anything else. |
| 13 | | |
| 14 | Q | Alright we're gonna go off tape hopefully for the last time. It is now 1255 |
| 15 | | hours. |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | I have reviewed and verified that this is an accurate transcription of the original |
| 20 | | interview.  Signature: _____ |
| 21 | | Sergeant Knight #44798 |
| 22 | | |
| 23 | | |
| 24 | | Transcribed by Gena Toumey, #40069, OPS, 6/29/20, 1325 hrs. |

20-387COT4994

Renee J. Waters
Principal Assistant City Attorney for
Michael G. Rankin
CITY ATTORNEY
P.O. Box 27210
Tucson, AZ  85726-7210
Telephone: (520) 791-4221
Fax: (520) 623-9803
Renee.Waters@tucsonaz.gov
State Bar No. 031691
*Attorneys for Defendants City of Tucson, Nicolo Solarino, Francisco Santa Maria, Marco Durazo, Sean Yeandle, Henry Gamez, Donovan Vance, Ryan Ake, Joseph Gradias, Eric Evans, Scott Ellis, Raymond Fleck, Silas Spencer, Keith Goldstein (hereafter "City Defendants")*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irene Briseno, on her own behalf and as the personal representative of the estate of Damian Eryko Alvarado,<br><br>          Plaintiff,<br><br>vs.<br><br>City of Tucson; Nicolo Solarino (Tucson Police); Francisco Santa Maria (Tucson Police); Marco Durazo (Tucson Police); Sean Yeandle (Tucson Police); Henry Gamez (Tucson Police); Donovan Vance (Tucson Police); R. Ake (Tucson Police); Joseph Gradias (Tucson Police); Eric Evans (Tucson Police); Scott Ellis (Tucson Police); Raymond Flex (Tucson Fire); Silas Spencer (Tucson Fire); Keith Goldstein (Tucson Fire); and Justin Canovali (private citizen), all in their individual capacities,<br><br>          Defendants. | No. 4:22-cv-00132<br><br>**DECLARATION OF<br>DR. JOSHUA GAITHER**<br><br>(Assigned to Hon. Raner C. Collins) |

Pursuant to 28 U.S.C. § 1746, I, Dr. Joshua Gaither, declare and state as follows:

1.     I make this Declaration based on my personal knowledge.

2.     I am over the age of 18 years old.

3.     I am currently contracted by the Tucson Fire Department as its Medical Director and have been since January 2020.

4.   I am a medical doctor, having received my M.D. from The University of Arizona in 2004, completed a residency in emergency medicine at Yale University in 2008 and a fellowship in Emergency Medical Services (EMS) at the University of Colorado, Denver Health and Hospital Authority in 2009.

5.   Part of my job is to ensure that the training and protocols utilized by Tucson Fire Department paramedics and EMS personnel are consistent with best practices.

6.   In 2021, I also implemented quality control and review procedures for the care of patients in the custody of law enforcement officers. While this review process was not in place at the time of the incident in this lawsuit, I have had the opportunity to review patient care provided by this same paramedic crew that attended to Mr. Alvarado, and it is a high-performing crew.

7.   At the time of the incident, there were no concerns about the performance of these paramedics.

8.   I reviewed the patient care provided to Mr. Alvarado during this incident, including a review of his vital signs. Based on my review of the materials and my training and experience, it is my opinion that the paramedics provided appropriate care to Mr. Alvarado.

9.   Mr. Alvarado articulated to paramedics that he was not injured.

10.   Mr. Alvarado also made statements like "get away from me," that, in March 2020, were taken as a refusal of further care.

11.   Paramedics quickly assessed Mr. Alvarado and obtained a set of vital signs from him, including his respiratory rate, blood pressure, heart rate, and pulse oxygen level. Both Mr. Alvarado's blood pressure and pulse oxygen levels were within the expected norm. Mr. Alvarado's respiratory rate and heart rate were both slightly elevated, and the paramedics reasonably concluded that the slight elevations were consistent with someone who had been physically exerting himself.

12.   At all times, the paramedics were professional with Mr. Alvarado.

COTMSJ0453

13.     Once Mr. Alvarado went into cardiac arrest and paramedics returned to the scene, they performed exceptionally well.

14.     Paramedics promptly took over CPR from the on-scene officer. They obtained intraosseous access within two minutes and provided the first dose of epinephrine within three minutes. Paramedics intubated Mr. Alvarado within eight minutes (and for context, the standard is nine minutes). Paramedics took all appropriate life-saving measures before and during their transport of Mr. Alvarado to the hospital.

15.     Based on the totality of the circumstances, including but not limited to Mr. Alvarado's expressed refusal of care, and the applicable standard of care in March 2020, it was reasonable for the paramedic crew to determine that Mr. Alvarado did not require medical transport.

16.     All of the opinions expressed herein are made to a reasonable degree of medical and professional certainty and are based on the nationally accepted standard of care in March 2020.

I state under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2024.

_____
Joshua B. Gaither, M.D.

# DAMIEN ALVARADO

20-0901

AUTOPSY REPORT

PIMA COUNTY, ARIZONA

TUCSON POLICE DEPARTMENT

CASE # 2003220124

MARCH 24, 2020

Page 1

COTMSJ0455
20-387COT3206

20-0901

Re:  DAMIEN ALVARADO

Page 2

## FINAL FINDINGS:

I.      Sudden cardiac arrest in the setting of acute methamphetamine intoxication and restraint
    A.  Postmortem toxicologic analysis of cavity blood is positive for methamphetamine,
      cannabinoids, naloxone, caffeine, and cotinine; see Axis Forensic Toxicology Report
    B.  Reported aggressive behavior and shouting prior to death
    C.  Reported restraint prior to death

II.     Blunt force injuries
    A.  Abrasions of head
    B.  Subscalp hemorrhage
    C.  Bilateral temporalis muscle hemorrhages
    D.  Hemorrhages of oral mucosa
    E.  Abrasions and contusion of torso
    F.  Soft tissue hemorrhages of lower back
    G.  Abrasions and contusions of upper and lower extremities

III.    Dilated cardiomyopathy (420 grams) of undetermined etiology

IV.     Therapeutic intervention
    A.  Hemothoraces
    B.  Status post thoracotomy

## OPINION:

In consideration of the known circumstances surrounding this death, the available medical history, and the examination of the remains, the cause of death is ascribed to sudden cardiac arrest in the setting of acute methamphetamine intoxication and restraint with dilated cardiomyopathy as a significant contributing condition.

The manner of death is accident.

Digitally signed by Ashley Lukefahr, MD
Forensic Pathologist  Jennifer G. Chen, MD
Date: 2020.05.07 13:36:28 -07'00'

COTMSJ0456 20-387COT3207

# SOLARINO BODY WORN CAMERA

COTMSJ0457

# YEANDLE BODY WORN CAMERA

COTMSJ0458

# AKE

# BODY WORN

# CAMERA

# GAMEZ BODY WORN CAMERA

COTMSJ0460

# GRADIAS BODY WORN CAMERA

COTMSJ0461

# VANCE BODY WORN CAMERA

COTMSJ0462

# DURAZO BODY WORN CAMERA

COTMSJ0463