Michelle R. Saavedra
Principal Assistant City Attorney for
Michael G. Rankin
CITY ATTORNEY
P.O. Box 27210
Tucson, AZ  85726-7210
Telephone: (520) 791-4221
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
*Attorney for Defendants City of Tucson, Nicolo Solarino, Francisco Santa Maria, Marco Durazo, Sean Yeandle, Henry Gamez, Donovan Vance, Ryan Ake, Joseph Gradias, Eric Evans, Scott Ellis, Raymond Fleck, Silas Spencer, and Keith Goldstein*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Irene Briseno, on her own behalf and as the personal representative of the estate of Damian Eryko Alvarado,<br><br>Plaintiff,<br><br>vs.<br><br>City of Tucson; Nicolo Solarino (Tucson Police); Francisco Santa Maria (Tucson Police); Marco Durazo (Tucson Police); Sean Yeandle (Tucson Police); Henry Gamez (Tucson Police); Donovan Vance (Tucson Police); R. Ake (Tucson Police); Joseph Gradias (Tucson Police); Eric Evans (Tucson Police); Scott Ellis (Tucson Police); Raymond Flex (Tucson Fire); Silas Spencer (Tucson Fire); Keith Goldstein (Tucson Fire); and Justin Canovali (private citizen), all in their individual capacities,<br><br>Defendants. | No. 4:22-cv-00132-RCC<br><br>**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to Hon. Raner C. Collins) |

Defendants City of Tucson ("the City"), Nicolo Solarino ("Solarino"), Francisco Santa Maria ("Maria"), Marco Durazo ("Duarzo"), Sean Yeandle ("Yeandle"), Henry Gamez ("Gamez"), Donovan Vance ("Vance"), R. Ake ("Ake"), Joseph Gradias ("Gradias"), Eric Evans ("Evans"), Scott Ellis ("Ellis"), Francisco Santa Maria ("Santa Maria"), Marco Durazo ("Durazo"), Raymond Flex ("Flex"), Silas Spencer ("Spencer"), and Keith Goldstein ("Goldstein") hereby submit the following Reply in Support of their Motion

1

for Summary Judgment, which addresses Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Response") (Doc. 119) and Plaintiff's Controverting Statement of Facts in Opposition to Defendants' Motion for Summary Judgment (Docs. 125, 125-1, and 125-2).

There are only two remaining issues for this Court to decide[1]: 1) was Solarino, Yeandle, Ake, Gamez, Gradias, Santa Maria, and Durazo's use of force reasonable based on the totality of the circumstances, and 2) even if any force used was excessive, are the officers protected from civil liability because it was not "obvious" or "clearly established," on March 22, 2020, that their use of force was unlawful. For all the following reasons, Defendants' MSJ should be granted.

## I.  Plaintiff Did Not Present Any Evidence That Creates A Genuine Issue Of Material Fact As To The Remaining Fourth Amendment Claims

This Court must "view the facts in light most favorable to the nonmovant, but [it is] 'limited to considering what facts the officer(s) could have known at the time of the incident." *Sabbe v. Washington County Board of Commissioners*, 84 F.4th 807 (2023). In addition, "[courts] do not credit a party's version of events that the record, such as an unchallenged video recording of the incident, quite clearly contradicts." *Id.*, 84 F.4th at 816 (citation, internal quotation marks, and alteration omitted).

Plaintiff's Controverting Statement of Facts ("CSOF") Nos. 1-284, and Plaintiff's additional statement of facts ("PSOF") Nos. 1-82, do not contradict the Defendants' Statement of Facts ("DSOF"), or the evidence Defendants presented in support of their MSJ. More importantly, the Court has before it seven (7) Tucson Police Department ("TPD") body worn camera videos (hereafter "TPD videos"), which Plaintiff agrees corroborate each officer's testimony. (DSOF 280-284, CSOF 280-284; COTMSJ0457-463). The TPD videos

---

[1] Plaintiff only opposes summary judgment as to Solarino, Yeandle, Ake, Gradias, Gamez, Santa Maria, and Durazo. (*See* Doc. 119 at 1, fn.1). The only claim alleged against these remaining named Defendants is a Fourth Amendment excessive force violation pursuant to 42 U.S.C. § 1983. (*See* Doc. 1, Count I, 24-25).

undisputedly show the officers' use of force and Damien Alvarado's ("Alvarado") actions during the encounter, and clearly contradict Plaintiff's representation of the facts.

