**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Irene Briseno, | No. CV-22-00132-TUC-RCC |
| Plaintiff, | |
| v. | **ORDER** |
| City of Tucson, et al., | |
| Defendants. | |

Plaintiff Irene Briseno, on her own behalf and as personal representative of the estate of Damien Eryko Alvarado, brought this civil rights action through counsel pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA) and invoked the Court's supplemental jurisdiction over her state law claim. Before the Court is a Motion for Summary Judgment filed by Defendants City of Tucson; Tucson Police Department (TPD) Officers Solarino, Santa Maria, Durazo, Yeandle, Gamez, Vance, Ake, and Gradias; TPD Sergeants Evans and Ellis; Tucson Fire Department (TFD) Paramedics Fleck and Goldstein; and TFD Firefighter Spencer. (Doc. 105.) The Motion is fully briefed. (Docs. 119, 128).

## I. Background

Plaintiff filed this action against multiple parties regarding the death of her son, Damien Eryko Alvarado ("Alvarado") asserting nine Counts under federal and state law. The Court previously granted in part Defendants' Motion to Dismiss and dismissed Counts Two, Five, Six, Eight, and Nine and the claims against TPD Officers in Count Seven. (Doc.

60.) After that, the remaining claims before the Court were Count One (Fourth Amendment excessive force claim against Defendants Solarino, Ake, Gamez, Gradias, Yeandle, and Ellis); Count Three (Fourth and Fourteenth Amendment claims against Defendant City of Tucson); Count Four (training claim against Defendants City of Tucson and TPD); and Count Seven (Fourteenth Amendment deliberate indifference claim against Defendants Fleck, Spencer, and Goldstein.[1] (*Id*.)

Defendants filed their pending Motion for Summary Judgment on behalf of the City of Tucson, TPD personnel Solarino, Santa Maria, Durazo, Yeandle, Gamez, Vance, Ake, Gradias, Evans and Ellis, and TFD personnel Fleck, Goldstein and Spencer. In their Motion, Defendants argue that TPD Officers Solarino, Yeandle, Ake, Gamez, Gradias, and Ellis and TFD personnel Fleck, Goldstein, and Spencer are entitled to qualified immunity and that Plaintiff's *Monell*[2] claim against the City of Tucson fails. (*See* Doc. 105 at 6-17.)

Plaintiff asserts in her Response that she "opposes the motion for summary judgment insofar as Defendants TPD Officers Solarino, Yeandle, Ake, Gamez, Durazo, Santa Maria, and Gradias contend that they committed no Fourth Amendment violation in restraining Mr. Alvarado and that any potential Fourth Amendment violation was not clearly established in March 2020." (Doc. 119 at 1.) Plaintiff states that she "does not oppose summary judgment as to the other Defendants not listed here." (*Id*. at n.1.)

Because Plaintiff does not oppose the entry of summary judgment to Defendants City of Tucson, TPD Officer Vance, TPD Sergeants Evans and Ellis, and TFD personnel Fleck, Goldstein, and Spencer, the Court will grant summary judgment to these Defendants and will dismiss Counts Three, Four, and Seven.

---

[1] Plaintiff also sued Justin Canovali, who is not identified as an employee of the City of Tucson. Defendant Canovali was served the Summons and Complaint on May 19, 2022 (Doc. 37), but Canovali did not answer. and no one has filed a notice of appearance on behalf of Canovali. On July 20, 2022, Plaintiff filed an Application for Entry of Default (Docs. 45, 46), and on July 27, 2022, the Clerk of Court entered default against Justin Canovali. (Doc. 47.)

[2] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–92 (1978).

The remaining claim now before the Court is Plaintiff's Fourth Amendment excessive force claim in Count One against Defendants TPD Officers Solarino, Yeandle, Ake, Gamez, Durazo, Santa Maria, and Gradias.

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

At summary judgment, where the evidence includes video footage, the Court considers the facts in the light depicted by the video but still draws all inferences from the video in Plaintiff's favor. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)). However, if a party's asserted facts clearly differ from the facts in the video, the Court must consider the facts as depicted by the video. *See Scott*, 550 U.S. at 380 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

## III.  Relevant Facts

On March 22, 2020, Alvarado was operating a white BMW SUV that was involved in a collision at the intersection of Campbell Avenue and Prince Road in Tucson, Arizona. (Doc. 125 at 38 (Pl.'s Statement of Controverting Facts) ¶¶ 7, 9, 11.)[3] At 5:15 p.m. that day, Tucson police dispatchers first received 911 calls involving the car collision and communicated that information immediately to officers in the field.[4] (*Id.* ¶ 9.) Around 5:18 p.m., 911 dispatch received the first call relating to a shooting at Winterhaven Terrace at 2901 E. Fort Lowell Rd., Tucson, Arizona; around 5:26 pm, officers were told that enough

---

[3] The Court begins with Plaintiff's Statement of Controverting Facts, which Defendants do not dispute, because it gives the clearest timeline of events. Defendants' Statement of Facts is separated into each individual Defendant's role that day.

[4] Defendants assert that a call about the collision was broadcast over the radio around 5:32 p.m., but Plaintiff disputes this statement, asserting that the car crash was first broadcast over the police radio at 5:15 p.m. (Doc. 106 (Defs.' Statement of Facts) ¶11; Doc. 125 at 1-37 (Pl.'s Controverting Statement of Facts) ¶ 11.)

officers were at the scene of the shooting and "they should circulate the area." (Doc. 106 ¶¶ 9-10.) Plaintiff disputes the time of the first call, asserting that at 5:20 p.m., TPD personnel entered for the first time into their Computer-Aided Dispatch system a reference to shots fired at 2901 E. Fort Lowell Road, which officers later learned was a homicide. (Doc. 125 at 3 ¶ 9.)

Alvarado's car collision occurred prior to the homicide, Alvarado was not related to the homicide, another individual was convicted in connection with the homicide, and there is no evidence in the record suggesting that Alvarado was a co-conspirator of the individual subsequently convicted for the homicide. (*Id*. at 38 ¶ 11.)

Alvarado was unarmed at all relevant times on March 22, 2020. (*Id*. at 41 ¶ 26.)

Justin and Jayce Canovali witnessed the car collision involving Alvarado and they were aware that Alvarado fled the scene of the car accident on foot. (*Id*. at 39 ¶¶ 12-13.) The Canovalis located Alvarado lying on the ground in an alleyway about a block from the accident. (*Id.* ¶ 14.) Justin Canovali later told investigators that Alvarado was playing in the dirt and appeared to be under the influence of some substance. (*Id.* ¶ 15.) Justin Canovali told investigators that he engaged in conversation with Alvarado and Alvarado did not exhibit aggression toward him. (*Id.* ¶ 16.)

Defendant Solarino was the first officer to arrive in the alleyway, at 5:40 p.m., and when Solarino arrived, the Canovalis observed Alvarado stand up and run away, and the Canovalis' first physical contact with Alvarado occurred when they ran after Alvarado and grabbed his legs to prevent him from escaping over a wall. (*Id*. at 40 ¶¶ 18-19.) Defendant Solarino noticed immediately that Alvarado was "under the influence." (*Id.* ¶ 20.) The next TPD officers to arrive in the alleyway were Defendants Yeandle, Ake, and Gamez, who arrived at about the same time, followed by Defendant Gradias. (*Id*. at 40-41 ¶¶ 22-24.) Defendants Solarino, Yeandle, Ake and Gamez were all involved in initially subduing Alvarado. (Doc. 106 ¶ 30.)

At 5:43 p.m., Defendant Yeandle placed his knee, and at least a portion of his body weight, on Alvarado's neck for a total of 23 seconds while Alvarado was resisting.[5] (Doc. 125 at 42 ¶ 29.) For 18 seconds, Alvarado was on his stomach and shifted briefly onto his back, and for several seconds Defendant Yeandle is seen with his knee on Alvarado's windpipe.[6] (*Id.* ¶ 31.) Beginning at 5:44 p.m., Alvarado was consistently positioned face down on his stomach with Defendant Yeandle fully on top of Alvarado's body in a position that can best be described as "straddling" for a period of three full minutes. (*Id.* ¶ 32.) At 5:45 p.m., Defendant Ake placed his knee on Alvarado's upper back while Alvarado was restrained on his stomach, keeping it there for approximately 50 seconds. (*Id.* ¶ 33.) After 50 seconds, Defendant Ake shifted the location of his knee and, in total, had his knee or some of his body weight on Alvarado for a total of approximately two minutes while Alvarado was on his stomach. (*Id.* at 43 ¶¶ 34-35.)

At 5:47 p.m., approximately six minutes after Defendant Solarino first arrived on the scene, Defendant Yeandle placed handcuffs on Alvarado and stated out loud that Alvarado was detained. (*Id.* ¶ 36.)

At approximately 5:47 p.m., after he was fully handcuffed, Alvarado said "I can't breathe" for the first time while positioned face down. (*Id.* ¶ 37.) Defendants Ake, Gamez, Solarino, and Yeandle were present to hear Alvarado say "I can't breathe" for the first time, as Ake, Solarino, and Yeandle had their collective body weight on top of him at that moment. (*Id.* ¶ 38.) In response to Alvarado saying he could not breathe, Defendant Ake said, "yes, you can. You're talking." (*Id.* at 44 ¶ 39.) Defendant Gamez then said Alvarado is "probably high" and encouraged the other officers to get Alvarado into a recovery

---

[5] Plaintiff asserts that Alvarado weighed approximately 195 pounds, Defendant Yeandle weighed between 240 and 260 pounds, Defendant Solarino weighed between 165 and 180 pounds, and Defendant Ake weighed between 150 and 160 pounds. (Doc. 125 at 37 ¶¶ 1, 3-5.)

[6] In support, Plaintiff cites, in part, to video from officers' body-worn cameras (BWC).

position as quickly as possible.[7] (*Id.* ¶ 41.) Approximately one minute elapsed after Gamez said that and when Alvarado was placed into the recovery position. (*Id*. at 45 ¶ 47.) Three minutes had elapsed from when Alvarado first said he cannot breathe and when he was placed into the recovery position. (*Id.* ¶ 48.)

