Michelle R. Saavedra
Tiffiney D. Franks
Principal Assistant City Attorney for
Michael G. Rankin
CITY ATTORNEY
P.O. Box 27210
Tucson, AZ 85726-7210
Telephone: (520) 791-4221
Fax: (520) 623-9803
Michelle.Saavedra@tucsonaz.gov
State Bar No. 25728
Tiffiney.Franks@tucsonaz.gov
State Bar No. 40313
*Attorneys for Defendants Nicolo Solarino, Sean Yeandle, Henry Gamez, Ryan Ake, Joseph Gradias, (hereafter "City Defendants")*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Irene Briseno, on her own behalf and as the personal representative of the estate of Damian Eryko Alvarado,<br><br>Plaintiff,<br><br>vs.<br><br>Nicolo Solarino (Tucson Police); Sean Yeandle (Tucson Police); Henry Gamez (Tucson Police); Ryan Ake (Tucson Police); Joseph Gradias (Tucson Police); and Justin Canovali (private citizen), all in their individual capacities,<br><br>Defendants. | No. 4:22-cv-00132-RCC<br><br>**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>(Assigned to Hon. Raner C. Collins) |

Defendants Nicolo ("Nick") Solarino, Sean Yeandle, Henry Gamez, Ryan Ake, and Joseph Gradias ("Defendants"), by and through undersigned counsel, hereby move for an entry of Judgment as a matter of law on all remaining claims. This motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Motion for Judgment as a Matter of Law Standard

Rule 50(a) permits this Court to remove claims, defenses, or entire cases from the jury when there is no "legally sufficient evidentiary basis" to support a particular outcome. Summers v. Delta Air Lines, Inc., 508 F.3d 923, 926 (9th Cir. 2007). A party must be "fully

1

"heard" before judgment as a matter of law may be granted, and the motion must specify the judgment sought and the law and facts entitling the moving party to that judgment. Fed. R. Civ. P. 50(a)(1). Where the evidence permits only one reasonable conclusion, judgment as a matter of law is appropriate.

**II. Fourth Amendment Legal Standard**

Plaintiff asserts that Defendants used excessive force in violation of Damian Alvarado's Fourth Amendment rights. To determine whether a Fourth Amendment violation has occurred, courts balance the nature and quality of the intrusion on the individual's rights against the countervailing governmental interests to determine whether the officer's conduct was objectively reasonable under the totality of the circumstances. Espinosa v. City & County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 396–97 (1989)).

The Ninth Circuit applies a structured analysis in evaluating excessive force claims. First, the Court assesses the severity of the intrusion by examining the type and amount of force used. Second, the Court evaluates the governmental interests at stake, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Espinosa, 598 F.3d at 537. Finally, the Court balances the gravity of the intrusion against the governmental need for that intrusion. Id. These are known as the *Graham* factors. Of these factors, the most important is whether the suspect posed an immediate threat to the safety of officers or others. Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (quoting Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005)). The degree of force used is permissible only when a sufficiently strong governmental interest justifies its use. Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001).

Courts also consider whether the suspect complied with officers' commands or instead refused to comply. Mattos v. Agarano, 661 F.3d 433, 450 (9th Cir. 2011). In addition, the Court may examine other specific factors relevant to the totality of the circumstances,

including the overall danger presented by the situation and how that danger informs the reasonableness of the officers' actions. Id.

The reasonableness inquiry requires careful balancing of the individual's Fourth Amendment interests against the governmental interests at stake. Deorle, 272 F.3d at 1279. This analysis must account for the fact that officers are often required to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving. Id. at 1283 (quoting Graham, 490 U.S. at 396–97). Accordingly, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the benefit of hindsight. Graham, 490 U.S. at 396.

**II. Plaintiff Has Not Met Her Burden To Prove Gamez or Gradias Used Excessive Force in Violation of Damian Alvarado's Fourth Amendment Rights**

The trial evidence, including the testimony of the Defendant officers Ryan Ake, Sean Yeandle, Henry "Mike" Gamez, and Nicolo ("Nick") Solarino and the numerous body-worn camera video exhibits admitted during Plaintiff's case-in-chief, does not provide sufficient facts, which if believed would allow a reasonable jury to find that Defendants Gamez or Joeseph Gradias used excessive force in violation of Damian Alvarado's Fourth Amendment rights.