Solarino's TPD video corroborates his testimony that he knew about the fleeing suspect from the shooting incident prior to coming across the car crash event. (*See* COTMSJ0457, 8:10-10:44). It also corroborates that Solarino believed the two events may be related. (*See Id.*, 16:17-16:29 "it's within proximity, location and time of our shooting"). It makes no difference whether Solarino's belief, or the other officers' belief, that Alvarado could be the same suspect was actually correct. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (internal quotations and citation omitted).

Solarino can be heard saying "10-3, we're fighting" just moments after getting to the brick wall where one of the civilians is seen holding on to Alvarado's leg. (*Id*. at 19:29). The other civilian's legs can be seen on Alvarado's left side just before they are able to get him off the wall. (*Id*. at 19:33-19:44). In addition, Alvarado's continuous aggressive resistance can be seen as Solarino, Yeandle, and Ake are physically engaged and trying to get him under control and detained in handcuffs. (COTMSJ458-459). Even after Gradias and Gamez arrive to assist, Alvarado is still seen actively resisting. (*Id.*, see also COTMSJ460-461). Although Yeandle and Ake partly use their bodyweight to try and get Alvarado detained and under control (*see* COTMSJ0458-461), during this time Alvarado is ignoring verbal commands to "stop," and is actively resisting. He is not yet handcuffed and can be heard saying "I'm gonna fuck you up" to the officers. (COTMSJ0458, 1:16-1:18).

The TPD videos contradict Plaintiff's assertion that Alvarado was "dogpiled by Officers Solarino, Yeandle, Ake, and Gamez (Doc. 119, 8:21-22)," or that "the force here consists of 'squeezing the breath' from a suspect" (*Id.*, 16:13-14). Instead, the officers can be seen struggling to get Alvarado handcuffed and then applying the first TARP to ensure he will not stand up and fight with them again. (*See* COTMSJ0458-461).

After the first TARP device is applied, the officers stand up, and no officer is using their bodyweight to restrain Alvarado. Shortly thereafter, Santa Maria and Durazo assist with controlling Alvarado's legs to apply the second TARP, and Alvarado is still resisting. (COTMSJ0458, 10:20-10:30). Even while the officers are trying to loosen the handcuffs Alvarado is seen bucking (*Id.*, 10:36-10:50).

When the first spit sock is applied, no officer is putting their bodyweight on Alvarado, and shortly thereafter Alvarado is seen on his back yelling to "take the mask off now" "now" "take it off now." (COTMSJ0463, 30:26-30:50). The TPD videos show that no officer was using their bodyweight to restrain or subdue Alvarado after the second TARP or spit sock were applied. (COTMSJ0458, 11:10-11:47; *see also* COTMSJ0463, 23:30-23:53).

There is no question, this was a dynamic, "tense, uncertain, and rapidly evolving" situation wherein Solarino, Ake, Yeandle, Gradias, Gamez, Santa Maria, and Durazo were forced to make "split-second decisions about the amount of force necessary in [this] particular situation." *Graham v. Connor*, 490 U.S. 386, 387, 109 S.Ct. 1864, 1867 (1989). The irrefutable evidence shows that these officers used only the level of force necessary to detain and control Alvarado, and their use of force was reasonable based on the totality of the circumstances.

## II. Plaintiff Concedes That Solarino's Use Of Force Prior To Other Officers Arriving Was Reasonable

The MSJ addresses each level of force used. (*See* Doc. 105, 7:8-11:27). The use of force began with officer presence when Solarino arrived in the alley, and the last use of force by police was the application of the first spit sock. Shortly thereafter the Tucson Fire Department arrived and they took over to provide medical treatment.