At 5:47 p.m., approximately 5.5 minutes after Defendant Solarino first arrived on scene, Defendants Gamez, Ake, Yeandle, and Gradias applied the first TARP on Alvarado as he was lying face down.[8] (Doc. 125 at 44 ¶ 43.) Almost a minute after Alvarado first said he could not breathe, an officer (likely Officer Ake) told Alvarado "Breathe! Breathe!" (*Id.* ¶ 44.) Officers continued placing their body weight on Alvarado for an additional 20 seconds after the officer told Alvarado to breathe. (*Id.* at 45 ¶ 46.) At 5:48 p.m., all officers removed their weight from Alvarado, and Alvarado did not attempt to resist or act in a hostile fashion. (*Id.* ¶ 45.) At 5:49 p.m., Alvarado said "I can't breathe" for the second time. (*Id.* ¶ 49.) In response, Defendant Yeandle said, "you can breathe just fine," and Defendant Solarino told Alvarado, "If you can complain, you can breathe." (*Id.* ¶ 50.) Just after 5:49 p.m., Alvarado expressed difficulty breathing, saying, "No oxygen," in the

---

[7] The parties do not explain in their facts what a recovery position is, but Defendant Solarino testified during his deposition that the recovery position involves "putting somebody . . . on their right side down preferred versus left side down. That will basically put their side of their body down towards the ground, opening up the left side of their chest cavity to include their lungs and heart." (Doc. 106-2 at 7 (Solarino Dep. at 10:7—12).) Solarino was describing the recovery position after being asked about his understanding of "positional asphyxia" which he said can occur because "certain body positions will include unnecessary stress of other parts of the body. The example would be laying somebody face down, putting pressure on their back. All that could end up collapsing the chest cavity putting undue pressure on the lungs, heart and those sort of things." (*Id*. at 6-7 (Solarino Dep. 9:24—10:5).)

[8] A TARP (Total Appendage Restraint Procedure) is "a nylon strap with a carabiner at one end and then a loop with kind of a tension device at the other," or a restraint used "to secure the person's ankles to their hands so that they can't, you know, extend their legs." (Doc. 106 ¶ 53.) A TARP is used when there is "[e]ither a specific threat of kicking or a high level of resistance or a likelihood of fleeing." (*Id.* ¶ 54.) A TARP is typically applied while a person is on their stomach and then they are put in the recovery position. (*Id.* ¶ 85.)

presence of Defendants Ake, Durazo, Gradias, Solarino, and Yeandle. (*Id*. at 46 ¶¶ 51-52.) In response, one of the officers said, "shut your fucking mouth." (*Id.* ¶ 53.)

Just before 5:52 PM, Alvarado said "I can't breathe" for the fourth time and can be heard on BWC footage respirating in a shallow and belabored manner. (*Id.* ¶¶ 54-55.) In response, Defendant Yeandle said, "you can breathe just fine" and Alvarado said, "no, I can't." (*Id.* ¶¶ 57-58.) Defendant Solarino then said, "if you can complain you can breathe just fine, just stop; get – do we have another TARP?" (*Id*. at 47 ¶ 59.) Defendants Yeandle, Solarino, Gradias, Durazo, Gamez, and Ake were present the fourth time Alvarado stated he couldn't breathe. (*Id.* ¶ 56.)

While in the recovery position on his right side, Alvarado was groaning, verbally protesting, and making unintelligible utterances upon every exhale. (*Id*. ¶ 60.)

At approximately 5:52 p.m., Defendant Solarino started applying a second TARP device. (*Id.* ¶ 61.) While the second TARP device was being applied, Defendant Solarino rolled Alvarado back onto his stomach, which was the second separate instance in which Alvarado was placed onto his stomach by officers. (*Id.* ¶ 62.) During the application of the second TARP device, Defendants Santa Maria and Durazo assisted Defendants Yeandle and Solarino, and Solarino, Santa Maria, and Durazo were placing their body weight on Mr. Alvarado. (*Id.* ¶¶ 63-64.) While applying the second TARP device, an officer said, "if you have this much strength, you can breathe." (*Id.* ¶ 65.)

At approximately 5:52 p.m., Alvarado said "I can't breathe" for the fifth time. (*Id*. at 48 ¶ 66.) In response, Defendant Solarino said "Stop complaining." (*Id.* ¶ 67.)

Around 5:52:25 p.m., Alvarado said "I can't breathe" for the sixth time. (*Id*. at 48 ¶ 68.) In response, Defendant Yeandle said, "if you're talking, you're breathing." (*Id.* ¶ 69.) Defendant Solarino also told Alvarado, "stop talking and complaining, just start breathing, you'll be fine." (*Id.* ¶ 70.)

At 5:53 p.m., Defendants Durazo, Yeandle, Santa Maria, and Solarino finished applying the second TARP while Alvarado was prone with his stomach on the ground. (*Id.*

¶ 71.) Defendants Yeandle and Solarino placed body weight on Alvarado while Alvarado was face down during the application of the second TARP device. (*Id.* ¶ 72.)

Defendant Sergeant Ellis directed officers on the scene to apply a spit mask, which covered Alvarado's mouth and nose.[9] (*Id.* ¶ 73.) At 5:54:25 p.m., Defendant Ake applied the first spit mask on Mr. Alvarado. (*Id.* at 49 ¶ 75.) At this time, TFD personnel arrived on the scene. (*Id.* ¶ 76.)

At 5:55 p.m., firefighters applied a second spit mask on top of the first one. (*Id.* ¶ 77.) While the second spit mask was being applied by firefighters, Alvarado groaned again. (*Id.* ¶ 78.) As Alvarado made a series of groaning noises, an officer mocked Alvarado by repeating back the groaning noises in an insulting tone of voice. (*Id.* ¶ 79.)

Firefighters placed Alvarado back in the recovery position after the second spit mask was applied. (*Id.* ¶ 80.) Prior to that, Alvarado was either in the prone position or supine position for three consecutive minutes leading up to the moment of placing Alvarado in the recovery position. (*Id.* ¶ 81.)

After having been fully handcuffed, Alvarado spent a total of 2 minutes, 53 seconds on his stomach, most of which Alvarado spent prone with officers' body weight pressed onto his torso. (*Id.* ¶ 82.)

TFD did a full vitals assessment. (Doc. 106 ¶ 204.) TFD made the decision not to transport Alvarado after they initially checked him out and Alvarado was still breathing at that time. (*Id.* ¶¶ 172, 205.) If there is concern about someone's ability to breathe, TFD would listen to their lungs and check their oxygen levels. (*Id.* ¶ 206.) Alvarado's pulse

---

[9] Defendants asserted in their Answer that a spit sock or mask (the parties use the term interchangeably) is a mesh cloth designed to prevent spitting and biting; during the Covid pandemic, the spit sock was also used to limit officers' and paramedics' exposure to viral particles. (Doc. 61 ¶ 136.) From the brief glimpses of Alvarado's head in the videos Defendants submitted, it appears the spit mask is a mesh bag that goes over the head, obscuring the face completely. For unknown reasons, Defendants have blurred out most of the views of Alvarado's head in the videos, including when he is wearing the spit mask, so it is difficult to get a good view of the spit mask.

oxygen level was checked and was 94 percent.[10] (*Id.* ¶ 207.) Nothing about Alvarado's oxygen level or any of the vitals caused TFD paramedic Fleck to be alarmed or believe Alvarado needed immediate medical attention. (*Id.* ¶ 208.)

TFD left and were called back to the scene a short while later when officers near Alvarado noticed he had stopped breathing. (*See id.* ¶¶ 173, 200.) TFD firefighter Spencer found TPD doing compressions on Alvarado; Spencer felt for a pulse, discovered Alvarado had no pulse and wasn't breathing, and Spencer started compressions. (*Id.* ¶ 229.) Spencer traveled with Alvarado to the hospital; Alvarado's condition while being treated by TFD up until when he was transferred to the hospital's care never changed. (*Id.* ¶ 231.) Alvarado remained pulseless and apneic on the way to the hospital. (*Id.* ¶ 252.)

An autopsy performed on Alvarado determined that the manner of his death was an accident and that the cause of his death was "sudden cardiac arrest in the setting of acute methamphetamine intoxication and restraint with dilated cardiomyopathy (heart murmur) as a significant contributing condition." (*Id.* ¶ 277.)

**Defendant TPD Officer Nick Solarino**

Defendant Solarino was in midtown Tucson where the shooting occurred on March 20, 2022. (Doc. 106 ¶ 12.). On his way to the scene, Solarino turned onto Campbell and came across a collision where other officers were already present. (*Id.*) After a brief conversation, Solarino was informed there was a collision near the shooting scene and, at some point, discovered the shooting incident was a homicide, and he was trying to figure out if the two incidents were related. (*Id.* ¶¶ 12-16.) Solarino was informed that a vehicle was seen leaving the shooting, which may have been driven by a suspect, and the vehicle was reported to be a Hyundai car, sedan or SUV. (*Id.* ¶ 14.) Plaintiff asserts that the vehicle seen leaving the scene of the shooting was described on police radio as a Hyundai sedan, not a Hyundai SUV. (Doc. 125 at 3 ¶ 14.) Around 5:40 p.m., officers were informed that the suspect from the shooting incident was still armed. (Doc. 106 ¶ 17.)

---

[10] Oxygen saturation at 92 or higher is healthy or normal and anything under 88 is concerning and under 80 is dangerous. (Doc. 106 ¶ 237.)

Solarino learned that the fleeing car crash suspect had "taken off running eastbound." (*Id.* ¶ 15.) Solarino arrived in a nearby alleyway and there were civilians with the suspect, and Solarino did not wait for backup because he was concerned for the civilians' safety and decided "the potential risk to the civilian essentially outweighed [his] safety as a solo Officer to go make contact with [Alvarado] . . ." (*Id.* ¶ 256). Plaintiff disputes this fact, asserting that Solarino personally observed that the civilians only "fought" with Alvarado when the civilians made the decision to pursue him. (Doc. 125 at 35 ¶ 256.) The two civilians were holding the fleeing suspect from the car crash, who was later discovered to be Alvarado. (Doc. 106 ¶ 18.) Plaintiff disputes the civilians were "holding" Alvarado to the extent that suggests physical contact between the civilians and Alvarado at the time Solarino arrived. (Doc. 125 at 3 ¶ 18.)

Solarino contacted Alvarado and gave multiple commands, including "stop right there," "get off the wall," "get down," or "get down on the ground," as Solarino tried to pull Alvarado off the wall, but Alvarado was not complying. (Doc. 106 ¶ 20.) Because Alvarado was not complying with commands and was avoiding apprehension, Solarino punched Alvarado multiple times in the face during the struggle to get him under control and detained. (*Id.* ¶ 22.) Solarino perceived Alvarado to be an active threat, and Solarino was trying to get him to comply. (*Id.* ¶ 24.) Alvarado had "clenched fist, hundred yard – thousand yard stare, grinding his teeth, things . . .consistent with the act of aggression." (*Id.* ¶ 23.) Very quickly after engaging Alvarado, Solarino realized that "[Alvarado] was taller and more physically fit" than him, and Solarino was thinking that he "had two witnesses . . . to protect" and himself. (*Id.* ¶ 257.) Because his punches were not effective, Solarino used his Taser to get Alvarado under control, but that was not effective either. (*Id.* ¶ 27.)

After Defendants Yeandle, Ake, and Gamez arrived, the four officers (Solarino, Yeandle, Ake and Gamez) were all trying to get Alvarado detained, under control, and in handcuffs during the struggle. (*Id.* ¶ 30.) Solarino used all his body weight and strength when Alvarado "was kicking and trying to buck" Solarino off. (*Id.* ¶ 32.) During the

struggle, Alvarado was reaching towards Solarino's duty belt and Solarino's shoulder, and Alvarado had custody of the gun magazine at some point, but it is not clear to Solarino how the magazine got loose. (*Id.* ¶ 28.) Solarino was concerned that Alvarado would use the magazine as a "blunt instrument" to attack Solarino, and the Taser was not effective, so Solarino delivered two to three closed fist strikes to the left side of Alvarado's face. (*Id.* ¶ 260.)