To the contrary, Plaintiff failed to present *any evidence* relating to Gradias' alleged use of force. Gradias was mentioned once during Plaintiff's case-in-chief during Ryan Ake's testimony. Ake identified who Gradias was by referencing the fact that he was the only person in Tucson wearing a jacket at that time of year. The jury has absolutely no evidence to find Gradias used excessive force against Alvarado, and he must be dismissed as a Defendant as a matter of law.

As for Gamez, the jury heard he only used softy empty hand controls, provided direction and instructions to the other officers, and assisted in freeing Sean Yeandle's left ankle from under Alvarado. Gamez's use of force was the least of all the officers who used force during this dynamic incident. The evidence showed that each officer confronted a rapidly evolving, violent encounter involving an individual they reasonably believed to be a

3

homicide suspect, who may still have been armed, who had fled a serious traffic collision, who was fighting with civilians and officers, and who continued to actively resist even after handcuffs were applied. Under those circumstances, and under the Graham factors already set forth above, Plaintiff has not met her burden as to any individual Defendant as further evaluated below.

## A. Defendant Nicolo Solarino[1]

The evidence presented at trial does not permit a reasonable jury to find that Officer Solarino used excessive force against Alvarado in violation of the Fourth Amendment. Officer Solarino testified that when he approached Alvarado, he believed Alvarado was the possible homicide suspect. He had been advised that the suspect had fled a shooting scene where the victim had died, that the suspect vehicle was a white SUV, that the suspect was a Hispanic male, and that the suspect may still be armed. He also knew that the driver of the white SUV had fled a major collision and that civilians were actively fighting with that same individual in the church parking lot. When Officer Solarino arrived, he saw civilians trying to restrain Alvarado while Alvarado was attempting to get over a wall and flee. He gave commands, but Alvarado ignored them and continued resisting. Officer Solarino further testified that he did not know whether Alvarado was armed or whether he may have already thrown a weapon over the wall. Under those circumstances, Solarino reasonably believed Alvarado was a flight risk and remained a danger to the officers, the civilians on scene, and the public if he escaped.

Officer Solarino also testified that Alvarado was "very strong," was profusely sweating, appeared to be under the influence of methamphetamine or some other mind-altering substance, and displayed what he described as "super human strength." According to his testimony, the encounter escalated into a direct physical fight, during which Alvarado removed a magazine from Officer Solarino's belt and struck him with it. Officer Solarino testified that he deployed his taser only after the struggle had escalated to the point that,

---

[1] This Court previously ruled, in its Order on Defendants' Motion for Summary Judgment, Doc. 131, that Officer Solarino's punches and taser deployment constituted reasonable force. Accordingly, Defendants do not address that force further in this motion.

absent additional force or assistance, he believed he was nearing the point where deadly force might otherwise become necessary. Even then, the taser had no effect.

That testimony, together with the body-worn camera evidence, strongly supports the reasonableness of Officer Solarino's conduct under Graham. First, the severity of the suspected crimes was extreme, as Solarino reasonably believed he was confronting a homicide suspect who had fled both the shooting scene and a major collision. Second, the immediate threat to officer and public safety was substantial because Alvarado was actively combative, possibly armed, attempting to flee, and posed a continuing danger to civilians, officers, and himself if he broke away. Third, the evidence showed continuous and active resistance from the moment Solarino arrived until Alvarado was ultimately secured. These factors weigh decisively in favor of the reasonableness of Solarino's actions.