Plaintiff's Response focuses on the officers' alleged use of their "bodyweight" and argues that the level of force was excessive. (*See* Doc. 119, Section I. a.-b., 10:2-14:15; *see also Id.*, 10:2-4, Section I, header, "Officers' Use of Body Weight On a Prone Suspect Who is Fully Restrained and Pleading for Air Amounts to Deadly Force"). Plaintiff made no attempt to argue that Solarino's use of force prior to the other officers arriving was excessive,

and the MSJ showed that his use of force was reasonable. For this reason alone, this Court should grant judgment in favor of Solarino for all force used prior to the other officers arriving.

### III. Even If Considered Deadly Force, The Force Used Was Reasonable

Defendants agree that Ninth Circuit precedent "establishes that the use of bodyweight compression on a prone individual can cause compression asphyxia," and this level of force can be considered severe, or "deadly force." *Scott v. Smith*, 109 F.4th 1215, 1223 (2024) (emphasis added) citing *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1056-57 (9th Cir. 2003). The use of deadly force, however, is permissible when "it is necessary to prevent escape and the officer[s] ha[ve] probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

The undisputed facts in this case support a finding that even if considered "deadly force," the force used in this case was reasonable under the Fourth Amendment. (*See* Section I., above; *see also* Doc. 105, Section I, 2:1-5:19 and Section, III. A.1., 7:8-11:27). All the officers believed that they were potentially dealing with a fleeing, potentially armed, homicide suspect who already fought or struggled with the two civilians and was actively resisting Solarino, Ake, and Yeandle. They were personally experiencing his active resistance, and they all were concerned that Alvarado could get free and flee or continue to fight with them. The situation they faced put all the officers in immediate danger, and they used the amount of force a reasonable officer in that same situation would use to try and detain a fleeing suspect.

### IV. Even If The Force Used Could Be Considered To Be Excessive, The Officers Are Protected From Liability Under Qualified Immunity

Plaintiff's Response argues that Defendants waived their qualified immunity defense because they did not meet their burden to prove it applies, did not "attempt[] to distinguish the present facts from binding Ninth Circuit caselaw," or did not distinguish these facts from

5

those in *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056-57 (9th Cir. 2003). (Doc. 119, Section V., 24:6-25:4). But this is not true.

      Defendants MSJ specifically addressed the factual distinctions between the officers' use of force in this case from those present in *Drummond* (s*ee* Doc. 105, 8:3- 10:26). *Drummond* and its progeny of cases did not put these officers on notice that their use of force would be unlawful because the facts in *Drummond* are clearly distinguishable from this case. Drummond was known to be unarmed, mentally ill, was hallucinating, and in an agitated state, and an eyewitness saw an officer knock him "'to the ground [,] where the officers cuffed his arms behind his back as [] Drummond lay on his stomach….Drummond offered no resistance…[an officer] 'put his knees into [] Drummond's back and placed the weight of his body on him. [Another officer] also put his knees and placed the weight of his body on him, except that he had one knee on [] Drummond's neck.'" *Drummond*, 343 F.3d at1054. In *Drummond*, the court noted that it was obvious that he was in respiratory distress and that the officers were causing him to have difficulty breathing. *Id.*

      This case is also factually distinguishable from the other cases Plaintiff references in her Response. In *Arce v. Blackwell*, 294 Fed.Appx. 259 (2008), the Ninth Circuit ruled that the use of force alleged was excessive under *Drummond,* but the court also acknowledged that the facts in *Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008), where distinguishable from those in *Arce* and *Drummond. Id.*, 294 Fed.Appx. at 261. In *Gregory*, the use of force was not excessive. Here, Alvarado's active resistance was greater than in *Gregory* and the officers' use of force was far less than what was deployed in *Gregory*. (Doc. 105, 9:25-28).

      In *Tucker v. Las Vegas Metropolitan Police Dept.*, 470 Fed.Appx. 627 (2012), the Ninth Circuit held that the use of force prior to handcuffing was not disputed, and there was no Fourth Amendment violation, but that "a jury could, however, reasonably conclude that the officers used excessive force in tasing Keith and applying their body pressure to restrain him after he was handcuffed and face down on a bed." *Id.*, 470 Fed.Appx. at 629. But in *Tucker* there were "significant discrepancies and omissions in [the officers'] respective

6

accounts of the altercation" and "[b]ecause genuine issues of material fact remain[ed] as to both the extent of the force used by the officers and the nature of the threat posed by Keith's handcuffed resistance, [the court] [could not] hold that the officers acted reasonably as a matter of law." *Id.* Here, Alvarado's active resistance and the extent of force used is captured on TPD videos and cannot be disputed.