Solarino described the struggle with Alvarado as the worst he has ever experienced and "the most like afraid I could I say I've been in, in a situation like that where I couldn't control it, like it, it needed the level, it needed the amount of Officers just to get the control." (*Id.* ¶ 262.) Solarino said he was used to suspects giving in at some point and Alvarado just continued fighting the whole time. (*Id.*) Plaintiff disputes that Alvarado continued fighting through the entire interaction with law enforcement. (Doc. 125 at 36 ¶ 262.) Solarino said later, "like I said I had the level of fear that I wasn't able to . . . I was not going to be able to control this guy um, and with everything going on and then with the other civilians witnesses that were nearby and the type of incident that I thought this guy was involved in I felt, I thought I was gonna end up having to shoot this guy." (Doc. 106 ¶ 263.) Solarino did not punch or tase Alvarado after he was in handcuffs. (*Id.* ¶ 33.)

After Alvarado was in handcuffs, a TARP was applied. (*Id.* ¶ 35.) Prior to the TARP being applied, Alvarado was "essentially kicking his feet, making statements to the effect he's going to fight officers, still flailing his body around, things of that nature, all of which is conflicting with our goal . . . which is to detain him and move on with the investigation." (*Id.* ¶ 36.) The initial TARP was not applied correctly and would not prevent full body double leg kicks or thrashing, so a second TARP was properly applied to reduce full range of motion and keep it secured to prevent escape. (*Id.* ¶ 75.) Defendants Santa Maria and Durazo and Sergeant Ellis arrived on the scene around the time the second TARP was applied. (Doc. 125 at 41 ¶ 25.)

. . . .

. . . .

**Defendant TPD Officer Sean Yeandle**

Defendant Yeandle was enroute to the scene of the shooting when the call came in about the collision and then information came in about Solarino being in contact with and fighting the person who fled the collision. (Doc. 106 ¶ 60.) Yeandle responded to the alley where Solarino was to assist. (*Id.* ¶ 61.) When Yeandle arrived on scene, he believed that the vehicle and suspect of the homicide were related to the collision call. (*Id.* ¶ 64.) Yeandle saw Solarino physically fighting with a suspect or "facing each other and struggling face to face" and tried to help Solarino gain control of Alvarado. (*Id.* ¶ 65.) Solarino and Alvarado were both on their feet when Yeandle first arrived, but Alvarado "was taken to the ground shortly thereafter and wound up on his stomach." (*Id.* ¶ 66.) Yeandle testified:

> It was a prolonged fight that lasted multiple minutes, so I guess every part of me got used at some point. My initial involvement I would believe I was off of Mr. Alvarado's left side, and I was attempting to get his left arm out from under his body and into a handcuffing position initially . . . My body weight would have wound up on him at some point, yes. Most of the imaging you can see where my knees are in use I'm in more of a squatting position than anything, not necessarily with the intent to apply maximum pressure but more as a pivot point in order to get joints manipulated so we can get arms behind backs.

(*Id.* ¶ 68.) At one point, Yeandle's "leg or legs were trapped underneath Mr. Alvarado's body and [Yeandle] was more or less stuck in this position . . . . in a semi-kneeling, semi-seated position on [his] hip because [Yeandle] couldn't get . . . [his] leg free." (*Id.* ¶ 74.)

Yeandle testified that "[i]t would have been impossible to tell on the initial contact" whether Alvarado had ingested drugs, but that "he was particularly aggressive, agitated and particularly strong, so it could have been inferred." (*Id.* ¶ 69.)

The use of force was necessary to get Alvarado in handcuffs because he was "combative and noncompliant." (*Id.* ¶ 72.) Plaintiff does not dispute that some level of force was "necessary to get [Alvarado] in handcuffs," but disputes paragraph 72 "to the extent that Defendants do not specify what level of force was necessary." (Doc. 125 at 11 ¶ 72.)

Yeandle did not think Alvarado was having difficulty breathing "when he was making comments to that effect" because of his observations of Alvarado "actually physically breathing and talking and not only talking but yelling and screaming and then still possessing the strength and will power to forcefully resist as opposed to behaving like you were low on oxygen or energy, things like turning blue, going limp, you know, any evidence to the contrary I guess you could say." (Doc. 106 ¶ 76.) Plaintiff disputes this statement, asserting that "[a]n officer's subsequent comments can provide circumstantial evidence to refute an officer's true state of mind earlier in the day" and that there is some evidence that Yeandle "verbally mocked Alvarado minutes after the time period cited in this fact" and another officer is heard stating "Breathe!" to Alvarado. (Doc. 125 at 11 ¶ 76, citing cases.) Plaintiff further states that Defendant Gamez issued a warning to Defendant Yeandle about possible respiratory distress "probably a few minutes into the incident" - before Alvarado finished making his various "I can't breathe" statements. (*Id*.)

**Defendant TPD Officer Ryan Ake**

Defendant Ake was originally responding to the shooting call, which then turned into a suspect fleeing in a vehicle, and then a call that there was a car accident, and he never made it to the car accident scene because he responded directly to assist Defendant Solarino. (Doc. 106 ¶¶ 93-94.) When Ake got to the scene, he could see Defendant Solarino "squared up" with Alvarado as they stood, and he could see the two civilians nearby, and Yeandle was just a few steps in front of Ake also responding to assist. (*Id*. ¶ 98.)

Alvarado said multiple times that he cannot breathe, and Defendant Ake told Alvarado he can breathe based on Ake hearing him breathing; at no time during his contact with Alvarado did Ake think Alvarado could not breathe. (*Id*. ¶¶ 106, 111.) Plaintiff disputes these statements to the extent that Defendant Ake believed Alvarado could breathe because he heard him breathe, asserting there is some evidence that Officer Ake may have verbally mocked Alvarado toward the end of the interaction, and an officer is heard stating "Breathe! Breathe!" to Alvarado while Defendant Ake was present. (Doc. 125 at 17-18 ¶¶ 106, 111.)

Defendant Ake thinks Defendant Gamez told them they needed to get Alvarado on his side because the officers were still struggling with Alvarado and they believed he was probably high, so they wanted to get him in the recovery position. (Doc. 106 ¶ 107.) Once Alvarado was detained, he was rolled onto his side and put in the recovery position when it was safe to do so. (*Id*. ¶¶ 108-09.) Plaintiff disputes when Alvarado was put in the recovery position, asserting he was placed into a recovery position almost three minutes after he was put in handcuffs and declared "detained." (Doc. 125 at 18 ¶¶ 108-09.)

If someone complains they cannot breathe, Defendant Ake knows to put the person in the recovery position, and in this case, Alvarado was already in the recovery position some of the time he was making that complaint. (Doc. 106 ¶ 81.) Alvarado was also complaining about not being able to breathe while the officers were still actively fighting with him. (*Id*. ¶ 82.) Plaintiff disputes paragraph 82, asserting that Alvarado made at least six distinct statements indicating that he was unable to breathe, with the first occurring after Alvarado was already fully secured in handcuffs. (Doc. 126 at 12 ¶ 82.) Plaintiff asserts it is undisputed that Alvarado was "flailing about, moving his body, [and] articulating things" after he was handcuffed, and Defendant Ake does not characterize these actions as "fighting." (*Id*.)

Defendant Ake understands what excited delirium is and he has a basic understanding of how drugs relate to it; based on his training and experience related to certain drugs, it was his assumption that Alvarado had ingested drugs. (Doc. 106 ¶¶ 83-84.)

The TARP was applied after Alvarado was in handcuffs "[b]ecause he was still actively kicking and things of that sort, so we wanted to make sure he was secured before we had med come in and check him out." (*Id*. ¶ 86.)

Defendant Ake had training on when to use a "spit sock." (*Id*. ¶ 87.) Spit socks do not impede someone's ability to breathe whether in "a highly agitated" state or not. (*Id*. ¶ 89.) Plaintiff disputes this statement, asserting that whether a spit sock impairs the ability to breathe requires scientific, technical, or other specialized knowledge, and Defendants

support their fact with only the lay testimony of a police officer. (Doc. 125 at 14 ¶ 89.) Plaintiff asserts there are circumstances when a spit sock impedes breathing. (*Id.*, citing *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1159, n.22 (E.D. Cal. 2016).)

Defendant Ake was concerned "[b]ecause [Alvarado] was spitting and making guttural sounds with his mouth while [Ake] was close to his head." (Doc. 106 ¶ 88.) Ake applied the first spit sock about 15-20 minutes into the incident and could not apply it sooner because Alvarado was actively fighting with the officers. (*Id.* ¶ 90.) Plaintiff disputes the timing of the application of the first spit sock, asserting it was applied 12 minutes after Defendant Solarino arrived at the scene and that Alvarado was not "fighting with the officers" during those 12 minutes. (Doc. 125 at 15 ¶ 90.)

**Defendant TPD Officer Mike Gamez**

Defendant Gamez first responded to the collision on Prince Rd. and Campbell Ave., and when he heard on the radio that officers were struggling with the suspect who fled the collision, he ran over to the area to assist. (Doc. 106 ¶ 115.) When he located them, he saw Defendants Solarino, Yeandle, and Ake struggling with Alvarado. (*Id.* ¶ 116.)

Defendant Gamez put his hand on Alvarado's head area and noticed "that this struggle doesn't really need any more force. It just needs some communication, some direction and some guidance. So I start basically doing that because adding more force is not going to do any good." (*Id.* ¶ 117.)

Defendant Gamez is familiar with positional asphyxia and the recovery position. (*Id.* ¶ 119.) From training, Gamez knew they needed to get Alvarado in handcuffs as quickly as possible and get him in the recovery position, and he communicated that to the other officers and believes it was less than a minute that Alvarado was put in the recovery position. (*Id.* ¶ 120.) Plaintiff disputes that it was less than a minute between handcuffing and placing Alvarado into a recovery position. (Doc. 126 at 19 ¶ 120.)

Defendant Gamez is familiar with excited delirium, and Alvarado was displaying several signs of that happening.[11] (Doc. 106 ¶ 122.) Alvarado was spitting and Defendant Gamez remembers someone asked for a spit sock. (*Id.* ¶ 123.) Plaintiff disputes this statement "to the extent Defendants suggest that Mr. Alvarado was intentionally trying to spit on officers." (Doc. 126 at 20 ¶ 123.) After TFD arrived, Defendant Gamez had limited contact with Alvarado. (Doc. 106 ¶ 125.)