The same is true of the decision to use the TARP restraint and then a second TARP. Officer Solarino testified that handcuffing alone was not sufficient because Alvarado continued fighting and continued using his legs as weapons even after he was cuffed. He explained that the TARP was the next necessary step because Alvarado remained dangerous to himself and others. He further testified that the first TARP was applied quickly and under urgent circumstances because of the need to finally get Alvarado detained after a prolonged and intense struggle, but that it did not fully secure him. Correcting it would have required removing the restraint entirely and effectively freeing Alvarado again, which would have further compromised officer safety and control of the scene. The evidence also showed that TFD could not safely evaluate Alvarado unless he was properly secured and no longer a danger. Officer Solarino testified that because Alvarado was still able to kick and flail, the second TARP was necessary to protect not only the officers and Alvarado himself, but also arriving medical personnel.

Just as important, the trial evidence showed that Officer Solarino's conduct was not indifferent to Alvarado's condition. To the contrary, Solarino repeatedly called for EMS while the struggle was still ongoing, reflecting concern for Alvarado's medical status even before he was fully secured. Thus, the evidence showed both that Solarino used only the

5

force necessary to respond to a dangerous and rapidly evolving situation and that he simultaneously took steps to obtain medical assistance.

On this record, no reasonable jury could find that Officer Solarino used force greater than was objectively reasonable. The trial evidence showed that Solarino confronted a suspected homicide offender who was a clear flight risk, posed an immediate danger to officers, civilians, and himself, and actively and continuously resisted detention. In response, Solarino used escalating force only as necessary, repeatedly summoned EMS, and acted throughout in response to the threats Alvarado presented and the urgent circumstances before him.

**B. Defendant Sean Yeandle**

Plaintiff likewise failed to present legally sufficient evidence that Officer Yeandle used excessive force. The trial evidence showed that before arriving at the scene, Officer Yeandle understood officers were responding to a shooting and that the suspect description from the shooting matched the hit-and-run: a white SUV driven by a Hispanic male. When he arrived, he saw Officer Solarino in an active stand-up fight with Alvarado, observed that Alvarado appeared extremely aggressive and possibly under the influence of stimulants, and believed Alvarado was the suspect from the shooting and collision. Yeandle testified that officers did not learn otherwise until after Alvarado's death. He also observed what appeared to be a magazine in Alvarado's hand while Alvarado was fighting with Officer Solarino. Thus, when Yeandle entered the struggle, he reasonably believed he was confronting a homicide suspect who had fled a crash scene, assaulted civilians, and was then actively assaulting a police officer.

Yeandle also explained the body-worn camera evidence and the physical positions seen during the struggle. He testified that his leg became trapped underneath Alvarado as Alvarado tensed, arched his body, and attempted to post up and gain leverage, creating concern that his ankle could be broken. He further testified that when he is seen using his knee or knees on Alvarado's upper or lower back, he was employing trained control techniques directed to muscle groups in an effort to gain control and obtain Alvarado's hands

for cuffing. He expressly testified that he did not place his knees or body weight on Alvarado's neck and did not place his full body weight on him, but instead balanced his weight to apply only the amount necessary to gain compliance. That testimony directly refutes any suggestion that Yeandle used gratuitous force; rather, the evidence showed that his force was trained, targeted, and responsive to Alvarado's continued resistance.

The trial evidence further showed that once Alvarado was restrained, Yeandle took steps to protect him. Yeandle testified that after Alvarado was placed in the recovery position, he remained there to keep Alvarado on his side, protect his head from striking the curb, and loosen the handcuffs when he realized they had been applied tightly during the struggle. He also immediately recognized that the first TARP, which had been applied quickly during a severe and prolonged fight, was not fully effective because Alvarado could still kick. Yeandle explained that after one of the worst fights of his career, and given the extraordinary strength Alvarado had displayed, he believed Alvarado remained dangerous to himself and others. He further testified that medical personnel were en route, that Alvarado needed to be evaluated, and that TFD would not do so unless Alvarado was properly subdued and the scene was secure. He also understood that if Alvarado's legs remained free during transport, Alvarado could injure himself or others. The evidence further showed that after the second TARP and spit sock were applied, Yeandle used no further force.