Likewise, *Abston v. City of Merced*, 506 Fed.Appx. 650 (2013), is also distinguishable. In *Abston*, the individual was driving the wrong way on a highway and pulled over when ordered to do so by a California Highway Patrol officer. A video captured by a bystander showed the last few minutes of his life and he can be "seen face-down, handcuffed and ankle-shackled, while defendants apply pressure to his back." *Id.* The video shows four individuals "physically restraining" him after he was handcuffed, ankle-shackled, and prone, and the court noted "[w]hat is not clear is whether Abston continued to resist during the is period and, if so, whether his resistance was anything more than minimal…" *Id.*

*Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1158 (E.D. Cal. 2016), also does not prove the officers' use of force here was clearly established to be unlawful. This case was found to be "sufficiently similar" to *Drummond*. The court held that "[*Drummond*] clearly warned officers that when a suspect is handcuffed and prone on the ground, further restraint measures, *if applied as alleged here*, would be unconstitutional." *Id.* (emphasis added). The individual in *Garlick* was merely suspected of being intoxicated in public, and plaintiff's facts argued that he was not combative or resistant, yet officers deployed several escalating levels of force to try and detain him in handcuffs, including deploying a police K9 to bite him in the face, using a police baton to strike him multiple times, and bodyweight pressure. *Id.*

Plaintiff also cites to *Zelaya v. Las Vegas Metro. Police Dep't*, 682 F.App'x 565 (9th Cir. 2017), but it too is factually distinguishable. In *Zelaya*, the individual involved was being held in a psychiatric module at the Clark County Detention Center after he was arrested on drug charges, and officers responded to him appearing "agitated." *Id.*, 682

7

F.App'x at 566-67. In *Zelaya*, "[f]or at least 90 seconds after [he] was handcuffed and had stopped resisting, three officers continued to pin him to the ground with their bodies. When the officers got off [him], he was unconscious. He died soon thereafter." *Id.*

*Sandoval v. Hish*, 461 F.App'x 568 (9th Cir. 2011), is also distinguishable. In *Sandoval*, "Defendants' use of pepper spray and physical force to restrain the decedent was objectively unreasonable, because Defendants knew that the decedent was mentally ill, that he had committed no crime, and that he did not pose any threat to the safety of Defendants or others." *Id.* Likewise, *Slater v. Deasey*, 789 F.App'x 17 (9th Cir. 2019), does not support Plaintiff's argument that the officers' use of force in this case was obviously unlawful. In *Slater*, the individual was "known to the deputies from prior contacts as mentally ill with a history of drug addiction" and "was allegedly pulling wires out of a gas station building." *Id.* The court found that the use of force up through the first "hobble" restraint was reasonable, but that the application of the second and third "hobble" restraints was excessive. *Id.* The court noted that "the second hobble [was] to bind his feet and hands more tightly together, and the third hobble to secure him to the car. While the second and third hobbles were applied, Slater remained on his chest and stomach. The officers admitted placing some pressure on Slater's ribs and shoulder during the application of the second and third hobbles. The autopsy showed extensive bruising that Plaintiffs argue is consistent with pressure to Slater's shoulders and back." *Id., 789 Fed. Appx. at 20*.

Even the more recent decision, *Scott v. Smith*, 109 F.4th 1215, which was issued years after the subject incident, supports this Court ruling the officers here are entitled to qualified immunity protection. In *Scott*, the Ninth Circuit, relying on *Drummond*, notes that "caselaw makes clear that any reasonable officer should have known that bodyweight force on the back of a prone, unarmed person who is not suspected of a crime is constitutionally excessive." *Scott,* 109 F.4th at 1226. Scott called 911 because he believed he was a victim of a crime and upon arrival the officers "quickly acknowledged at the scene that he appeared to be suffering from mental illness." *Id.* The Ninth Circuit noted that *Scott* and *Drummond* were "striking[ly]" similar because neither was suspected of a crime, and both were known

8

to be suffering from a mental illness and were being taken into custody for their own safety. (*See Id.*, 109 F.4th 1226-27). As the Ninth Circuit recognized, "Scott did not attack the officers or anyone else, nor did he threaten to do so. Instead, he stood where officers directed him to stand and made no threatening movements." (*Id.*, 109 F.4th at 1225). Also, in *Scott*, Plaintiffs had an expert who "opined that Smith and Huntsman had alternatives to bodyweight force," and that they failed to employ any of those known alternatives. (*Id.*).