**Defendant TPD Officer Joseph Gradias**

Defendant Gradias first encountered the two civilians in the alleyway and understood they were involved in a struggle with Alvarado. (Doc. 106 ¶¶ 132-33.) Gradias talked briefly to the civilians and then called out to the officers to see if they had the situation handled but he didn't get a response. (*Id.* ¶ 134.) Gradias ran to the scene and there were four officers dealing with Alvarado when he arrived, and Gradias assisted with the post-handcuffing. (*Id.* ¶¶ 134-35.) Alvarado grabbed one of Gradias' arms or hands, and Gradias grabbed Alvarado's arm, and a TARP was applied. (*Id.* ¶ 136.) Defendant Gradias was not the officer captured on video saying, "if you complain, you can breathe." (*Id.* ¶ 137.) Defendants assert, and Plaintiff disputes, that a TARP does not prevent someone from breathing when applied correctly. (*Id.* ¶ 138; Doc. 126 at 22 ¶ 138.) Plaintiff asserts that several Defendants testified that a suspect could experience difficulty breathing when forced into the prone position for a prolonged length of time and that a TARP applied correctly "requires the subject to be at least temporarily placed onto their stomach." (Doc. 126 at 22 ¶ 138.)

Defendant Gradias thinks he ran and tried to yell out to another officer closer to the ambulance that they needed them (presumably referring to TFD personnel) to come back because he thought that would be faster than the radio, and Gradias looked in a patrol car to see if there was an automated external defibrillator, but there was none. (Doc. 106

---

[11] Defendant Gamez described "excited delirium" as "basically a person exhibiting behavior outside of the norm, disrobing, violence toward inanimate objects, elevated heart rate, basically hallucinations, violent behavior, erratic behavior, and Mr. Alvarado was exhibiting many of those signs." (Doc. 106-2 at 247 (Gamez Dep. 29:6-10).)

¶¶ 139-140.) Gradias saw that another officer was performing CPR, so he assumed Alvarado was not breathing. (*Id.* ¶ 141.)

### Defendant TPD Officer Marco Durazo

When Defendant Durazo responded to the alleyway scene, Alvarado was thrashing around, but already in handcuffs, and he had the initial TARP on. (Doc. 106 ¶ 179.) Plaintiff disputes this statement to the extent it suggests Alvarado continued resisting after Durazo arrived at the scene. (Doc. 125 at 27 ¶ 179.) Durazo saw TPD put the first spit sock on, and he knew that TFD applied the second one. (Doc. 106 ¶ 180.)

Defendant Durazo assisted with applying the second TARP because the first was not working properly. (*Id.* ¶ 182.) Alvarado kicked Durazo pushing him back. (*Id.* ¶ 183.) At some point, Durazo had his hand slightly on Alvarado's shoulder and over his head to try to prevent him from injuring himself because before that Alvarado thrashed forward when TFD was trying to check his vitals, and he smacked his head against the wall. (*Id.* ¶ 184.) Durazo believes it was less than a minute after TFD left that Alvarado stopped breathing. (*Id.* ¶ 185.) TPD removed the restraints and started doing compressions. (*Id.* ¶ 186.)

### Video Evidence from BWC

Defendants have submitted video from the BWC of Defendants Gamez, Solarino, Durazo, Ake, Yeandle, Vance, and Gradias. The Court has reviewed all the BWC videos and summarizes the most relevant portions here.

### Solarino BWC

The relevant portion of Defendant Solarino's BWC video begins with him running in the alleyway and one person is seen trying to pull a second person (presumably Alvarado) off a block wall and Solarino is yelling, "stop right there! Stop right there! . . . Get off the wall!" (Ex. 107, Solarino Video at 19:20—19:31.) Alvarado is eventually pulled off the wall and there is a struggle where Alvarado is on the ground and then standing, but it is difficult to see what is happening; as Solarino tries to handcuff Alvarado he is telling Alvarado "stop" and "shut up" and "get down on the ground right now." (*Id*. at 19:40—

20:02.) Alvarado is upright at that point, and it appears one of the bystanders pulls him to the ground, a yellow Taser appears, and then the video abruptly ends. (*Id*. at 20:02—20:14.)

**Yeandle BWC**

Yeandle's BWC video begins as he is running down the alley toward the struggle and when he reaches Alvarado, a Taser is heard and Alvarado is saying "stop Tasing me," and officers are repeatedly saying give me your hands and stop moving as Alvarado is struggling with them and appears to try to stand up. (Ex. 107, Yeandle Video at 0:02—0:56.) About one minute into the video, Alvarado is on the ground with someone's hand on his head and someone is telling Alvarado repeatedly to stop, stop moving, and someone, possibly Alvarado, says, "you stop" and "fuck you up." (*Id*. at 1:00—01:20.) Three officers or their hands now appear off and on in the video and Alvarado is still on the ground and moving around; one officer is holding Alvarado down at his head as two others try to handcuff him, and the officer at Alvarado's head says "don't fucking bite me, I swear to god. You understand that?" (*Id*. at 1:20—1:39.) The officer at Alvarado's head is seen for a few seconds with his forearm on or near the back of Alvarado's neck but then the camera angle changes and only the back of the officer is visible for a while and then his forearm is again visible pressing down onto Alvarado's upper back and neck area before the officer puts both hands on Alvarado's head as the officer stands. (*Id*. at 1:40—2:12.)

Alvarado is on his stomach and an officer's knee is then placed on the back of Alvarado's upper back/neck area for approximately 10 to 14 seconds and Alvarado is heard emitting a grunt. (*Id*. at 02:14—02:28.) The officer moves his knee off Alvarado's neck and moves it a few inches down Alvarado's back as he assists the other two officers with handcuffs; one of the other officers appears to be kneeling at Alvarado's side and only the hands of the third officer are seen—not his body and everyone seems to be breathing heavily. (*Id*. at 02:26—02:55.) Approximately three minutes into the video an officer says, "he's detained" and Alvarado's hands are seen briefly cuffed behind his back. (*Id*. at 02:43—02:49.) The officer with his knee on Alvarado's upper back appears to shift his weight and Alvarado emits another grunt and says, "stop it" and "take off these handcuffs

now!" (*Id*. at 02:55-03:02.) The officer still has his knee on Alvarado's upper back and a hand holding Alvarado's head down, and Alvarado is yelling, "No, No, No!" as another officer says, "he's gonna break my fucking ankle." (*Id*. at 03:02—03:06.) Alvarado's hands are again seen cuffed behind his back and the officer still has a knee pressed on Alvarado's upper back and a hand on Alvarado's head or neck as Alvarado appears to struggle under him and yell; an officer calls out to someone to "get a car with a screen, Explorer or Tahoe" and "he's gonna fight the whole time." (*Id*. at 3:07—03:37.) The view of the officer's knee is blocked by someone's arm but then the arm moves, and the officer's knee is seen on Alvarado's arm or to the side and is no longer on Alvarado's back. (*Id*. at 03:47.)

The officers are talking to each other and Alvarado yells "stop it" and can be heard breathing heavily. (*Id*. at 03:38—03:50.) Alvarado then yells "I can't breathe!" and someone says, "yes you can. You're talking." (*Id*. at 03:50—03:55.) An officer's knee is seen either on Alvarado's left arm or back and he has a hand on Alvarado's head and presses his other hand on Alvarado's upper back. (*Id*. at 03:53—03:55.) Alvarado is moaning and the view shifts from Alvarado's head to his midsection where several officers are positioned; someone puts on gloves, Alvarado's feet are seen, and then a strap appears in someone's hands. (*Id*. at 4:00—04:30.) During this, someone says, "he's been in this downward position a while? He's probably high so we gotta get him on his side." (*Id*. at 04:15—04:22.) Alvarado is still moaning and crying out but not as loudly as before and it appears four officers are kneeling around him, with one officer's knee on Alvarado's arm. (*Id*. at 4:25—04:33.) Alvarado is still on his stomach, with his pants down at his ankles and buttocks exposed and does not appear to be moving as officers' hands are seen applying a strap to the handcuffs and then to Alvarado's ankle area. (*Id*. at 04:35—05:08.) During this procedure, Alvarado's knees are bent so that his ankles are at his buttocks and then his legs are straightened by an officer. (*Id*.) At that point, Alvarado is moved onto his side. (*Id*. at 05:15.) Four to five officers are seen standing above Alvarado, who is on his side on the ground and gasps, "Don't touch me [unintelligible], get away! I don't like this!" (*Id*. at 05:23—05:38.)

The view is no longer on Alvarado but on an officer standing above Alvarado, and someone says, "wake up, breathe" and someone else says, "he's fine" and Alvarado yelps. (*Id*. at 06:06—06:12.) Officers are now standing, but Alvarado is not on camera and says, "I can't breathe" and someone responds, "you can breathe just fine. Shut your fucking mouth" and Alvarado, who seems to be gasping, says something unintelligible. (*Id*. at 06:32—06:37.) Alvarado gasps out something like "get it off" as the officers standing above him are talking to each other. (*Id*. at 06:44—06:55.) The officers discuss which car will take Alvarado and doing "meds first" and then Alvarado cries out and moans and it sounds like he says, "help me" and "I can't breathe" and "take the mask off me" as he is gasping. (*Id*. at 07:05—07:58.) Alvarado is still not on camera and the officers on camera are standing and moving around, but it sounds like Alvarado continues to groan and breathe heavily and is saying words that are not clear on the video other than "now!" and "bullshit." (*Id*. at 08:05—08:28.)

The officers continue to talk to each other about transporting Alvarado and one mentions that before they put Alvarado in the car they should "secure the second TARP the right way and wrap it and we'll leave this one on." (*Id*. at 08:30—08:49.) Defendant Solarino is standing over Alvarado and telling other officers about punching Alvarado in the face as Alvarado continues to groan off camera and says with heavy breathing, "Don't do that to me. I can't breathe." (*Id*. at 08:50—09:00.) Solarino says, "you can breathe just fine," and Alvarado gasps, "no, I can't," and Solarino says, "If you can complain, you can breathe. Just stop." (*Id*. at 08:58—09:04.) Officers then talk about getting another TARP and "we need to tarp him properly. This is just expeditious." (*Id*. at 09:05—09:14.)

Alvarado is heard groaning and mumbling. (*Id*. at 09:05—09:20.) Solarino is handed a strap and then kneels beside Alvarado's ankles; Alvarado is grunting and says again, "uh, I can't breathe" and someone or possibly two people respond, "you can breathe just fine. Stop complaining. If you're talking, you can breathe. Stop talking. Stop complaining. Just start breathing. You'll be fine." (*Id*. at 09:20—09:33.)

Alvarado can be heard groaning and mumbling as Solarino is doing something at Alvarado's ankles with the strap, and then Solarino kneels on Alvarado's lower legs. (*Id.* at 9:35—09:58.) Alvarado's upper body is not visible at this time, and this video does not show what the other officers are doing. Alvarado had been on his side, but it appears that at some point, the officers have turned Alvarado's torso onto his stomach to do something with the restraints, but his legs remain sideways. (*Id.* at 10:10—10:18.) Alvarado is grunting and says, "no, no" and "stop it" and Alvarado is flipped onto his stomach, and Alvarado tries to turn onto his side or back, and officers turn him back onto his stomach; someone says, "then stop fighting" and "if you've got this much strength, you can breathe." (*Id.* at 10:14—10:24.) Three officers are above Alvarado, and it appears an officer has his knee on Alvarado's left arm, a different knee is seen in Alvarado's upper back area, another officer has his knees on Alvarado's thigh area, and a third officer is pressing down on Alvarado's arm or back with a closed hand, but the video is purposely blurred at Alvarado's midsection, so it is not possible to see the exact position of the officers. (*Id.* at 10:20—10:29.)