Taken together, the trial evidence does not permit a reasonable jury to find that Officer Yeandle used excessive force. Under the Graham factors, the severity of the suspected crimes was substantial, the immediate threat to officers and public safety was significant, and Alvarado was actively and continuously resisting. In response, Yeandle used trained control techniques directed at gaining compliance, not gratuitous force, and once Alvarado was secured, he took affirmative steps to protect him and ensure he could be safely evaluated by EMS. On this record, no reasonable jury could conclude that Officer Yeandle's actions were objectively unreasonable under the Fourth Amendment.

**C. Defendant Henry Gamez**

The trial evidence likewise fails to support any finding that Officer Gamez used excessive force. Officer Gamez testified that he was initially at the accident scene when he heard over dispatch that Officers Solarino, Ake, and Yeandle were actively fighting with Alvarado. He testified that by that point he understood the individual they were fighting with was believed to be the suspect who had fled a serious collision and who might also be involved in the homicide. Gamez further testified that, given that information, the severity of the suspected crime was very high in his mind when he ran to assist. He also testified that he believed the officers were at risk of fatigue because the struggle had already been going on for some time, and he was concerned for the safety of the officers, the civilians, and Alvarado himself. Both his testimony and the body-worn camera evidence showed that he approached with urgency because he believed there was an immediate danger and that the situation needed to be brought under control quickly.

When Gamez arrived, the evidence showed that Alvarado was still actively resisting and had not been brought under control. Gamez testified that his objective was not to introduce unnecessary force, but to help get Alvarado into custody quickly through communication, direction, and controlled physical assistance so that the risk to everyone involved could be reduced. He testified that Yeandle had control of the right wrist and Ake had control of the left wrist, and that he took over the left side, applied leverage to move the arm into a cuffing position, and warned Alvarado to stop fighting or his arm could be broken. Importantly, Gamez testified that the warning gained enough compliance to move the arm into position without actually breaking it. He further explained that officers then decided a TARP was necessary because Alvarado remained violent, erratic, thrashing, and unpredictable. Gamez described using his knee to "staple" the legs only to manipulate them into a safe forty-five-degree position so the restraint could be applied, and testified that as soon as the TARP was applied, he began telling the other officers they needed to get Alvarado onto his side. The body-worn camera evidence confirms that officers moved Alvarado into the recovery position as soon as it was feasible to do so.

Under the Graham factors, Plaintiff did not present legally sufficient evidence that Gamez's conduct was unreasonable. First, the severity of the suspected offenses was extreme, because Gamez reasonably believed officers were trying to detain a potentially armed homicide suspect who had fled both a shooting and a collision scene. Second, the immediate threat to officers and others was substantial, as Alvarado remained combative, unpredictable, and actively resistant when Gamez arrived. Third, the evidence showed that Alvarado was not complying with commands but was instead continuously resisting throughout the encounter. In response to those circumstances, Gamez used limited, controlled tactics directed toward gaining custody quickly and reducing danger, not gratuitous force. He described his role as "soft empty hand control," and the evidence showed that his actions centered on communication, teamwork, cuffing, securing the legs, and getting Alvarado into the recovery position as soon as possible. Significantly, Gamez was not involved in the application of the second TARP.

On this record, no reasonable jury could conclude that Officer Gamez used force greater than was objectively reasonable. The trial evidence showed that he responded to an immediate and dangerous situation, used measured and limited force to help secure a still-resistant suspect, and took steps to reduce the risk of harm once Alvarado could be brought under control.

**D. Defendant Ryan Ake**

Plaintiff also failed to meet her burden as to Officer Ake. The trial evidence showed that Ake and Officer Yeandle were initially headed toward the shooting scene, but diverted when Officer Solarino radioed that he was in an active fight. Ake testified that he heard a taser deployment over the radio and, upon arrival, observed Alvarado posturing in an ongoing fight with Officer Solarino. Based on the information available to him at that time, Ake testified that he believed Alvarado had committed homicide, fled a hit-and-run collision, assaulted civilians, and was then assaulting a police officer. Those facts strongly favored the officers under the first two Graham factors because the suspected offenses were severe and the threat presented was immediate and substantial.