The undisputed factual circumstances in this case are not similar to those presented in *Drummond* or any of the other cases Plaintiff relied on in her Response.

### V.    Plaintiff Did Not Establish That The Use Of The TARP Devices Was Clearly Established To Be Unlawful

Plaintiff's Response separately, and briefly, argues that the use of "hobble" restraints, or "hogtie restraints," are excessive, and although she does not make it clear, it can be presumed she is referring to the use of the TARP devices. (*See* Doc. 119, Section VI.C., 30:3-21). Plaintiff relies on *Sandoval* and *Slater*, which are clearly distinguishable from this case for all the reasons just discussed. (*See* Section IV., above).

In addition, Plaintiff cites to *Agster v. Maricopa Cnty. Sheriff's Office*, 144 Fed. Appx. 594, 596 (9th Cir. 2005), for the proposition that the TARP devices, as applied and used in this case, was clearly established to be unlawful. (Doc. 119, 30:13-16). But *Agster* is also distinguishable. In *Agster*, the court noted, "[a]rrested on a misdemeanor charge of trespass, manacled and surrounded by officers in the jail, this small-sized, drug-depleted man was endangering neither the officers nor himself but was uncooperative. His lack of cooperation was no justification for the application of force which was foreseeably dangerous to his life and in fact was fatal. The County's own regulations warned against the danger of 'the chair' causing positional asphyxia." *Agster*, 144 Fed. Appx. at 596.

Nothing presented in Plaintiff's Response shows that the use of the TARP devices in this case was obviously unlawful.

# CONCLUSION

Plaintiff concedes that the City of Tucson, Scott Ellis, Raymond Flex, Silas Spencer, and Keith Goldstein are entitled to judgment in their favor as a matter of law. (*See* Doc. 119, 1:26, fn. 1). The only remaining named defendants are Solarino, Yeandle, Ake, Gamez, Gradias, Santa Maria, and Durazo[2].

Plaintiff alleged that Solarino, Yeandle, Ake, Gamez, Gradias, Santa Maria, and Durazo, used excessive force against Alvarado, and that these officers were put on notice that their use of force was unlawful. The undisputed facts surrounding this case are captured on several videos, and Plaintiff concedes that the videos corroborate the officers' testimonies. These officers' use of force was reasonable based on the facts known to them at the time and the *Graham* factors analysis. Based on this alone, these officers are entitled to summary judgment in their favor as a matter of law.

Alternatively, even if any of the force used could be considered excessive, the factual circumstances of this particular case are distinguishable from *Drummond* and all the cases Plaintiff cites to or relies on in her Response. Simply put, it was not obvious that the force used in this case was unlawful, and the remaining officers are entitled to judgment in their favor as a matter of law under qualified immunity.

For all the reasons stated above, and those set forth in Defendants' MSJ (Doc. 105), and DSOF (Doc. 106; Docs. 106-1 through 106-463), Defendants Solarino, Ake, Yeandle, Gamez, Gradias, Santa Maria, and Durazo are all entitled to judgment in their favor as a matter of law.

DATED: November 19, 2024.

        MICHAEL G. RANKIN
        City Attorney

By   */s/ Michelle R. Saavedra*
      Michelle R. Saavedra
      Principal Assistant City Attorney

---

[2] The other named defendants and claims not addressed in the MSJ were previously dismissed when the Court ruled on the Defendants' Motion to Dismiss. (*See* Doc. 60).

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2024, the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul Gattone
Law Office of Paul Gattone
301 South Convent
Tucson, Arizona 85701
gattonecivilrightslaw@gmail.com
*Attorney for Plaintiff*

By /s/ M.Piper/rw