Alvarado is then fully on his stomach with the strap running from his wrist area to his ankles and pulling his ankles into the air and there may be someone's knee on Alvarado's upper back. (*Id.* at 10:25—10:33.) An officer talks about loosening the handcuffs and Alvarado is groaning and yells "stop it!" and someone says, "stop fighting, I'm trying to make you more comfortable," although it does not appear Alvarado is struggling with the officers. (*Id.* at 10:35—10:46.) Alvarado, still on his stomach, says, "I can't breathe!" as the officers appears to be adjusting the restraints, with one officer bending Alvarado's legs towards his back, and Alvarado yells "get off me now!" and "what'd I do?" (*Id.* at 10:50—11:06.) Alvarado is still on his stomach crying, "stop," "stop," "noooow" as an officer appears to kneel on Alvarado's arm or back for a few seconds. (*Id.* at 11:10—11:24.) Alvarado is then rolled from his stomach to his side by officers and cries out roughly, "stop it now." (*Id.* at 11:31—11:44.) Officers are seen standing looking down at Alvarado as Alvarado flips onto his back crying out and grunting

- 22 -

and a white bag on his head is partially visible. (*Id*. at 11:50—11:57.) About 20 seconds later, he yells, "take off the mask now!" and someone says, "no" and Alvarado cries out, "nowww!" (*Id*. at 12:09—12:14.) Someone says, "this is to protect you sir, and us," and Alvarado says again, "take it off now." (*Id*. at 12:15—12:17.)

Fire personnel are now on camera. and one appears to be bending toward Alvarado while holding another spit mask. (*Id*. at 12:15—12:20.) Alvarado, who is not on camera, yells again several times, "take it off!" (*Id*. at 12:20—12:35.) Someone wearing a TFD cap leans over Alvarado, who is not visible, and asks, "hey, are you hurt?" and Alvarado says, "no, get it off now!," and the TFD person says, "ok, you're not hurt. That's good news." (*Id*. at 12:45—12:48.) Alvarado then screams something unintelligible, and someone responds, "don't worry, we'll cover this up" as they appear to drape a sheet over Alvarado's lower half, which has been exposed. (*Id*. at 12:50—12:54.) Alvarado is not on camera, and someone says, "take a look" and "let's roll you over on your side." (*Id*. at 12:58—13:04.) Officers are heard talking about taking Alvarado to jail, taking a break and getting water, and Alvarado can be heard yelling in the background, "take it off, nowww" and crying out. (*Id*. at 13:15—13:43.) Officers are talking about their own injuries, and one shows his shin. (*Id*. at 14:00—14:10.) At that point, the audio is turned off on the BWC video.

Alvarado is not seen again on this video for about 10 mins and the view is mainly of officers standing and talking to each other. About 24 minutes into the video, two officers are seen in the distance and appear to be kneeling on either side of Alvarado, and a minute later one of the officers stands and points in the direction of the camera. (*Id*. at 25:15.) The camera then moves back to Alvarado and an officer is seen doing chest compressions as six other officers look on. (*Id*. at 25:22—26:28.) Alvarado is then turned onto his side, with a mesh bag/spit mask (electronically blurred) still on his head, and it appears someone is taking his pulse. (*Id*. at 26:30—26:47.)

A firefighter then returns to the scene and several officers and the firefighter grab Alvarado's arms and legs and carry him off camera. (*Id*. at 26:50—27:25.) About a minute later, the camera pans back to Alvarado on the gurney where someone is doing chest

compressions and other officers are seen going through Alvarado's pants and collecting items on the ground. (*Id*. at 28:10—28:50.) Alvarado is then wheeled away on the gurney. (*Id*. at 29:00—29:10.)

**Gamez BWC**

In the pertinent portion of Gamez's BWC video, Alvarado is on the ground on his stomach but not yet handcuffed and three officers are seen initially with one officer straddling Alvarado's midsection and another officer with his hand on Alvarado's head. (Ex. 107, Gamez Video at 22:00—22:09.) As two officers' hands are seen cuffing one of Alvarado's wrists, a third officer leans onto Alvarado's neck or upper back with his forearm. (*Id*. at 22:21—22:30.) Then an officer's knee moves off Alvarado's arm and onto his neck or upper back before the view is blocked. (*Id*. at 22:50—23:00.) The knee on the neck area comes into view again about 20 seconds later. (*Id*. at 23:20—23:45.) A different officer appears to be kneeling on Alvarado's back as the first TARP is applied.[12] (*Id*. at 25:00—25:49.)

**Durazo BWC**

In this video, Durazo arrives at the alleyway after Alvarado has already been subdued and restrained with handcuffs and the first TARP; Alvarado is on his side and 5 officers are standing over Alvarado who is saying "don't touch me" and "I don't like this!" (Ex. 107, Durazo Video at 23:40—23:56.) The officers continue standing over him and one asks about checking his pockets, and an officer says, "wake up, breathe"; the camera is not on Alvarado, but he can be heard saying "I can't breathe" as he gasps. (*Id*. at 24:00—24:51.)

The camera leaves the area where Alvarado is lying on the ground and officers are talking to each other, with a couple officers standing over Alvarado; another police vehicle pulls up in the alley. Alvarado can be heard mumbling and grunting in the background as

---

[12] Gamez walked away from Alvarado after the first TARP was applied and appears to return as officers are applying the second TARP but the view of what is happening is blocked by other officers standing and kneeling around Alvarado. (*See* Gamez video at 30:00—31:14.)

the officers talk about vehicles and getting photos. (*Id*. at 26:00—27:17.) Alvarado says, "I can't breathe" and an officer tells him he can breathe just fine if he can talk. (*Id*. at 27:18—27:25.)

Three officers are standing over Alvarado now and they talk about getting a second TARP. (27:25—27:30.) An officer is seen working at Alvarado's ankle area as Alvarado says he can't breathe, but the rest of Alvarado's body is not in the frame. (*Id*. at 27:40—28:10.) An officer then kneels down near Alvarado's head, stands up, and kneels down again, but only the officer's upper half is visible, not his legs or knees. (*Id*. at 28:10—28:22.) The two officers on camera appear to be calmly and methodically working on Alvarado, and one speaks to another officer who is off camera and smiles and says, "this is unrelated" and the other says "I know, right?" (*Id*. at 28:10—28:15.) Alvarado's body is not visible and only the upper bodies of the two officers working on him are visible. The officer near Alvarado's head then asks someone for a handcuff key so he can double lock the cuffs. (*Id*. at 28:20—28:26.) The two officers' heads then come together over Alvarado's midsection, but it is still not possible to see where the officer's hands or legs are. (*Id*. at 28:30—28:34.) Then the camera angle shifts, and Alvarado's feet are seen in the air, Alvarado is on his stomach, and the knee of the officer at Alvarado's head is seen on Alvarado's upper back for several seconds. (*Id*. at 28:34—28:44.) The video is purposely blurred at Alvarado's head area, and it is not possible to see how long the officer's knee remains on Alvarado's upper back, but the officer does not appear to move his knee off Alvarado for as long as the camera remains on him before someone else blocks the view. (*See id*. at 28:44—28:57.) Also, due to the purposeful blurring of a portion the video, it is not possible to tell if a second officer also has his knee on Alvarado during this time.

Alvarado's knees are then bent upward as the officer at Alvarado's head tells him to stop fighting and that he's trying to make Alvarado more comfortable, and Alvarado is saying he can't breathe. (*Id*. at 28:49—29:09.) There is another glimpse of the two officers near Alvarado's head and it appears at least one of them still has his knee and bodyweight

on Alvarado before the view is blocked again, but the officer's head can still be seen in the same position over Alvarado. (*See id*. at 29:42—29:54.) About 15 seconds later, the officer's knee on Alvarado's back again comes into view. (*Id*. at 29:14—29:25.) The officer who had his knee on Alvarado's back then stands up. (*Id*. at 29:27.)

The TFD firefighters eventually appear on the scene, assess Alvarado, and appear to finish about six minutes later and walk away, although they are not on camera. (*Id*. at 32:00—38:00.) Someone in the background is talking about a call coming in about a shooting and "he" took off running. (*Id*. at 37:43—37:58.)

A person's hand is seen on Alvarado's shoulder and Alvarado, who appears to be on his side, is heard quietly grunting while officers talk about the shooting call. (*Id*. at 37:43—38:00.) Only Alvarado's shoulder is visible, and he makes small movements and groans, and someone says, "stop dude" and Alvarado stops. (*Id*. at 38:05—38:18.) Officers are talking in the background and Alvarado is quiet except for a few heavy breath sounds, and his head is not visible at all. (*Id*. at 38:55—39:04.) Someone else kneels by Alvarado but it's not clear what he is doing; he appears to have his hands on Alvarado's midsection. (*Id*. at 39:10—39:30.) The heavy breathing sounds have stopped, and Alvarado does not appear to be moving, although only his shoulder is visible.

It's not clear Alvarado is breathing from this point on as one officer's hand remains on Alvarado's shoulder or upper arm and the other person has two hands on Alvarado's midsection; the two officers are not saying anything as their hands remain on Alvarado. (*Id*. at 39:40—41:24.) The two officers continue to have their hands on Alvarado who does not appear to be moving at all or making any sounds and the two officers are not talking. (*Id*. at 41:24—43:00.)

People in the background can be heard talking; at one point someone asks if they searched him, and another person says "as best I could" but he didn't find a wallet or ID. (*Id*. at 42:45—42:53.) Someone then asks twice, "is he still breathing?," and another person responds, "yeah" and then "I don't know." (*Id*. at 43:03—43:12.) Someone asks, "what's his name" and the other person says, "we don't know." (*Id*. at 43:13—43:16.) Someone

says, "roll, roll him over." (*Id*. at 43:18.) Alvarado is rolled onto his back and is limp and someone says, "no, his eyes are rolling" and someone appears to be checking for a heartbeat and pulse. (*Id*. at 43:17—43:26.) Someone says, "meds leaving?" and "Hey, come back. Stop." (*Id*. at 43:28—43:32.) Someone says "he sounds like he's gurgling something, hey, go ahead, start compressions man. You guys are gonna switch off. Alright man. Donovan?" (*Id*. at 43:36.) In the background, someone is shouting, "cardiac arrest," and an officer is seen doing compressions on Alvarado's chest with another officer on the other side of Alvarado and three officers looking on. (*Id*. at 43:40—44:11.) Someone says, "get that off" and it looks like someone removes a spit mask from Alvarado's head, but, again, the view of Alvarado's head is purposely blurred in the video, and the chest compressions continue. (*Id*. at 44:07—44:45.) Someone says, "take his cuffs off"; the compressions have stopped now, and officers and fire personnel prepare to move Alvarado. (*Id*. at 44:44—45:22.) Alvarado is then moved onto a gurney. (*Id*. at 45:35—45:45.) Once on the gurney, someone from TFD starts chest compressions and medical equipment is unpacked, and Alvarado is wheeled off camera. (45:50—47:07.)