Ake further testified that when he arrived, it was clear that lesser force options had already failed and that officers would have to go hands-on to bring Alvarado under control. He explained that his objective was to secure a part of Alvarado's body he could control and to subdue him with the least amount of force possible. Because Solarino and Yeandle were primarily engaged with the upper body, Ake focused on the lower body, as Alvarado was still kicking, moving, and attempting to escape. Ake described the encounter as one of the hardest fights of his career and testified that it was remarkable that three grown men were still struggling to control Alvarado. He also made clear that his purpose in applying force was to stop Alvarado's movement, prevent escape, and limit injury to Alvarado, himself, and the other officers. That testimony goes directly to the third Graham factor as well, because the trial evidence showed that Alvarado was not complying with commands but instead was actively and continuously resisting.

Ake also explained the body positions visible on the body-worn camera. He testified that when he placed his knee on Alvarado's upper back or shoulder-blade area, he did so to control movement and pin the left arm while maintaining balance, and that at no time did he place his knee on Alvarado's neck. He expressly testified that he did not put all of his body weight on Alvarado, and that the video supports that point. Rather, he described using his left leg for balance and only partial pressure while remaining low and stable so that Gamez could maneuver the arm free for cuffing. He further explained that once Alvarado was spread out and each officer was controlling a different limb, that positioning reduced Alvarado's strength and allowed officers to work toward restraint with less force, not more. This evidence refutes any suggestion that Ake used gratuitous force; instead, it showed targeted and controlled tactics aimed at ending the struggle safely.

Officer Ake also addressed Alvarado's statement that he could not breathe. Ake testified that he understood that statement to mean Alvarado had just been through a major physical struggle and may have been having difficulty recovering, not that officers were forcing his face into the ground. He specifically testified that he was not shoving Alvarado's face into the dirt. As to the second TARP, Ake testified that the first TARP had been applied

10

quickly only to gain immediate control, but it proved ineffective because Alvarado remained strong enough to defeat it. He further testified that because TFD was on the way, officers needed to secure Alvarado more effectively so that medical personnel could safely approach and evaluate him without being injured.

Taken together, the trial evidence does not support any finding that Officer Ake used excessive force. Under the Graham factors, Ake reasonably believed he was confronting a suspect involved in multiple serious offenses, including homicide, who posed an immediate threat to officers and others and was actively resisting and attempting to evade detention. In response, Ake used control tactics directed at gaining restraint with the least amount of force possible, did not place his knee on Alvarado's neck, and participated in a coordinated effort to stop resistance, prevent escape, reduce injury, and secure the scene for EMS. On this record, no reasonable jury could conclude that Officer Ake's actions were objectively unreasonable under the Fourth Amendment.

**E. Defendant Joseph Gradias**

Plaintiff likewise failed to present legally sufficient evidence that Officer Gradias used excessive force. The trial evidence showed that Officer Gradias came out of briefing around the time officers were responding to a homicide near Ft. Lowell and Country Club. He understood that a suspect vehicle had fled westbound and that a nearby collision involving a white SUV had also been reported, with the driver fleeing on foot. Because of the close proximity in time and location, officers were attempting to determine whether the collision and homicide were related, and Gradias testified that officers positioned themselves tactically in the area to contain the suspect and prevent escape.

Gradias further testified that he later received information that civilians were chasing or fighting with the suspect in the back parking lot of the church. He observed Officers Yeandle and Ake head in that direction and then responded himself. When he arrived, he first encountered the civilian father and son, who were out of breath, and then observed officers still on the ground struggling with Alvarado. He called out to ask whether assistance was needed, and when he received no response, he ran in to help. Gradias testified that when

he arrived, it was clear officers were still trying to get Alvarado detained and Alvarado was actively resisting. He recalls assisting with the legs at one point, but he did not describe any independent, prolonged, or gratuitous use of force beyond briefly helping secure Alvarado during the ongoing struggle of applying the second TARP.

Under the Graham factors, Plaintiff did not present evidence from which a reasonable jury could find Gradias's conduct objectively unreasonable. First, the severity of the suspected offenses was substantial, because Gradias understood officers were attempting to detain an individual believed to be involved in a homicide, who had also fled a collision scene. Second, the immediate threat to officers and others remained significant, as Gradias arrived to find civilians out of breath, officers still engaged in a ground struggle, and detention still not complete. Third, the evidence showed that Alvarado was actively resisting and had not yet been secured when Gradias entered the encounter. In that setting, Gradias's brief assistance in controlling the legs was a limited and reasonable response to an active and dangerous situation, not excessive force.