In the background, someone asks, "he stop talking to you guys or what changed?" and someone answered, "stopped breathing." (46:54—46:56.)

## IV.   Fourth Amendment Legal Standard

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty.*

*of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97; *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (citations omitted). "Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018); *see Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (considering officer's failure to warn plaintiff that he would be shot if he did not comply with the officer's orders and what other tactics, if any, were available to effect the arrest in determining whether force used was reasonable); *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of*

*Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

## V. Discussion

### A. Nature of the Force Inflicted

Defendants assert that when Alvarado did not comply with Solarino's commands to get off the wall and down on the ground, Solarino punched Alvarado on the side of the face multiple times, which was not effective, and Alvarado grabbed his gun magazine, and so Solarino used his Taser to try and get Alvarado under control, but the Taser was also ineffective. (Doc. 105 at 8-9, citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) ("Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force") and *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (use of a Taser is "considerable force" but less then deadly force).)[13] Defendants further assert that during their struggle to handcuff Alvarado, the officers used their body weight and put their hands on his body and head to keep him from continuing to thrash around. (*Id*. at 9, citing *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (holding that officers "press[ing] their weight on [the suspect's] neck and torso as he lay handcuffed on the ground and begged for air" is a "severe use of force") and *Valenzuela v. City of Anaheim*, 20-55372, 2021 WL 3362847, at *1 (9th Cir. Aug. 3, 2021) (finding that police officers' use of "multiple, extended choke holds even as [the suspect] gagged,

---

[13] Defendants lump all their arguments under the heading "TPD Officers' Use Of Force Was Reasonable" thus requiring the Court to try to discern their arguments with respect to each of the factors under *Graham* and *Espinosa*. In addition, Defendants do not argue each individual Defendant's liability but rather focus on the officers collectively.

wheezed, turned purple, and screamed that he could not breathe" was "severe" force "capable of causing death or serious injury") (quoting *Drummond*, 343 F.3d at 1056).)

Plaintiff argues that the parties agree that officers' use of their own body weight on top of a handcuffed and face-down suspect ranks higher on the scale of seriousness than, for example, use of a Taser or pepper spray, and is, in fact, "severe, deadly force." (Doc. 119 at 10-11 (quoting *Scott v. Smith*, 109 F.4th1215, 1223 (9th Cir. 2024) (holding that "the use of bodyweight compression on Scott's back and neck during and shortly after handcuffing him" and "for about one to two minutes while Scott's pleas turned increasingly incoherent and breathless" amounted to "severe, deadly force").) Plaintiff further argues that by 2001, circuit courts were acknowledging a discernable pattern of suspects experiencing a drug-induced or mental-health-related crisis who were consistently dying after being restrained face-down in multiple-point restraints. (*Id*., citing *Cruz v. City of Laramie, Wyo*., 239 F.3d 1183, 1189 (10th Cir. 2002) (noting articles that "detail the breathing problems created by pressure on the back and placement in a prone position, especially when an individual is in a state of 'excited delirium'" and finding that the "decedent's diminished capacity was apparent to the officers from the moment they arrived on the scene"); *Drummond*, 343 F.3d at 1056 n.4; *Agster v. Maricopa Cnty. Sheriff's Off*., 144 F. App'x 594, 596 (9th Cir. 2005) ("The law was clearly established that forbade the deputies to deploy such potentially lethal force" of restraining a "small-sized, drug-depleted man" in a chair when he "was endangering neither the officers nor himself but was uncooperative"); *Perez v. City of Fresno*, 98 F.4th 919, 933-34 (9th Cir. 2024) (Thomas, J., concurring and identifying 13 cases involving death from law enforcement's application of bodyweight).)

Plaintiff argues that Alvarado was held face-down for a total of 5 minutes and 19 seconds, and nearly 3 minutes of that was spent on his stomach while handcuffed and incapable of meaningfully resisting. (*Id*. at 14.) In addition to the downward pressure on Alvarado's back and neck while face-down, Plaintiff notes that Alvarado was also restrained in a hobble (i.e., TARP) restraint and with a spit mask. (*Id*.)

In their Reply, Defendants argue that Plaintiff focuses on the officers' use of their bodyweight and because Plaintiff makes no argument that Defendant Solarino's use of force prior to the arrival of the other officers was excessive, the Court should grant judgment in favor of Solarino for all force used prior to the other officers arriving. (Doc. 128 at 4-5.) Defendants further assert that while the use of bodyweight compression on a prone individual can be considered severe or deadly force, the force used in this case was reasonable under the Fourth Amendment. (*Id*. at 5.)

The evidence reflects that initially Solarino used verbal commands, followed by punches and then a Taser to try to subdue Alvarado during a tense, uncertain, and rapidly evolving situation where Solarino was the only officer on the scene and there were two bystanders. *See Graham*, 490 U.S. at 396-97. While punches and tasering can be considerable levels of force, Plaintiff does not argue that these uses of force were excessive and not reasonable in this context. Therefore, the Court will grant summary judgment to Defendants for Solarino's use of punches and a Taser.[14]

As to Defendants' use of their bodyweight to subdue Alvarado, Defendants do not dispute the following facts presented by Plaintiff. During the initial struggle to handcuff Alvarado, Defendant Yeandle had his knee on Alvarado's neck for 23 seconds while Alvarado was on his stomach, and then on Alvarado's windpipe for several seconds when Alvarado flipped onto his back, and that Defendant Ake had his knee on Alvarado's upper back while Alvarado was on his stomach and then Ake shifted the location of his knee and in total had his knee or some of his body weight on Alvarado for a total of approximately two minutes. After Alvarado was fully handcuffed and said the first time he could not

_____

[14] While the evidence shows the Defendant officers used escalating levels of force beginning with Defendant Solarino punching and tasing Alvarado, followed by multiple officers using their body weight on Alvarado's prone body before and after he was handcuffed, and then applying two separate TARPs and spit masks, neither Defendants nor Plaintiff have presented any evidence or argument about the interplay of these combined and escalating levels of force. Indeed, no party has presented any expert testimony about the uses of force or the cause of Alvarado's death, aside from two pages of the autopsy report.

breathe, Defendants Ake, Solarino, and Yeandle had their collective body weight on top of Alvarado. Then, as Defendants Gamez, Ake, Yeandle, and Gradias were applying the first TARP, Alvarado was again face down and officers continued placing their body weight on Alvarado. Alvarado said three more times either he could not breathe or no oxygen. Minutes later, when the second TARP was applied, Defendants Yeandle, Solarino, Santa Maria, and Durazo were placing their body weight on Alvarado while he was face down.

The evidence reflects that Alvarado was essentially hogtied by TARPs for approximately 20 minutes before he stopped breathing, with his head in a spit mask for much of that time so that no one could see his face. Although the parties do not argue whether the spit masks contributed to Alvarado's death, the parties dispute whether the use of one and then two spit masks can impede breathing and Plaintiff disputes that a TARP restraint would not affect the ability to breathe. The autopsy determined that the cause of death was "sudden cardiac arrest in the setting of acute methamphetamine intoxication and *restraint* with dilated cardiomyopathy (heart murmur) as a significant contributing condition."[15] (Doc. 106 ¶ 277 (emphasis added).) It is unclear what the use of the word "restraint" means in the autopsy report, but drawing all inferences in Plaintiff's favor, a reasonable jury could conclude it refers to the body weight on Plaintiff's prone body, the TARPs, or even the spit masks.

In *Scott*, the Ninth Circuit found that "precedent establishes that the use of bodyweight compression on a prone individual can cause compression asphyxia" leading to death or serious injury. *Scott*, 109 F.4th at 1223 (citing *Drummond*, 343 F.3d at 1056-57*); see also Garlick*, 167 F. Supp. 3d at 1155 ("Prevailing precedent in the Ninth Circuit is that law enforcement officers' use of body weight to restrain a 'prone and handcuffed individual[ ] in an agitated state' can cause suffocation 'under the weight of restraining

---

[15] Aside from this quote from the autopsy report, neither Plaintiff nor Defendants presented expert testimony opining on the cause of death or how the various measures used to subdue and restrain Alvarado contributed to or did not contribute his death.

officers,' therefore, such conduct may be considered deadly force.") (citing *Drummond*, 343 F.3d at 1056-57).

Here, the level of force used by Defendants was, at minimum, severe, and Defendants themselves assert that the use of bodyweight compression on a prone individual can be considered severe or even deadly force. Therefore, drawing all reasonable inferences in Plaintiff's favor, a jury could find that Defendants' use of force, particularly their body weight on Alvarado's neck and back, was deadly force.

### B. Government Interests (*Graham* factors)

Whether the above severe, potentially deadly force, was reasonable depends on the government interests at stake, which requires analyzing the severity of Plaintiff's crime, the threat posed by Plaintiff, and whether Plaintiff was resisting or evading arrest. *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396-97. In addition, "'a detainee's mental illness' is a factor bearing on the government's interest." *Slater v. Deasey*, 789 F. App'x 17, 21 (9th Cir. 2019) (quoting *Drummond*, 343 F.3d at 1058).

### 1. Severity of the Crime

Defendants assert that Alvarado fled from the scene of a serious car crash, fought with a civilian witness and officers (resisting arrest), and the officers reasonably believed Alvarado was the armed homicide suspect who fled from a shooting nearby and close in time. (Doc. 105 at 8.) Plaintiff does not dispute that Alvarado fled from the scene of a car crash or that he initially resisted arrest before he was handcuffed and the first TARP was applied, but Plaintiff does dispute that Alvarado was fighting with the civilians before Defendant Solarino arrived in the alleyway, and he disputes that Alvarado had any involvement in the homicide that occurred around the time of the car crash. (Doc. 119.) Plaintiff argues that officers only possessed concrete evidence that Alvarado had committed a low-level traffic-related crime, and that driving under the influence and fleeing the scene of an accident is most typically a misdemeanor offense. (*Id*. at 20.) Defendants argue in their Reply that it makes no difference whether the officers' belief that Alvarado could be the same suspect was actually correct. (Doc. 128 at 3, citing *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009) ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'") (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting).)

Defendants do not present any evidence about the severity of the car crash or argue what laws were implicated when Alvarado fled from the crash site. The homicide and car crash occurred close in time, and while Defendants may have reasonably believed initially that Alvarado was involved in the homicide, they present no evidence that they continued to reasonably believe Alvarado was possibly the homicide suspect throughout the 20 to 25 minutes that Alvarado was on the ground. Officers can be heard calmly talking on the various BWC videos about the car crash and the shooting, and there is no information about whether or when Defendants' information about the homicide was updated or if they believed throughout the entirety of the encounter with Alvarado that he was involved in the homicide. Moreover, Defendants assert in their Motion that they reasonably believed that Alvarado was the "armed" homicide suspect, but they present no evidence that Alvarado was ever armed and once Alvarado was subdued, the reasonable inference is that they searched Alvarado and discovered within the first few minutes he was not armed.