Gradias's testimony also supports the reasonableness of the officers' efforts to secure the scene before EMS involvement. He testified that, consistent with training and experience, the scene must be made safe before paramedics can approach, and that he had previously been in situations where TFD would not respond until the scene was secure. He further testified that paramedics were called, that they were evaluating Alvarado, and that just as they were beginning to leave, officers realized Alvarado had stopped breathing and alerted medical personnel that their assistance was still needed. That testimony reinforces that the officers' actions, including Gradias's brief assistance, were directed toward ending the struggle and securing the scene so medical personnel could safely respond.

On this record, no reasonable jury could conclude that Officer Gradias used excessive force. At most, the trial evidence showed that he arrived during an active struggle with a suspect that officers believed may have committed a homicide, observed that detention was still in progress, and briefly assisted in securing Alvarado so the struggle could end and EMS could safely engage. That is not a Fourth Amendment violation.

For all of these reasons, Plaintiff failed to meet her burden of proving that any individual Defendant used force that was objectively unreasonable under the Fourth Amendment. The trial evidence instead showed a dangerous, fast-moving, and highly resistant encounter in which each Defendant responded to the severity of the suspected crimes, the immediate threat Alvarado posed, and his continuous resistance, and used only the force reasonably necessary to gain control of Alvarado and secure the scene.

**III. Plaintiff has not met her burden in proving that the actions of each of the Defendants were the cause in fact and proximate cause of Damien Alvarado's death**

Even if the Court were inclined to find that Plaintiff presented sufficient evidence to create a jury question on whether any Defendant used excessive force, Plaintiff's claims still fail as a matter of law because Plaintiff presented no legally sufficient evidence that the conduct of any individual Defendant was the cause in fact and proximate cause of Damian Alvarado's death. That failure is fatal. Without competent evidence of causation, Plaintiff cannot meet her burden, and allowing this case to go to the jury would require the jury to speculate on a medically complex issue that Plaintiff was required—but failed—to prove.

In a § 1983 action, causation must be established as to the specific constitutional violation alleged and as to each individual Defendant. Ward v. City of San Jose, 967 F.2d 280, 282 (9th Cir. 1991). It is therefore not enough for Plaintiff to argue generally that there was a struggle, or that force was used at some point before Alvarado later became unresponsive. Plaintiff was required to present evidence from which a reasonable jury could find that a particular act by a particular Defendant was both the actual cause and proximate cause of death. Plaintiff did not do so.

The causation failure is especially clear here because the cause of death identified in the record is medically complex and not within the common understanding of lay jurors. The Pima County Medical Examiner determined that the cause of death was "sudden cardiac arrest in the setting of acute methamphetamine intoxication and restraint, with dilated cardiomyopathy as a significant contributing condition." Defense Exhibit 26. On its face, that determination involves multiple potential contributing factors, including acute

methamphetamine intoxication, a preexisting cardiac condition, and restraint. Plaintiff presented no medical testimony explaining what "restraint" meant in that context, how it physiologically caused or contributed to death, whether it referred to any particular act by any particular officer, or how it interacted with methamphetamine intoxication and dilated cardiomyopathy. Those are not matters a lay jury may infer on its own.

That is precisely why the Ninth Circuit requires expert testimony when causation depends on complex medical questions beyond the understanding of laypersons. See Domingo v. T.K., 289 F.3d 600, 606 (9th Cir. 2002); Kennedy v. Collagen Corp., 161 F.3d 1226, 1227 (9th Cir. 1998); Clausen v. M/V New Carissa, 339 F.3d 1049, 1060 (9th Cir. 2003).* Without such testimony, the jury is left to guess. That is exactly the problem here. Plaintiff presented no medical expert testimony—and indeed no medical causation testimony at all—connecting any specific act of any Defendant to Alvarado's death. Plaintiff likewise presented no evidence apportioning causation among the multiple factors identified by the medical examiner, no evidence ruling out methamphetamine intoxication as the precipitating cause, no evidence explaining the significance of dilated cardiomyopathy, and no evidence establishing that any particular use of force by any particular Defendant caused the sudden cardiac arrest. Without that proof, any finding of causation would be speculation.