Based on this record, there are questions of fact whether officers reasonably believed Alvarado was a suspect in the shooting or for how long they reasonably believed he was a suspect in the shooting and for how long they suspected Alvarado may be armed or may have committed crimes other than fleeing from a car accident or possibly driving under the influence.

### 2. Threat to Officers and Others

The "most important *Graham* factor" is whether the suspect "posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441. But "[a] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281.

Defendants argue that Alvarado posed an immediate threat to the safety of the civilian witnesses and Solarino, the first TPD officer to contact Alvarado, and so Solarino did not wait for backup, even when Solarino realized Alvarado was taller and more physically fit than him. (Doc. 105 at 8.) Defendants argue that the safety threat rose when Alvarado was able to grab a gun magazine from Solarino's waistbelt, which could be used as a blunt instrument against Solarino. (*Id*. at 8-9.) Defendants cite to Solarino's description of his struggle with Alvarado as the worst he has ever experienced. (*Id*. at 11.) Defendants assert that it was not until Yeandle, Ake, Gamez, and Gradias arrived, and they coordinated their efforts to get Alvarado in handcuffs and applied the first TARP, that they got him under control. (*Id*. at 9.) Defendants contend that Alvarado was aggressively fighting with officers and was kicking, attempting to buck, flailing, combative, and noncompliant. (*Id*.) Defendants assert that the first TARP still allowed Alvarado to fully extend his legs behind him and the officers were concerned he would continue to struggle, thrash, and kick. (*Id*. at 10.)

Plaintiff responds that Alvarado was held face-down for a total of 5 minutes and 19 seconds, and almost three minutes of that was spent on his stomach while handcuffed and therefore incapable of meaningfully resisting, and Alvarado was eventually restrained by the TARP and a spit mask. (Doc. 119 at 14.) Plaintiff argues that Defendants fail to identify how Alvarado posed an immediate threat to anyone other than Defendant Solarino during those initial moments when he sought escape from the lone officer on the scene. (*Id*. at 15.) Plaintiff contends that officers understood almost immediately after engaging with Alvarado in the alleyway that he was unarmed. (*Id*. at 18.) Plaintiff argues that Alvarado never attempted to fight with the two civilians except when they chased after Alvarado to detain him. (*Id*.) Plaintiff contends that Alvarado's actions minutes before the officers' arrival cannot be used to justify "squeezing the breath" from Alvarado. (*Id*. at 16, quoting *Drummond*, 343 F.3d at 1059.) Plaintiff argues that Alvarado's reckless driving cannot supply the justification for a high level of force 20, 30 and 40 minutes after Alvarado abandoned his vehicle, and Alvarado's combative behavior with Defendant Solarino at the

beginning of the struggle cannot justify a high level of force 10 and 20 minutes later while Alvarado was secured on the ground. (*Id*. at 16-17.) Plaintiff argues that even the belief that Alvarado was a homicide suspect does not justify officers' use of deadly force after he was subdued and not actively posing a threat to officers or others. (*Id*. at 19.)

Plaintiff further argues that the relevant law enforcement interaction lasted 23 minutes, measured from the moment Defendant Solarino first made contact with Alvarado to the moment an officer realized Alvarado did not appear to be breathing and that in similar factual scenarios, the Ninth Circuit has found that officers acted reasonably in deploying Tasers and pepper spray but acted unreasonably minutes later when the suspect was prone on the ground. (*Id*. at 17, citing *Hyde v. City of Willcox*, 23 F.4th 863, 870-71 (9th Cir. 2022) (finding "the need for more force waned as circumstances changed" and that two minutes after Hyde was handcuffed and shackled, officers should have recognized that Hyde had effectively stopped resisting and posed no threat to the officers surrounding him giving the officers time to reassess their use of force); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2020) (holding that a jury could "reasonably conclude that the officers used excessive force in tasing Keith and applying their body pressure to restrain him after he was handcuffed and face down on a bed").)

Defendants reply that the TPD videos contradict Plaintiff's assertion that the force here consisted of squeezing the breath from Alvarado and instead officers can be seen struggling to get Alvarado handcuffed and then applying the first TARP to ensure he will not stand up and fight with them again. (Doc. 128 at 3.)

The evidence here supports that Alvarado posed some threat to Defendants initially during their encounter when they believed Alvarado may be armed and possibly related to the homicide call. Plaintiff does not dispute that Alvarado attempted to flee when Defendant Solarino arrived in the alleyway or that Alvarado fought with Solarino and then Defendants Yeandle, Ake, and Gamez as the four officers struggled to subdue Alvarado and put him in handcuffs. Thus, reasonable officers in the position of these Defendants could have reasonably believed Alvarado posed a threat to themselves and others up to the

point Alvarado was declared "detained"—which happened about three minutes into Defendants' encounter with Alvarado.

Genuine issues of material fact prevent the Court from reaching this same conclusion as to the level of threat, if any, Alvarado posed once he was in handcuffs. At some point not evident in this record, Defendants learned Alvarado was unarmed, which dissipated that threat. Defendants present some evidence that two minutes after handcuffing him, Alvarado was still struggling and potentially posed some threat, as they applied the first TARP. Defendants make no argument that Alvarado presented a threat to them four to five minutes after that when they applied a second TARP, and Plaintiff presents evidence that as Defendants Santa Maria, Durazo, Yeandle and Solarino were applying the second TARP, Solarino, Santa Maria, and Durazo were placing their body weight on Alvarado, after Alvarado had already said four times he could not breathe. Defendants left both TARPs on Alvarado over the next 15 minutes until officers noticed he was no longer breathing. There are questions of fact what threat Alvarado posed, if any, after he was handcuffed and during the application of the first TARP and there are questions of fact regarding what level of threat Alvarado posed, if any, during the application of the second TARP and those final 15 minutes before he was found not breathing.

. . . .

### 3.    Resisting Arrest or Fleeing

It is undisputed that Alvarado was attempting to flee when Defendant Solarino arrived in the alleyway, that Alvarado did not comply with Solarino's orders to get off the wall and on the ground, or that Alvarado resisted arrest until Defendants Solarino, Yeandle, Ake, Gamez managed to get Alvarado in handcuffs and continued to struggle as they applied the first TARP.

There are, however, questions of fact how much resistance Alvarado could have mustered once he was handcuffed and then when the first and second TARPs were applied and over the next 15 minutes before he was found not breathing.

## C.    Whether the Force Used was Necessary

In this analysis, courts

> must balance the force used against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos*, 287 F.3d at 854). Generally, deadly force is not permissible "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Smith*, 394 F.3d at 704 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). But even non-deadly force must not to be deployed lightly. *Drummond*, 343 F.3d at 1057. Force "is permissible only when a strong government interest compels" the degree of force used. *Id.* (quoting *Deorle*, 272 F.3d at 1280).

*Scott*, 109 F.4th at 1225.

Here, Defendants used escalating degrees of force against an individual who fled from a car crash and whom some of the Defendants initially thought may have been involved in a nearly concurrent homicide. Alvarado fled from Defendant Solarino, did not comply with Solarino's commands to stop, get off the wall, and get down on the ground, and Solarino's punches and Taser use were not effective in gaining Alvarado's compliance. Plaintiff does not appear to dispute that some force was necessary early on to control Alvarado, and Plaintiff does not make any argument about the punches to Alvarado's face or use of the Taser being unnecessary. Plaintiff's Response focuses on Defendants' use of their bodyweight to control Alvarado before and after he was handcuffed and when the TARPs were applied, particularly the second TARP.

Defendants argue in their Reply that after the first TARP device was applied, the officers stood up and no officer was using bodyweight to restrain Alvarado. (Doc. 128 at 4.) They contend that Defendants Santa Maria and Durazo assisted with controlling Alvarado's legs to apply the second TARP, and Alvarado was still resisting, and even while the officers are trying to loosen the handcuffs, Alvarado is seen bucking. (*Id.*, citing

COTMSJ0458 (Yeandle BWC) at 10:20—10:50.)[16] They assert that the TPD videos show no officer was using their bodyweight to restrain or subdue Alvarado after the second TARP or spit sock was applied. (*Id.*) They argue there is no question this was a dynamic "tense, uncertain, and rapidly evolving" situation where Defendants were forced to make "split-second decisions about the amount of force necessary in [this] particular situation" and the irrefutable evidence shows these officers used only the level of force necessary to detain and control Alvarado, and their use of force was reasonable based on the totality of the circumstances. (*Id.*, citing *Graham*, 490 U.S. at 387.)

The videos of the application of the second TARP do not support that there was still a dynamic tense, uncertain, and rapidly evolving situation that forced Defendants to make split-second decisions. By the time officers applied the second TARP, several minutes had gone by since Alvarado was fully restrained on the ground with handcuffs and the first TARP. During this time, officers are seen on video calmly standing above Alvarado, or milling about, and talking with each other. Once officers decide to apply a second TARP, officers are seen calmly and methodically applying the second TARP to Alvarado and one of them is even smiling and talking with a nearby officer. Alvarado is complaining he cannot breathe as the officers apply the second TARP and it is not possible to say that Alvarado's movements during the application of the second TARP are actual resistance as opposed to Alvarado attempting to position himself so he can breathe.

Based on these facts, a reasonable jury could conclude there was no need for Defendants to use their body weight after Alvarado was handcuffed such as Defendants used to apply the first and second TARPs. *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130–31 (9th Cir. 2017) ("By the time Jones was prone and surrounded by multiple officers, there would have been no continuing justification for using intermediate force: Jones was on the ground after his body 'locked up' as a result of repeated taser

---

[16] This is the point where during the officers' application of the second TARP, Alvarado is saying "no" and moves from his stomach to his side and an officer says, "if you've got this much strength, you can breathe."

shocks; he had no weapon and was making no threatening sounds or gestures"). There is also a question of fact whether there was any need for a second TARP and, if so, whether there was a need for two TARPs to remain in use on Alvarado for another 15 minutes when the video evidence shows he was not resisting, was repeatedly crying out he could not breathe and moaning, and his breathing was increasingly labored before stopping altogether.

Based on this record, there are genuine issues of material fact whether Defendants violated Alvarado's Fourth Amendment rights precluding the grant of summary judgment to Defendants Solarino, Yeandle, Ake, Gamez, Durazo, Santa Maria, and Gradias.

### D.    Qualified Immunity

Defendants argue that even if Plaintiff could establish a Fourth Amendment violation, they are entitled to qualified immunity because it was not clearly established that their use of force could be considered a constitutional violation. (Doc. 105 at 12.)

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis formerly required the court to make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry." *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002). The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The "qualified immunity inquiry" asks if the right was clearly established at the relevant time. *Id.* at 201–02.