The trial evidence only highlights that deficiency. Before any encounter with the Defendant officers, Alvarado had already been involved in a serious collision in which airbags deployed, climbed out of the vehicle window, fled the crash scene, fought with civilian witnesses, and attempted to jump a six-foot concrete wall. Plaintiff presented no competent evidence distinguishing the physiological effects of those events from the effects of any later police restraint. Nor did Plaintiff present evidence separating the impact of the collision, the flight, the struggle with civilians, the prolonged exertion, the methamphetamine intoxication, and the underlying cardiomyopathy from the officers' efforts to restrain him. The record therefore contains no competent basis on which a reasonable jury could isolate cause.

The timing evidence is equally fatal to Plaintiff's theory. The trial evidence established that once the second TARP was applied, no further force was used on Alvarado for approximately twelve minutes before he became unresponsive. During that interval, he was in the recovery position, no officer was applying force to him, and Tucson Fire Department personnel had arrived and were evaluating him. The testimony was also consistent that the purpose of the TARP was to secure Alvarado because he remained combative and able to kick, and because EMS could not safely engage until the scene was secure. On this record, a jury could not reasonably conclude—without speculation—that a specific act by a specific Defendant caused the later cardiac arrest rather than the methamphetamine intoxication, dilated cardiomyopathy, earlier collision, flight, civilian struggle, prolonged exertion, or the overall physiological stress reflected in the medical examiner's findings.

Nor can Plaintiff rely on lay testimony to fill this evidentiary gap. Federal Rule of Evidence 701 prohibits lay witnesses from offering opinions based on scientific, technical, or other specialized knowledge. Whether Alvarado died from methamphetamine intoxication, cardiomyopathy, restraint, some combination of those factors, or some particular act by one or more officers is a question requiring medical expertise, not lay inference. Without qualified expert testimony under Rule 702, Plaintiff cannot prove medical causation.

At bottom, Plaintiff's causation theory asks the jury to infer that because force preceded death, force must have caused death. That is not enough. Temporal sequence is not proof of cause in fact, and it certainly is not proof of proximate cause as to each individual Defendant. Because Plaintiff failed to present competent evidence that any Defendant's conduct was the cause in fact and proximate cause of Damian Alvarado's death, Defendants are entitled to judgment as a matter of law on this independent and dispositive ground.

**CONCLUSION**

After being fully heard at trial, Plaintiff failed to present a legally sufficient evidentiary basis for a reasonable jury to find in her favor on the essential elements of her claims. The trial evidence showed that each Defendant responded to a rapidly evolving and dangerous situation involving a suspect they reasonably believed had committed homicide, posed an immediate threat to officers and civilians, and actively and continuously resisted detention. On this record, no reasonable jury could find that any Defendant used objectively unreasonable force under the Fourth Amendment.

Plaintiff's claims also fail independently for lack of causation. Plaintiff presented no expert or other competent evidence establishing that any specific act by any individual Defendant was the cause in fact or proximate cause of Damian Alvarado's death. Instead, the record reflects a medically complex cause of death involving acute methamphetamine intoxication, restraint, and underlying cardiac disease, and any finding of causation would necessarily rest on speculation.

Accordingly, Defendants respectfully request that the Court grant judgment as a matter of law in their favor on all remaining claims and enter judgment accordingly.

DATED: March 26, 2026.

ROI LUSK
City Attorney

By      /s/ Michelle R. Saavedra
          Michelle R. Saavedra
          Principal Assistant City Attorney

# CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Paul Gattone
Law Office of Paul Gattone
301 South Convent
Tucson, Arizona 85701
gattonecivilrightslaw@gmail.com
*Attorney for Plaintiff*

By M.Piper/rw