Plaintiff bears the burden of identifying a case where an officer acting under similar factual circumstances was held to have violated the constitution. *Sharp v. Cnty. of Orange,* 871 F.3d 901, 911 (9th Cir. 2017). "[T]he prior precedent must be 'controlling'— from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 617

(1999)). For a right to be clearly established there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 580 U.S. at 79).

Here, the Court has already found questions of fact regarding whether Defendants violated Alvarado's Fourth Amendment rights. Therefore, the qualified immunity analysis focuses on whether the right was clearly established when Defendants encountered Alvarado in March 2020.

Plaintiff argues that the continued use of body weight and restraints on a face-down suspect who was fully restrained, wearing a spit mask, and pleading for air was clearly established in March 2020. (Doc. 119 at 25.) Plaintiff asserts that the right at issue was established twenty years earlier in *Drummond*, which held that "any reasonable officer should have known" it to be unlawful to hold a suspect "against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance." (*Id.*, quoting *Drummond*, 343 F.3d at 1061.)

In *Drummond*, police officers responded to a call regarding a mentally disturbed individual in a 7-Eleven parking lot, and when they arrived, they found Drummond, unarmed, agitated, and hallucinating. 343 F.3d at 1054. Without warning, the officers knocked Drummond to the ground and handcuffed him behind his back, and even though Drummond did not resist, one officer put both his knees and body weight against Drummond's back, and another officer placed one knee on Drummond's back and the other knee on Drummond's neck. *Id.* The officers then "continued to press their weight on [Drummond's] neck and torso as he lay handcuffed on the ground and begged for air," and

a witness said the officers were laughing even though it was obvious Drummond was having trouble breathing. *Id.* at 1056. After approximately 20 minutes of being held down this way while the officers awaited backup to provide a hobble restraint, Drummond lost consciousness and was later revived through CPR but suffered permanent brain damage. *Id.* at 1055. Under these circumstances, the Ninth Circuit determined that "[t]he officers— indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.* at 1056.

Plaintiff argues the fact that Mr. Drummond was not suspected of a crime and was compliant, aside from his agitated stated, does not take Alvarado's situation outside of *Drummond's* orbit. (Doc. 119 at 27.) Plaintiff asserts that after *Drummond*, by 2012, it was clearly established that an officer violates the Fourth Amendment by pressing her weight on the upper torso of a "delirious, prone, and handcuffed individual who poses no serious safety threat" even if the detainee "continued to resist the officers after handcuffs were applied." (*Id*. at 28, quoting *Tucker*, 470 F. App'x at 629.) By 2013, Plaintiff argues, it was clearly established that the "same method of restraint" is unlawful even where the suspect is "high on methamphetamine and driving the wrong way" on a major highway, engaged in a "scuffle" with officers before being handcuffed, and kicked an officer in the shoulder after being handcuffed. (*Id*. at 28, quoting *Abston v. City of Merced*, 506 F. App'x 650, 653 (9th Cir. 2013).) And by 2017, Plaintiff argues, it was clearly established that using bodyweight compression for as little as 90 seconds on a prone suspect who was handcuffed and had stopped resisting could violate the Fourth Amendment. (*Id*., citing *Zelaya v. Las Vegas Metro. Police Dep't*, 682 F. App'x 565, 567 (9th Cir. 2017.)

Plaintiff also cites two district court cases that denied qualified immunity to officers where the suspect in one case was held face down with pressure on the back for approximately 2.5 minutes after being handcuffed and in the other case for 1 minute and 50 seconds after being handcuffed. (*Id*. at 28-29, citing *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1097 (N.D. Cal. 2017) and *Wroth v. City of Rohnert Park*, Case No. 17-cv-

05339-JST, 2019 WL 1766163, at *3 (N.D. Cal. Apr. 22, 2019).) Plaintiff argues that Alvarado continued to be held on his stomach for a combined 2 minutes and 53 seconds after being handcuffed and was kept on his stomach for one minute after Defendant Gamez shared his concern about the need to place Alvarado in the recovery position. (*Id*. at 29-30.)

Lastly, Plaintiff argues that it was clearly established that bodily restraints—beyond traditional handcuffs—"has constitutional significance." (*Id*. at 30, citing *Sandoval v. Hish*, 461 F. App'x 568, 569, (9th Cir. 2011) (finding a violation of a clearly established right after the suspect died from pepper spray and "physical restraints"); *Agster*, 144 F. App'x at 596 (finding violation where detainee died after being held for a prolonged period in a restraint chair); *Slater*, 789 F. App'x at 20 (defendant deputies not entitled to qualified immunity where the arrestee, who later died, "was hogtied and placed on his stomach in the back of the police car, and the deputies applied pressure to his body during the second and third hobbling, after pressure was already applied to his shoulders in the prone position during the first hobbling").

Defendants reply that *Drummond* and its progeny did not put them on notice that their use of force would be unlawful because the facts in *Drummond* are clearly distinguishable in part because the court there noted it was obvious that Drummond, who was known to be unarmed, mentally ill, hallucinating, and in an agitated state, was in respiratory distress and the officers were causing him to have difficulty breathing. (Doc. 128 at 6.)

Defendants argue that all the other cases cited by Plaintiff are also factually distinguishable. Defendants note that in *Tucker*, there were genuine issues of material fact "as to both the extent of the force used by the officers and the nature of the threat posed by [the suspect's] handcuffed resistance" such that the court could not "hold that the officers acted reasonably as a matter of law." (*Id*., quoting *Tucker*, 470 F. App'x at 629.) Defendants argue that in the present case, "Alvarado's active resistance and the extent of force used is captured on TPD videos and cannot be disputed." (*Id*.) Defendants assert that

the individual in *Abston* was pulled over after driving the wrong way on a highway and the defendants applied pressure to the individual's back while he was face down, handcuffed and ankle shackled, and the court found it was "not clear [] whether Abston continued to resist during th[is] period and, if so, whether his resistance was anything more than minimal . . . ." (*Id*., quoting *Abston*, 506 F. App'x at 650.) Defendants argue that *Garlick* is distinguishable because the individual there "was merely suspected of being intoxicated in public, and plaintiff's facts argued that he was not combative or resistant, yet officers deployed several escalating levels of force to try and detain him in handcuffs, including deploying a police K9 to bite him in the face, using a police baton to strike him multiple times, and bodyweight pressure." (*Id*. citing *Garlick*, 167 F. Supp. 3d at 1158.)

Defendants argue that *Zelaya* is distinguishable because the individual involved was in a psychiatric module at the jail after being arrested on drug charges, "and officers responded to him appearing 'agitated'." (*Id*., quoting *Zelaya*, 682 F. App'x at 567 ("For at least 90 seconds after [he] was handcuffed and had stopped resisting, three officers continued to pin him to the ground with their bodies. When the officers got off [him], he was unconscious. He died soon thereafter.").) Defendants argue that *Sandoval* is distinguishable because the defendants in that case knew the decedent was mentally ill, had committed no crime, and did not pose any threat to the safety of the defendants or others. (*Id*. at 8, citing *Sandoval*, 462 F. App'x at 568.) And Defendants note that in *Slater*, the individual was known to the deputies from prior contacts as mentally ill with a history of drug addiction and was allegedly pulling wires out of a gas station building. (*Id*., citing *Slater*, 789 F. App'x at 17 (finding that the use of force up through the first "hobble" restraint was reasonable).) Defendants assert that the court in *Slater* found it was the application of the second and third "hobble" restraints as the individual remained on his chest and stomach that was excessive, and the officers there admitted putting some pressure on the individual's ribs and shoulder during the application of the second and third hobbles. (*Id*.)

Defendants also argue that Plaintiff has not established that the use of the TARP

devices was clearly established to be unlawful. (*Id*. at 9.) Defendants assert that *Sandoval* and *Slater* are clearly distinguishable from this case for all the reasons discussed with respect to the use of compression. (*Id*.) And Defendants argue that *Agster* is distinguishable because the court in that case noted that the detainee was "[a]rrested on a misdemeanor charge of trespass, manacled and surrounded by officers in the jail, [and] this small-sized, drug-depleted man was endangering neither the officers nor himself but was uncooperative. His lack of cooperation was no justification for the application of force which was foreseeably dangerous to his life and in fact was fatal. The County's own regulations warned against the danger of 'the chair' causing positional asphyxia." (*Id*., quoting *Agster*, 144 F. App'x at 596.)

Over 20 years ago, the Ninth Circuit found in *Drummond* that force employed by one or more officers pressing their weight on a prone subject's neck and torso and on his windpipe while the subject "lay handcuffed on the ground and begged for air" to be "severe" and "capable of causing death or serious injury." *Drummond*, 343 F.3d at 1056 ("[t]he officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable"). Thus, it was clearly established by March 2020 that "use of body compression to restrain a prone and bound suspect, who was in no position to offer any meaningful resistance, would violate the rule established by *Drummond* . . . ." *Abston*, 506 F. App'x at 653 (finding genuine issue of material fact as to whether an individual who was handcuffed, ankle-shackled, and prone, resisted, and, if so, "whether his resistance was anything more than minimal").

Unlike in *Drummond*, the evidence here does not support that Defendants continued to use their body weight to hold Alvarado down after the second TARP was applied. But they did use their body weight in applying both TARPs, both to Alvarado's neck and upper back, and there are questions of fact whether Alvarado could meaningfully resist once he was handcuffed such that officers needed to use their body weight to apply either TARP. And, as in *Drummond*, Alvarado is not seen on video resisting the officers during the last

- 45 -

15 minutes of the encounter such that the continued use of two TARPs was necessary. Instead, Alvarado was gasping and breathing heavily at times and telling officers he could not breathe.

Based on the above, Defendants Solarino, Yeandle, Ake, Gamez, Durazo, Santa Maria, and Gradias are not entitled to qualified immunity.

**IT IS ORDERED:**

(1)     Defendants' Motion for Summary Judgment is **granted in part** and **denied in part**. (Doc. 105) The Motion **granted** as to Defendants City of Tucson, Evans, Ellis, Vance, Fleck, Goldstein, and Spencer, and these Defendants and Counts Three, Four and Seven are dismissed from this action. The Motion is also **granted** as to Defendant Solarino's use of punches and a Taser. The Motion is otherwise **denied**.

(2)     The remaining claim now before the Court is Plaintiff's Fourth Amendment excessive force claim in Count One against Defendants TPD Officers Solarino, Yeandle, Ake, Gamez, Durazo, Santa Maria, and Gradias.

(3)     This action is referred by random lot to Magistrate Judge Eric J. Markovich for the purpose of conducting a settlement conference. *See* LRCiv 83.10

(4)     Counsel shall contact Judge Markovich's chambers at 520-205-4600 within fourteen (14) days of the date of this Order to schedule the settlement proceedings.

(5)     Counsel shall file a Joint Status Report with the Court within ten (10) days of the completion of settlement proceedings indicating the outcome of the settlement conference.

Dated this 3rd day of March, 2025.

Honorable Raner C. Collins
Senior United States District Judge